

October 29, 2018

HON. MAGISTRATE JUDGE VIRGINIA K. DEMARCHI
United States District Court, Northern District of California
280 South 1st Street, Room 2112
San Jose, CA 95113

**CASE:** ***Aly Raisman v. United States Olympic Committee, et al.***
Case No.: 5:18-cv-02479-BLF

**RE:** **DISCOVERY LETTER BRIEF AS TO DEPOSITION OF MR. RICK ADAMS**

Hon. Virginia K. DeMarchi,

In accord with the Honorable Magistrate Judge Virginia K. DeMarchi's Standing Order for Civil Cases, with respect to discovery disputes, the Parties (the term "Parties" defined for purposes of this letter as the Plaintiff, Alexandra Rose Raisman ("Plaintiff") and Defendant United States Olympic Committee ("USOC")) submit the instant Letter Brief in compliance with Section 4(c).

## I.  STATEMENT OF DISPUTE REQUIRING RESOLUTION.

The Plaintiff seeks additional testimony of USOC employee Rick Adams. The Parties disagree about the present discoverability of the following subjects:

1.  Questioning about the meaning of Mr. Adams' "apology", statements to Congress in March of 2017, wherein he stated that USOC was taking "responsibility" for its failures of Olympic athletes, and what information should have been "detected" earlier;

    and

2.  Issues that Plaintiff contends relate to establishing an "alter ego" relationship between USOC and USA Gymnastics ("USAG").

## II.  PARTIES' POSITIONS

Pursuant to Section 4(c)(ii) of the Standing Order, the Parties provide their respective positions in 1500 words or less:

telephone    949 252 9990
toll-free     800 761 2220
fax          949 252 9991

19100 Von Karman Avenue, Suite 800
Irvine, CA 92612
www.manlystewart.com

### 1.  The Plaintiff's Position On Discoverability of Testimony.

First, and a threshold matter that is critical to the evaluation of these issues, is that discovery in the instant Matter has <u>not</u> been stayed, or otherwise limited to jurisdictional issues only. At the September 6, 2018 hearing (for which there was, unfortunately, an equipment malfunction and no hearing tapes are, thus, available), the Court set a trial date in this matter and refused to enter an order staying any portion of discovery. While USOC (and other defense counsel) have stated that Plaintiff "stipulated" to hold discovery on merits-based issues in abeyance (pursuant to a Case Management Statement filed before the hearing when there was no trial date), at the hearing, the Court clarified, unambiguously and expressly, that there was no stay of any aspect of discovery in the matter, and that she has not entered any such order.

Defendants, below, take the position that merits-based discovery was stayed as a result of some "stipulation" that they fail to produce. They fail to produce one because no such stipulation exists. The only support Defendants have for this position is the Case Management Conference Statement indicating the parties had agreed to stay merits-based discovery until the jurisdictional issues were resolved. However, it was at the actual case management conference where the Court, after reviewing the Case Management Conference Statement, and speaking with counsel, refused to implement a discovery stay. As such, contrary to Defendants' positon below, that Plaintiff must produce some order indicating discovery is "<u>not stayed</u>," it is Defendants' obligation to produce an order that discovery in this case <u>is stayed</u>. Otherwise, the default (the case here) is that discovery is 100% open and not stayed. And more to the point, Plaintiff's position is that merits-based discovery should not be stayed because USAG and Defendant Parilla have submitted to jurisdiction and limiting discovery to jurisdictional issues would only serve to increase costs, consume unnecessary time and resources, and require multiple depositions of parties, in various states across the U.S., when single depositions will suffice.

Thus, the below-noted issues are measured against the liberal "discoverability" standard. *Federal Rule of Civil Procedure* 26(b)(1)("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. **Information within this scope of discovery need not be admissible in evidence to be discoverable**." [emphasis added].)

As such, these matters are, admittedly, discoverable as to the "merits" of the causes of action, as the Plaintiff has pleaded causes of action for Negligence, Negligent Supervision, and an *alter ego* relationship between all named Defendants, including USAG and USOC. *See* <u>Complaint</u>, ¶¶ 32, 137-171. Plaintiff's counsel believes that when the Court finds no jurisdictional stay to be in place, which is in fact the case, then the discoverability analysis is clear and undisputed.

In the event that, for some reason, the Court sees fit to limit the analysis to jurisdiction, despite there being no such order to that effect in the record, the questions posed remain relevant under the

discovery standard as to jurisdictional inquiries relevant to the pending *F.R.C.P.* 12(b)(2) motion of the USOC. Specifically, the issues are as follows:

      i.      <u>Questions About Adams' Congressional Testimony Are Relevant To Jurisdiction</u>.

In Adams' March 2017 testimony to Congress, he made statements concerning how USOC apologized, claimed to take "responsibility" for its conduct and how Larry Nassar's sexual abuse should have been "detected" sooner. Specifically, the portion of his testimony is:

> "The Olympic community failed the people it was supposed to protect. The U.S. Olympic Committee leads the diverse network of Olympic sports organizations in the United States, and we must therefore take responsibility for its failures. We do take responsibility, and we apologize to any young athlete who has ever faced abuse." *See* <u>Exhibit "1"</u>.

Adams went on to say, "[t]he abuse should have been detected, it should have been prevented, and it should have been promptly reported." <u>Exhibit "1"</u>. At deposition, Adams was asked about these statements made to Congress, including parts of the testimony referencing an abusive environment that "discouraged" reporting of abuse. <u>Adams Deposition</u>, 179:19-182:16, excerpts at <u>Exhibit "2"</u>.

From an evidentiary standpoint, the statement was a party-admission by Adams who was testifying in front of Congress, **as a representative of USOC**. *See Federal Rule of Evidence* 801 ("…was made by the party's agent or employee on a matter within the scope of that relationship and while it existed…"). The evidence would not merely be "reasonably calculated" but rather, **directly discoverable**. Moreover, Courts have found that apologies can be used as admissions, and therefore, relevant to the claims of parties. *See Melton v. Pasqua* (4th Cir. 2003) 339 F.3d 222, 226; *see also C.G. ex rel. Gonzalez v. City of New York* (E.D.N.Y., Oct. 24, 2013, No. 12-CV-1606 ARR VVP) 2013 WL 5774291, at fn. 7 ("Therefore, while there is no doubt that plaintiff at some point apologized to the officers, there are conflicting accounts about when plaintiff apologized, to whom he apologized, how many times he apologized, and the specific substance of what he said.") Thus, understanding the scope of Adams' admission is relevant, specifically, to understand what "responsibility" Adams was taking on behalf of USOC. Whether Adams was going to take legal responsibility (submitting USOC's claims to evaluation by a California civil jury; as was asked at deposition), or some other responsibility, is discoverable. These questions were posed and no responses were provided. <u>Adams Deposition</u>, 179:19-180:10, <u>Ex. "2"</u>.

Moreover, substantively, if USOC had knowledge that Nassar was an abuser, that is relevant to the "Effects Test" of personal jurisdiction. *See Calder v. Jones,* 465 U.S. 783 (1984). In the California Court of Appeals application of this "effects test", it held that purposefully directing a sexual abuser towards the forum state can confer jurisdiction unto the out-of-state entity. *See Archdiocese of Milwaukee v. Superior Court* (2003) 112 Cal.App.4th 423, 441 ("Here, in stark contrast, the Milwaukee Archdiocese did not merely approve a request to work outside the Milwaukee Archdiocese or acquiesce in Widera's move. Rather, the evidence supports the finding the Milwaukee Archdiocese sought to rid itself of Widera by intentionally sending him into California.") In *Archdiocese of Milwaukee*, a Wisconsin diocese was found to have purposefully availed themselves

to California's personal jurisdiction by "targeting" a pedophile towards California. *Id.* at 441. Here, USOC's notice of Nassar is relevant to whether they purposefully directed Nassar to the 2012 Olympic Trials in San Jose, where he abused the Plaintiff (and two other Plaintiffs in the Related Actions.) Understanding what USOC meant (through Adams) when it said Nassar should have been "detected" is directly relevant to USOC's knowledge of Nassar being an abuser. Without cross-examination on this point, Plaintiff is left with an amorphous statement about *something* that should have been detected in regards to Nassar. Clearly, it would fall under the discovery standard for the Plaintiff to understand the basis for this.

Thus, the Plaintiff, at a minimum, have a right to understand the scope and nature of the apology offered by Adams (and other parts of his statements to Congress), as it very well could be directly relevant to the subject matter of the jurisdictional claim; notwithstanding the inherent direct relevance to the merits of the issues.

ii.    The Alter Ego Relationship Between USOC and USAG is Relevant To Jurisdiction.

As pleaded, the complaint claims that each defendant was in an *alter ego* relationship with each other defendant. Complaint, ¶32. In the context of jurisdiction, under the recent Ninth Circuit analysis in Ninth Circuit law is clear that, "[i]n contrast to the agency test, the Court left intact this circuit's alter ego test for 'imputed' general jurisdiction. See id. at 759 (noting, without opining on, the fact that "several Courts of Appeals" employ an alter ego test.) *Ranza v. Nike, Inc.* 793 F.3d 1059, 1071 (9th Cir. 2015)[1].

Under California Law, "[a] court may also disregard the corporate form in order to hold one corporation liable for the debts of another affiliated corporation when the latter "'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation.'" *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1107. "Factors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. [Citation.] 'No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Id.* at 1108-09. Under this law, determining the control that USOC exerted over USAG is a relevant area of inquiry even if confined to a jurisdiction-only analysis. As asked at the deposition, Adams was instructed not to answer numerous questions directed at the authority that USOC officials exerted over USAG firings. Adams Deposition, 115:8-116:16, 182:18-184:18, 196:7-22, 234:24-235:22, Ex. "2". Plaintiff's counsel asked numerous questions about the power of USOC to force USAG executives to resign, and specifically about the compliance relationship between USAG and USOC.

Adams was instructed not to answer these questions, for which responses are relevant to the

---

[1] In recognition of the refutation of the "agency" test, the Ninth Circuit held that the *alter ego* test was still viable, after the *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014) decision.

jurisdictional analysis (at a minimum).

## 2. USOC's Position On Discoverability of Testimony.

Plaintiff admits that the parties agreed to stay merits discovery. The Joint Case Management Conference Statement that Plaintiff submitted to the Court states:

> In light of the 12b(2) Motions that have been filed by USOC and Penny, the parties are conducting jurisdictional discovery on these issues. The Parties have agreed that merits discovery should be stayed pending resolution of the 12(b)(2) Motions.

Dkt. 44 ¶ 8 (emphasis added); *see also id.* ¶ 7 (agreeing that it would be "premature" to discuss Initial Disclosures, "[g]iven that jurisdictional discovery is proceeding as to the 12b(2) Motions to Dismiss"). The parties' agreement in this case followed an order staying merits discovery in five related cases pending in the Central District of California. *See Doe v. Nassar, and Related Cases*, 2:18-cv-03462-JLS-KES, Dkt. 40, § IV.2 (C.D. Cal. Aug. 2, 2018) ("This limitation (limiting the parties to jurisdictional discovery only) shall remain in place as to each Defendant until a ruling is issued on that Defendant's currently pending motion to dismiss."). Moreover, the Plaintiff's deposition notice to Mr. Adams was captioned "Jurisdictional Discovery." "Exhibit 3."

Plaintiff now claims that this Court overruled the parties' agreement to stay merits discovery but fails to identify any Court order so stating. This is because there is none, and the Court said no such thing in the scheduling conference. To the contrary, the Court expressed appreciation that the parties were working together on discovery issues and observed the need for coordination with the related pending cases (in which merits discovery is also stayed). The Court did nothing to modify the parties' agreement to bifurcate discovery.

Based on this agreement, USOC and other defendants have already produced 10 witnesses for early jurisdictional depositions, and Plaintiff has noticed an additional 14 jurisdictional depositions over the next three weeks. Given that Plaintiff can (and likely will) depose these same witnesses a second time after the jurisdictional issues are resolved and merits discovery commences, there is no basis for re-opening Mr. Adams' deposition now.

As described more fully below, Plaintiff's motion to compel seeks evidence going to the merits of her claims, not to personal jurisdiction. Plaintiff's motion should be denied.

### i. The Congressional Statements Are Unrelated To Personal Jurisdiction.

Mr. Adams' statements to Congress have no relevance to the existence of general personal jurisdiction, which hinges on whether a defendant is incorporated or based in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 127, 137 (2014). Nor do the statements implicate the Court's specific jurisdiction. For specific jurisdiction to exist,

(1) the defendant must "purposefully direct [its] activities" toward California;

(2) the plaintiff's claims must "arise[] out of or relate[] to" the defendant's "forum-related activities"; and

(3) The exercise of jurisdiction must "comport with fair play and substantial justice."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017).

To establish purposeful direction, Plaintiff must demonstrate, pursuant to the "effects" test set forth in *Calder v. Jones*, 465 U.S. 783, 788–89 (1984), that USOC intentionally directed conduct into California and "knew the intentional conduct would cause harm in [California]." *Archdiocese of Milwaukee v. Super Ct.*, 112 Cal. App. 4th 423, 436 (2003) (emphasis added). Proper categories of jurisdictional discovery therefore include (1) intentional conduct aimed by the USOC at California, and (2) USOC's knowledge, if any, that such conduct would cause harm that was likely to occur in California, as opposed to another State.

Before Mr. Adams' deposition, USOC sent Plaintiff a letter explaining the above and stated that questions directed to the merits of Plaintiff's claims are not a proper subject of jurisdictional discovery. *See* "Exhibit 4." USOC invited Plaintiff to discuss any concerns. Plaintiff never responded to USOC's letter. Instead, at Mr. Adams' deposition, Plaintiff posed numerous questions going solely to merits, which are now the subject of this motion.

Plaintiff's complaint that she was foreclosed from asking whether USOC "purposefully directed" Nassar to the 2012 Olympic Trials is meritless. Consistent with the *Calder* effects test, which requires actual knowledge, counsel for USOC did not object to Plaintiff's questions about whether USOC knew about Nassar's misconduct. For example, Mr. Adams fully answered the question of whether his statement to Congress was "[in] reference to the fact that someone at the USOC knew Larry Nassar had engaged in sexual misconduct before he was removed as the Olympic doctor?". "Exhibit 2", 167:20–168:1 (emphasis added). Mr. Adams stated unequivocally that it was not, and further testified that he is unaware of anyone at USOC who knew Nassar had been accused of sexual misconduct prior to 2016. *E.g.*, *id.* 169:3–7.

The only questions Mr. Adams did not answer go solely to the merits of Plaintiff's claims. For example, whether Mr. Adams "mean[t]" to say that USOC was "legal[ly]" responsible for Nassar's conduct, and why Mr. Adams "apologize[d]" to the victims of sexual abuse, go to the ultimate issue of whether Mr. Adams believes USOC should be held liable. *See id.* 179:19–182:10. Likewise, whether USOC "should have" detected Nassar's abuse sooner is unrelated to jurisdiction because the "effects test" looks to actual knowledge, not negligence. *Archdiocese of Milwaukee*, 112 Cal. App. 4th at 436 (relevant jurisdictional inquiry is whether defendant "knew the intentional conduct would cause harm in [California].").

ii.     Plaintiff Has Not Articulated An Alter Ego Theory.

Plaintiff's "alter ego" argument is a red herring. None of Plaintiff's questions concerning "the power of USOC to force USAG executives to resign" or "the compliance relationship between

USAG and USOC" actually bears on the alter ego analysis. There are two independent bases for rejecting the "alter ego" argument.

*First*, the alter ego argument is facially inapplicable here. As the Ninth Circuit has repeatedly stated, "[a] parent corporation's relationship with its subsidiary may confer personal jurisdiction over the parent if the subsidiary is acting as the parent company's alter ego, so as to justify disregard of the corporate entity." *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (emphasis added); *Chemco Int'l Distribs., Inc. v. BASF, AG*, 932 F.2d 973 (Table), 1991 WL 71488, at *2 (9th Cir. 1991); *see also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071–72 (9th Cir. 2015) (parent may also act as subsidiary's later ego). USOC and USAG, however, do not share any corporate familial relationship—as parent/subsidiary or otherwise— and Plaintiff offers no justification for the position that the alter ego analysis even applies to two legally distinct and autonomous entities lacking any common ownership.[2]

In fact, courts have recognized that national governing bodies ("NGBs") such as USAG exercise "monolithic control" over their respective sports, pursuant to statute. *See, e.g.*, *JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1230–31 (11th Cir. 2006); *see also* 36 U.S.C § 220522(a)(5) (NGBs "independently decide[] and control[] all matters central to governance").

*Second*, even assuming that Plaintiff had asserted a viable corporate alter ego theory— which she has not—none of the deposition questions at issue pertains to the alter ego analysis. Questions about whether USOC pressured USAG to terminate certain executives (years after the alleged abuse in this case) has no bearing on whether there is "such unity of interest and ownership that the separate personalities [of the two entities] no longer exist," such that "failure to disregard [their separate identities] would result in fraud or injustice." *Ranza*, 793 F.3d at 1073 (emphasis added). Likewise, USOC's right to withdraw USAG's "NGB" designation for failing to meet certain requirements is no different from the influence that a large business might exercise over its exclusive supplier. *See, e.g.*, *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682-83 (9th Cir. 2009) (Wal-Mart's right to audit and terminate supplier for failure to meet requirements does not constitute "day-to-day control" over the supplier's employees).

In sum, Plaintiff has failed to demonstrate that the alter-ego analysis applies absent common ownership, or that Plaintiff's questions relate to the alter-ego standard of whether USOC and USAG failed to "observe their respective corporate formalities," such that USAG should be viewed as a sham entity. *See Ranza*, 793 F.3d at 1074-75 ("[W]e have held no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions."). Rather, Plaintiff's questions appear to be

---

[2] Plaintiff relies on *Toho-Towa Co.*, but that case addressed three entities that "were all owned by the same person." 159 Cal. Rptr. 3d at 476. Here, where there has been no showing (or even allegation) that USOC and USAG are commonly owned. Furthermore, *Toha-Towa* addressed liability, not jurisdiction.

directed to a theory that USOC and USAG have a principal-agent relationship. However, the Ninth Circuit has expressly rejected that theory as a basis for imputing <u>jurisdiction</u>. *Id.* at 1071. Thus, there is no basis for Plaintiff to re-open Mr. Adams' deposition at the jurisdictional discovery stage.

## III.   WHETHER COURT SHOULD CONDUCT A HEARING.

### 1.  Plaintiff's Position

Given the various factual complexities of this case, the numerous parties, and the challenges being raised from similarly (as well as disparately) situated parties, Plaintiff's counsel believes a hearing would be beneficial to address these issues. Plaintiff's counsel believes that other discovery issues will be arising with other defendants that may bear on the same core legal issues, thus, it would benefit all parties to schedule a hearing for such matters.

### 2.  USOC's Position

Given the parties' prior agreement to limit the scope of current discovery to jurisdictional issues and the existing law on the alter ego theory, the issues raised by Plaintiff's motion are straight forward and can be easily resolved by this Court without the need for a hearing. Moreover, as depositions in this case are currently scheduled and ongoing, a quick resolution of the parties' disagreement as to the proper scope of these current discovery would avoid future disputes.

## IV.   DISCOVERY CUT-OFF DATES FOR FACT AND EXPERTS.

The discovery cut-off dates are as follows:

**January 10, 2020:**   Non-Expert Discovery Cutoff

**March 9, 2020:**   Expert Discovery Cutoff

Importantly, for the jurisdictional challenges and discovery disputes that are pending, **November 21, 2018** is the final day for the Plaintiff to file Oppositions to the USOC's (and other defendants') challenges under *F.R.C.P.* 12(b)(2).

## V.   ATTESTATION TO COMPLIANCE WITH LEAD COUNSEL CONFERENCE.

On October 22, 2018 at 2:15 p.m., Lead Counsel in this matter (Mr. Vince Finaldi for the Plaintiff and Ms. Carolyn Kubota for USOC; with presence of other counsel) conferred, pursuant to the demand of Plaintiff under the Standing Order, though no informal resolution could be attained.

## VI.   ATTACHMENTS WITH SPECIFIC DISCOVERY MATERIAL AT-ISSUE

The following attachments to this submission are as follows:

Exhibit "1"      Testimony of Rick Adams Provided to Congress

Exhibit "2"      Deposition Excerpts of Rick Adams That Are At-Issue

Exhibit "3"      Plaintiff's "Notice of Taking Deposition of Rick Adams and Request for Production of Documents (Jurisdictional Discovery)"[3]

Exhibit "4"      USOC Response to Plaintiff's Deposition Notice[4]

The undersigned agree that Lead Counsel in this matter, for the respective parties engaged in a confer effort about the discovery that was disputed (and noticed in this letter), and no compromise was able to be reached.

/s/ Vince W. Finaldi

VINCE W. FINALDI, Esq.
**MANLY, STEWART & FINALDI**
Counsel for Plaintiff Alexandra Rose Raisman

/s/ Carolyn Kubota

CAROLYN KUBOTA, Esq.
**COVINGTON & BURLING LLP**
Counsel for Defendant United States Olympic Committee

---

[3] Plaintiff's counsel objects to the inclusion of this Notice, as a violation of the Hon. Judge DeMarchi's Standing Order, which only allows the disputed discovery material to be attached as an Exhibit. USOC counsel disagrees with Plaintiff's counsel's objection. Plaintiff's Deposition Notice and Requests for Production to Mr. Adams are within the Court's Standing Order, which permits parties to attach, *inter alia*, "the specific discovery material at issue," including subpoenas and document requests.

[4] See Footnote 3 for the same objection, as the evidence goes beyond the dispute in front of the Court. USOC counsel disagrees with Plaintiff's counsel's objection. USOC's Response to Plaintiff's Deposition Notice to Mr. Adams is within the Court's Standing Order, which permits parties to attach, *inter alia*, "the specific discovery material at issue" and "the responses, if any" to such material.

# EXHIBIT 1




U.S. PARALYMPICS

Statement of

Rick Adams
Chief of Paralympic Sport and National Governing Body Organizational Development
United States Olympic Committee

before the

Committee on the Judiciary
United States Senate

hearing on

Protecting Young Athletes from Sexual Abuse
March 28, 2017

Good morning Chairman Grassley, Senator Feinstein, and members of the Committee. I am Rick Adams, and I serve as the Chief of Paralympic Sport and National Governing Body Organizational Development for the United States Olympic Committee. My responsibilities include the Olympic Committee's oversight and management of our SafeSport initiative. SafeSport is the term that we use for our ongoing efforts to strengthen the Olympic and Paralympic communities' response to issues related to sexual and other abuse of athletes, including young athletes.

The stories of abuse that we have heard today and elsewhere are appalling, disheartening, and unacceptable. The Olympic community failed the people it was supposed to protect. The U.S. Olympic Committee leads the diverse network of Olympic sports organizations in the United States, and we must therefore take responsibility for its failures. We do take responsibility, and we apologize to any young athlete who has ever faced abuse.

We recognize the difficulty of stepping forward to share your stories, and it is our obligation to build on your courage and bravery to make real and lasting changes. That includes changes to our policies and protocols, and also changes to the environment that discouraged victims from reporting abuse. We must look for ways to improve protections for young athletes, and we are grateful for this Committee's interest in being a leader in that effort.

The U.S. Olympic Committee recently reached an important milestone in our effort to protect athletes with the launch of the U.S. Center for SafeSport at the beginning of this month. The launch of the Center is the most recent step in our seven-year effort to implement reforms directed at preventing sexual and other abuse of youth athletes in the Olympic community.



EXHIBIT
13
ADAMS 9/12/18
PENGAD 800-631-6989

The Center for SafeSport will be responsible for investigating and resolving allegations of sexual abuse associated with the National Governing Bodies, which are the 47 independent entities recognized by the U.S. Olympic Committee to manage the training and development in each Olympic or Pan American sport. The Center's activities will be guided by a SafeSport Code, which I have appended to my testimony, that covers everything from harassment and hazing to physical and sexual misconduct.

The U.S. Olympic Committee requires each National Governing Body to participate in the Center for SafeSport as a condition of being recognized by the U.S. Olympic Committee. Now that the Center is open – and the U.S. Olympic Committee's policies and procedures related to the Center are now effective – the governing bodies are in the process of amending their individual bylaws to require allegations of abuse to be reported to the Center. We anticipate that all National Governing Bodies will complete this process in the coming weeks. Many have already completed the process and are now obligated and prepared to send allegations of abuse to the Center.

The U.S. Olympic Committee's regular and periodic audits of the independent National Governing Bodies include auditing of the organizations' compliance with the requirements of SafeSport. Additionally, we are announcing today that we are in the process of selecting an independent auditor to conduct a unique one-time audit of all National Governing Bodies and the Committee itself to ensure that the new SafeSport requirements have been fully implemented across the Olympic and Paralympic community.

The approach that we have taken with the Center for SafeSport is similar to the approach that we previously adopted in establishing the U.S. Anti-Doping Agency in 1999. The U.S. Anti-Doping Agency has been very successful at concentrating expertise and ensuring independence in investigations of doping issues. By following this model in the creation of the U.S. Center for SafeSport, we will also bring expertise and independence to our efforts to prevent abuse of youth athletes.

We strongly support S. 534, the Protecting Young Victims from Sexual Abuse Act, which was introduced by the Chairman, the Ranking Member, and a number of additional Senators a few weeks ago, and the goals that it advances. The key provisions of the bill require National Governing Bodies and their personnel to report suspected incidents of child abuse and sexual abuse to law enforcement. This requirement complements the rules that the U.S. Olympic Committee established in the SafeSport program. It is important to us that this legislation complements our efforts and permits us to continue to implement the structural reforms we have adopted.

Specifically, under section 8.7(l) of the U.S. Olympic Committee's bylaws, each National Governing Body must comply with the Committee's policies related to SafeSport and, additionally, the policies and procedures of the U.S. Center for SafeSport. These provisions require all National Governing Bodies and their personnel to report suspected sexual abuse to the Center and to law enforcement. The Center has exclusive authority within the Olympic community to investigate and resolve violations involving sexual misconduct. Additionally, the Center has discretionary authority to assume responsibility for the investigation and resolution of

other violations of the Code; if not exercised, the applicable governing body retains the authority and obligation to investigate and resolve the allegation.

In addition to the Code, the U.S. Center for SafeSport has adopted practices and procedures and procedural rules for arbitration that govern its investigation and resolution of alleged violations. These important procedural improvements centralize and clarify the process by which allegations of abuse are investigated and resolved. By adopting clear procedures that apply to all investigations by the Center, we seek to ensure a fair process that permits swift actions to protect children.

Mr. Chairman and Senator Feinstein, we appreciate your leadership in this area. A single instance of child or sexual abuse is one too many. With the launch of the U.S. Center for SafeSport, we have dramatically reformed and improved the Olympic and Paralympic communities' ability to prevent abuse and strengthened the protections that we can jointly achieve for young athletes.

## U.S. Olympic Committee and National Governing Bodies

The U.S. Olympic Committee was founded in 1894. It serves as both the National Olympic Committee and National Paralympic Committee for the United States. The Olympic Committee is responsible for the training and funding of U.S. teams for the Olympic, Paralympic, Youth Olympic, Pan American, and Parapan American Games, and serving as a steward of the Olympic movement throughout the country.

In 1978, the Amateur Sports Act (now called the Ted Stevens Olympic and Amateur Sports Act) appointed the U.S. Olympic Committee as the coordinating body for all Olympic athletic activity in the United States. Pursuant to the statute, the U.S. Olympic Committee supports athletes through funding, health insurance, tuition grants, marketing opportunities, and career services. The Committee supports the Olympic Training Centers and Olympic Training Sites for athletic training, conditioning, sports medicine, and nutrition assistance. The Committee also oversees the process by which U.S. cities bid to host the Olympic and Paralympic Games, the Youth Olympic Games, and the Pan/Parapan American Games.

The Ted Stevens Act also authorizes the U.S. Olympic Committee to recognize a National Governing Body for any sport that is included in the various Olympic Games. The Olympic Committee may recognize only one such governing body for each sport (except as it may relate to the Paralympics). Once selected, that organization takes on a number of obligations related to amateur athletic activity in that sport in the United States, including sanctioning and conducting competitions, and recommending teams to represent the United States in the Olympic Games. The National Governing Bodies also oversee the training and development of athletes in their respective sports.

Today, there are 47 organizations that have been recognized by the U.S. Olympic Committee as National Governing Bodies. There is a large degree of variation among these 47 independent organizations. For example, U.S. Soccer manages national soccer activities that range from local recreational soccer programs for children to the U.S. National Men's and Women's soccer teams. These diverse soccer programs include thousands of coaches and officials and hundreds of

thousands of athletes. Olympic activity, therefore, is a small part of U.S. Soccer's focus and activities. Conversely, USA Pentathlon is a smaller organization and Olympic activities are a primary focus of the organization.

Because each National Governing Body is the primary organization that manages and oversees the activities of coaches and athletes, each organization has its own rules and procedures related to athletes and coaches. On key areas of governance, however, the U.S. Olympic Committee uses its designation authority under the Ted Stevens Act to require each National Governing Body to adopt certain standards. And in challenging areas that affect the entire Olympic community, we have gone even further to establish entities that are independent of any individual National Governing Body and dedicated to addressing specific challenging topics. This is the approach that we took in response to doping issues in the late 1990s, and it is the approach we are taking with the U.S. Center for SafeSport today.

**U.S. Center for SafeSport**

The U.S. Olympic Committee has long worked with the National Governing Bodies on efforts to protect youth athletes from sexual and other abuses. In 2010, the Committee determined that the issue warranted renewed attention following public reports of sexual abuse cases concerning swimmers. The Committee convened a working group to study the problem and make specific recommendations for improvements to the U.S. Olympic Committee board. Nina Kemppel, a four-time Olympic skier and current board member of the U.S. Olympic Committee, chaired the working group. The working group produced six comprehensive recommendations for action by the U.S. Olympic Committee: Increase its leadership role; lead by example; develop training materials; develop resources for use by local clubs and organizations; standardize services that promote safe training environments; and encourage National Governing Bodies to adopt policies to address sexual and physical misconduct.

Since then, the U.S. Olympic Committee has implemented each of the working group's recommendations. As it was implementing the working group's recommendations, the U.S. Olympic Committee concluded that the Olympic sports program would benefit from an independent entity dedicated to protecting youth athletes' safety. In June 2014, the Committee's board approved the creation of an independent SafeSport entity and began the process of establishing the U.S. Center for SafeSport. In September 2015, the Committee established the Center's nominating and governance committee. In January 2016, the first board of the Center was seated and held its first meeting. In June 2016, the Committee's board approved the launch of the Center. In November 2016, the Center selected its first chief executive officer, Shellie Pfohl, who previously served as the executive director of the President's Council on Fitness, Sports, and Nutrition. In March 2017, the Center officially opened.

**USA Gymnastics**

Finally, Mr. Chairman and Senator Feinstein, I would like to take a moment to discuss the very serious issues that have been brought to light concerning USA Gymnastics. We share your deep concerns about USA Gymnastics' handling of allegations of abuse, and we supported Steve Penny's decision to resign. We hope that his resignation will offer an opportunity for the organization to implement significant change. The abuse should have been detected, it should

have been prevented, and it should have been promptly reported. The Olympic community failed and must do better.

The Center for SafeSport seeks to address one of the issues that this case highlights: The barriers and disincentives that victims may face when seeking to report abuse. The Center creates an independent path for reporting and an independent system for investigating and resolving cases of sexual abuse. With the Center, we have created a system that removes the investigation and resolution of allegations of sexual abuse from the control of any National Governing Body, including USA Gymnastics, and a resource dedicated to education and awareness of the importance of reporting abuse. We believe that these changes will significantly improve the protection of youth athletes from sexual and other abuses.

Our work in this area will never be done. We must continue to look for ways to protect our young athletes. We will be open to new ideas and approaches. We will continue to look for additional ways to strengthen protections, including supporting your important legislation to require National Governing Bodies and associated personnel to report allegations of abuse.

<div align="center">*    *    *</div>

Thank you again for the opportunity to be here today, and I would be happy an answer your questions.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
SANTA ANA
Civil Case No. 8:18:cv-01136-JLS-KES

VIDEO DEPOSITION OF RICK ADAMS
September 12, 2018

JANE JD DOE, an individual,

Plaintiff,

vs.

DOE 1, an individual; DOE 2, an Indiana business entity of form unknown; DOE 3, an individual; DOE 4, an individual; DOE 5, an individual; and Does 6 through 500,

Defendants.

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
SANTA ANA
Civil Case No. 8:18-cv-01117-JLS-KES

VIDEO DEPOSITION OF RICK ADAMS
September 12, 2018

JANE LM DOE, an individual,
Plaintiff,
vs.
DR LARRY NASSAR, an individual; USA GYMNASTICS, an Indiana Business Entity of form unknown; ROBERT COLAROSSI, an individual; STEPHEN "STEVE" PENNY, an Individual; BELA KAROLYI, an individual; MARTHA KAROLYI, an individual; KAROLYI TRAINING CAMPS, LLC, a Texas Business Entity of form unknown; KAROLYI WORLD GYMNASTICS INC., a Texas Business Entity of form unknown; KAROLYI'S ELITE, a Texas Business Entity of form unknown; AOGC ALL OLYMPIA GYMNASTICS CENTER INC., a California Business Entity of form unknown; GALINA MARINOVA, an individual; ARTUR AKOPYAN, an individual, and DOES 1 through 500,

Defendants.

2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
Civil Case No. 2:18:cv-03461-JLS-KESx

VIDEO DEPOSITION OF RICK ADAMS
September 12, 2018

MCKAYLA MARONEY, an individual,

Plaintiff,

vs.

MICHIGAN STATE UNIVERSITY, a Michigan Entity of form unknown; and UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of form unknown; LARRY NASSAR, an individual, and DOES 1 through 500,

Defendants.

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE
Civil Case No. 5:18:cv-02479-BLF

VIDEO DEPOSITION OF RICK ADAMS
September 12, 2018

ALEXANDRA ROSE RAISMAN, an individual,

Plaintiff,

vs.

UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of form unknown; LARRY NASSAR, an individual; STEVE PENNY, an individual; PAUL PARILLA, an Individual, and DOES 1 through 500,

Defendants.

4

Jilio-Ryan Court Reporters
ph. 714.424.9902 info@jilioryan.com

| | | |
|---|---|---|
| 01:47:39 | 1 | USOC during this time period. Do you have any |
| 01:47:44 | 2 | reason to dispute that 54 employees in the state |
| 01:47:47 | 3 | of California was not accurate at that point in |
| 01:47:50 | 4 | time? |
| 01:47:50 | 5 | A    I mean, I just - - I can't speak to |
| 01:47:54 | 6 | how that came together. I don't - - again, I |
| 01:47:58 | 7 | just don't know. I wasn't involved at all, |
| 01:48:03 | 8 | actually, at that point. |
| 01:48:03 | 9 | Q    Okay. Moving on to the next page, |
| 01:48:05 | 10 | it has USOC staff executive/senior level officials |
| 01:48:05 | 11 | and managers and first/mid-level officials and |
| 01:48:14 | 12 | managers. Do you see that at the very top of the |
| 01:48:17 | 13 | page on Page 20? |
| 01:48:19 | 14 | A    I do. |
| 01:48:20 | 15 | Q    Do those terms, executive/senior |
| 01:48:24 | 16 | level officials and managers and first/mid-level |
| 01:48:29 | 17 | officials and managers, do those have specific |
| 01:48:32 | 18 | meaning for the USOC that you're aware of? |
| 01:48:36 | 19 | A    Some do and some don't. |
| 01:48:40 | 20 | Q    Okay. So it says California had |
| 01:48:45 | 21 | twelve of these individuals employed in the state. |
| 01:48:49 | 22 | Again, do you have any reason to dispute that |
| 01:48:51 | 23 | number? |
| 01:48:51 | 24 | A    I just don't know how that number |
| 01:48:55 | 25 | was arrived at, so I don't know. |

113

| | | |
|---|---|---|
| 01:48:57 | 1 | Q    Okay. All right. We can go on to |
| 01:49:01 | 2 | the next page as well. Again, it says USOC staff |
| 01:49:07 | 3 | administrative support workers, craft workers, |
| 01:49:09 | 4 | operatives, professionals, service workers and |
| 01:49:12 | 5 | technicians. |
| 01:49:13 | 6 | Do you see that? |
| 01:49:13 | 7 | A    I do. |
| 01:49:17 | 8 | Q    Okay. And it says California had 42 |
| 01:49:21 | 9 | of these individuals, do you see that? |
| 01:49:23 | 10 | A    I do. |
| 01:49:25 | 11 | Q    And do you know if these were |
| 01:49:27 | 12 | employees of California or you just don't know |
| 01:49:30 | 13 | because you didn't write the document? |
| 01:49:32 | 14 | A    I just don't know. |
| 01:49:33 | 15 | Q    If you move down, it says Michigan, |
| 01:49:38 | 16 | two USOC staff count. Do you know if that |
| 01:49:42 | 17 | included Larry Nassar? |
| 01:49:44 | 18 | A    I don't know. |
| 01:49:45 | 19 | Q    So I want to go on. I believe it's |
| 01:49:59 | 20 | in the bylaws, which are attached in this |
| 01:50:02 | 21 | document. This was one document on USOC's |
| 01:50:06 | 22 | website. And it will be Page 18 of those bylaws |
| 01:50:12 | 23 | that I would like to refer you to. Towards the |
| 01:50:18 | 24 | back of the - - |
| 01:50:23 | 25 | A    Is it committees and task forces? |

114

| | | |
|---|---|---|
| 01:50:26 | 1 | Q    Right. Section 5, committees and |
| 01:50:28 | 2 | task forces. Do you see that? |
| 01:50:29 | 3 | A    I do. |
| 01:50:30 | 4 | Q    And over the years, I assume you |
| 01:50:33 | 5 | have reviewed the bylaws of the USOC several |
| 01:50:37 | 6 | different times for different reasons? |
| 01:50:39 | 7 | A    I have. |
| 01:50:39 | 8 | Q    So if you go down to Section 5.3.3, |
| 01:50:44 | 9 | responsibilities. It says, responsibilities, the |
| 01:50:49 | 10 | purpose of the audit committee shall be to assist |
| 01:50:52 | 11 | the board in its oversight of - - and then if you |
| 01:50:55 | 12 | go down to Section C, it says the financial and |
| 01:51:00 | 13 | managerial capabilities of the NGBs and PSOs and |
| 01:51:06 | 14 | their compliance with corporation contracts, |
| 01:51:09 | 15 | agreements and applicable laws and regulations. |
| 01:51:15 | 16 | Did the USOC have authority over the |
| 01:51:18 | 17 | NGBs to audit all of their materials, including |
| 01:51:21 | 18 | governance documents, financial documents, |
| 01:51:24 | 19 | contracts and agreements? |
| 01:51:26 | 20 | MR. KAMIN:  Objection. It's beyond |
| 01:51:28 | 21 | the scope of this jurisdictional deposition. I'll |
| 01:51:32 | 22 | instruct him not to answer. |
| 01:51:34 | 23 | MR. CUNNY:  I would like to meet and |
| 01:51:35 | 24 | confirm it because it goes straight to the alter |
| 01:51:37 | 25 | ego issues if USOC is acting with control over |

115

| | | |
|---|---|---|
| 01:51:42 | 1 | USAG, with control over USAG's governance. And |
| 01:51:45 | 2 | again, this is foundational. I haven't gotten to |
| 01:51:45 | 3 | USAG yet. |
| 01:51:47 | 4 | But if they're acting with control |
| 01:51:51 | 5 | over those core management functions of USAG, who |
| 01:51:54 | 6 | has admitted and submitted to jurisdiction, there |
| 01:51:58 | 7 | is an alter ego argument to be made. So I would |
| 01:52:01 | 8 | ask you to reconsider your position or potentially |
| 01:52:05 | 9 | think about it on a break. |
| 01:52:06 | 10 | MR. KAMIN:  I'm happy to think about |
| 01:52:08 | 11 | it on a break, but my instruction stands. |
| 01:52:08 | 12 | MR. CUNNY:  Okay. Can I have you |
| 01:52:11 | 13 | mark the transcript on that. Thank you, ma'am. |
| 01:52:16 | 14 | I'm going to make my record on it as |
| 01:52:18 | 15 | well. |
| 01:52:18 | 16 | MR. KAMIN:  Okay. |
| 01:52:18 | 17 | BY MR. CUNNY: |
| 01:52:19 | 18 | Q    So with the USOC, did you have |
| 01:52:23 | 19 | authority - - actually, I'll back up a little bit. |
| 01:52:23 | 20 | We talked about the Audit Committee |
| 01:52:26 | 21 | previously. Do you recall that? |
| 01:52:27 | 22 | A    I do. |
| 01:52:27 | 23 | Q    You weren't on the Audit Committee, |
| 01:52:30 | 24 | but every so often, would you work with the Audit |
| 01:52:36 | 25 | Committee? |

116

Q    All right.  So going into this document, it says, good morning, Chairman Grassley, Senator Feinstein and the members of the Committee.  I'm Rick Adams and I served as the Chief of Paralympic Sport and National Governing Body Organizational Development for the United States Olympic Committee.  My responsibilities include the Olympic Committee's oversight and management of our SafeSport initiative.
And that was correct?
A    Yes.
Q    And you had other duties, but that was one of them?
A    Correct.
Q    It goes on and says, SafeSport is the term we use for our ongoing efforts to strengthen the Olympic and Paralympic communities' response to issues related to sexual and other abuse of athletes, including young athletes.
The stories of abuse that we have heard today and elsewhere are appalling, disheartening and unacceptable.  The Olympic community failed the people it was supposed to protect.
Who were you referring to in that?

165

MR. KAMIN:  Given the very limited scope of this deposition to jurisdictional issues related to California, I object to questions about the substance, such as you just posed, and will instruct my client not to answer.
BY MR. CUNNY:
Q    When you submitted this testimony, were you referring to McKayla Maroney as one of the people that the Olympic Committee failed to protect?
MR. KAMIN:  Same objection and same instruction.
MR. CUNNY:  And again, I'm going to make my record.
MR. KAMIN:  Go ahead.  No problem.
BY MR. CUNNY:
Q    I don't mean to keep people here longer than necessary.  Were you referring to Jamie Dantzscher when you submitted this provision stating that the Olympic Committee - - community failed the people it was supposed to protect?
MR. KAMIN:  Same objection and same instruction.
BY MR. CUNNY:
Q    When you made the statement in this

166

document, and again, regardless of who wrote it, you approved this statement to be sent out.  In terms of failing the people that it was supposed to protect, were you referring to the fact that Larry Nassar was not reported and removed as an Olympic doctor sooner?
MR. KAMIN:  Same objection and same instruction.
BY MR. CUNNY:
Q    In terms of failing those people it was supposed to protect, were you referring to the fact that the US Olympic Committee or somebody at the US Olympic Committee knew Larry Nassar had been accused of sexual conduct prior, but allowed him to remain in that position?
MR. KAMIN:  You can answer.
THE WITNESS:  Can you restate the question?
BY MR. CUNNY:
Q    Sure.  When you stated in this document, it says the Olympic community failed the people it was supposed to protect.  Were you making reference to the fact that someone at the USOC knew Larry Nassar had engaged in sexual misconduct before he was removed as the Olympic

167

doctor?
A    No.
Q    Okay.  When did you become aware that Larry Nassar had been accused of sexual misconduct?
A    The - - my understanding of it being Larry Nassar specifically was in September of 2016.
Q    Okay.  When you say it being Larry Nassar specifically, were you aware that a doctor at USAG and/or USOC had been accused of sexual misconduct prior to that time?
A    I was aware of numerous public reports that emerged prior to the Rio Games.  I was not aware of the specifics beyond the public reporting that that was being made.
Q    Okay.  What public reports are you referring to?
A    I'm referring to articles such as those that were in the Indy Star.
Q    Okay.  Do you know if those came out before or after the Olympic Games?
A    I believe that there was one before and that there was one after.  There may have been numerous.  But the ones I'm referring to - -

168

or one that came out before, and I believe there
was some reporting after as well.

Q   Okay.  Are you aware that anybody at
the USOC knew Larry Nassar had been accused of
sexual misconduct prior to those first public
reports being made by the Indy Star?

A   I'm not aware.

Q   Do you know if anybody was aware at
USOC prior to January 1st, 2016 that Larry Nassar
had been accused of sexual misconduct?

A   I would have to look at information
that has come out after my testimony, around the
timing of when individuals or an individual at
the USOC were made aware of it.  I was not made
aware of it.

Q   So prior to your testimony, didn't
you want to go around and ask people who, you
know, may have known something about Larry Nassar,
you know, what did you know and when did you know
it?

MR. KAMIN:  Objection, that's
argumentative and beyond the scope.  Instruct not
to answer.

BY MR. CUNNY:

Q   Did you go around prior to your

169

testimony and find out who, if anybody, knew Larry
Nassar had been accused of sexual misconduct prior
to him being publicly exposed in the Indy Star
report?

A   In preparation for this testimony
and following the - - that information becoming
known, I along with, I think, others absolutely
wanted to know what happened.

Q   Okay.  Was there a reason you didn't
look into it?

MR. KAMIN:  Objection, misstates the
testimony and it's beyond the scope.  I'll instruct
not to answer.

BY MR. CUNNY:

Q   Okay.  Sorry.  At any time after
your testimony that you gave in March of 2017, did
you become aware that any individual at USOC had
been made aware of allegations of sexual abuse by
Larry Nassar prior to those public allegations
being made in September of 2016?

A   I became aware of an individual at
the USOC who had information.  I'm not clear as
to who or what the scope of it was.  That was
before my testimony in March of 2017.

Q   And who is that?

170

A   Larry Buendorf.

Q   Anybody else?

A   Not to my knowledge.

Q   Do you know if Mr. Buendorf reported
Larry Nassar to law enforcement upon obtaining
that information, prior to Larry Nassar being
publicly exposed in September of 2016?

A   I do not.

Q   And that question - - so as you sit
here today, you don't know whether or not he
reported to law enforcement or not?

A   As I sit here today, I'm not - -
I'm unclear as to what Larry Buendorf did or
didn't do in a certain time frame.

Q   Okay.  Well, have you talked to
Larry Buendorf about what he did or did not do?

A   I have not.

Q   And is there a reason why you
haven't?

A   Just didn't seem appropriate.

Q   What do you mean by that?

A   In light of the work and effort
that was being done around all of this - -  this
entire - this - - all of what the entirety of
what you described, I was handling, you know,

171

speaking or not speaking based on what I felt was
best, in light of the, you know, the situation
that we were in.  So there wasn't - - there was
not a lot of communications internally between
colleagues, etc.

Q   Okay.  I guess, when did you become
aware of this information about Mr. Buendorf?

A   I became aware approximately maybe
six months ago.  I could be off.  I'm not sure
when the information about what Larry knew or
didn't know.  It was several months ago.

Q   And when you say Larry, you mean
Larry Buendorf?

A   Correct.

Q   So in those six months, you haven't
spoken with Larry Buendorf, is that accurate to
say?

A   No.

Q   That's not - - is that accurate or
it's not accurate to say that?

A   If you don't mind, ask the
question - -

Q   Right.  It's a double negative,
yeah.  In the past six months, have you spoken
with Larry Buendorf about Larry Nassar?

172

BY MR. CUNNY:

Q    Sure.  So when Steve Penny had this communication with you that you're not too sure on the specifics of, did he indicate to you that he had previously been speaking with law enforcement regarding Larry Nassar?

Does that clarify?

MR. KAMIN:  No.  In terms of when he was potentially speaking with law enforcement, are you speaking - - I mean, is there a time frame for that when Penny - - are you talking about at the present when the conversations occurred or in the past?

MR. CUNNY:  In the past.

BY MR. CUNNY:

Q    Did he indicate to you that he had previously spoken to law enforcement regarding Larry Nassar, prior to these allegations being made public in the Indy Star article?

MR. KAMIN:  Objection, beyond the scope and I'll instruct not to answer.

MR. CUNNY:  And again, I'm going to make my record.

BY MR. CUNNY:

Q    Did Steve Penny indicate to you that

177

he was speaking with an agent from the FBI named Jay Abbott regarding Larry Nassar's sexual abuse allegations?

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    Did Mr. Penny indicate to you anything regarding his relationship with Jay Abbott?

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    Did Steve Penny indicate to you anything to the effect of a job offer between Jay Abbott and USAG?

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    Did Steve Penny indicate to you that he had - - that he, Larry Nassar, had formerly been banned from the Karolyi Ranch for a period of time?

MR. KAMIN:  Is this asking about those same conversations that may have been around the time of the Indy Star articles?

178

MR. CUNNY:  No, previous to the Indy Star article, previous to 2015.

BY MR. CUNNY:

Q    Did Larry Nassar - - did Steve Penny indicate to you that Larry Nassar had been kicked out of the Karolyi Ranch for a period of time?

MR. KAMIN:  Lack of foundation.

BY MR. CUNNY:

Q    You can answer.

A    No.

Q    Did Steve Penny indicate to you at any point that he had received complaints about Larry Nassar taking an excessive amount of photographs of McKayla Maroney while at the Karolyi Ranch?

A    No.

Q    Or while at international events?

A    No.

Q    I want to go back to your testimony in Exhibit 13.  Okay.  So we read the part the Olympic Committee failed the people it was supposed to protect.  The US Olympic Committee leads the diverse network of Olympic sports organizations in the United States and we must therefore take responsibility for its failures.

179

In terms of saying we must therefore take responsibility, did you in any way mean in a legal sense?

MR. KAMIN:  Objection, given the limited scope of this deposition, which is limited to jurisdictional issues, this exceeds the scope and so I'm instructing my client not to answer.

BY MR. CUNNY:

Q    When you made this statement to Congress, did you indicate on behalf of USOC that USOC was going to take legal responsibility for their conduct and stand trial in a civil case in California?

MR. KAMIN:  Same objection.  Same instruction.  It also inappropriately calls for legal conclusions from a lay witness.

BY MR. CUNNY:

Q    Okay.  It goes on, it says, we do take responsibility.  What responsibility were you referring to if not - - if it wasn't a legal responsibility?

MR. KAMIN:  Same objection.  Same instruction.

MR. CUNNY:  Can you mark the transcript on those, please.

180

45  (Pages 177 to 180)

BY MR. CUNNY:

Q    When you said we do take responsibility, were you referring to the fact that you were going to submit to jurisdiction in the state of California and stand trial in front of a California jury?

MR. KAMIN:  Same objection and same instruction.  And it's also argumentative because you're aware of the legal positions taken in that litigation.

BY MR. CUNNY:

Q    It goes on.  It says, and we apologize to any young athlete who has ever faced abuse.

What were you apologizing for when you said that?

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    I'm going to go down to the next paragraph.  It says we recognize the difficulty of stepping forward to share your stories, and that it is our obligation to build on your courage and bravery to make real and lasting changes.  That includes changes to our policies and protocols and

181

also changes to the environment that discourages victims from reporting abuse.

When you make reference to the environment that discourages victims from reporting abuse, was this an environment that, based on your testimony to Congress, you believe to be in place at USAG prior to Larry Nassar being removed as their doctor?

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    What were you referring to in terms of the environment that discourages victims from reporting abuse?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

Q    I want to go on to Page 2, third paragraph down.  And it says - - it begins, it says, the US Olympic Committee's regular and periodic audit of independent National Governing Bodies include auditing of the organizations' compliance with the requirements of SafeSport.

Was a condition for an NGB, such as USAG, to, in fact, be an NGB, that they comply

182

with requirements of SafeSport?

MR. KAMIN:  Hold on one second.  Is this just open ended as to time period?

BY MR. CUNNY:

Q    So prior to September - - prior to June of 2015, was it a requirement by USOC that NGB implement SafeSport?

MR. KAMIN:  Objection, it's beyond the scope and I'll instruct my client not to answer.

MR. CUNNY:  And on those, I would like to make an offer of proof on that as to the alter ego.  Again, if it's a condition of USAG operating as an NGB that they need to comply with SafeSport or they will have some sort of action taken against them, whether it's decertification or otherwise, it goes to the alter ego prong of control over USAG.

MR. KAMIN:  Okay.  Well, I see that it speaks somewhat to the relationship between USOC and the NGBs, but I don't see how it even arguably supports an alter ego argument, to the extent an alter ego argument is the basis to establish jurisdiction, so I'll stand on the objection.

MR. CUNNY:  Okay.  Can you mark the

183

transcript on that.

BY MR. CUNNY:

Q    If an NGB didn't implement SafeSport, is it true that USOC could decertify them?

MR. KAMIN:  Beyond the scope.  Instruct not to answer.

BY MR. CUNNY:

Q    Again, this is prior to June of 2015.

MR. KAMIN:  Same objection.  Same instruction.

BY MR. CUNNY:

Q    Prior to June of 2015, was USAG in compliance with SafeSport?

MR. KAMIN:  Vague and ambiguous, overbroad and beyond the scope.  Instruct not to answer.

BY MR. CUNNY:

Q    Okay.  Okay.  So on Page 3, this will be the - - there is one half of a paragraph at the top.  Two, three, four, fifth full paragraph down, starting in 1978.  Do you see that?

A    I do.

184

03:27:01 1   Q   So the second sentence of that
03:27:04 2  paragraph says, pursuant to the statute, the US
03:27:07 3  Olympic Committee supports athletes through
03:27:09 4  funding, health insurance, tuition grants,
03:27:12 5  marketing opportunities and career services.
03:27:14 6       Were these all services provided to
03:27:18 7  McKayla Maroney from USOC or do you know?
03:27:23 8   A   I don't know if she would have been
03:27:25 9  the recipient of all of this.
03:27:28 10  Q   Do you know if these were services
03:27:31 11 provided to Jamie Dantzscher?
03:27:33 12  A   I don't know if they would have
03:27:36 13 been -- if she would have availed herself or had
03:27:38 14 been provided all of these.
03:27:40 15  Q   Do you know if these were made
03:27:42 16 available to those individuals I just mentioned?
03:27:45 17  A   I don't know. I'm not familiar
03:27:48 18 with that.
03:27:48 19  Q   The next -- actually, the last
03:27:57 20 sentence of that paragraph says, the Committee
03:28:00 21 also oversees a process by which US cities bid to
03:28:05 22 host the Olympics and Paralympic Games, Youth
03:28:05 23 Olympic Games and the Pan/Parapan Olympic Games
03:28:12 24 -- American Games.
03:28:13 25       Do you see that?

185

03:28:13 1   A   I do.
03:28:14 2   Q   Okay. In terms of the bid to host
03:28:16 3  the Olympics, you understand that the Olympics are
03:28:19 4  going to be held in LA in 2028?
03:28:22 5   A   I do.
03:28:22 6   Q   And you had a role in helping bring
03:28:26 7  the Olympics to LA, correct?
03:28:28 8       MR. KAMIN: You, meaning?
03:28:28 9  BY MR. CUNNY:
03:28:29 10  Q   You personally, Mr. Adams.
03:28:31 11  A   I do not believe I had a role in
03:28:34 12 bringing the Olympic Games personally to the
03:28:37 13 United States. I was part of an executive team
03:28:40 14 that assisted when asked. But I did not have a
03:28:44 15 role in the acquisition of the games, a
03:28:48 16 meaningful role.
03:28:48 17  Q   When the Olympic Games are held in
03:28:52 18 the United States, the US Olympic Committee has
03:28:57 19 jurisdiction to run those games, correct?
03:28:59 20  A   No.
03:28:59 21  Q   None whatsoever?
03:29:03 22      MR. KAMIN: It's vague and ambiguous
03:29:05 23 as to what jurisdiction and run mean in this
03:29:09 24 context. Maybe you can be a little more specific.
03:29:09 25 BY MR. CUNNY:

186

03:29:09 1   Q   Sure. So the US Olympic Committee
03:29:12 2  organizes the Olympic Games that occur on United
03:29:17 3  States soil. Is that fair to say?
03:29:18 4   A   No.
03:29:18 5   Q   Okay. What's the US Olympic
03:29:20 6  Committee's role in preparing for or helping
03:29:23 7  contribute to the Olympic Games that are held on
03:29:28 8  US soil?
03:29:28 9   A   The role is really to work with the
03:29:34 10 Organizing Committee, particularly around issues
03:29:38 11 of sponsorship, marks, rights. The Organizing
03:29:43 12 Committee, through a joint venture, has rights to
03:29:49 13 all of the marks for the games. And they run --
03:29:52 14 they are the organizing committee of the games.
03:29:55 15 And that would be LA '28, and obviously our
03:29:59 16 secondary role is fielding a team to participate
03:30:02 17 in the games.
03:30:03 18  Q   Do you mean like a logistics team
03:30:08 19 or like the actual athlete teams?
03:30:11 20  A   I think it would be inclusive of
03:30:16 21 both.
03:30:16 22  Q   Okay. So when the Olympics are held
03:30:18 23 in the United States, USOC prepares a team of
03:30:22 24 people to go to them, both as athletes and as
03:30:26 25 support and logistics and management?

187

03:30:29 1   A   Yes.
03:30:30 2   Q   And those individuals are preparing,
03:30:32 3  as we speak, for the LA Games, correct?
03:30:34 4   A   That would be far down the
03:30:39 5  pipeline, but that could be the case, given the
03:30:42 6  ten-year distance between now and LA '28.
03:30:47 7   Q   Okay. But the USOC is currently
03:30:50 8  planning in California for the Olympic Games to
03:30:54 9  occur in 2028, is that fair to say?
03:30:57 10  A   Yes.
03:30:58 11  Q   And the USOC, when Olympics are held
03:31:03 12 in the United States, they gain substantial sums
03:31:06 13 of money for having them held on American soil, as
03:31:11 14 opposed to being held in South Korea or Russia or
03:31:15 15 somewhere else, correct?
03:31:17 16  A   No.
03:31:17 17  Q   They don't get any more money for
03:31:20 18 that than they would otherwise if it's held
03:31:21 19 internationally?
03:31:21 20  A   The amount of money is based on a
03:31:23 21 joint venture agreement between the US Olympic
03:31:27 22 Committee and the Organizing Committee.
03:31:29 23  Q   And is that the same for every
03:31:32 24 Olympics, regardless of where it's held?
03:31:37 25  A   If you can ask the question again.

188

teams who participate in those games?

A    Help me understand.  By teams, who are you referring to?

Q    So the Olympians who go participate at those games, the USOC arranges for the accommodations for those individuals, correct?

A    In many cases.

MR. KAMIN:  So we're clear, too, for Team USA is what you're asking?

MR. CUNNY:  Correct.

THE WITNESS:  Yes.

BY MR. CUNNY:

Q    Okay.  So on Page 4 of your testimony, going down to USA Gymnastics, again, on the phone, we're back to Exhibit 13.

It says, finally, Mr. Chairman and Senator Feinstein, I would like to take a moment to discuss the very serious issues that have been brought to light concerning USA Gymnastics.  We share your deep concerns about USA Gymnastics' handling of allegations of abuse, and we supported Steve Penny's decision to resign.

As to the first part of that last sentence, we share your deep concerns about USA Gymnastics' handling of allegations of abuse, were

193

you specifically discussing the handling of USA Gymnastics' allegations pertaining to Larry Nassar, prior to him being publicly exposed in September of 2016?

MR. KAMIN:  Objection, it's beyond the scope of this jurisdictional deposition and I'll instruct my client not to answer.

MR. CUNNY:  Mark the transcript, please.

BY MR. CUNNY:

Q    In regards to the concerns about USA Gymnastics' handling of allegations of abuse, were you specifically referring to Steve Penny's handling of allegations of abuse, prior to Larry Nassar being publicly exposed in September of 2016?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

Q    Were you referring to Steve Penny's handling of allegations of abuse by Larry Nassar prior to 2015?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

194

Q    Were you referring to - - what allegations of abuse were you referring to in this?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

Q    Were you referring to any allegations of abuse by Larry Nassar that were dealt with by Steve Penny?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

Q    It says we supported Steve Penny's decision to resign.  Can USOC force a board member at an NGB to resign, as just a general matter?

MR. KAMIN:  Objection, only because Penny - - you asked about a board member?

MR. CUNNY:  Yeah.

MR. KAMIN:  Just to be clear.

BY MR. CUNNY:

Q    Okay.  Can USOC force an executive at an NGB to resign?

A    We cannot.

Q    Can USOC condition either funding or designation as an NGB, essentially threaten

195

decertification, if a CEO or executive does not resign?

MR. KAMIN:  Objection, it's compound and vague and ambiguous.

THE WITNESS:  Yes.

BY MR. CUNNY:

Q    Is that what happened with Steve Penny in his resignation from USAG?

MR. KAMIN:  Objection, this is beyond the scope and I'll instruct my client not to answer.

MR. CUNNY:  And again, I just want to put on the record that we're going after the alter ego aspect of it.  And I understand you disagree with it but I want to make my record.

BY MR. CUNNY:

Q    Was it your understanding that USOC exerted this control threatening decertification or some lower form of punishment to USAG if Steve Penny did not resign?

MR. KAMIN:  Same objection and instruction.

BY MR. CUNNY:

Q    Did Steve Penny ever communicate to you his knowledge of allegations about Larry

196

Nassar sexually abusing McKayla Maroney prior to 2015?

A   No.

Q   Do you know if he ever communicated that to anybody at the USOC at any point?

MR. KAMIN:  Prior to 2015?

BY MR. CUNNY:

Q   His knowledge prior to 2015, but whether or not he communicated to USOC that knowledge at any point?

MR. KAMIN:  Objection, that's beyond the scope.

THE WITNESS:  Can you clarify the timeline?

BY MR. CUNNY:

Q   Sure.  So was there ever a point, to your knowledge, whether Steve Penny told you yesterday or five years ago or whenever, that he had knowledge of Larry Nassar sexually abusing gymnasts prior to June of 2015?

A   Not that I recall.

Q   Do you know if he ever made that communication to anyone at the USOC?

A   Prior to?  Again, I'm - - my hesitation is the timeline.  I don't - - I need

197

- - so prior to when in 2015?

Q   Prior to 2015, so January 1st, 2015 or before, did Steve Penny - - did Steve Penny ever indicate that he had knowledge or some suspicion that Larry Nassar was sexually abusing gymnasts that he communicated to somebody, which he knew prior to January 1st, 2015?

MR. KAMIN:  Now I'm a little bit confused.  I apologize.

The question, I think, let me know whether - - whether Mr. Adams knows whether Steve Penny communicated to anyone at USOC that Steve Penny knew of Nassar's abuse prior to 2015?

MR. CUNNY:  Correct.

MR. KAMIN:  Okay.

MR. CUNNY:  Regardless of when he actually told somebody.

THE WITNESS:  Okay.  So that's helpful.  Can you just state the question again, so I can answer.

BY MR. CUNNY:

Q   Sure.  At any point, did Steve Penny communicate to you or anyone else at the USOC that he had knowledge Larry Nassar was abusing girls or had a suspicion that Larry Nassar was abusing

198

girls prior to January 1st, 2015?

A   Not to my knowledge.

Q   Did you review any documents in preparing for your deposition today?

A   I did.

Q   Which documents?

MR. KAMIN:  Objection, calls for attorney/client privilege and work product, and I'll instruct my client not to answer.

MR. CUNNY:  Okay.  Well, he just testified that he reviewed documents prepared for the deposition.

MR. KAMIN:  Right.  Do you want to ask if he reviewed any documents outside of meetings with counsel?  I believe documents reviewed with counsel are subject to the privilege.

MR. CUNNY:  Do you have a case on that?

MR. KAMIN:  Not at the tip of my tongue, no.

MR. CUNNY:  Okay.  Because I think there's a case explicitly saying anything he uses to prepare himself for a deposition, I get to have produced at deposition.

MR. KAMIN:  I'm not aware of that

199

authority.

MR. CUNNY:  I'll look at it on a break.

MR. KAMIN:  Okay.

BY MR. CUNNY:

Q   Okay.  Outside of the presence of counsel, did you review any documents in preparation for your deposition here today?

A   I did.

Q   What documents did you review?

A   I looked at documents around Chula Vista Training Center.

Q   And when you say documents around the training center, what are you referring to?

A   I'm referring to the volume and kinds of training that we were doing, that we do today in Chula Vista.

Q   Are these spreadsheets you're looking at or - - I guess I haven't seen the documents.  So what kind of documents are we talking about?

A   They would be - - I don't know what the format description would be, but it would be documents that were, you know, how much did we spend, for example, in 2017.

200

coaches?
A    Yes.
Q    Okay.  So in conducting that investigation, do they actually go to the site of the alleged conduct to do the investigation or interview witnesses near that site?
A    I'm not familiar with how they're - - how they're executing their investigations. I just don't know how, when a case - - they're independent of us.  So when a case comes in, it would really be dependent upon how the center were to, you know, handle a particular case.
Q    So in your current job role, what's your liaison between yourself and the center for SafeSport?
A    We have a - - we have a VP of athlete safety and she is the primary liaison with the center.
Q    And do you have any other communication with the center or interaction with the center?
A    I do.
Q    And what's the extent of that?
A    It might be - - oftentimes, it might be around NGBs that have not, for example,

233

paid the center for their portion of the monies that they are required to pay annually.  If the center has an issue with, you know, something specific to the NGB, they might reach out to the USOC for assistance.  And there is education and research, education and training where there's some overlap.
Q    In the education and training, does SafeSport provide that in the state of California for members or NGBs?
A    Yes.
Q    And in what medium?  Is it an online thing or do they actually go out and give seminars?
A    It's an online program.
Q    Are there any in-person aspects to that?
A    I'm not - - I don't - - I'm not sure if they do that or not.
Q    Something I want to go back to, you are aware that Ms. Perry recently resigned as USAG president?
A    I am.
Q    So days prior to that, Ms. Hirshland, who's the new CEO at USOC, indicated

234

she was going to go have a meeting with Kerry Perry.  Are you aware of that meaning?
MR. KAMIN:  Objection, this is beyond the scope of jurisdictional deposition, and I'll instruct not to answer.
MR. CUNNY:  Can you mark the transcript.
BY MR. CUNNY:
Q    Was Kerry Perry demanded to resign her position, otherwise USAG would have suffered either financial consequences or issues regarding its designation as an NGB?
MR. KAMIN:  Same objection and instruction.
BY MR. CUNNY:
Q    Was there any coercive effects communicated from USOC to Ms. Kerry Perry?  And coercive meaning lack in funding, decertification, any other withholding of resources by USOC, if Ms. Perry did not resign her employment with USAG?
MR. KAMIN:  Same objection and instruction.
MR. CUNNY:  I'm going to check my notes, but I'll let Justin ask questions.
MR. PFEIFFER:  Oh, sure.  Thank you,

235

Alex.  I appreciate it.  Microphone is okay. Everyone can hear?
EXAMINATION
BY MR. PFEIFFER:
Q    Mr. Adams, thank you so much for your time today, sir.  I really appreciate it.
Various Plaintiffs argued that the environment at the National Team Training Camps in Huntsville, Texas, constituted jurisdictional contact with California because of the effect it is alleged to have in California.
Now, the Karolyis disagree completely with that contention.  The District Court in this matter, however, has allowed jurisdictional discovery on the issue.
So I wanted to ask just a few questions.  Was the Karolyi Ranch considered a USOC training site?
A    Yes.
Q    Did the USOC have any role in selecting that site?
A    I don't have firsthand knowledge of that.
Q    Okay.  Did the USOC have any role in deselecting that site?

236

1    I, RICK ADAMS, do hereby certify that I
2    have read the foregoing transcript and that the
3    same and accompanying amendment sheets, if any,
4    constitute a true and complete record of my
5    testimony.
6    Date: _____
7
8

_____
9    Signature of Deponent
10   ( ) No amendments
     ( ) Amendments attached
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

245

1    STATE OF COLORADO)
2                    )ss.  REPORTER'S CERTIFICATE
3    COUNTY OF COSTILLA)
4        I, Linda S. Overdeer, do hereby certify that I
5    am Shorthand Reporter and Notary Public within the
6    State of Colorado; that previous to the
7    commencement of the examination, the deponent was
8    duly sworn to testify to the truth.
9        I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, that it was thereafter reduced
12   to typewritten form, and that the foregoing
13   constitutes a true and correct transcript.
14       I further certify that I am not related to,
15   employed by, nor of counsel for any of the parties
16   or attorneys herein, nor otherwise interested in
17   the result of the within activity.
18       In witness whereof, I have affixed my
19   signature this 19th day of September, 2018.
20
21       My commission expires June 10, 2021.
22
23
24       -----------------
         Linda S. Overdeer
25       216 - 16th Street, Suite 650

246

# EXHIBIT 3

JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX CUNNY (State Bar No. 291567)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys of Record for Plaintiff, ALEXANDRIA ROSE
RAISMAN, an individual

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual. <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual, STEVE PENNY, an individual, PAUL PARRILLA, an individual, and DOES 1 through 500. <br><br> Defendants. | Civil Case No. 5:18-cv-02479-BLF <br><br> [The Honorable Beth Labson Freeman] <br><br> **NOTICE OF TAKING DEPOSITION OF RICK ADAMS AND REQUEST FOR PRODUCTION OF DOCUMENTS** <br><br> **(JURISDICTIONAL DISCOVERY)** <br><br> Date: September 12, 2018 <br> Time: 10:00 a.m. <br> Location: Regus Business Centers <br> 102 South Tejon Street, Suite 1100 <br> Colorado Springs, CO 80903 <br> 719-578-8862 |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 10:00 a.m., on September 12, 2018, at Regus Business

Centers, 102 South Tejon Street, Suite 1100, Colorado Springs, CO 80903, 719-578-8862, Plaitniff

ALEXANDRA ROSE RAISMAN ("Plaintiff") will take the oral deposition of Rick Adams. If for

any reason the taking of such deposition is not completed on the date scheduled, said deposition

shall continue, day-to-day, Sundays and holidays excepted, until completed, or will be continued

to such other dates and times as shall be designated by the party noticing the deposition.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**NOTICE OF TAKING DEPOSITION OF RICK ADAMS**

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

If for any reason the taking of such deposition is not completed on the date scheduled, said deposition shall continue, day-to-day, Sundays and holidays excepted, until completed, or will be continued to such other dates and times as shall be designated by the party noticing the deposition.

**PLEASE TAKE FURTHER NOTICE** that if an interpreter is required to translate testimony, notice of same must be given to this noticing party at least five (5) working days prior to the deposition date, and the specific language and/or dialect thereof designated.

**PLEASE TAKE FURTHER NOTICE** that pursuant to *Code of Civil Procedure* section 2025(d)(5) and (d)(6), Plaintiff reserves the right to record the deposition testimony of the deponent by audio tape and/or videotape in addition to recording the testimony by stenographic method.

**FURTHERMORE**, said deponent is expected to produce the documents set out in the attached document request.

Dated: September 4, 2018          **MANLY, STEWART & FINALDI**

By: _Alex E. Cunny_____
ALEX E. CUNNY, Esq.
Attorneys for Plaintiff
.

# DEFINITIONS AND INSTRUCTIONS

1.     The term "ANY" shall mean any and all.

2.     The term "USOC" shall mean the United States Olympic Committee, which is a named defendant in this Action.

3.     The terms "YOU", "YOUR", or "RICK ADAMS" shall mean the Responding Party to the present set of requests for production, RICK ADAMS.

4.     The terms "DOCUMENT" and "DOCUMENTS" shall mean any and all manner of written, typed, printed, reproduced, filmed, ESI, OR recorded material and all photographs, pictures, plans, or other representations of any kind of anything pertaining, describing, referring, or relating, directly or indirectly, in whole or in part, to the subject matter of each discovery request and the term includes, but is not limited to:  papers, books, journals, ledgers, statements, bank statements, property title reports, title records, recording of title, memoranda, reports, invoices, work sheets, work papers, notes, transcriptions of notes, letters, correspondence, abstracts, checks, diagrams, plans, blueprints, schematics, software programs, films, photographs, diaries, lists, logs, publications, advertisements, instructions, minutes, orders, purchase orders, messages, resumes, applications, summaries, agreements, contracts, telegrams, e-mails, instant messages, text messages, telexes, cables, recordings, audio tapes, magnetic tapes, visual tapes, transcriptions of tapes or records, computer tapes, books, speeches, pamphlets, leaflets, flyers, announcements, bulletins, periodicals, agenda, reports, opinions, charts, tabulations, digests, compilations, studies, expert analyses, evaluations, manuals, guides, research papers, articles, computer files, computer hard drives, or other writings or tangible things as defined by Section 250 of the Evidence Code, in the possession, custody or control of YOU, YOUR attorneys, agents, servants, representatives, investigators, subsidiaries, boards, directors, affiliated business entities and others who have obtained possession, custody or control.

5.     The term "Policies" shall mean policies, procedures, rules, standards, regulations, and guidelines.

6.     The term "MEMBERS" shall refer to a participant who is affiliated with a National Governing Body as a member.

7.      The term "USAG" shall refer to Defendant USA Gymnastics.

## REQUESTS FOR PRODUCTION:

Plaintiff hereby requests that you produce the following documents in your possession, custody or control:

### REQUEST FOR PRODUCTION NO. 1:

Produce all DOCUMENTS evidencing USOC's contracts with individuals or businesses from the State of California, in preparation for the 2012 Olympic Trials for gymnastics.

### REQUEST FOR PRODUCTION NO. 2:

Produce all DOCUMENTS evidencing USOC's contracts with individuals or businesses from the State of California, in preparation for the 2028 Olympics to be held in Los Angeles.

### REQUEST FOR PRODUCTION NO. 3:

Produce all DOCUMENTS evidencing USOC's communications with individuals or businesses from the State of California, in preparation for the 2012 Olympic Trials for gymnastics.

### REQUEST FOR PRODUCTION NO. 4:

Produce business licenses that USOC possesses, in order to conduct business in California.

### REQUEST FOR PRODUCTION NO. 5:

Produce all DOCUMENTS evidencing Larry Nassar's approval by USOC to conduct medical treatment within the State of California.

### REQUEST FOR PRODUCTION NO. 6:

Produce all DOCUMENTS evidencing USOC's contact with medical boards, medical providers, or others that would permit USOC's staff to conduct medical treatment in the State of California.

### REQUEST FOR PRODUCTION NO. 7:

Produce all DOCUMENTS evidencing USOC having an Olympic Training Center in the State of California.

### REQUEST FOR PRODUCTION NO. 8:

Produce all DOCUMENTS evidencing the operating expenses of the USOC's Olympic Training Center in the State of California, from 1994 through 2017.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**REQUEST FOR PRODUCTION NO. 9:**

Produce all DOCUMENTS evidencing the number of employees that USOC employed within the State of California, from 1994 through present.

**REQUEST FOR PRODUCTION NO. 10:**

Produce all DOCUMENTS evidencing real estate owned by USOC in the State of California from 1994 through present.

**REQUEST FOR PRODUCTION NO. 11:**

Produce all DOCUMENTS evidencing USOC investigations of MEMBERS at National Governing Bodies, within the State of California, from 1994 through present.

**REQUEST FOR PRODUCTION NO. 12:**

Produce complaints of sexual misconduct that USOC received regarding Larry Nassar.

**REQUEST FOR PRODUCTION NO. 13:**

Produce all videos that USOC had in its possession, custody, or control, that depict Larry Nassar performing or explaining medical treatment.

**REQUEST FOR PRODUCTION NO. 14:.**

Produce all licenses that USOC has in its possession regarding Larry Nassar.

**REQUEST FOR PRODUCTION NO. 15:**

Produce Larry Nassar's volunteer file with USOC.

**REQUEST FOR PRODUCTION NO. 16:**

Produce Larry Nassar's employment file with USOC.

**REQUEST FOR PRODUCTION NO. 17:**

Produce all DOCUMENTS evidencing events that USOC held in the State of California from 1994 through present.

**REQUEST FOR PRODUCTION NO. 18:**

Produce ALL DOCUMENTS evidencing investigations of sexual misconduct by USOC in the state of California between 1994 through present.

**REQUEST FOR PRODUCTION NO. 19:**

**NOTICE OF TAKING DEPOSITION OF RICK ADAMS**

Produce all DOCUMENTS evidencing USOC's obligations to keep minors participating in USOC programs safe, while at events in the State of California, from 1994 through 2015.

**REQUEST FOR PRODUCTION NO. 20:**

Produce all communications between USOC and USAG, regarding Larry Nassar, between 1994 and 2016.

**REQUEST FOR PRODUCTION NO. 21:**

Produce all communications between USOC and law enforcement, regarding Larry Nassar, between 1994 and 2016.

**REQUEST FOR PRODUCTION NO. 22:**

Produce all communications between USOC and Bela Karolyi, regarding Larry Nassar, between 1994 and 2016.

**REQUEST FOR PRODUCTION NO. 23:**

Produce all communications between USOC and Martha Karolyi, regarding Larry Nassar, between 1994 and 2016.

**REQUEST FOR PRODUCTION NO. 24:**

Produce all communications between USOC and Steve Penny, regarding Larry Nassar, between 1994 and 2016.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Manly, Stewart & Finaldi, 19100 Von Karman Ave., Suite 800, Irvine, CA 92612.

On September 4, 2018, I served the within documents:

1) **NOTICE OF TAKING DEPOSITION OF RICK ADAMS AND REQUEST FOR PRODUCTION OF DOCUMENTS (JURISDICTIONAL DISCOVERY)**

**[X]** **BY E-MAIL OR ELECTRONIC TRANSMISSION** I caused the documents to be sent to the persons on the e-mail addresses as listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

FEDERAL - I certify under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on September 4, 2018, at Irvine, California.

*Kathy Frederiksen*
Kathy Frederiksen

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Kevin James Minnick
Skadden Arps Slate Meagher and Flom LLP
300 South Grand Avenue Suite 3400
Los Angeles, CA 90071
213-687-5000
Fax: 213-687-5600
Email: kevin.minnick@skadden.com
Attorneys for Defendant MICHIGAN STATE UNIVERSITY

Mitchell A. Kamin
mkamin@cov.com
Carolyn Kubota
ckubota@cov.com
Mark Y. Chen
mchen@cov.com
Paulina Slagter
pslagter@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749
Attorneys for Defendant UNITED STATES OLYMPIC COMMITTEE

Udit Sood
usood@cov.com
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Attorneys for Defendant UNITED STATES OLYMPIC COMMITTEE

Margaret M. Holm
Melissa McKenna Leos
Sheryl M Rosenberg
Clyde & Co US LLP
2020 Main Street
Suite 1100
Irvine, CA 92614-8234
(949) 567-7838 (Direct)
(714) 322-5578 (Cell)
margaret.holm@clydeco.us
Melissa.leos@clydeco.us
sheryl.rosenberg@clydeco.us
Attorneys for Defendants USA GYMNASTICS, an Indiana business entity of form unknown and Defendant PAUL PARILLA

Edith R Matthai
Leigh Porter Robie
Robie and Matthai
500 South Grand Avenue Suite 1500
Los Angeles, CA 90071
213-706-8000
Fax: 213-706-9913
ematthai@romalaw.com
lrobie@romalaw.com
Attorneys for Defendant STEVE PENNY

Alan K. Brubaker
Partner
Wingert Grebing Brubaker & Juskie LLP
600 West Broadway, Suite 1200
San Diego, CA 92101
T 619-232-8151
F 619-232-4665
abrubaker@wingertlaw.com
Attorneys for Kathy Scanlan

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**NOTICE OF TAKING DEPOSITION OF RICK ADAMS**

# EXHIBIT 4

**COVINGTON**

Mitchell A. Kamin

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
T +1 424 332 4759
mkamin@cov.com

BEIJING   BRUSSELS   DUBAI   JOHANNESBURG   LONDON
LOS ANGELES   NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

**Via Electronic Mail**                                    September 10, 2018

John C. Manly, Esq.
Vince Finaldi, Esq.
Manly, Stewart & Finaldi
19100 Von Karman Avenue, Suite 800
Irvine, California 92612

>        Re:     **Deposition of Richard Adams in Nassar Cases**

Dear Counsel:

I write in regard to the September 12, 2018 deposition of Richard (Rick) Adams, the chief of sport operations and Paralympics for Defendant United States Olympic Committee ("USOC").

As you are aware, Mr. Adams will appear for the purpose of jurisdictional discovery, as opposed to merits discovery—namely, to determine whether California courts have personal jurisdiction over the USOC. *See* Sept. 4, 2018 Dep. Notice. The only parties who are contesting jurisdiction are the USOC, the Karolyis, Kathy Scanlan, and Steve Penny.

"A court's exercise of personal jurisdiction over a nonresident defendant may be either general or specific." *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997). Despite the fact that the USOC is not incorporated or based in California and thus plainly cannot be subject to general jurisdiction there, the USOC will permit questioning about conduct or activities in California.

Plaintiffs may also question Mr. Adams about facts pertinent to specific jurisdiction. For specific jurisdiction to exist, the lawsuit must "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (emphasis, alterations, and internal quotation marks omitted). Specifically:

(1) The USOC must "purposefully direct [its] activities" toward California;
(2) Plaintiffs' claims must "arise[] out of or relate[] to" the USOC's "forum-related activities"; and
(3) The exercise of jurisdiction must be "reasonable," meaning that the exercise must "comport with fair play and substantial justice."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068, 1069 (9th Cir. 2017) (internal quotation marks omitted). To establish purposeful direction, Plaintiffs must demonstrate, pursuant to the "effects" test set forth in *Calder v. Jones*, 465 U.S. 783, 788–89 (1984), that the

USOC intentionally directed conduct into California and "knew the intentional conduct would cause harm in [California]." *Archdiocese of Milwaukee v. Superior Court*, 112 Cal. App. 4th 423, 436 (2003).

Proper categories of deposition testimony relating to specific jurisdiction therefore include (1) any intentional conduct aimed by the USOC at the State of California, and (2) the USOC's knowledge, if any, that such conduct would cause harm that is likely to occur in California as opposed to in another State. We will not permit questioning about matters irrelevant to jurisdiction, such as questions directed to the merits of Plaintiffs' negligence claims.

Finally, we note that the document requests accompanying Plaintiffs' deposition notice do not comply with the Federal Rules of Civil Procedure. Rule 34 provides a 30-day window in which to respond to requests for production. The requests attached to the deposition notice provide fewer than 9 days. We also note that the requests appear largely duplicative of requests for production already propounded on the USOC. To the extent the requested documents are not already being produced pursuant to the prior requests, the USOC will respond to these new requests under the timeframe set forth in Rule 34. This letter is not a substitute for or waiver of any additional objections to those requests. The USOC reserves all rights.

We are available to confer should you have questions about the USOC's position prior to Mr. Adams's deposition.

Sincerely,

/s/ Mitchell A. Kamin

Mitchell A. Kamin

*Attorney for Defendant USOC*

cc: All Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Manly, Stewart & Finaldi, 19100 Von Karman Ave., Suite 800, Irvine, CA 92612.

On October 29, 2018, I served the within documents:

1)  DISCOVERY LETTER BRIEF AS TO DEPOSITION OF MR. RICK ADAMS

ELECTRONIC - As addressed to all parties appearing on the Court's ECF service list in this action via the North District of California's Court's CM/ECF system, and shall be available for viewing and downloading from the ECF system.

FEDERAL - I certify under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on October 29, 2018, at Irvine, California.

_____/s/ Kathy Frederiksen_____
Kathy Frederiksen

MANLY, STEWART & FINALDI
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

SERVICE LIST
Alexandra Rose Raisman v. United States Olympic Committee, et al.
USDC, Case No. 5:18-cv-02479-BLF

Kevin James Minnick
Skadden Arps Slate Meagher and Flom LLP
300 South Grand Avenue Suite 3400
Los Angeles, CA 90071
213-687-5000
Fax: 213-687-5600
Email: kevin.minnick@skadden.com
Attorneys for Defendant MICHIGAN STATE UNIVERSITY

Mitchell A. Kamin
Carolyn Kubota
Mark Y. Chen
Paulina Slagter
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749
Attorneys for Defendant UNITED STATES OLYMPIC COMMITTEE

Udit Sood
David M. Jolley
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Attorneys for Defendant UNITED STATES OLYMPIC COMMITTEE

Margaret M. Holm
Melissa McKenna Leos
Sheryl M Rosenberg
Clyde & Co US LLP
2020 Main Street, Suite 1100
Irvine, CA 92614-8234
(949) 567-7838 (Direct)
(714) 322-5578 (Cell)
margaret.holm@clydeco.us
Melissa.leos@clydeco.us
sheryl.rosenberg@clydeco.us
Attorneys for Defendants USA GYMNASTICS, an Indiana business entity of form unknown and Defendant PAUL PARILLA

-2-

Edith R Matthai
Leigh Porter Robie
Robie and Matthai
500 South Grand Avenue Suite 1500
Los Angeles, CA 90071
213-706-8000
Fax: 213-706-9913
ematthai@romalaw.com
lrobie@romalaw.com
Attorneys for Defendant STEVE PENNY

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28