JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys of Record for Plaintiff, ALEXANDRA ROSE
RAISMAN, an individual

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OLYMPIC COMMITTEE, a Business Entity of Form Unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual; STEVE PENNY, an individual; PAUL PARRILLA, an individual; and DOES 1 through 500. | Civil Case No. 5:18-cv-02479-BLF <br><br> [The Honorable Beth Labson Freeman] <br><br> **NOTICE OF PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO DEFENDANT STEVE PENNY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER *FEDERAL RULE OF CIVIL PROCEDURE* 12(B)(2); MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **Hon. Judge Beth Labson Freeman** <br><br> [Filed concurrently with Declaration of Alex E. Cunny] <br><br> Complaint filed: February 28, 2018 <br><br> Hearing: February 7, 2019 <br> Time: 9:00 a.m. <br> Judge: Honorable Beth Labson Freeman <br> Courtroom: 3 |

///

///

**i**

**TO THE COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff Alexandra Rose Raisman ("Plaintiff") hereby files the instant Opposition to Defendant Steve Penny's ("Penny") Motion to Dismiss for Lack of Personal Jurisdiction Under *Federal Rule of Civil Procedure* 12(b)(2). This Opposition is grounded in following legal and factual bases, all of which justify denying the instant Motion, *in toto*:

1) Penny has submitted to the personal jurisdiction of California, as he has had substantial contacts with the forum and has purposefully availed himself to the laws and benefits of the State of California;

2) Penny, as the President and CEO of Defendant USA Gymnastics ("USAG"), contrary to his declaration, was responsible for the minor gymnasts participating in Olympic events, and personally coordinated the national team events in California, including the 2012 Olympic Trials at which Plaintiff was molested by Nassar, failing to uphold his duty to protect Plaintiff from such abuse;

3) Penny directed officials to go to the Karolyi Ranch and conceal documents from law enforcement, which are believed to be related to the Nassar investigation. As such, this concealment of evidence should extinguish Penny's claims for lack of personal jurisdiction, as the evidence concealed is believed to be directly relevant to his knowledge of Nassar being an abuser, prior to Plaintiff being abused in San Jose, in 2012. *Archdiocese of Milwaukee v. Superior Court* 112 Cal.App.4th 423 (2003). As such, Penny should not benefit from this allegedly criminal conduct.

4) Through his Motion to Stay Discovery due to his criminal indictment in Texas, Penny availed himself to the Court's jurisdiction, acknowledging its jurisdiction by seeking its relief. As such, Penny, under California "general appearance" rules applied in Federal Court, has waived his objection to personal jurisdiction in California.

///

///

///

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**NOTICE OF PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

# TABLE OF CONTENTS

I.    INTRODUCTION AND FACTIONAL BACKGROUND ................................. 1

      A.    Steve Penny and His Role as President of USAG ................................. 2

      B.    Plaintiff's Sexual Abuse by USAG Physician Nassar ........................... 5

      C.    Institutional Knowledge of Abusers by USAG. ........................................ 5

      D.    Penny's Recent Concealment and Potential Destruction of Evidence by USAG Agents…………………………………………………………………6

      E.    Attempts to Obtain Deposition of Penny ............................................... 7

II.    ARGUMENT…………………………………………………………………7

      A.    Personal Jurisdiction May Be Exercised Over Defendant Steve Penny When He Has Minimum Contacts with California, Related to the Action, and the Exercise of Jurisdiction Does Not Offend Traditional Notions of Fair Play and Substantial Justice. ............................................. 7

      B.    California Has a "Special Interest" In Permitting Minors to Seek Redress in its Courts for Torts Committed within its Territory, Especially Victims of Abuse Who Are in a "Special Relationship" with an Adult or Organization *In Loco Parentis* ........................................................................ 9

      C.    Specific Jurisdiction Can Be Asserted by the California Court Over Penny, Given His Purposeful Availment to California. ...................................... 12

            1.    Committing a Tort in California Is Sufficient for this Court to Exercise Specific Jurisdiction Over Defendant Penny's Conduct for His Role at the 2012 Olympic Trials in San Jose, California. ...... 13

            2.    Secondarily, Under the "Effects Test," Specific Jurisdiction Exists Because Penny Purposefully Availed Himself to the Benefits of the State of California by "Purposefully Directing" His Activities in the State in Coordinating an Olympic Trial in San Jose, California…15

            3.    Penny's Concealment of Evidence Shows Why Jurisdiction Can Be Found Under *Archdiocese of Milwaukee*; As the Evidence that Could Have Been Obtained About His Knowledge of Nassar, Was Made Unavailable……………………………………………………18

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

iv

**D.** **Under California Law Governing "General Appearances," Defendant Penny's Motion to Stay Discovery Has Availed Him to California's Jurisdiction** ........................................................ 19

**E.** **Plaintiff Seeks Leave in the Alternative to Finish the Already Pending Jurisdictional Discovery Against Defendant Steve Penny.**....................... 22

**III.** **CONCLUSION**.................................................................................. 22

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

## FEDERAL LAW

*Federal Rule of Civil Procedure* (12)(b).................................................................... 2,19

*Federal Rule of Civil Procedure* 12(b)        21

*Bristol Meyers Squibb v. Superior Court* (2017) 137 S. Ct. 1773, 1780 ............................. 15

*Bluemner v. Ergo Media Capital, LLC*, 2015 WL 3533218, at *4 (C.D. Cal., June 4, 2015, No. CV 15-01392 MMM AJWX)............................................................................................... 21

*Burger King Co. v. Rudzewicz*, 471 U.S. 462 (1985) ......................................................... 8,9,12

*Calder v. Jones*, 465 U.S. 783 (1984)……………………………………………………16,17,18,19

*Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006) ............................. 21

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ...................................................................... 21

*Gerber v. Riordan*, 649 F.3d 514, 522 (6th Cir. 2011) ..................................................... 21

*Guaranty Trust v. York*, 326 U.S. 99, 108 (1945) ............................................................. 21

*Hanson v. Denckla*, 357 U.S. 235 (1958) ........................................................................ 12

*Hess v. Pawloski* 274 U.S. 352 (1927)............................................................................ 12,14

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)……21

*International Shoe Co. v. Wash.*, 326 U.S. 310 (1945)...................................................... 7,12

*Kulko v. Superior Court*, 436 U.S. 84, 92 (1978) ............................................................. 8

*McGee v. International Life Ins. Co.* 355 U.S. 220 (1957) ............................................... 14,15

*Palmore v. Sidoti* 466 U.S. 429 (1984) ........................................................................... 10

*Rosenblatt v. American Cyanamid Co.*, 382 U.S. 110 (1965) ............................................ 10

 *Taylor-Rush v. Multitech Corp.*, 217 Cal.App.3d 103 (1990) ............................................ 17

*Vons Companies, Inc. v. Seabest Foods, Inc.*, 14 Cal.4th 434 (1996) ............................... 7,12,13

*World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .................................... 8,12

**CALIFORNIA LAW**

*Code of Civil Procedure. §340.1* ........................................................................ 10

*Code of Civil Procedure ("C.C.P.") § 410.10* ..................................................... 7,9

*Code of Civil Procedure § 410.50(a)* .................................................................. 21

*Code of Civil Procedure §1014*……………………………………………………….20,21,22

*Penal Code §11166, et seq.* [Child Abuse Neglect and Reporting Act ("CANRA")] ......... 10

*Anglo Irish Bank Corp., PLC v. Superior Court*, 165 Cal.App.4th 969 (2008) ................. 10

*Archdiocese of Milwaukee*, 112 Cal. App. 4th 423 (2003) .............................. 1,18,19

*Boaz v. Boyle & Co.*, 40 Cal.App.4th 700 (1995) ..................................................... 8

*Brown v. Watson*, 207 Cal.App.3d 1306 (1989) .................................................... 17

*CollegeSource, Inc. v. AcademyOne, Inc.* (9th Cir. 2011) 653 F.3d 1066 ........................... 8,9

*California Overseas Bank v. French American Banking Corp.* (1984) 154 Cal.App.3d 179 ............................................................................................. 20

*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32 ................................................ 20

*Doe v. United States Youth Soccer Association, Inc.* ("*USYSA*") (2017) 8 Cal.App.5th 1118 ............................................................................................. 10,11

*Factor Health Management v. Superior Court*, 132 Cal.App.4th 246 (2005)....................... 20

*Gilmore Bank v. AsiaTrust New Zealand Limited*, 223 Cal. App. 4th 1558 ....................... 8

*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028........................................ 20

*Hamilton v. Asbestos Corp.,* 22 Cal.4th 1127 (2000) ............................................. 21

*Hesse v. Best Western Int'l, Inc.*, 32 Cal.App.4th 404 (1995) .................................... 12

*In re Automobile Antitrust Cases I and II*, 135 Cal.App.4th 100 (2005) ............................ 10

*In re Clergy Cases I*, (2010) 188 Cal.App.4th 1224 ............................................... 10

*Magnecomp Corp. v. Athene Co.*, 209 Cal. App. 3d 526 (1989) ........................................ 8

*Nam Tai Electronics, Inc. v. Titzer* 93 Cal.App.4th 1301 (2001) ....................................... 20

*Pavlovich v. Superior Court*, 29 Cal.4th 262 (2002)………………………….7,11,12 13, 20

*Quattrone v. Superior Court*, 44 Cal.App.3d 296 (1975) ....................................... 9

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

*Renoir v. Redstar Corp.*, 123 Cal.App.4th 1145 (2004) ...................................................... 19

*Secrest Machine Corp. v. Superior Court*, 33 Cal.3d 664 (1983) ........................................ 12

*Simons v. Steverson*, 88 Cal. App.4th 693 (2001) ............................................................... 17

*Snowney v. Harrah's Entertainment, Inc.*, 35 Cal. 4th 1054 (2005) ................................... 8

*Szynalski v. Superior Court* 172 Cal.App.4th 1 (2009) ...................................................... 20

**SECONDARY SOURCES**

Judicial Council Comments (8), *C.C.P.* §410.10 .................................................................. 9,10

*Restatement (Second)* §36 .................................................................................................... 9

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF AUTHORITIES**

This Opposition is grounded in this notice, the attached Memorandum of Points and Authorities, the Declaration of Alex E. Cunny and exhibits attached thereto, the records and files in this action, and upon such further evidence and argument as may be presented prior to or at the time of hearing on the motion.

Dated: November 21, 2018                                 MANLY, STEWART & FINALDI

                                                   By: _____
                                                       ALEX E. CUNNY, Esq.
                                                       Attorney for Plaintiff,
                                                       ALEXANDRA RAISMAN

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**NOTICE OF PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION AND FACTUAL BACKGROUND

1  This case arises from the serial molestation of Plaintiff Alexandra Rose Raisman ("Plaintiff"), a three-time Olympic gold medalist, who, while competing for her country, endured repeated molestation by the USA Gymnastics' ("USAG") team physician, now-former Dr. Larry Nassar ("Nassar"), during Defendant Steve Penny's ("Penny") tenure as President and CEO of USAG. The Plaintiff attended national and international competitions with locations including but not limited to: San Jose, California; the "Karolyi Ranch" in Huntsville, Texas; other locations across the U.S. and elite competition sites spanning the globe, such as Japan, Australia, the United Kingdom, and the Netherlands. Complaint, ¶¶1,5,10, Ex. "1" to Declaration of Alex Cunny ("Cunny Decl."). These events were hosted, sanctioned, supervised, and/or endorsed by, under the supervision of, chartered, and/or under the mandate of USAG, Penny, and other defendants. Id. at ¶4, 22 24, Ex. "1". Despite disclaiming all responsibility for Nassar's conduct and role with USAG (Declaration of Steve Penny ("Penny Declaration"), ¶¶15-19, filed concurrently with Motion), Penny was the highest-ranking member within USAG and had the power to censure, discipline, or otherwise disallow Nassar from attending the event where he sexually abused the Plaintiff in California. Compl., ¶22, Ex. "1". Furthermore, in November of 2016, Penny directed a USAG employee to retrieve documents from the Karolyi Ranch, where the Plaintiff was abused, and during the pendency of an investigation by the Walker County Texas Rangers, in order to retrieve documents that are believed to be central to the Nassar cases. For this reason, and as explained further under the analysis of *Archdiocese of Milwaukee v. Superior Court* 112 Cal.App.4th 423 (2003), Penny's knowledge of complaints and malfeasance by Nassar, prior to the California event in San Jose, is germane to whether he directed Nassar, as the CEO of this organization, towards the Plaintiff in California. As such, Penny does not get a windfall for concealing and potentially destroying evidence.

Notwithstanding these facts, Penny applied to this Federal District Court in November of 2018, in order to protect his Fifth Amendment Rights with a stay pending the resolution of his criminal matter pending in Texas. *Ex Parte* Application for Stay, Ex. "2" to Cunny Decl. This

**1**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1   request for substantive relief under California Law is a recognition by Penny that California law

2   has authority over him, and thus, he is amenable to suit therein.

3       The Plaintiff respectfully requests that the Court deny this Motion, *in toto*, and hold Penny

4   amenable to suit in the State of California.

5   A.   <u>STEVE PENNY AND HIS ROLE AS PRESIDENT OF USAG</u>.

6       Penny served as President and CEO of USAG, and, in this capacity, assumed overall

7   management and strategic planning responsibilities for the organization. <u>Compl.</u>, ¶22. He began

8   his employment with USAG in 1999. <u>Penny Decl.</u>, ¶3. Penny oversaw a wide-ranging, calculated

9   concealment over numerous instances, complaints, and allegations of sexual abuse and

10  misconduct among the participants and members of Defendant USAG. <u>Compl.</u>, ¶22, 40. During

11  his tenure as President, Penny's actions and inactions enabled and ratified the sexual abuse by

12  Defendant Nassar against Plaintiff, alongside other participants and members of Defendant

13  USAG. *Id.* at ¶19-21, 22, 23, 24. Plaintiff believes, is informed, and alleges that as a direct result

14  of this active concealment of USAG-related abuse, Defendant Penny fostered an environment that

15  reduced the likeliness for victims to seek and obtain much-needed medical and/or psychological

16  treatment. Penny affirms that he served as President of Defendant USAG from in or around 2005

17  to 2017. <u>Penny Decl.</u>, ¶¶1-2. At all times herein alleged, Penny operated as an employee, agent,

18  and/or servant of Defendant USAG. <u>Motion</u>, 3:5-7; <u>Compl.</u>, ¶22, Ex. "1".

19      Most devastating to Penny's jurisdictional challenge is the inescapable, undisputed fact

20  that Plaintiff was sexually molested by Dr. Nassar at the 2012 Olympic Trials in San Jose,

21  California, while Steve Penny, as then-President of USAG, was present. <u>Declaration of Raisman</u>,

22  ¶ 3-5, Ex. "3" to <u>Cunny Decl.</u>; <u>Deposition of Lee Johnson</u> ("<u>Johnson Depo.</u>"), 29:8-9, Ex. "4" to

23  <u>Cunny Decl.</u>; <u>Motion</u>, 10: 15-18 ("Mr. Penny's duties as the CEO of USAG required traveling to

24  national and international competitions, including the 2012 Olympic Trials in San Jose"). A

25  defendant cannot visit California, mandate that a minor athlete attend, assume responsibility for a

26  minor, allow her to get molested, and then fly back home without consequence. Penny's attempt

27  to evade liability on jurisdiction grounds is an affront to well-established California law and those

28  injured in California, including Plaintiff, who are entitled to protection under the state's law.

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Penny, in his Motion to Dismiss, denies that she had any responsibility for the safety and well-being of gymnasts at competition.

While Penny proffers a declaration that conclusorily claims that he had no role with choosing Nassar to be a medical professional at the 2012 Olympic Trials, the evidence elicited about the duties of the President/CEO of USAG conflict with this declaration. <u>Penny Decl.</u>, ¶19; *see also* <u>Motion</u>, 10:16-18 (while "in San Jose, [Penny's] duties did not involve undertaking a duty to act as any gymnast's guardian within California"). Former president Kathy Scanlan (who was president from 1994 to 1998), explained that as president, there were some cases where she was responsible for the safety of members at events. <u>Deposition of Kathy Scanlan</u>, 77:3-78:3, Exhibit "5" to <u>Cunny Decl.</u> When questioned about her duties further, Ms. Scanlan provided the following testimony:

> "Q.   And you understood as the president that part of your job was to keep them safe, whatever state they were in, including California, correct?
>
> MS. KUBOTA: Objection; beyond --
>
> MR. BRUBAKER: I'm concerned --
>
> MS. KUBOTA: -- the scope.
>
> MR. BRUBAKER: -- about the scope of the inquiry.
>
> Q.   Go ahead.
>
> **A.   Yes.**" <u>Scanlan Depo.</u>, 161:20-162:4, Ex. "5" [Emphasis Added].

Ms. Scanlan further testified that she helped enact national policies to protect children, that USAG would publish the names of "terminated members" in the magazine published by USAG, and further declared in a declaration that, in her role as CEO of USAG, she was responsible for being involved with member discipline. *Id.* at 169:22-25, 170:2-4, Ex. "5"; <u>Declaration of Kathy Scanlan</u>, ¶¶2-5, Ex. "15" to <u>Cunny Decl.</u> Ms. Scanlan then stated, under oath, "**[u]ltimately, my job duties included ensuring the safety of minors at National and International events held by USAG.**" <u>Scanlan Decl.</u>, ¶2 [Emphasis Added], Ex. "5". Ms. Scanlan's successor, Robert Colarossi (who drafted the letter attached as Exhibit "A" to the Complaint), testified that he specifically addressed the grievance process with USOC, in order to protect children from harm. <u>Deposition of Robert Colarossi, Vol. 2</u>, 51:7-53:24, Ex. "6" to <u>Cunny</u>

///

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Decl. Mr. Colarossi then further stated that if a child was presented in an unsafe environment, USAG would inform the parents. *Id.* at 80:1-6.

At the deposition of **Penny**, when asked whether USAG had an obligation to protect minors who travelled without their parents, Penny responded: "**I believe we had a responsibility to do our best to protect the athlete in that environment, yes.**" Penny Depo., 202:2-4, Ex. "7". Mr. Penny went further to discuss how USAG provided medical care to elite athletes "was something we felt was the right thing to do." *Id.* at 214:1-11. Finally, Penny stated that it was also his province to review and evaluate bylaws such that USAG could "…protect young people." *Id.* at 218:22-219:7. As president, Penny was **clearly** responsible for the safety of USAG at competitions, despite his conclusory declaration to the contrary.

As President, Penny's connections to California were well-documented. In fact, during his own deposition, prior to the filing of the instant action, Penny, after noting that the Gymnastics World Championship "was held in San Jose in 2007," affirmed that San Jose was even called "**Gymnastics City USA.**" Penny Depo, 166:20-167:10 (emphasis added). Penny noted that this was a deliberate "branding term that the city created to demonstrate its commitment to hosting the Olympic trials," having hosted the Olympic national championships, the Olympic trials, and the even the world championships. *Id.* at 160: 1-25. Lee Johnson, Vice-President of Marketing for USAG, chronicled the extent to which Penny involved himself in the 2012 Olympic Trials in San Jose, California. Penny maintained involvement in the five to ten planning meetings prior to the 2012 Trials in San Jose. Johnson Depo, 30:17-23. Penny personally approved of the marketing materials for the 2012 Trials. *Id.* at 38:17-25. Penny orchestrated the budget for the even as well as outlined the "marketing [that] was going to be happening." *Id.* at 41:6-11. Penny personally oversaw Kathy Kelly, the vice-president of the women's program, during the event itself. *Id.* at 46:10-11. Penny maintained a "whole host of job duties that he was performing at that [San Jose] event." *Id.* at 47:25-48:3. Finally, Penny attended the actual event in San Jose, California. *Id.*, 29: 8-9. Now, however, despite his integral involvement in these events, Penny ardently denies California jurisdiction.

///

**4**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**B.      PLAINTIFF'S SEXUAL ABUSE BY USAG PHYSICIAN NASSAR.**

Plaintiff is a three time Olympic Gold Medalist, who trained and competed on behalf of the United States for the USAG and USOC. <u>Complaint</u>, ("<u>Compl.</u>") ¶1, Exhibit ("Ex.") "1" to <u>Declaration of Alex Cunny</u> ("<u>Cunny Decl.</u>"). During her time competing as an elite gymnast in the sport she loved, the Plaintiff was molested repeatedly by Nassar from in or around 2010 to 2012, and again, in or around 2015 during non-optional medical treatment. <u>Compl.</u>, ¶5, Ex. 1. To abuse the Plaintiff, Nassar used his trusted position as a doctor to gain access to the Plaintiff, tell the Plaintiff she suffered from a medical condition, and then inserted his ungloved fingers into her vagina without warning and without consent. <u>Compl.</u>, ¶5, 37. The sexual abuse suffered by the Plaintiff was not known to be illegitimate or sexually abusive, at the time, as she believed it was how such medical treatment should have been provided. *Id.* at ¶1,3,37. The sexual abuse occurred at numerous events and specifically, in California at a USOC event: the 2012 Olympic Trials in San Jose, California. <u>Declaration of Alexandra Raisman</u> ("<u>Raisman Decl.</u>"), ¶3-5, Ex. "2" to <u>Cunny Decl</u>. Furthermore, the sexual abuse of the Plaintiff occurred at the Karolyi Ranch, which **was an Olympic Training Site from 2011 forward.** <u>Compl.</u>, ¶8. As a result, the Plaintiff continues to suffer from depression, anxiety, and sequelae related to the abuse. *Id.* at ¶¶3,58-60.

**C.      INSTITUTIONAL KNOWLEDGE OF ABUSERS BY USAG.**

Nassar was the team physician for USAG from 1996 until 2015, and began as a trainer in 1986. <u>Compl.</u>, ¶24. Nassar was also retained by USOC and was an Osteopathic physician to provide care and athletic training to athletes for USOC and USAG. *Id.* Through this position of trust, Nassar perpetrated his abuse upon the Plaintiff, despite USOC and USAG concealing Nassar's abusive history and misrepresenting Nassar as being a safe physician. *Id.*

The Nassar abuse scandal was not the first time USAG became aware of abuse allegations in amateur sports. **In or around 1994, <u>and only months after the Plaintiff was born</u>, USAG President Kathy Scanlan was made aware of the serious threat posed to amateur athletes in gymnastics.** <u>Declaration of Scanlan</u>, ("<u>Scanlan Decl.</u>"), ¶2-3, Ex. "15" to <u>Cunny Decl.</u> These issues were communicated to USOC, though little was done. *Id.* at ¶¶4-5.

///

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    **In October of 1999, when Penny was employed by USAG,** the USOC was made aware,

2   in writing, that sexual abuse of gymnasts was a prevalent problem within the sport and that these

3   athletes were at a foreseeable risk. Compl., ¶44, Ex. "A" to Compl, Ex. "1". Colarossi informed

4   USOC that it had implemented a "…fundamentally flawed process…" for discipline of members

5   and that the USOC's process had an "…apparent indifference to the welfare of young children

6   manifest in the Committee's actions." *Id.* Colarossi and Scanlan testified that they were aware

7   that child molestation in gymnastics, by USAG professional members, was a problem that needed

8   to be fixed. Deposition of Scanlan ("Scanlan Depo.") 47:18-22, Ex. "5" to Cunny Decl.;

9   Deposition of Colarossi ("Colarossi Depo.") 28:8-15, 51:7-53:24, Ex. "6" to Cunny Decl.

10  **D.    PENNY'S RECENT CONCEALMENT AND POTENTIAL DESTRUCTION OF
        EVIDENCE BY USAG AGENTS.**

11

12      **In June of 2015**, an athlete came forward at the Karolyi Ranch and reported their abuse to

13  USAG officials. Deposition of Paul Parilla Volume II, 458:7-459:19, Ex. "8" to Cunny Decl.

14  After waiting five (5) weeks, Penny then reported to a well-known friend within the Federal

15  Bureau of Investigation ("FBI"), Mr. Jay Abbott. *Id.* at 457:24-458:14. For some reason, Nassar

16  was not arrested and it is unclear why the investigation stalled. In an e-mail to the USOC's Chief

17  Security Officer, Larry Buendorf, **Penny stated that he knew a "great guy" who was an FBI

18  agent in Indianapolis who would be a good fit for Mr. Buendorf's job.** E-mail correspondence

19  between Penny and Buendorf, 00002148, Ex. "16" to Cunny Decl.. An in-depth news article was

20  also published in November 2018 which illuminates Penny's close relationship with law

21  enforcement that investigated childhood sexual abuse. Indianapolis Star Article of November 11,

22  2018, Ex. "9" to Cunny Decl. These are facts supporting the concealment and conflict of interest

23  that Penny had in prior reports of suspected abuse to law enforcement. Compl., ¶22, Ex. "1".

24      **In November 2016**, Steve Penny, former president of USAG, directed an individual

25  (Amy White) to go to the Karolyi Ranch, and collect documents, given law enforcement wanted

26  to search the facility, pertaining to Nassar. Congressional Hearing Record, July 24, 2018-

27  Testimony of Kerry Perry, p.035-037, Ex. "10" to Cunny Decl. Ms. White purchased suitcases

28  and brought scores of documents back from the Karolyi Ranch with her. *Id.* At deposition Ms.

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

White invoked her 5th Amendment rights as to all USAG questioning. <u>Deposition of Amy White</u>, Ex. "11" to <u>Cunny Decl.</u> Penny was indicted in September of 2018 for this conduct.[1] <u>Indictment of Steve Penny</u>, Ex. "12" to <u>Cunny Decl.</u> Former USAG employee, Rhonda Faehn, testified that she told now-former president Kerry Perry about what Ms. White had done with the documents. <u>Deposition of Rhonda Faehn</u> ("<u>Faehn Depo</u>"), 152:17-167:9, Ex. "13" to <u>Cunny Decl.</u> Ms. Perry responded: "…**oh, that's not good**." *Id.* at 167:9[emphasis added].

**E.      ATTEMPTS TO OBTAIN DEPOSITION OF PENNY.**

After the removal of this matter to Federal Court (and given that Penny's deposition was previously taken before the instant Matter was filed), Plaintiff's counsel sought the deposition of Penny. <u>Cunny Decl.</u>, ¶3. The deposition was scheduled to proceed on October 23, 2018, by the agreement of counsel. *Id.* On October 18, 2018, counsel for Penny unilaterally took the deposition "off-calendar" and refused to appear. *Id.* A Certificate of Non-Appearance was obtained, Penny subsequently attempted to obtain a stay, which is now pending. *Id.* As such, Plaintiff's counsel has not had the opportunity to depose Penny regarding the timeframe and issues involved in the instant Matter, for which his testimony would be germane. *Id.* Plaintiff requests leave, in the event the Court is not inclined to deny Penny's Motion, for want of further discovery. *Id.*

**II.      ARGUMENT**

**A.      PERSONAL JURISDICTION MAY BE EXERCISED OVER DEFENDANT STEVE PENNY WHEN HE HAS MINIMUM CONTACTS WITH CALIFORNIA, RELATED TO THE ACTION, AND THE EXERCISE OF JURISDICTION DOES NOT OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.**

The State of California may exercise personal jurisdiction over a nonresident entity if the entity has certain minimum contacts with the forum state so that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Code of Civil Procedure* ("*C.C.P.*") § 410.10; *Int'l Shoe Co. v. Wash.*, (1945) 326 U.S. 310; *Pavlovich v. Superior Court*, 29 Cal.4th 262, 268 (2002); *Vons Companies, Inc. v. Seabest Foods, Inc.*, 14 Cal.4th 434, 444 (1996). The key to whether a state's exercise of personal jurisdiction comports with due process

---

[1] Contrary to the Congressional Statements of Ms. Perry, news reports of November 8, 2018 indicate that USAG located some documents that may have been "missing." <u>Indianapolis Star Article</u>, Ex. "9" to <u>Cunny Decl.</u> It is unclear whether these are the same documents.

**7**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1  is whether the defendant established minimum contacts in the forum state, which applies equally

2  to individual and corporate defendants; the court's inquiry must focus on the relationship among

3  the defendant, the forum, and the litigation. *Burger King Co. v. Rudzewicz*, 471 U.S. 462, 474

4  (1985); *see also World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). The

5  minimum contacts test is not susceptible to rote, mechanical application; rather, the facts of each

6  case must be carefully weighed to determine whether the requisite affiliating circumstances are

7  present. *Kulko v. Superior Court*, 436 U.S. 84, 92 (1978); *Snowney v. Harrah's Entertainment,*

8  *Inc.*, 35 Cal. 4th 1054, 1061 (2005). The relevant time period during which the "minimum

9  contacts" must have existed is when the cause of action arose, rather than those existing when the

10 complaint was filed. *Boaz v. Boyle & Co.*, 40 Cal.App.4th 700, 717 (1995) ("We shall assume

11 that the relevant period is when Emons' predecessors were distributing DES, some 25 years ago,

12 rather than just before Emons was served.") Since foreign (e.g. non-California) business entities,

13 by their inherent nature, can only operate through agents, courts may exercise jurisdiction over

14 such entities based upon the acts of their agents within the forum state, even where the

15 corporation engages in no business or other activities in the state. *Magnecomp Corp. v. Athene*

16 *Co.*, 209 Cal. App. 3d 526, 535 (1989). Here, however, USAG has engaged with the state.

17     A nonresident defendant may be subject to California's specific jurisdiction if a three-

18 prong test is met. First, the defendant must have purposefully availed himself to the state's

19 benefits. Second, the controversy must be related to or arise out of the defendant's contacts with

20 the state. Third, considering the defendant's contacts with the state and other factors, California's

21 exercise of jurisdiction over the defendant must comport with traditional notions of fair play and

22 substantial justice. *CollegeSource, Inc. v. AcademyOne, Inc.* (9th Cir. 2011) 653 F.3d 1066, 1076.

23 A plaintiff bears the burden of establishing the first two requirements, and, if plaintiff establishes

24 these requirements, the burden shifts to the defendant to show that California's exercise of

25 jurisdiction would be inherently unreasonable. *Gilmore Bank v. AsiaTrust New Zealand Limited*,

26 223 Cal. App. 4th 1558, 1567-69. "Where, as here, the defendant's motion is based on written

27 materials rather than an evidentiary hearing, 'the plaintiff need only make a *prima facie* showing

28 ///

**8**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

of jurisdictional facts to withstand the motion to dismiss.'" *CollegeSource, Inc. supra*, 653 F.3d 1066, 1073, *citing Burger King Co.*, 471 U.S. at 476-78.

While the Plaintiff does not contend that Defendant Steve Penny is subject to general jurisdiction, he is certainly subjected to specific jurisdiction, as he was present at the USAG event, the 2012 Olympic Trials in San Jose, California, where Plaintiff was abused by Larry Nassar. Johnson Depo, 29:8-9. Secondarily, Penny specifically played a pivotal role in recruiting the Plaintiff onto the USAG team, sending her to the 2012 Olympic Trials in San Jose, California, as a requisite to participating in the London 2012 Olympic Games. Therein, Plaintiff endured sustained abuse by Nassar under Penny's watch and with Penny's knowledge about rampant sexual abuse of minor gymnasts. Thus, Penny is subject to Specific Jurisdiction on several distinct bases:

**B.** **CALIFORNIA HAS A "SPECIAL INTEREST" IN PERMITTING MINORS TO SEEK REDRESS IN ITS COURTS FOR TORTS COMMITTED WITHIN ITS TERRITORY, ESPECIALLY VICTIMS OF ABUSE WHO ARE IN A "SPECIAL RELATIONSHIP" WITH AN ADULT OR ORGANIZATION *IN LOCO PARENTIS*.**

California recognizes that, where (as here) a statute is passed specifically governing an activity, the state has a "special interest" in governing the activity and may exercise jurisdiction exclusively on that basis over an act that causes effects in California: "[W]here the forum state has manifested a special interest in controlling the effects by enacting special legislation with respect thereto, the exercise of jurisdiction based upon such effects is justified." *Quattrone v. Superior Court*, 44 Cal.App.3d 296, 306 (1975). California has a special interest in exercising jurisdiction over those who commit tortious acts within its territory. *C.C.P.* §410.10 (Judicial Council Comments, (8); *citing Rest. Second* §36 ("A state has a special interest in exercising judicial jurisdiction over those who commit torts within its territory.") Furthermore, California's Long-Arm Statute's Comment from the Judicial Council provides that:

> "A state has power to exercise judicial **jurisdiction over an individual** who has done, **or has caused to be done**, an act in the state with respect to any cause of action in tort arising from such act, and any cause of action not in tort arising from such act unless the nature of the act and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." *C. C. P.* § 410.10 (Comment from Judicial Council) [emphasis added].

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

These Judicial Council Comments further to provide that, "[w]ith respect to the first of these factors, it is reasonable that a state should exercise judicial jurisdiction over the defendant as to causes of action arising from an act done, or caused to be done, by him in the state which the state subjects to special regulation." *Id.; Rosenblatt v. American Cyanamid Co.* 86 S.Ct. 1, 3 (1965). This is because California torts involve wrongful conduct that California seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor will be liable for damages that are the proximate result of the tort. *Abbott, supra,* at 277. Accordingly, the commission of a tortious act within California ordinarily justifies the exercise of specific personal jurisdiction in an action arising from the tortious act, and California courts may properly exercise personal jurisdiction over one who commits a tort or who causes a tort to be committed within the state. *Anglo Irish Bank Corp., PLC v. Superior Court,* 165 Cal.App.4th 969, 980 (2008); *In re Automobile Antitrust Cases I and II,* 135 Cal.App.4th 100, 109 (2005). It is enough that the complaint states a cause of action, in tort, based on the underlying act or omission, and the action may be based on injury to intangible interests as, for example, damage to one's reputation. *Abbott, supra,* at 279.

California has enacted a host of laws (and court decisions) to protect children from the ravages of sexual abuse, to hold their supervisors and guardians responsible and accountable for their protection, and to allow children to be raised in an environment devoid of sexual abuse and predation. *See C.C.P.* §340.1 [extended statute of limitations for victims of Childhood Sexual Abuse]; *Penal Code* §11166, *et seq.* [Child Abuse Neglect and Reporting Act ("CANRA")]. These laws evidence an unequivocal intention of the California legal system to prioritize minor children's rights and protect them from the threat of childhood sexual abuse. *See In re Clergy Cases I,* (2010) 188 Cal.App.4th 1224, 1235 *quoting Palmore v. Sidoti* 466 U.S. 429, 433 (1984) ("'[t]he State… has a duty of the highest order to protect the interests of minor children, particularly those of tender years.'").

Moreover, and as appears to be the crux of Penny's challenge, California law clearly imposes a substantive duty for adults to protect minor children in their custody, care, and control. *Doe v. United States Youth Soccer Association, Inc.* ("*USYSA*") (2017) 8 Cal.App.5th 1118. This

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

is commonly referenced, in California jurisprudence, as standing "*in loco parentis*" or in the place of parent. *USYSA* involved a minor soccer participant, who played in a locally-run organization overseen by a national affiliate; the minor was sexually abused by a coach in that program. *Id*. In *USYSA*, the court stated: "[i]n sum, we conclude that, as in *Juarez*, there was a special relationship between defendants and plaintiff." I*d*. [Emphasis Added]. To explain this special relationship, the Court relied on the following facts: "[h]ere, plaintiff was a member of US Youth and played on a West Valley team, which was the local affiliate of US Youth and Cal North. West Valley was required to comply with the policies and rules of US Youth. Since US Youth established the standards under which coaches were hired, US Youth determined which individuals, including [the perpetrator], had custody and supervision of children involved in its programs." *Id*. (emphasis added). In short, when the sexual well-being of children are at stake and organizations operate in loco parentis, California law imputes broad liability throughout and around the abusing individual and/or abusing entity to those with overlapping purview.

Despite the fact that Penny minimizes his role in allowing Larry Nassar's unrelenting abuse and discounts any responsibility for athlete safety at events, both in and beyond California, the facts presented clearly show that Penny, in his capacity as President of the USAG, had a duty to protect minor athletes. *See* Section I(A) *supra*. As President of USAG, Penny would have been intimately aware of the rampant, unaddressed sexual deviance that pervaded USAG operations, posing particular, identifiable, and recurrent threats to minors. Indeed, then-President of USAG Bob Colarossi noted in his 1999 letter to USOC that the safety procedures followed by USAG were part a "fundamentally flawed process" amidst an "apparent indifference to the welfare of young children manifest in the Committee's actions." <u>Compl.</u>, Ex. "A" to <u>Compl</u>. There is no evidence this problem suddenly abated. Moreover, during Penny's tenure, the members of the USAG National Team was comprised, nearly exclusively, of minors. Thus, California has a "special interest" in ensuring its remarkable young girls, like Plaintiff, are afforded redress in California forums for acts both occurring in California and having damaging effect in California.

///

///

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**C.** **SPECIFIC JURISDICTION CAN BE ASSERTED BY THE CALIFORNIA COURT OVER PENNY, GIVEN HIS PURPOSEFUL AVAILMENT TO CALIFORNIA.**

For specific jurisdiction to apply to an out-of-state entity or individual, a party must have only sufficient "minimum contacts" to be hauled into California Courts. *Vons Companies*, *supra*, at 446. Under the specific jurisdiction doctrine, a party is said to have such minimum contacts when that party purposefully avails itself of the privilege of conducting activities in the state, thereby invoking the benefits of that state's laws. *See Hesse v. Best Western Int'l, Inc.*, 32 Cal.App.4th 404, 410 (1995); *Vons Companies*, *supra*, at 446; *Pavlovich*, *supra*, at 268. A non-resident party that purposefully avails itself of a state's benefits is deemed to be on notice that it may be subject to litigation in the state, resulting from its activities while there. *Vons Companies*, *supra*, at 446-447, *citing World-Wide Volkswagen*, *supra* at 292. Unlike the substantial contacts required for the exercise of general jurisdiction, the exercise of specific jurisdiction requires that the controversy must "arise out of" or be related to the party's contacts with that state. *Vons Companies*, *supra*, at 446, *citing Burger King Corp.*, *supra*, at 472; *see also Hanson v. Denckla*, 357 U.S. 235, 250-53 (1958).

In determining whether a party has "purposefully availed" itself of the benefits of a state, the courts have applied several tests. One assesses if the party has deliberately engaged in "significant activities" within the state. *Vons Companies*, *supra* at 446. Another examines if the party has "purposefully directed" his activity at state residents. *Vons Companies*, *supra*, at 446, citing *Burger King*, *supra*, 471 U.S. at 475-476. Another is where the party "causes effects" within the state. *Secrest Machine Corp. v. Superior Court*, 33 Cal.3d 664, 669 (1983).

After deciding that a party purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Vons Companies*, *supra*, at 447-448, *citing Burger King*, *supra*, at 476, *and International Shoe*, *supra*, at 320. Courts may, for example, evaluate the burden placed upon the defendant associated with appearing in the forum, the forum state's interests in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and "the shared interest of

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1   the several States in furthering fundamental substantive social policies." *Vons Companies*, *supra*,

2   at 447-448. Thus, Penny is amenable to personal jurisdiction on two separate theories of specific

3   jurisdiction: jurisdiction arising from his intentional acts in California in 2012, as well as his

4   "purposeful directing" of activities to California, while negligent minors entrusted in the care of

5   Larry Nassar at the 2012 Olympic Trials in San Jose, California.

6       **1.**    **Committing a Tort in California is Sufficient for this Court to Exercise Specific Jurisdiction Over Defendant Penny's Conduct for His Role at the 2012 Olympic Trials in San Jose, California.**

7

8       Citing to *Pavlovich v. Superior Court* (2002) 29 Cal.4[th] 262, 270-71, Penny asserts that he

9   has committed no intentional tort aimed at the State of California: "most courts agree that merely

10  asserting that a defendant knew or should have known that his intentional acts would cause harm

11  in the forum state is not enough to establish jurisdiction under the effects test." <u>Motion</u>, 7:20-25.

12  The facts of *Pavlovich* are readily distinguishable with the present case. In *Pavlovich*, a Texas

13  company posted source code online that a California company deemed proprietary. Reasonably,

14  the Court held that the defendant's contacts with California did not meet… jurisdiction, since the

15  defendant neither aimed his tortious conduct at or targeted California, never worked in California;

16  had no property, bank accounts, or telephone listings there; and never solicited or transacted any

17  business in California. *Id*. at 262. By stark contrast, Penny personally orchestrated and attended

18  the Olympic Trials in the city calling itself "USA Gymnastics City" in California at which

19  Plaintiff was repeatedly molested. *Pavlovich* expressly articulates the test for establishing

20  personal jurisdiction for torts directed at a forum state, noting that, in the Ninth Circuit, the

21  plaintiff must show that the defendant acts in such a way that he knows is likely to illicit harm in

22  the forum state while "commit[ting] an intentional act… expressly aimed at the forum state." *Id*.

23  at 271. Committing an *intentional act* is not the same as committing an *intentional tort*, and, thus,

24  coordinating an event in the forum state satisfies the latter element. Furthermore, Penny joined

25  USAG in 1999 and became its CEO and President in 2005. Consequently, he was familiar with

26  Bob Colarossi's October 1999 letter, detailing the systemic, unaddressed abuse of minor athletes

27  within USAG by their physicians and coaches. <u>Compl.</u>, Ex. "A" to <u>Compl.</u> Turning a blind eye to

28  such chronic abuse and allowing Nassar to have unfettered access to Plaintiff satisfies the element

**13**

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1   that Penny knew his willful indifference was likely to illicit harm at an Olympic Trial event in

2   California. *Id.* Thus, jurisdiction is proper.

3       In *Hess v. Pawloski* (1927) 274 U.S. 352, the Court held that a nonresident who sustained

4   a car accident in the forum state could be sued in that forum state. *Id.* at 356. Specifically, in

5   analyzing the application of the forum state's long-arm statute, the Court held that "[i]t makes no

6   hostile discrimination against nonresidents, but tends to put them on the same footing as

7   residents. Literal and precise equality in respect of this matter is not attainable; it is not required.

8   [citation omitted]. The state's power to regulate the use of its highways extends to their use by

9   nonresidents as well as by residents." *Id.* at 356. The Court continued: "[t]he measure in question

10  operates to require a nonresident to answer for his conduct in the state where arise causes of

11  action alleged against him, as well as to provide for a claimant a convenient method by which he

12  may sue to enforce his rights." *Id.*

13      Moreover, in another case exploring the breadth of specific jurisdiction. "[i]t is sufficient

14  for purposes of due process that the suit was based on a contract which had substantial connection

15  with that State. [citations omitted] The contract was delivered in California, the premiums were

16  mailed from there and the insured was a resident of that State when he died." *McGee v.

17  International Life Ins. Co.* 355 U.S. 220, 223 (1957). As seen in *McGee*, **a single insurance

18  contract** sufficiently conferred jurisdiction onto the defendant insurance company, despite the

19  fact that the insurance company had no office or agent in California and "never solicited or d[id]

20  any insurance business in California apart from the policy involved [t]here." *Id.* at 220.

21  Nevertheless, the Court found that the Texas company could be properly hauled into California

22  court. *Id.* at 224.

23      As seen in *Hess*, *supra*, 274 U.S. 352, the unsurprising proposition that a nonresident must

24  answer in a state for their involvement in a car accident therein is directly analogous to the

25  situation at-bar, as Defendant Steve Penny personally attended the 2012 Olympic Trials in San

26  Jose, California, bearing responsibility for the recruitment and supervision of Plaintiff at that

27  event—as well as her subsequent abuse by Nassar. *See supra* Section A. Just as in *McGee*, this

28  single transaction is sufficient to assert jurisdiction over Defendant Steve Penny, given that,

**14**

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

"[t]he[] resident[] would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a foreign forum—thus in effect making the company judgment proof." *Id.* at 223. Just as the Texas company sought to avoid jurisdiction in *McGee*, so too does Defendant Penny. The critical exception between the present facts and *McGee* is that Defendant Penny was actually *physically present* in California during the tortious conduct giving rise to the present litigation.

Given the conduct of Defendant Steve Penny within the jurisdiction of California during the tortious conduct, specific personal jurisdiction is proper.

**2.** **Secondarily, Under the "Effects Test," Specific Jurisdiction Exists Because Penny Purposefully Availed Himself to the Benefits of the State of California by "Purposefully Directing" His Activities in the State in Coordinating an Olympic Trial in San Jose, California.**

Penny argues that he has not purposefully availed himself to the forum benefits of California. Motion, 9: 10-11. To this end, Defendant Penny alleges an insufficient connection between the forum and the specific claims at issue, citing to *Bristol Meyers Squibb v. Superior Court* (2017) 137 S. Ct. 1773, 1780. Motion, 9: 20-21. This claim is ridiculous. As noted above, Penny's contacts with the forum State of California were *extensive*, directly facilitating the California event at which Plaintiff endured abuse. Lee Johnson, Vice-President of Marketing for USAG, chronicled the extent to which Penny involved himself in the 2012 Olympic Trials in San Jose, California. Penny maintained involvement in the five to ten planning meetings prior to the 2012 Trials in San Jose. Johnson Depo, 30:17-23, Ex. "4". Penny personally approved of the marketing materials for the 2012 Trials. *Id.* at 38:17-25, Ex. "4". Penny orchestrated the budget for the even as well as outlined the "marketing [that] was going to be happening." *Id.* at 41:6-11, Ex. "4". Penny personally oversaw Kathy Kelly, the vice-president of the women's program, during the event itself. *Id.* at 46:10-11, Ex. "4". Penny maintained a "whole host of job duties that he was performing at that [San Jose] event." *Id.* at 47:25-48: 3, Ex. "4". Finally, **Penny attended the actual event in San Jose, California**. *Id.*, 29: 8-9 (emphasis added).

///

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

*Calder v. Jones*, 465 U.S. 783 (1984) serves as the leading case establishing the "effects test," an analysis by which out-of-state defendants can be hailed into California, even if their tortious conduct (in *Calder* itself, allegedly libelous publications) was written in Florida and only distributed in California. In *Calder*, the plaintiff, a California resident, filed a libel suit in California, for publications written and edited by several Florida defendants, including a publisher, reporter (South), and editor (Calder), all Florida residents. *Id.* at 784-85. The weekly publication, possessing a national distribution of 5,000,000 copies, distributed approximately 600,000 of those copies within California. *Id.* at 785. Upon the suit's filing, the publisher and distributing company both submitted to California jurisdiction, though the reporter and editor both challenged personal jurisdiction in California. *Id.* The reporter made several trips to California per year, whereas the editor had only been to California on two separate occasions, **both occasions being unrelated to the libel action.** *Id.* Nevertheless, the Court held both the reporter and editor subject to personal jurisdiction in California. *Id.* at 791. In so holding, the Court stated that the "[p]etitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, **their status as employees does not somehow insulate them from jurisdiction.**" *Id.* at 790 (emphasis added). The Court further held that, "petitioners are primary participants **in an alleged wrongdoing intentionally directed at a California resident**, and jurisdiction over them is proper on that basis." *Id.* (emphasis added).

Here, Defendant Penny emphatically insists that " [w]hile Mr. Penny's duties as the CEO of USAG required traveling to national and international competitions, including the 2012 Olympic Trials in San Jose, his duties did not involve undertaking a duty to act as any gymnast's guardian within California… [nor did he] control or direct the gymnasts, the medical care they received, or the results of the competition." <u>Motion</u>, 10: 15-20; *see also* <u>Penny Decl.</u>, ¶¶ 8, 17, 19. These claims are irrelevant for *purposes of establishing jurisdiction* in California. Serving a distinct role as an employee within an organization may minimize liability in a given cause of action but it "does not somehow insulate [him or her] from *jurisdiction.*" *Calder* at 465 U.S. at 790 (emphasis added). Defendant tries to reframe *Calder* by asserting that "[m]ere knowledge of

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1 tortious activity by the corporation is not enough to hold a director or officer liable for the torts of

2 the corporation absent other 'unreasonable participation' in the unlawful conduct," *citing to*

3 *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103, 114. <u>Motion</u>, 13: 8-11. However,

4 actively concealing child sexual abuse and turning a blind eye to unsupervised contact between

5 potential child molesters and minor athletes is *precisely the "unreasonable participation"* carved

6 out by *Taylor-Rush*.

7       Similarly, in *Brown v. Watson*, 207 Cal.App.3d 1306 (1989), the California Courts held

8 that a Texas law firm availed itself to personal jurisdiction in California. The firm performed

9 services in Texas that the court to be purposefully directed at the State of California. *See also*

10 *Simons v. Steverson*, 88 Cal. App.4th 693 (2001) (where personal jurisdiction over a New York

11 law firm was proper despite the fact that only one associate was licensed in California and none

12 of the subject matter legal services were performed in California). Several California residents

13 had retained a California law firm, which, in turn, retained a Texas law firm to perform legal

14 services in Texas. *Id.* Despite having been hired to perform legal services in Texas—and without

15 lawyers even licensed in California, not traveling to California, nor engaging with California to

16 perform any of the services of which the California plaintiffs complained—the Texas law firm

17 was still subject to California's dominion under specific jurisdiction. *Id.* at 1312. The Court based

18 jurisdiction on the Texas attorneys' continuous contacts with the California attorneys, and the fact

19 that the Texas attorneys had entered into a fee-splitting arrangement with the California attorneys

20 representing the plaintiffs. *Id.* at 1314-15.

21       Here, Penny approved hosting and personally orchestrated the 2012 Olympic Trials in San

22 Jose, oversaw selection the USAG National Team, and engaged in numerous press and publicity

23 events in California while assembling minor athletes to represent the USAG at the London 2012

24 Olympics. Under the "effects test" asserted in *Calder*, the fact that the abuse and repercussions

25 thereof occurred in California directly associated with a California event, is sufficient for

26 purposes of establishing personal jurisdiction over the event's principle overseer, USAG

27 President Penny. In attempting to defeat personal jurisdiction, Penny frames his lack of specific

28 jurisdiction in California around *Walden v. Fiore* 571 U.S. 277 (2014). ("[T]he defendant's suit

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

related conduct must create a substantial connection with the forum State… [and the relationship] must arise out of the contacts with… the forum state. Walden, supra, 571 U.S. 227 (2014)." Motion, 7:7-11. This case, whose facts are never explicitly referenced in Defendant's Motion, is clearly distinguishable. In *Walden*, the plaintiffs had residences in both California and Nevada, though they only offered California identification. *Id.* at 280. The plaintiff was travelling back to the continental U.S. from Puerto Rico, when they were questioned by TSA, who learned that they were carrying several thousands of dollars in cash. *Id.* at 279-80. DEA in Georgia detained the plaintiffs, and a DEA agent and local officer seized the funds. *Id.* at 280. The DEA released the plaintiffs without their funds. *Id.* The plaintiffs returned home and subsequently filed suit in Nevada for violations of their Constitutional rights against the local officer. *Id.* at 280-81. The Court held that "[p]etitioner's relevant conduct occurred entirely in Georgia, and the mere fact that his conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 291. Unlike in *Walden*, Plaintiff, as an elite gymnast targeted by the USAG to compete for the United States, was required to attend the 2012 Olympic Trials in San Jose, California, as a requisite to participate in the London 2012 games. As recognized by the Court in *Walden*, the facts of *Calder*, like here, show how the defendants conduct "…connected the **defendants' conduct** to California, not just to **a plaintiff** who lived there." *Id.* at 288 (emphasis added). The notion that an organization and its leadership can systematically take minor girls from across the country, subject them to an inherently dangerous environment resulting in molestation, and then insist that the orchestrator is not availing himself the state in which abuse occurs is fundamentally discordant with *Calder*. Under the "effects test," Penny should be held amenable to California's jurisdiction. California should not be forced to absorb the foreseeable consequences of abuse and then allow Penny to escape liability,

      i.   Penny's Concealment of Evidence Shows Why Jurisdiction Can Be Found Under *Archdiocese of Milwaukee*; As The Evidence That *Could Have Been Obtained About His Knowledge of Nassar*, Was Made Unavailable.

*Archdiocese of Milwaukee*, 112 Cal. App. 4th at 438 held that an entity cannot escape jurisdiction in California, when they direct a known pedophile to the State to be around children. *Id.* at 438. In *Archdiocese*, a known pedophile (Widera) was excardinated from the Milwaukee

**18**

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Archdiocese and then subsequently sent to parishes in California. *Id.* at 432. The perpetrator then molested children in California. *Id.* at 432-33. In holding the Archdiocese of Milwaukee amenable to suit in California, the court held that, "[t]he nature of the Milwaukee Archdiocese's conduct—sending a pedophile priest directly into California—meant the Milwaukee Archdiocese's conduct would harm California residents." *Id.* at 440. Here, there is substantial evidence, including a criminal indictment of Penny, that indicates that Penny took evidence that was material to a Texas law enforcement investigation regarding Nassar. <u>Penny Indictment</u>, Ex. "12"; <u>Walker County Press Release</u>, Ex. "14" to <u>DAC</u>. If Penny knew that Nassar was abusing girls, as is pleaded (<u>Compl.</u>, ¶_), prior to the Plaintiff being abused in California, then clearly, he would be amenable to jurisdiction in California under the "Effects Test" in *Calder* and its correlate, *Archdiocese of Milwaukee*. However, the documents at the Karolyi Ranch that were taken, very well could have contained such information, especially considering that they were taken with knowledge of a Nassar investigation being conducted on the Karolyi Ranch. <u>Walker County Press Release</u>, Ex. "14" to <u>DAC.</u> Plaintiff's counsel has already sent Rule 11 Notice to Nassar (<u>Cunny Decl.</u> ¶4), yet this concealment of evidence shows why Penny should not be able to benefit from this conduct. Effectively, by concealing evidence, Penny made his 12(b)(2) motion stronger, as it obscured potential further knowledge about abusers and Nassar. As such, this is an additional basis that Penny should not be permitted to challenge jurisdiction.

**D.** **UNDER CALIFORNIA LAW GOVERNING "GENERAL APPEARANCES," DEFENDANT PENNY'S MOTION TO STAY DISCOVERY HAS AVAILED HIM TO CALIFORNIA'S JURISDICTION.**

Penny filed with this Court a Motion to Stay Discovery until the conclusion of his criminal proceeding in Texas. <u>Motion to Stay</u>, Ex. "2". It is not enough to simply label one's appearance "special." The talisman for availing oneself to the jurisdiction of the Court is whether a party's actions crosses from objecting to a Court's dominion over a cause of action to actively calling upon the court's assistance. *See Renoir v. Redstar Corp.* (2004) 123 Cal.App.4th 1145, 1153. If a defendant raises an issue for resolution or seeks relief available only if the court maintains jurisdiction over the defendant or present cause of action, then the appearance is

///

**19**

considered a general one under California *Code of Civil Procedure* §1014[2] and its progeny, **thereby waiving any objections to personal jurisdiction**. *See Factor Health Management v. Superior Court* (2005) 132 Cal.App.4th 246, 250; *see also Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1037 ("if the movant seeks relief on any basis other than lack of personal jurisdiction, he or she makes a general appearance"); Merely namely a motion or pleading as a "special appearance," as Defendant Penny has done, "is not controlling." Motion to Stay, 5:3-5, Ex. "2"; *see Szynalski v. Superior Court* (2009) 172 Cal.App.4th 1, 11. Thus, Penny's Motion to Stay Discovery until after his criminal proceedings constitutes such a request for assistance from the Court and, by extension, submission to California's jurisdiction over the present matter.

Dial 800 v. Fesbinder (2004) 118 Cal.App.4th 32, 52-53, frames Penny's actions in their proper jurisdictional context, stating that "'[t]he [California] Court of Appeal ha[s] described the scope of actions in the litigation process which constitute a general appearance as follows: "A general appearance occurs where a party, either directly or through counsel, participates in any action in some manner which recognizes the authority of the court to proceed. It does not require any formal or technical act... '[i]f the defendant *raises any other questions, or asks for any relief which can only be granted upon the hypothesis that the court has jurisdiction of his person, his appearance is general.'"'* (emphasis in original). *See also California Overseas Bank v. French American Banking Corp.* (1984) 154 Cal.App.3d 179, 184, 201 Cal.Rptr. 400; see *Nam Tai Electronics, Inc. v. Titzer* (2001) 93 Cal.App.4th 1301, 1306–1309, 113 Cal.Rptr.2d 769; *disapproved on another ground in Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 278, fn. 8, 127 Cal.Rptr.2d 329, 58 P.3d 2.

///

---

[2] "A defendant appears in an action when the defendant answers, demurs, files a notice of motion to strike, files a notice of motion to transfer pursuant to Section 396b, moves for reclassification pursuant to Section 403.040, gives the plaintiff written notice of appearance, or when an attorney gives notice of appearance for the defendant. After appearance, a defendant or the defendant's attorney is entitled to notice of all subsequent proceedings of which notice is required to be given. Where a defendant has not appeared, service of notice or papers need not be made upon the defendant." *California Code Civ. Proc.*, § 1014.

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    Defendant may try to argue that California's clear, strict rules that distinguish general

2    appearances from special appearances should not apply, since the present action is in federal

3    court. However, *Federal Rule of Civil Procedure* 12(b), while governing appearance in federal

4    court, does not expressly define whether a party's appearance is special or general. This is not

5    because federal courts lack such a distinction for appearances or fail to recognize one[3], but,

6    rather, federal courts accept such a distinction as a creature of *state law*, particularly when parties

7    sit in diversity. Federal courts apply the state law accordingly.[4] Consequently, federal courts in

8    California recognize the applicability of California *Code of Civil Procedure* § 1014. Federal case

9    *Bluemner v. Ergo Media Capital, LLC* (C.D. Cal., June 4, 2015, No. CV 15-01392 MMM

10   AJWX) 2015 WL 3533218, at *4, states that "California *Code of Civil Procedure* §1014

11   provides, in relevant part, that a defendant generally appears in an action 'when the defendant

12   answers, demurs, files a notice of motion to strike, files a notice of motion to transfer pursuant to

13   Section 396b, moves for reclassification pursuant to Section 403.040, gives the plaintiff written

14   notice of appearance, or when an attorney gives notice of appearance for the defendant.' Cal.

15   Code Civ. Proc. § 1014. **This list is not exclusive**, however. *Hamilton v. Asbestos Corp.,* 22

16   Cal.4th 1127, 1147, 95 Cal.Rptr.2d 701, 998 P.2d 403 (2000). A defendant who invokes the

17   authority of the court or who affirmatively seeks relief available only if the court has jurisdiction

18   over the defendant is deemed to have made a general appearance'" (emphasis added), *see also*

19   *California Code of Civil Procedure* § 410.50(a), 1014 ("[the] statutory list of acts constituting an

20   'appearance' is not exclusive; rather, the term may apply to various acts which, under all of the

---

[3] "Notwithstanding the absence of an answer or pre-answer motion, **a defendant can still waive a personal-jurisdiction challenge by certain participation in the litigation**." *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir.2006). *See Gerber v. Riordan* (6th Cir. 2011) 649 F.3d 514, 522 (emphasis added).

[4] *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) mandates that a federal court must apply state substantive law in cases of diversity jurisdiction and federal procedural law, drawn from the Federal Rules of Civil Procedure. *Guaranty Trust Co. v. York*, 326 U.S. 99, 108 (1945), stated that some laws deemed procedural by the state (e.g. a limitations period in *Guaranty Trust* itself) would nonetheless be considered substantive for Erie purposes, given effect in federal-court if they were outcome-determinative and, most critically, lacking a federal rule in diametric opposition. Here, the lack of a federal distinction between general and special appearances but recognition in federal case law that such a distinction exist makes the application of *California Civil Procedure* §1014 in federal court appropriate under *Erie*.

**PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO STEVE PENNY'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(B)(2)**

circumstances, are deemed to confer jurisdiction of the person"). Consequently, Penny's invocation of the court's authority to stay discovery is just that—an invocation of the court's authority. Penny has waived his objection to personal jurisdiction in California and submits to the Court under *Cal. Code Civ. Proc.* § 1014.

**E.** **PLAINTIFF SEEKS LEAVE, IN THE ALTERNATIVE, TO FINISH THE ALREADY PENDING JURISDICTIONAL DISCOVERY AGAINST DEFENDANT STEVE PENNY.**

Notwithstanding the arguments set forth herein, Plaintiff requests that a continuance be granted by the Court, in order to pursue and complete discovery that was ordered to proceed on October 23, 2018; specifically, the deposition of Penny. Cunny Decl., ¶3. The parties were in the midst of discovery when the instant Opposition was due, Penny continued to refuse to sit for deposition and Plaintiff believes that his deposition will be germane to many of the issues raised in the instant Matter, which may yield information that is relevant to the analysis of personal jurisdiction. *Id.*

## III. CONCLUSION

The Plaintiff respectfully requests that the Court deny Penny's Motion to Dismiss and assert its personal jurisdiction over him. In the alternative, Plaintiff requests leave to conduct the deposition of Penny which was previously set to occur October 23, 2018, but has not been placed back on-calendar.

Dated: November 21, 2018

MANLY, STEWART & FINALDI

By: _____
ALEX E. CUNNY, Esq.
Attorney for Plaintiff,
ALEXANDRA ROSE RAISMAN

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**22**

JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys of Record for Plaintiff, ALEXANDRA ROSE
RAISMAN, an individual

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES OLYMPIC COMMITTEE, a Business Entity of Form Unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual; STEVE PENNY, an individual; PAUL PARRILLA, an individual; and DOES 1 through 500. | Civil Case No. 5:18-cv-02479-BLF<br><br>[The Honorable Beth Labson Freeman]<br><br>**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA RAISMAN'S OPPOSITION TO DEFENDANT STEVE PENNY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER *FEDERAL RULE OF CIVIL PROCEDURE* 12(B)(2); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Hon. Judge Beth Labson Freeman**<br><br>[Filed concurrently with Declaration of Alex E. Cunny]<br><br>Complaint filed: February 28, 2018<br><br>Hearing:    February 7, 2019<br>Time:      9:00 a.m.<br>Judge:    Honorable Beth Labson Freeman<br>Courtroom: 3 |

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## DECLARATION OF ALEX E. CUNNY

I, ALEX E. CUNNY, hereby declare:

1. I am an attorney duly licensed to practice law in the State of California. I am an attorney with Manly, Stewart & Finaldi, attorneys of record for ALEXANDRA ROSE RAISMAN (hereinafter, the "Plaintiff"), in the above-entitled matter. I am personally familiar with the facts of this case and the contents of this Declaration, and if called upon, could and would competently testify as to its contents.

2. This Declaration is made in support of the Plaintiff's Opposition to Defendant Stephen "Steve" Penny's Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2).

3. The deposition of Penny was planned to occur on October 23, 2018. After Penny was indicted in the State of Texas, Walker County, in September, pertaining to the allegations in the criminal indictment attached as Exhibit "15", he was arrested just prior to his deposition that was scheduled and agreed to proceed. On October 18, 2018, Penny's counsel indicated that he would not be appearing for deposition. Furthermore, Penny filed an *ex parte* Application to Stay these proceedings, based upon his Fifth Amendment rights. Plaintiff's counsel was unable to obtain his testimony *in this matter*, despite the fact he was deposed in the *Jane LM Doe* matter prior to the filing of the instant case. As such, in the event the Court believes the evidence set forth is insufficient to develop the record, Plaintiff's counsel requests leave to obtain the testimony of Penny, who will undoubtedly have relevant information pertaining to his claims that there is no jurisdiction in California, including cross-examination as to the declaration Penny subsequently filed in support of his Motion to Dismiss.

4. Counsel for the Plaintiff has given Penny notice of an *FRCP* 11 Motion, under the safe harbor requirements on October 22, 2018. This is, essentially, for Penny to withdraw his Motion, as the inequitable nature of his conduct makes his request for dismissal on jurisdictional grounds, made in bad-faith. Plaintiff's counsel has not yet received any acknowledgment that the offending pleading will be withdrawn, though, the Plaintiff's counsel requests leave in the event

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

there is a question as to the viability of Penny's jurisdictional defense.

5.     Attached hereto as Exhibit "1" is a true and correct copy of Plaintiff Alexandra Raisman's Complaint, which is the operative complaint in the instant Matter.

6.     Attached hereto as Exhibit "2" is a true and correct copy of Steve Penny's Application for a Stay on an *Ex Parte* Basis, which was filed in this matter, as Docket No. 78.

7.     Attached hereto as Exhibit "3" is a true and correct copy of the Declaration of Alexandra Raisman.

8.     Attached hereto as Exhibit "4" is a true and correct copy of the relevant portions of the Deposition of Lee colaro.

9.     Attached hereto as Exhibit "5" is a true and correct copy of the relevant portions of the Deposition of Kathy Scanlan.

10.    Attached hereto as Exhibit "6" is a true and correct copy of relevant portions of the Deposition (Vol. 2) of Robert Colarossi. This deposition was taken in a different matter, prior to this action being filed.

11.    Attached hereto as Exhibit "7" is a true and correct copy of the relevant portions of the Deposition of Steve Penny. This deposition was taken in a different matter, prior to this action being filed.

12.    Attached hereto as Exhibit "8" is a true and correct copy of the relevant portions of the Deposition of Paul Parilla, Volume II. This deposition was taken in a different matter, prior to this action being filed.

13.    Attached hereto as Exhibit "9" is a true and correct copy of the Indianapolis Star Article (November 11, 2018) titled, "As evidence mounted, IMPD child abuse investigator defended USA Gymnastics." This document was retrieved on November 20, 2018 from the following website:

https://www.indystar.com/story/news/2018/11/11/usa-gymnastics-larry-nassar-sexual-abuse-scandal-impd-detective-bruce-smith-conduct-under-review/1693853002/

14.    Attached hereto as Exhibit "10" is a true and correct copy of the Congressional

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1  Hearing (July 24, 2018)—Testimony of Kerry Perry, Pg. 35-37. a true and correct copy of the

2  Congressional Transcript for the Senate Commerce, Science and Transportation Subcommittee on

3  Consumer Protection, Product Safety, Insurance and Data Security Holds Hearing on Protecting

4  Amateur Athletes, from July 24, 2018. Pursuant to *FRCP* 201(b), the Plaintiff makes a request

5  that the Court judicially notice this document as it is a Congressional Record that was published

6  at one point in the Congressional Quarterly.

7    15.    Attached hereto as Exhibit "11" is a true and correct copy of the relevant portions

8  of the Deposition of Amy White. This deposition, considering the numerous instructions not to

9  answer, is relevant to Plaintiff's inability to obtain evidence surrounding the alleged concealment

10  of records at the Karolyi Ranch, and necessity for the deposition testimony of Penny.

11    16.    Attached hereto as Exhibit "12" is a true and correct copy of the Indictment of

12  Steve Penny. This indictment was obtained from the clerk of the Walker County Court, who

13  provided a certified copy of the document to my office. In light of the e-filing requirements, we

14  have scanned a true and correct copy of that document that was received from Walker County, as

15  well as the seal of that document. Pursuant to *FRCP* 201(b), the Plaintiff makes a request that the

16  Court judicially notice this document as it is an official court record from the State of Texas and

17  is not be reasonably questioned as to its accuracy.

18    17.    Attached hereto as Exhibit "13" is a true and correct copy of the relevant portions

19  of the Deposition of Rhonda Faehn. Though the face page of this document indicates that there

20  are "confidential portions" of the transcript, none of those confidential portions have been

21  attached hereto.

22    18.    Attached hereto as Exhibit "14" is a true and correct copy of the Walker County

23  Press Release sent after the arrest of Steve Penny by authorities. This release was obtained from

24  the internet and is believed to have been sent by the Walker County District Attorney's office.

25    19.    Attached hereto as Exhibit "15" is a true and correct copy of the Declaration of

26  Kathy Scanlan.

27  ///

28

**4**

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA
ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO
*FRCP* 12(b)(2), (6)**

20.    Attached hereto as Exhibit "16" is a true and correct copy of the e-mail correspondence between Larry Buendorf and Penny, regarding Jay Abbott. This document was produced by USOC as "USOC-LIT-00002148."

I hereby declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this November 21, 2018 at Irvine, California.

By: _____
ALEX E. CUNNY, Esq.,
Declarant

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**5**
**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

# EXHIBIT "1"

E-FILED
2/28/2018 3:09 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV323989
Reviewed By: G. Reyes

JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX CUNNY (State Bar No. 291567)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys of Record for Plaintiff, ALEXANDRA ROSE
RAISMAN, an individual

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual. <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual, STEVE PENNY, an individual, PAUL PARRILLA, an individual, and DOES 1 through 500. <br><br> Defendants. | Case No.:       18CV323989 <br> Judge: _____ <br> Department: _____ <br><br> **COMPLAINT FOR DAMAGES FOR:** <br><br> 1) **SEXUAL HARASSMENT (_C.C._ § 51.9);** <br> 2) **MASHA'S LAW (18 _U.S.C._ §§2255, 2423(b), 2423(c))** <br> 3) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;** <br> 4) **UNFAIR BUSINESS PRACTICES (_CAL. BUS. & PROF. CODE_ §17200);** <br> 5) **BREACH OF FIDUCIARY DUTY;** <br> 6) **CONSTRUCTIVE FRAUD;** <br> 7) **NEGLIGENCE;** <br> 8) **NEGLIGENT SUPERVISION** <br> 9) **NEGLIGENT RETENTION/ HIRING;** <br> 10) **NEGLIGENT FAILURE TO WARN;** <br> 11) **GENDER VIOLENCE (_C.C._ §52.4);** <br> 12) **SEXUAL BATTERY.** <br><br> [Filed pursuant to _C.C.P._ §340.1] <br><br> **DEMAND FOR JURY TRIAL.** |

**COMES NOW**, Plaintiff ALEXANDRA ROSE RAISMAN (hereinafter referred to as "Plaintiff" or "ALY RAISMAN") who complains and alleges as follows:

EXHIBIT 1
001

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## GENERAL ALLEGATIONS AS TO THE PARTIES

1.      This case arises from the serial molestation, sexual abuse and harassment of ALY RAISMAN, three-time Olympic gold medalist, by her trusted team physician and former Olympic Team Doctor Defendant Lawrence "Larry" Gerard Nassar ("NASSAR"), while ALY RAISMAN was a young girl and woman, competing for the honor of her country. These molestations of the Plaintiff occurred over several continents, on numerous occasions, and could have been prevented, had Defendants USA Gymnastics ("USAG"), the United States Olympic Committee ("USOC") or former president of USAG, Defendant STEVE PENNY ("PENNY") had taken the mandate of ALY RAISMAN's safety, and numerous other minors in their care, seriously. Despite having knowledge that NASSAR had been sexually abusive towards minor, been left in solitary contact with minor girls, and having been notified that NASSAR was a pedophile (or could have learned of such through reasonable diligence), Defendants USAG, USOC, PENNY and DOES 1 through 500 instead put their quest for money and medals, above the safety of the Plaintiff and other minor competitive athletes; athletes who were responsible for the financial success and prosperity of those Defendants. The Plaintiff, ALY RAISMAN, began her gymnastics career at the tender age of two (2) years old, and gained her inspiration from watching and re-watching a VHS tape of the "Magnificent Seven" at the 1996 Olympics held in Atlanta, Georgia and who won the Women's Team Final. Since that time, ALY RAISMAN dedicated her childhood to the pursuit of honoring that legacy, competing in the Olympics, and winning a gold medal for her country. The Plaintiff accomplished this monumental goal by the age of eighteen (18) years old, all while being serially molested by her confidant and trusted physician, NASSAR, under the watch of Defendants USOC, USAG, PENNY and DOES 1 through 500.

2.      Despite having the power, authority, and mandate to do so, the Defendants USAG, USOC, PENNY and DOES 1 through 500 never intervened to discipline Defendant NASSAR, never ensured that Defendants USAG and NASSAR were following Defendant USOC rules and mandates, and through the express disregard for the safety of minors, allowed Defendant NASSAR to continue in his position of trust, power and access to ALY RAISMAN, as well as numerous

///

EXHIBIT 1
002

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    other elite minor athletes who competed with ALY RAISMAN. After Defendant NASSAR was

2    only finally removed from his position at USAG, he continued to sexually abuse minors in his role

3    as a physician for over a year.

4         3.     To this day, ALY RAISMAN continues to suffer depression, anxiety and fear

5    stemming from her abuse by Defendant NASSAR, which affects her daily life, including but not

6    limited to the Plaintiff not trusting medical professionals, not trusting adult males, and constantly

7    suffering from feelings of fear, anxiety, and depression. In addition to this psychological and

8    physical trauma suffered by ALY RAISMAN, the Plaintiff continued to train for years in pain,

9    believing that Defendant NASSAR was properly treating her physical ailments associated with her

10   sport. When she was young, ALY RAISMAN always felt guilty for thinking NASSAR was weird,

11   and questioned why she did not like the purported best gymnastics doctor in the world, though she

12   did not understand the purported medical treatment she was receiving, at that time, was sexual

13   abuse. Upon learning that this was not legitimate treatment, the Plaintiff suffered further

14   humiliation, guilt, shame, and disgust.

15                   **THE PLAINTIFF**

16                   **ALY RAISMAN**

17        4.     The Plaintiff ALY RAISMAN is now a young adult female who currently resides

18   in the State of Massachusetts, who was born on May 25, 1994. The Plaintiff ALY RAISMAN was

19   formerly an elite minor gymnast who was sexually abused by NASSAR believing this was medical

20   treatment, while competing in National and International Competitions, including but not limited

21   to competitions in California, Japan, the Karolyi Ranch in Huntsville, Texas (and other locations

22   across the United States and internationally, including in Europe, Asia and Australia) that were

23   hosted, sanctioned, supervised, and/or endorsed by, under the supervision of, chartered, and/or

24   under the mandate of Defendants USAG, USOC, and DOES 1 through 500. During many of these

25   events, the Defendants USOC, USAG, PENNY, and DOES 1 through 500, took care, custody and

26   control of Plaintiff ALY RAISMAN and stood *in loco parentis* with her and her parents.

27   Defendants USOC, PENNY and USAG had a duty to protect ALY RAISMAN from known or

28   foreseeable dangers, such as Defendant NASSAR, and to promptly investigate, censure, discipline,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    and/or remove Defendant NASSAR; and/or take remedial actions; actions they never took until

2    after the cessation of ALY RAISMAN's abuse.

3        5.      The Plaintiff was an elite level gymnast and member of Team USA who competed

4    and trained in National and International competitions on behalf of the United States. These

5    National and International competitions and trainings occurred in places including, but not limited

6    to: Santa Clara County in California, the "Karolyi Ranch" located in Huntsville, Texas and other

7    locations across the United States and internationally, including the most elite competitions

8    occurred in Asia, Australia, and Europe. During many of these competitions, the Plaintiff was

9    subjected to sexual harassment, sexual assault, sexual abuse and molestation by Defendant

10   NASSAR, including but not limited to competitions and trainings that occurred in Santa Clara

11   County in California, at the Karolyi Ranch in Huntsville, Texas, in Japan, and other locations

12   across the United States and internationally, including Europe and Australia. The Plaintiff was

13   sexually abused on numerous occasions and at numerous locations in or around 2010 through in

14   or around 2012, and in 2015. This sexual abuse of the Plaintiff occurred at events where

15   Defendants USAG, USOC, PENNY and DOES 1 through 500 were responsible to supervise the

16   Plaintiff, ensure proper medical procedures and protocols were followed, warn the Plaintiff of

17   known dangers, and to provide for her safety.

18       6.      This action is brought pursuant to *Code of Civil Procedure* §340.1, which governs

19   the statutes of limitations arising from childhood sexual abuse. As a victim of childhood sexual

20   abuse, and a young adult under the age of 26 years old, thus, ALY RAISMAN's action is timely.

21                                    **DEFENDANTS**

22              **DEFENDANT, UNITED STATES OLYMPIC COMMITTEE ("USOC")**

23       7.      Defendant USOC, at all times mentioned herein, was and is a business entity of

24   form unknown, having its principal place of business in the State of Colorado and is headquartered

25   in Colorado Springs, Colorado. The USOC is a federally chartered nonprofit corporation, which

26   was reorganized by the Ted Stevens Amateur Sports Act, originally enacted in 1978. As advertised

27   on its website, "[t]he USOC has two primary responsibilities in its oversight of Olympic and

28   Paralympic sport in the United States. The first is to generate resources in support of its mission,

-4-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
004

which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end." Furthermore, Defendant "…**USOC is committed to creating a safe and positive environment for athletes' physical, emotional and social development and to ensuring that it promotes an environment free of misconduct.**" Under the Ted Stevens Amateur Sports Act, 36 *U.S.C.* §§220501, *et seq.* (hereinafter, "Ted Stevens Act") Defendant USOC had a mandatory obligation to ensure that before granting NGBs, including USAG, a sanction to host National or International events, that they provide "**proper medical supervision will be provided for athletes who will participate in the competition.**" 36 *U.S.C.* §§220525(b)(4)(E).

8.      For in or around 2011 through the cessation of the Plaintiff's sexual abuse by Defendant NASSAR, the "Karolyi Ranch" was designated as being the United States' Olympic Training Center, thus, was required to follow all protocols, mandates, policies, bylaws, rules, and/or practices of Defendant USOC (as well as Defendant USAG).

9.      During all relevant times during ALY RAISMAN's abuse, Defendant USOC was responsible for ensuring that the Karolyi Ranch, provided adequate supervision for the minors competing thereat, reasonable safety protocols ensuring the safety of those minors, and reasonable supervision, training, and oversight procedures for all medical care provided to gymnasts at the Karolyi Ranch, including training of staff on identification of sexual abuse, proper procedures, use of proper medical care, and staffing of ample medical personnel to ensure proper care of all minor gymnasts, including the Plaintiff ALY RAISMAN. Despite these duties under the law, Defendant USOC implemented virtually no safety protocols or procedures at the Karolyi Ranch, and failed to provide any supervision for minor gymnasts training at the Karolyi Ranch.

10.      At all times relevant to the Plaintiff's sexual abuse at the hands of NASSAR, Defendant USOC was responsible for the Plaintiff's supervision while competing at the Olympics, the Olympic Trials, and the World Artistic Gymnastics Championships and trainings for such. Despite being the body responsible for the Plaintiff's safety during these events, including, being responsible for her supervision, medical care, and well-being, Defendant USOC provided entirely inadequate or effective measures to ensure her protection from the risk of sexual abuse, either at

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9900

COMPLAINT FOR DAMAGES

EXHIBIT 1
005

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

1   the events or in her living quarters, where sexual abuse by NASSAR occurred. Despite competing

2   in Australia, Japan, the United Kingdom and the Netherlands (among other international sites), the

3   Plaintiff ALY RAISMAN was either provided no supervision while medical treatment was

4   performed in her living quarters by NASSAR or USAG employee Debbie Van Horn was present

5   for such treatment. Based on information, and therefore belief, despite Ms. Van Horn being

6   represented as a qualified medical professional, she was not properly trained to supervise

7   NASSAR, not given mandate to do so, and was otherwise present for sexually abusive treatments

8   that NASSAR would perform, without reporting such to law enforcement or the proper authorities.

9   This is how and why NASSAR was allowed solitary access to these minors, including the Plaintiff

10  ALY RAISMAN, or alternatively, was allowed to abuse minors (such as the Plaintiff) in the

11  presence of USAG staff (Ms. Van Horn).

12          11.     In 2010, during the Plaintiff ALY RAISMAN's sexual abuse at the hands of

13  NASSAR, Defendant USOC convened what it termed the "Working Group for Safe Training

14  Environments" in order to address, among many things, physical and sexual abuse of amateur

15  athletes in National Governing Bodies ("NGB"). It was not until 2011, after this commission met,

16  that Defendant USOC hired an individual to head its "SafeSport" program and not until 2012 that

17  a "SafeSport" Handbook was adopted and promulgated safeguards and safety protections for

18  minor athletes, from the ravages of sexual abuse. Despite only instituting these SafeSport policies

19  in 2012, Defendant USOC was acutely aware of the ravages of sexual abuse posed to minors in

20  amateur sports, **for at least a decade prior to this SafeSport program being created**, as they

21  were informed by former Defendant USAG President, Robert "Bob" Colarossi. *See infra.*

22          12.     As a requirement for NGBs, such as Defendant USAG, to remain in "good

23  standing" with Defendant USOC, Defendant USOC policies require that USAG "…l) comply with

24  the safe sport policies of the corporation and with the policies and procedures of the independent

25  safe sport organization designated by the corporation to enhance safe sport practices and to

26  investigate and resolve safe sport violations (no exceptions to this requirement shall be allowed

27  unless granted by the CEO, or his or her designee, after allowing the [NGB] or PSO to present the

28  reasons for such exception)…" The Plaintiff is informed and believes, and on that basis alleges,

COMPLAINT FOR DAMAGES

EXHIBIT 1
006

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    that the Safe Sport program was introduced in or around 2011, and that such policies have become

2    more stringent over the years. Nevertheless, the Defendant USOC continued to fail to adequately

3    enforce these policies against Defendant NASSAR, and has continually failed to uphold said

4    policies through proper reporting, supervision, mandates on NGBs (including Defendant USAG),

5    and other preventative procedures. Even as the SafeSport policies state today herein, Defendant

6    USOC still failed to uphold these policies and procedures, had they been in-place at the

7    commencement of ALY RAISMAN's sexual abuse. Defendant USOC has and had a culture and

8    atmosphere that conceals known and suspected sexual abusers, which transcends all policies and

9    procedures that are set in-place. For this reason, Defendant USOC has a practice and culture of

10   ignoring its own internal rules and mandates for NGBs, in order to protect its reputation and blind

11   itself to known abusers within the ranks of NGBs for which it is responsible.

12        13.    Moreover, the Defendant USOC currently promulgates the SafeSport policies that

13   prevent "…USOC employees, coaches, contracted staff, volunteers, board members, committee

14   and task force members, and other individuals working with athletes or other sport participants

15   while at an OTC, whether or not they are employees of the USOC" and "…[a]thletes training

16   and/or residing at a USOC Olympic Training Center" from engaging in sexually abusive

17   misconduct, including "child sexual abuse" and "sexual misconduct." *See* USOC Safe Sport

18   Policies, Section II(c). SafeSport policy also has policies for identifying "grooming" behaviors,

19   which it defines as, "…the most common strategy used by offenders to seduce their victims."

20        14.    Subsequent to sometime in 2012, Plaintiff is informed and believes and on that

21   basis alleges that these policies (or prior versions that were similar or less restrictive) were in effect

22   at Defendant USOC, and applied to Defendant USAG. Despite the existence of these policies after

23   2012, Defendant USOC allowed Defendant NASSAR to continue to participate with minor

24   children at Defendant USAG, the NGB for Women's Gymnastics, and failed to adequately enforce

25   these policies, or mandate that Defendant USAG enforce these policies. Due to its systemic and

26   knowing failure to enforce these policies, the Plaintiff was sexually harassed, abused, and molested

27   by Defendant NASSAR; an individual who was subject to these policies. Plaintiff is informed, and

28   on that basis, believes that Defendant USAG was at all times in "good standing" with Defendant

-7-
COMPLAINT FOR DAMAGES

EXHIBIT 1
007

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

USOC, despite failing to adhere to, and enforce the SafeSport policies, which it violated by allowing Defendant NASSAR access to minor gymnasts, including the Plaintiff ALY RAISMAN. Furthermore, in failing to report suspected child abuse of Defendant NASSAR and/or failing to enforce policies and procedures to prevent said sexual abuse of minors, the Defendant USOC prevented the Plaintiff and her parents from avoiding the sexual abuse of the Plaintiff and/or ceasing it sooner.

15. Further, Defendant USOC was required to ensure that NGBs, including Defendant USAG, ensure that "**proper safety precautions have been taken to protect the personal welfare of the athletics and spectators at the competition.**" 36 *U.S.C.* §§220525(b)(4)(F). Moreover, as part of an NGB's mandate from the Defendant USOC, it was to, "**encourage and support research, development, and dissemination of information in the areas of sports medicine and sports safety.**" 36 *U.S.C.* §220524(9). Had Defendant USOC performed its mandate reasonably, diligently, and in accord with its duty to protect minor children under both Federal and California Law, Defendant NASSAR would have been investigated, sanctioned, and/or removed from Defendants USAG, USOC, and others, and never have been placed in solitary contact with the Plaintiff. Defendant USOC never adequately or reasonably enforced these policies, thus, the sexual abuse perpetrated by Defendant NASSAR on the Plaintiff, as well as hundreds of other minor girls, was a natural, probable and foreseeable outgrowth of Defendant USOC's dereliction of its duties. Defendant USOC willfully blinded itself and its officers, agents, employees, and servants, to ravages of sexual abuse that were rampant in amateur sports and in organizations for which it was responsible to supervise, including Defendant USAG.

16. In March of 2017, under the United States Senate Judiciary Committee's inquiry into the failure of the Defendants USAG and USOC in protecting gymnasts from sexual assault, specifically centered around Defendant NASSAR, the Defendant USOC's president publicly admitted, "[t]he Olympic community failed the people it was supposed to protect."

17. Plaintiff is informed, and believes, and on that basis alleges that Defendant USOC was aware, at the highest levels of its organization, that Defendant NASSAR had molested Olympian and National Team level gymnasts who participated with Defendant USAG, an NGB

-8-

COMPLAINT FOR DAMAGES

EXHIBIT 1
008

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-5990

under Defendant USOC's charter, while Defendant NASSAR was permitted to return to his medical practice at Michigan State University ("MSU") without MSU being warned, advised or otherwise contacted by Defendants USOC or USAG regarding Defendant USOC's knowledge of NASSAR's sexual abuse of elite, minor gymnasts. Plaintiff is informed and believes, and on that basis alleges that despite having actual knowledge of Defendant NASSAR's molestation of minor gymnasts as early as 2015, Defendant USOC concealed their involvement with Defendant USAG, concealed its knowledge of Defendant NASSAR's sexual misconduct with minor children, and ultimately, misdirected the United States Senate into believing that Defendant USOC had only failed to protect minor gymnasts through lack of oversight. Plaintiff is informed and believes, and on that basis alleges, that Defendant USOC knew that NASSAR had been removed from Defendant USAG for allegations of child molestation as early as 2015 (as it was Defendant USOC's custom and practice to necessarily learn of reports of child molestation by a NGB employee, like those made to Defendant USAG in 2015) given that Defendant USOC was responsible for the supervision of Defendant USAG. Nonetheless, Defendant USOC had representatives present at the March 2017 Senate Judiciary Committee Hearing and concealed their prior knowledge of Defendant NASSAR being a pedophile and sexual abuser; leaving the Senators, those present, and the public with the false impression that Defendant USOC simply failed to implement proper procedures to prevent abuse. During this hearing, and as early as 2015, Defendants USOC, USAG and PENNY had knowledge that Defendant NASSAR had abused young girls, and that he continued to sexually abuse young girls for over another year at MSU, without notifying, informing, or otherwise communicating this knowledge to MSU.

18.    Under California *Penal Code* § 11165.7, Defendant USOC is an organization whose employees, agents, and/or servants are legally "mandated reporters", considering that Defendant USOC is a youth recreational program and Defendant USOC's employees' duties require direct contact and supervision of children.

### DEFENDANT, USA GYMNASTICS ("USAG")

19.    USAG, at all times mentioned herein, was and is a business entity of form unknown, having its principal place of business in the State of Indiana. Plaintiff is informed and believes,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    and on that basis alleges that USAG was incorporated in the state of Texas and/or Arizona.

2    Defendant USAG is the NGB for gymnastics in the United States, as designated and permitted by

3    Defendant USOC under the Ted Stevens Amateur Sports Act, and selects and trains the United

4    States gymnastics teams for the Olympics and World Championships, promotes and develops

5    gymnastics locally and nationally, and serves as a resource center for members, clubs, fans and

6    gymnasts throughout the United States. USAG has more than 174,000 athletes and professional

7    members, more than 148,000 athletes registered in competitive programs, as well as more than

8    25,000 professional, instructor and club members. Approximately 4,000 competitions and events

9    throughout the United States are sanctioned annually by USAG. USAG was the primary entity

10   owning, operating and controlling the activities and behavior of its employee agents, including,

11   but not limited to NASSAR. USAG is also the entity that selects gymnasts for the US National

12   and Olympic Teams.

13        20.    The bylaws of Defendant USAG, or similar bylaws previously enacted, were made

14   in conformance and under the mandate of Defendant USOC, and were intentioned at protecting

15   minor gymnasts, including ALY RAISMAN from the ravages of sexual abuse, molestation and

16   harassment; a known, foreseeable and palpable risk posed to minor athletes in amateur sports.

17   Nevertheless, despite these bylaws, rules, policies and procedures purportedly being in effect at

18   Defendant USAG, Defendant USOC never ensured, audited or checked to confirm that these

19   policies were effective and being implemented properly, adequately and in conformance with the

20   standard of care. Had Defendant USOC upheld its duties under Federal Law (specifically, the Ted

21   Stevens Act) in ensuring National Team members, including the Plaintiff ALY RAISMAN, were

22   provided proper medical care and supervision, and that they were properly supervised at

23   competitions and the National Training Center (the Karolyi Ranch in Huntsville, Texas), then the

24   dozens of molestations suffered by ALY RAISMAN and numerous other gymnasts could have

25   been avoided.

26        21.    Under California *Penal Code* § 11165.7, USAG is an organization whose

27   employees, agents, and/or servants are legally "mandated reporters", considering that Defendant

28

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
010

USAG is a youth recreational program and USAG's employees' duties require direct contact and supervision of children.

### DEFENDANT, STEPHEN "STEVE" PENNY

22.     Defendant STEVE PENNY (hereinafter "PENNY") at all times mentioned herein was and is an adult male individual, who Plaintiff is informed and believes lived in the State of Indiana during the period of time during which the sexual abuse and harassment alleged herein took place and is currently a citizen of the State of Indiana. Defendant PENNY was the President of Defendant USAG charged with the overall management and strategic planning for the organization. Plaintiff is informed and believes and, on that basis, alleges that Defendant PENNY oversaw a wide-ranging, calculated concealment of numerous instances, complaints, and allegations of sexual abuse and misconduct among the participants and members of Defendant USAG. Through this conduct, Defendant PENNY's actions and inactions enabled and ratified the sexual abuse by Defendant NASSAR against Plaintiff and other participants and members of Defendant USAG and fueled the ongoing concealment of abuse at Defendant USAG, making it more unlikely for victims (such as the Plaintiff) to obtain much needed medical and/or psychological treatment. Plaintiff is informed and believes that Defendant PENNY served as President of Defendant USAG from in or around 2005 to 2017. At all times herein alleged, Defendant PENNY was an employee, agent, and/or servant of Defendant USAG, and/or was under their complete control and/or active supervision.

### DEFENDANT, PAUL PARILLA

23.     Defendant PAUL PARILLA (hereinafter "PARILLA") at all times mentioned herein was and is an adult male individual, who Plaintiff is informed and believes lived in the State of California, County of Orange, during the period of time during which the sexual abuse and harassment of ALY RAISMAN by NASSAR alleged herein took place and is currently a citizen of the State of California. Defendant PARILLA was a board member of USAG from in or around 1999 to 2018, and was Chairman of the USAG board from approximately 2015 to in or around January of 2018. Plaintiff is informed and believes and, on that basis, alleges that Defendant PARILLA oversaw a wide-ranging, calculated concealment of numerous instances, complaints,

EXHIBIT 1

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

1   and allegations of sexual abuse and misconduct among the participants and members of Defendant

2   USAG. Through this conduct, Defendant PARILLA's actions and inactions enabled and ratified

3   the sexual abuse by Defendant NASSAR against Plaintiff and other participants and members of

4   Defendant USAG and fueled the ongoing concealment of abuse at Defendant USAG, making it

5   more unlikely for victims (such as the Plaintiff) to obtain much needed medical and/or

6   psychological treatment. Plaintiff is informed and believes that Defendant PARILLA served as

7   Chairman of the Board from 2015 to present. At all times herein alleged, Defendant PARILLA

8   was an employee, agent, and/or servant of Defendant USAG, and/or was under their complete

9   control and/or active supervision.

### DEFENDANT, LARRY NASSAR

11      24.      Defendant NASSAR, the Perpetrator, at all times mentioned herein was and is an

12  adult male individual, who lived in the State of Michigan during the period of time during which

13  the sexual abuse, harassment, and molestation of the Plaintiff alleged herein took place and is

14  currently a citizen of the State of Michigan. Plaintiff is informed and believes that the NASSAR

15  was accepted onto the staff of USAG as a trainer in 1986 and then as the National Medical Director

16  and the National Team Physician for the women's gymnastics team in 1996. NASSAR was also

17  responsible for coordinating the care for USAG and for participants and members at every national

18  and international competition, and would routinely travel to National and International

19  competitions. NASSAR continued to function in this capacity at USAG until in or around the

20  middle of 2015. Moreover, it is upon information and belief, that as the National Team Doctor for

21  USAG, which was chartered via Defendant USOC, NASSAR was the individual responsible for

22  maintaining USAG's compliance with the medical requirements, policies and procedures set forth

23  by Defendant USOC. Nevertheless, Defendant USOC failed to provide supervision, oversight, and

24  any meaningful inhibition to limit NASSAR's access to minor children. Defendant NASSAR was

25  retained by Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500 as an

26  Osteopathic Physician and certified athletic trainer to provide care, treatment, and athletic training

27  to the Defendants USAG and USOC, and its participants, many of which were minors while in his

28  care. It was through this position of trust and confidence, that Defendant NASSAR exploited ALY

EXHIBIT 1
012

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

1    RAISMAN, in perpetrating his sexual abuse and harassment upon her. All of the sexually abusive

2    and harassing conduct alleged herein was done for Defendant NASSAR's sexual gratification and

3    was based upon the gender of ALY RAISMAN.

4         25.    It is on information and reasonable belief that NASSAR, using his apparent

5    authority and position within Defendant USAG and USOC over the minor participants in his

6    charge, that Defendant NASSAR sexually abused and harassed multiple other members of the

7    United States Women's Olympic Gymnastics Team and National teams, over the nearly 30 years

8    in which Defendant NASSAR has been affiliated with Defendants USAG, USOC and DOES 1

9    through 500.

10        26.    At all times herein alleged, NASSAR was an employee, agent, and/or servant of

11   USAG, Defendant USOC, and DOES 1 through 500, and/or was under their complete control

12   and/or active supervision.

13        27.    In the event DOE 1 be prosecuted and convicted of a felony for the conducted

14   alleged herein, the Plaintiff requests leave to amend the instant Complaint, such that a request for

15   attorneys' fees can be made against DOE 1 pursuant to *Code of Civil Procedure* § 1021.4.

16                       **DEFENDANTS, DOE 1 THROUGH 500**

17        28.    Defendants DOES 1 through 500, inclusive, and each of them, are sued herein

18   under said fictitious names. Plaintiff is ignorant as to the true names and capacities of DOES 1

19   through 500, whether individual, corporate, associate, or otherwise, and therefore sue said

20   Defendants by such fictitious names. When their true names and capacities are ascertained,

21   Plaintiff will request leave of Court to amend this Complaint to state their true names and capacities

22   herein.

23        29.    Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through

24   500, inclusive, are sometimes collectively referred to herein as "Defendants" and/or as "All

25   Defendants"; such collective reference refers to all specifically named Defendants as well as those

26   fictitiously named herein.

27        30.    Plaintiff is informed and believe, and on that basis, allege that at all times

28   mentioned herein, each Defendant was responsible in some manner or capacity for the occurrences

-13-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
013

herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by all said Defendants.

31.  At all times mentioned herein, each and every Defendant NASSAR was an employee, agent, and/or servant of USAG, Defendant USOC, and DOES 1 through 500, inclusive, and/or was under their complete control and/or active supervision. Defendants and each of them are individuals, corporations, partnerships and/or other entities that engaged in, joined in, and conspired with other Defendants and wrongdoers in carrying out the tortuous and unlawful activities described in this Complaint.

32.  Plaintiff is informed and believe, and on that basis, allege that at all times mentioned herein, there existed a unity of interest and ownership among Defendants and each of them such that any individuality and separateness between Defendants, and each of them, ceased to exist. Defendants and each of them were the successors-in-interest and/or alter egos of the other Defendants, and each of them, in that they purchased, controlled, dominated and operated each other without any separate identity, observation of formalities, or other manner of division. To continue maintaining the facade of a separate and individual existence between and among Defendants, and each of them, would serve to perpetrate a fraud and injustice.

33.  Plaintiff is informed and believes, and on that basis, alleges that at all times mentioned herein, Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500 were the agents, representatives and/or employees of each and other. In doing the things hereinafter alleged, Defendants and each of them were acting within the course and scope of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent.

34.  Plaintiff is informed and believes, and on that basis alleges that at all times mentioned herein, Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500 were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each other, and the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9900

-14-
COMPLAINT FOR DAMAGES

EXHIBIT 1
014

and consent of each and every other Defendant and that said conduct was thereafter ratified by each and every other Defendant, and that each of them is jointly and severally liable to Plaintiff.

## SEXUAL ABUSE OF ALY RAISMAN AND RESULTING LIFELONG DAMAGES

35.     By his position within the Defendants' institutions, Defendants and NASSAR demanded and required that Plaintiff respect Defendant NASSAR, in his position as team physician for USAG, authorized by USOC.

36.     NASSAR did sexually abuse, harass and molest the ALY RAISMAN, who was a minor child at the time of the acts at-issue.

37.     The sexual harassment and abuse of Plaintiff by the Perpetrator (NASSAR), outlined below, took place while Defendant the Perpetrator (NASSAR) was the team physician of Defendant USAG and under the control of Defendants USOC, PENNY, PARILLA, and DOES 1 through 500. Plaintiff was a participant and member of Defendants USAG, USOC, and DOES 1 through 500, while the Perpetrator (NASSAR) was serving as an agent and employee of Defendants in his capacity as team physician:

a.    In his capacity as team physician with Defendants USOC, USAG, and DOES 1 through 500, the Perpetrator (NASSAR) was given custody and supervision of minors, including Plaintiff. The Perpetrator (NASSAR) used this position to coerce children to concede to his sexual suggestions, using his authority and position of trust to exploit them physically, sexually, and emotionally;

b.    Plaintiff became a member and participant of USAG, and a part of the Junior National Team for USAG in 2009. Plaintiff soon formed a relationship with the Perpetrator (NASSAR), USAG's team physician. At this time, in or around 2010, the Perpetrator (NASSAR) commenced the process of "grooming" Plaintiff for later physical, sexual and emotional abuse. Plaintiff is informed and believes the Perpetrator (NASSAR) would use the guise of care, athletic training, osteopathy, and kinesiology to normalize intimate, inappropriate, and sexually abusive contact with Plaintiff. Plaintiff is informed and believes the Perpetrator (NASSAR) would enter the living quarters of the Plaintiff ALY RAISMAN and other gymnasts at the Karolyi Ranch, hotel rooms at meets, in training rooms, and at other locations, placing Plaintiff under the impression this inappropriate contact was part of treatment. During this period, Plaintiff was a patient under the Perpetrator's (NASSAR) direct supervision and control.

c.    Plaintiff is informed and believes the Perpetrator's (NASSAR) physical and sexual abuse of Plaintiff commenced after the grooming of Plaintiff began, and occurred dozens of times while the team was traveling and before and after competitive meets from in or around 2010 to 2012, and in or around 2015. Specifically, the Plaintiff was sexually abused by NASSAR in Texas at the Karolyi Ranch, in Santa Clara County in California, and at numerous locations around the country, as well as internationally in Australia, Japan, in the United Kingdom and in the Netherlands. During this period, Plaintiff was a participant, member, and patient under the Perpetrator's (NASSAR) and Defendants' direct supervision and control.

COMPLAINT FOR DAMAGES

EXHIBIT 1
015

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

Using his position as team physician, the Perpetrator (NASSAR) would interact with Plaintiff under the guise of providing her care and treatments necessary for her to compete as a world-class, Olympic medal-winning gymnast. Under these circumstances, the Perpetrator (NASSAR) placed his bare hand on and near the Plaintiff's unclothed vagina and anus, on multiple occasions, in Plaintiff's assigned living quarters, without any supervision or a chaperone. Further, NASSAR, on numerous occasions, had an erection while performed the claimed medical treatment. Plaintiff is informed and believes that the Perpetrator's (NASSAR) sexual abuse, molestation, and harassment of Plaintiff occurred on the premises of Defendants USAG, USOC, in hotels around the world, and various other locations including, but not limited to in living quarters, in training facilities, in gyms.

38. Plaintiff is informed and believes, and on that basis alleges, that such conduct by Defendant NASSAR was based upon Plaintiff's gender, and was done for Defendant NASSAR's sexual gratification. These actions upon ALY RAISMAN were performed by Defendant NASSAR without the free consent of Plaintiff, as ALY RAISMAN was a young child, and could therefore not give valid legal consent.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS BY PLAINTIFF

39. At all times material hereto, Plaintiff was a minor participant and member of Defendant USAG, USOC and DOES 1 through 500, and was under their complete control, dominion, and supervision. Defendant NASSAR worked for, was employed by, and an agent/servant of Defendants USAG, USOC and DOES 1 through 500 when NASSAR came into contact with ALY RAISMAN.

40. At all times material hereto, Defendant NASSAR was under the direct supervision, management, agency and control of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, inclusive. Defendant NASSAR was the team physician of Defendant USAG and for Team USA, under the dominion of Defendant USOC. While a team physician at Defendant USAG, NASSAR's employment duties included coordinating the care for Defendant USAG at every national and international competition, providing individual care and providing for the physical needs and well-being of participants and members of Defendant USAG (and in accord with Defendant USOC policies, procedures, and mandates), and care including but not limited to osteopathic adjustments and kinesiology treatment to participants and members of Defendant USAG, which included ALY RAISMAN. ALY RAISMAN was a participant and member of Defendant USAG, and it is under these circumstances that ALY RAISMAN came to be under the

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9909

1   direction and control of Defendant NASSAR, who used his position of authority and trust to molest

2   and sexually abuse ALY RAISMAN.

3        41.    As a member and participant of Defendant USAG and USOC while NASSAR was

4   a team physician, the ALY RAISMAN was under Defendant NASSAR's direct supervision,

5   control and care, which created a special, confidential, and fiduciary relationship between ALY

6   RAISMAN, her parents, and Defendant NASSAR. Because of such relationship, Defendant

7   NASSAR owed Plaintiff a special duty of care. Additionally, as the employers and supervisors of

8   NASSAR, with knowledge that he was in contact with and providing care to children, Defendants

9   USAG, USOC, PENNY, PARILLA, and DOES 1 through 500 were also in a special, confidential,

10  and fiduciary relationship with Plaintiff, owing her a duty of care.

11       42.    By assigning Defendant NASSAR as team physician of Defendant USAG under

12  the mandated and control of Defendants USOC and DOES 1 through 500, Defendant USOC

13  represented to the community and participants and members of Defendant USAG that NASSAR

14  was safe, trustworthy, and of high moral and ethical repute, such that parents of participants and

15  members need not worry about having NASSAR interact with, and provide care to their minor

16  children. Defendants did so in order to preserve their own public image and reputation, so they

17  could retain past participants and members and recruit new participants and members, thus

18  allowing donations and other financial support to continue flowing into their coffers for financial

19  gain.

20       43.    Plaintiff is informed and believes, and on that basis, alleges that Defendants USAG,

21  USOC and DOES 1 through 500 knew or should have known that Defendant NASSAR had

22  engaged in unlawful sexually-related conduct in the past, and/or was continuing to engage in such

23  conduct. Defendants had a duty to disclose these facts to ALY RAISMAN and her parents, but

24  negligently and/or intentionally suppressed, concealed or failed to disclose this information. The

25  duty to disclose this information arose by the special, trusting, confidential, fiduciary relationship

26  between Defendants and Plaintiff.

27       44.    Plaintiff is informed and believes, and on that basis, alleges that Defendants knew

28  or should have known that sexually abusive staff, such as Defendant NASSAR, were violating

-17-
COMPLAINT FOR DAMAGES

EXHIBIT 1
017

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9990

1   Defendants USOC and USAG policies, without enforcement or abatement, and were continually

2   allowed to be in contact with minor children, such as ALY RAISMAN. As early as 1999,

3   Defendant USOC was placed on notice by former Defendant USAG president Bob Colarossi, who

4   wrote a letter to the USOC, explaining that the safety procedures and policies that USOC required

5   USAG to follow, were part of a "…fundamentally flawed process…" and that at USOC there was

6   an "…**apparent indifference to the welfare of young children manifest in the Committee's**

7   **actions.**" *See* Exhibit A as the Letter from Robert Colarossi to USOC. It was not until 11 years

8   later, that Defendant USOC created the SafeSport program and issued a handbook detailing

9   specific procedures for preventing sexual abuse of minors, and access to minors by sexual abusers.

10  Despite instituting this handbook and program, Defendant USOC maintained its course and culture

11  of ignoring abuse, ignoring its internal policies and procedures, and placing minors in the way of

12  danger.

13          45.     Plaintiff is informed and believes and, on that basis, alleges Defendants knew of,

14  or should have known of, Defendants NASSAR's propensity and disposition to engage in sexual

15  misconduct with minors before he sexually abused and molested ALY RAISMAN, and knew of

16  the probability that NASSAR would molest minors with whom he came into contact, such as ALY

17  RAISMAN.

18          46.     Defendant failed to implement reasonable safeguards to avoid acts of unlawful

19  sexual conduct by Defendant NASSAR in the future, including avoiding placement of Defendant

20  NASSAR in a position where contact and interaction with children is an inherent function.

21  Defendants ignored and suppressed the past sexual misconduct Defendant NASSAR had engaged

22  in, and concealed that information from ALY RAISMAN and her family.

23          47.     Plaintiff is informed and believes, and on that basis alleges, that Defendants were

24  apprised, knew or should have known of and/or were put on notice of Defendant NASSAR's past

25  sexual abuse of children, past claims and/or investigations, and his propensity and disposition to

26  engage in such unlawful activity and unlawful sexual activity with minor participants and members

27  such that Defendants knew or should have known that Defendant NASSAR would commit

28  wrongful sexual acts with participants and members, including ALY RAISMAN. Plaintiff is

EXHIBIT 1
018

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

informed and believes, and on that basis alleges that personnel and/or employment records and other records of Defendants' reflect numerous incidents of inappropriate sexual contact and conduct with minor participants and members by Defendant NASSAR and other professionals, employees, assistants, agents, supervisors and others, including incidents occurring both on and off the physical premises of such Defendants and at national and international meets. Based on these records, Defendants knew and/or should have known of Defendant NASSAR's history of sexual abuse, past claims and/or past investigations, and his propensity and disposition to engage in unlawful activity and unlawful sexual activity with participants and members such that Defendants knew or should have known that Defendant NASSAR would commit wrongful sexual acts with those minor participants and members, including ALY RAISMAN.

48.     Plaintiff is informed and believes, and on that basis alleges, that Defendant NASSAR was repeatedly informally censured, disciplined and/or reprimanded by Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500, for taking an inordinate number of photographs of young girls, who were gymnasts. This conduct by Defendant NASSAR was in direct contravention of his duties set forth by the Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500, and was not communicated to the Plaintiff or her family. This conduct was not further investigated, was not reported to law enforcement or child welfare authorities, and was never communicated to the Plaintiff, her parents or other gymnasts, in direct violation of Defendant USAG's mandate under the Defendant USOC's policies, procedures and rules. Subsequent to NASSAR's initial arrest in 2016, thousands of images of child pornography were located by Federal law enforcement on his electronic devices, and Defendant NASSAR pleaded guilty to such possession of child pornography in July of 2017. Had Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 effectively implemented their safety policies and procedures, damage to the Plaintiff could have been minimized and NASSAR's conduct could have been stopped earlier, but it was not.

49.     Because of the relationship between Plaintiff and Defendants, Defendants had an obligation and duty under the law not to hide material facts and information about NASSAR's past, and his deviant sexual behavior and propensities. Additionally, Defendants had an affirmative

EXHIBIT 1
019

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

duty to inform, warn, and institute appropriate protective measures to safeguard minors who were reasonably likely to come in contact with Defendant NASSAR, including ALY RAISMAN at the time. Defendants willfully refused to notify, give adequate warning and implement appropriate safeguards, thereby creating the peril that ultimately damaged ALY RAISMAN.

50.     Plaintiff is informed and believes, and on that basis alleges, that prior to ALY RAISMAN's sexual abuse by Defendant NASSAR, Defendants engaged in a pattern and practice of employing sexual abusers. Defendants concealed these facts from participants and members, their parents, the Plaintiff's community, the gymnastics community, the public at large, other NGB's, the United States government, various local governments, and law enforcement agencies.

51.     As is set forth herein, Defendants and each of them have failed to uphold numerous mandatory duties required of them by state and federal law, as well as their own internal written policies and procedures, including:

- Duty to use reasonable care to protect participants and members from known or foreseeable dangers

- Duty to inform the Plaintiff ALY RAISMAN and her parents of the known risks to the health and well-being of their daughter while in Defendant's USAG and/or USOC sponsored, authorized, and supervised programs, events and trainings;

- Duty to enact policies and procedures that are not in contravention of the Federal Civil Rights Act, section 1983 and the 14th amendment of the United States Constitution;

- Duty to protect participants and members and staff, and provide adequate supervision;

- Duty to ensure that any direction given to participants and members is lawful, and that adults act fairly, responsible and respectfully towards participants and members;

- Duty to properly train staff so that they are aware of their individual responsibility for creating and maintaining a safe environment;

- Duty to review the criminal history of applicants and current employees;

- Duty to provide diligent supervision over minors;

- Duty to act promptly and diligently and not ignore or minimize problems.

- Duty to report suspected incidents of child abuse and more specifically childhood sexual abuse (*Penal Code* sections 11166, 11167).

- Duty to provide adequate and safe medical care pursuant to 36 U.S.C. §§220525(b)(4)(E).

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 752-9900

52. Defendants and each of them had and have a duty to protect participants and members, including ALY RAISMAN. Defendants were required to, and failed, to provide adequate supervision, and failed to be properly vigilant in seeing that supervision was sufficient at Defendants USAG and USOC to ensure the safety of ALY RAISMAN and others.

53. Despite having a duty to do so, Defendants failed to adequately train and supervise all staff to create a positive and safe environment, specifically including training to perceive, report and stop inappropriate sexual conduct by other members of the staff, specifically including NASSAR with children.

54. Defendants failed to enforce their own rules and regulations designed to protect the health and safety of the participants and members. Further, they failed to adopt and implement safety measures, policies and procedures designed to protect minor children such as Plaintiff's child from the sexually exploitive and abusive acts of their agents and employees such as NASSAR.

55. Plaintiff is informed and believes and, on that basis, alleges that as part of Defendants' conspiratorial and fraudulent attempt to hide NASSAR's propensity to sexually abuse children, and prior sexual misconduct with children, from public scrutiny and criminal investigation, Defendants implemented various measures designed to make NASSAR's conduct harder to detect and ensure minors with whom he came into contact, such as ALY RAISMAN, would be sexually abused, including:

a. Permitting NASSAR to remain in a position of authority and trust after Defendants knew or should have known that he was a molester of children;

b. Placing NASSAR in a separate and secluded environment, at USAG and USOC authorized camps and events, including assigning him unfettered access and control over minor participants and members that included individual and private examinations, private osteopathic adjustments without a chaperone, and allowing NASSAR to physically and sexually interact with the children, including ALY RAISMAN;

c. Failing to disclose NASSAR's prior record of misconduct, sexual abuse, harassment and molestation and his propensity to commit such acts towards participants and members in USAG's and USOC's program, the public at large, and law enforcement;

d. Allowing NASSAR's unsupervised and un-controlled access to minors, including ALY RAISMAN;

COMPLAINT FOR DAMAGES

EXHIBIT 1
021

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

e.    Holding out NASSAR to ALY RAISMAN, other participants and members of USAG and USOC, and the public at large as a trustworthy and honest person of high ethical and moral repute who was capable and worthy of being granted unsupervised access to the children of USAG;

f.    Failing to investigate or otherwise confirm or deny such facts about NASSAR including prior arrests, charges, claims and investigations for sexual abuse;

g.    Failing to inform, or concealing from Plaintiff and law enforcement officials the fact that ALY RAISMAN and others were or may have been sexually abused, harassed and molested, after Defendants knew or should have known that NASSAR may have sexually abused ALY RAISMAN or others, thereby enabling ALY RAISMAN to continue to be endangered and sexually abused, harassed, molested, and/or creating the circumstance where ALY RAISMAN and others were less likely to receive proper medical treatment, thus exacerbating the harm to ALY RAISMAN;

h.    Holding out NASSAR to Plaintiff and to the community as being in good standing and trustworthy;

i.    Cloaking NASSAR's prior sexual misconduct with children within the facade of normalcy, thereby disguising the nature of his sexual abuse and contact with minors;

j.    Failing to take reasonable steps and to implement reasonable safeguards to avoid acts of unlawful sexual conduct by NASSAR such as avoiding placement of NASSAR in functions or environments in which his solitary contact with children was inherent;

k.    Failing to put in place a system or procedure to supervise or monitor physicians, athletic trainers, and agents to insure they do not molest or abuse minors in Defendants' care.

l.    Failing to investigate Nassar's background adequately.

m.    Allowing NASSAR to practice medicine without a Texas medical license at the National Training Center.

n.    Failing to implement any reasonable, meaningful, or adequate supervision policies, practices or procedures at the National Training Center, which would have prevented NASSAR solitary access to minors, including the Plaintiff.

56.    By his position within the Defendants' institutions, NASSAR attained a position of influence over ALY RAISMAN, her parents, and others. Defendants' conduct created a situation of peril that was not, and could not be appreciated by ALY RAISMAN. By virtue of Defendants' conspiratorial and fraudulent conduct, and in keeping with their intent to fail to disclose and hide NASSAR's past and present conduct from the community, the public at large and law enforcement, Defendants allowed NASSAR to remain in a position of influence where his unsupervised or negligently supervised conduct with minor participants and members made the molestation and abuse of minor participants and members possible.

-22-

EXHIBIT 1
022

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

57.     During the period ALY RAISMAN was being sexually abused and harassed by NASSAR, Defendants had the authority and ability to prevent such abuse by removing Defendant NASSAR from his position as team physician at Team USA, USAG and in his status with the USOC. They failed to do so, allowing the abuse to occur and to continue unabated. Plaintiff is informed and believes and, on that basis, alleges that this failure was a part of Defendants' conspiratorial plan and arrangement to conceal NASSAR's wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal, to avoid the disclosure of their tolerance of child sexual molestation and abuse, to preserve a false appearance of propriety, and to avoid investigation and action by public authority including law enforcement. Such actions were motivated by a desire to protect the reputation of Defendants and protect the monetary support of Defendants, while fostering an environment where such abuse could continue to occur.

58.     As a direct result of the sexual harassment and abuse that ALY RAISMAN suffered from Defendant NASSAR, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failing to inform the ALY RAISMAN (or her parents) of the danger posed to her by NASSAR, Plaintiff has had difficulty in meaningfully interacting with others, including those in positions of authority over Plaintiff including physicians, athletic supervisors, athletic trainers, as well as their servants and agents. Plaintiff has been limited in her ability to meaningfully interact with others due to the trauma of childhood sexual abuse, and the upset of having known that they could have prevented such, had Defendants conveyed the appropriate information. This inability to interact creates conflict with Plaintiff's values of trust and confidence in others, and has caused Plaintiff substantial emotional distress, anxiety, nervousness and fear. As a direct result of this conduct, Plaintiff suffered immensely, including, but not limited to, encountering issues with a lack of trust, various negative psychological and emotional sequelae, depressive symptoms, anxiety, and nervousness. Having been one of the most famous gymnasts in United States (and World) history, ALY RAISMAN lost millions of dollars in economic damages, as a result of her sexual abuse at the hands of NASSAR, and continues to suffer from such loss.

59.     As a direct and proximate result of Defendants' tortious acts, omissions, wrongful conduct and breaches of their duties, Plaintiff's employment and professional development has

-23-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
023

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    been adversely affected. Plaintiff has lost wages, endorsements, and many financial opportunities

2    and will continue to lose wages in an amount to be determined at trial. Plaintiff has suffered

3    substantial economic injury, all to Plaintiff's general, special and consequential damage in an

4    amount to be proven at trial, but in no event less than the minimum jurisdictional amount of this

5    Court.

6          60.    As a further direct and proximate result of Defendants' wrongful actions, as herein

7    alleged, Plaintiff has been hurt in their health, strength and activity. Plaintiff has sustained

8    permanent and continuing injury to their nervous system and person, which has caused and

9    continues to cause great mental, physical and nervous pain, suffering, fright, upset, grief, worry

10   and shock in an amount according to proof at trial but in no event less than the jurisdictional

11   minimum requirements of this Court.

12         61.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

13   USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500 acted willfully and

14   maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as

15   to constitute malice and/or oppression under California *Civil Code* section 3294. Plaintiff is

16   informed and believes, and on that basis alleges, that specifically, the Defendants acted in concert,

17   and under their authority as child care providers, with reckless disregard for the concern of the

18   minor participants in its charge, in order to further financially benefit their respective business'

19   growth. The Defendants acted intentionally in creating an environment that harbored molesters,

20   put the vulnerable minor participants at-risk of harm, ignored clear warning signs and their duties

21   to report sexual abusers and molesters in their ranks, to maintain a façade of normalcy, in order to

22   maintain its funding and provide further financial growth of Defendants USAG, USOC, and

23   PENNY and PARILLA, individually, on the international level. The safety of the minor

24   participants that were entrusted to Defendant USAG and represented as being protected through

25   Defendant USOC, was compromised due to Defendants desire to maintain the status quo of the

26   Defendants USAG and USOC organizations, and avoid any public scrutiny for its misconduct.

27   Plaintiff is informed, and on that basis alleges, that these willful, malicious, and/or oppressive acts,

28   as alleged herein above, were ratified by the officers, directors, and/or managing agents of the

-24-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
024

Defendants. Plaintiff is therefore entitled to recover punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500.

### FIRST CAUSE OF ACTION
### SEXUAL HARASSMENT: CIVIL CODE § 51.9
### (Plaintiff ALY RAISMAN Against Defendants USAG, USOC, NASSAR and DOES 1 through 500)

62.     The Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

63.     During the Plaintiff ALY RAISMAN's time as a minor gymnast under the care, control and/or mandate of Defendants USOC, USAG and DOES 1 through 500, NASSAR recklessly and wantonly made sexual advances, solicitations, requests, demands for sexual compliance of a hostile nature based on the Plaintiff ALY RAISMAN's gender that were unwelcome, pervasive and severe. NASSAR intentionally, recklessly and wantonly did acts which resulted in harmful and offensive contact with intimate parts of the Plaintiff ALY RAISMAN's person, including but not limited to NASSAR using the authority and trust inherent in his position as an Olympic Doctor to exploit her physically, psychologically and emotionally. These acts were done for NASSAR's sexual gratification; all while NASSAR was acting in the course and scope of his agency/employment with Defendants USAG, USOC, and DOES 1 through 500.

64.     The incidents of abuse outlined herein above took place while the Plaintiff ALY RAISMAN was under the care of NASSAR, in his capacity and position as an Olympic Doctor, while acting specifically on behalf of Defendants USOC, and DOES 1 through 500.

65.     Because of the Plaintiff ALY RAISMAN's young age, nature of her competitive sport, and relationship with NASSAR as a gymnast at Defendant USAG (under the control and authority of Defendants USOC and USAG), the Plaintiff ALY RAISMAN was unable to easily terminate her doctor-patient relationship with NASSAR.

66.     Because of NASSAR's position of authority over Plaintiff ALY RAISMAN, and the Plaintiff ALY RAISMAN's mental and emotional state, and her young age under the age of consent, Plaintiff ALY RAISMAN was unable to, and did not give meaningful consent to such acts.

COMPLAINT FOR DAMAGES

EXHIBIT 1
025

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

67.     Even though Defendants USAG, USOC and DOES 1 through 500 knew or should have known of these activities by NASSAR, Defendants USOC, USAG, and DOES 1 through 500 did nothing to investigate, supervise or monitor NASSAR to ensure the safety of Plaintiff ALY RAISMAN. Defendants USAG, USOC and DOES 1 through 500 ratified the sexual misconduct of NASSAR by retaining him in employment after discovering, or ignoring the facts that would have led them to discover, his misconduct.

68.     Defendants USOC, USAG, and DOES 1 through 500's conduct was a breach of their duties to the Plaintiff ALY RAISMAN.

69.     As a result of the above-described conduct, Plaintiff ALY RAISMAN suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

70.     In subjecting Plaintiff to the wrongful treatment herein described, Defendants USOC, USAG, NASSAR and DOES 1 through 500, acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression under California *Civil Code* section 3294. Plaintiff is informed, and on that basis alleges, that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified by the officers, directors, and/or managing agents of the Defendants USOC, USAG, and DOES 1 through 500. Plaintiff is therefore entitled, to the recovery of punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, and DOES 1 through 500.

**SECOND CAUSE OF ACTION**
**MASHA'S LAW (18 U.S.C. §§2255, 2423(b), 2423(c))**
**(Plaintiff ALY RAISMAN Against Defendants USAG, USOC, NASSAR and DOES 1 through 500)**

71.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
026

72.　Under 18 U.S.C. §§2255, the Plaintiff ALY RAISMAN has a private right of action against NASSAR, and any defendants who are vicariously and/or strictly responsible for NASSAR while abroad perpetrating his sexual assaults against ALY RAISMAN, including Defendants USOC, USAG, and DOES 1 through 500. *See Doe v. Celebrity Cruises, Inc.* (11th Cir. 2004) 394 F.3d 891, 894.

73.　Plaintiff ALY RAISMAN is a victim of the federal crime codified as 18 U.S.C. §2423(b), which was perpetrated by NASSAR and provides, "[a] person who travels in interstate commerce or travels into the United States, **or a United States citizen … who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.**"

74.　Furthermore, Plaintiff ALY RAISMAN is a victim of the federal crime codified as 18 U.S.C. §2423(c), which was perpetrated by NASSAR and provides, "**[a]ny United States citizen … who travels in foreign commerce** or resides, either temporarily or permanently, in a foreign country, **and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both**."

75.　As alleged herein, Defendant NASSAR travelled with ALY RAISMAN to Europe, Australia, Japan, and across state lines, wherein he sexually harassed, abused, and molested her, when she was under the age of 18 years old and as previously stated herein. Defendant NASSAR travelled with ALY RAISMAN for the sole purpose of engaging in this elicit sexual conduct with her.

76.　As a result of the above-described conduct, the Plaintiff ALY RAISMAN suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

EXHIBIT 1
027

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

77.     In subjecting Plaintiff to the wrongful treatment herein described, Defendants USOC, USAG, and DOES 1 through 500, acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression under California *Civil Code* section 3294.  Plaintiff is informed, and on that basis alleges, that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified by the officers, directors, and/or managing agents of the Defendants USAG, USOC and DOES 1 through 500. Plaintiff is therefore entitled, upon proper application to the court, to the recovery of punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, and DOES 1 through 500.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500)

78.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

79.     Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500's conduct toward Plaintiff, as described herein, was outrageous and extreme.

80.     A reasonable person would not expect or tolerate Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 putting NASSAR in positions of authority at Defendants USAG, USOC, or DOES 1 through 500, which enabled NASSAR to have access to minors including Plaintiff ALY RAISMAN, so that he could commit wrongful sexual acts with her, including the conduct described herein above. Plaintiff had great trust, faith and confidence in in Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, which, by virtue of NASSAR and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's wrongful conduct, turned to fear.

81.     Moreover, by failing to report NASSAR or honor any of their legal reporting obligations and by failing to promptly notify the parents of Plaintiff ALY RAISMAN of the abuse of their daughter, Defendants USOC and DOES 1 through 500 knew that Plaintiff would be directly harmed. Under the holding in *Phyllis P.* case, a special relationship and a duty to notify the parents of Plaintiff was stated. Such duty being independent of any duty Defendants USOC, USAG,

EXHIBIT 1
028

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    PENNY, PARILLA, and DOES 1 through 500 owed to Plaintiff ALY RAISMAN and is a direct

2    duty owed to the Plaintiff's parents and was thereby created with Plaintiff's parents, whereby

3    Plaintiff's parents are intended or direct victims of Defendants USOC, USAG, PENNY,

4    PARILLA, and DOES 1 through 500 failures and can recover for any emotional distress

5    proximately caused thereby. Specifically, Defendants USOC, USAG, PENNY, PARILLA, and

6    DOES 1 through 500 had knowledge of NASSAR's dangerous propensities to sexually abuse

7    children, yet concealed and failed to disclose to Plaintiff ALY RAISMAN this information.

8        82.    A reasonable person would not expect or tolerate Defendants USOC, USAG,

9    PENNY, PARILLA, and DOES 1 through 500 to be incapable of supervising and preventing

10   employees of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, including

11   NASSAR, from committing wrongful sexual acts with minor gymnasts including Plaintiff ALY

12   RAISMAN, or to properly supervise NASSAR to prevent such abuse from occurring, or to

13   promptly notify parents or authorities.

14       83.    Defendants USOC, USAG, PENNY, PARILLA, NASSAR, and DOES 1 through

15   500's conduct described herein was intentional and malicious and done for the purpose of causing,

16   or with the substantial certainty that it would cause Plaintiff ALY RAISMAN and her parents, to

17   suffer humiliation, mental anguish and emotional and physical distress.

18       84.    As a result of the above-described conduct, Plaintiff suffered and continues to suffer

19   great pain of mind and body, shock, emotional distress, physical manifestations of emotional

20   distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

21   have suffered and continues to suffer and was prevented and will continue to be prevented from

22   performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings

23   and earning capacity, and has incurred and will continue to incur expenses for medical and

24   psychological treatment, therapy, and counseling.

25       85.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

26   USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500 acted willfully and

27   maliciously with the intent to harm Plaintiff ALY RAISMAN, and in conscious disregard of

28   Plaintiff's rights, so as to constitute malice and oppression under California *Civil Code* section

EXHIBIT 1
029

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    3294. Plaintiff is therefore entitled to the recovery of punitive damages, in an amount to be

2    determined by the court, against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

3    through 500, in a sum to be shown according to proof.

4                              **FOURTH CAUSE OF ACTION**
     **UNFAIR BUSINESS PRACTICES (*BUSINESS & PROFESSIONS CODE* §17200)**
5    **(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and**
                              **DOES 1 through 500)**

6         86.    Plaintiff re-alleges and incorporates by reference herein each and every allegation

7    contained herein above as though fully set forth and brought in this cause of action.

8         87.    Plaintiff is informed and believes and, on that basis,, alleges that Defendants

9    USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 have engaged in unlawful, unfair

10   and/or deceptive business practices including allowing NASSAR to engage in repeated harassment

11   of participants and members, including Plaintiff ALY RAISMAN, and failing to take all

12   reasonable steps to prevent harassment and abuse from occurring. The unlawful, unfair and

13   deceptive business practices also included failing to adequately investigate, vet, and evaluate

14   individuals for employment with Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

15   through 500, refusing to design, implement, and oversee policies regarding sexual harassment and

16   abuse of children in a reasonable manner that is customary in similar educational environments.

17   Plaintiff is informed and believes and, on that basis, alleges that Defendants USOC, USAG, and

18   DOES 1 through 500 have engaged in unlawful, unfair and deceptive business practices including

19   concealing sexual harassment, abuse and/or molestation claims by participants and members, such

20   as Plaintiff ALY RAISMAN, so as to retain other participants and members within Defendants

21   USAG, who were not apprised of such illicit sexual misconduct by NASSAR.

22        88.    Plaintiff is informed and believes, and on that basis alleges that Defendants USOC

23   USAG, PENNY, PARILLA, and DOES 1 through 500 engaged in a common scheme, arrangement

24   or plan to actively conceal allegations against sexual abusers who were employees, agents,

25   members, and/or participants at Defendants USAG, USOC, and DOES 1 through 500, such that

26   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 could maintain their

27   public image, and avoid detection of such abuse and abusers. Plaintiff is informed and believes

28   and thereon alleges that Defendants USOC, USAG, and DOES 1 through 500 actively concealed

                                        -30-

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

1    these allegations, such that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through

2    500 would be insulated from public scrutiny, governmental oversight, and/or investigation from

3    various law enforcement agencies, all done in order to maintain the false sense of safety for

4    participants and their families and to perpetuate the program financially.

5          89.     By engaging in unlawful, unfair and deceptive business practices, Defendants

6    USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 benefitted financially to the

7    detriment of its competitors, who had to comply with the law.

8          90.     Unless restrained, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

9    through 500 will continue to engage in the unfair acts and business practices described above,

10    resulting in great and irreparable harm to Plaintiff and/or other similarly situated participants and

11    members.

12          91.     Plaintiff seeks restitution for all amounts improperly obtained by Defendants

13    USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 through the use of the above-

14    mentioned unlawful business practices, as well as the disgorgement of all ill-gotten gains and

15    restitution on behalf of Plaintiff and all other similarly situated participants and members who were

16    also subjected to Defendant's illegal and unfair business practices.

17          92.     Pursuant to section 17203 of the California *Business and Professions Code* and

18    available equitable powers, Plaintiff is entitled to a preliminary and permanent injunction,

19    enjoining Defendants USOC, USAG, and DOES 1 through 500 from continuing the unlawful and

20    unfair business practices described above. Further, Plaintiff seeks the appointment of a court

21    monitor to enforce its orders regarding client safety. In addition, Plaintiff is entitled to recover

22    reasonable attorneys' fees pursuant to the California *Business and Professions Code* and section

23    1021.5 of the *California Code of Civil Procedure*.

24                        **FIFTH CAUSE OF ACTION**
                        **BREACH OF FIDUCIARY DUTY**

25    **(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and**
                        **DOES 1 through 500)**

26          93.     Plaintiff re-alleges and incorporates by reference herein each and every allegation

27    contained herein above as though fully set forth and brought in this cause of action.

28

EXHIBIT 1
031

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

94.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, as childcare custodians representing that they would keep Plaintiff ALY RAISMAN safe, were in a fiduciary relationship with Plaintiff ALY RAISMAN, owing her a special duty of due care. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 are mandated reporters, or organizations required to comply with Mandated Reporting laws, with respect to claims of child abuse and child safety.

95.     Moreover, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff ALY RAISMAN a statutory, common law and constitutional duty to protect her and guarantee her safety while in their custody, care, and control.

96.     The Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 also owed a special duty to ALY RAISMAN's parents. As direct victims for failure to notify of abuse of their minor child (*See Phyllis P. v. Claremont Unified School District*, 183 Cal. App. 3d at 1193) which held that a school district had a special relationship with a parent because the parent was the "real and foreseeable" victim of the defendants' negligent conduct. Direct victims may bring claims where there was a negligent breach of a duty arising out of a preexisting relationship. Any breach committed by the Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 violates this special relationship and duty owed to Plaintiff ALY RAISMAN's parents.

97.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their fiduciary duty by failing to properly supervise NASSAR and take appropriate steps to prevent the lewd and lascivious conduct perpetrated by NASSAR against ALY RAISMAN. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 also failed to report NASSAR pursuant to USOC and USAG policy. Defendants USOC, USAG, and DOES 1 through 500 also failed to implement or follow appropriate policies and procedures to protect minors, including ALY RAISMAN. In addition, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to report NASSAR's abuse or promptly notify ALY RAISMAN's parents.

98.     The employees, servants, agents, volunteers or other representatives of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, respectively, willfully and

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
032

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    intentionally ignored behavior in NASSAR and complaints against NASSAR that they should have

2    reported due to their responsibility as mandated reporters.

3         99.    As a result of the above-described conduct, Plaintiff suffered and continues to suffer

4    great pain of mind and body, shock, emotional distress, physical manifestations of emotional

5    distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

6    has suffered and continues to suffer and were prevented and will continue to be prevented from

7    performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings

8    and earning capacity, and has incurred and will continue to incur expenses for medical and

9    psychological treatment, therapy, and counseling.

10        100.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

11   USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 acted willfully and maliciously

12   with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute

13   malice and oppression under California *Civil Code* section 3294. Plaintiff is therefore entitled to

14   the recovery of punitive damages, in an amount to be determined by the court, against Defendants

15   USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, in a sum to be shown according to

16   proof.

17                           **SIXTH CAUSE OF ACTION**
                             **CONSTRUCTIVE FRAUD**
18   **(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and**
                             **DOES 1 through 500)**

19        101.    Plaintiff re-alleges and incorporates by reference herein each and every allegation

20   contained herein above as though fully set forth and brought in this cause of action.

21        102.    By holding NASSAR out as an agent of Defendants USOC, USAG, PENNY,

22   PARILLA, and DOES 1 through 500, and by allowing him to undertake the physical care and

23   athletic training of minor children such as ALY RAISMAN, Defendants USOC, USAG, PENNY,

24   PARILLA, and DOES 1 through 500 entered into a confidential, fiduciary, and special relationship

25   with Plaintiff.

26        103.    By holding themselves out as professional organizations for woman's gymnastics,

27   undertaking to select and train national gymnastics teams, enforcing policies, rules, and procedures

28   for gymnasts' safety and facilitating competition both nationally and internationally of ALY

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
033

RAISMAN and other minor team participants and members, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 entered into a confidential, fiduciary and special relationship with Plaintiff and other minor gymnasts (as well as their families).

104. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their confidential, fiduciary duty and special duties to Plaintiff by the wrongful and negligent conduct described above and incorporated into this cause of action, and in so doing, gained an advantage over Plaintiff in matters relating to Plaintiff's safety, security and health. In particular, in breaching such duties as alleged, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were able to sustain their status as institutions (or individuals) of high moral repute, and preserve their reputation, all at the expense of Plaintiff's further injury and in violation of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's mandatory duties.

105. By virtue of their confidential, fiduciary and special relationship with Plaintiff, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to:

    a. Investigate or otherwise confirm or deny such claims of sexual abuse;

    b. Reveal such facts to Plaintiff, the gymnastics community, the community at large, and law enforcement agencies;

    c. Refuse to place NASSAR and other molesters in positions of trust and authority within Defendants USOC, USAG and DOES 1 through 500's institutions;

    d. Refuse to hold out NASSAR and other molesters to the public, the community, minors, parents and law enforcement agencies as being in good standing and, trustworthy in keeping with him and his position as a team physician and authority figure;

    e. Refuse to assign NASSAR and other molesters to positions of power within Defendants USOC, USAG, and DOES 1 through 500 and over minors; and

    f. Disclose to Plaintiff, the public, the school community, minors, and law enforcement agencies the wrongful, tortious, and sexually exploitive acts that NASSAR had engaged in with children.

106. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's breach of their respective duties included:

    a. Not making reasonable investigations of NASSAR;

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9900

-34-
COMPLAINT FOR DAMAGES

EXHIBIT 1
034

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

b.   Issuing no warnings about NASSAR;

c.   Permitting NASSAR to routinely be alone with and in control of minors, unsupervised;

d.   Not adopting a policy to prevent NASSAR from routinely having minors and participants and members in his unsupervised control;

e.   Making no reports of any allegations of NASSAR's abuse of participants and members, or of minors prior to or during his employment and/or agency at Defendants USOC, USAG and DOES 1 through 500; and

f.   Assigning and continuing to assign NASSAR to duties which placed him in positions of authority and trust over minors, positions in which NASSAR could easily isolate and sexually abuse minors.

107.   At the time that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 engaged in such suppression and concealment of acts, such acts were done for the purpose of causing Plaintiff to forbear on her rights.

108.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's misconduct did reasonably cause Plaintiff to forbear on her rights.

109.   The misrepresentations, suppressions and concealment of facts by Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were intended to and were likely to mislead Plaintiff and others to believe that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had no knowledge of any charges, claims or investigations against NASSAR, or that there were no other charges, claims or investigations of unlawful or sexual misconduct against NASSAR or others and that there was no need for them to take further action or precaution.

110.   The misrepresentations, suppressions and concealment of facts by Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 was likely to mislead Plaintiff and others to believe that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had no knowledge of the fact that NASSAR was a molester, and was known to commit wrongful sexual acts with minors, including with ALY RAISMAN.

111.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known at the time they suppressed and concealed the true facts regarding others' sexual molestations, that the resulting impressions were misleading.

112.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 suppressed and concealed the true facts regarding NASSAR with the purpose of: preventing

-35-
COMPLAINT FOR DAMAGES

EXHIBIT 1
035

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    Plaintiff, and others, from learning that NASSAR and others had been and were continuing to

2    sexually harass, molest and abuse minors and others under NASSAR's and Defendants USOC,

3    USAG, PENNY, PARILLA, and DOES 1 through 500's control, direction, and guidance, with

4    complete impunity; inducing people, including ALY RAISMAN and other benefactors and donors

5    to participate and financially support Defendants USOC and DOES 1 through 500; USOC, USAG,

6    PENNY, PARILLA, and DOES 1 through 500's program and other enterprises of Defendants

7    USOC, USAG, and DOES 1 through 500; preventing further reports and outside investigations

8    into NASSAR and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's

9    conduct; preventing discovery of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

10   through 500's own conduct; avoiding damage to the reputations of Defendants USOC, USAG,

11   PENNY and DOES 1 through 500; protecting Defendants USOC, USAG, PENNY, PARILLA,

12   and DOES 1 through 500's power and status in the community and the gymnastics community;

13   avoiding damage to the reputation of Defendants USOC, USAG, PENNY, PARILLA, and DOES

14   1 through 500, or Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's

15   institutions; and avoiding the civil and criminal liability of Defendants USOC, USAG, PENNY,

16   PARILLA, and DOES 1 through 500, of NASSAR, and of others.

17       113.   At all times mentioned herein, Defendants USOC, USAG, PENNY, PARILLA, and

18   DOES 1 through 500, with knowledge of the tortious nature of their own and NASSAR's conduct,

19   knowingly conspired and gave each other substantial assistance to perpetrate the

20   misrepresentations, fraud and deceit alleged herein—covering up the past allegations of sexual

21   misconduct lodged against NASSAR, and allowing NASSAR to remain in his position as a team

22   physician so they could maintain their reputations and continue with their positions within the

23   organization.

24       114.   The Plaintiff and others were misled by Defendants USOC, USAG, PENNY,

25   PARILLA, and DOES 1 through 500's suppressions and concealment of facts, and in reliance

26   thereon, were induced to act or induced not to act, exactly as intended by Defendants USOC,

27   USAG, PENNY, PARILLA, and DOES 1 through 500. Specifically, Plaintiff were induced to

28   believe that there were no allegations of criminal or sexual abuse against NASSAR and that he

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
036

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

1     was safe to be around children. Had Plaintiff known the true facts about NASSAR, they would

2     have not participated further in activities of NASSAR, or continued to financially support

3     Defendants USOC, USAG, and DOES 1 through 500's activities. They would have reported the

4     matters to the proper authorities, to other minor participants and members and their parents so as

5     to prevent future recurrences; they would not have allowed children, including the Plaintiff, to be

6     alone with, or have any relationship with NASSAR; they would not have allowed children,

7     including the Plaintiff, to attend or be under the control of Defendants USOC, USAG and DOES

8     1 through 500; they would have undertaken their own investigations which would have led to

9     discovery of the true facts; and they would have sought psychological counseling for the Plaintiff,

10    and for other children molested and abused by NASSAR.

11        115.    By giving NASSAR the position of team physician, Defendants USOC, USAG,

12    PENNY, PARILLA, and DOES 1 through 500 impliedly represented that NASSAR was safe and

13    morally fit to give children care and provide osteopathic adjustments.

14        116.    When Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

15    made these affirmative or implied representations and non-disclosures of material facts,

16    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have

17    known that the facts were otherwise. Defendants USOC, USAG, PENNY, PARILLA, and DOES

18    1 through 500 knowingly and intentionally suppressed the material facts that NASSAR had on

19    numerous, prior occasions sexually, physically, and mentally abused minors and participants and

20    members of Defendants USOC, USAG and DOES 1 through 500, including the Plaintiff, and knew

21    of or learned of conduct, or should have known of conduct by NASSAR which placed Defendants

22    USOC, USAG, and DOES 1 through 500 on notice that NASSAR had previously been suspected

23    of felonies, including unlawful sexual conduct with minors, and was likely abusing children.

24        117.    Because of Plaintiff's position on the outside of these organizations, and because

25    of the status of NASSAR as a trusted, authority figure to Plaintiff and her family, ALY RAISMAN

26    was vulnerable to NASSAR and the representations of Defendants USOC, USAG, PENNY,

27    PARILLA, and DOES 1 through 500, both express and implied. NASSAR sought the Plaintiff out,

28

COMPLAINT FOR DAMAGES

EXHIBIT 1
037

1    and was empowered by and accepted ALY RAISMAN's vulnerability. Plaintiff's vulnerability

2    also prevented her from effectively protecting herself from the sexual advances of NASSAR.

3         118.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had the

4    duty to obtain and disclose information relating to sexual misconduct of NASSAR.

5         119.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

6    misrepresented, concealed or failed to disclose information relating to sexual misconduct of

7    NASSAR.

8         120.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew

9    that they had misrepresented, concealed or failed to disclose information related to sexual

10    misconduct of NASSAR.

11         121.    Plaintiff justifiably relied upon Defendants USOC, USAG, PENNY, PARILLA,

12    and DOES 1 through 500 for information relating to sexual misconduct of NASSAR.

13         122.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, in

14    concert with each other and with the intent to conceal and defraud, conspired and came to a meeting

15    of the minds whereby they would misrepresent, conceal or fail to disclose information relating to

16    the sexual misconduct of NASSAR, the inability of Defendants USOC, USAG, PENNY,

17    PARILLA, and DOES 1 through 500 to supervise or stop NASSAR from sexually harassing,

18    molesting and abusing ALY RAISMAN, and their own failure to properly investigate, supervise

19    and monitor his conduct with minor participants and members.

20         123.    By so concealing, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

21    through 500 committed at least one act in furtherance of the conspiracy.

22         124.    As a result of the above-described conduct, Plaintiff has suffered and continues to

23    suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional

24    distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of

25    enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be

26    prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

27    loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for

28    medical and psychological treatment, therapy, and counseling.

EXHIBIT 1
038

125. In addition, when Plaintiff finally discovered the fraud of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and continuing thereafter, Plaintiff experienced recurrences of the above-described injuries. Plaintiff experienced extreme and severe mental anguish and emotional distress that Plaintiff had been the victim of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's fraud; that Plaintiff had not been able to help other minors being molested because of the fraud, and that Plaintiff had not been able, because of the fraud, to receive timely medical treatment needed to deal with the problems Plaintiff has suffered and continues to suffer as a result of the sexual harassment, molestation and abuse of ALY RAISMAN.

126. In subjecting ALY RAISMAN to the wrongful treatment herein described, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression under California *Civil Code* section 3294. Plaintiff is informed, and on that basis, allege that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified by the officers, directors, and/or managing agents of these Defendants. Plaintiff is therefore entitled to recover punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, PENNY and DOES 1 through 500.

## SEVENTH CAUSE OF ACTION
### NEGLIGENCE
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)**

127. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

128. Prior to and after the first incident of the Perpetrator's (NASSAR) sexual harassment, molestation and abuse of Plaintiff, through the present, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, knew and/or should have known that the Perpetrator (NASSAR) had and was capable of sexually, physically, and mentally abusing and harassing Plaintiff or other victims.

129. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 and each of them had special duties to protect the minor Plaintiff and the other participants and

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 1
039

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

members, when such minors were entrusted to Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's care by their parents. Plaintiff's care, welfare and physical custody was entrusted to Defendants USOC and DOES 1 through 500. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 voluntarily accepted the entrusted care of Plaintiff. As such, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff, a minor child, a special duty of care that adults dealing with children owe to protect them from harm. The duty to protect and warn arose from the special, trusting, confidential, and fiduciary relationship between Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 and Plaintiff.

130. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duties of care to the minor Plaintiff by allowing the Perpetrator (NASSAR) to come into contact with the minor Plaintiff and other participants and members, without supervision; by failing to adequately hire, supervise and retain the Perpetrator (NASSAR) whom they permitted and enabled to have access to Plaintiff; by concealing from Plaintiff, her family, and law enforcement that the Perpetrator (NASSAR) was sexually harassing, molesting and abusing minors; and by holding the Perpetrator (NASSAR) out to Plaintiff and her family as being of high moral and ethical repute, in good standing and trustworthy.

131. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duties to Plaintiff by failing to investigate or otherwise confirm or deny such facts of sexual abuse by the Perpetrator (NASSAR), failing to reveal such facts to Plaintiff, her parents, the community and law enforcement agencies, and by placing the Perpetrator (NASSAR) into a position of trust and authority, holding him out to Plaintiff, her parents, and the public as being in good standing and trustworthy.

132. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duty to Plaintiff by failing to adequately monitor and supervise the Perpetrator (NASSAR) and failing to prevent the Perpetrator (NASSAR) from committing wrongful sexual acts with minors including Plaintiff. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's voluminous past records of sexual misconduct by the Perpetrator (NASSAR) caused Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 to know, or

gave them information where they should have known, of the Perpetrator's (NASSAR) incapacity to serve as a team physician, providing for the physical care of minor females.

133.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### EIGHTH CAUSE OF ACTION
### NEGLIGENT SUPERVISION
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)

134.    Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

135.    By virtue of Plaintiff's special relationship with Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's relation to the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to provide reasonable supervision of the Perpetrator (NASSAR), to use reasonable care in investigating the Perpetrator's (NASSAR) background, and to provide adequate warning to Plaintiff, Plaintiff's family, and minor participants and members of the Perpetrator's (NASSAR) dangerous propensities and unfitness. As organizations and individuals responsible for, and entrusted with, the welfare of minor children, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had a duty to protect, supervise, and monitor both the Plaintiff from being preyed upon by sexual predators, and to supervise and monitor the Perpetrator (NASSAR) such that he would not be placed in seclusion with minor children, including the Plaintiff.

136.    As representatives of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, where many of the participants and members thereof are vulnerable minors entrusted to these Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, these

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-41-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
041

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9900

Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's agents expressly and implicitly represented that team physicians and staff, including the Perpetrator (NASSAR), were not a sexual threat to children and others who would fall under the Perpetrator's (NASSAR) influence, control, direction, and care.

137.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, by and through their respective agents, servants and employees, knew or should have known of the Perpetrator's (NASSAR) dangerous and exploitive propensities and that the Perpetrator (NASSAR) was an unfit agent. Despite such knowledge, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 negligently failed to supervise the Perpetrator (NASSAR) in his position of trust and authority as a team physician and authority figure over children, where he was able to commit wrongful acts of sexual misconduct against Plaintiff. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to provide reasonable supervision of the Perpetrator (NASSAR), failed to use reasonable care in investigating the Perpetrator (NASSAR), and failed to provide adequate warning to Plaintiff and Plaintiff's family of the Perpetrator's (NASSAR) dangerous propensities and unfitness. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 further failed to take reasonable steps to ensure the safety of minors, including Plaintiff, from sexual harassment, molestation, and abuse.

138.    At no time during the periods of time alleged did Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 have in place a reasonable system or procedure to investigate, supervise and monitor the team physician or staff, including the Perpetrator (NASSAR), to prevent pre-sexual grooming and sexual harassment, molestation and abuse of children, nor did they implement a system or procedure to oversee or monitor conduct toward minors and others in Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's care.

139.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were aware or should have been aware of how vulnerable children were to sexual harassment, molestation and abuse by teachers and other persons of authority within Defendants USOC and DOES 1 through 500's entities.

EXHIBIT 1
042

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9990

140.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were put on notice, knew and/or should have known that the Perpetrator (NASSAR) had previously engaged and was continuing to engage in unlawful sexual conduct with minors, and had committed other felonies, for his own personal sexual gratification, and that it was foreseeable that he was engaging, or would engage in illicit sexual activities with Plaintiff, and others, under the cloak of the authority, confidence, and trust, bestowed upon him through Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500.

141.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were placed on actual or constructive notice that the Perpetrator (NASSAR) had molested other minors and participants and members during his employment with Defendants USOC and DOES 1 through 500. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were informed of molestations of minors committed by the Perpetrator (NASSAR) prior to Plaintiff's sexual abuse, and of conduct by the Perpetrator (NASSAR) that would put a reasonable person on notice of such propensity to molest and abuse children.

142.    Even though Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known of these illicit sexual activities by the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 did not reasonably investigate, supervise or monitor the Perpetrator (NASSAR) to ensure the safety of the minor participants and members.

143.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's conduct was a breach of their duties to Plaintiff.

144.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and each of them, breached their duty to Plaintiff by, *inter alia*, by failing to adequately monitor and supervise the Perpetrator (NASSAR) and stop the Perpetrator (NASSAR) from committing wrongful sexual acts with minors including Plaintiff.

145.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of

EXHIBIT 1
043

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9990

1    enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be

2    prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

3    loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for

4    medical and psychological treatment, therapy, and counseling.

## NEGLIGENCE *PER SE*-CONDUCT IN VIOLATION OF MANDATED REPORTING LAWS

146.    Under applicable law, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, by and through their employees and agents, were child care custodians and were under a duty to report known or suspected incidents of sexual molestation or abuse of minors to a child protective agency, and not to impede the filing of any such report.

147.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known that their team physician, the Perpetrator (NASSAR), and other staff of Defendants USOC, USAG, and DOES 1 through 500, had sexually molested, abused or caused touching, battery, harm, and/or other injuries to minors, including Plaintiff, giving rise to a duty to report such conduct.

148.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew, or should have known, in the exercise of reasonable diligence, that an undue risk to minors, including Plaintiff, existed because Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 did not comply with California's mandatory reporting requirements.

149.    By failing to report the continuing molestations and abuse by the Perpetrator (NASSAR), which Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known about, and by ignoring the fulfillment of the mandated compliance with the reporting requirements, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 created the risk and danger contemplated by the applicable mandated reporting laws, and as a result, unreasonably and wrongfully exposed Plaintiff and other minors to sexual molestation and abuse.

150.    Plaintiff was a member of the class of persons for whose protection applicable mandated reporting laws were specifically adopted to protect.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1     151.   Had Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

2    adequately reported the molestation of Plaintiff and other minors as required by applicable

3    mandated reporting laws, further harm to Plaintiff and other minors would have been avoided.

4     152.   As a proximate result of Defendants USOC, USAG, PENNY, PARILLA, and

5    DOES 1 through 500's failure to follow the mandatory reporting requirements, Defendants USOC,

6    USAG, PENNY, PARILLA, and DOES 1 through 500 wrongfully denied Plaintiff and other

7    minors the intervention of child protection services. Such public agencies would have changed the

8    then-existing arrangements and conditions that provided the access and opportunities for the

9    molestation of Plaintiff by the Perpetrator (NASSAR).

10     153.   The physical, mental, and emotional damages and injuries resulting from the sexual

11    molestation of Plaintiff by the Perpetrator (NASSAR), were the type of occurrence and injuries

12    that the applicable mandated reporting laws were designed to prevent.

13     154.   As a result, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through

14    500's failure to comply with the mandatory reporting requirements constituted a per se breach of

15    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's duties to Plaintiff.

16     155.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and

17    each of them, breached their duty to Plaintiff by, inter alia, by failing to adequately monitor and

18    supervise the Perpetrator (NASSAR) and stop the Perpetrator (NASSAR) from committing

19    wrongful sexual acts with minors including Plaintiff.

20     156.   As a result of the above-described conduct, Plaintiff has suffered and continues to

21    suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional

22    distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of

23    enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be

24    prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

25    loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for

26    medical and psychological treatment, therapy, and counseling.

27

28

**NINTH CAUSE OF ACTION**
**NEGLIGENT HIRING/RETENTION**
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)**

-45-

EXHIBIT 1
045

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

157.    Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

158.    By virtue of Plaintiff's special relationship with Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's relation to the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to not hire or retain the Perpetrator (NASSAR), given his dangerous and exploitive propensities, which Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known about had they engaged in a reasonable, meaningful and adequate investigation of her background prior to her hiring or retaining her in subsequent positions of employment.

159.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 expressly and implicitly represented that the team staff, trainers, and team physicians, including the Perpetrator (NASSAR), were not a sexual threat to children and others who would fall under the Perpetrator's (NASSAR) influence, control, direction, and guidance.

160.    At no time during the periods of time alleged did Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 have in place a reasonable system or procedure to investigate, supervise and monitor team staff, trainers, and team physicians, including the Perpetrator (NASSAR), to prevent pre-sexual grooming or sexual harassment, molestation and abuse of children, nor did they implement a system or procedure to oversee or monitor conduct toward minors, participants and members and others in Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's care.

161.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were aware or should have been aware and understand how vulnerable children were to sexual harassment, molestation and abuse by teachers and other persons of authority within the control of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 prior to Plaintiff's sexual abuse by the Perpetrator (NASSAR).

162.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were put on notice, and should have known that the Perpetrator (NASSAR) had previously engaged and

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
046

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

1    continued to engage in unlawful sexual conduct with minors and was committing other felonies,

2    for his own personal gratification, and that it was, or should have known it would have been

3    foreseeable that he was engaging, or would engage in illicit sexual activities with Plaintiff, and

4    others, under the cloak of his authority, confidence, and trust, bestowed upon her through

5    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500.

6        163.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were

7    placed on actual or constructive notice that the Perpetrator (NASSAR) had molested or was

8    molesting minors and participants and members, both before his employment within Defendants

9    USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and during that employment

10   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had knowledge of

11   inappropriate conduct and molestations committed by the Perpetrator (NASSAR) before and

12   during his employment, yet chose to allow him to remain unsupervised where she sexually abused

13   Plaintiff.

14       164.    Even though Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through

15   500 knew or should have known of these sexually illicit activities by the Perpetrator (NASSAR),

16   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to use reasonable

17   care in investigating the Perpetrator (NASSAR) and did nothing to reasonably investigate,

18   supervise or monitor the Perpetrator (NASSAR) to ensure the safety of the minor participants and

19   members.

20       165.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's

21   conduct was a breach of their duties to Plaintiff.

22       166.    As a result of the above-described conduct, Plaintiff has suffered and continues to

23   suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional

24   distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of

25   enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be

26   prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

27   loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for

28   medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

## TENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO WARN, TRAIN, or EDUCATE
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)

167.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

168.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR) by properly warning, training or educating Plaintiff and other about how to avoid such a risk.

169.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR), such as the failure to properly warn, train or educate Plaintiff and other minor participants and members about how to avoid such a particular risk that the Perpetrator (NASSAR) posed—of sexual misconduct.

170.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR), by failing to supervise and stop employees of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, including the Perpetrator (NASSAR), from committing wrongful sexual acts with minors, including Plaintiff.

171.     As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## ELEVENTH CAUSE OF ACTION
### SEXUAL BATTERY: *Civil Code* § 1708.5
### (Plaintiff ALY RAISMAN Against DEFENDANT NASSAR)

172.    Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

173.    NASSAR, in doing the things herein alleged, including intending to subject Plaintiff to numerous instances of sexual abuse and harassment by NASSAR, during Plaintiff's time with USAG and USOC, beginning on or around 2010 to in or around 2012, and in or around 2015, including but not limited to instances of NASSAR groping and fondling the Plaintiff's vagina all while NASSAR acted in the course and scope of his agency/employment with Defendants, and each of them and were intended to cause harmful or offensive contact with Plaintiff's person, and did cause such harmful or offensive contact.

174.    NASSAR did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person, and would offend a reasonable sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable sense of personal dignity.

175.    Because of NASSAR's position of authority over Plaintiff, and Plaintiff's mental and emotional state, and Plaintiff's young age under the age of consent, Plaintiff was unable to, and did not, give meaningful consent to such acts.

176.    As a direct, legal and proximate result of the acts of NASSAR, Plaintiff sustained serious and permanent injuries to her person, all of his damage in an amount to be shown according to proof and within the jurisdiction of the Court.

177.    As a direct result of the sexual abuse by NASSAR, Plaintiff has difficulty in reasonably or meaningfully interacting with others, including those in positions of authority over Plaintiff including teachers, and supervisors, and in confidential, business, and familial relationships, due to the trauma of childhood sexual abuse inflicted upon her by NASSAR. This inability to interact creates conflict with Plaintiff's values of trust and confidence in others, and has caused Plaintiff substantial emotional distress, anxiety, nervousness and fear. As a direct result of the sexual abuse and harassment by NASSAR, Plaintiff suffered immensely, including, but not

limited to, encountering issues with a lack of trust, various psychological sequelae, depressive symptoms, anxiety, and nervousness.

178. Plaintiff is informed and based thereon alleges that the conduct of NASSAR was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of others, and were carried out with a conscious disregard of her right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California *Civil Code* section 3294, entitling Plaintiff to punitive damages against NASSAR in an amount appropriate to punish and set an example of NASSAR.

### THIRD CAUSE OF ACTION
### GENDER VIOLENCE
### (Plaintiff ALY RAISMAN Against DEFENDANT NASSAR)

179. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

180. NASSAR's acts committed against Plaintiff, as alleged herein, including the sexual harassment and abuse of the Plaintiff constitutes gender violence and a form of sex discrimination in that one or more of NASSAR's acts would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

181. NASSAR's acts committed against Plaintiff, as alleged herein, including the sexual harassment and abuse of the Plaintiff constitutes gender violence and a form of sex discrimination in that NASSAR's conduct caused a physical intrusion or physical invasion of a sexual nature upon Plaintiff under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

182. As a proximate result of NASSAR's acts, Plaintiff is entitled to actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief. Plaintiff is also entitled to an award of attorney's fees and costs pursuant to *Civil Code* § 52.4, against NASSAR.

///

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9990

EXHIBIT 1
050

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

1       **WHEREFORE**, Plaintiff prays for a jury trial and for judgment against Defendants as

2  follows:

3                    **FOR ALL CAUSES OF ACTION**

4     1.    For past, present and future non-economic damages in an amount to be

5  determined at trial;

6     2.    For past, present and future special damages, including but not limited to past,

7  present and future lost earnings, economic damages and others, in an amount to be determined at

8  trial.

9     3.    Any appropriate statutory damages;

10     4.    For costs of suit;

11     5.    Punitive damages, according to proof, though not as to the Negligence Causes of

12  Action (Causes of Action 7, 8, 9, and 10);

13     6.    For interest based on damages, as well as pre-judgment and post-judgment

14  interest as allowed by law;

15     7.    For attorney's fees pursuant to California *Code of Civil Procedure* sections

16  1021.5, *et seq.*, or as otherwise allowable by law;

17     8.    For declaratory and injunctive relief, including but not limited to court

18  supervision of Defendants USAG, and USOC; and

19     9.    For such other and further relief as the Court may deem proper.

20

21  Dated: February 28, 2018            **MANLY, STEWART & FINALDI**

22

23                        By:  *John C. Manly*

24                            JOHN C. MANLY, Esq.
                                Attorneys for Plaintiff ALY RAISMAN

25

26

27

28

**COMPLAINT FOR DAMAGES**

EXHIBIT 1
051

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Plaintiff ALY RAISMAN hereby demands a trial by jury.

Dated: February 28, 2018                    **MANLY, STEWART & FINALDI**

                                   By:  *John C. Manly*
                                        JOHN C. MANLY, Esq.
                                        Attorneys for Plaintiff ALY RAISMAN

-1-
EXHIBIT 1
052

# EXHIBIT "A"

EXHIBIT 1
053

 

# GYMNASTICS

October 11, 1999



Mr. William J. Hybl, President
Mr. Dick Schultz, Executive Director
Mr. Scott Blackmun, Deputy Executive Director
and General Counsel
United States Olympic Committee
One Olympic Plaza
Colorado Springs, CO 80909

Dear Bill, Dick and Scott:

I am reluctant, given the extraordinary demands being placed on each of you these days, to bring a matter directly to your attention. Unfortunately, I have concluded that I must. The recent experiences of USA Gymnastics with the USOC's Membership and Credentials Committee has been so troubling for our organization, and for me personally, that I feel compelled to share it with you.

On September 7, our Chair, Sandy Knapp, received a letter signed by Membership and Credentials Chairman, Steve Sobel, informing us that "USAG is not in compliance with National Governing Body and membership requirements." This communication is, in our view, the inevitable result of a fundamentally flawed process. Let me be direct; the professional and volunteer leadership of USA Gymnastics believes that the USOC's Membership and Credentials' audit process is badly broken and, perhaps more importantly, are deeply concerned by the apparent indifference to the welfare of young children manifest in the Committee's actions.

There is much about the accomplishments of USA Gymnastics during the past two decades in which we take great pride. Perhaps nothing gives us a greater sense of satisfaction, however, than our national leadership among sports organizations in attempting to protect young athletes from coming in contact with individuals who are unfit to have the honor of being called "coach". While other organizations have chosen to ignore the problem of child abuse in youth sports (see enclosed copy of recent cover story from the September 13 edition of *Sports Illustrated*), USA Gymnastics has investigated every charge and processed each complaint in an effort to protect the children who put their faith in us. To date we have devoted hundreds of thousands of dollars to this effort.

Pan American Plaza • 201 South Capitol Avenue • Suite 300 • Indianapolis, IN 46225 • Phone: 317-237-5050 • Fax: 317-237-5069



EXHIBIT
7

EXHIBIT 1
054

Believing this to be an area in which there is no margin for error, USA Gymnastics established its rules and procedures with a single clear priority in mind – serving the best interests of the young people in our sport. In order to do that, we established procedures that allowed the president of USA Gymnastics to suspend immediately (pending a prompt resolution of the underlying allegation) any individual charged with a felony involving a statute designed to protect children (e.g. child molestation, statutory rape, battery or assault against a minor), and further allowed the president to deny or rescind the membership of any individual who was convicted or pleaded guilty to a felony. We believed when we created those rules (and continue to believe today) that our approach was the proper one. The Membership and Credentials Committee disagreed with us.

After extensive discussions and correspondence with representatives of the Committee by me and Sandy Knapp, the matter was referred to Jack Swarbrick and Scott. Following his discussions with Scott, Jack recommended to us that USAG agree to forego our ability to suspend individuals who had been charged with a crime, but retain our ability to deny the privilege of membership where the judicial process had resulted in a felony conviction. This was not a compromise we were thrilled with (it meant that an individual who is arrested for child molestation and freed on bond can go back to the gym and coach the next day), but one we were prepared to live with in the interest of getting the matter behind us. Remarkably, despite the good faith efforts of two people – Scott and Jack – infinitely more qualified to evaluate the situation than any member of the Membership and Credentials Committee, that Committee rejected this approach. What is particularly stunning about the Committee's decision is the nature of its rejection. We did not receive a measured response aimed, for example, at trying to distinguish cases involving a felony conviction where the nexus between the conviction and potential risk to children was tenuous, but rather were told merely that "a hearing must be provided for in all situations and... USAG could not except from the hearing process, and impose an immediate suspension on, those individuals who has been subjected to a prior non-USAG judicial or administrative hearing" (emphasis added).

In hindsight, I suppose we should not have been surprised by the position taken by the Committee. During the now nearly two years these discussions have dragged on, USA Gymnastics has repeatedly been urged by members of the Committee to resolve the problem by conducting bare-bones telephonic hearings immediately upon receipt of a complaint. This exultation of form over substance is all too typical of the predisposition of this Committee. More importantly, it also ignores the various reasons why such an approach is untenable and poses significant risk to our organization. As the USOC learned in 1994, the intersection between the criminal justice system and the Amateur Sports Act can be an especially treacherous location.

I suspect that if USAG Gymnastics invested additional time and money, we could cobble together some sufficiently muddled amendment to our Bylaws that would satisfy the Membership and Credentials Committee. That is, however, a use of Federation resources I am no longer prepared to allow. Simply stated, we have no intention of dealing further on this matter with representatives of the Membership and Credentials Committee.

EXHIBIT 1
055

We welcome the opportunity to address this matter in other forums acceptable to the three of you, but in inviting that resolution want you to know that we are more resolute than ever in our determination to do whatever it takes to protect the children we serve.

In anticipation of future discussions, let us be absolutely clear about our position. USA Gymnastics has no reluctance to provide hearings to any athlete or professional member in circumstances where hearings are appropriate. In fact, we believe our grievance and member discipline procedures are more refined, and the number of hearings we have conducted in the past ten years is greater, than those of almost any other national governing body. All we want to be certain of here is that: 1) we do not have a circumstance where a panel of three volunteers is asked to reconsider and independently evaluate the factual circumstances that give rise to a felony conviction in a court of law of competent jurisdiction in this country; and 2) we do not allow the occasion of a delay in the timing of a hearing (regardless of the legitimate factors which may contribute to that delay) to put any USA Gymnastics' member gymnasts in a position where we believe their personal safety to be at risk. From our perspective, any risk is an unacceptable risk when it comes to protecting young athletes from abuse.

While the circumstances of this particular issue have undeniably inflamed the passions of those of us responsible for leading USA Gymnastics, these unhappy circumstances are all too indicative of our experiences with this Committee in recent years. In brief, I believe that this Committee has fundamentally lost its way and ought to be reconstituted or its purpose redefined. What ought to be a positive experience of helping national governing bodies conduct a self-audit designed to make them better organizations has turned into a hyper-technical review of governance documents by individuals whose qualifications to conduct such a review are tenuous at best.

Properly conducted, we believe the Membership and Credentials Committee review could be a positive and productive experience. As the Committee which reviews the core activities of each national governing body, the Membership and Credentials Committee is in a position to serve as a valuable information source for what is and isn't working in our industry. Unfortunately, they do not view that as their mission. So we come to the circumstance we have here. The Membership and Credentials Committee reviews national governing bodies who, regrettably, appear to have chosen to ignore the issue of coaching misconduct (but have acceptable hearing procedures in place) and decrees these governing bodies to be in compliance. Yet the national governing body who has taken the lead in this country in moving to protect its athletes against physical, sexual and emotional abuse, and who has provided its procedures for doing so in great detail, is found to be out of compliance because we refuse to conduct a hearing to determine whether an individual who has been convicted of child molestation ought to be allowed to be a professional member of our association. That is a process and a result that no longer deserves the support of the Olympic family.

Again, my apologies for having to add to your already crowded agendas, but, as I hope you can now appreciate, this is a matter about which we feel passionately. It is a matter that goes to the core of the relationship between the national governing body and its

EXHIBIT 1
056

athletes, and so is a matter that ought to be of central importance to the USOC. As USA Gymnastics' experience demonstrates, this is not an issue that can be wished away. The USOC can either position itself as a leader in the protection of young athletes or it can wait until it is forced to deal with the problem under much more difficult circumstances. It is my sincere hope that the USOC will seize the opportunity presented by this dispute to follow the former course of action.

Thank you in advance for you attention to this matter.

Sincerely,

Robert Colarossi

Enclosure

CC:    Sandy Knapp
       Jack Swarbrick
       Michelle Dusserre-Farrell
       Gary Johansen
       Steve Sobel

EXHIBIT 1
057

# EXHIBIT "2"

1 | ROBIE & MATTHAI
A Professional Corporation
2 | EDITH R. MATTHAI, ESQ. (SBN 66730)
LEIGH P. ROBIE, ESQ. (SBN 294688)
3 | 500 South Grand Avenue, Suite 1500
Los Angeles, California 90071
4 | Telephone:   (213) 706-8000
Facsimile:   (213) 706-9913
5 | E-Mail:      ematthai@romalaw.com
             lrobie@romalaw.com
6
Attorneys for Specially Appearing Defendant
7 | STEVE PENNY

8 |                 UNITED STATES DISTRICT COURT

9 |           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 | ALEXANDRA ROSE RAISMAN, an          Case No.:      5:18-cv-02479-BLF
individual,
11 |                                     **EX PARTE APPLICATION OF**
                Plaintiff,              **SPECIALLY-APPEARING**
12 |                                     **DEFENDANT STEPHEN PENNY**
         v.                             **FOR A STAY OF THIS ACTION;**
13 |                                     **DECLARATION OF LEIGH P.**
UNITED STATES OLYMPIC               **ROBIE**
14 | COMMITTEE, a Business Entity of
form unknown; USA GYMNASTICS,
15 | an Indiana Business Entity of Form
Unknown; LARRY NASSAR, an           DATE:
16 | individual; STEVE PENNY, an        TIME:
individual, PAUL PARRILLA, an       CTRM:          3
17 | individual, and DOES 1 through 500,

18 |                Defendants.

19 |

20 |
**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD**:
21 |
        **PLEASE TAKE NOTICE** that, specially-appearing defendant Stephen Penny
22 |
moves ex parte for an order staying the case for a period of six-months, in order to
23 |
protect his rights under the Fifth Amendment of the Constitution, and permitting Mr.
24 |
Penny to request a further stay, if necessary.
25 |
        Mr. Penny's counsel is aware that ex parte applications are solely for
26 |
extraordinary relief and are discouraged by the Court.  However, given the
27 |
unexpected October 17, 2018 arrest of Mr. Penny, the upcoming February 7, 2019
28 |

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
001

1   hearing on Mr. Penny's 12(b)(2) motion, and Plaintiffs' counsels' indicated

2   intention to take a non-appearance of Mr. Penny for a deposition on October 23,

3   2018 and to file a Rule 11 motion with regard to his pending Rule 12(b)(2) motion,

4   there is insufficient time for Mr. Penny to make this request via noticed motion.

5        Because the facts relevant to the Texas criminal investigation overlap with the

6   issues Plaintiffs are seeking to explore in jurisdictional discovery here, Mr. Penny's

7   Fifth Amendment rights may be adversely impacted if this case proceeds against

8   him at this time.  As such, if this action is not stayed, Mr. Penny will be unable to

9   fully respond to and defend himself against the claims asserted, resulting in

10  substantial prejudice.

11       This application is based on this Notice; the accompanying Memorandum of

12  Points and Authorities; the Declaration of Leigh Robie; any reply papers filed by

13  Plaintiffs; all documents, pleadings and records on file with this Court; all materials

14  that may be properly considered in connection with this motion; and oral argument

15  at any hearing on this matter.

16       Plaintiffs are represented by:

17  John Manly, Esq.
    Vince Finaldi, Esq.
18  Manly, Stewart & Finaldi
19  19100 Von Karman Ave., Suite 800
    Irvine, CA 92612
20  Telephone:  (949) 252-9990
21  E-mail:      jmanly@manlystewart.com, vfinaldi@manlystewart.com

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
002

On October 22, 2018, counsel for Mr. Penny conferred via email with Plaintiffs' counsel, and advised that Mr. Penny intended to bring this request for stay.  Declaration of Leigh P. Robie, ¶ 4.  In response, Plaintiffs' counsel advised that Plaintiffs would not consent to a stay.  *Id*.


DATED:        October 22, 2018        ROBIE & MATTHAI


                                              /s/  Leigh P. Robie

By: _____

EDITH R. MATTHAI
LEIGH ROBIE
Attorneys for Defendant
STEVE PENNY

Civil Case No. 5:18-cv-02479-BLF

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
003

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

From the initiation of this litigation, specially-appearing defendant Stephen Penny has contested the jurisdiction of State and Federal Courts in California over the claims made against him.  Those jurisdictional issues remain before this Court, and Mr. Penny is confident he will ultimately prevail on those issues.  Over a year ago Mr. Penny was deposed on jurisdictional issues in *LM Doe v. Nassar, et al.*, Case No. BC638724[1] and he had twice been scheduled to appear for a deposition in the federal cases in which he is named as a party.  Mr. Penny's deposition on the jurisdictional issues was initially set on August 14, 2018.  After counsel for Mr. Penny wrote to Plaintiffs' counsel setting forth the limitations on jurisdictional discovery, and discussed the issues with one of the Plaintiffs' counsel, the deposition was taken off calendar by Plaintiffs' counsel with the concurrence of Mr. Penny's counsel.  The deposition was rescheduled for October 23, 2018.

On September 28, 2018, Mr. Penny was indicted by the Grand Jury in Walker County Texas on a charge of intentionally or knowingly destroying or concealing records.  Mr. Penny did not know of the indictment until after he was arrested on October 17, 2018 by U.S. Marshalls, in the presence of his wife and children, while on vacation in Tennessee.  Had he known of the indictment, or had the Texas authorities contacted one of his easily identifiable lawyers, he would have made the appropriate arrangements to appear in Texas.  Mr. Penny denies the charges.

The morning after the arrest, Mr. Penny's counsel notified all other counsel in the case that Mr. Penny's deposition would not go forward on October 23, 2018.[2]

---

[1] That matter has been removed to the United States District Court, Central District of California, Western Division, Case No: 8:18-CV-01117-JLS-KES.

[2] Because the indictment was in Texas and the arrest in Tennessee, it was unknown on October 18 what process would be necessary or how long the process would take to secure the release of Mr. Penny.

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
004

1  Within forty-eight hours of Mr. Penny's arrest, Plaintiffs' counsel unequivocally

2  showed their intent to use Mr. Penny's indictment as a weapon in the jurisdictional

3  stage of this litigation which would force Mr. Penny to choose between asserting his

4  Fifth Amendment rights and contesting this Court's jurisdiction as he has the right

5  to do.  A stay of this proceeding as to Mr. Penny until the resolution of the Texas

6  charges against him would avoid forcing such a choice upon Mr. Penny while not

7  prejudicing the interests of the Plaintiffs or others.

8  ## II.   STATEMENT OF FACTS AND THE ISSUE PRESENTED

9      On August 31, 2018, Mr. Penny filed a motion and memorandum detailing

10  why the Complaint supports neither general nor specific jurisdiction over him.

11  Raisman Docket Entry 49.  In connection with that motion, Mr. Penny agreed to his

12  deposition on the jurisdictional issues.  Mr. Penny was originally scheduled to be

13  deposed on such issues on August 14, 2018.  That deposition was postponed after

14  discussions between counsels over the scope of the discovery; Plaintiff's counsel

15  suggested the postponement and Mr. Penny's counsel agreed.  The deposition was

16  subsequently rescheduled for October 23rd.

17      On the evening of October 17th, Mr. Penny was arrested in Tennessee on

18  charges originating in Texas alleging his concealment or destruction of documents

19  related to Larry Nassar from the Karolyi Ranch in Walker County, Texas.  On

20  October 18th, with Mr. Penny still in custody, Penny's counsel informed Plaintiffs'

21  counsel that the deposition was "off calendar."  Plaintiffs' counsel claimed that the

22  removal of the deposition from the schedule was "gamesmanship" and decried that

23  counsel "have not even attempted to provide any justification therefor."   Yet, they

24  knew the reason for removing the deposition was Mr. Penny's arrest.  Plaintiffs'

25  counsel had sent multiple tweets praising the arrest of Mr. Penny.

26      The following day, October 19th, Plaintiffs' counsel served Mr. Penny's

27  lawyers with a Rule 11 motion premised on the notion that the Texas indictment and

28  Plaintiffs' counsels speculation about the existence and nature of those documents

5

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
005

1    rendered Mr. Penny's pending Rule 12(b)(2) motion improper.  Plaintiffs' counsel

2    assert that the documents Mr. Penny has been accused of destroying "would have

3    been germane to Penny's knowledge of Nassar as an abuser, and having

4    purposefully targeted Nassar towards California and Californians, including the

5    Plaintiff and others in the Related Actions." (emphasis removed).  Having

6    themselves adjudged both that Mr. Penny is guilty and that the alleged documents

7    contain the information necessary to cure the jurisdictional defects of the claims

8    against Mr. Penny, Plaintiffs' counsel deem that Mr. Penny's pending Rule 12(b)(2)

9    motion was made for an improper purpose and must be withdrawn.  Quite simply,

10   Plaintiffs' counsel are attempting to utilize the Texas indictment against Mr. Penny

11   as a cudgel to destroy his jurisdictional defenses in any way they can.[3]

12          Plaintiffs' counsels' Rule 11 motion makes clear that if discovery were

13   allowed to proceed against Mr. Penny, counsel would aggressively explore both the

14   existence and content of the documents that are the alleged basis of the Texas

15   criminal charges.  If such questioning were allowed to proceed, Mr. Penny, in

16   accordance with the direction of his criminal counsel, would have to plead the Fifth

17   Amendment until such time as the Texas charges are resolved.  As already laid out

18   by their Rule 11 motion, Plaintiffs' counsel would then try to use Mr. Penny's

19   invocations of his constitutional rights to assert that Mr. Penny could not proceed to

20   challenge jurisdiction.  Indeed, Plaintiffs want to obtain a default against Mr. Penny

21   based on the indictment alone.  Mr. Penny is innocent and by law innocent until

22   proven guilty.  This Court should stay this matter as to Mr. Penny until the Texas

23   criminal case is resolved.  At this time Mr. Penny requests a six-month stay of the

24

25   [3] As further evidence of Plaintiffs' Counsel's tactics, the primary case cited in their

26   motion, *Archdiocese of Milwaukee v. Superior Court*, 112 Cal.App.4th 423 (2003)
     has no legal relevance to their argument and serves solely to reinforce a inferential

27   link between the conduct alleged here and the abuse issues in the Catholic church.

28

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
006

1   action as to him with the right to request renewal of the stay depending upon the
2   status of the Texas proceedings.  If the Texas proceedings are more quickly
3   resolved, Mr. Penny will notify this court of the resolution.

4   **III.   <u>ARGUMENT</u>**

5         The Fifth Amendment provides that "No person shall be . . . compelled in any
6   criminal case to be a witness against himself."  U.S. Const. amend. V.  "The
7   Amendment not only protects the individual against being involuntarily called as a
8   witness against himself in a criminal prosecution but also privileges him not to
9   answer official questions put to him in any other proceeding, civil or criminal,
10  formal or informal, where the answers might incriminate him in future criminal
11  proceedings."  *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

12        When the Fifth Amendment is implicated in a civil case because of a pending
13  criminal prosecution, an appropriate remedy may be to "postpon[e] civil discovery
14  until termination of the criminal action."  *United States v. Kordel*, 397 U.S. 1, 9
15  (1970) (footnote omitted).  And this Court has authority to stay civil proceedings
16  "when the interests of justice seem to require such action."  *Keating v. Office of*
17  *Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995).  As explained in *Keating*, when
18  faced with a conflict between a civil litigation and a defendant's Fifth Amendment
19  rights, the analysis should be conducted "in light of the particular circumstances and
20  competing interests involved in the case" and after contemplation of "the extent to
21  which the defendant's fifth amendment rights are implicated."  *Id.* (citations
22  omitted).  Each of the factors laid out in *Keating* are addressed below, and each
23  favors issuance of a stay for Mr. Penny.[4]

24  _____

25  [4] The factors laid out by the *Keating* case are: "(1) the interest of the plaintiffs in
26  proceeding expeditiously with this litigation or any particular aspect of it, and the
    potential prejudice to plaintiffs of a delay; (2) the burden which any particular
27  aspect of the proceedings may impose on defendants; (3) the convenience of the
    court in the management of its cases, and the efficient use of judicial resources; (4)
28

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION
EXHIBIT 2
007

1
2

**a.    The Anticipated Invocation of Mr. Penny's Fifth Amendment Rights Warrants a Stay.**

3
4
5
6
7
8

Mr. Penny is charged in a criminal indictment with conduct related to the maintenance of documents kept at the Karolyi Ranch in Walker County, Texas. Plaintiffs' counsel has shown that allowing discovery to proceed against Mr. Penny at this time would represent a significant threat to Mr. Penny's Fifth Amendment rights.  Further, a stay as to Mr. Penny would not impede the advancement of the litigation against other parties.

9

**b.    The Remainder of the Keating Factors Favor A Stay.**

10
11

i.    *Any Prejudice to Plaintiffs is Outweighed by Penny's Fifth Amendment Concerns.*

12
13
14
15
16
17
18
19
20
21
22
23
24
25

A stay of civil proceedings frequently has the potential of working some prejudice to the plaintiffs, yet Courts routinely issue such stays, frequently over the totality of a litigation.  *See, e.g., Pacers, Inc. v. Superior* Court, 162 Cal. App. 3d 686 (4th Dist. 1984).  There is no way the requested stay would compromise Plaintiffs' positions as to Mr. Penny (other than by not allowing them to force him to the choice between his rights and his defense).  Here the requested stay only as to Mr. Penny would not prevent Plaintiffs from developing the case as to the other defendants, nor would it serve to prevent Plaintiffs from taking discovery from any witnesses other than Mr. Penny.  Moreover, the resolution of the criminal litigation against Mr. Penny may serve to illuminate issues regarding the content and actual relevance of the documents that serve as the basis of the Texas indictment.  The Texas proceedings are likely to dispel Plaintiffs' counsel's presently foundationless speculation about the relevance of the documents to Mr. Penny's jurisdictional challenges.

26
27
28

---

the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation."  *Keating* at 325.

8

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
008

1    ii.  *Proceeding With This Case Severely Burdens Mr. Penny.*

2   As described above, proceeding with this case against Mr. Penny at this time

3 would likely force him to choose between fully defending himself in this action and

4 preserving his Fifth Amendment rights by refusing to answer questions pertaining to

5 the Texas indictment.  The extreme prejudice that will result from forcing this

6 choice upon Mr. Penny, particularly at the jurisdictional stage of this litigation,

7 outweighs any purported prejudice to Plaintiffs from a finite delay as to him in this

8 matter.

9    iii.  *The Convenience of the Court Weights in Favor of a Stay.*

10   The Court has an interest in managing its cases efficiently.  "Staying the case

11 makes efficient use of judicial resources by insuring that common issues of fact will

12 be resolved and subsequent civil discovery will proceed unobstructed by concerns

13 regarding self-incrimination." *Jones v. Conte*, 2005 WL 1287017, *2 (N.D. Cal.

14 2005) (internal citations omitted).  As evidenced by Plaintiffs' counsel's Rule 11

15 motion, it is hard to imagine that absent a stay, the parties will not ultimately be

16 back before this Court regarding a challenge to some element of Mr. Penny's

17 invocation of his Fifth Amendment rights, likely in the form of Plaintiffs seeking an

18 adverse inference based on such a refusal to answer.  The Court can avoid the

19 potential for such issues by granting the limited stay requested.

20    iv.  *No Interests of Persons Not Parties to the Action Will Be*

21        *Affected by a Stay.*

22   The interests of persons not parties to this action will not be affected by a

23 stay.  The case is currently in a phase of jurisdictional discovery.  Since the Texas

24 case has just been filed against Mr. Penny, no representation can be made to the

25 court regarding the actual time it will take to resolve the charges.  However, there is

26 a potential that the Texas criminal case will be resolved quickly.  Once the Texas

27 case is resolved the jurisdictional discovery as to Mr. Penny can be concluded and

28 the jurisdictional motion heard.  No non-party to this litigation would be affected by

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
009

1  the delay in the jurisdictional discovery. Mr. Penny's criminal counsel certainly

2  expects that the criminal indictment in Texas will be resolved sufficiently far in

3  advance of the currently scheduled Non-Expert Discovery Cutoff of January 10,

4  2020 to allow for complete exploration of the jurisdictional issues, and to the extent

5  necessary, the merits of the complaint as to Mr. Penny within the existing case

6  schedule. Consequently, a stay as to Mr. Penny will not prejudice any such persons'

7  interests.

8              v.        *The Interest of the Public Favors a Stay.*

9         The public has an interest in "ensuring that the criminal process is not

10  subverted by ongoing civil cases." *Douglas v. United States*, 2006 WL 2038375

11  (N.D. Cal. July 17, 2006). Absent a stay as to Mr. Penny, this case will proceed

12  parallel to the Texas criminal case, potentially severely impacting Mr. Penny's

13  reasonable opportunity to offer a defense here and potentially subjecting him to the

14  jurisdiction of a Court where it otherwise would not lie. This scenario does not

15  further the public's interest in a justice system that provides for the fair resolution of

16  both civil and criminal matters. Conversely, a stay would promote the public

17  interest by providing Mr. Penny with a meaningful opportunity to exercise his

18  constitutional rights *and* to present a full and complete defense to the civil charges

19  against him here.

20        c.     **The Action Can Proceed As To Other Defendants.**

21         The crux of Plaintiffs' allegations are against Dr. Nassar and USA

22  Gymnastics, not against Mr. Penny. The issuance of a stay as to Mr. Penny would

23  not stop Plaintiffs' ability to proceed against the other defendants. The requested

24  stay would do nothing to prevent their development of such claims through

25  discovery both to other Defendants and to third-parties.[5]

26  _____

27  [5] Notably, the vast majority of any documents that Mr. Penny may have had that

28  could relate to the merits of the litigation are not in his control but rather in the

10                                                        Civil Case No. 5:18-cv-02479-BLF

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
010

1

IV.   **CONCLUSION**

2

For the foregoing reasons, specially-appearing defendant Stephen Penny

3

respectfully requests that this action be stayed as to him for six months.  If the

4

criminal case in Texas is resolved within the six months, Mr. Penny will notify this

5

court of the resolution.  If the criminal charges remain pending at the conclusion of

6

the six month period, Mr. Penny will address the issue of any further stay by motion

7

to this court.

8

9

DATED:     October 22, 2018          ROBIE & MATTHAI

10

11

By: _____

/s/  Leigh P. Robie

12

EDITH R. MATTHAI

13

LEIGH ROBIE

Attorneys for Defendant

STEVE PENNY

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

possession and control of other Defendants.  Consequently, the effect of granting the
stay as to Penny will have an even lesser impact as to the advancement of discovery
in the case than would otherwise be anticipated.

11

Civil Case No. 5:18-cv-02479-BLF

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
011

## DECLARATION OF LEIGH P. ROBIE

I, Leigh P. Robie, declare as follows:

1.     I am an attorney for specially-appearing defendant Stephen Penny in this action.  I have personal knowledge of the facts stated in this declaration and would testify to them if called to do so.  I make this declaration in support of Stephen Penny's Motion for Stay.

2.     Attached as Exhibit 1 are true and correct copies of email correspondence between counsel for Mr. Penny and Plaintiffs' counsel regarding the scheduling of Mr. Penny's deposition.

3.     Attached as Exhibit 2 is a true and correct copy of the Rule 11 Motion served by Plaintiffs' counsel on October 19, 2018.

4.     Attached as Exhibit 3 is a true and correct copy of the email correspondence with Plaintiffs' counsel on October 22, 2018 concerning Mr. Penny's intention to seek a stay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed October 22, 2018, in Los Angeles, California.


/s/ Leigh P. Robie
_____
LEIGH P. ROBIE

Civil Case No. 5:18-cv-02479-BLF
EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
012

# EXHIBIT 1

EXHIBIT 2
013

**Leigh Robie**

| | |
|---|---|
| **From:** | Edith Matthai |
| **Sent:** | Thursday, October 18, 2018 8:09 AM |
| **To:** | 'Alex Cunny'; Holm, Margaret; Daniel White; Leos, Melissa; Leigh Robie |
| **Cc:** | John Manly; Vince Finaldi; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery |
| **Subject:** | RE: USAG - Depositions - Steve Penny and Others |

The deposition of Steve Penny is off calendar.

Edith R. Matthai
**ROBIE & MATTHAI**
500 South Grand Ave.
Suite 1500
Los Angeles, CA 90071
213-706-8000
213-706-9913 (fax)

WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

---

**From:** Alex Cunny [mailto:acunny@manlystewart.com]
**Sent:** Tuesday, October 9, 2018 11:12 AM
**To:** Holm, Margaret; Daniel White; Edith Matthai; Leos, Melissa; Leigh Robie
**Cc:** John Manly; Vince Finaldi; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery
**Subject:** USAG - Depositions - Steve Penny and Others

All,

Per Edith's offer, we will be noticing the deposition of Steve Penny for October 23, 2018 in Indianapolis. **Dan/Peggy**- We still have not gotten any dates for Leslie King or Bitsy Kelley. We still need them, asked a while back, and will be sending subpoenas today if we do not get any by the close of business tomorrow. Please advise of their availability.

Thank you,

Alex E. Cunny, Esq.
*Attorney*
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com

EXHIBIT 1
EXHIBIT 2    13
014



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

EXHIBIT 1
EXHIBIT 2     14
015

## Leigh Robie

| | |
|---|---|
| **From:** | Vince Finaldi <vfinaldi@manlystewart.com> |
| **Sent:** | Thursday, October 18, 2018 9:13 AM |
| **To:** | Edith Matthai; Alex Cunny; Holm, Margaret; Daniel White; Leos, Melissa; Leigh Robie |
| **Cc:** | John Manly; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery |
| **Subject:** | RE: USAG - Depositions - Steve Penny and Others |

Edith,

You can't just unilaterally take his deposition off calendar after already agreeing to it. Especially since this is the second time you have done it. Talk about gamesmanship. Especially since you have not even attempted to provide any justification therefor. Not a single sentence. Please advise because we intend to proceed with this deposition, as scheduled. He has filed a dispositive motion and our clients are entitled to depose him regarding those issues so long as that motion is still on calendar.

Awaiting your timely response.

Vince William Finaldi, Esq.
**MANLY, STEWART & FINALDI**
19100 Von Karman Avenue, Suite 800
Irvine, California 92612
Phone: (949) 252-9990
Direct: (949) 943-8423
Fax: (949) 252-9991
vfinaldi@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Edith Matthai [mailto:EMatthai@romalaw.com]
**Sent:** Thursday, October 18, 2018 8:09 AM
**To:** Alex Cunny <acunny@manlystewart.com>; Holm, Margaret <Margaret.Holm@clydeco.us>; Daniel White <DWhite@WhiteAmundson.com>; Leos, Melissa <Melissa.Leos@clydeco.us>; Leigh Robie <LRobie@romalaw.com>
**Cc:** John Manly <jmanly@manlystewart.com>; Vince Finaldi <vfinaldi@manlystewart.com>; Kathy Frederiksen <kfrederiksen@manlystewart.com>; Kamin, Mitchell A <MKamin@cov.com>; Chen, Mark Y <MYChen@cov.com>; Jolley, David <djolley@cov.com>; Victoria Mery <VMery@bafirm.com>
**Subject:** RE: USAG - Depositions - Steve Penny and Others

The deposition of Steve Penny is off calendar.

Edith R. Matthai
**ROBIE & MATTHAI**

EXHIBIT 1
EXHIBIT 2    15
016

500 South Grand Ave.
Suite 1500
Los Angeles, CA 90071
213-706-8000
213-706-9913 (fax)

WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

---

**From:** Alex Cunny [mailto:acunny@manlystewart.com]
**Sent:** Tuesday, October 9, 2018 11:12 AM
**To:** Holm, Margaret; Daniel White; Edith Matthai; Leos, Melissa; Leigh Robie
**Cc:** John Manly; Vince Finaldi; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery
**Subject:** USAG - Depositions - Steve Penny and Others

All,

Per Edith's offer, we will be noticing the deposition of Steve Penny for October 23, 2018 in Indianapolis. **Dan/Peggy**- We still have not gotten any dates for Leslie King or Bitsy Kelley. We still need them, asked a while back, and will be sending subpoenas today if we do not get any by the close of business tomorrow. Please advise of their availability.

Thank you,

Alex E. Cunny, Esq.
*Attorney*
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

EXHIBIT 1
EXHIBIT 2      16
017

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

_____

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

EXHIBIT 1
EXHIBIT 2     17
018

## Leigh Robie

| | |
|---|---|
| **From:** | Vince Finaldi <vfinaldi@manlystewart.com> |
| **Sent:** | Thursday, October 18, 2018 9:24 AM |
| **To:** | Edith Matthai |
| **Cc:** | Alex Cunny; Holm, Margaret; Daniel White; Leos, Melissa; Leigh Robie; John Manly; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery |
| **Subject:** | RE: USAG - Depositions - Steve Penny and Others |

Edith,

People get arrested all the time, for various reasons. Granted, they are not always hiding out in a cabin in the rural Smoky Mountains of Tennessee when they are, but, nevertheless, it happens. Will he be released on bail by the time of the deposition?

As to the substance of the motion, Mr. Penny's indictment states:

"Upon indictment, the 278th Judicial District Court issued a warrant for Penny's arrest in Cause Number 28849. If convicted, the range of punishment is 2 to 10 years in prison and up to a $10000 fine.

According to the indictment, Steve Penny, the former president of USA Gymnastics, is alleged to have tampered with evidence during the investigation of sexual assault allegations against Dr. Larry Nassar. The indictment alleges that Penny ordered the removal of documents from the Karolyi Ranch in Walker County, Texas that were related to the activities of Nassar at the ranch. The indictment further alleges that the removal of the documents was done for the purpose of impairing the ongoing investigation by destroying or hiding the documents. During the investigation by the Texas Rangers and the Walker County Sheriff's Office, several sources reported that Penny ordered the removal of the documents from the ranch after learning that an investigation was underway. The investigation revealed that the documents were delivered to Penny at the USAG Headquarters in Indianapolis, Indiana. To date, those records have not been recovered and the location of the records is unknown. The Texas Rangers and the detectives believe that those records are material to their investigation and that the removal of the records by Penny prevented them from reviewing documents that would have helped in their investigation of Nassar as well as assisted with the investigation of other offenses that may have occurred at the Karolyi Ranch."

Thus, how can Penny credibly argue that he is entitled to escape civil liability on jurisdiction grounds when he actively destroyed the documents that are relevant thereto? This is not a simple jurisdictional opposition anymore. This is now a Rule 11 issue.

I would like your substantive response to these issues, to which we are entitled. Your unilateral edict that "the deposition will not go forward," which may be fine for some counsel, does not suffice for our office. Especially when we have oppositions to these motions to dismiss, which attempt to erase our client's method of recovery against Mr. Penny, to file.

Awaiting your timely substantive response.

Vince William Finaldi, Esq.
**MANLY, STEWART & FINALDI**
19100 Von Karman Avenue, Suite 800
Irvine, California 92612
Phone: (949) 252-9990

EXHIBIT 1
EXHIBIT 2     18
019

Direct: (949) 943-8423
Fax: (949) 252-9991
vfinaldi@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT
PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS
HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED
RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Edith Matthai [mailto:EMatthai@romalaw.com]
**Sent:** Thursday, October 18, 2018 9:17 AM
**To:** Vince Finaldi <vfinaldi@manlystewart.com>
**Cc:** Alex Cunny <acunny@manlystewart.com>; Holm, Margaret <Margaret.Holm@clydeco.us>; Daniel White
<DWhite@WhiteAmundson.com>; Leos, Melissa <Melissa.Leos@clydeco.us>; Leigh Robie <LRobie@romalaw.com>;
John Manly <jmanly@manlystewart.com>; Kathy Frederiksen <kfrederiksen@manlystewart.com>; Kamin, Mitchell A
<MKamin@cov.com>; Chen, Mark Y <MYChen@cov.com>; Jolley, David <djolley@cov.com>; Victoria Mery
<VMery@bafirm.com>
**Subject:** Re: USAG - Depositions - Steve Penny and Others

Mr. Finaldi,
I know you are aware that Steve has been arrested. The deposition will not go forward.
Edith

Edith Matthai

Sent from my iPhone

On Oct 18, 2018, at 9:12 AM, Vince Finaldi <vfinaldi@manlystewart.com> wrote:

> Edith,
>
> You can't just unilaterally take his deposition off calendar after already agreeing to it. Especially since
> this is the second time you have done it. Talk about gamesmanship. Especially since you have not even
> attempted to provide any justification therefor. Not a single sentence. Please advise because we intend
> to proceed with this deposition, as scheduled. He has filed a dispositive motion and our clients are
> entitled to depose him regarding those issues so long as that motion is still on calendar.
>
> Awaiting your timely response.
>
> Vince William Finaldi, Esq.
> **MANLY, STEWART & FINALDI**
> 19100 Von Karman Avenue, Suite 800
> Irvine, California 92612
> Phone: (949) 252-9990
> Direct: (949) 943-8423
> Fax: (949) 252-9991
> vfinaldi@manlystewart.com
> <image001.jpg>
> THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-
> WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE
> NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR AN

EXHIBIT 1
EXHIBIT 2
020
19

OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Edith Matthai [mailto:EMatthai@romalaw.com]
**Sent:** Thursday, October 18, 2018 8:09 AM
**To:** Alex Cunny <acunny@manlystewart.com>; Holm, Margaret <Margaret.Holm@clydeco.us>; Daniel White <DWhite@WhiteAmundson.com>; Leos, Melissa <Melissa.Leos@clydeco.us>; Leigh Robie <LRobie@romalaw.com>
**Cc:** John Manly <jmanly@manlystewart.com>; Vince Finaldi <vfinaldi@manlystewart.com>; Kathy Frederiksen <kfrederiksen@manlystewart.com>; Kamin, Mitchell A <MKamin@cov.com>; Chen, Mark Y <MYChen@cov.com>; Jolley, David <djolley@cov.com>; Victoria Mery <VMery@bafirm.com>
**Subject:** RE: USAG - Depositions - Steve Penny and Others

The deposition of Steve Penny is off calendar.

Edith R. Matthai
**ROBIE & MATTHAI**
500 South Grand Ave.
Suite 1500
Los Angeles, CA 90071
213-706-8000
213-706-9913 (fax)

WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

**From:** Alex Cunny [mailto:acunny@manlystewart.com]
**Sent:** Tuesday, October 9, 2018 11:12 AM
**To:** Holm, Margaret; Daniel White; Edith Matthai; Leos, Melissa; Leigh Robie
**Cc:** John Manly; Vince Finaldi; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery
**Subject:** USAG - Depositions - Steve Penny and Others

All,

Per Edith's offer, we will be noticing the deposition of Steve Penny for October 23, 2018 in Indianapolis. **Dan/Peggy-** We still have not gotten any dates for Leslie King or Bitsy Kelley. We still need them, asked a while back, and will be sending subpoenas today if we do not get any by the close of business tomorrow. Please advise of their availability.

Thank you,

**Alex E. Cunny, Esq.**
*Attorney*

EXHIBIT 1
EXHIBIT 2    20
021

**MANLY, STEWART & FINALDI**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com
<image001.jpg>

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-
WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE
NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY
OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO
THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY
PROHIBITED.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report
this email as spam.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report
this email as spam.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as
spam.

EXHIBIT 1
EXHIBIT 2    21
022

## Leigh Robie

| | |
|---|---|
| **From:** | Leigh Robie |
| **Sent:** | Thursday, October 18, 2018 9:24 AM |
| **To:** | 'Vince Finaldi'; Edith Matthai; Alex Cunny; Holm, Margaret; Daniel White; Leos, Melissa |
| **Cc:** | John Manly; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery |
| **Subject:** | RE: USAG - Depositions – Steve Penny and Others |
| **Attachments:** | RE: Nassar Cases - Deposition of Steve Penny |

Mr. Finaldi,
Our firm did not unilaterally take Mr. Penny's deposition off calendar in August. Please see the attached correspondence between you and our office.

*Leigh Robie*
**Robie & Matthai**
500 South Grand Ave.
Suite 1500
Los Angeles, CA 90071
213-706-8000
213-706-9913 (fax)

WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

**From:** Vince Finaldi [mailto:vfinaldi@manlystewart.com]
**Sent:** Thursday, October 18, 2018 9:13 AM
**To:** Edith Matthai <EMatthai@romalaw.com>; Alex Cunny <acunny@manlystewart.com>; Holm, Margaret <Margaret.Holm@clydeco.us>; Daniel White <DWhite@WhiteAmundson.com>; Leos, Melissa <Melissa.Leos@clydeco.us>; Leigh Robie <LRobie@romalaw.com>
**Cc:** John Manly <jmanly@manlystewart.com>; Kathy Frederiksen <kfrederiksen@manlystewart.com>; Kamin, Mitchell A <MKamin@cov.com>; Chen, Mark Y <MYChen@cov.com>; Jolley, David <djolley@cov.com>; Victoria Mery <VMery@bafirm.com>
**Subject:** RE: USAG - Depositions - Steve Penny and Others

Edith,

You can't just unilaterally take his deposition off calendar after already agreeing to it. Especially since this is the second time you have done it. Talk about gamesmanship. Especially since you have not even attempted to provide any justification therefor. Not a single sentence. Please advise because we intend to proceed with this deposition, as scheduled. He has filed a dispositive motion and our clients are entitled to depose him regarding those issues so long as that motion is still on calendar.

Awaiting your timely response.

EXHIBIT 1
EXHIBIT 2        22
023

Vince William Finaldi, Esq.
**MANLY, STEWART & FINALDI**
19100 Von Karman Avenue, Suite 800
Irvine, California 92612
Phone: (949) 252-9990
Direct: (949) 943-8423
Fax: (949) 252-9991
vfinaldi@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Edith Matthai [mailto:EMatthai@romalaw.com]
**Sent:** Thursday, October 18, 2018 8:09 AM
**To:** Alex Cunny <acunny@manlystewart.com>; Holm, Margaret <Margaret.Holm@clydeco.us>; Daniel White <DWhite@WhiteAmundson.com>; Leos, Melissa <Melissa.Leos@clydeco.us>; Leigh Robie <LRobie@romalaw.com>
**Cc:** John Manly <jmanly@manlystewart.com>; Vince Finaldi <vfinaldi@manlystewart.com>; Kathy Frederiksen <kfrederiksen@manlystewart.com>; Kamin, Mitchell A <MKamin@cov.com>; Chen, Mark Y <MYChen@cov.com>; Jolley, David <djolley@cov.com>; Victoria Mery <VMery@bafirm.com>
**Subject:** RE: USAG - Depositions - Steve Penny and Others

The deposition of Steve Penny is off calendar.

Edith R. Matthai
**ROBIE & MATTHAI**
500 South Grand Ave.
Suite 1500
Los Angeles, CA 90071
213-706-8000
213-706-9913 (fax)

WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

**From:** Alex Cunny [mailto:acunny@manlystewart.com]
**Sent:** Tuesday, October 9, 2018 11:12 AM
**To:** Holm, Margaret; Daniel White; Edith Matthai; Leos, Melissa; Leigh Robie
**Cc:** John Manly; Vince Finaldi; Kathy Frederiksen; Kamin, Mitchell A; Chen, Mark Y; Jolley, David; Victoria Mery
**Subject:** USAG - Depositions - Steve Penny and Others

All,

EXHIBIT 1
EXHIBIT 2    23
024

Per Edith's offer, we will be noticing the deposition of Steve Penny for October 23, 2018 in Indianapolis. **Dan/Peggy**- We still have not gotten any dates for Leslie King or Bitsy Kelley. We still need them, asked a while back, and will be sending subpoenas today if we do not get any by the close of business tomorrow. Please advise of their availability.

Thank you,

**Alex E. Cunny, Esq.**
*Attorney*
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

EXHIBIT 1
EXHIBIT 2      24
025

## Leigh Robie

| | |
|---|---|
| **From:** | Vince Finaldi <vfinaldi@manlystewart.com> |
| **Sent:** | Monday, August 13, 2018 3:51 PM |
| **To:** | Edith Matthai |
| **Cc:** | Leigh Robie; DWhite@WhiteAmundson.com (DWhite@WhiteAmundson.com); SAMUNDSON@WhiteAmundson.com; rlack@WhiteAmundson.com; Holm, Margaret; Leos, Melissa; krista.gutierrez@clydeco.us; Rosenberg, Sheryl; Lorraine.Gallo@clydeco.us; Kamin, Mitchell A; TSpath@cov.com; mchen@cov.com; pslagter@cov.com; Kubota, Carolyn; Jolley, David; usood@cov.com; MJacobs@mrllp.com; apawlyk@mrllp.com; jkrompier@mrllp.com; jbooth@boothllp.com; ceaston@boothllp.com; prasmussen@boothllp.com; jpfeiffer@bafirm.com; dberg@bafirm.com; Gregory.Lee@wilsonelser.com; David.Eisen@wilsonelser.com; lalaw500@gmail.com; kevinoconnell.law@gmail.com; kevin.minnick@skadden.com; abrubaker@wingertlaw.com; Mercedes Mendoza; Mark Johnson; John Manly |
| **Subject:** | RE: Nassar Cases - Deposition of Steve Penny |

Ok, we will regroup next week, meet and confer separately as to these issues, and then try to come to agreement on a new date. Good?

Vince William Finaldi, Esq.
**MANLY, STEWART & FINALDI**
19100 Von Karman Avenue, Suite 800
Irvine, California 92612
Phone: (949) 252-9990
Direct: (949) 943-8423
Fax: (949) 252-9991
vfinaldi@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Edith Matthai [mailto:EMatthai@romalaw.com]
**Sent:** Monday, August 13, 2018 3:45 PM
**To:** Vince Finaldi <vfinaldi@manlystewart.com>
**Cc:** Leigh Robie <LRobie@romalaw.com>; DWhite@WhiteAmundson.com (DWhite@WhiteAmundson.com) <DWhite@WhiteAmundson.com>; SAMUNDSON@WhiteAmundson.com; rlack@WhiteAmundson.com; Holm, Margaret <Margaret.Holm@clydeco.us>; Leos, Melissa <Melissa.Leos@clydeco.us>; krista.gutierrez@clydeco.us; Rosenberg, Sheryl <Sheryl.Rosenberg@clydeco.us>; Lorraine.Gallo@clydeco.us; Kamin, Mitchell A <MKamin@cov.com>; TSpath@cov.com; mchen@cov.com; pslagter@cov.com; Kubota, Carolyn <ckubota@cov.com>; Jolley, David <djolley@cov.com>; usood@cov.com; MJacobs@mrllp.com; apawlyk@mrllp.com; jkrompier@mrllp.com; jbooth@boothllp.com; ceaston@boothllp.com; prasmussen@boothllp.com; jpfeiffer@bafirm.com; dberg@bafirm.com; Gregory.Lee@wilsonelser.com; David.Eisen@wilsonelser.com; lalaw500@gmail.com; kevinoconnell.law@gmail.com; kevin.minnick@skadden.com; abrubaker@wingertlaw.com; Mercedes Mendoza <mmendoza@romalaw.com>; Mark

EXHIBIT 1
EXHIBIT 2    25
026

Johnson <MJohnson@romalaw.com>; John Manly <jmanly@manlystewart.com>
**Subject:** Re: Nassar Cases - Deposition of Steve Penny

We are in agreement on the postponement of the deposition.

Edith Matthai

Sent from my iPhone

On Aug 13, 2018, at 3:38 PM, Vince Finaldi <vfinaldi@manlystewart.com> wrote:

> Mrs. Matthai,
>
> I have read your letter. From our end, we are in the process of culling materials received from USAG, some of which pertain to Mr. Penny, and preparing for a mediation session on Friday. I believe it would probably be in our clients' collective interests to push this deposition out a few weeks. Perhaps we may be able to reach agreement on some issues raised in your letter, and raised in the first session, in the interim. Please let me know whether you agree, and if so, we will continue the deposition. Because the deposition is set for tomorrow morning, however, time is of the essence.
>
> Thanks,
>
> Vince William Finaldi, Esq.
> **MANLY, STEWART & FINALDI**
> 19100 Von Karman Avenue, Suite 800
> Irvine, California 92612
> Phone: (949) 252-9990
> Direct: (949) 943-8423
> Fax: (949) 252-9991
> vfinaldi@manlystewart.com
> <image001.jpg>
> THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Mark Johnson [mailto:MJohnson@romalaw.com]
**Sent:** Monday, August 13, 2018 11:51 AM
**To:** John Manly <jmanly@manlystewart.com>; Vince Finaldi <vfinaldi@manlystewart.com>
**Cc:** DWhite@WhiteAmundson.com (DWhite@WhiteAmundson.com) <DWhite@WhiteAmundson.com>; SAMUNDSON@WhiteAmundson.com; rlack@WhiteAmundson.com; Holm, Margaret <Margaret.Holm@clydeco.us>; Leos, Melissa <Melissa.Leos@clydeco.us>; krista.gutierrez@clydeco.us; Rosenberg, Sheryl <Sheryl.Rosenberg@clydeco.us>; Lorraine.Gallo@clydeco.us; Kamin, Mitchell A <MKamin@cov.com>; TSpath@cov.com; mchen@cov.com; pslagter@cov.com; Kubota, Carolyn <ckubota@cov.com>; Jolley, David <djolley@cov.com>; usood@cov.com; MJacobs@mrllp.com; apawlyk@mrllp.com; jkrompier@mrllp.com; jbooth@boothllp.com; ceaston@boothllp.com; prasmussen@boothllp.com; jpfeiffer@bafirm.com; dberg@bafirm.com; Gregory.Lee@wilsonelser.com; David.Eisen@wilsonelser.com; lalaw500@gmail.com; kevinoconnell.law@gmail.com; kevin.minnick@skadden.com; abrubaker@wingertlaw.com; Edith Matthai <EMatthai@romalaw.com>; Leigh Robie <LRobie@romalaw.com>; Mercedes Mendoza <mmendoza@romalaw.com>
**Subject:** Nassar Cases - Deposition of Steve Penny

EXHIBIT 1
EXHIBIT 2    26
027

Please see the attached letter of today's date from Edith Matthai.

Mark Johnson | Assistant to
Edith R. Matthai and Gabrielle M.
Jackson
**ROBIE & MATTHAI** | A
Professional Corporation
500 South Grand Avenue | 15th
Floor | Los Angeles | California
90071-3062
Tel: (213) 706-8000 ext. 330 | Fax:
(213) 706-9913 | www.romalaw.com
********************************

WARNING TO UNAUTHORIZED
RECIPIENTS
This transmission and the document(s) attached,
if any, are intended only to be received by, and
for the use of, the individual entity to whom this
transmission is addressed. These materials may
contain confidential or privileged information
that is not intended for unauthorized
recipients. If this transmission has been
transmitted in error or has been received by
someone other than the individual or entity to
whom it is addressed, please contact the sender
immediately at (213) 706-8000 ext. 330 or
MJohnson@romalaw.com

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report
this email as spam.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as
spam.

EXHIBIT 1
EXHIBIT 2     27
028

## Leigh Robie

| | |
|---|---|
| **From:** | Mark Johnson |
| **Sent:** | Monday, August 13, 2018 11:51 AM |
| **To:** | John Manly; Vince Finaldi |
| **Cc:** | DWhite@WhiteAmundson.com (DWhite@WhiteAmundson.com); SAMUNDSON@WhiteAmundson.com; rlack@WhiteAmundson.com; Holm, Margaret; Leos, Melissa; krista.gutierrez@clydeco.us; Rosenberg, Sheryl; Lorraine.Gallo@clydeco.us; Kamin, Mitchell A; TSpath@cov.com; mchen@cov.com; pslagter@cov.com; Kubota, Carolyn; Jolley, David; usood@cov.com; MJacobs@mrllp.com; apawlyk@mrllp.com; jkrompier@mrllp.com; jbooth@boothllp.com; ceaston@boothllp.com; prasmussen@boothllp.com; jpfeiffer@bafirm.com; dberg@bafirm.com; Gregory.Lee@wilsonelser.com; David.Eisen@wilsonelser.com; lalaw500@gmail.com; kevinoconnell.law@gmail.com; kevin.minnick@skadden.com; abrubaker@wingertlaw.com; Edith Matthai; Leigh Robie; Mercedes Mendoza |
| **Subject:** | Nassar Cases - Deposition of Steve Penny |
| **Attachments:** | ERM to Manly re scope of Penny depo.pdf |

Please see the attached letter of today's date from Edith Matthai.

Mark Johnson | Assistant to
Edith R. Matthai and Gabrielle M. Jackson
**ROBIE & MATTHAI** | A Professional Corporation
500 South Grand Avenue | 15th Floor | Los Angeles |
California 90071-3062
Tel: (213) 706-8000 ext. 330 | Fax: (213) 706-9913 |
www.romalaw.com
*************************************
WARNING TO UNAUTHORIZED RECIPIENTS
This transmission and the document(s) attached, if any, are intended only
to be received by, and for the use of, the individual entity to whom this
transmission is addressed. These materials may contain confidential or
privileged information that is not intended for unauthorized recipients. If
this transmission has been transmitted in error or has been received by
someone other than the individual or entity to whom it is addressed,
please contact the sender immediately at (213) 706-8000 ext. 330 or
MJohnson@romalaw.com

EXHIBIT 1
EXHIBIT 2
28
029

# ROBIE & MATTHAI

**A PROFESSIONAL CORPORATION**

James R. Robie (1949-2011)
Edith R. Matthai*
Kyle Kveton
Natalie A. Kouyoumdjian * *
Gabrielle M. Jackson
Marta A. Alcumbrac
Leigh P. Robie
T. John Fitzgibbons
Timothy W. Bucknell

August 13, 2018

Admitted Specialist
in all State agency laws
Licensed member of California Bar
the State Bar of California and Board
of Legal Specialization

### *Via Email*

John C. Manly, Esq.
Vince Finaldi, Esq.
Manly, Stewart & Finaldi
19100 Von Karman Avenue, Suite 800
Irvine, California 92612

Re: *Nassar Cases*

Gentlemen:

I am writing in advance of tomorrow's deposition to advise you of our position concerning the scope of Mr. Penny's deposition.

If you have legal authority or additional facts which contradict the following, please provide that information to me in order that I might consider your position.

The court orders and our agreement to produce Mr. Penny limit the deposition of Mr. Penny to the question of whether the courts in California, either state or federal, have jurisdiction over the following named defendants:[1]

- Steve Penny

- The United States Olympic Committee

- The Karolyis

- Kathy Scanlan

Mr. Penny will follow the orders of the courts.

---

[1] We understand USA Gymnastics is no longer challenging jurisdiction in California.

STRAIGHTFORWARD  •  TO THE POINT

EXHIBIT 1

EXHIBIT 2        29

030

John C. Manly, Esq.
Vince Finaldi, Esq.
August 13, 2018
Page 2

    None of the listed defendants is subject to general jurisdiction in California. The individuals do not reside in California. The United States Olympic Committee is not incorporated in nor does it have its principal place of business in California; none of the Karolyi entities are incorporated in California nor do they have their principal place of business in California. Thus, under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2013) and *Bristol-Myers Squibb v. Superior Court of San Francisco*, 137 S. Ct. 1773 (2017), there is no general jurisdiction over any of the defendants at issue.

    Thus, the questioning at Mr. Penny's deposition is limited to whether the California courts can exercise specific jurisdiction over any of these defendants.

    In *Bristol-Myers Squibb v. Superior Court, supra*, the United States Supreme Court rejected the prior California authorities which applied a sliding scale approach to specific jurisdiction and rejected the theory that wide-ranging contacts with the state can establish specific jurisdiction. There must be specific tortious acts that impact the forum state.

    Mr. Penny's deposition has been noticed in the LM Doe, AJ Doe, Wieber and Raisman cases.

    Mr. Penny was previously deposed in the LM Doe case on jurisdictional issues. Other than the two questions which Judge Susan Bryant Deason allowed in ruling on your motion to compel, Mr. Penny will not be giving testimony with regard to jurisdiction in the LM Doe case.[2]

    AJ Doe (Ms. Antolin) did not participate in any events in California during the time that Mr. Penny was employed by USA Gymnastics.

    The only event in California in which Ms. Raisman and Ms. Wieber participated, and at which we understand Nassar was present, in the timeframe in which they allege molestation, was the 2012 Olympic trials held in San Jose from June 28 through July 1, 2012.

---

[2] Although we don't believe those questions remain relevant given USAG's waiver of any jurisdictional challenge, Mr. Penny will follow the court order.

EXHIBIT 1
EXHIBIT 2        30
031

John C. Manly, Esq.
Vince Finaldi, Esq.
August 13, 2018
Page 3

In order for there to be specific jurisdiction, there must be forum-related acts *personally committed by the non-resident defendant.* To establish specific jurisdiction the plaintiff must show:

- The defendant committed an intentional tort;

- The plaintiff felt the brunt of the harm from that tort in the forum state such that the forum state was the focal point of the tortious injury; and

- The defendant expressly aimed the tortious conduct at the forum state such that the forum state was the focal point of the tortious activity.

*Burdick v. Superior Court of Orange*, 233 Cal.App.4[th] 8 (2015)

The relationship must arise out of the contacts that the *defendant* creates with the forum state; the plaintiff's contacts with the forum state are not the issue.

The *Archdiocese of Milwaukee* case frequently cited by you does not contradict this analysis.

We are unaware of any tortious acts targeted at California committed by any of the defendants who are challenging jurisdiction. Nevertheless, we recognize that you are entitled to inquire with regard to the existence of such tortious activities as it relates to the only relevant event in California, the 2012 San Jose Olympic trials.

I realize from past communications with your office that you will disagree with our position. If you have legal authorities that I should review which contradict our analysis of the scope of the jurisdictional discovery, please provide them so that I may consider

EXHIBIT 1
EXHIBIT 2        31
032

John C. Manly, Esq.
Vince Finaldi, Esq.
August 13, 2018
Page 4

those authorities. Otherwise, we will limit the deposition to that which is allowed under
the court orders and the authorities cited above.

Very truly yours,

**ROBIE & MATTHAI**
A Professional Corporation

EDITH R. MATTHAI

ERM:mwj

cc: All Counsel

EXHIBIT 1
EXHIBIT 2    32
033

# EXHIBIT 2

EXHIBIT 2
034

## Leigh Robie

| | |
|---|---|
| **From:** | Alex Cunny <acunny@manlystewart.com> |
| **Sent:** | Friday, October 19, 2018 5:02 PM |
| **To:** | Edith Matthai; Leigh Robie |
| **Cc:** | Vince Finaldi; John Manly; Kathy Frederiksen |
| **Subject:** | Jane LM Doe v. USAG, et al. - Notice of FRCP 11 Safe Harbor |
| **Attachments:** | FRCP 11 - Def Penny - Service Only.pdf |

Ms. Robie and Ms. Matthai,

Attached to this correspondence, please find our Motion, pursuant to FRCP 11. Pursuant to subsection (c)(2), please provide a response on or before November 12, 2018.

Thank you,

**Alex E. Cunny, Esq.**
*Attorney*
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

EXHIBIT 2
33

EXHIBIT 2
035

JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys for Plaintiff, JANE LM DOE

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA,

## SOUTHERN DIVISION SANTA ANA

| | |
|---|---|
| JANE LM DOE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DR. LARRY NASSAR, an individual; USA GYMNASTICS, an Indiana business entity of form unknown; ROBERT COLAROSSI, an individual; STEPHEN "STEVE" PENNY, an individual; BELA KAROLYI, an individual; MARTHA KAROYLI, an individual; KAROLYI TRAINING CAMPS, LLC, a Texas business entity of form unknown; KAROLYI WORLD GYMNASTICS INC., a Texas business entity of form unknown; KAROLYI'S ELITE, a Texas business entity of form unknown; AOGC ALL OLYMPIA GYMNASTIC CENTER INC., a California business entity of form unknown; GALINA MARINOVA, an individual, ARTUR AKOPYAN, an individual, and DOES 1 through 500.<br><br>Defendants. | Civil Case No. 8:18-cv-01117-JLS-KES<br><br>[The Honorable Josephine L Staton]<br><br>**NOTICE OF PLAINTIFF JANE LM DOE'S MOTION AND MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11 MOTION AND MOTION TO DEFENDANT STEPHEN "STEVE" PENNY; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Notice of Motion and Memorandum of Points and Authorities]<br><br>Date:      TBD<br>Time:      TBD |

///

///

**NOTICE OF PLAINTIFF JANE LM DOE'S FEDERAL RULE OF CIVIL PROCEDURE 11 MOTION TO DEFENDANT PENNY**

EXHIBIT 2
34

EXHIBIT 2
036

**TO DEFENDANT STEPHEN "STEVE" PENNY AND HIS COUNSEL:**

**PLEASE TAKE NOTICE** that Plaintiff Jane LM Doe ("Plaintiff") hereby serves the instant Motion for Sanctions Pursuant to *Federal Rule of Civil Procedure* 11, As To Defendant Stephen "Steve" Penny ("Penny"). The instant Motion is based upon the following facts and legal authorities:

1.) On October 17, 2018, Defendant Penny was arrested, based on an indictment issued from Walker County, Texas, for "intentionally or knowingly destroy[ing] or conceal[ing] records or documents, to wit: records and documents related to Larry Nassar kept at the Karolyi Ranch in Walker County, Texas, with intent to impair the availability as evidence in the investigation." This conduct, based upon this charging document, was alleged to have occurred "on or about **the 11ᵗʰ day of November, 2016**." *See* Indictment of Stephen D. Penny, Jr., to be filed with the Motion.

2.) The instant action was filed on **October 27, 2016**, two weeks prior to the destruction date cited in the indictment. *See* Complaint, to be filed with the Motion.

3.) On March 6, 2017, Defendant Penny, through his prior counsel, filed a Motion to Quash Service for Lack of Subject Matter Jurisdiction in the Superior Court action, prior to this matter's removal to Federal Court. *See* Motion to Quash in Superior Court, to be filed with the Motion. Subsequent updated pleadings were filed both in state court, as well as the pending Motion to Dismiss in the instant Action, which was filed on August 31, 2018, which deals with the same issue;

4.) The instant Motion is based upon *F.R.C.P.* 11(b)(4) which specifically provides that a Motion must be certified by the party's counsel that "...the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 2
35

EXHIBIT 2
037

information." *F.R.C.P.* 11(b)(4). Subsequent to the filing of the instant Matter, Defendant Penny destroyed and/or concealed documents pertaining to the investigation of former, disgraced Doctor Larry Nassar ("Nassar"). Upon destroying these documents, only months later, Penny filed a Motion to Quash Service for Lack of Personal Jurisdiction; a jurisdictional inquiry that has shown **those records would have been germane to Penny's knowledge of Nassar as an abuser, and having purposefully targeted Nassar towards California and Californians, including the Plaintiff and others in the Related Actions.** *See Archdiocese of Milwaukee v. Superior Court* (2003) 112 Cal.App.4th 423, 441 ("Rather, the evidence supports the finding the Milwaukee Archdiocese sought to rid itself of Widera by intentionally sending him into California.");

5.) Penny's pending Motion to Dismiss pursuant to *F.R.C.P.* 12(b)(2) is made for an improper purpose, asserting a jurisdictional defense that would have been defeated outright, had the documents he destroyed/concealed been produced. As such, the Plaintiff will request that the Court strike Penny's pending Motion to Dismiss and impose sanctions in the amount incurred by Plaintiff's counsel in conducting jurisdictional discovery against him.

This Motion is grounded in this notice, the attached Memorandum of Points and Authorities, the Declaration of Alex E. Cunny and exhibits attached thereto, the records and files in this action, and upon such further evidence and argument as may be presented prior to or at the time of hearing on the motion.

Dated: October 19, 2018

MANLY, STEWART & FINALDI

By:

ALEX E. CUNNY, Esq.
Attorneys for Plaintiff,
JANE LM DOE.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 2
36
EXHIBIT 2
038

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    INTRODUCTION AND FACTUAL BACKGROUND

The instant Motion is based upon *Federal Rule of Civil Procedure* 11(b)(4), which was violated by Penny, in authorizing the filing of a Motion to Dismiss under *F.R.C.P.* 12(b)(2), on the grounds that he destroyed and concealed evidence that would have been germane to extinguishing that Motion. This is a Rule 11 violation considering that Penny has filed a motion alleging a defense to the case, for which he has "knowingly and intentionally" destroyed or otherwise concealed information. This Motion to Dismiss raises a defense that is known to be frivolous, in light of the fact that Penny destroyed the very evidence that would have supported the Motion. Moreover, Penny's counsel has recently informed my office that, "I know you are aware that Steve has been arrested. The deposition will not go forward." *See* October 18, 2018 E-mail From Ms. Edith Matthai, to be filed with Motion.

The instant Motion sounds in *F.R.C.P.* 11, but also in *F.R.C.P.* 37 sanctions for evidence spoliation, which we believe will be an issue to be dealt with once the instant Matter has been resolved. Notwithstanding the bearing of this spoliation on any *F.R.C.P.* 37 Motion, the instant *F.R.C.P.* 11 Motion must be addressed first, as hearing is fast approaching.

On this basis, the Plaintiff requests that Mr. Penny withdraw his *F.R.C.P.* 12(b)(2) Motion in this case, as well as in the Related Actions, as his actions in destroying and concealing evidence, are in violation of *F.R.C.P.* 11(b)(2).

### A.    INDICTMENT OF PENNY AND TESTIMONY OF HIS DESTRUCTION OF EVIDENCE RELATED TO NASSAR.

On October 17, 2018, Defendant Penny was arrested based on an indictment in Walker County of Texas. *See* Indictment from Walker County, to be filed with the Motion. On October 17, 2018, Defendant Penny was arrested, based on an indictment issued from Walker County, Texas, for "intentionally or knowingly destroy[ing] or conceal[ing] records or documents, to wit: records and documents

1

EXHIBIT 2
37
EXHIBIT 2
039

1    related to Larry Nassar kept at the Karolyi Ranch in Walker County, Texas, with

2    intent to impair the availability as evidence in the investigation." This conduct,

3    based upon this charging document, was alleged to have occurred "on or about **the**

4    **11th day of November, 2016**." *See* Indictment of Stephen D. Penny, Jr., to be filed

5    with the Motion.

6          The instant action was filed on **October 27, 2016**, two weeks prior to the

7    destruction date cited in the indictment. *See* Complaint, to be filed with the Motion.

8          On March 6, 2017, Defendant Penny, through his prior counsel, filed a

9    Motion to Quash Service for Lack of Subject Matter Jurisdiction in the Superior

10   Court action, prior to this matter's removal to Federal Court. *See* Motion to Quash

11   in Superior Court, to be filed with the Motion. Subsequent updated pleadings were

12   filed both in state court, as well as the pending Motion to Dismiss in the instant

13   Action, which was filed on August 31, 2018, which deals with the same issue.

14                            **II.    ARGUMENT**

15   **A.    RULE 11 MOTIONS ARE PROPER AGAINST AN ATTORNEY OR A**
     **       PARTY, FOR FILING CLAIMS OR ASSERTING DEFENSES**
16   **       WITHOUT MERIT OR OTHERWISE IMPROPERLY,**

17         The instant Motion is based upon *F.R.C.P.* 11(b)(4) which specifically

18   provides that a Motion must be certified by the party's counsel that "...the denials

19   of factual contentions are warranted on the evidence or, if specifically, so identified,

20   are reasonably based on belief or a lack of information." *F.R.C.P.* 11(b)(4).

21   Subsequent to the filing of the instant Matter, Defendant Penny destroyed and/or

22   concealed documents pertaining to the investigation of former, disgraced Doctor

23   Larry Nassar ("Nassar"). Upon destroying these documents, only months later,

24   Penny filed a Motion to Quash Service for Lack of Personal Jurisdiction; a

25   jurisdictional inquiry that has shown **those records would have been germane to**

26   **Penny's knowledge of Nassar as an abuser, and having purposefully targeted**

27   **Nassar towards California and Californians, including the Plaintiff and others**

28   **in the Related Actions.** *See Archdiocese of Milwaukee v. Superior Court* (2003)

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1   112 Cal.App.4th 423, 441 ("Rather, the evidence supports the finding the

2   Milwaukee Archdiocese sought to rid itself of Widera by intentionally sending him

3   into California."). As such, the evidence that was concealed and destroyed by

4   Penny, for which he is facing criminal prosecution, is germane to the dispositive

5   Motion that Penny filed and is attempting to have the instant Matter dismissed.

6        Plaintiff specifically requests that Penny withdraw his 12(b)(2) Motion, as

7   maintaining a baseless claim, as a result of his own misfeasance, runs afoul of Rule

8   11. Furthermore, Plaintiff reserves the right to obtain her reasonable costs and fees

9   as a result of conducting jurisdictional discovery on Penny's 12(b)(2) Motion.

10  **B.    REQUEST   TO   WITHDRAW   F.R.C.P.   12(b)(2)   MOTION   AND**
    **SPECIFIC NOTICE.**

11       The Plaintiff specifically requests that Penny withdraw his *F.R.C.P.* 12(b)(2)

12  Motion within 21 days of today's date and under the requirement of *F.R.C.P.*

13  11(c)(2); **specifically, on or before November 12, 2018.** In the event Penny has

14  not agreed to withdraw his 12(b)(2) Motion at that point, my office will file the

15  instant Motion (or one more thoroughly examining these points, and proceed with

16  our request for sanctions.

17  **C.    RESERVATION   OF   MORE   DETAILED   BRIEFING   IF   "SAFE**
    **HARBOR" WARNING IS NOT HEEDED.**

18       The Plaintiff serves the instant "Motion" in order to give proper warning to

19  Defendant Penny (21 days, in fact) to withdraw his 12(b)(2) Motion. *See F.R.C.P.*

20  11(c)(2)("The motion must be served under Rule 5, but it must not be filed or be

21  presented to the court if the challenged paper, claim, defense, contention, or denial

22  is withdrawn or appropriately corrected within 21 days after service or within

23  another time the court sets.") The instant Motion is more than sufficient to apprise

24  Mr. Penny of the basis for the sanctions sought, and apprises him of the information

25  underlying such Motion. *Matrix IV, Inc. v. American Nat. Bank and Trust Co. of*

26  *Chicago* (7th Cir. 2011) 649 F.3d 539, 552("...we have held that a letter informing

27  the opposing party of the intent to seek sanctions and the basis for the imposition of

28

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1  sanctions—like the one Gateway sent in this case—is sufficient for Rule 11

2  purposes.") As such this notice is sufficient, and the depth of the Motion will likely

3  increase, upon public filing, in the event Mr. Penny does not heed this warning.

### III.  CONCLUSION

5  The Plaintiff respectfully requests that Defendant Penny withdraw his

6  Motion made pursuant to Rule 12(b)(2), in order to avail himself of the Safe Harbor

7  provision of Rule 11.

9  Dated: October 19, 2018                    **MANLY, STEWART & FINALDI**

11  By: _____
          ALEX E. CUNNY, Esq.
12        Attorneys for Plaintiff,
          JANE LM DOE.

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

# EXHIBIT 3

EXHIBIT 2
043

1  JOHN C. MANLY, Esq. (State Bar No. 149080)
2  VINCE W. FINALDI, Esq. (State Bar No. 238279)
   ALEX E. CUNNY (State Bar No. 291567)
3  JANE E. REILLEY (State Bar No. 314766)
   **MANLY, STEWART & FINALDI**
4  19100 Von Karman Ave., Suite 800
   Irvine, CA 92612
5  Telephone: (949) 252-9990
   Fax: (949) 252-9991
6
7  Attorneys of Record for Plaintiff, ALEXANDRA ROSE
   RAISMAN, an individual
8
9
10              **UNITED STATES DISTRICT COURT**
11      **FOR THE NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE**
12
13  ALEXANDRA ROSE RAISMAN, an         Civil Case No. 5:18-cv-02479-BLF
    individual,
                                       [The Honorable Beth Labson Freeman]
14
            Plaintiff,                 **DECLARATION OF PLAINTIFF**
15                                      **ALEXANDRA RAISMAN IN SUPPORT**
       v.                              **OF PLAINTIFF'S OPPOSITION TO**
16                                      **DEFENDANTS STEVE PENNY AND**
    UNITED STATES OLYMPIC COMMITTEE,   **UNITED STATES OLYMPIC**
17  a Business Entity of Form Unknown; USA  **COMMITTEE'S MOTION TO DISMISS**
    GYMNASTICS, an Indiana Business Entity of  **FOR LACK OF PERSONAL**
18  Form Unknown; LARRY NASSAR, an     **JURISDICTION UNDER** *FEDERAL*
    individual; STEVE PENNY, an individual;  *RULE OF CIVIL PROCEDURE* **12(B)(2)**
19  PAUL PARRILLA, an individual; and DOES 1
    through 500.                       **Hon. Judge Beth Labson Freeman**
20
21                                     [Filed concurrently with Declaration of Alex
                                       E. Cunny]
22
                                       Complaint filed: February 28, 2018
23
24                                     Hearing:     February 7, 2019
                                       Time:        9:00 a.m.
25                                     Judge:       Honorable Beth Labson Freeman
                                       Courtroom: 3
26
27
28

**DECLARATION OF ALEXANDRA RAISMAN IN SUPPORT OF OPPOSITIONS TO**
*FRCP* **12(B) MOTIONS BY USOC AND PENNY**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## DECLARATION OF ALEXANDRA RAISMAN

I, ALEXANDRA "ALY" RAISMAN, hereby declare:

1.     I am the Plaintiff in the action now-pending before the Northern District of California, in and for the San Jose Division, Case Number 5:18-cv-02479-BLF.

2.     This Declaration is made in support of Plaintiff's Opposition to Defendant Stephen "Steve" Penny's Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2) and in support of Defendant United States Olympic Committee's ("USOC") Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2), (6).

3.     In 2012, I attended the Olympic Trials for Women's Gymnastics ("2012 Trials"), which was held in San Jose, California. I competed at this event and earned a spot on the 2012 Olympic Team for Women's Gymnastics, which was subsequently held in London, England.

4.     During the 2012 Olympic Trials, while I was in San Jose, California, Dr. Lawrence Nassar ("Nassar') provided treatment to me as a doctor affiliated with USAG and USOC. During these treatments, Nassar sexually abused me by touching, penetrating and fondling my vagina, genital area, and anus with his ungloved hand, for his sexual pleasure.

5.     In 2011, when I was in Japan for the 2011 World Championships, I was in a car with the Olympic Team Coach, John Geddert, and my teammate, McKayla Maroney. During the car ride, McKayla began discussing how she felt uncomfortable with how Nassar had touched her, and she stated that Nassar was "fingering" her, meaning placing his fingers into her vagina. McKayla made this statement in front of John Geddert who clearly heard the statement. To my knowledge, no report was made about what McKayla stated in the car that day.

I hereby declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this November 21, 2018 at Irvine, California.

By:  _____
ALEXANDRA ROSE RAISMAN
Declarant

**DECLARATION OF ALEXANDRA RAISMAN IN SUPPORT OF OPPOSITIONS TO**
*FRCP* **12(B) MOTIONS BY USOC AND PENNY**

**Leigh Robie**

| | |
|---|---|
| **From:** | Alex Cunny <acunny@manlystewart.com> |
| **Sent:** | Monday, October 22, 2018 1:00 PM |
| **To:** | Leigh Robie |
| **Cc:** | Edith Matthai; Vince Finaldi; John Manly |
| **Subject:** | Re: Stay as to Mr. Penny (Wieber, LM, and Raisman) |

No, we don't consent to a stay.

Alex E. Cunny, Esq.
*Attorney*
**Manly, Stewart & Finaldi**
19100 Von Karman Ave.
Suite 800
Irvine, CA 92612
P (949) 252-9990
F (949) 252-9991
acunny@manlystewart.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR THE
ATTORNEY-WORK PRODUCT PRIVILEGES. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND
THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON ACTUALLY
RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT, OR THE EMPLOYEE OR
AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING
OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

On Oct 22, 2018, at 12:58 PM, Leigh Robie <LRobie@romalaw.com> wrote:

> Gentlemen,
> In light of Mr. Penny's arrest and the Texas Indictment, we intend to seek a six-month
> stay of the civil actions (Wieber, LM, and Raisman) as to Mr. Penny in order to protect
> his Fifth Amendment rights. Please advise if you will consent to a stay.
>
> Best,
> Leigh
>
> *Leigh Robie*
> **Robie & Matthai**
> 500 South Grand Ave.
> Suite 1500
> Los Angeles, CA 90071
> 213-706-8000
> 213-706-9913 (fax)
>
> WARNING: This e-mail is covered by the Electronic Communications Privacy Act, 18
> U.S.C. 2510-2521 and is legally privileged. It contains information from the law firm of

EXHIBIT 2
044

EXHIBIT 3
41

Robie & Matthai, which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic transmission is received in error, please notify Robie & Matthai immediately at (213) 706-8000. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

EXHIBIT 3
EXHIBIT 2
045
42

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

     I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 500 South Grand Avenue, Suite 1500, Los Angeles, California 90071.

4

5

     On October **22**, 2018, I served the foregoing document described as **EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY FOR A STAY OF THIS ACTION; DECLARATION OF LEIGH P. ROBIE** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

6

7

8

**SEE ELECTRONIC SERVICE LIST**

9

\_\_\_\_\_ **VIA U.S. MAIL:**  As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

10

11

12

13

\_\_\_\_\_ **VIA PERSONAL SERVICE:**  I delivered such envelope by hand to the above addressee(s).

14

\_\_\_\_\_ **VIA OVERNIGHT COURIER:**  I am "readily familiar" with the firm's practice of collecting and processing overnight deliveries.  The package was deposited before the regular pickup time and marked accordingly for delivery the next business day.

15

16

17

✓ **VIA ELECTRONIC SERVICE:**  I caused the listed documents to be electronically filed through the CM/ECF system at the United States District Court for the Northern District of California which generated a Notice of Electronic Filing to all parties and constitutes service of the electronically filed documents on all parties listed on attached Electronic Service List for purposes of the Federal Rules of Civil Procedure.

18

19

20

\_\_\_\_\_ **VIA FACSIMILE TRANSMISSION:**  I caused the above-referenced document(s) to be transmitted to the above-named person(s) at the telecopy number(s) listed above.

21

22

     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed October **22**, 2018, at Los Angeles, California.

23

24

25

            _____
               MERCEDES E. MENDOZA

26

27

28

43

Civil Case No. 5:18-cv-02479-BLF

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
046

1

**ELECTRONIC SERVICE LIST**

2 Alexander E. Cunny:  acunny@manlystewart.com

3 Carolyn Kubota:       ckubota@cov.com; rtoombs@cov.com

4 David M. Jolley:      djolley@cov.com, echiulos@cov.com, eerlich@cov.com

5 Edith R. Matthai:     ematthai@romalaw.com, mmendoza@romalaw.com

6 John Clinton Manly:   jmanly@manlystewart.com

7 Kevin J. Minnick:     Kevin.Minnick@skadden.com, dlmlclac@skadden.com

8 Leigh P. Robie:       lrobie@romalaw.com, mmendoza@romalaw.com

9 Margaret M. Holm:     margaret.holm@clydeco.us, krista.gutierrez@clydeco.us,

10                       lorraine.gallo@clydeco.us, melissa.leos@clydeco.us

11 Mark Y. Chen:         mychen@cov.com

12 Mitchell A. Kamin:    mkamin@cov.com, mitchell-kamin-1218@ecf.pacerpro.com,

13                       tspath@cov.com

14 Paulina Slagter:      pslagter@cov.com

15 Sheryl Rosenberg:     sheryl.rosenberg@clydeco.us

16 Udit Sood:            usood@cov.com

17 Vince W. Finaldi:     vfinaldi@manlystewart.com

18

19

20

21

22

23

24

25

26

27

28

EX PARTE APPLICATION OF SPECIALLY-APPEARING DEFENDANT STEPHEN PENNY;
FOR A STAY OF THIS ACTION

EXHIBIT 2
047

# EXHIBIT "4"

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

COORDINATION PROCEEDINGS ) HON. RANDALL J. SHERMAN
Special Title (Rule 3.550) ) DEPT. CX105
                           ) JCCP NO. 4943
NASSAR CASES               )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

ALEXANDRIA ROSE RAISMAN, an )
individual,                 )
                            )
         Plaintiff,         )
                            )
         -v-                ) CAUSE NO.
                            ) 5:18-cv-02479-BLF
UNITED STATES OLYMPIC       )
COMMITTEE, a Business Entity )
of form unknown, et al.,    )
                            )
         Defendants.        )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE PCNE DOE, an          )
individual; and JOHN PCNE  )
DOE, an individual,        )
                           )
         Plaintiffs,       )
                           )
         -v-               ) CAUSE NO.
                           ) 2:18-cv-03464-JLS-KES
USA GYMNASTICS, a Business )
Entity of form unknown, et )
al.,                       )
                           )
         Defendants.       )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1

| | | |
|---|---|---|
| 10:37:24 | 1 | MR. JOLLEY: Objection, vague and ambiguous. |
| 10:37:28 | 2 | Q So other than the jobs we've just gone through, |
| 10:37:32 | 3 | have you had any other jobs in the field of sports |
| 10:37:37 | 4 | marketing that we haven't discussed yet? |
| 10:37:41 | 5 | A Minor consulting over the years. |
| 10:37:47 | 6 | Q For whom? |
| 10:37:49 | 7 | A University of Kansas. |
| 10:37:53 | 8 | Q Was that during the time that you were with USAG? |
| 10:37:57 | 9 | A No, I don't believe so. |
| 10:38:03 | 10 | Q All right. So going back to your time at USAG, |
| 10:38:09 | 11 | when you were first hired, who was the individual |
| 10:38:11 | 12 | that hired you? |
| 10:38:14 | 13 | A Steve Penny. |
| 10:38:15 | 14 | Q And prior to that, did you know Steve Penny? |
| 10:38:19 | 15 | A I did not. |
| 10:38:24 | 16 | Q Had you ever met him before that? |
| 10:38:25 | 17 | A I had never met him. |
| 10:38:27 | 18 | Q And during your time as the marketing -- either |
| 10:38:30 | 19 | senior marketing director or -- was it vice |
| 10:38:34 | 20 | president of marketing? |
| 10:38:35 | 21 | A Yes. |
| 10:38:37 | 22 | Q Steve Penny oversaw all of your work there? |
| 10:38:39 | 23 | A Yes. |
| 10:38:41 | 24 | Q So specifically going to the 2012 Olympic Trials |
| 10:38:48 | 25 | for gymnastics, those were held in San Jose; |

28

EXHIBIT 4
002

| | | |
|---|---|---|
| 10:38:53 | 1 | correct? |
| 10:38:55 | 2 | A Yes. |
| 10:38:55 | 3 | Q And you were responsible for marketing at that |
| 10:38:57 | 4 | event? |
| 10:38:58 | 5 | A Yes. |
| 10:38:58 | 6 | Q And did you actually attend that event? |
| 10:39:02 | 7 | A Yes. |
| 10:39:04 | 8 | Q Was Steve Penny at that event? |
| 10:39:06 | 9 | A Yes. |
| 10:39:07 | 10 | Q And when I say "that event," it's actually a whole |
| 10:39:11 | 11 | weekend long; correct? |
| 10:39:12 | 12 | A Yes. |
| 10:39:18 | 13 | Q And are you and the rest of, I'll just term it, the |
| 10:39:20 | 14 | senior management team at that event; in terms of |
| 10:39:23 | 15 | the COO, the CFO, is everybody at the event? |
| 10:39:27 | 16 | A No. |
| 10:39:29 | 17 | Q Who are the personnel that are at that event, |
| 10:39:32 | 18 | generally speaking? |
| 10:39:35 | 19 | A Chief operating officer, chief executive officer, |
| 10:39:41 | 20 | vice president of marketing.  And I don't remember |
| 10:39:52 | 21 | seeing -- it would be my staff that would have been |
| 10:39:58 | 22 | there that I would have seen the most, head of |
| 10:40:01 | 23 | women's program, head of men's program. |
| 10:40:06 | 24 | Q Leading up to that event, I assume there's quite a |
| 10:40:08 | 25 | bit of preparation that goes into it? |

29

EXHIBIT 4
003

| | | |
|---|---|---|
| 10:40:10 | 1 | A Yes. |
| 10:40:11 | 2 | Q Are you conducting meetings in California for that |
| 10:40:16 | 3 | event in terms of sponsorships, meeting with local |
| 10:40:19 | 4 | agencies, things like that? |
| 10:40:22 | 5 | A Not exactly. |
| 10:40:24 | 6 | Q Okay. What do you mean "not exactly"? Are |
| 10:40:28 | 7 | these -- |
| 10:40:29 | 8 | A Yes, we would have a meeting or there would be |
| 10:40:31 | 9 | planning meetings. But it wouldn't be pitching -- |
| 10:40:37 | 10 | I wouldn't be pitching local sponsors. |
| 10:40:43 | 11 | Q Okay. So when you have these planning meetings, |
| 10:40:45 | 12 | who is in these planning meetings, generally? |
| 10:40:50 | 13 | A USA Gymnastics staff, building staff, the local |
| 10:40:56 | 14 | sports commission staff. |
| 10:41:02 | 15 | Q Are these meetings held in California? |
| 10:41:04 | 16 | A Yes. |
| 10:41:05 | 17 | Q Do you know approximately how many planning |
| 10:41:07 | 18 | meetings there were prior to the 2012 Trials in San |
| 10:41:10 | 19 | Jose? |
| 10:41:11 | 20 | A No. |
| 10:41:12 | 21 | Q Do you have an estimate? Was it more than five, |
| 10:41:14 | 22 | less than three? |
| 10:41:17 | 23 | A I can estimate. More than five, less than ten. |
| 10:41:24 | 24 | Q And in these meetings, is Steve Penny present? |
| 10:41:29 | 25 | A At some. |

30

EXHIBIT 4
004

| | | |
|---|---|---|
| 10:51:37 | 1 | and/or feedback to someone on my staff. |
| 10:51:40 | 2 | Q When you say "creative," is that a term of art in |
| 10:51:43 | 3 | marketing? |
| 10:51:44 | 4 | A Yes. |
| 10:51:45 | 5 | Q What does that mean? |
| 10:51:47 | 6 | A The actual piece that has been created that would |
| 10:51:52 | 7 | at some point be placed in digital media, in |
| 10:51:56 | 8 | traditional media, printed out as a banner or a |
| 10:52:00 | 9 | flyer.  And that would -- if you use the term |
| 10:52:04 | 10 | creative, it would encompass those things, those |
| 10:52:07 | 11 | elements. |
| 10:52:09 | 12 | Q So would it be fair to say that for the 2012 Trials |
| 10:52:15 | 13 | for USAG, whenever you wanted to use a USOC |
| 10:52:22 | 14 | insignia, logo, trademark, you had to submit it |
| 10:52:25 | 15 | through that process? |
| 10:52:26 | 16 | A Yes. |
| 10:52:40 | 17 | Q The marketing materials that you created or your |
| 10:52:44 | 18 | team created for the 2012 Trials, were those also |
| 10:52:48 | 19 | approved by Steve Penny before they went out? |
| 10:52:50 | 20 | A Yes. |
| 10:52:51 | 21 | Q And was there a formal approval process with |
| 10:52:54 | 22 | Mr. Penny; or was it just kind of show it to him, |
| 10:52:58 | 23 | make sure it looks good, and send it out? |
| 10:52:59 | 24 | A Yes. |
| 10:53:00 | 25 | Q Yes, as to -- |

38

EXHIBIT 4
005

| | | |
|---|---|---|
| 10:55:47 | 1 | A Yes. |
| 10:55:49 | 2 | Q Do you know if -- do you know who that was? |
| 10:55:52 | 3 | A Yes. |
| 10:55:53 | 4 | Q Who was it? |
| 10:55:54 | 5 | A The director of marketing, Justin Hirnisey. |
| 10:56:00 | 6 | Q And did that have with it a budget as well as an |
| 10:56:05 | 7 | outline of what marketing was going to be |
| 10:56:08 | 8 | happening? |
| 10:56:09 | 9 | A Yes. |
| 10:56:10 | 10 | Q Was that approved by Steve Penny? |
| 10:56:11 | 11 | A Yes. |
| 10:56:11 | 12 | Q And do you know when that was approved or generally |
| 10:56:18 | 13 | when that was created? |
| 10:56:21 | 14 | A No. |
| 10:56:22 | 15 | Q Did you have any oversight over making that plan or |
| 10:56:26 | 16 | critiquing that plan? |
| 10:56:28 | 17 | A I would have had input. |
| 10:56:34 | 18 | Q Did that plan have any consideration for the USOC |
| 10:56:41 | 19 | in it to your memory?  Meaning, you know, part of |
| 10:56:45 | 20 | the marketing budget is going to be split with |
| 10:56:50 | 21 | USOC, the materials are going to contain USOC |
| 10:56:53 | 22 | information, anything of that nature? |
| 10:56:56 | 23 | MR. JOLLEY:  Objection, vague and ambiguous. |
| 10:56:57 | 24 | Objection, document speaks for itself. |
| 10:57:00 | 25 | A I don't recall. |

41

| | | |
|---|---|---|
| 11:13:05 | 1 | at 11:13 a.m. |
| 11:13:07 | 2 | BY MR. CUNNY: |
| 11:13:08 | 3 | Q All right, sir. You understand you're still under |
| 11:13:11 | 4 | oath? |
| 11:13:12 | 5 | A Yes. |
| 11:13:13 | 6 | Q During the 2012 Olympic Trials that were held in |
| 11:13:16 | 7 | San Jose, did you actually attend the events |
| 11:13:19 | 8 | themselves? |
| 11:13:20 | 9 | A Yes. |
| 11:13:21 | 10 | Q And was Steve Penny with you at those events? |
| 11:13:29 | 11 | A Steve Penny attended the event. I wouldn't say he |
| 11:13:34 | 12 | attended the event with me. |
| 11:13:36 | 13 | Q Okay. Was there a box for all of the USAG |
| 11:13:41 | 14 | executives or higher-ups, for lack of a better |
| 11:13:44 | 15 | term? |
| 11:13:44 | 16 | A No. |
| 11:13:45 | 17 | Q During those events, what would you be doing? |
| 11:13:48 | 18 | A I would be hosting corporate partners, sponsors. |
| 11:13:56 | 19 | Q And during those events, what would Steve Penny be |
| 11:14:00 | 20 | doing? |
| 11:14:01 | 21 | A Typically he would be sitting on the production |
| 11:14:03 | 22 | table. |
| 11:14:06 | 23 | Q And explain for me what the production table is. |
| 11:14:10 | 24 | A It would be the table that returns parallel to the |
| 11:14:14 | 25 | vault runway where various elements of TV |

46

EXHIBIT 4
007

| | | |
|---|---|---|
| 11:14:20 | 1 | production, various employees may sit.  Special |
| 11:14:30 | 2 | guests may sit on the production table. |
| 11:14:33 | 3 | Q  Is that where Martha Karolyi would sit during those |
| 11:14:39 | 4 | events? |
| 11:14:40 | 5 | A  I believe so, yes. |
| 11:14:41 | 6 | Q  And is that at the actual -- I don't want to call |
| 11:14:47 | 7 | it a playing field -- but is that at the floor |
| 11:14:51 | 8 | height? |
| 11:14:51 | 9 | A  Yes. |
| 11:14:55 | 10 | Q  And are you interacting with Steve Penny at that |
| 11:14:57 | 11 | time in any way saying, oh, I'm talking to this |
| 11:15:01 | 12 | sponsor or I'm doing this? |
| 11:15:04 | 13 | A  Typically, no. |
| 11:15:06 | 14 | Q  Do you know what he's doing at those events, in |
| 11:15:09 | 15 | terms of his job and role? |
| 11:15:11 | 16 | A  No. |
| 11:15:15 | 17 | Q  Was it your understanding that Steve Penny was |
| 11:15:18 | 18 | overseeing Kathy Kelly at that point? |
| 11:15:25 | 19 | A  That would be my understanding. |
| 11:15:26 | 20 | Q  And do you know who Kathy Kelly is? |
| 11:15:28 | 21 | A  Yes. |
| 11:15:30 | 22 | Q  What was her job title in 2012 at the Trials -- |
| 11:15:34 | 23 | during the time of the Trials, I should say? |
| 11:15:45 | 24 | A  I believe vice president of women's program. |
| 11:15:49 | 25 | Q  So I assume Steve Penny, at that point, had a whole |

47

EXHIBIT 4
008

| | | |
|---|---|---|
| 11:15:56 | 1 | host of job duties that he was performing at that |
| 11:16:02 | 2 | event? |
| 11:16:02 | 3 | A  I would guess, yes. |
| 11:16:05 | 4 | Q  Was Steve Penny interacting with any of the |
| 11:16:08 | 5 | gymnasts at that event, to your knowledge? |
| 11:16:13 | 6 | A  Not to my knowledge. |
| 11:16:14 | 7 | Q  Was he doing press at that event, meaning, was he |
| 11:16:19 | 8 | giving on-camera interviews? |
| 11:16:23 | 9 | A  I don't recall seeing him do interviews. |
| 11:16:28 | 10 | Q  Would it be common for Steve Penny, during events |
| 11:16:32 | 11 | such as the Olympic Trials, U.S. Nationals, the |
| 11:16:36 | 12 | Secret Classic, to give on-camera interviews? |
| 11:16:40 | 13 | A  Yes. |
| 11:16:41 | 14 | MS. ROBIE:  Objection, beyond the scope of the |
| 11:16:43 | 15 | jurisdiction in the case in which Steve Penny is |
| 11:16:47 | 16 | involved. |
| 11:17:10 | 17 | Q  So during the 2012 Olympic Trials, Martha's sitting |
| 11:17:15 | 18 | at that production table; correct? |
| 11:17:18 | 19 | A  To the best of my recollection, yes. |
| 11:17:19 | 20 | Q  Okay.  And what's your understanding -- |
| 11:17:20 | 21 | MR. PFEIFFER:  And I would object just that |
| 11:17:21 | 22 | it's beyond the scope of the cases she's involved, |
| 11:17:24 | 23 | just to put that on the record. |
| 11:17:26 | 24 | Q  And what is she doing at that time, based on your |
| 11:17:29 | 25 | understanding? |

48

EXHIBIT 4
009

STATE OF INDIANA

COUNTY OF HENDRICKS


    I, Elizabeth T. Lindner, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

    That the foregoing deposition was taken on behalf of the Plaintiffs; that said deposition was taken at the time and place heretofore mentioned between 10:12 a.m. and 2:10 p.m.;

    That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

    And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

    I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

EXHIBIT 4
010

1      IN WITNESS WHEREOF, I have hereunto set my

2  hand and affixed my notarial seal this 5th day of

3  September, 2018.

4

5

6                        *Elizabeth T. Lindner*

7                        Elizabeth T. Lindner
                          NOTARY PUBLIC SEAL
8                          STATE OF INDIANA
                          Commission No. 673751
9                     My Commission Expires Nov. 11, 2023

10

11  My commission expires:
    November 11, 2023
12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 4
011

# EXHIBIT "5"

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE

Coordination Proceeding          )Hon. RANDALL J. SHERMAN
Special Title (Rule 3.550)       )DEPT. CX105
                                 )JCCP NO. 4943
                                 )
NASSAR CASES                     )
                                 )
_____ )

_____

DEPOSITION UPON ORAL EXAMINATION BEFORE TRIAL
OF
KATHY SCANLAN
_____

2:12 P.M.
August 6, 2018
1700 Seventh Avenue, Suite 2100
Seattle, Washington

Deanna M. Ellis, CCR No. 2511

EXHIBIT 5
001

1    If you think I'm violating the Court's order -- you've

2    already proved you know where the judge is -- go deal

3    with it, okay?

4        Q.   All right.  So you hired Mr. Agnew because you

5    believed there was a problem with abuse at USA

6    Gymnastics, correct?

7        A.   Yes.

8        Q.   All right.  And that became apparent to you

9    immediately -- almost immediately upon you taking over,

10   correct?

11       A.   No.

12            MS. KUBOTA:  Objection; misstates

13   testimony.

14       A.   It -- no.  It became --

15            THE WITNESS:  Am I answering?

16            MR. BRUBAKER:  Yes.

17       Q.   Sure.

18       A.   You asked -- the original question was when

19   did I become aware there was abuse?  And that was upon

20   my immediate hiring.  The fact that we -- the extent of

21   the problem didn't become clear to me until probably

22   into 1995, when I'd been there six to eight months.

23       Q.   Okay.  And when you became aware of it, what

24   did you do to address it?

25            MR. BRUBAKER:  That's where I think for

47

EXHIBIT 5
002

1      Q.    -- in charge --

2      A.    -- Kelly or Ron Galimore.

3      Q.    So when you -- when you left USA Gymnastics,

4  at national and international events who was in charge

5  of the safety of the female gymnasts, both at the event

6  and at their place where they were staying?

7      A.    Well, in some cases I can tell you that

8  ultimately I was.  And I recall this particularly at the

9  Junior Pan American Games in -- wherever we were --

10  Venezuela, I think, or perhaps this was the event in

11  Columbia.

12      At any rate, we were somewhere in South America,

13  and we had a minor, she was a minor member -- a minor,

14  she was under 18, and she wanted to stay at an event and

15  come home later with somebody, a man.  And so I

16  exercised my authority as president to say, no, you're

17  not, essentially, young lady.

18      Q.    Wait.  She wanted to come home with a man?

19      A.    (Shakes head up and down.)

20      Q.    Okay.

21      A.    Yeah.  We're like, no.  You're coming with the

22  team right now.

23      Q.    And why did you do that?

24      A.    Well, because, of course, it was unsafe, I

25  mean, potentially.

77

EXHIBIT 5
003

1          *So in some cases, even as president, I would.  But*
2    *if you're asking the question in terms of a more typical*
3    *safety question --*
4          Q.   Yeah.  Let me just be clear.  I know
5    ultimately -- and I appreciate you saying that -- I
6    guess, you're in charge, okay?  I think you've made that
7    clear, and I appreciate that.
8          My question's a little different:  From a practical
9    level, who was in charge of just making sure that the
10   conditions were safe at the event and the conditions
11   were safe where they stayed?  Who would --
12         A.   The program director, Kathy --
13         Q.   So that --
14         A.   -- Kelly, Ron Galimore.
15         Q.   Now, in terms of income from California --
16   well, let me ask it a different way.
17         What is the -- did California have the most members
18   of USA Gymnastics when you were there?
19         A.   I don't know.
20         Q.   Okay.  Do you remember the state where you had
21   the most members?
22         A.   No.
23         Q.   Okay.  It's been a while, right?
24         A.   (Shakes head up and down.)
25         Q.   All right.

EXHIBIT 5
004

 1          MR. MANLY:  This is the most ridiculous

 2    set of objections I've ever heard, and you're just

 3    trying to interrupt my questioning.  You better stop.

 4          MS. KUBOTA:  I beg to differ.

 5          MR. MANLY:  Okay.

 6          MS. KUBOTA:  If you say "most" of them,

 7    if you don't think that's vague, then we have a

 8    disagreement.

 9      Q.   All right.  Were most of the -- the members of

10    USA Gymnastics under 18?

11      A.   The athlete members?

12      Q.   Yes.

13          MS. KUBOTA:  Same objection.

14      A.   On the woman's side, yes.

15      Q.   Okay.

16      A.   On the men's side, I would think the answer

17    would be yes.

18      Q.   Okay.

19      A.   Um-hum.

20      Q.   And you understood as the president that part

21    of your job was to keep them safe, whatever state they

22    were in, including California, correct?

23          MS. KUBOTA:  Objection; beyond --

24          MR. BRUBAKER:  I'm concerned --

25          MS. KUBOTA:  -- the scope.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 5
005

1          MR. BRUBAKER:  -- about the scope of the

2     inquiry.

3          Q.   Go ahead.

4          A.   Yes.

5          Q.   Okay.  And when you became aware, as you've

6     testified, that there was a problem with sexual abuse at

7     USA Gymnastics, other than sending out a couple of

8     articles and changing the ethics code, did you do

9     anything California-focused to try and keep kids safe

10    from that?

11         MS. KUBOTA:  Objection; beyond the

12    scope, compound, argumentative.

13         A.   No.

14         Q.   Okay.  Did you do anything on a national basis

15    that would have implicated California, other than what I

16    mentioned, to keep children safe?

17         MR. BRUBAKER:  Other -- and other than

18    what's been testified to in the articles?

19         MR. MANLY:  Correct.

20         MS. KUBOTA:  Same objections.

21         MR. PFEIFFER:  Join.

22         A.   Well, what we did to keep people safe was to

23    publish in USA Gymnastics magazine, which did go to

24    parents, our list of terminated members, as well as in

25    Technique.  In addition, I wrote the articles that I've

EXHIBIT 5
006

1  questions.  Thank you so much.

2                      MS. KUBOTA:  I have some questions.

3                      CROSS-EXAMINATION

4  BY MS. KUBOTA:

5      Q.  Ms. Scanlan, I introduced myself at the

6  beginning of this deposition, but that was a while ago.

7  My name's Carolyn Kubota, and I represent the US Olympic

8  Committee.  So I just had a few follow ups on some of

9  your testimony.

10     You testified about a dispute between USA

11  Gymnastics and the US Olympic Committee about the

12  circumstances under which you were allowed to discipline

13  a coach; do you remember that?

14     A.  A professional member?

15     Q.  A professional member.

16     A.  Yes.

17     Q.  Okay.  So did you -- is it your recollection

18  that that had to do with compliance with the Ted Stevens

19  Act?

20     A.  I don't know why they objected.  I -- I don't

21  recall.

22     Q.  Okay.  And do you -- you don't remember anyone

23  from the US Olympic Committee saying that it was their

24  understanding of the Ted Stevens Act that it had to be

25  done -- discipline had to be done a certain way?

EXHIBIT 5
007

1      A.   Not that I remember.

2      Q.   Were you the person who was principally

3  handling that issue for USA Gymnastics?

4      A.   Yes.

5      Q.   Okay.  All right.  And do you remember, were

6  there letters exchanged back and forth?

7      A.   I don't remember that.

8      Q.   Okay.  All right.

9      Now, you also testified about Larry Nassar's

10  involvement in I believe it was the 1996 Olympic Games;

11  is that right?

12      A.   Yes.

13      Q.   And I may have misunderstood you, but did you

14  say that the US Olympic Committee first -- was the first

15  or sort of led to the first introduction of Larry Nassar

16  to USA Gymnastics?

17      A.   To the best of my knowledge.

18      Q.   Okay.  Do you know whether Larry Nassar had

19  involvement as far back as '86 and '87 --

20      A.   And the --

21      Q.   -- with USA Gymnastics?

22      A.   Not -- not that I'm aware of --

23      Q.   Okay.

24      A.   -- no.

25      Q.   So what you're saying, then, is to your

EXHIBIT 5
008

1  delivering the same to the appropriate authority;

2          I further advise you that as a matter of firm
   policy, the Stenographic notes of this transcript will
3  be destroyed three years from the date appearing on the
   Certificate unless notice is received otherwise from any
4  party or counsel hereto on or before said date;

5          IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my official seal this 14th day of
   August, 2018.

6

7          _____
   Deanna M. Ellis, CCR
8

9          Deanna M. Ellis, CCR
           Washington State Certified
           Court Reporter
10         License No. 2511

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 5
009

# EXHIBIT "6"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

--o0o--

JANE LM DOE, an individual,          )
                                     )
          Plaintiff,                 )
                                     )
     v.                              ) CASE NO. BC638724
                                     )
DR. LARRY NASSAR, an individual,     )
et al.,                              )
                                     )
          Defendants.                )
_____)


Videotaped Deposition of

ROBERT COLAROSSI

VOLUME II

Monday, August 28, 2017


Reported by Christine Vandermeer, CSR No. 11110

```
 1                   APPEARANCES:

 2

 3    Appearing for the Plaintiff:

 4           Manly, Stewart & Finaldi
              BY:  JOHN C. MANLY and VINCE W. FINALDI
 5                 Attorney At Law
                   19100 Von Karman Avenue, Suite 800
 6                 Irvine, California  92612
                   (949) 252-9990
 7

 8    Appearing for Defendants All Olympia Gymnastics Center,
      Inc., Galina Marinova, and Artur Akopyan:
 9
              Michelman & Robinson, LLP
10            BY:  CRYSTAL FRYMAN (appearing telephonically)
                   Attorney At Law
11                 10880 Wilshire Boulevard, 19th Floor
                   Los Angeles, California  90024
12                 (310) 564-2670

13

      Appearing for Defendants USA Gymnastics, Robert Colarossi,
14    and Kathy Scanlan:

15            Sedgwick
              BY:  ALISON BEANUM (appearing telephonically)
16                 Attorney At Law
                   2020 Main Street, Suite 1100
17                 Irvine, California  92614
                   (949) 852-8200
18

19    Appearing for Defendants USA Gymnastics and Robert
      Colarossi:
20
              White & Amundson
21            BY:  DANIEL M. WHITE
                   Attorney At Law
22                 402 W. Broadway, Suite 1140
                   San Diego, California  92101
23                 (619) 239-0300

24

25
```

2

EXHIBIT 6
002

```
 1                   APPEARANCES (Continued):

 2

 3      Specially Appearing for Defendant Steve Penny:

 4             Robie & Matthai
               BY:  LEIGH P. ROBIE (appearing telephonically)
 5                  Attorney At Law
                    500 South Grand Avenue, 15th Floor
 6                  Los Angeles, California  90071
                    (213) 706-8000
 7

 8      Also Present:

 9             MATT MILLER, VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 6
003

| | | |
|---|---|---|
| 10:33:47 | 1 | against coaches or professional members or staff? |
| 10:33:50 | 2 |     A    Not if it was investigated and found -- and found |
| 10:34:02 | 3 | that something had happened.  We actually published our |
| 10:34:05 | 4 | terminated members list. |
| 10:34:08 | 5 |     Q    Okay.  So now, you said -- you've said -- you used |
| 10:34:20 | 6 | the term "corroborated" or in terms like that about |
| 10:34:24 | 7 | allegations. |
| 10:34:26 | 8 |         Can you give me an example of something you |
| 10:34:29 | 9 | recall, without naming names, that was corroborated? |
| 10:34:32 | 10 |     A    Yeah.  There was a particular case of -- I believe |
| 10:34:38 | 11 | it was in Texas.  There was a coach who was accused of |
| 10:34:44 | 12 | sexually molesting some of his athletes, and the girls got |
| 10:34:52 | 13 | together and signed a complaint and sent it in to the |
| 10:34:52 | 14 | office, and it was investigated, it was adjudicated, and |
| 10:34:56 | 15 | he was terminated. |
| 10:34:57 | 16 |     Q    So unless a child signed a complaint, unless a |
| 10:35:05 | 17 | minor signed a complaint, USAG would not report it nor |
| 10:35:09 | 18 | investigate it; is that correct? |
| 10:35:10 | 19 |     MR. WHITE:  Objection; lack of foundation, it was |
| 10:35:14 | 20 | -- excuse me, it misstates the witness's -- |
| 10:35:14 | 21 |     MR. MANLY:  Well, please correct me if I'm wrong. |
| 10:35:16 | 22 |     MR. WHITE:  Well, John, let me finish my |
| 10:35:18 | 23 | objection. |
| 10:35:18 | 24 |     MR. MANLY:  Sorry.  I thought you were done. |
| 10:35:21 | 25 |     MR. WHITE:  No.  That's fine.  I hesitated.  Lack |

28

EXHIBIT 6
004

11:11:46  1     Q     All right.

11:11:46  2     A     It just wasn't prevalent.

          3     Q     Okay.

11:11:48  4     A     And the majority of the time when we had -- when

11:11:51  5     we were made aware of an issue, it was not us reporting to

11:11:55  6     law enforcement, it was law enforcement reporting to us.

11:11:58  7     Q     So you didn't think this was a -- I'm not saying

11:12:03  8     you didn't think it was important, but you didn't think it

11:12:06  9     was that big of an issue in the sport, correct?

11:12:09 10           MR. WHITE:  Objection; misstates the witness's

11:12:10 11     testimony, it's argumentative as phrased.

11:12:12 12           Go ahead.

11:12:13 13           THE WITNESS:  I think it's horrible if one person

11:12:15 14     is abused.  I think it's -- it's absolutely horrible.  And

11:12:23 15     but what I'm -- what I'm saying is that it wasn't

11:12:26 16     prevalent enough that it was happening, you know,

11:12:33 17     frequently when I was -- when I was in charge.  We just

11:12:36 18     didn't get that many complaints that came out of the

11:12:39 19     general public or out of the professional ranks.

11:12:42 20     BY MR. MANLY:

11:12:42 21     Q     Okay.  If that's true, why did you write the

11:12:49 22     letter to the USOC about it?

11:12:52 23     A     That's a different question.

11:12:57 24     Q     Well, I know that.  That's why I asked it.

11:12:59 25     A     Yeah.  That's a different question.  We wrote the

EXHIBIT 6
005

| | | |
|---|---|---|
| 11:13:01 | 1 | letter to the USOC because we wanted -- we wanted to be |
| 11:13:09 | 2 | able to suspend a membership without a hearing, and that |
| 11:13:15 | 3 | was our policy at that time, until we could fully |
| 11:13:22 | 4 | investigate and decide if this member's conduct was such |
| 11:13:27 | 5 | that he needed to -- he or she needed to be terminated as |
| 11:13:31 | 6 | a member of USA Gymnastics.  And the membership and |
| 11:13:35 | 7 | credentials committee told us that we couldn't do that |
| 11:13:39 | 8 | because of the Ted Stevens Amateur Sports Act. |
| 11:13:43 | 9 | Q    Okay.  And you sent an e-mail to the president of |
| 11:13:47 | 10 | the USOC, right? |
| 11:13:47 | 11 | A    A letter. |
| 11:13:48 | 12 | Q    A letter.  And you included Scott Blackman, |
| 11:13:50 | 13 | correct? |
| 11:13:51 | 14 | A    Um-hmm. |
| 11:13:52 | 15 | Q    Yes? |
| 11:13:52 | 16 | A    Yes. |
| 11:13:52 | 17 | Q    Did you talk to Mr. Blackman about this issue? |
| 11:13:54 | 18 | A    I did. |
| 11:13:56 | 19 | Q    Okay.  And you're friends, right? |
| 11:14:00 | 20 | A    I haven't seen Scott in a long time, but. |
| 11:14:04 | 21 | Q    Well, you were friends? |
| 11:14:04 | 22 | A    Yeah, we were, of sorts. |
| 11:14:06 | 23 | Q    And he -- well, are you not friends anymore? |
| 11:14:09 | 24 | A    No.  I worked for Scott. |
| 11:14:10 | 25 | Q    I understand. |

EXHIBIT 6
006

11:14:11    1          A      Yeah.

11:14:11    2          Q      You were colleagues.

            3          A      Yeah, we were colleagues.

11:14:13    4          Q      Let me put it that way.   Okay.

11:14:15    5                 And he thought enough of you he offered you a job,

11:14:18    6     which is why you left USA Gymnastics, right?

11:14:21    7          A      That's correct.

11:14:21    8          Q      Okay.   So when you talked to him about it, you

11:14:22    9     know, did you say, listen, this is a big deal, we need to

11:14:24   10     deal with this?

11:14:24   11          A      So the first time I spoke to Scott about this was

11:14:29   12     actually onsite in Colorado Springs.   And we had sent the

11:14:36   13     letter that we sent to Dick Schultz and Bill Hybl.   And --

11:14:42   14     and Bill said -- he pulled me aside and said, "Membership

11:14:47   15     and credentials are going to make a motion tomorrow to

11:14:50   16     decertify USA Gymnastics."   And I said to Bill, "If you

11:14:56   17     want to have a conversation about being -- you know, about

11:15:01   18     not letting us enforce what we think is a really important

11:15:06   19     thing to be able to protect our athletes, and you want to

11:15:09   20     have that conversation in front of God, country, and the

11:15:13   21     national media, I'll see you tomorrow morning."   And Bill

11:15:15   22     turned to Scott Blackman and said, "Scott, you need to get

11:15:21   23     this resolved tonight so that membership and credentials

11:15:26   24     will withdraw their motion to decertify us."

11:15:30   25          Q      So who at membership and credentials was driving

EXHIBIT 6
007

11:51:56 1    Q    Okay.  But if there were, would it be reason -- if
11:51:58 2  there were such an unsafe situation and USA Gymnastics
11:52:01 3  became aware of that, you would expect -- it would not be
11:52:06 4  unreasonable in your view for a parent to expect that you
11:52:09 5  would notify them of that, correct?
11:52:13 6    A    That's correct.
11:52:14 7    Q    Okay.  All right.  Now, Larry Nassar was licensed
11:52:18 8  to practice medicine -- practice osteopathic medicine
11:52:23 9  where?
11:52:23 10    A    I believe in Michigan, but I'm not sure.
11:52:26 11    Q    Okay.  So he was routinely at the camps?
11:52:33 12    A    I don't recall.
11:52:35 13    Q    Okay.  Well, let me just represent to you that my
11:52:39 14  clients will testify that he was -- they -- they recall
11:52:42 15  him being at every camp, okay?
11:52:45 16    A    Okay.
11:52:47 17    Q    If that's so, let's assume for purposes that it --
11:52:49 18  that it -- that is, those camps from '99 on were to -- all
11:52:52 19  occurred in Texas, right?
11:52:54 20    A    That's correct.
11:52:57 21    Q    Okay.  So to your knowledge, did Larry Nassar have
11:52:59 22  a license to practice osteopathic medicine or a license of
11:53:05 23  any type to practice medicine in Texas?
11:53:06 24         MR. WHITE:  Objection; lack of foundation, calls
11:53:08 25  for speculation, it's also irrelevant for the purposes of

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER


        The undersigned certified shorthand reporter
of the state of California does hereby certify:

        That the foregoing deposition was taken before
me at the time and place therein set forth, at which
time the witness was duly sworn by me;

        That the testimony of the witness and all
objections made at the time of the deposition were
recorded stenographically by me and thereafter
transcribed, said transcript being a true copy of my
shorthand notes thereof.

        In witness whereof, I have subscribed my name
this date _____ SEP 0 8 2017 _____.



                    *Christine Vandermeer*

                    Certificate No.: _/ / / 0_

# EXHIBIT "7"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES


JANE LM DOE, an individual,    ) CASE NO.:BC638724
                                       )
               Plaintiff,         )
                                       )
         v.                    )
                                       )
DR. LARRY NASSAR, an individual,  )
et al.,                         )
                                       )
              Defendants.     )
_____)



VIDEOTAPED DEPOSITION OF

STEVE PENNY

VOLUME I

MONDAY, JUNE 5, 2017

10:05 A.M.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 7
001

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                 IN AND FOR THE COUNTY OF LOS ANGELES

3

4   JANE LM DOE, an individual,      ) CASE NO.:BC638724
                                     )
5                   Plaintiff,       )
                                     )
6              v.                    )
                                     )
7   DR. LARRY NASSAR, an individual, )
    et al.,                          )
8                                    )
                    Defendants.      )
9   _____)

10

11

12

13

14

15

16

17

18

19

20

21        The deposition of STEVE PENNY, taken on behalf of

22   the Plaintiffs, before Louann Thibert, CSR No. 8152 for

23   the State of California, at 10:05 a.m., on Monday, June

24   5, 2017 at Manly, Stewart & Finaldi, 19100 Von Karman,

25   Suite 800, Irvine, California.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 7
002

02:55:45 1  while I was CEO or while I was at USA Gymnastics.

2  Q  Okay.  How about before; do you know?

3  A  I don't know.

4  Q  What's the next competition that's held

02:55:58 5  annually?

6  A  The next big event?

7  Q  Yes.

8  A  The next big event would be the national

9  championships.

02:56:03 10  Q  Okay.  And that has been held in California,

11  correct?

12  A  Yes, it has.

13  Q  And it's going to be held here this year,

14  correct?

02:56:09 15  A  That's correct.

16  Q  In Anaheim?

17  A  That's correct.

18  Q  All right.  And at the Honda Center, right?

19  A  That's correct.

02:56:15 20  Q  And has it been held at other locations in

21  California besides Anaheim?

22  A  Yes, it has.

23  Q  Where else?

24  A  It was held in San Jose in 2007.

02:56:33 25  Q  Okay.  Have you ever heard San Jose called

EXHIBIT 7
003

02:56:36  1    <u>Gymnastics City USA?</u>

2         <u>A</u>    <u>Yes, I have.</u>

3         **Q**    **Why is it called that?**

4         <u>A</u>    <u>It was a branding term that the city created to</u>

02:56:48  5    <u>demonstrate its commitment to hosting the Olympic trials.</u>

6         **Q**    **Well, it's hosted the national champions -- the**

7    **Olympic national championships, the Olympic trials and**

8    **what else?**

9         <u>A</u>    <u>It hosted the Pacific Alliance Gymnastics</u>

02:57:06 10   <u>Championships in 2008.</u>

11        **Q**    **Okay.  All right.  What's the next event after**

12   **the national championship?**

13        A    That USA Gymnastics hosts?

14        **Q**    **Of the year.  Where the national team would go**

02:57:27 15   **and compete, either domestically or internationally?**

16        A    It would be the world championships.

17        **Q**    **Okay.  Is that held annually?**

18        A    Yes, it is.

19        **Q**    **Okay.  And have the world championships ever**

02:57:40 20   **been held in California?**

21        A    Yes, they have.

22        **Q**    **In Anaheim in 2004, right -- or '3?**

23        A    2003, that's correct.

24        **Q**    **Did you attend that?**

02:57:57 25   A    Yes.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 7
004

04:20:35  1   the question.

2        THE WITNESS:  I believe we had a responsibility

3   to do our best to protect the athlete in that

4   environment, yes.

04:21:03  5   BY MR. MANLY:

6        Q    Okay.  You thought about that answer a long

7   time.  Was there something that was confusing you?

8        MS. MATTHAI:  I'm going to object to that as

9   argumentative.

04:21:14 10        MR. MANLY:  I'm not trying to be argumentative.

11   I'm just curious.

12        THE WITNESS:  No.

13   BY MR. MANLY:

14        Q    Okay.  So -- and you would agree it would not

04:21:23 15   be unreasonable for Jamie's mom and dad to expect that,

16   for example, you weren't going to permit somebody to be

17   in their -- a man to be in their daughter's room with

18   them with her alone or with another little girl, correct?

19        MS. MATTHAI:  Vague, ambiguous, argumentative.

04:21:42 20        THE WITNESS:  Could I ask you to be more

21   specific about the question and the use of the word

22   "you"?  You --

23   BY MR. MANLY:

24        Q    Okay.  Let me rephrase it.

04:21:52 25        A    Please.  Thank you.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 7
006

## CERTIFICATION

### OF

### CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the state of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date _____ JUN 1 5 2017 _____.

Certificate No.: *8152*

EXHIBIT 7
006

# EXHIBIT "8"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES


JANE LM DOE, an individual,   ) CASE NO.:BC638724
                            )
           Plaintiff,      )
                            )
        v.            )
                            )
DR. LARRY NASSAR, an individual, )
et al.,                     )
                            )
           Defendants.     )
_____)


VIDEOTAPED DEPOSITION OF

PAUL PARILLA

VOLUME II

FRIDAY, SEPTEMBER 15, 2017

8:47 A.M.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 8
001

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              IN AND FOR THE COUNTY OF LOS ANGELES

 3

 4  JANE LM DOE, an individual,      ) CASE NO.:BC638724
                                     )
 5                  Plaintiff,       )
                                     )
 6             v.                    )
                                     )
 7  DR. LARRY NASSAR, an individual, )
    et al.,                          )
 8                                   )
                    Defendants.      )
 9  _____)

10

11

12

13

14

15

16

17

18

19

20

21       The deposition of PAUL PARILLA, taken on behalf of

22  the Plaintiff, before Louann Thibert, CSR No. 8152 for

23  the State of California, at 8:47 a.m., on Friday,

24  September 15, 2017 at Manly, Stewart & Finaldi, 19100 Von

25  Karman, Suite 800, Irvine, California.
```

280

EXHIBIT 8
002

01:57:47  1   not just with him but with -- with other references to

2   it.  So that -- and, of course, that's the information

3   that -- that I was given that he had shipped this

4   material to our lawyer Scott Himsel and it's my

01:58:04  5   understanding he got that material just a number of days

6   before we went to the FBI on July 28th.

7        Q    Okay.  Well, how did you -- how did Steve Penny

8   describe that video to the FBI, if at all?

9             MR. WHITE:  Objection; lack of foundation,

01:58:19 10   speculation.

11             THE WITNESS:  I don't recall him actually --

12             MR. WHITE:  Assuming facts not in evidence.  Go

13   ahead.

14             THE WITNESS:  I don't recall him actually

01:58:26 15   describing the video.  There were a number of things.

16   Some of them were kind of on irrelevant materials.  I

17   think he gave -- you know, there were like 10 or 11

18   things that were transmitted to Scott Himsel and which I

19   ended up putting on the hard drive to give to the FBI in

01:58:48 20   Los Angeles.  But Steve Penny and Scott Himsel had given

21   the information to the FBI in Indianapolis.  I didn't do

22   that.

23   BY MR. MANLY:

24        Q    Okay.  And did anybody after that report ever

01:59:03 25   follow up with the Indiana office of the FBI?

EXHIBIT 8
003

01:59:08  1      A      I was -- Mr. Penny told me on several occasions

        2  that he attempted and did follow up.

        3      **Q      With whom?**

        4      A      With --

01:59:18  5      **Q      Jay Abbott?**

        6      A      With Jay Abbott.

        7      **Q      Did anybody -- Mr. Abbott ever tell you or Mr.**

        8  **Penny in your presence that you were not to tell anybody**

        9  **about this?**

01:59:30 10      A      I heard Mr. Abbott say several times during the

       11  course of the July 28th meeting that they did not want

       12  USA Gymnastics or any of its personnel to take any action

       13  that would interfere with their investigation that they

       14  were going to launch based upon our report.

01:59:50 15      **Q      Okay.  Did you tell them that he was still**

       16  **treating USAG members at Michigan State and at Twistars?**

       17      A      We told the FBI.  I wasn't aware at the time

       18  that he treated or even worked at Twistars.  It was just

       19  totally unknown to me.  What we told the FBI that -- that

02:00:18 20  he had -- after we received the -- the June 2015 inquiry

       21  about an athlete's concern between then and July 28th,

       22  that Dr. Nassar had not performed any services for USA

       23  Gymnastics.

       24          We -- we -- he was going to attend the Secret

02:00:40 25  Classic meet in Chicago as a spectator, not as a -- as a

                                                                    458

EXHIBIT 8
004

02:00:44   1   <u>medical personnel and we asked him not to even do that</u>

  2   <u>and he said -- he complied and didn't go.  And then he</u>

  3   <u>was supposed to work as a medical provider at the</u>

  4   <u>championships and we told him he was not to do that and</u>

02:00:59   5   <u>he complied.  Then, within days or right after we met</u>

  6   <u>with the FBI, we told him that he was not going to</u>

  7   <u>receive any further assignments from USA Gymnastics.</u>

  8         **Q**   **<u>Why did you tell him that?</u>**

  9         <u>A</u>   <u>Because he had been wanting to know what the</u>

02:01:16 10   <u>future was going to be with respect to him because</u>

11   <u>remember, we had asked him not to go to the Secret and</u>

12   <u>then we asked him not to go to the championships and, you</u>

13   <u>know, it was kind of like one assignment at a time.  And</u>

14   <u>then we told him, no, you're not going to be doing</u>

02:01:34 15   <u>anything further for us.</u>

16         **Q**   **So did you tell him why?**

17         A   I didn't.  I had no communications with him.

18   This was all being handled by Steve Penny and Scott

19   Himsel, so I don't know what they told him.

02:01:47 20         **Q**   **So what is your understanding of the reason he**

21   **was no longer going to get assignments from USA**

22   **Gymnastics?**

23         A   Because he was under -- going to be under

24   investigation by the FBI.

02:02:00 25         **Q**   **For what?**

EXHIBIT 8
005

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the state of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date _____SEP 2 8 2017_____.

Certificate No.: 8152

# EXHIBIT "9"

$5 FOR 3 MONTHS

Subscribe Now
(http://offers.indystar.com/specialoffer?
gps-
source=BENB&utm_medium=nanobarap14&utm_source=bounce-
exchange&utm_campaign=2018CYBER)

# As evidence mounted, IMPD child abuse investigator defended USA Gymnastics

Marisa Kwiatkowski,Tim Evans and Tony Cook, **Indianapolis Star**    Published 6:00 a.m. ET Nov. 11, 2018 | **Updated 1:29 p.m. ET Nov. 11, 2018**



Indianapolis police are investigating the conduct of a detective who worked behind the scenes to defend USA Gymnastics while it was in the midst of a broadening child sexual abuse scandal.

He was not just any detective.

Bruce Smith was supervisor of the Indianapolis Metropolitan Police Department's Child Abuse Unit at the time. He also is a friend of then-USA Gymnastics President and CEO Steve Penny.

Emails, texts and other communications obtained by IndyStar reveal Smith collaborated with Penny to deflect criticism of USA Gymnastics in 2016 and 2017 — as a growing number of survivors claimed the national governing body failed to protect them from child sexual abuse.

*(Photo: Vic Ryckaert/IndyStar)*

**USA Gymnastics probe:** 'Missing' records may have been found in Indianapolis (/story/news/investigations/2018/11/08/usa-gymnastics-larry-nassar-sexual-abuse-scandal-steve-penny-missing-records-maybe-found/1932219002/)

**A blind eye to sex abuse:** How USA Gymnastics failed to report cases (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/)

Even after Smith disclosed the friendship as a conflict of interest in 2015 and recused himself from investigating USA Gymnastics, he tried to influence the public's understanding of the situation, pushing his version of the story to reporters. He went as far as writing a press release defending USA Gymnastics — even sending draft language to Penny prior to forwarding it to officials at IMPD and the prosecutor's office.

He told a reporter that IndyStar was "barking up the wrong tree" as it was preparing to write about Penny's four-year delay (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/) in reporting sexual abuse allegations against Indianapolis coach Marvin Sharp. In those unsolicited text messages, Smith dismissed the paper's source as "disgruntled."

Smith also assisted a Virginia lawyer USA Gymnastics had hired "to help combat some of the unfair and negative media that the organization has been getting."

Smith denies any wrongdoing.

And IMPD officials didn't rein Smith in. Instead, the department and the Marion County prosecutor's office sometimes turned to him on questions related to USA Gymnastics and allowed him to communicate directly with Penny on IMPD's behalf. Other times, Smith inserted himself into the conversation.

**8** free articles left. Subscribe for 99¢/month.

EXHIBIT 9
001

Police **Support local journalism today**
**99¢ per month. Save 90%.**

**(https://subscribe.indystar.com/?**
**_help_** influence their decision not to investigate or prosecute USA Gymnastics officials. But lawyers representing abuse survivors suing USA Gymnastics aren't buying it. They are critical of what they see as Indianapolis law enforcement's lack of interest in holding gymnastics officials accountable.

Law enforcement in Michigan and Texas **gprr-=CPCAMBARD&utm_campaign=2018THANKS&utm_content=freearticleleft&utm_medium=ONSITE&utm_source=CPCAMBARD&**
**gymnastics-larry-**
**nassar-sexual-abuse-**
**scandal-impd-**
**detective-bruce-**
**smith-conduct-under-**
**review%2F1693853002%2F)** aggressive in seeking information about individual and institutional failures that may have led to widespread abuse of athletes in gymnastics and other sports. Yet an IndyStar review of hundreds of pages of records found no acknowledgment that IMPD so much as visit USA Gymnastics' downtown headquarters to investigate the organization's sexual abuse reporting practices. No search warrants were sought. No questions asked.

Even after it was revealed that USA Gymnastics had quietly reviewed allegations against former team doctor Larry Nassar for five weeks before reporting him to the FBI, IMPD did not investigate the national governing body.

When confronted with details of Smith's interactions, Police Chief Bryan Roach directed Internal Affairs to investigate Smith "to ensure the department's standard of conduct was followed as it relates to protecting and serving the people of Indianapolis." IMPD also noted the press release drafted by Smith defending USA Gymnastics was never issued.

Roach declined an interview for this story, and provided a statement: "We take all allegations of misconduct seriously and will immediately begin an internal review of this information."

**Buy Photo**



**IMPD Chief of Police Bryan Roach has ordered a review of Lt. Bruce Smith's conduct.** *(Photo: Matt Kryger/IndyStar)*

Smith said he welcomes the investigation. He said he has an underlined exemplary record (https://www.documentcloud.org/documents/5031664-Bruce-Smith-personnel-file.html) with IMPD. He said he recused himself from investigating or discussing whether USA Gymnastics violated the law in 2011 by not reporting a complaint against Sharp. Smith said his support for USA Gymnastics was limited to its handling of Sharp, who was arrested for sexual misconduct in 2015 after a second complaint emerged, and killed himself in jail (/story/news/crime/2015/12/21/indianapolis-gymnastics-coach-marvin-sharpe-died-suffocation/77691840/).

"I stand by how I conducted myself during these events and so do my supervisors," Smith said in response to IndyStar questions.

But involvement by an officer who has recused himself due to a conflict of interest is "highly unusual" and ill-advised, according to Tom Tremblay, a former police chief who trains and advises police, prosecutors and others on issues related to sexual violence.

"Once he's recused himself from this," Tremblay said, "there is absolutely no way that as a police leader I would want him commenting on this in any way, shape or form."

## Marvin Sharp 'has a problem'

EXHIBIT 9
002

Police and prosecutors in Indianapolis had an opportunity to look into USA Gymnastics' handling of sexual abuse complaints in August 2015. That's when Penny reported an abuse allegation against Sharp directly to his friend Smith — and revealed he had not reported another allegation against Sharp four years earlier.

Penny and Smith knew each other through their daughters, who attended school together and were on the same gymnastics team.

Days later, IMPD arrested Sharp. The coach faced charges of sexual misconduct with a minor and possessing child pornography. He was accused of touching a gymnast's vagina and taking sexually explicit pictures of her beginning when she was 12 years old, police records show.

During the investigation of the 2015 case, Smith said detectives asked if USA Gymnastics had received any other complaints about Sharp.

Penny retrieved an email from the USA Gymnastics headquarters, and he and his attorney turned it over to Smith. The email had been sent to Penny in 2011 by longtime gymnastics judge Pat Warren. Yet, instead of forwarding it to authorities, Penny had filed it away.

Indiana law requires people to immediately report allegations of child abuse to police or the Department of Child Services. That raised a question: Had Penny violated the law?

Smith said he recused himself from that decision. But by the time of the 2015 investigation — four years after Penny received the 2011 email — it was a moot point. The two-year statute of limitations on Indiana's failure-to-report law had passed. So, prosecutors could not file a charge.

Authorities could, however, have investigated whether USA Gymnastics failed to report any other abuse allegations.

An examination might have revealed that USA Gymnastics had conducted its own investigation for five weeks before reporting Nassar to the FBI in Indianapolis. And that USA Gymnastics executives had a policy of not reporting child abuse allegations unless they were submitted in writing and signed by a survivor or survivor's parent.

But IMPD officials chose not to investigate. Later, they went further. They defended Penny's decision not to report the 2011 email.

Smith told IndyStar the allegations in Warren's email were "very vague" and did not provide adequate detail to justify an investigation. By 2011, Sharp had already made more than 100 pornographic images of six underage girls from his gym, underlined federal court records (https://www.documentcloud.org/documents/5031666-Sharp-federal-records-2.html) show.

"We all have the benefit of hindsight now," Smith said, "but in real time there was no specific abuse allegation, no specific victim, and no detailed explanation on what was observed."

Smith said the email "essentially called Sharp creepy, the girls didn't like him, and the way he handled the girls in front of the parents was creepy."

But Warren's email, which was obtained by IndyStar (https://www.documentcloud.org/documents/5031668-Warren-letter-about-Marvin-Sharp.html), did provide several specific details. She described an incident she had witnessed and other situations. She included dates and names of the minors involved and other witnesses.

Warren's email described Sharp's treatment of one preteen girl: "Marvin literally put her on the podium, stomach down and her legs hanging over the edge … and picked her leotard up, put it in her crack and ice massaged her hamstring."

The email also said the mother of another girl told her Sharp instructed her 13-year-old daughter "to go into his office, take her leo off" and put on a T-shirt so he could massage her pelvic area to treat a pulled groin. Warren said the girl was uncomfortable with the request and called her mother, who picked up the girl and moved her to a new gym the next day.

"He has a problem," Warren told Penny in the email, "and should not be coaching children!"

Tremblay, the police consultant, said he disagrees with Indiana officials' contention that Warren's email was vague and lacked the detail needed to justify an investigation.

He said if he had been with a police department that received the email, it would have sparked an investigation. At the very least, he would have interviewed Warren and looked into the suspect.

Tremblay said the email described behaviors that are typical of child predators, including grooming, testing and isolation. And it was written by someone who appeared to have extensive experience in gymnastics.

"She's outlining, again, this long pattern of concerning behavior," Tremblay said, "and for me that's a big red flag."

EXHIBIT 9
003

## Bruce Smith says IndyStar reporters 'barking up the wrong tree'



**Marvin Sharp faced charges of sexual misconduct with a minor and possessing child pornography.** *(Photo: Provided by Marion County Prosecutor's Office)*

In the summer of 2016, Smith took the lead in defending USA Gymnastics' handling of Warren's allegations against Sharp.

The first contact IndyStar reporters had with Smith came after they emailed then-Chief Troy Riggs about the Sharp case. Smith sent an unsolicited text message to a reporter who was not involved in IndyStar's gymnastics investigation.

"So whoever is doing the story on USA Gymnastics and Marvin Sharp is barking up the wrong tree," Smith wrote in a July 12, 2016, text message.

Smith's text said "the lady" who had written the email was "disgruntled."

When asked this year why he had reached out to IndyStar, Smith initially claimed it was because IndyStar had published unfair stories about USA Gymnastics. But the newspaper had not yet published its first gymnastics article. When that was pointed out, Smith acknowledged he was not sure what had prompted his text.

Referring to Penny, however, he said: "I absolutely did not get direction from Steve to intervene."

Penny's attorney did not respond to questions for this article.

Emails between Smith, Penny and others at IMPD reveal that, despite his recusal, Smith continued working behind the scenes in support and defense of USA Gymnastics.

After IndyStar published its first story (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/) on USA Gymnastics in August 2016, Smith emailed Kendale Adams, then a public information officer with IMPD. He complained that IndyStar hadn't detailed the extent of USA Gymnastics' cooperation in the 2015 investigation that led to Sharp's arrest.

"I guess what we had to say just didn't fit their smear agenda," Smith said in the email (https://www.documentcloud.org/documents/5031671-IMPD-emails-3.html).



**"They had an agenda from day 1,"** Lt. Kendale Adams said in an email regarding IndyStar. *(Photo: Kelly Wilkinson /IndyStar)*

Adams, now a top aide to Police Chief Bryan Roach, responded: "Not at all. They had an agenda from day 1."

A day later, Smith emailed Penny (https://www.documentcloud.org/documents/5032147-Bruce-Smith-emails.html) what he called a "rough draft" of a press release Smith said he was writing for the IMPD media office. Smith's draft referred to the 2011 email as "so vague it would not have generated an investigation."

He went on to praise the organization. "USA Gymnastics response to the Marvin Sharp investigation reduced obsticals (sic) often present in child abuse cases," Smith wrote. "We would encourage others (sic) organizations to respond similarly."

Penny emailed his friend back.

"Thanks. This is very helpful," Penny wrote. "If there is any chance to add a comment about IMPD impressions of our practices in a favorable manner, that would be great but if not, no worries. Thanks so much."

EXHIBIT 9
004



**Former USA Gymnastics President Steve Penny and Smith were friends.** *(Photo: Carolyn Kaster, AP)*

This year, Smith told IndyStar he sent the draft to Penny "to ensure my description of his actions were accurate." He said he did not make Penny's suggested revisions. But he did add one sentence (https://www.documentcloud.org/documents/5031670-IMPD-emails-2.html): "The procedures employed by USA Gymnastics regarding this matter was consistent with our expectations and best practices."

The emails obtained by IndyStar reveal Smith also sent the draft to Jeff Knoop at the Marion County prosecutor's office.

"Prosecutor agreed," Smith wrote in the Aug. 6, 2016, email (https://www.documentcloud.org/documents/5031670-IMPD-emails-2.html) to IMPD Major Richard Riddle. "Adjust whatever you need to."

Tremblay, the law enforcement consultant, said it was unusual that Smith would be allowed to draft the release "applauding" USA Gymnastics for its handling of the Sharp case. It "sounds like good judgment" on Smith's part to recuse himself in 2015 from any discussions about the situation, Tremblay said.



**Tom Tremblay, a former police chief who trains and advises police, prosecutors and others on issues related to sexual violence.** *(Photo: Provided by Tom Tremblay)*

"And what he should've done," Tremblay added, "was continue to recuse himself from commenting about this."

Aliya Wishner, the IMPD spokesperson, told IndyStar that Smith's work "drafting the document was outside of his official capacity as an investigator and not a standard IMPD practice."

"The draft was not considered in the best interest of the department and IMPD's internal processes ensured that the release was never issued," Wishner said.

Smith moved out of the Child Abuse Unit after being promoted from sergeant to lieutenant in January 2017.

That was the month an attorney hired by USA Gymnastics reached out to Smith via email (https://www.documentcloud.org/documents/5032197-Email-with-USA-Gymnastics-attorney.html). The attorney said Penny suggested Smith might have information "to help combat some of the unfair and negative media." Smith agreed to help. The attorney, who no longer represents USA Gymnastics, later interviewed him by phone.

## Steve Penny admits delay in reporting Larry Nassar

IMPD had another opportunity to investigate USA Gymnastics a few weeks later, but again chose not to do so.

On Feb. 16, 2017, Penny and then-USA Gymnastics board Chairman Paul Parilla acknowledged publicly they had waited more than five weeks to report Nassar to the FBI. Again, Indiana law requires immediate reporting, and in one case, the Indiana Supreme Court decided a school principal who waited four hours violated the law.

**Larry Nassar's cover story:**   'Can we just say i am sick?' (/story/news/2018/05/24/larry-nassar-being-investigated-sexual-abuse-usa-gymnastics-agreed-cover/599381002/)

EXHIBIT 9
005

By early 2017, there was growing evidence of a pattern of USA Gymnastics not immediately reporting sexual abuse allegations. It included the delay in reporting Nassar, the four-year delay in reporting the first complaint against Sharp and other failures revealed by an IndyStar investigation.

Yet Smith seemed incredulous when asked if IMPD investigated Penny's delay in reporting Nassar.

"You have got to be kidding me with this Larry Nassar question," Smith responded.

"IMPD did not investigate Larry Nassar. It was reported to the FBI. You know this! How would we have any knowledge of how long USA Gymnastics 'studied' the Larry Nassar case if we were not part of the investigation or have jurisdictional authority?"

IMPD's spokeswoman cited similar reasons.

"We are not aware of any report or allegation brought to IMPD or made publicly that indicates Larry Nassar committed any offense within IMPD's jurisdiction," Wishner told IndyStar in an email. "The Larry Nassar investigation was conducted by the FBI and agencies outside of the State of Indiana."

Wishner acknowledged that IMPD "does not need an official complaint, but there would need to be leading information to cause an investigation to be opened."

Other jurisdictions found such information in public statements.

In Texas, for example, officials said they decided to investigate Penny based on another former USA Gymnastics official's testimony at a congressional hearing. Penny was later indicted on a felony charge of tampering with evidence. He denies he broke the law.

Yet, IMPD told IndyStar it hasn't gone to USA Gymnastics' headquarters, sought a search warrant or questioned Penny or any other USA Gymnastics officials about anything other than the 2015 Sharp case.

The prosecutor's office also limited its focus to Sharp. In 2017, IndyStar asked the Marion County prosecutor's office whether it planned to investigate USA Gymnastics officials for not immediately reporting Nassar. The request for comment included a copy of USA Gymnastics' own timeline that showed the five-week delay.

"It would not be appropriate for our office to comment on this matter," spokeswoman Peg McLeish replied in a Feb. 17, 2017, email.

The statute of limitations expired that summer.

In 2018, IndyStar asked McLeish again about USA Gymnastics' delay in reporting Nassar. This time, she cited jurisdictional issues.

"In this particular instance we do not read the Indiana statute as requiring individuals to report alleged abuse which occurred in another state to the Indiana Department of Child Services or Indiana law enforcement," she said. "Our assumption is that USA Gymnastics operates nationwide and would have been subject to the jurisdiction of the state where the alleged abuse occurred."

A law professor at the Indiana University Robert H. McKinney School of Law in Indianapolis said Indiana's child abuse reporting law is vague on that point.

"There is nothing in the statute that makes it clear either way," said Shawn Marie Boyne. "As a matter of policy, I would think that mandatory reporters would have to report no matter where the child is located."

## Aly Raisman's mom: 'It's disgusting'

When the allegations against Sharp became public in 2015, Lynn Raisman said she thought for sure police and the FBI would connect the dots between Sharp and Nassar.

Raisman said her daughter, Olympic gold medalist Aly, attended camps where Sharp was coaching, and it appeared Sharp and Nassar were friends.

Knowing what she knows now, Raisman said she feels angry, horrified and betrayed.

"I don't understand the police officer," she said. "I don't understand the FBI."

IndyStar previously reported (/story/news/investigations/2018/10/18/usa-gymnastics-chief-steve-penny-approached-head-fbi-agent-job/1687527002/) that Penny had discussed a job opportunity with then-FBI agent W. "Jay" Abbott as the agency's Nassar investigation languished. Penny told Abbott the head of security for the U.S. Olympic Committee would be retiring and suggested Abbott might be interested in the position.

EXHIBIT 9
006

Penny's attorney Edith Matthai previously told IndyStar that "any suggestion that Steve had the conversation with Abbott in order to impact the FBI investigation is false and defamatory." She did not respond to questions about Penny's relationship with Smith.

Jon Little, an Indianapolis-based attorney whose practice is focused on representing abused athletes in Olympic sports, told IndyStar he has begged local officials for years to pursue an investigation into USA Gymnastics and Penny.

He pointed out that dozens of sexual misconduct complaint files compiled by USA Gymnastics are kept in Indiana. He said it is "appalling" that no one in Indiana has been prosecuted for failure to report.

"It's just insane to me," Little said. "So, yes, I think that there's for some reason, a complete lack of will, interest, whatever, at the Marion County prosecutor's office."

John Manly, a California attorney who represents 180 Nassar survivors in lawsuits against the organization, said it is "despicable" that no one from IMPD or the prosecutor's office has knocked on USA Gymnastics' door to ask for a single document.

"I find that disturbing and not a coincidence," Manly said. "And either they're incompetent or they're looking the other way. And either way, frankly, somebody ought to investigate them. Because, you know, every other jurisdiction — even tiny Walker County, Texas — has shown interest."

Raisman said she feels there still are people working at USA Gymnastics who knew about Nassar.

"It's disgusting that the police and the FBI aren't doing something to get to the bottom of who knew what when, who helped cover it up," Raisman said. "They shouldn't be working anymore. They shouldn't be working with children, period."

*Call IndyStar reporter Marisa Kwiatkowski at 317-444-6135. Follow her on Twitter: @IndyMarisaK.*

*Call IndyStar reporter Tim Evans at 317-444-6204. Follow him on Twitter: @starwatchtim.*

*Call IndyStar reporter Tony Cook at 317-444-6081. Follow him on Twitter: @indystartony.*

Read or Share this story: https://www.indystar.com/story/news/2018/11/11/usa-gymnastics-larry-nassar-sexual-abuse-scandal-impd-detective-bruce-smith-conduct-under-review/1693853002/

EXHIBIT 9
007

# EXHIBIT "10"

# Senate Commerce, Science and Transportation Subcommittee on Consumer Protection, Product Safety, Insurance and Data Security Holds Hearing on Protecting Amateur Athletes

LIST OF PANEL MEMBERS AND WITNESSES

MORAN:

Our Subcommittee will come to order. Again, the Ranking Member, Senator Blumenthal is enroute. We've been joined by couple of our colleagues. I'm going to begin with my opening statement.

I apologize to our witnesses and to our audience for tardiness in start time. We had two votes on the Senate floor. I don't think there are further votes this afternoon, so I doubt that we would be intruded any additional time from the Committee.

So, good afternoon. Welcome to today's Subcommittee hearing.

In January, this Subcommittee launched an investigation to examine cultural and systemic issues regarding abuse in the Olympic movement following the horrific revelations that former USA Gymnastics team doctor Larry Nassar sexually abused and assaulted hundreds of athletes over a span of two decades, even well after numerous survivors alerted authorities about his actions.

This Subcommittee, which exercises jurisdiction over the U.S. Olympic Committee and amateur sports, is fully committed to ensuring the health and safety of all American athletes, and today marks the third hearing in our ongoing investigation.

EXHIBIT 10
001

I'd like to first acknowledge the incredible statement made at last week's ESPY Awards, watching over 100 survivors take the stage to accept the Arthur Ashe Courage Award. If any of you haven't had a chance to see that ceremony, I encourage you to do so.

The actions, these brave actions of our young athletes who shed light on their painful pasts have invigorated a national calling for change. And I'm glad to have so many of them with us this afternoon.

Since initiating our bipartisan investigation, this Subcommittee has held two critical hearings in which the Members of the Committee and the American public heard from distinct witness panels on their experiences related to procedural missteps and cultural inaction experienced within these troubled organizations.

In the first hearing, we heard testimony from four survivors of abuse across different Olympic sports who shared personal experiences about the systemic practices that have safeguarded perpetrators - have safeguarded perpetrators, have both inhibited victims from coming forward, and have prevented victims' reports from coming to light.

All of the survivors we've met have highlighted the institutional failures that have allowed these heinous acts to continue, which we recommit ourselves to fixing by being here today.

Once again, I'd like to echo my appreciation for those survivors and the many others who've spoken to us and to our staff regarding their painful experiences.

EXHIBIT 10
002

Their insightful recommendations on what needs to be done to correct these failures are certainly appreciated and continue to be considered as this Committee works toward thoughtful and lasting change.

In the second hearing, we called on former USA Gymnastics CEO Steve Penny, former Women's Program Director of USA Gymnastics, Rhonda Faehn, and former Michigan State University President Dr. Lou Anna (ph) Simon to provide testimony and answer questions on how rampant abuse that took place in the hands of Nassar was able to perpetuate for as long as it did.

I would also like to note that Scott Blackmun, the former President of U.S. Olympic Committee, and Martha Karolyi, the former National Team Coordinator for USA Gymnastics, were invited to attend but declined for medical reasons.

There were a number of significant details that came to light from the questions this Committee posed in that hearing, including USA Gymnastics' mishandling of critical medical records, lack of communication to and within Michigan State University related to sexual abuse reports against their employee, and most significant, the complete lack of cooperation demonstrated by Mr. Penny in his refusal to answer questions.

From these findings, along with continued analysis of lengthy documentation produced by USA Gymnastics, U.S. Olympic Committee and Michigan State University, we continue to pursue answers to many serious questions that remain for the current executives of these organizations.

Most importantly, we expect to hear today which aspects of their systems and cultures have changed, and how they plan to implement serious reforms moving forward.

EXHIBIT 10
003

Joining us today is Mr. John Engler, Interim President of Michigan State University, Ms. Susanne Lyons, the Acting CEO of U.S. Olympic Committee, Ms. Kerry Perry, President and CEO of USA Gymnastics, and Mr. Xiao, Chair of the U.S. Olympic Committee Athlete Advisory Council.

It is my expectation we will receive full cooperation of today's panel in answering the Subcommittee's questions to the best of their abilities.

We are also honored to welcome the Chairman and Ranking Member of the Senate Judiciary Committee, Senator Chuck Grassley of Iowa and Senator Dianne Feinstein of California, to the Subcommittee to provide opening testimony.

Given their leadership and work with Chairman Thune of the Commerce Committee to enact the Protecting Young Victims from Sexual Abuse and SafeSport Authorization Act of 2017, let me also add the Ranking Member of the Commerce Committee, Senator Nelson, their testimony today will be invaluable in helping this Subcommittee further raise awareness and identify solutions that will make a difference.

We have explored U.S. Center for SafeSports in our conversations and we appreciate the role that they do and may play. Let me thank you, Senators, Senator Grassley and Senator Feinstein for your efforts in this regard in the past and the time you've taken to prepare and present your testimony today.

I conclude my opening remarks by emphasizing the bipartisan approach that this Subcommittee has taken in its comprehensive investigation. With the consultation of law enforcement, survivors and advocates, we have worked closely together to identify meaningful reforms in the best interests of athletes and their families.

EXHIBIT 10
004

During Aly Raisman's powerful speech last week at the ESPY Awards, she reminded survivors of abuse. She said "You are not alone."

We are here today to remind all survivors this. We are listening. We are committed to change and we'll make certain the next generation of athletes are free to compete and represent our nation without fear of abuse.

In regard to that bipartisanship, I want to recognize my Ranking Member, Senator Blumenthal and his willingness to work closely with me and Members of this Committee to see that our work is well done.

With that, I recognize Senator Blumenthal for his opening statement.

BLUMENTHAL:

Thank you Senator Moran and thank you for your leadership on this Subcommittee and, most particularly, on this issue.

We had a remarkable event this morning.

We heard voices and saw faces of young athletes of all different ages, all different parts of the country who suffered at the hands of Larry Nassar but equally so at the hands of the United States Olympics Committee and USA Gymnastics and Michigan State University, not only the immediate perpetrator of this unspeakably cruel and brutal criminal conduct but also all of the organizations and individuals who were complicit by their silence or by their looking the other way, which was much easier to do.

EXHIBIT 10
005

Last week, similarly in a remarkable display of unity, resilience, strength, more than a 140 heroic survivors came to the ESPY Awards and they were honored with the Arthur Ashe Award for Courage.

No one better deserves it than they.

These young women have come forth bravely, sacrificing their privacy, fighting through efforts to silence them directly and overtly, stop their voices and then, in effect, re-victimize them.

That's a term of scientific art that has very apt application here. They have been re-victimized by this whole process. And they have risked their athletic careers and reputations to shed light on the heinous crimes committed by Nassar.

But he is only one of numerous perpetrators here.

And the main point is that USOC and USAG in effect prioritized medals and money over athlete safety. They concealed the shocking pervasiveness of abuse across many sports as well as their own woefully inadequate systems to address and prevent it.

And Michigan State University - officials looked the other way while athletes reported abuse over two decades. I am concerned that there has been continuing failure, loopholes and lapses.

And I am also concerned about the efficacy and independence of the U.S. Center for SafeSports, the lack of transparency and responsibility on the part of USOC and USAG, at the most basic level, the amount of empathy and support that officials at MSU have shown for survivors.

EXHIBIT 10
006

At the last press conference we had, before this one, one of the survivors said to me when I asked her, what she would ask if she were sitting here.

And she said she would want to know why wasn't one enough? Why was it two or three or 140 or more, hundreds around the country? Why wasn't one enough for these organizations to take action? And the fact is that there were many, many more than one.

These institutions have to answer to themselves, their own constituencies. They have to answer to history for their glaring failure. The system continues to be badly broken. And now we are at a turning point.

I said this morning when 80 of these wonderful, smart, accomplished athletes each said in introducing herself, USOC and USAG and MSU failed me that I don't want to be at an event in a year or three or five years from now and have the refrain be (ph) and Congress failed me.

We have an obligation to do more and do better.

So we're going to continue with these hearings. And we are going to support action. More than words, action is necessary. As the saying goes, actions speak louder than words. In fact, in this instance, words are not enough. You are not alone but we need to honor your pain with action.

And I want to thank all of you. I look at this audience and I see many of you, the survivors here again. You have not only been brave and passionate but you have been so patient and energetic in this cause.

EXHIBIT 10
007

I also want to mention again, as I did this morning, the role of the press in giving voice to these survivors, organizations like the IndyStar, the New York Times, USA Today deserve our thanks at a time when we need that free press more than ever.

And finally, my thanks again to Senator Moran for his leadership, Chairman Thune, and Ranking Member Nelson and, of course, to the two of our colleagues who will begin today because Senator Feinstein and Senator Grassley have helped to lead this effort.

MORAN:

Senator Blumenthal, thank you very much.

We do now turn to the two senators from the Judiciary Committee, the Chairman, Senator Grassley and the Ranking Member Senator Feinstein.

Senator Grassley, you're recognized for your testimony.

GRASSLEY:

Yes. Well, of course good afternoon and thank you, Mr. Chairman, for convening this hearing and giving Senator Feinstein and me the opportunity to participate.

From my part, as a parent, and as a grandparent, I can think of no issue of greater importance than keeping children safe from sexual predators. The abuse scandal that's the focus of today's hearing is a grim reminder of that fact.

Unfortunately, USA Gymnastics and Michigan State University aren't the only institutions that have made headlines over the years due to sexual abuse of young athletes. Other institutions also have struggled with this issue.

EXHIBIT 10
008

Sexual abuse, in any form, is an especially troubling crime because its victims suffer both physical and mental trauma that can last a lifetime. When the abuse is by a coach or a team doctor and the victim is a minor, the betrayal of the trust is even greater.

When as here, there were adults who were in a position to intervene, but they failed to act, it's a particularly tragic situation.

The doctor you've referred to, Dr. Nassar, the former National Team Doctor for USA Gymnastics, abused hundreds of victims over the period of years. The significant sentences he received ensure that he'll never again hurt a young gymnast or any other child.

But we must do more to prevent these horrific crimes from happening again. Congressional oversight of the FBI falls within the jurisdiction of Senator Feinstein and my Committee.

And after hearing one gymnast's complaint about the FBI's handling of the allegations against Nassar, I wrote the FBI Director to request a briefing on the Bureau's involvement in this case.

My Committee staff spoke with the FBI yesterday, and we were advised that the FBI's handling of this investigation has been referred to the Justice Department Office of Inspector General.

And where I have of - particularly in this office, have respect for the Inspector General, sometimes I see this as a move maybe to protect the FBI from some embarrassment, at least immediate embarrassment.

EXHIBIT 10
009

Our Committee convened its own hearing on the importance of protecting amateur athletes last year. Also last year, I joined Senator Feinstein in introducing the bill entitled Protecting Young Victims from Sexual Abuse and Safe Sports Authorization Act.

This new law requires amateur athletics governing bodies to immediately report suspected sexual abuse to the authorities. Our Judiciary Committee approved this measure and then worked closely with your Committee and Chairman Thune for on additional changes, before the President signed the final version in February.

And I thank this Committee for that cooperation.

The new law also authorizes the U.S. Center for SafeSports to respond to instances of sexual misconduct within the U.S. Olympics and Paralympic community. And since its inception, SafeSport has fielded more than 1,200 misconduct allegations and issued sanctions against 300 individuals.

Its website, safesports.org, has a searchable database that enables the public to find out if someone's been banned from a sport or otherwise disciplined.

Just in the last month, I've convened two other Judiciary Committee hearings on the topic of sexual violence. I've learned that we still need to do more to educate adults who are in a position to protect children. We also must reduce opportunities for predators to exploit victims.

For example, in many or most instances, adult coaches, trainers, and doctors shouldn't be left alone while working with young athletes.

EXHIBIT 10
010

I'll conclude by thanking you again, Chairman Moran, for your leadership on the Consumer Affairs Subcommittee. In holding several hearings on this issue, you've given a voice to people that until lately didn't have a voice or sexual abuse victims.

Thank you.

MORAN:

Senator Grassley, thank you very much. Thank you for your appearance today and your words. Senator Feinstein.

FEINSTEIN:

Thanks very much, Mr. Chairman. Members, thank you for being here.

It was about or it's (ph) well over a year ago that I had a meeting in my conference room with a group of women. And I walked in and Senator Grassley, I looked at faces with expressions that I had never seen before.

And I realized that it was something really serious. And in the course of that discussion, events were related we did a bill. Others joined. That bill has passed and we have taken a giant step forward.

Last week in an extraordinary moment broadcast for the whole world to see, U.S. Olympic Gymnasts, Aly Raisman, Jordyn Wieber, Jamie Dantzscher, along with a 100 athletes took the stage at the ESPY Awards to accept the Arthur Ashe Courage Award. It was an incredibly moving presentation.

EXHIBIT 10
011

And I thought about that time in my office when these frightened faces were in front of me and the survivors, many of whom are here today, radiate today remarkable grace, beauty, and strength.

I wonder if they would stand so that we might recognize them in this hearing room.

(APPLAUSE)

Thank you.

(APPLAUSE)

These Sister Survivors took the stage after having endured hellish abuse over many years. This abuse was compounded by the toll it has taken on them to come forward to tell their story, tell their truth despite certain institutions' repeated attempts to silence them.

Their solidarity and courage in coming forward, I marvel at it.

I've worked with Chairman Grassley, Chairman Thune, Ranking Member Nelson to protect future victims through the Protecting Victims from Sexual Abuse Act. And I so appreciate the support of my colleagues.

But the fact is revelations regarding institutional failures continue to force these victims from having to relive their experience over and over again.

There must be a full and transparent accounting of what Michigan State University, the U.S. Olympic Committee, USA Gymnastics and the FBI all knew and did about Dr. Larry Nassar while he continued to abuse young girls.

EXHIBIT 10
012

Earlier this month, Judiciary Chairman Chuck Grassley, Senator Blumenthal and I wrote a letter to the FBI Director Chris Wray requesting information about why after the FBI received information about Dr. Nassar in July of 2015, the FBI failed to intervene while dozens of athletes continued to be treated and abused by Dr. Nassar.

Similarly, despite reports that officials within Michigan State University, the U.S. Olympic Committee and USA Gymnastics knew that Dr. Nassar was alleged to have abused athletes he was allowed to continue to treat and molest young victims.

Even after Dr. Nassar was finally arrested and prosecuted, hundreds of victims and their parents were never notified, contacted, or informed by these institutions about how they could obtain information about all that had happened to their children.

To this day, many families of these survivors have yet to be contacted by officials at these institutions.

Indeed, it appears that these institutions undertook massive public relations campaigns to preserve themselves rather than rallying to the side of these survivors and their families.

And let me say that is unacceptable.

Last year, when we worked on the Protecting Victims from Sexual Abuse Act, the overarching principle for me was the question of how can we best support and empower survivors.

I believe each of the bill's supporters had the same intention.

EXHIBIT 10
013

Tragically, it does not appear that Michigan State, the USOC, USA Gymnastics or even the FBI adhered to the same guiding principle. Instead there have been disturbing revelations of cover-up and trying to silence vulnerable victims.

Some victims were pressured to sign non-disclosure statements to silence them from coming forward. I and other senators are looking closely at this issue.

Ultimately, these institutions must all continue to re-examine their mission and focus to truly serve as a beacon to lift up the wellbeing of athletes rather than to profit off them and protect the bottom line.

Who can forget when Jessica Howard testified last year in our Committee, Mr. Chairman, that USA Gymnastics officials stated its priority was "Money and medals" and not the wellbeing of young athletes in their care.

As lawmakers, we must make sure, Mr. Chairman, that these institutions are held accountable. So again, I would like to thank you Mr. Chairman, Ranking Member Blumenthal, and particularly, those Members who've taken the time to be here today, and to the Sister Survivors here with us again, I want to say thank you to them.

Thank you, Mr. Chairman.

MORAN:

Senator Feinstein, thank you very much.

I know you and Senator Grassley have a lot on your plate today and I appreciate the emphasis you've placed on the topic that this Subcommittee is paying a lot of attention to (ph).

EXHIBIT 10
014

FEINSTEIN:

Thank you, thanks very much.

MORAN:

You're welcome.

We'll call our other witnesses to the table please.

I call the Honorable John Engler, the Interim President of Michigan State University, Ms. Susanne Lyons, the Acting Chief Executive Officer of the United States Olympic Committee and Ms. Kerry Perry, President and Chief Executive Officer of USA Gymnastics, Mr. Han Xiao, the Chairman of the Athletes' Advisory Council.

(UNKNOWN)

Hi.

MORAN:

Welcome. (OFF-MIKE) President Engler - Governor Engler, we'll start with you. Welcome.

ENGLER:

Well, thank you Mr. Chairman and Ranking Member Blumenthal and Members of the Subcommittee, thank you for your invitation to discuss the important matter of protecting young athletes.

EXHIBIT 10
015

For me, next week will mark six months of service as Interim President, Michigan State. When I arrived on campus, Nassar was already behind bars. His crimes had shocked the MSU community and the nation.

The statements and testimony of survivors before your Subcommittee and the courts have saddened all of us. Our hearts go out to them and we are truly sorry for that a former faculty member perpetrate these crimes through his associations with MSU, USA Gymnastics, the U.S. Olympic Committee and others.

We all failed the survivors.

At MSU, my commitment is to make sure this never happens again. We are seeking to simultaneously deliver what justice and healing we can for the survivors and put strong accountability measures in place to ensure that MSU is safe.

As Senator Blumenthal just stated, actions are critical. I made clear from day one that we would do everything we could to cooperate with the several investigations and to seek to resolve the numerous legal claims.

In May, I was pleased to announce that the MSU Board of Trustees and the many law firms representing more than 300 survivors had agreed to an historic $500 million global settlement. The MSU parties have signed the agreement and it is now being finalized with the signatures of the survivors.

We are proud of this settlement but we have always believed that the legal settlement is only one part of the necessary response. From the start, we've made organizational changes geared toward improving safety and accountability.

EXHIBIT 10
016

Our goal is to make Michigan State a campus that works aggressively to prevent sexual misconduct and assault and if prevention fails, has appropriate procedures in place to respond.

My written testimony details many of the actions we've taken and the progress we are making. Today, I'll touch on some of the most salient points.

Very early on and as a direct response to the abuse Nassar perpetrated, we put strong emphasis on ensuring the protection of minors and indeed everyone that comes to our clinics.

We strengthened and standardized protocols for patient consent for informing patients and parents of their rights and for requiring chaperones in the examination room.

In my first week, I acted to revoke the tenure of William Strampel, the former Dean who failed to supervise Nassar and failed to ensure compliance. Earlier this month, we reached an agreement, severed all of the former Dean's ties to our university.

We realigned our medical education and clinical operations to foster a healthy culture of safety and accountability. One important change, for example, the athletic trainers now report to the medical staff.

In the area of prevention, while MSU policies were found to be comprehensive and robust, we have followed through on a number of expert recommendations to improve the Title IX program as detailed in, again, my written testimony.

Early on, I appointed a Relationship Violence and Sexual Misconduct Expert Advisory Working Group consisting of nationally-recognized faculty and staff subject matter experts on our campus.

EXHIBIT 10
017

The Work Group has been soliciting inputs from across the university community, assessing ideas for improving services and making very specific recommendations that we have already implemented including strengthening our policy on mandatory reporting obligations.

Most recently, I created a new Office of Enterprise Risk Management, Ethics and Compliance. It is charged with overseeing the development of a framework for identifying, prioritizing and managing risk and ensuring that those who are in charge of compliance are doing their job.

For new students, we've improved our summer (ph) orientation programs to focus on the prevention of sexual misconduct. Over 7,400 students have already - incoming students have already been trained.

We also hope to reach into Michigan's high schools with prevention program in the coming school year.

In terms of personnel, we've added or budgeted for more than 30 (ph) new staff positions at the Title IX Office, Counseling and Psychiatric Services, the MSU Sexual Assault Program, Campus Police, and our new Office of Enterprise Risk Management, among others.

Let me just close by saying I'm proud of the way Michigan State community, my alma mater, have come together in this unbelievably difficult time to respond not only in support of the survivors but also to address the urgent issue of sexual misconduct and assault that is a serious challenge not just on every campus but in so many workplaces across America.

EXHIBIT 10
018

MSU is a great global institution, more than 50,000 students, all 50 states, 133 countries. This fall, we will welcome our largest most diverse freshman class in our university's history. While they're settling in the Board of Trustees Search Committee will be moving forward to identify a new President.

In my remaining time, I pledge to continue to implement meaningful reforms, administrative changes that increase safety, accountability and respect on the Michigan State campus.

I hope that our experiences, the lessons we have learned and the solutions we have identified may help other institutions a reckoning with the persistent problems of sexual assault and harassment is clearly enhanced (ph) for many institutions. We owe it to all survivors of the abuse everywhere to dedicate ourselves to finding effective solutions.

Thank you, Mr. Chairman, Ranking Member and Members for the opportunity to be with you today.

MORAN:

Thank you. Ms. Lyons.

LYONS:

Good afternoon Chairman Moran, Ranking Member Blumenthal, and the Members of the Subcommittee.

Last February, I agreed to serve as the Acting CEO of the U.S. Olympic Committee because I felt an obligation to help the organization address the critically important issues of athlete safety and empowerment.

EXHIBIT 10
019

Two weeks ago, we announced that Sarah Hirshland will be the next CEO of the Olympic Committee. She's joining us in the audience today because of the importance of this issue. And she looks forward to working with Congress as she leads and implements the reforms and the initiatives that the Olympic Committee has currently begun.

Like all of you, I was deeply saddened and angered by Larry Nassar's abuse. I heard the stories of victims and survivors in court, before this Committee, and last week in the moving ceremony at the ESPY's and as recently as the press conference today and many of those same athletes, as you know, are joining us in this room.

Some survivors shared stories of seeking help from the Olympic community and finding it unresponsive, needlessly complex, and fraught with risks to their Olympic dreams.

This is appalling and unacceptable. The Olympic community failed the people it was supposed to protect, and I apologize again to each and every one of them, and their families.

I want you to know your voices have been raised and we hear you. We have an obligation to do better and we will do better

When I became CEO, I announced a series of initiatives to address issues of abuse and other structural weaknesses and I'd like to update you on our efforts.

First, we accelerated our efforts with the Center for SafeSport and our own athlete safety programs. We doubled our grant to the Center enabling it to build on its investigative capabilities.

EXHIBIT 10
020

We also instituted new reporting requirements of our own requiring national governing bodies to report to us on ongoing investigations, unresolved complaints and banned and suspended members.

Second, we are working to increase the voice and the power of athletes. We engaged with the Athletes' Advisory Council to understand its priorities and recommendations. We are proposing changes to the role of the Athlete Ombudsman and we are creating a new athlete services department to assist with athlete grievances.

Third, we announced a governance review and launched a commission to study and report on engagement with athletes and with the national governing bodies.

This commission is headed by WNBA President, Lisa Borders. The commission will provide recommendations on potential changes to the Ted Stevens Act, the bylaws of the Olympic organizations as well as other policies.

Rebuilding USA Gymnastics is our fourth category of focus. And after we insisted that the previous CEO and then the entire board resign, we helped USA Gymnastics implement governance changes and elect a permanent board with a majority of independent directors.

USA Gymnastics has now completed all of the immediate requirements that we set in January for it to maintain its certification as a National Governing Body.

They know they still have a long way to go.

We will continue to support USA Gymnastics on its way to implementing a true change in culture.

EXHIBIT 10
021

A fifth category will develop when we receive the report of the independent investigation. The investigation focuses on both the Olympic Committee and USA Gymnastics. And we will make the report public in its entirety and take whatever actions are appropriately based on whatever the findings may be.

As Congress considers additional solutions I'd respectfully ask to offer some input.

First, Congress can support further funding of the Center for SafeSport. The Center's independence is critical to its success and expanding its sources of funding will strengthen that independence.

Second, the Olympic Committee encourages the Congress to look closely at the recommendations that will come from the Athlete and NGB Engagement Commission.

Third, the Safe Sport Act provides the Center with liability protection for sharing information on bans and suspensions. We ask Congress to consider extending those protections to bans and suspensions imposed by National Governing Bodies.

We have begun to make significant progress in strengthening protections for athletes but our collective efforts must not cease. We must support the victims and survivors, and honor those who have stood up against abuse. We promise to lead the Olympic community to bring real and lasting change.

I would be happy to answer your questions.

MORAN:

Thank you. Ms. Perry.

EXHIBIT 10
022

PERRY:

Chairman Moran, Ranking Member Blumenthal, and Members of the Subcommittee, thank you for inviting me to testify today.

I want to commend the Subcommittee for their excellent work aimed at preventing amateur athletes from abuse. This is your third hearing in the series, and it is incredibly important, because today we focus on what we are doing to provide a safe and empowered environment for our athletes.

As I have said before the House, I will say again today, on behalf of USA Gymnastics, I apologize to our athletes, many of whom are here today. What Larry Nassar did to these incredibly brave women is unconscionable.

I joined USA Gymnastics in December 2017 from outside the sport and the Olympic movement. My primary focus is to transform USA Gymnastics into an athlete-centric organization with a supportive and empowering culture that helps our athletes achieve their gymnastic dreams in a safe environment.

I have heard the heart-wrenching stories of these courageous athletes who have been harmed by those that should have been - they should have been able to trust.

I commit to you that I will keep their words and experiences at the core of every decision I make, every day, as the leader of this organization. Their stories have broken my heart, but also strengthened my resolve.

USA Gymnastics is on a new path, with new leadership, and a commitment to creating a culture that puts athletes first. Here are just a few of our decisive actions to put USA Gymnastics on a new course in the past months.

EXHIBIT 10
023

We closed the National Training Center at the Karolyi Ranch, and we are seeking proposals on a new high performance training and wellness facility.

We hired a new High Performance Team Coordinator for the Women's Program through a selection process that involved both athletes and coaches.

We created an Athlete Task Force where our former athletes are helping to shape our organization's future. Just last week, we announced the five core members, one of whom is a survivor of sexual abuse.

We expanded our Safe Sport department to include new regional positions to better support, train, educate and serve our members.

We are extensively revising our Safe Sport Policy.

We are educating and training our staff, Board, and members on the new Safe Sport Policy and a new Ethical Code of Conduct.

I am pleased to report that our staff and Board are 100 percent compliant with both. And beginning this season, all professional members must be Safe Sport certified as a condition of membership.

We continue to implement the Deborah Daniels recommendations. 86 percent of the recommendations are either implemented or in progress. Today, I'm announcing that we are making publicly available on our website exactly what we have done to implement these recommendations.

We made reporting of abuse easier with a dedicated toll-free number and online reporting.

EXHIBIT 10
024

We are participating in mediation in order to resolve the athletes' claims fairly and expeditiously.

We created an Athlete Assistance Fund, in cooperation with the National Gymnastics Foundation that provides the survivors of abuse with the needed financial resources for counseling and medical services.

These changes and others we have made are part of a cultural shift that reflects our commitment to prioritize the safety of all of our athletes and members and to become the standard-bearer of change.

At the same time, I have ideas that I would be happy to share with the Subcommittee regarding what changes Congress might consider to help USOC and all National Governing Bodies do more to further protect athletes.

I have traveled the country, listening to athletes, listening to survivors, listening to parents and listening to coaches. My mission is to ensure that USA Gymnastics emerges as a stronger, more empowered organization that is focused on our athletes, so that generations to come will be able to share their stories of how gymnastics positively impacted their lives.

I am testifying today on behalf of the new USA Gymnastics. Our incredible athletes have always been, and will continue to be, a great source of national pride.

We will be there for them to help them realize their potential in a safe and supportive environment. Athlete safety must be at the forefront of everything we do, every day.

Thank you. And I am happy to answer your questions.

MORAN:

EXHIBIT 10
025

Thank you. Mr. Han Xiao.

XIAO:

Chairman Moran, Ranking Member Blumenthal, and Members of the Committee, good afternoon and thank you for inviting me to testify here today.

My name is Han Xiao and I'm the elected Chair of the US Olympic Committee Athletes' Advisory Council, also known as the AAC.

In 1978, the U.S. Congress enshrined the AAC into U.S. law and designated it as the voice of the athletes of the United States. I am here before you today as the official spokesperson for elite athletes under the USOC umbrella, including U.S. Olympians and Paralympians.

My testimony will reflect what I believe is the most accurate opinion of the athletes who comprise Team USA. On behalf of these athletes, I want to thank you for exercising oversight of the Olympic and Paralympic system during this critical juncture.

America's gymnasts and their courageous testimony at the Nassar hearings have brought the national media and all of you in the Senate here today.

While establishing the U.S. Center for SafeSport is an important step in the right direction it should not be the only outcome of their suffering.

First, we cannot allow the U.S. Center for SafeSport to fail in its mission. The athlete abuse problem is far bigger than the USOC or any of us anticipated. The Center received its 1000th complaint of sexual abuse after just 15 months of opening its

EXHIBIT 10
026

doors. The Center needs increased funding so that it has the capacity to handle this case load as well as embark on critical education efforts.

To be successful SafeSport must have the technical expertise to conduct investigations and hearings and it must be able to preserve its full independence to retain the trust of athletes in the public.

The adjudication process for complaints must improve with input from subject matter experts. Right now, I fear that none of those criteria are being fully met. The sexual abuse of athletes is just one symptom of broader systemic issues that must be addressed to substantially empower and protect U.S. athletes moving forward.

Individual athletes have almost no power in our system, instead the USOC and National Governing Bodies hold the dreams of our athletes in their hands and athletes fear these coaches and administrators, armed with congressionally granted monopoly power will retaliate if they protest or dissent.

One failure to be compliant or obedient could mean the end of that athletic future. There is no other Olympic committee or Paralympic committee to appeal to, to get a chance to compete for America.

Our athletes aren't just powerless to remedy sexual abuse, they're also powerless to address financial injustices and many serious government issue - governance issues.

To combat this problem, I have made two major recommendations. First, I recommend establishing autonomous Inspector General's office reporting to Congress and the ASC.

EXHIBIT 10
027

The role of this office would be to hear athlete concerns confidentially without fear of retaliation about the governance and operation of the USOC and NGBs to independently investigate issues in the Olympic and Paralympic movements and so to determine necessary corrective actions.

Establishing this office and providing additional oversight would contribute greatly to a necessary cultural shift within our movement towards a focus on serving our - our country's athletes.

I also recommend the establishment of an athlete advocate. In 1998, Congress amended the Sports Act to require a new position, the athlete ombudsman. The position was meant to solve the recurring problem of athlete conflicts with their NGB or the USOC.

However, the ombudsman's office currently only advises of their rights, directs them to available resources and provides mediation services in most individual athlete's cases.

These are essential and invaluable functions for the athlete body. However, individual athletes and the ASC need independent legal advice and sophisticated, professional athlete advocacy. The athlete's Advocate's role would be to provide confidential legal advice to athletes and actively advocate for their rights and interests on a full time basis.

In addition to directly represents an athletes when necessary with a client attorney relationship, the athlete Advocate would work with other athlete representatives in the movement to raise repetitive issues with the USOC , NGBs and other organizations.

EXHIBIT 10
028

I've presented several other governance problems in my written statement along with more detailed information supporting my remarks today. I'd like to note however that we've been down this road many times before. In 1978, the amateur Sports Act was established imports to provide athletes with rights, however it also set up an unregulated monopoly.

In the 40 years since the 1978 Act, we have seen a cycle of scandals followed by internal USOC reforms. Now is the time to implement significant structural reforms to increase transparency and accountability, limit unnecessary bureaucratic expansion and shift power to athletes.

The USOC must reorient its primary mission for supporting the nation's Olympic and Paralympic athletes in service to this nation. Today's problems are not merely bad PR for the Olympic and Paralympic movement. Instead, it is time for Congress to enact structural changes that can bring about a cultural change.

If in another decade, with the Olympic and Paralympic Games coming back to the U.S., we find ourselves here again asking the same questions and searching for the same answers, we will have failed team USA athletes again, including the heroic gymnasts who have brought these issues for attention for now. Thank you for your time.

MORAN:

Mr. Xiao, thank you very much, I think, your testimony was very valuable to me, you and I've not met, we've not had a conversation, I didn't know, what you were going to say until I read your testimony and I find it valuable and useful and a good admonition that it's not a path we want to go down again.

EXHIBIT 10
029

We - we need to solve the problems today, thank you for being here. Let me start with the Ms. Lyon, excuse me, Ms. Lyons, Congress gave the Olympic committee, the NGBs and the U. S. Center for SafeSport immunity from defamation lawsuits unless a witness or entity speaks or acts with malice.

Congress clearly wants SafeSport to be able to publish the names of banned members who abuse children and I believe, if athletes and parents are to know they are safe in the knowledge of who has been banned, is absolutely essential.

When will USOC require that all NGB's make the list of their banned members public?

LYONS:

We also agree that one of the most powerful things that we can do is get the names of people who are banned and suspended in the public domain for parents, for potential employers, for anyone who works with the athletes community.

The Center for SafeSport is beginning serious work on this, they already have a searchable database for the cases that they personally have adjudicated, one of the many things that I mentioned in my opening statement and perhaps there's misunderstanding about this is the NGBs do not believe that they have that same limited liability that would protect them, if they make their names public and that's causing a bit of a road block at the moment.

So I think we need to investigate is that true and perhaps Congress can assess by ensuring that the NGB's feel that they do have that - that liability protection as well, they are in general very, very willing to make this information public and transparent

EXHIBIT 10
030

and they're working right now with us and with the Center to figure out how the database systems will work, to allow us all to seamlessly share that information.

But that is a stumbling block we'd like to overcome.

MORAN:

So today the - the database only includes at say - at U.S. SafeSport, those individuals that are involved in cases that have been referred to U.S. SafeSport since its creation?

LYONS:

That's correct and we also have, that the Center's publishing on a bi-weekly basis is what they're calling an adjudication log, that's actually a written log of all of the banned and suspended individuals that the NGVs have reported.

We know who they are and that's being updated every two weeks but it's not yet public.

MORAN:

So are - there is a list of banned coaches and employees?

LYONS:

Correct.

MORAN:

And who knows about that list?

EXHIBIT 10
031

LYONS:

At the moment, that's an internal list between the NGBs and the Center for SafeSport but the system that we're hoping to develop would allow that to become public.

MORAN:

Would there still be coaches who were on that banned list who are coaching or employees who are still employed?

LYONS:

Well, there certainly should not be and I think we just discovered, just in the past few days that there are still some weaknesses in the communication system that when someone is banned, not only does that individual needs to be notified immediately but anywhere where they are currently employed that we could possibly be aware of, also needs to be simultaneously advised.

We've discovered that there has been some lag in timing in that system that needs to be close.

MORAN:

So the point you're making is that if - if someone is banned, only the banned person, the coach or employee gets notified, not simultaneously is the employer notified?

LYONS:

The - the employer should be notified simultaneously. I read an article and I don't know, if this is factual that the employer of one of those individuals did not receive

EXHIBIT 10
032

notification until a few days later and that individual was still coaching in that interim period.

MORAN:

To your knowledge, what FBI checks have been run on current coaches or employees? Current process by which someone is investigated by the FBI?

LYONS:

Well, we have background checks, all of - all of these individuals go through standardized background checks and we have a standard list of things that needed to be checked. I'm not entirely sure if the FBI is a part of that.

MORAN:

When you say, all these folks, does that mean every coach, I don't what the - what the category would be of what type of employees but all NGBs.

LYONS:

For all NGBs, anyone who is authorized to have contact with athletes, it could be medical staff, it could be coaches, it could be trainers, they are all required every two years to undergo a background check.

MORAN:

Has there been any anonymous inquires, requesting anonymous information from athletes in which they can provide information about experiences they've had that are inappropriate?

EXHIBIT 10
033

LYONS:

I'm sorry, could you rephrase your question?

MORAN:

Has - has the athletes involved in the U.S. Olympics been - has there been enquiry by which they can anonymously respond about any experiences they've had, that would reflect the sexual abuse or other bad behavior?

LYONS:

Right, within the USOC and adjacent to the ASC, there's an athlete ombudsman who has a strong relationship with the ASC, any information that's provided to them is confidential, it does not have to be shared with the USOC as an entity.

And an athlete has the opportunity to reach out to the ombudsman and make known to them any information they have. If that information involves sexual abuse the ombudsman as required by law to report that to the Center immediately.

MORAN:

The questions I just ask you about banning coaches, investigations background checks and anonymous ability to report something to an ombudsman. When did that come into existence?

LYONS:

Well, the ombudsman has been in existence for quite a long time, it's been -

EXHIBIT 10
034

MORAN:

Including the times in which Nassar was doing the things he was doing.

LYONS:

Yes. One of the issues that I think, we need to all work on is education amongst the athlete population to even know that there is an ombudsman. We recently did some research that shows that many athletes are unaware of that position, not necessarily sure how to reach out to them.

Similarly they need to know how to reach out to the Center.

MORAN:

Ms. Perry, at our last hearing, Rhonda Faehn testified that Amy White, an employee of USA gymnastics was directed by Steve Penny, her boss to go to the curly ranch into take documents from the national training Center back to USAG headquarters in Indianapolis. Have - have you seen those documents?

PERRY:

Thank you Senator Moran so what I know is that that instruction, it was - it was told to me that that that instruction was given to Ms. White that Ms. White came back to the office with a suitcase and some boxes.

Where those documents went from there, I don't know, I was also told that there was not a sort of logging in, if you will, of those documents in the organization but those documents were given to then CEO, Steve Penny.

EXHIBIT 10
035

MORAN:

Do you know that those documents were given to - to Mr. Penny?

PERRY:

Of course, I wasn't there, Senator Moran, but that's what I was told.

MORAN:

And we've made enquiry of USA gymnastics so with an extensive request for documents, those documents have not been provided.

PERRY:

I know we've produced close to a million documents in production so those documents could be in there, they may not be but I - I don't know -I don't know where those documents are.

Miss - Steve Penny would know where those documents are.

MORAN:

There would be no chance of those documents exist within your custody at USA gymnastics unless they were provided to us unless they're included in the list that you - the million documents that you provided us?

PERRY:

Right.

EXHIBIT 10
036

MORAN:

Otherwise you can assure me that they don't exist within your custody?

PERRY:

To my knowledge, they do not exist in our custody.

MORAN:

Sir Blumenthal.

BLUMENTHAL:

Thanks Mr. Chairman. Mr. Engler, are you familiar with Kelly Lawrence.

ENGLER:

Yes.

BLUMENTHAL:

She's here today and she remembers a conversation with you in which you said, and I'm quoting her, ' Mr. Engler then looked directly at me and asked, quote, right now, if I wrote you a check for $250,000 would you take it? When I explained that it's not about the money for me and I just want to help, he said quote, well, give me a number, end quote', that's accurate, correct?

ENGLER:

No Sir, it is not.

EXHIBIT 10
037

BLUMENTHAL:

Well, you offered her money, did you not?

ENGLER:

No Sir.

BLUMENTHAL:

You never spoke to her about money?

ENGLER:

No Sir.

BLUMENTHAL:

Did you meet with her absent her attorney?

ENGLER:

Yes, at her request, at her mother's request.

BLUMENTHAL:

And there was no discussion of money at that meeting?

ENGLER:

There was not any discussion of any settlement, she is now part of the settlement that has been requested -

EXHIBIT 10
038

BLUMENTHAL:

Was there in another meeting, discussion about paying her individually, in connection with her assailant?

ENGLER:

No.

BLUMENTHAL:

Let me ask you, Ms Lyons. You know, I've - I've listened to your apologies and I would have found them more credible if today were Thursday before the filing of an answer by your organization in court.

That answer in effect disclaimed any and all responsibility. Did you authorize the filing of that answer?

LYONS:

I did and -

BLUMENTHAL:

And are you aware, that in effect, it denies that the USOC had any responsibility for Larry Nassar?

LYONS:

EXHIBIT 10
039

That is not our intent, as publicly stated and I will state again that we believe we do have responsibility and accountability along with the rest of the movement in failings these athletes.

The questions in the motion to dismiss are a different set of questions about the legal liabilities and our relationship with Larry Nassar's different than the relationship of -

BLUMENTHAL:

The contention in your - excuse me for interrupting but my time is limited. In those court papers, your organization stated that there was no legal grounds to sue because. Nassar never worked for the federation nor were his crimes foreseeable?

In other words you couldn't anticipate, couldn't expect or suspect any crimes by him. Is that's the position of your organization?

LYONS:

Yes and I'm not a lawyer, that is the legal term whether something can be foreseeable and I think that the courts will have to determine if we have legal liability, we certainly have social and ethical liability.

BLUMENTHAL:

Well, in effect, you have said you have no reason and the plaintiffs have no reason to hold you accountable in a court of law, that's correct, right?

LYONS:

That's correct, from a legal perspective and the court can determine if -

EXHIBIT 10
040

BLUMENTHAL:

So in effect you've washed your hands off.

LYONS:

I'm sorry, if it would appear that that's the impression you've gotten, that is certainly not our intent, we are actively engaged in everything we can do to help keep athletes safe.

BLUMENTHAL:

Except being part of the legal process that will impose any sort of court orders, impose any kind of accountability or responsibility?

LYONS:

I think the court will determine, if we need to be part of those proceedings and if they determine we should be, we absolutely will be.

BLUMENTHAL:

Let me ask you, Ms. Perry, because your organization filed a similar filing. And I think in your case it was a motion to dismiss and that was on behalf of the new - the new USA gymnastics.

You said, in one of the parts of that motion to dismiss, when the issue was whether Nassar was - was a certified athletic trainer, osteopathic physician, national medical director and national team physician? The response was denied, that correct?

EXHIBIT 10
041

PERRY:

Senator Blumenthal, I'm not sure what motion to dismiss you're referring to or the timing of that or the timing of that statement.

BLUMENTHAL:

Well, it may have been an answer, I'm not sure whether it was an answer or a motion to dismiss but in either event you denied that contention, correct?

PERRY:

I don't - I'm not familiar with that, if there's a document that I can look at, I'm happy to read that and provide answers to you. I do know Senator Blumenthal -

BLUMENTHAL:

Well, let me ask you a different -

PERRY:

Yes.

BLUMENTHAL:

- way, isn't it true that he was a certified athletic trainer, Osteopathic physician, national medical director and national team physician?

PERRY:

I don't know all of his designations but I will say -

EXHIBIT 10
042

BLUMENTHAL:

But you work there, correct?

PERRY:

Yes, he - he was a volunteer and he had -

BLUMENTHAL:

But when you say, he was a volunteer, he was compensated, correct?

PERRY:

I - he was compensated for - from what I've been told, he was compensated for expenses and travel and they're like -

BLUMENTHAL:

And he received fringe benefits?

PERRY:

I don't know what fringe benefits that would have been but -

BLUMENTHAL:

And he received the stature and prestige of being announced as and I'm quoting, part of the USA gymnastics medical task force, to provide leadership and oversight of USA gymnastics practices procedures and protocols.

EXHIBIT 10
043

PERRY:

Senator Blumenthal, that was before my time, that designation and - but I - but here's what I think is important, is that from day one when I came on board, I made it very publicly known, that this organization is going to be making our every attempt we can, to resolve the situation.

The survivors are the most important thing and reason that I took this job because their voices and their courage moved me so much -

BLUMENTHAL:

And I'm out of time.

PERRY:

But I -

BLUMENTHAL:

And I accept your words.

PERRY:

Yes.

BLUMENTHAL:

But just last Friday, you filed this answer that strikes me as a blatant falsehood.

PERRY:

EXHIBIT 10
044

I'm not familiar with that action, Senator Blumenthal.

BLUMENTHAL:

Didn't you authorize it?

Perry: I not familiar with that - I would like to see that and be able to answer your question.

BLUMENTHAL:

Well -

PERRY:

A motion to dismiss -

BLUMENTHAL:

Are you here with counsel today.

PERRY:

I am.

BLUMENTHAL:

I would suggest that maybe your counsel should show it to you because you are testifying here. And both you and Ms. Lyons are responsible for those filings in court, not just for the legal position but the factual assertions.

EXHIBIT 10
045

And I hope that you will review them before you leave here.

BLUMENTHAL:

I will and Mr. Engler, I'm not sure, how to follow up on your denial of any conversation with Ms. Kelly Lawrence but I'm going to do so. Thank you Mr. Chairman.

MORAN:

Senator Peters.

PETERS:

Thank you Mr. Chairman, Ranking member, thank you again for this hearing, been to others hearing. You know, this morning I had an opportunity to hear directly from a number of very courageous survivors. And many of them are - are here in the in the audience for this hearing, right now.

Mr. Engler, in talking to them, they feel very strongly that you have not listened to them and if you have listened to them, you certainly haven't heard, what they have to say and the concerns that they've expressed.

And so today, as their Senator, I want to amplify their voices and ask some of the questions that they raised. First off, the - the Detroit news has reported that in the past 20 years - 20 years, at least 14 people, most of whom are or were MSU employees were notified of Nassar's behavior.

So in - in the interest of time, I'm just going to ask some yes or no questions, if you'd answer, yes or no, I'd appreciate it.

EXHIBIT 10
046

First yes or no have you subjected any of these individuals to any disciplinary action?

ENGLER:

Yes. The immediate action that I took with regard to Dean Strampel was an indication of my assessment that his leadership as Chair - as the Head of the -as Dean of the college of Osteopathic medicine fell far short of appropriate performance standards.

PETERS:

So you have one - just in time - when you had one individual you took the disciplinary action is Mr. Strampel?

ENGLER:

Well, I think, all of these happened, I arrived in February of 18 -

PETERS:

So no, you haven't, that's fine, so no is the answer. Mr. Strampel, I understand, you called in February for a revocation of his tenure.

ENGLER:

That's correct.

PETERS:

But that did not happen, he is actually allowed to retire according to -

ENGLER:

EXHIBIT 10
047

No, his tenure - that's correct his retirement has separated him from the University and so he is no longer connected anyway to the University.

PETERS:

Right, so he was allowed to retire and I was - he received $175,000 as well as part of the settlement, I understand -

ENGLER:

That was the settlement that we judged as more in the interests of the University and the survivors to have him gone and separated, versus a tenure proceeding which I hear, administrative procedures could run more than a year and would have cost much more than $170,000.

PETERS:

So that was - that situation, yes or no, beyond Nassar and Strampel, so no - no - no other person has been fired?

ENGLER:

And there is an ongoing investigation, I would - would remind the Senator, by the Attorney General of the State of Michigan, at the request of the Board of trustees, to see if anyone else should be subject to sanctions.

PETERS:

So all these individuals will be interviewed?

EXHIBIT 10
048

ENGLER:

I believe, they have been.

PETERS:

And that's done by the Attorney General's office?

ENGLER:

That is correct.

PETERS:

Yes or no, do you believe that there was a culture of enabling and covering up of the actions of a predator over 20 years, in MSU.

ENGLER:

Well, I wasn't there until February of 2018 but when I arrived, I felt that there are weaknesses in procedures and protocols. I felt that the shared governance model at University didn't lead to specific accountability and so I thought those weaknesses -

PETERS:

So there were problems, I need to keep moving if I could President.

ENGLER:

OK, but I would - if I can't answer the questions, I'm not allowed but -

EXHIBIT 10
049

PETERS:

Well, that was a yes or no and if you were not there, you think, yes, there were some issues, you -

ENGLER:

Well, there are issues for sure.

PETERS:

So you answered a yes, do you believe there's a job is to instill trust?

ENGLER:

Oh absolutely, I think trust and trust is done by accountability and people accepting responsibility for their roles, be that someone in charge of compliance in a medical school or someone in charge of you know, assuring that an investigation is done properly at the police department.

PETERS:

And I appreciate that and in addition to the - the - the - making sure there's accountability, it's also the people you put in place to instill trust, one thing that the survivors felt very strongly about, I think many of us believe is - is true, is that, you should bring outside perspective into the leadership, fresh eyes are very important.

Having national searches to bring in folks who are going to bring a different view on how things are happening in Michigan state it's important. We have seen you have

EXHIBIT 10
050

pledged or you pledged to do that for a national - for your athletic director, have a national search, that didn't happen.

You hired somebody from within the University, you also hired a Head of the Office for Civil rights and - and Title 9, someone who was actually assigned to defend Michigan State University against sexual assault lawsuits as opposed to being someone traditionally in many universities, someone who works with diversity and working with students is really a defender and a champion for students as opposed to the University.

So I - I think, for what came out very clear to me is in addition to some of your hiring decisions that I mentioned briefly, your lack of empathy and respect to survivors, especially for Kelly Lawrence which I think, Senator Blumenthal in your remaining time are going to ask more questions about that.

We also have a situation with Rachael Denhollander who you accused of receiving kickbacks for manipulating other survivors, are you willing to apologize to her?

ENGLER:

Oh, I've already done so.

PETERS:

Have you done that publicly, verbally?

ENGLER:

Yes, I have.

EXHIBIT 10
051

PETERS:

So Mr, Chairman, I'd like to enter into the record, a letter signed by over 120 survivors, written to members of the MSU's Board of trustees into the committee record, if I may.

MORAN:

Without objection.

PETERS:

I'd like to read a couple of brief passages, first passage in this letter signed by 120 survivors, we recognize that the greatest measure of an abusive culture is how survivors are viewed and whether perpetrators and enablers will be held accountable and that the environment in which they thrive remediated.

On all of these metrics, President Engler has only reinforced the culture of abuse at MSU and now they go on to say, we are here to tell you that all the organizational changes in policy and procedure enhancements in the world mean nothing, if there is not leadership that creates an environment where survivors feel safe to speak up and it is our position that MSU cannot move forward and become an institution of integrity and safety, until John Engler is no longer President and a new interim leader who will stand against the abusive culture is found.

And Mr. Chairman, I just have one last question and this is a question that came from Jessica Smith, who I met with, this morning, another one of courageous survivors and she had one question for you and I would like you to - to ask, especially after hearing excerpts from this letter, from 120 survivors and there's much more in that letter.

EXHIBIT 10
052

Her question was, if your presence is so harmful to survivors, why should you keep your job? Would you answer that, please?

ENGLER:

Absolutely, be happy to, under my leadership, accountability is being instilled across the University, we're seeing the number of complaints coming forward, people are being willing to bring complaints to the office of - is to select tighter line of investigation.

We have fixed the problems of the medical clinic now by strengthening the protocols, strengthening the Chaperone Policy, strengthened the billing and reporting procedures in the department, strengthened the evaluation of deans and the key personnel themselves.

Arrived at a $500 billion settlement to put some of the litigation behind, fully cooperate with all the investigations and we're also starting a process to bring a new President in.

You mentioned earlier appointment, you mentioned only two but there is a national search under way for the head of the title in office, you neglected to mention that, man is in interim there.

The Athletic Director was somebody chosen from outside the Athletic department, yes, he was part of the university but he was chosen with the strong support of your constituents in Michigan.

Constituents who include not only the football and the basketball and soccer and the golf coaches of the men's and the women's side but alumni supporters and everybody

EXHIBIT 10
053

who views that this man who has a legal degree and a Master's degree from Northwestern University has a strong commitment to compliance is exactly the right person to come in and be strong as a leader of the department.

And in having a national search, we would have found an outsider just as I found an insider of the department but we could not do a better job and he deserves your support and mine.

PETERS:

So the national search wasn't conducted, you said, you will do one for this other individual -

ENGLER:

I said, it is being done, Senator.

PETERS:

It is being done, yes, but that has been done and there is now a national search for a permanent President?

ENGLER:

Yes.

PETERS:

My understanding you will not be part of that search and if offered the position, you will not take it?

EXHIBIT 10
054

ENGLER:

I've got a candidate and I strongly support the Board's decision to move forward, they're in the process of hiring the search for and compiling the search committee. I would hope that they would have somebody very quickly and when that person arrives, you give them your support.

PETERS:

All right, thank you.

MORAN:

Senator Cortez Masto.

CORTEZ MASTO:

Thank you, Mr. Chair and - and Ranking member Blumenthal. Thank you for continuing your work and leadership to bring witnesses before this committee that can provide us real answers.

I know that members of the committee take this very seriously and are hard at work to provide more structured safeguards for Olympic athletes and then to the survivors in this room, I want to personally thank those who have stood together to present an image for the world and are standing up and telling their story.

I know it's not easy, but you are athletes with unimaginable strength and courage and I thank you for everything you do every day, for using your voices.

EXHIBIT 10
055

As elected leaders, we must remain committed to our obligation to demand reforms and provide for real thoughtful solutions that will make positive change. I remain committed to working with my colleagues, survivors, advocacy groups and many others to make fundamental changes to the governance and oversight of the amateur sport in this country.

And so, Ms. Lyons, let me start with you and I want to follow-up in a conversation with the Chair that you started with regarding the ban list. Can I ask you what are the consequences that the USOC outlines if a member club hires a coach or an individual on the banned list.

LYONS:

That's an excellent question. To my knowledge, we do not - we have the USOC do not have anything that is written as to what would happen if an outside club hired someone on the banned list.

Typically, the USOC is not aware of which coaches are at which clubs. That's generally something that the NGBs are much more aware of, but I think you point out a structural issue that is something we should look at.

MASTO:

So, Ms. Perry let me ask you this. What actions is USA Gymnastics taking to identify and remove coaches, athlete, directors, employees and officials who witnessed emotional and physical abuse of athletes and did not report child abuse to the authorities and did nothing to stop it.

PERRY:

EXHIBIT 10
056

So, we have made both are permanently ineligible list and are suspension list public on our website. There are several ways that we communicate that information out. Of course, we provide notice to the adverse party and we provide notice to the club owners and we also ask the club owner to provide notice to the membership in their club area.

And so ...

MASTO:

Let me ask you this, so you are actually taking action to identify and remove coaches, athlete, directors, employees and officials who witnessed emotional and physical abuse of these athletes and did not report the child abuse to authorities.

PERRY:

As long as we have a report and we're made aware of it, we are going to follow our safe sport policy and our bylaws, which allows us to take action. And again, depending on the nature of the misconduct if it's sexual misconduct that goes to the center if it's non-sexual misconduct that stays presently with the national governing body. And so, we have specific processes that we follow, some of that of course is governed by not only our bylaws and our safe sport policy but by the Ted Stevens Act. And so, we follow all of those processes to find it at the end of a hearing panel. For example, what their decision is and based on their decision in that hearing panel the action is taken.

MASTO:

EXHIBIT 10
057

So are you currently taking any actions to identify or remove current employees who knew about the sexual views and didn't do anything to report it and stayed silent.

PERRY:

Did you say current employees?

MASTO:

Yes.

PERRY:

So, right now, we are going through an independent investigation, the Ropes and Gray and that information I think is not only critical for this body and all of the investigations that are going on, but it's very critical for us, because it's important that we learn the facts around this and so you know if there are ...

MASTO:

All right. So, let me stop you there.

PERRY:

Sure.

MASTO:

I appreciate the filibuster, but I've only got five minutes and we'll follow-up with you. In the testimony offered by Mr. Rick Adams of the USOC in March of 2017. He testified that there was "an environment that discouraged victims from reporting

EXHIBIT 10
058

abuse" at NGBs including the USA. Do you agree with Mr. Adams' assessment of the culture at USA gymnastics prior to your tenure.

PERRY:

Senator, I saw immediately that we had to become an athlete centric organization.

MASTO:

Does that mean yes?

PERRY:

I saw immediately that this organization and probably very much other organizations need to focus their priorities on the safety of the athletes.

MASTO:

So, let me ask, is it Mr. Xiao, thank you very much. You've heard the opening statements of the individuals that are on the panel with you. Let me ask you this, is there anything that they have said that satisfies your concern that structural changes is going to occur.

XIAO:

I think that we're engaging in this process in good faith from the Athletes Advisory Council and will continue to provide our suggestions for structural changes. But in the end, as I said in my testimony, I do think that we've done this before. I think we've done independent commissions. We've done sweeping governance changes. We've done the tag (ph) commission not too long ago and here we are today.

EXHIBIT 10
059

MASTO:

That's my concern. So, did you hear anything different today that's going to change your mind - make you - or at least satisfy concerns that change ...

XIAO:

Personally, I don't think so. I think that there is not a feeling necessarily of the organization. I think it's a feeling of the entire system the way it is set up.

MASTO:

Thank you. I know my time has run out. Thank you.

MORAN:

Mr. Xiao, Ms. Cortez Masto went down a path that I was intending to go. Let me take what you just said, a step further. My question was and perhaps is, so we've heard testimony from Mr. Engler, Ms. Lyons, Ms. Perry. I would summarize their testimony and what we've heard from them in other meetings is that things are different today than they were. We take sexual abuse seriously. We put protocols in place. We have reporting requirements. We've created safe sport.

You were on the advisory committee, I would guess prior to Ms. Lyons, it would be about the same time of her arrival but is the world of Olympic athletes and the relationship between USA Olympics and the governing bodies, is it different today than it was at the time of Larry Nassar or is the only thing that's different today is that Larry Nassar is in prison.

XIAO:

EXHIBIT 10
060

I don't think that the only thing that's different is that Larry Nassar is in prison. I do think that in many cases, the presence of safe sport has pushed certain national governing bodies to do more to protect athletes. But I don't think that there has been necessarily a see change in the relationship between athletes and the NGBs or the athletes in the USOC.

MORAN:

And my understanding of your testimony is maybe putting words in your mouth, but part of that significant problem is the monopolistic nature of the U.S. Olympic Committee. So, when you say that there is things wrong that hasn't changed in the way that it needs to, the structure is flawed. The problem is the relationship between athletes and the U.S. Olympic Committee, which is their only option to compete and to perform. That's the story. I mean that's your testimony.

XIAO:

I think that's accurate.

MORAN:

Thank you. Let me ask Ms. Lyons, former president Scott Blackmun of the U.S. Olympic Committee stated in his written responses to questions for the record that a confidential memo summarizing the chronology of events relating to the athletes report of abuse in the summer of 2015 and the actions taken by USA Gymnastics including its engagement with the FBI was drafted by USAG. and forwarded to USOC in September 2015.

EXHIBIT 10
061

So, Mr. Blackmun's written response, his testimony was that there was a report forwarded from USAG. to the U.S. Olympic Committee in September of 2015 and that report indicated referral or conversation, engagements with the FBI. This document has not been provided to the Subcommittee for our review. Are you aware of the existence of this document and why was it not provided in our request of the USOC for documentation.

LYONS:

I am not aware of the existence of that document. I have not seen it. My understanding was that that initial - it was a conversation that informed Mr. Blackmun that USAG was informing the FBI and that was back I believe in July. I have not seen any document that would be a chronology of events that was produced in September.

MORAN:

If that document exists, would you know about it? If that document exists within your custody of the U.S. Olympic Committee would you know about it?

LYONS:

We would think from all of the search that we have done on keywords and the like that something that contain any of those keywords about gymnastics, Nassar et cetera should have been revealed if it existed.

MORAN:

Just like with the documents that were retrieved from the Crowley Ranch, we've yet to see - this is a document that I think would be very valuable to us and I would ask you

EXHIBIT 10
062

to pursue the possibility that it exists within your custody and provided if it does that I assume you're willing to do.

LYONS:

Absolutely, willing to do that.

MORAN:

Ms. Perry, do you know anything about that document?

PERRY:

I do not.

MORAN:

So, I suppose a copy could exist, it was forwarded from U.S. Gymnastics to the U.S. Olympic Committee. One would think there might be a document again. Same story with the Crowley Ranch documents, if it's in your custody, I assume you will pursue it further and provided if it exists.

PERRY:

Yes, sir.

MORAN:

Thank you.

PERRY:

EXHIBIT 10
063

Senator Moran, may I add because my attorney has just advised me of which document we're talking about.

MORAN:

Yes, ma'am.

PERRY:

I believe there was a document sent from Steve Penny to us at the time of Chief of Security Larry Bondar. And my understanding is that that document has been provided.

MORAN:

That is the document, it was provided to your security director, your security chief. I don't believe we have that document. And if again, I would ask you if you'd provided, if it does exist and apparently it does, so thank you for checking with your attorney and we would appreciate you providing it to the committee. Thank you.

Senator Blumenthal.

BLUMENTHAL:

Thanks Mr. Chairman. Mr. Engler, I want to be fair to you and give you a chance to go back to your previous answer. The comments made by Caeli Lawrence were in a public comment session. He recounted that conversation. And you deny that the meeting with her without her attorney in which you offered money took place. Correct.

EXHIBIT 10
064

ENGLER:

I did not deny there was a meeting. She waited for some 45 minutes with her mother to meet with me and I along with two women were on my staff, Carol that the family did meet with her.

BLUMENTHAL:

But there was no discussion. You deny any discussion of ...

ENGLER:

No. Our discussion was about, what is it among all of the actions we've taken, many of which were in my written testimony, is there anything else that from the survivor perspective could be done and the discussion was how do we hear from people about what is it that might help.

BLUMENTHAL:

So, no discussion of money. I want to be absolutely ...

ENGLER:

No discussion, yes, we were in settlement talks or no point in having a settlement with a single ...

BLUMENTHAL:

Did you consider it proper to meet with her without her attorney present. You need she was representing.

EXHIBIT 10
065

ENGLER:

That was up to her. I asked that question to her and her mother, if they could meet with me. It's appropriate, I could meet with them. But could they meet with me and they ask that would this be done privately that nothing be said, they could get in big trouble. It was not a problem on my side. It was an issue for them and I have met with others and ...

BLUMENTHAL:

You made no offer of money as she very specifically said, she didn't.

ENGLER:

No, I was not doing settlement negotiations with one plaintiff that would be.

BLUMENTHAL:

So, are you saying that she lied when she made that comment.

ENGLER:

I have said publicly, we have very different recollections. The people in the room that were part of the university have different recollections of that conversation that she has.

BLUMENTHAL:

Did you comment on the Williams Rampal (ph) in that meeting with her.

EXHIBIT 10
066

ENGLER:

I don't remember. I might have, because I think I might have mentioned the fact that we had already begun the tenure revocation. Did you say about the charges of misconduct against him that they were "no big deal".

BLUMENTHAL:

No, you deny that you said that.

ENGLER:

Absolutely. I mean we're revoking a gentleman's tenure. That's a big deal. And the actions that the failures of his leadership were a very big deal.

BLUMENTHAL:

Ms. Perry, earlier I referred to the answer that was filed on Thursday. And I also made mention of the motion to dismiss filed by the United States Olympic Committee.

I want to be clear, you are saying that Larry Nassar never worked for USA Gymnastics in a way that would make you in anyway legally responsible.

PERRY:

No. Senator Blumenthal, I'm not saying that at all. What I'm saying is that he was not an employee of USA Gymnastics. Of course, as the team doctor. Yes, there was definitely a relationship there with USA Gymnastics at the time and of course, I wasn't there. But that he was known as the team doctor for USA Gymnastics.

EXHIBIT 10
067

BLUMENTHAL:

But that seems contrary to what you have said in court. I mean in court you said, he in effect was like a volunteer who just happened to be there, and you have no responsibility for anything you did.

PERRY:

Senator.

BLUMENTHAL:

By the way that contention is belied by your own documents. I'm going to ask that the Chairman put in a record a statement of July 11, 2014, which describes "services" I mentioned it earlier.

MORAN:

Without objection.

PERRY:

Senator Blumenthal I've joined USA Gymnastics in December of 2017. So, I've been with USA Gymnastics for seven months. The legal actions and the statements that I believe you referred to, based on the date were made prior to my becoming the CEO of USA Gymnastics.

BLUMENTHAL:

Well, the court filing was on Thursday.

EXHIBIT 10
068

PERRY:

I have to look at that. Yes.

BLUMENTHAL:

Well, I would look at it really hard. Yes. And I would decide and I'm being very serious, whether your organization really wants to stand by that representation which in my view is entirely disingenuous and false and I want to add one more point. I don't know how athletes, parents or communities can trust an organization that says, Larry Nassar wasn't employed when in fact he was the team doctor.

PERRY:

Absolutely. He was - the only clarification I made was that he wasn't an employee. He was an employee of Michigan State. But I will find out about that. I have counsel here. I'm not aware of a motion to dismiss by USA Gymnastics, but I will get to the bottom of that and I do want to say this Senator Blumenthal that really from day ...

BLUMENTHAL:

I want to correct your misimpression, just to be clear. USA Gymnastics filed an answer. I'm not familiar with Michigan civil procedure.

PERRY:

OK.

BLUMENTHAL:

EXHIBIT 10
069

And apparently it was in the state court. But just so the record is clear. It was an answer. U.S. Olympic Committee filed a motion to dismiss.

PERRY:

OK.

BLUMENTHAL:

Ask about that.

PERRY:

Great. Thank you for clarifying that.

BLUMENTHAL:

Ms. Perry in a letter dated February 9, 2018 to Chairman Moran and me. You denied that USA Gymnastics used non-disclosure agreements as part of your investigations. Do you recall that letter?

PERRY:

Senator Blumenthal, I would have to look at that letter, but I don't recall denying.

BLUMENTHAL:

I have copies of it, I'm sure your counsel does.

PERRY:

EXHIBIT 10
070

Yes. So, there was a non-disclosure agreement that I think everybody is aware of that was put in place a few years ago prior to my being the CEO. And when I found out about that non-disclosure, I immediately instructed our legal team to release that individual from any non-disclosure agreement as I will not tolerate the silencing of any sexual abuse victims. And from that point on as well as I'm the new CEO, I said, there will not be any non-disclosure agreements that silence sexual victims as long as I'm leader of this organization.

BLUMENTHAL:

There was in fact with McKayla Maroney, a non-disclosure agreement which contained a clause that would find her $100,000 if she were to speak out about her abuse and are there any others.

PERRY:

I am not aware of any others prior to my being CEO, Senator Blumenthal, but again it's very important that everybody understands that that is not acceptable, and I released and made very public that this organization will not stand by that.

BLUMENTHAL:

And you would commit here that if there are any other agreements, you will release on behalf of your organization those individuals from that command.

PERRY:

I will not allow a survivor or a victim of sexual abuse to be silenced to be able to speak out about their sexual abuse. I absolutely commit to that.

EXHIBIT 10
071

BLUMENTHAL:

Going forward and retrospectively.

PERRY:

Absolutely.

BLUMENTHAL:

Have you ever discussed with - Mr. Perry - I'm sorry Mr. Perilla - Paul Perilla, the former USAG. board chairman, his involvement in the use of that non-disclosure agreement?

PERRY:

I was aware that he was involved in that situation, but to the extent that he made the decision or who made the decision. I'm not aware.

BLUMENTHAL:

Did you ever talk to him about it?

PERRY:

I asked him about it. Absolutely.

BLUMENTHAL:

And what did he say?

EXHIBIT 10
072

PERRY:

It was his recollection that that was something that was agreed upon by both parties. And that's pretty much the information he shared with me.

BLUMENTHAL:

And I have one last couple of questions. One last ...

MORAN:

One last couple of questions. Just so you know you're not putting one over on.

BLUMENTHAL:

You know I told the survivors this morning that I had a lot of questions. But I warned that we had only limited amounts of time. So, I thank the Chairman for allowing me unlimited remaining questions. No, I'm just kidding Mr. Chairman.

Are you familiar with a report in the Orange County Register of last. Well, actually of yesterday with regard to two coaches, two suspended coaches still working in Southern California Gymnastics Club. Their names are Colden Racier (ph) and Terry Gray (ph).

PERRY:

I am.

BLUMENTHAL:

Can you explain how they can be suspended, but USA Gymnastics still permits them.

EXHIBIT 10
073

PERRY:

Senator Blumenthal, I believe that the individual that wrote the article was absolutely correct in that. And I think to Mr. Xiao, am I pronouncing - Xiao. His point is, this illustrates a systemic and structural challenge that we have. And again, I look at it from outside the Olympic movement. But here's what happened with Mr. Gray (ph). Mr. Gray (ph) was a U.S. senator for Safe Sport case. And when the USA Gymnastics was instructed of the allegation, USA Gymnastics act acted swiftly and put that individual on an interim suspension. That interim suspension is on our website. So, it's public.

There was - I was told, there was notice given to the parties that should have been given to under the Ted Stevens Act. When you take anybody out of the field of play that individual is entitled to a hearing panel. That hearing panel heard the - so he was on interim suspension and USA Gymnastics acted swiftly.

So, the hearing panel occurred, and they reduced the consequence if you will down to no contact with a minor child.

BLUMENTHAL:

They're coaching minors now.

PERRY:

I'm sorry.

BLUMENTHAL:

They are coaching minors, aren't they?

EXHIBIT 10
074

PERRY:

So, this illustrates Senator Blumenthal one of the areas where I think Congress can really help us.

BLUMENTHAL:

And Mr. Xiao highlighted one of those areas. Mr. Xiao have you talked to Ms. Lyons about the structural reforms that you've suggested?

XIAO:

Some of them. Some of them are issues that the AAC has raised before and continues to brainstorm.

BLUMENTHAL:

And how has the U.S. Olympic Committee received those suggestions?

XIAO:

Ms. Lyons has engaged on many of those reforms.

BLUMENTHAL:

Have they adapted any?

XIAO:

EXHIBIT 10
075

Not fully. I think we are waiting for the athlete and NGB engagement working group to begin, which has been assembled, but I have not received information about when it's going to start work.

BLUMENTHAL:

So, nothing's happened.

XIAO:

Not that I've seen on most of the - most of the large-scale reforms.

BLUMENTHAL:

Thank you.

MORAN:

Senator Hassan. We're going to try to conclude this hearing in the near future and Senator Hassan you are recognized.

HASSAN:

Well, thank you very much, Mr. Chair. I want to thank you and Ranking Member Blumenthal for your continued attention to the issue of sexual abuse in the Olympic system. And I also just want to thank all of the survivors again for not only being here today, but for everything you've done to really focus the greater public on this horror. And on the treatment, you've all experienced. And I am grateful that you're extraordinarily harrowing stories are finally being heard. Thank you.

EXHIBIT 10
076

Thanks to the persistence of these young men and women. I'll start with a question to you Ms. Perry, and thanks to the tireless work of journalists like those at the Indianapolis Star Tribune. They made sure that these stories were heard when they published their expose in 2016.

But let's not forget that these athletes and their families have been trying to protect themselves and each other for a long time. And even today certain individuals are still attacking these men and women for sharing these incidents and for pursuing legal action.

USA Gymnastics engaged in an egregious response over the course of decades, keeping a file of complaints against more than 50 coaches hidden away in a drawer and refusing to report these complaints of sexual abuse, misconduct and potential child abuse to authorities.

Now, your testimony today focused on the very many things you're doing to reorganize leadership and structure. But I would like to hear from you Ms. Perry, what exactly are you planning to do to ensure that transparency, reporting and disclosure policies are in place, so young athletes are protected from this kind of abuse, so not just reorganizing, but how are you going to make sure that when somebody comes forward, not only are they respected, not only is there a process, but there is the kind of transparency is reporting and disclosure that we all know is so necessary in this area.

PERRY:

Thank you, Senator. I think that it is a - not only incredibly important that we address all of the things in an organization, the structure as you mentioned the systems, the

EXHIBIT 10
077

policies, but also the culture. And it's unacceptable. It's absolutely unacceptable that our athletes at any point in time could feel that their voices weren't important. And so, one of the things that - a lot of the things that we've done in a very short period of time is we've - not only through just the actions that I've taken speaking to survivors, asking them what do we do. And quite frankly, I'm very hopeful that more survivors will join our efforts.

But we are looking at everything from top to bottom. One of the things that I notice right away is that there was very inadequate trackings mechanisms in place. So, we began keeping track and a database of all complaints that came into the organization. And then we went and we're not - we're not going to wait, we're not going to wait for others, we're not going to wait. Whether the center takes on all forms of misconduct which quite frankly I think is a great idea. We started looking at investing in software programs similar to the center to say, we've got to get our handle on this.

So, we are launching the Maxine (ph) software program which is similar to what it's exactly what the center is using and it's my hope that they will talk, because I think one of the greatest challenges we have as a national governing body is our ability to understand what's going on at the center.

HASSAN:

So, I thank you for that. And I'm going to stop you there. I have one other question I want to ask and I'm sensitive to the length of the afternoon for everybody, but it's also really important that adults understand that they will be held legally responsible.

PERRY:

Absolutely.

EXHIBIT 10
078

HASSAN:

If they fail to report and disclose and take action.

PERRY:

Absolutely.

HASSAN:

And that is at the core of much of this, right.

PERRY:

Yes.

HASSAN:

So that it's not just about tracking. It's about letting people know that they have an obligation it's not optional.

PERRY:

Yes.

HASSAN:

Right. And that even if it damages the institution or other people's reputations. It's not optional, because protecting our athletes has to be the priority.

PERRY:

EXHIBIT 10
079

Absolutely, Senator. And I want you to know that the things that we're doing as an organization to make sure that that is not only our actions, but at each time a member - a professional member for example is registering for their - either a new application or renewing as a condition of their membership, they go through the Safe Sport course, which talks to them about those kinds of things.

HASSAN:

All right. Thank you. I want to just turn and with a little bit of indulgence from the Chair. Last question to Mr. Engler, please. One of the things that concerns me the most. It has been shocking, and saddening is that the individuals have come forward and they've not only had to relive their worst nightmares to tell their stories, but when they do they are often still not being believed or their motives and personal character are attacked. And I am sorry to say that you recently made remarks doing just that.

I am appalled by the email you sent earlier this year disparaging Ms. Van Hollander (ph), a gymnast who was abused by Dr. Larry Nassar under the watch of Michigan State and others. Your treatment of this issue raises concerns about how MSU will move forward here. Even with all the evidence, why did you doubt Ms. Van Hollander (ph)?

ENGLER:

The email of course was in the midst of our very difficult negotiation and it was private, it was never public, and it reflected, I guess just the passions of the moment about whether or not there were referral fees being paid. The reality is that our actions today I think have consistently shown our support for the survivors and that is what we have to create. We have to have a culture.

EXHIBIT 10
080

HASSAN:

I'm going to interrupt you Mr. Engler. I'm sorry. When you write an email referring to athletes as being manipulated. Not only are these strong accomplished smart athletes who have overcome enormous barriers in their lives to reach the pinnacle of their sport. They have survived unspeakable abuse and the notion that you would think they could be manipulated by trial lawyers and that you would speak of them that way. Is just deeply, deeply offensive. Private email or not, it reflects an attitude at the top of the institution that you are asking this committee, your current students, your current athletes, your alumni to trust. And I think you have some repair work today to put it mildly.

ENGLER:

Well, I think you're right. That's why I apologized.

HASSAN:

Well, thank you for the apology. I just - I want to know that we keep applauding survivors of abuse for coming forward. And then even though we say the right words, we haven't yet really taken a look at the adults in institutions who were in-charge and held them accountable. And what we do is we keep trying to make excuses for this unbelievable horror that these young people have experienced, and it really needs to stop. We need to take responsibility here. Michigan State needs to take responsibility. The committees need to take responsibility and we need to change laws and hold people accountable.

And I know that that's what this hearing is about. I know that that's what we're trying to do here. But at the end of the day, private email or not disparaging these survivors

EXHIBIT 10
081

takes all of the good work that so many people are trying to do to make sure this never happens again and moves us backwards.

ENGLER:

Senator, I appreciate that. As I said, that is why I apologize. I have three daughters aged 23, the exact same age as many of the survivors. And I know exactly what you're talking about. I recognize that my own family what could have happened. And I feel very deeply that's why we work so hard over the nearly six months I've been at Michigan State to fix the problem.

When you're in litigation with 11 firm's emotions, you'll get high instead of adversarial process. And I confess to getting very frustrated, but at the end of the day, we did get the settlement done. We have fixed the policies. We've strengthened accountability. Ms. Trevor I'd like to submit for the record, an executive order that I did create the Office of Risk Management, Ethics and Compliance. It's exactly - it's part of the actions that this Senator Blumenthal said, there is a lot of talk out there. There is a lot of support, but at Michigan State we are fixing the problem and you could not have a Larry Nassar again at Michigan State.

You've got a challenge I think on the part of all universities and a lot of organizations to fix the relationship between the sexes and how do we deal with assault and misconduct. But I would argue that we're done. We hope that what we've done at Michigan State can be a model for others. And I brought also two articles that are excellent articles one from Midland Daily News, a local paper, my own district. One from the Bleacher Report. These are survivor's testimonies just as you said were the media told the story. They got it out and it helps to explain how challenging this is to fix. But I feel this deeply from a personal standpoint and my actions have been

EXHIBIT 10
082

consistent with my belief that this should never ever happen again. None of these women should have to or no future women's will have to go through what these women have gone through.

HASSAN:

One might suggest that they never should have needed to sue the university in the first place. Thank you very much.

ENGLER:

I would agree with that. Thank you. Mr. Chairman may I submit these for the record?

MORAN:

Senator Hassan, thank you. The documents will be submitted to the record without objection.

ENGLER:

All right.

MORAN:

I'm going to try to ask just a couple of questions. Senator Blumenthal has agreed that I have now equal time to his excessive questions. But first of all, let me go back to Senator Blumenthal's question to you, Ms. Perry. I don't understand the flaw in the system that the two people that are coaching in Southern California, the flaw that allows them to do that is what?

EXHIBIT 10
083

PERRY:

So, the example that I gave Senator Moran is with the coach, his last name is Gray (ph). And we have our bylaws allow us to invoke immediate action called Interim suspension when we feel that our membership is in harm's way. In the Ted Stevens Act, anybody that is removed from the field of play is entitled to a hearing. So, we invoked the Interim suspension immediately. The hearing panel heard the interim suspension and said, we come back with this finding. We're going to reduce it from suspension to no contact with minor children.

So, you've got that at play and you also have the center which also is problematic in terms of this whole scenario that is in-charge of investigating and has complete jurisdiction over sexual misconduct. So, the information they give to us to present to the hearing panel is very limited.

So, you've got this system that's in place.

MORAN:

Is it a gymnastics club in Southern California that has allowed these coaches to coach.

PERRY:

That's correct. It's a member club.

MORAN:

A member of the USA gymnastics. Is that way to say that.

PERRY:

EXHIBIT 10
084

Yes.

MORAN:

OK. Apparently not. You were hesitant to agree with me.

PERRY:

Member of USA Gymnastics.

MORAN:

OK.

PERRY:

The coach. Right.

MORAN:

So, they've been notified that the restrictions on the coach is reduced to no contact with minors, but they're still coaching and at least according to Senator Blumenthal they're coaching minors.

PERRY:

They have to be according to the hearing panel recommendation that individual is still allowed to coach but has to have supervision.

MORAN:

EXHIBIT 10
085

Supervision.

PERRY:

Right.

MORAN:

So, they can coach with supervision. Why would any gymnastics group want that circumstance to be the case?

PERRY:

And this is exactly Senator Moran why we have such challenges, is that number one, we've got the U.S. Center for Safe Sport who has jurisdiction but cannot tell us the facts in great detail about that situation. So, if it's a misconduct, it goes right to the center. They inform us about it. USA Gymnastics makes a decision based on the limited information that the center has given to us. And we're going to err on the side of athlete safety every time. And so, this - so, we made a decision as an organization to put that individual on interim suspension, so they get removed from coaching. Right.

MORAN:

I understand the scenario.

PERRY:

Right.

EXHIBIT 10
086

MORAN:

I don't understand why the person is still coaching at the gymnastics club in Southern California. Having been censured in a way that prohibits him or her from having contact without supervision with young athletes.

PERRY:

But that's one of the challenges with the Ted Stevens Act is that prior to us, our ability to invoke interim measures that an individual that goes through the process if you will, an adverse party is entitled to a hearing.

MORAN:

All of which I understand the hearing occurred. The findings were held in the sense that something bad had happened or some reason for restricting this coach's capabilities to have contact with minors.

PERRY:

So, the hearing panel found that that they lessened the consequence from suspension and not ...

MORAN:

I understand all the facts. As you described.

PERRY:

Right.

EXHIBIT 10
087

MORAN:

But what keeps you from making certain that that group. First of all, I don't understand why a group would take the risk of hiring somebody in that circumstance. But secondly, what is your authority to do something about it when they do. And your answer to that is nothing, because the person presumably is being supervised.

PERRY:

No. So, our answer, USA Gymnastics answer is to put an individual on interim suspension. This is a sexual misconduct case. So, there is a lot of things that fall under sexual misconduct. So, when the center tells us about this case, the case went to the center and the center tells us about a case. We have very limited information given from the center and we have to make a decision at that point in time. Our decision is, do you put that individual on interim suspension or do you wait until the hearing process goes through at the center, because that's where it occurs.

And once the investigation and the disciplinary hearing takes place then if the center says - comes back and says, we're done with our finding, this is how we resolve this situation. All throughout that process, we don't know what's going on. And for the most part we have no idea how long it's going to take. So, in the meantime, we have this ...

MORAN:

So, these individuals or this individual can be there until there is a final determination by ...

PERRY:

EXHIBIT 10
088

By the center.

MORAN:

Center for Safe Sports.

PERRY:

That's true.

MORAN:

And that's what you're waiting on now.

PERRY:

And they're still in that process.

MORAN:

And when that finding occurs then what's your enforcement against the clubs?

PERRY:

So, then depending on the facts and I don't - we don't - I don't know the facts in this case.

MORAN:

Make this one more hypothetical.

PERRY:

EXHIBIT 10
089

Yes.

MORAN:

So, you have somebody who has been determined to be - it's inappropriate for them to be coaching the Center for Safe Sports. Hypothetically, a case has determined that, what prohibits a club from continuing to hire people who they should not hire.

PERRY:

So, there is two things. One is as a requirement of their membership, they have to. For example, in this case. If another club looks at hiring this individual and they're on a permanently an eligible list or they're on the suspension - they have to look at those lists that's a requirement of their continued membership. They have to do background screening. They have to get references. There is a series of things that that club owner has to do. And if for any reason they've hired somebody on a permanently eligible list in this situation, the organization has the right to revoke their membership as a club owner.

MORAN:

And the consequence of being a club that's no longer has membership with USAG is what?

PERRY:

The membership is a privilege that club still can operate their business, they just can't participate, and USA Gymnastics sanctioned kinds of events.

MORAN:

EXHIBIT 10
090

You were asked Ms. Perry about non-disclosure agreements. Ms. Lyons, any non-disclosure agreements at work at the USA Olympics, at U.S. Olympics.

LYONS:

No, I've asked that question and none to our knowledge.

MORAN:

And Mr. Engler, President Engler at Michigan State?

ENGLER:

No non-disclosure agreements. We don't disclose this leak.

MORAN:

In regard to reports about next steps, Ms. Lyons, the U.S. Olympic Committee has hired outside folks to review process procedure, find out the facts. I assume make recommendations to improve the circumstance. Is that all accurate? I'm describing that correctly?

LYONS:

Yes, we have a number of initiatives in the house.

MORAN:

When will we the public be able to see the results of that study for those studies.

LYONS:

EXHIBIT 10
091

There is a lot of interim things that will happen before those studies are completed, as you know we're doing a lot of interim steps, but the commission that is looking at the governance will begin and probably begin early September. We finalized - pretty much are finalizing the membership of that committee and I know that seems slow and moving as quickly as we can, but we want to make sure we have the right people we are looking at.

MORAN:

Is this the committee that Mr. Xiao was speaking of.

LYONS:

Yes, and he will be a member of that committee as well.

MORAN:

but you've hired a law firm to evaluate process and procedure. And when we last visited, I think we were expecting a report from that effort this summer.

LYONS:

I think you're referring to the Ropes and Gray investigation, which is not so much looking policies and procedures, it's looking at the who knew what when.

MORAN:

Yes.

LYONS:

EXHIBIT 10
092

And we expect probably in September. Our understanding is they've pretty much completed their investigations at the USOC. I think also that the USAG, they have a few more interviews to do a Center for Safety Sports. I believe they are almost close to finishing their investigation and then they would write their report. They've given us to understand probably early September is when we would look at.

MORAN:

Mr. Engler, there was conversations about the Michigan State Attorney General, the state of Michigan's Attorney General. I also think was there a legislative inquiry.

ENGLER:

There were a couple of different committees. They've wrapped up their work.

MORAN:

So, you're who what when where reports have been completed and are known publicly?

ENGLER:

That's correct. The attorney general we think is nearing the end. They've interviewed, I believe more than 100 people on campus. We don't know when that report will be done. We hope soon and that should be it for the state level reporting.

MORAN:

And Michigan State didn't hire anybody separate from the state efforts.

EXHIBIT 10
093

ENGLER:

We did not.

MORAN:

OK. And Ms. Perry at USA Gymnastics?

PERRY:

There are several investigations that are ongoing. One includes the Ropes and Gray, independent investigation. There are of course the congressional investigations and others. And according to Ms. Lyons and what we've been informed that Ropes and Gray should near its end around - and beginning of the fall.

MORAN:

In my view, certainly it would not be able to conclude our work until we see the who what when and where reports from your organizations. Let me - I think this is it, Senator Blumenthal for me. Center for Safe Sports. Just to want to give you further license.

Center for Safe Sports, I want to talk about it for a moment. This would be to Mr. Xiao and Ms. Lyons. One of the primary concerns that we've heard through are my conversations with athletes and our investigation is the belief or concern that the center is not truly independent from USOC. There is a resulting lack of trust on the part of the athletes, so they see the center as something created by the U.S. Olympic Committee and I'd like to hear from - I am going to start with you Mr. Xiao, is that an accurate assessment of where we are and what can we do about it.

EXHIBIT 10
094

XIAO:

As a collective I think there is a little bit of a concern, not necessarily with the board of the center of Safe Sports, but a little bit of the funding model, because to be honest not many entities have been interested in funding the Center for Safe Sports, as I understand. And so, a lot of the funding comes from the USOC and the national governing bodies.

MORAN:

And athletes I've talked to have expressed concern because the funding of the U.S. Olympic Committee of Safe Sports, but I also would say what you just said which is in the absence of the funding of the U.S. Olympic Committee. I doubt that the funding is there for Safe Sports.

XIAO:

And that's certainly a challenge and I think that's fair. The other issue that we're concerned about is the presence of former USOC staff members still operating in a staff capacity at the Center for Safe Sports, which raises some concerns for some people.

MORAN:

Say that sentence again. Make sure I understand.

XIAO:

EXHIBIT 10
095

There are staff members at Safe Sports, who were formerly staff members at the USOC committee. I can think of one. I don't know if there are others, but that certainly raised concerns within the community as well.

MORAN:

Ms. Lyons.

LYONS:

Just comment on the same question?

MORAN:

Yes.

LYONS:

Let me first say that I separate two parts of independence in terms of the investigations of the Center for Safe Sport is 100 percent independent. We have no insight into that and it is all completely confidential and there is no USOC employee who has any involvement with any of the ongoing investigations in any way.

There are areas where I think in the interest of all the athletes, the NGBs, the USOC and the center need to collaborate and that is things like creating these databases so that we can provide information and I think it is in helping to find additional funding, because they don't have enough to be successful at their mission. And much like you saw that which had its origins within the USOC, but then became a fully independent organization with not just funding from the USOC, but also from the government. We

EXHIBIT 10
096

think that that is really the evolution that the center needs to have so that it can truly become independent of any influence from us or anyone else.

MORAN:

Senator Blumenthal.

BLUMENTHAL:

I want to ask Mr. Chairman that we put in the record the article I referenced it earlier from the Orange County Register, dated yesterday.

MORAN:

Without objection.

BLUMENTHAL:

And just to point out that Ms. Perry it says that no notice of these individual's suspension was provided, is that true?

PERRY:

Senator Blumenthal, I checked into that this morning and I was told that notice was given through both an email and a first-class mail.

BLUMENTHAL:

So, you're saying that Terry Gray (ph) worked with the CIGA club in Southern California. And did so with notice despite Cathy (ph), the Director of that club saying,

EXHIBIT 10
097

"no notice was given to us nor Terry from USA Gymnastics prior to the list going out on line".

PERRY:

That individual. Yes. I'm sorry. I apologize Senator. I was told this morning because I quickly checked into that to make sure that notice was because that's part of our procedure. And I was told positively that both an e-mail and a letter was sent out.

BLUMENTHAL:

That's just not true. That's fake.

PERRY:

I was told I was told that they were sent out.

BLUMENTHAL:

You know we seem to have differences in accounts here. Mr. Engler I am not going to let this issue go.

PERRY:

I think it goes to the heart of why we're here in part because the survivors were disbelieved for so long. And I just want to say for the record, I believe Caylee Lawrence (ph) in her account - I regret that we're at this point in the testimony where there are differences in factual accounts of what happened. And I want to say, and I mean this as a lawyer and as a traveler, there are all kinds of defenses that the parties can make in court. But there is also a moral responsibility here.

EXHIBIT 10
098

And if the U.S. Olympic Committee and USA Gymnastics are really serious and sincere, they will put aside this characterization of Larry Nassar relationship to your organization that very respectfully let me say, disingenuously disclaim any legal responsibility. If you're serious and sincere, you will withdraw that answer and motion to dismiss, because you need to be part of the legal solution, not just come here and apologize and say, there is a new USA Gymnastics, because it is the new USA Gymnastics that file that answer and motion to dismiss on the part of the U.S. Olympic Committee.

PERRY:

Senator Blumenthal I am not aware of a motion to dismiss and I think you corrected that that it wasn't USA Gymnastics, but I will be very, and I want to reassure all of the senators and all of the survivors and everybody in this room that USA Gymnastics is absolutely dedicated and committed to legal resolution. And we've gone through mediation. We're going to continue until we get resolution. And you're absolutely right, we have a moral obligation.

BLUMENTHAL:

You have a moral obligation, but you also have a legal obligation.

PERRY:

And we have a legal obligation.

BLUMENTHAL:

EXHIBIT 10
099

And you will withdraw that answer and correct it or amend it, whatever the correct procedure is under those rules and you will accept that Larry Nassar worked for, was employed by, was an agent of, and therefore imposes that legal responsibility on USA Gymnastics.

PERRY:

And Senator Blumenthal, Larry Nassar was absolutely an agent of USA Gymnastics. I've never said any different than that as a team doctor and I will find out what that is that you're referring to. I don't know what legal action. I know that there wasn't a motion to dismiss, but I will find out what that was about it. It could be a lot of ...

BLUMENTHAL:

I am not saying that was a motion to dismiss.

PERRY:

Could it be a lot of different things.

BLUMENTHAL:

It was an answer. And I want to make clear, I'm not trying to impose pressure on you from this position, because you're entitled to your legal rights. Your lawyer is entitled to advise you as to those rights, you're entitled to assert those rights. But as part of your moral responsibility, in my view, with all due respect, it is also to accept legal responsibility because that will make you a part of the solution that will make you part of any court order. The same goes for United States Olympic Committee.

PERRY:

EXHIBIT 10
100

And Senator Blumenthal, I want to reinforce to you again that this organization under my leadership has and will be committed to legal resolution with our survivors. These are our athletes and we will do whatever it takes to get to that point.

BLUMENTHAL:

Thank you. And again, I want to thank the survivors who are here today. Your presence sends a powerful message and is an important statement. And again, my thanks to the Chairman of the Subcommittee, Senator Moran.

MORAN:

Senator Blumenthal, thank you very much. Let me as I have - never hearing that I've chaired ask the witnesses if they have anything they'd like to put on the record that they were unable to do so that they want to correct something they said or felt like there is something we need to know that we didn't ask about.

ENGLER:

I would simply say Mr. Chairman that I appreciate the opportunity to come here to clarify the issues. I understand there might be differences in interpretation, but the opportunity come here and talk about the changes we have made to put those on the record to talk about a $500 billion settlement. That's part of the healing is an opportunity that we very much appreciate. We're proud of what we've done. We're proud of what we're doing, and we think when we're done, universities around the country are going to look to Michigan State to say, what policies did you put in place and how might they help us.

MORAN:

EXHIBIT 10
101

Anyone else?

PERRY:

Senator Moran and Senator Blumenthal and all Senators, I want to thank you. This is an incredibly important time for our organization and we take it very seriously. These are our athletes and we're going to do whatever we can to earn back their trust. And I want to say that coming from outside the Olympic movement, there are things that I think we can address moving forward with the help of Congress and the funding of the center that will help us do everything we can in our power to prevent what happened. Thank you.

LYONS:

Mr. Chairman, I just like to say, I am coming to the end of my tenure as the CEO at the USOC. And I hope that in some way we have begun a journey that will get us to a new culture that is all about the athletes that they are the center of that and the reason that's happening is because of the brave voices of the women behind in this room and I hope that small amount of time that I've been able to devote to them yield some results in the future. Thank you.

XIAO:

I just like to say from the Athletes Advisory Council, we'll continue to do our job. We're going to continue to engage in good faith and all of the reform efforts here. But I also wanted to point out that the core problem here until that solves, there are just going to be more problems, more different symptoms that are going to arise. And the core problem being athlete representatives have heard administrators, staffers,

EXHIBIT 10
102

coaches, sometimes expressed the same sentiment which is athletes come and go, and athletes are replaceable. I'm told that changes were never going to get anywhere.

MORAN:

Thank you. Again, we thank you all for being here today. Thank you for testifying. We appreciate those in the audience today including the survivors. The hearing record will remain open for two weeks, during that time senators are asked to submit any questions for the record upon receipt. This will be questions to you or witnesses that witnesses are requested to submit their written answers to the committee as soon as possible, but no later than August 21st of 2018. This concludes the hearing and the hearing is now adjourned.

List of Panel Members and Witnesses
PANEL MEMBERS:

SEN. JERRY MORAN, R-KAN., CHAIRMAN

SEN. DEAN HELLER, R-NEV.

SEN. ROY BLUNT, R-MO.

SEN. TED CRUZ, R-TEXAS

SEN. DEB FISCHER, R-NEB.

SEN. JAMES M. INHOFE, R-OKLA.

SEN. MIKE LEE, R-UTAH

SEN. SHELLEY MOORE CAPITO, R-W.VA.

EXHIBIT 10
103

SEN. TODD YOUNG, R-IND.

SEN. JOHN THUNE, R-S.D., EX OFFICIO

SEN. RICHARD BLUMENTHAL, D-CONN., RANKING MEMBER

SEN. AMY KLOBUCHAR, D-MINN.

SEN. EDWARD J. MARKEY, D-MASS.

SEN. TOM UDALL, D-N.M.

SEN. TAMMY DUCKWORTH, D-ILL.

SEN. MAGGIE HASSAN, D-N.H.

SEN. CATHERINE CORTEZ MASTO, D-NEV.

SEN. BILL NELSON, D-FLA., EX OFFICIO

SEN. CHARLES E. GRASSLEY, R-IOWA

SEN. DIANNE FEINSTEIN, D-CALIF.

WITNESSES:

FORMER GOV. JOHN ENGLER, R-MICH., INTERIM PRESIDENT OF
MICHIGAN STATE UNIVERSITY

SUSANNE LYONS, ACTING CEO OF THE U.S. OLYMPIC COMMITTEE

KERRY PERRY, PRESIDENT AND CEO OF USA GYMNASTICS

EXHIBIT 10
104

AND HAN XIAO, CHAIRMAN OF THE ATHLETES' ADVISORY COUNCIL,
TESTIFY

EXHIBIT 10
105

# EXHIBIT "11"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

ALEXANDRIA ROSE RAISMAN, AN   )
INDIVIDUAL,                    )
                               )
          Plaintiff,           )
                               )
     -v-                       ) CAUSE NO.
                               ) 5:18-cv-02479-BLF
UNITED STATES OLYMPIC          )
COMMITTEE, A BUSINESS ENTITY   )
OF FORM UNKNOWN, USA           )
GYMNASTICS, AN INDIANA         )
BUSINESS ENTITY OF FORM        )   The Honorable
UNKNOWN; LARRY NASSAR, AN      )   Beth Labson Freeman
INDIVIDUAL; STEVE PENNY, AN    )
INDIVIDUAL; PAUL PARRILLA, AN  )
INDIVIDUAL; AND DOES 1         )
THROUGH 500,                   )
                               )
          Defendants.          )
_____)


        The telephonic videotaped deposition upon oral
examination of AMY SUE WHITE, a witness produced and
sworn before me, Elizabeth T. Lindner, RPR, Notary
Public in and for the County of Hendricks, State of
Indiana, taken on behalf of the Plaintiffs at Stewart
Richardson Deposition Services, One Indiana Square,
Suite 2425, Indianapolis, Indiana, on November 13,
2018, at 10:33 a.m., pursuant to all applicable rules.

1

EXHIBIT 11
001

| | | | |
|---|---|---|---|
| 10:48:32 | 1 | A | For which work? |
| 10:48:34 | 2 | **Q** | **For the elementary school that you --** |
| 10:48:40 | 3 | A | No. |
| 10:48:40 | 4 | **Q** | **Do you know if you were trained as a mandatory** |
| 10:48:43 | 5 | | **reporter when you worked at that school?** |
| 10:48:47 | 6 | A | I do not know that. |
| 10:48:50 | 7 | **Q** | **Do you know what a mandatory reporter is, or does** |
| 10:48:56 | 8 | | **that term --** |
| 10:48:58 | 9 | A | I've heard the term.  The exact definition of that |
| 10:49:01 | 10 | | term, I couldn't repeat verbatim, no. |
| 10:49:05 | 11 | **Q** | **Okay.  And where had you heard that term before?** |
| 10:49:12 | 12 | A | We did some work at USA Gymnastics with a child |
| 10:49:21 | 13 | | advocacy center recently, and I remember that term |
| 10:49:25 | 14 | | coming up. |
| 10:49:26 | 15 | **Q** | **Okay.  And how recently are we talking?** |
| 10:49:31 | 16 | A | I respectfully decline to answer that pursuant to |
| 10:49:35 | 17 | | the Fifth Amendment to the United States |
| 10:49:37 | 18 | | Constitution that protects -- protections provided |
| 10:49:41 | 19 | | to me by Ohio and Reiner. |
| 10:49:43 | 20 | | MR. CUNNY:  Okay.  And just to simplify |
| 10:49:46 | 21 | | things -- I can work this out with your counsel -- |
| 10:49:48 | 22 | | there will probably be several questions you're |
| 10:49:52 | 23 | | going to be invoking the Fifth Amendment on, I |
| 10:49:55 | 24 | | would presume.  In the event you do wish to invoke |
| 10:49:58 | 25 | | the Fifth Amendment, I would stipulate that she can |

23

EXHIBIT 11
002

| | | |
|---|---|---|
| 10:50:01 | 1 | just say "Fifth" to memorialize what she just said |
| 10:50:06 | 2 | so she doesn't have to say that a hundred times. |
| 10:50:10 | 3 | MR. DOWNEY: Understood. Yeah, you can just |
| 10:50:10 | 4 | say -- |
| 10:50:10 | 5 | THE WITNESS: I just say "the Fifth." |
| 10:50:13 | 6 | MR. DOWNEY: Well, I'd just say, "I'll assert |
| 10:50:15 | 7 | the Fifth." I. |
| 10:50:16 | 8 | THE WITNESS: Okay. |
| 10:50:16 | 9 | MR. DOWNEY: Okay? |
| 10:50:17 | 10 | THE WITNESS: Yes. |
| 10:50:17 | 11 | BY MR. CUNNY: |
| 10:50:19 | 12 | Q Great. I'll go back in time a little bit where |
| 10:50:21 | 13 | this might not be relevant, but you were at |
| 10:50:23 | 14 | Plainfield elementary for about a year you said? |
| 10:50:27 | 15 | A One school calendar. |
| 10:50:29 | 16 | Q Okay. Where did you go after that? |
| 10:50:33 | 17 | A National Travel Systems. |
| 10:50:37 | 18 | Q Okay. And was that a pre-existing company, or, |
| 10:50:40 | 19 | again, did you create the company? |
| 10:50:41 | 20 | A No, it's a company located in Lubbock, Texas. |
| 10:50:49 | 21 | Q Gotcha. And you worked remotely from Indiana? |
| 10:50:51 | 22 | A No. I worked in Gymnastics' office for National |
| 10:50:55 | 23 | Travel Systems. |
| 10:50:56 | 24 | Q Oh, okay. So when you were at National Travel |
| 10:51:02 | 25 | Systems, that company dealt with in some way USA |

24

EXHIBIT 11
003

| | | |
|---|---|---|
| 10:51:07 | 1 | Gymnastics? |
| 10:51:10 | 2 | A  Yes, that is their client. |
| 10:51:11 | 3 | Q  Oh, okay.  Gotcha. |
| 10:51:13 | 4 | Do you know what year you started at National |
| 10:51:15 | 5 | Travel Systems? |
| 10:51:18 | 6 | A  2007. |
| 10:51:18 | 7 | Q  Okay.  And was USAG your client when you first |
| 10:51:25 | 8 | started at National Travel Systems? |
| 10:51:27 | 9 | A  Yes, among others. |
| 10:51:31 | 10 | Q  Okay.  In your role at National Travel Systems, you |
| 10:51:35 | 11 | serviced multiple clients? |
| 10:51:38 | 12 | A  Yes. |
| 10:51:39 | 13 | Q  And what would you do in terms of providing |
| 10:51:41 | 14 | services to those clients? |
| 10:51:49 | 15 | A  Book air, book car, hotel contracting, setting up |
| 10:51:53 | 16 | transportation movements, as far as busing goes, |
| 10:51:59 | 17 | for events. |
| 10:52:01 | 18 | Q  And how long did you work for National Travel |
| 10:52:03 | 19 | Systems? |
| 10:52:08 | 20 | A  I came on to USA Gymnastics' payroll six years ago, |
| 10:52:22 | 21 | roughly. |
| 10:52:23 | 22 | Q  Okay.  So would it be fair to say somewhere between |
| 10:52:27 | 23 | 2007 and maybe 2012, 2013 that you worked for |
| 10:52:30 | 24 | National Travel Systems? |
| 10:52:30 | 25 | A  Yes. |

EXHIBIT 11
004

| | | |
|---|---|---|
| 10:52:31 | 1 | Q  Okay.  And after you worked at National Travel |
| 10:52:35 | 2 | Systems, were you doing the same job for USA |
| 10:52:42 | 3 | Gymnastics? |
| 10:52:44 | 4 | A  Yes -- |
| 10:52:46 | 5 | MR. DOWNEY:  We're going to assert the Fifth |
| 10:52:47 | 6 | on the USA Gymnastics. |
| 10:52:51 | 7 | A  I assert the Fifth. |
| 10:52:53 | 8 | Q  Who hired you at USA Gymnastics? |
| 10:52:58 | 9 | A  I assert the Fifth. |
| 10:52:59 | 10 | Q  Who was your direct supervisor when you first began |
| 10:53:01 | 11 | at USA Gymnastics? |
| 10:53:02 | 12 | A  I assert the Fifth. |
| 10:53:04 | 13 | Q  Did your direct supervisor change over time while |
| 10:53:08 | 14 | you were at USA Gymnastics? |
| 10:53:09 | 15 | A  I assert the Fifth. |
| 10:53:11 | 16 | Q  Was Steve Penny your supervisor at USA Gymnastics |
| 10:53:14 | 17 | when you first began? |
| 10:53:16 | 18 | A  I assert the Fifth. |
| 10:53:18 | 19 | Q  Was Steve Penny your supervisor the entire time you |
| 10:53:20 | 20 | were at USA Gymnastics? |
| 10:53:21 | 21 | A  I assert the Fifth. |
| 10:53:23 | 22 | Q  Are you still employed at USA Gymnastics? |
| 10:53:26 | 23 | A  I assert the Fifth. |
| 10:53:28 | 24 | Q  What was your job title when you first began at USA |
| 10:53:32 | 25 | Gymnastics? |

26

EXHIBIT 11
005

| | | |
|---|---|---|
| 10:53:33 | 1 | A  I assert the Fifth. |
| 10:53:36 | 2 | Q  When you first began at USA Gymnastics, were you |
| 10:53:39 | 3 | provided mandatory reporter training? |
| 10:53:43 | 4 | A  I assert the Fifth. |
| 10:53:44 | 5 | Q  When you first arrived at USA Gymnastics, were you |
| 10:53:47 | 6 | provided any training regarding document retention |
| 10:53:50 | 7 | policies? |
| 10:53:52 | 8 | A  I assert the Fifth. |
| 10:53:52 | 9 | Q  Do you know if USA Gymnastics had document |
| 10:53:56 | 10 | retention policies? |
| 10:53:57 | 11 | A  I assert the Fifth. |
| 10:53:59 | 12 | Q  Specifically, do you know if there were retention |
| 10:54:02 | 13 | policies for medical records at USA Gymnastics when |
| 10:54:04 | 14 | you first began? |
| 10:54:05 | 15 | A  I assert the Fifth. |
| 10:54:07 | 16 | Q  Did your understanding change over the years as to |
| 10:54:09 | 17 | that document retention policy for medical records, |
| 10:54:13 | 18 | specifically? |
| 10:54:13 | 19 | A  I assert the Fifth. |
| 10:54:16 | 20 | Q  Did USA Gymnastics keep medical records for the |
| 10:54:19 | 21 | girls who competed in their programs? |
| 10:54:22 | 22 | A  I assert the Fifth. |
| 10:54:23 | 23 | Q  Did you book any travel for Larry Nassar? |
| 10:54:26 | 24 | A  I assert the Fifth. |
| 10:54:28 | 25 | Q  Did you book any travel for Steve Penny? |

27

EXHIBIT 11
006

| | | |
|---|---|---|
| 10:54:31 | 1 | A   I assert the Fifth. |
| 10:54:32 | 2 | Q   Did you book any travel for McKayla Maroney? |
| 10:54:34 | 3 | A   I assert the Fifth. |
| 10:54:36 | 4 | Q   Did you book any travel for Aly Raisman? |
| 10:54:39 | 5 | A   I assert the Fifth. |
| 10:54:40 | 6 | Q   Did you book any travel for Jordyn Wieber? |
| 10:54:42 | 7 | A   I assert the Fifth. |
| 10:54:42 | 8 | Q   Did you book any travel for Mattie Larson? |
| 10:54:43 | 9 | A   I assert the Fifth. |
| 10:54:45 | 10 | Q   Do you know who any of those individuals are with |
| 10:54:47 | 11 | relation to USA Gymnastics or the United States |
| 10:54:50 | 12 | Olympic Committee? |
| 10:54:52 | 13 | A   I assert the Fifth. |
| 10:54:57 | 14 | Q   Did USA Gymnastics provide you any sort of training |
| 10:55:00 | 15 | regarding the retention of records at the company? |
| 10:55:06 | 16 | A   I assert the Fifth. |
| 10:55:07 | 17 | Q   Did USA Gymnastics provide you any sort of training |
| 10:55:09 | 18 | on how to report suspected child abuse? |
| 10:55:14 | 19 | A   I assert the Fifth. |
| 10:55:16 | 20 | Q   Did you ever speak to Steve Penny about processes |
| 10:55:20 | 21 | for reporting suspected child abuse at USA |
| 10:55:22 | 22 | Gymnastics? |
| 10:55:23 | 23 | A   I assert the Fifth. |
| 10:55:24 | 24 | Q   Did Steve Penny ever tell you not to report |
| 10:55:27 | 25 | suspected child abuse at USA Gymnastics? |

EXHIBIT 11
007

| | | |
|---|---|---|
| 10:55:29 | 1 | A  I assert the Fifth. |
| 10:55:30 | 2 | Q  Did you ever speak to Steve Penny about suspected |
| 10:55:33 | 3 | child abuse at USA Gymnastics? |
| 10:55:35 | 4 | A  I assert the Fifth. |
| 10:55:36 | 5 | Q  Did you ever speak to Steve Penny about complaints |
| 10:55:39 | 6 | he had received about Larry Nassar prior to June of |
| 10:55:43 | 7 | 2015? |
| 10:55:44 | 8 | A  I assert the Fifth. |
| 10:55:44 | 9 | Q  Did you ever speak to Steve Penny about complaints |
| 10:55:47 | 10 | that Larry Nassar was photographing young, minor |
| 10:55:52 | 11 | girls at the Karolyi Ranch in excess? |
| 10:55:56 | 12 | A  I assert the Fifth. |
| 10:55:56 | 13 | Q  Did you ever learn from any source that Larry |
| 10:56:01 | 14 | Nassar was photographing -- taking hundreds of |
| 10:56:04 | 15 | photographs of little girls at the ranch while he |
| 10:56:05 | 16 | was providing medical care for those girls? |
| 10:56:10 | 17 | A  I assert the Fifth. |
| 10:56:11 | 18 | Q  Did you ever speak to Steve Penny about Marvin |
| 10:56:12 | 19 | Sharp and any relation to Larry Nassar? |
| 10:56:18 | 20 | A  I assert the Fifth. |
| 10:56:18 | 21 | Q  Did you speak to Steve Penny whatsoever about |
| 10:56:22 | 22 | Marvin Sharp? |
| 10:56:24 | 23 | A  I assert the Fifth. |
| 10:56:25 | 24 | Q  Do you know who Marvin Sharp is? |
| 10:56:31 | 25 | A  I assert the Fifth. |

EXHIBIT 11
008

| | | |
|---|---|---|
| 10:56:31 | 1 | Q When's the last time you've spoke with Steve Penny? |
| 10:56:37 | 2 | A I assert the Fifth. |
| 10:56:37 | 3 | Q Do you know why Steve Penny was in California |
| 10:56:40 | 4 | yesterday? |
| 10:56:42 | 5 | A I assert the Fifth. |
| 10:56:52 | 6 | Q Have you spoken with Steve Penny since |
| 10:56:55 | 7 | September 2016 about Larry Nassar? |
| 10:56:58 | 8 | A I assert the Fifth. |
| 10:56:58 | 9 | Q Have you spoken with Steve Penny since |
| 10:57:01 | 10 | September 2016 about the FBI's handling of the |
| 10:57:06 | 11 | Larry Nassar matter? |
| 10:57:07 | 12 | A I assert the Fifth. |
| 10:57:08 | 13 | Q Have you spoken with Steve Penny between June of |
| 10:57:12 | 14 | 2015 and September of 2016 regarding allegations |
| 10:57:16 | 15 | that Larry Nassar was abusing young girls? |
| 10:57:20 | 16 | A I assert the Fifth. |
| 10:57:20 | 17 | Q Have you spoken with the FBI regarding the |
| 10:57:22 | 18 | investigation into Larry Nassar? |
| 10:57:25 | 19 | A I assert the Fifth. |
| 10:57:26 | 20 | Q Have you spoken with anybody from law enforcement |
| 10:57:30 | 21 | regarding the investigation of Larry Nassar? |
| 10:57:33 | 22 | A I assert the Fifth. |
| 10:57:33 | 23 | Q Have you spoken with anybody from the Indianapolis |
| 10:57:36 | 24 | Police Department regarding Larry Nassar? |
| 10:57:38 | 25 | A I assert the Fifth. |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
009

| | | |
|---|---|---|
| 10:57:40 | 1 | Q  Have you spoken with anybody from the Department of |
| 10:57:41 | 2 | Child and Family Services regarding Larry Nassar? |
| 10:57:45 | 3 | A  I assert the Fifth. |
| 10:57:46 | 4 | Q  Have you spoken with anybody from Ropes & Gray |
| 10:57:48 | 5 | regarding Larry Nassar? |
| 10:57:51 | 6 | A  I assert the Fifth. |
| 10:57:52 | 7 | Q  Have you spoken with Debra Daniels regarding Larry |
| 10:57:55 | 8 | Nassar? |
| 10:57:55 | 9 | A  I assert the Fifth. |
| 10:57:56 | 10 | Q  Have you ever been to the Karolyi Ranch? |
| 10:58:03 | 11 | A  I assert the Fifth. |
| 10:58:04 | 12 | Q  Did you -- after the Larry Nassar allegations broke |
| 10:58:09 | 13 | in September of 2016, did you travel to the Karolyi |
| 10:58:12 | 14 | Ranch? |
| 10:58:15 | 15 | A  I assert the Fifth. |
| 10:58:15 | 16 | Q  Did Steve Penny instruct you to travel to the |
| 10:58:19 | 17 | Karolyi Ranch? |
| 10:58:21 | 18 | A  I assert the Fifth. |
| 10:58:22 | 19 | Q  Did USA Gymnastics pay for your travel to the |
| 10:58:24 | 20 | Karolyi Ranch? |
| 10:58:25 | 21 | A  I assert the Fifth. |
| 10:58:27 | 22 | Q  Did Steve Penny instruct you to go to the ranch to |
| 10:58:30 | 23 | retrieve documents after the Larry Nassar scandal |
| 10:58:34 | 24 | had broken in September of 2016? |
| 10:58:37 | 25 | A  I assert the Fifth. |

EXHIBIT 11
010

| | | |
|---|---|---|
| 10:58:37 | 1 | Q  Did you, in fact, go to the ranch to retrieve those |
| 10:58:41 | 2 | documents as requested by Steve Penny? |
| 10:58:43 | 3 | A  I assert the Fifth. |
| 10:58:45 | 4 | Q  Were you made aware that the Texas Rangers had |
| 10:58:51 | 5 | approached the ranch in attempts to find documents |
| 10:58:55 | 6 | that Steve Penny wanted you to retrieve from the |
| 10:58:57 | 7 | ranch? |
| 10:58:58 | 8 | A  I assert the Fifth. |
| 10:58:59 | 9 | Q  Who made you aware of the fact that the Texas |
| 10:59:01 | 10 | Rangers wanted documents at the ranch? |
| 10:59:04 | 11 | A  I assert -- |
| 10:59:07 | 12 | MS. MATTHAI:  Lacks foundation. |
| 10:59:10 | 13 | A  I assert the Fifth. |
| 10:59:12 | 14 | Q  Did Bela Karolyi call you after the Texas Rangers |
| 10:59:16 | 15 | had arrived at the ranch? |
| 10:59:19 | 16 | A  I assert the Fifth. |
| 10:59:20 | 17 | Q  Did Gary Warren call you after the Nassar scandal |
| 10:59:25 | 18 | broke to inform you that the Texas Rangers had |
| 10:59:29 | 19 | approached the ranch and wanted documents from that |
| 10:59:32 | 20 | facility? |
| 10:59:33 | 21 | A  I assert the Fifth. |
| 10:59:34 | 22 | Q  Did Kathy Kelly contact you or speak with you in |
| 10:59:37 | 23 | any way to indicate that the Texas Rangers had come |
| 10:59:41 | 24 | to the ranch and were looking for documents? |
| 10:59:45 | 25 | A  I assert the Fifth. |

EXHIBIT 11
011

| | | |
|---|---|---|
| 10:59:45 | 1 | Q Did any of those individuals indicate to you that |
| 10:59:49 | 2 | they told the Texas Rangers to go away because they |
| 10:59:53 | 3 | didn't have a search warrant? |
| 10:59:54 | 4 | A I assert the Fifth. |
| 11:00:02 | 5 | Q Did Steve Penny instruct you to go to the ranch |
| 11:00:05 | 6 | expediently such that you could get the documents |
| 11:00:08 | 7 | before the Rangers could obtain a search warrant? |
| 11:00:13 | 8 | A I assert the Fifth. |
| 11:00:14 | 9 | Q Did Steve Penny give you money to buy suitcases to |
| 11:00:18 | 10 | bring back those documents? |
| 11:00:21 | 11 | A I assert the Fifth. |
| 11:00:21 | 12 | Q How many documents did you go to the ranch to |
| 11:00:24 | 13 | obtain? |
| 11:00:26 | 14 | A I assert the Fifth. |
| 11:00:27 | 15 | Q Where did you buy the suitcases in order to bring |
| 11:00:31 | 16 | the documents back from the ranch? |
| 11:00:33 | 17 | A I assert the Fifth. |
| 11:00:33 | 18 | Q What date did you go to the ranch to retrieve the |
| 11:00:37 | 19 | documents that Steve Penny instructed you to bring |
| 11:00:39 | 20 | back? |
| 11:00:40 | 21 | A I assert the Fifth. |
| 11:00:42 | 22 | Q Did Gary Warren pull the documents together for you |
| 11:00:46 | 23 | at the ranch for you to bring back to Indianapolis? |
| 11:00:50 | 24 | A I assert the Fifth. |
| 11:00:50 | 25 | Q What were your instructions in bringing those |

33

EXHIBIT 11
012

| | | |
|---|---|---|
| 11:00:53 | 1 | documents back to Indianapolis? |
| 11:00:56 | 2 | A I assert the Fifth. |
| 11:00:56 | 3 | Q Were you instructed to preserve those documents at |
| 11:00:59 | 4 | any point by Steve Penny? |
| 11:01:02 | 5 | A I assert the Fifth. |
| 11:01:04 | 6 | Q Did you ever bring those documents back to |
| 11:01:06 | 7 | Indianapolis? |
| 11:01:07 | 8 | A I assert the Fifth. |
| 11:01:09 | 9 | Q Did Steve Penny tell you to destroy those documents |
| 11:01:12 | 10 | at the ranch? |
| 11:01:13 | 11 | A I assert the Fifth. |
| 11:01:14 | 12 | Q Was Gary Warren destroying any documents when you |
| 11:01:18 | 13 | got to the ranch? |
| 11:01:19 | 14 | A I assert the Fifth. |
| 11:01:20 | 15 | Q Was anybody destroying documents when you got to |
| 11:01:22 | 16 | the ranch? |
| 11:01:23 | 17 | A I assert the Fifth. |
| 11:01:24 | 18 | Q Did you speak to Gary Warren about the documents |
| 11:01:27 | 19 | that you were to obtain from the ranch? |
| 11:01:31 | 20 | A I assert the Fifth. |
| 11:01:31 | 21 | Q Did you speak with Rhonda Faehn prior to going to |
| 11:01:35 | 22 | the ranch about the documents that you would |
| 11:01:37 | 23 | retrieve? |
| 11:01:39 | 24 | A I assert the Fifth. |
| 11:01:41 | 25 | Q When you got to the ranch, where did you get the |

34

EXHIBIT 11
013

11:01:44  1  documents from?  Meaning, where were they located

11:01:48  2  specifically at the ranch?

11:01:53  3 A I assert the Fifth.

11:01:53  4 Q Did the ranch have depositories for medical records

11:01:57  5  that were on the premises?

11:01:59  6 A I assert the Fifth.

11:02:00  7 Q Were there any garages or sheds that you searched

11:02:02  8  in to obtain those documents?

11:02:05  9 A I assert the Fifth.

11:02:05 10 Q Did Kathy Kelly or Gary Warren assist you in

11:02:09 11  obtaining the documents from the ranch?

11:02:11 12 A I assert the Fifth.

11:02:12 13 Q Were you on any mutual communications, meaning

11:02:17 14  either copied or a direct recipient of emails, text

11:02:23 15  messages, between Gary Warren and Steve Penny about

11:02:26 16  what documents should be taken from ranch?

11:02:30 17 A I assert the Fifth.

11:02:31 18 Q Were those documents that were to be taken from the

11:02:33 19  ranch specifically pertaining to Larry Nassar and

11:02:37 20  his abusive medical treatments of little girls?

11:02:40 21 A I assert the Fifth.

11:02:41 22 Q What specific instructions regarding Larry Nassar's

11:02:43 23  documents did Steve Penny give you in retrieving

11:02:47 24  those from the ranch?

11:02:48 25 A I assert the Fifth.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
014

| | | |
|---|---|---|
| 11:02:50 | 1 | Q How many documents did you take from the ranch? |
| 11:02:52 | 2 | A I assert the Fifth. |
| 11:02:53 | 3 | Q Did you review those documents before you put them |
| 11:02:57 | 4 | into receptacles to bring them back to |
| 11:02:59 | 5 | Indianapolis? |
| 11:03:00 | 6 | A I assert the Fifth. |
| 11:03:01 | 7 | Q Did you in fact bring those documents in |
| 11:03:03 | 8 | receptacles back to Indianapolis? |
| 11:03:05 | 9 | A I assert the Fifth. |
| 11:03:08 | 10 | Q Did Martha Karolyi ever speak to you regarding the |
| 11:03:11 | 11 | documents that were to be removed from the Karolyi |
| 11:03:15 | 12 | Ranch? |
| 11:03:16 | 13 | A I assert the Fifth. |
| 11:03:17 | 14 | MS. MERY: Objection, assumes facts not in |
| 11:03:19 | 15 | evidence. |
| 11:03:20 | 16 | MR. CUNNY: What was the objection? |
| 11:03:23 | 17 | MS. MERY: Lacks foundation. |
| 11:03:24 | 18 | MR. CUNNY: Oh, sorry. Didn't hear it. |
| 11:03:27 | 19 | Q Okay. Did Martha Karolyi help you in searching for |
| 11:03:34 | 20 | documents located at the ranch? |
| 11:03:36 | 21 | A I assert the Fifth. |
| 11:03:37 | 22 | MS. MERY: Objection, lack of foundation. |
| 11:03:39 | 23 | Q Did Bela assist you -- |
| 11:03:42 | 24 | MS. MATTHAI: Alex, I'm going to -- |
| 11:03:46 | 25 | Q -- in searching for documents that were located at |

EXHIBIT 11
015

11:03:46 1        **the ranch?**

11:03:46 2            MS. MATTHAI:  I'm going to ask to interrupt

11:03:46 3        for a second.

11:03:46 4            Alex, obviously the witness is going to be

11:03:49 5        taking the Fifth to all of these questions that you

11:03:51 6        are asking.  You are making a large number of

11:03:55 7        assumptions in your questions that are not true and

11:03:59 8        for which there are no foundations.

11:04:02 9            I think it just is going to clutter this

11:04:04 10       record if we all jump in as to every one of those

11:04:05 11       questions and assert the lack of foundation.  So

11:04:08 12       given the fact that the witness is not going to be

11:04:10 13       providing substantive answers, it seems to me we

11:04:14 14       should just agree there is a running objection on

11:04:17 15       this.  So if these questions ever come back at a

11:04:20 16       time when the issue in Texas has been cleared up

11:04:22 17       and they're actually going to be asked and

11:04:25 18       answered, we can reserve our foundation objections

11:04:27 19       to that period -- or at that time.

11:04:31 20           MR. CUNNY:  Yeah.  And I'd posit to you that

11:04:34 21       most of those objections -- lacks foundation, calls

11:04:36 22       for speculation -- those are preserved for the

11:04:39 23       record regardless of you making them.  So I'm fine

11:04:43 24       with that.

11:04:44 25           MS. MATTHAI:  Yeah.  Okay.  Thanks.  Because I

37

EXHIBIT 11
016

| | | |
|---|---|---|
| 11:04:46 | 1 | just don't want to be objecting every time you're |
| 11:04:47 | 2 | saying something that I know is just not right. |
| 11:04:50 | 3 | MR. CUNNY: Okay. |
| 11:04:53 | 4 | MS. MERY: This is Victoria Mery. I agree |
| 11:04:54 | 5 | with Edith. You know, there are certain questions |
| 11:04:57 | 6 | I have to object to. But if we have a running |
| 11:04:59 | 7 | objection on lack of foundation to this inquiry, |
| 11:05:02 | 8 | then that's fine with me. |
| 11:05:04 | 9 | MR. CUNNY: Yeah, that's fine. |
| 11:05:07 | 10 | MS. HOLM: This is Margaret Holm. I agree. |
| 11:05:09 | 11 | MS. KIES: This is Marianne Kies. I agree. |
| 11:05:13 | 12 | MR. CUNNY: Okay. Is that good with you? |
| 11:05:14 | 13 | MR. DOWNEY: That's fine with me. |
| 11:05:18 | 14 | MR. CUNNY: Okay. |
| 11:05:18 | 15 | MR. AMUNDSON: Alex, this is Steve Amundson. |
| 11:05:20 | 16 | As I was trying to ask, can we have the running |
| 11:05:23 | 17 | foundation that Edith just proposed retroactive to |
| 11:05:27 | 18 | when the witness started asserting the Fifth? |
| 11:05:31 | 19 | MR. CUNNY: That's fine. I mean, they're |
| 11:05:32 | 20 | preserved for the record anyway. That's fine. |
| 11:05:38 | 21 | MR. AMUNDSON: Well, I'm not so clear on that, |
| 11:05:40 | 22 | but let's -- we've got it on this record, so thank |
| 11:05:44 | 23 | you. |
| 11:05:44 | 24 | BY MR. CUNNY: |
| 11:05:44 | 25 | Q Okay. When you arrived at the ranch to obtain |

EXHIBIT 11
017

| | | |
|---|---|---|
| 11:05:48 | 1 | documents per the orders of Steve Penny, who met |
| 11:05:52 | 2 | you at the ranch? |
| 11:05:52 | 3 | A   I assert the Fifth. |
| 11:05:54 | 4 | Q   Did that person direct you to locations at the |
| 11:05:57 | 5 | ranch where those documents were held? |
| 11:06:00 | 6 | A   I assert the Fifth. |
| 11:06:01 | 7 | Q   Who was that individual that met you? |
| 11:06:04 | 8 | A   I assert the Fifth. |
| 11:06:05 | 9 | Q   How long, in terms of hours, days, were you at the |
| 11:06:09 | 10 | ranch collecting documents? |
| 11:06:12 | 11 | A   I assert the Fifth. |
| 11:06:13 | 12 | Q   Did you speak to whoever was gathering the |
| 11:06:16 | 13 | documents, if it wasn't you, about what the |
| 11:06:23 | 14 | documents contained? |
| 11:06:25 | 15 | A   I assert the Fifth. |
| 11:06:25 | 16 | Q   Were those medical records that you were collecting |
| 11:06:29 | 17 | at the ranch? |
| 11:06:31 | 18 | A   I assert the Fifth. |
| 11:06:31 | 19 | Q   Was it any records specifically pertaining to Jamie |
| 11:06:35 | 20 | Dantzscher that you obtained from the ranch? |
| 11:06:39 | 21 | A   I assert the Fifth. |
| 11:06:39 | 22 | Q   Was there any records specifically regarding Mattie |
| 11:06:43 | 23 | Larson that you were obtaining from the ranch? |
| 11:06:45 | 24 | A   I assert the Fifth. |
| 11:06:46 | 25 | Q   Were there any records specifically pertaining to |

EXHIBIT 11
018

| | | |
|---|---|---|
| 11:06:49 | 1 | McKayla Maroney that you were obtaining from the |
| 11:06:53 | 2 | ranch? |
| 11:06:55 | 3 | A  I assert the Fifth. |
| 11:06:55 | 4 | Q  Were there any records specifically relating to |
| 11:06:58 | 5 | Jordyn Wieber that you obtained from the ranch? |
| 11:07:03 | 6 | A  I assert the Fifth. |
| 11:07:04 | 7 | Q  How many pounds of documents were removed from the |
| 11:07:07 | 8 | ranch? |
| 11:07:08 | 9 | A  I assert the Fifth. |
| 11:07:09 | 10 | Q  When you traveled to the ranch, did USAG pay for |
| 11:07:14 | 11 | your trip there and back, or did you pay for it |
| 11:07:16 | 12 | through your own funds? |
| 11:07:19 | 13 | A  I assert the Fifth. |
| 11:07:19 | 14 | Q  Did Steve Penny instruct you to pay for it through |
| 11:07:21 | 15 | your own funds so it wouldn't be traced back to |
| 11:07:25 | 16 | USAG? |
| 11:07:26 | 17 | A  I assert the Fifth. |
| 11:07:29 | 18 | Q  Did anybody instruct you to pay for your travel or |
| 11:07:30 | 19 | the suitcases with your own money or cash such that |
| 11:07:34 | 20 | it wouldn't be traced back to USA Gymnastics? |
| 11:07:38 | 21 | A  I assert the Fifth. |
| 11:07:39 | 22 | Q  When you got to the ranch, who were the identities |
| 11:07:43 | 23 | of the individuals that you spoke with? |
| 11:07:47 | 24 | A  I assert the Fifth. |
| 11:07:48 | 25 | Q  Did you speak with any gymnasts at the ranch? |

40

EXHIBIT 11
019

11:07:52 1    A  I assert the Fifth.

11:07:52 2    Q  Was it during a national training camp that you

11:07:55 3       went to the ranch?

11:07:57 4    A  I assert the Fifth.

11:07:58 5    Q  Was it some other training camp at the ranch that

11:08:00 6       you attended?

11:08:01 7    A  I assert the Fifth.

11:08:04 8    Q  Did you speak with any of the medical staff when

11:08:07 9       you were at the ranch collecting documents?

11:08:09 10   A  I assert the Fifth.

11:08:10 11   Q  How many times had you been to the ranch prior to

11:08:13 12      the occasion that you traveled to the ranch to get

11:08:16 13      those documents?

11:08:17 14   A  I assert the Fifth.

11:08:18 15   Q  When I say "prior to the occasion," the occasion

11:08:20 16      where Steve Penny had directed you to go to the

11:08:23 17      ranch.

11:08:24 18   A  I assert the Fifth.

11:08:29 19   Q  Did any of the documents relate to Nassar's

11:08:33 20      volunteer background?

11:08:36 21   A  I assert the Fifth.

11:08:36 22   Q  Did any of the documents you were instructed to

11:08:39 23      look for pertain to Larry Nassar whatsoever?

11:08:43 24   A  I assert the Fifth.

11:08:45 25   Q  Did Steve Penny explain the reasons for which you

EXHIBIT 11
020

| | | |
|---|---|---|
| 11:08:47 | 1 | were going to the ranch to get documents? |
| 11:08:49 | 2 | A  I assert the Fifth. |
| 11:08:51 | 3 | Q  Prior to you actually bringing the documents back, |
| 11:08:55 | 4 | did Steve Penny tell you what he was going to do |
| 11:08:56 | 5 | with the documents? |
| 11:08:57 | 6 | A  I assert the Fifth. |
| 11:08:58 | 7 | Q  Did Steve Penny tell you to bring him the |
| 11:09:00 | 8 | documents, or did he tell you to bring them to |
| 11:09:02 | 9 | somebody else at USAG? |
| 11:09:06 | 10 | A  I assert the Fifth. |
| 11:09:07 | 11 | Q  Did anybody review the documents before they were |
| 11:09:08 | 12 | gathered from the ranch? |
| 11:09:10 | 13 | A  I assert the Fifth. |
| 11:09:19 | 14 | Q  What date did you bring the documents back from the |
| 11:09:22 | 15 | ranch? |
| 11:09:24 | 16 | A  I assert the Fifth. |
| 11:09:25 | 17 | Q  Did all the documents come back at one time or did |
| 11:09:30 | 18 | you ship documents first and then bring documents |
| 11:09:32 | 19 | with you on the plane? |
| 11:09:35 | 20 | A  I assert the Fifth. |
| 11:09:40 | 21 | Q  Are you aware of there being a fire pit at the |
| 11:09:43 | 22 | ranch? |
| 11:09:44 | 23 | A  I assert the Fifth. |
| 11:09:44 | 24 | Q  Do you know if any documents were thrown into that |
| 11:09:47 | 25 | fire pit? |

42

EXHIBIT 11
021

| | | |
|---|---|---|
| 11:09:48 | 1 | A  I assert the Fifth. |
| 11:09:48 | 2 | Q  Do you know if anyone destroyed documents at the |
| 11:09:52 | 3 | ranch prior to you bringing certain documents back? |
| 11:09:56 | 4 | A  I assert the Fifth. |
| 11:09:58 | 5 | Q  At any point are you aware of documents that were |
| 11:10:01 | 6 | taken from the ranch being destroyed? |
| 11:10:08 | 7 | A  I assert the Fifth. |
| 11:10:08 | 8 | Q  Do you remember what time of day your flight was |
| 11:10:10 | 9 | back from the ranch with documents? |
| 11:10:13 | 10 | A  I assert the Fifth. |
| 11:10:14 | 11 | Q  Did you fly back into Indianapolis? |
| 11:10:17 | 12 | A  I assert the Fifth. |
| 11:10:19 | 13 | Q  When you flew back into Indianapolis and got your |
| 11:10:22 | 14 | luggage that contained the documents, where's the |
| 11:10:27 | 15 | first place that those documents were taken? |
| 11:10:31 | 16 | A  I assert the Fifth. |
| 11:10:31 | 17 | Q  Were those documents taken directly to USAG |
| 11:10:37 | 18 | headquarters? |
| 11:10:38 | 19 | A  I assert the Fifth. |
| 11:10:38 | 20 | Q  After you brought those to USAG headquarters, |
| 11:10:43 | 21 | assuming you did, did you review those documents? |
| 11:10:47 | 22 | A  I assert the Fifth. |
| 11:10:47 | 23 | Q  When those documents were brought back to USAG |
| 11:10:50 | 24 | headquarters, were you aware that the Texas Rangers |
| 11:10:52 | 25 | were conducting an ongoing investigation of the |

43

EXHIBIT 11
022

| | | |
|---|---|---|
| 11:10:59 | 1 | Karolyi Ranch? |
| 11:11:00 | 2 | A  I assert the Fifth. |
| 11:11:00 | 3 | Q  **Were you aware of who at USAG, if anyone, reviewed** |
| 11:11:03 | 4 | **those documents once they were brought back to the** |
| 11:11:05 | 5 | **USAG headquarters?** |
| 11:11:10 | 6 | A  I assert the Fifth. |
| 11:11:12 | 7 | Q  **When you brought those documents back to USAG** |
| 11:11:15 | 8 | **headquarters, where specifically in the building** |
| 11:11:17 | 9 | **did you bring them?** |
| 11:11:20 | 10 | A  I assert the Fifth. |
| 11:11:20 | 11 | Q  **Did you bring them into Steve Penny's office?** |
| 11:11:23 | 12 | A  I assert the Fifth. |
| 11:11:24 | 13 | Q  **Did Steve Penny tell you where to bring those** |
| 11:11:25 | 14 | **documents?** |
| 11:11:26 | 15 | A  I assert the Fifth. |
| 11:11:33 | 16 | Q  **Did you speak with Steve Penny when you came back** |
| 11:11:36 | 17 | **to the USAG headquarters with those documents?** |
| 11:11:39 | 18 | A  I assert the Fifth. |
| 11:11:39 | 19 | Q  **Were those documents cataloged into any USAG** |
| 11:11:45 | 20 | **databases or other document filing programs?** |
| 11:11:51 | 21 | A  I assert the Fifth. |
| 11:11:51 | 22 | MR. CUNNY:  I want to take a quick break. |
| 11:11:59 | 23 | THE VIDEOGRAPHER:  It's 11:11.  Off the |
| 11:12:01 | 24 | record. |
| 11:12:02 | 25 | (A brief recess was taken.) |

44

EXHIBIT 11
023

| | | |
|---|---|---|
| 11:21:14 | 1 | THE VIDEOGRAPHER: We're now back on the |
| 11:21:16 | 2 | record, 11:21. |
| 11:21:17 | 3 | BY MR. CUNNY: |
| 11:21:18 | 4 | Q All right. Miss, do you understand you're still |
| 11:21:24 | 5 | under oath? |
| 11:21:26 | 6 | A Yes. |
| 11:21:26 | 7 | Q When we left off, we were talking about -- so when |
| 11:21:29 | 8 | the documents were returned to Indianapolis, were |
| 11:21:32 | 9 | they returned to a specific room at USAG |
| 11:21:37 | 10 | headquarters? |
| 11:21:38 | 11 | A I assert my Fifth. |
| 11:21:41 | 12 | Q When they were returned to Indianapolis, did Steve |
| 11:21:45 | 13 | Penny tell you what to do with them? |
| 11:21:49 | 14 | A I assert the Fifth. |
| 11:21:49 | 15 | Q Were those documents given directly to Steve Penny |
| 11:21:53 | 16 | when they were returned to Indianapolis? |
| 11:21:57 | 17 | A I assert the Fifth. |
| 11:21:58 | 18 | Q When you gave those records either to Steve Penny |
| 11:22:01 | 19 | or you lodged them in some sort of filing room or |
| 11:22:05 | 20 | room at USA Gymnastics, did Steve Penny tell you |
| 11:22:10 | 21 | what he was going to do with those documents? |
| 11:22:13 | 22 | A I assert the Fifth. |
| 11:22:13 | 23 | Q Did he tell you whether or not he was going to have |
| 11:22:16 | 24 | anybody review those documents? |
| 11:22:19 | 25 | A I assert the Fifth. |

45

EXHIBIT 11
024

| | | |
|---|---|---|
| 11:22:19 | 1 | Q Did he tell you he was going to destroy those |
| 11:22:22 | 2 | documents? |
| 11:22:23 | 3 | A I assert the Fifth. |
| 11:22:23 | 4 | Q Do you know if those documents exist as of today's |
| 11:22:26 | 5 | date? |
| 11:22:26 | 6 | A I assert the Fifth. |
| 11:22:28 | 7 | Q Did anybody do an accounting of which documents |
| 11:22:31 | 8 | were retrieved when they were brought back to |
| 11:22:35 | 9 | Indianapolis? |
| 11:22:37 | 10 | A I assert the Fifth. |
| 11:22:37 | 11 | Q Is there any way of knowing, based on either |
| 11:22:41 | 12 | recordkeeping by you, by Steve Penny, by USA |
| 11:22:45 | 13 | Gymnastics, of whether all the documents you |
| 11:22:49 | 14 | brought back to the headquarters still exist? |
| 11:22:53 | 15 | A I assert the Fifth. |
| 11:22:53 | 16 | Q Were those documents ever given to Deborah Daniels? |
| 11:22:57 | 17 | A I assert the Fifth. |
| 11:22:58 | 18 | Q Were those documents ever given to Ropes & Gray? |
| 11:23:03 | 19 | A I assert the Fifth. |
| 11:23:03 | 20 | Q Were those documents ever given to Congress? |
| 11:23:06 | 21 | A I assert the Fifth. |
| 11:23:07 | 22 | Q Whose job was it to compile those documents for |
| 11:23:13 | 23 | Congress? |
| 11:23:14 | 24 | A I assert the Fifth. |
| 11:23:24 | 25 | Q Was it anybody's responsibility to look after those |

46

EXHIBIT 11
025

| | | |
|---|---|---|
| 11:23:33 | 1 | documents once they were brought back to USAG |
| 11:23:36 | 2 | headquarters? |
| 11:23:37 | 3 | A  I assert the Fifth. |
| 11:23:38 | 4 | Q  Do you know why Steve Penny wanted you to bring |
| 11:23:40 | 5 | those documents back to the USAG headquarters? |
| 11:23:44 | 6 | A  I assert the Fifth. |
| 11:23:45 | 7 | Q  Did Steve Penny indicate to you that there was |
| 11:23:47 | 8 | information in those documents about Larry Nassar? |
| 11:23:50 | 9 | A  I assert the Fifth. |
| 11:23:52 | 10 | Q  Did you speak with anybody at USA Gymnastics who |
| 11:23:57 | 11 | had reviewed those documents who told you that they |
| 11:24:01 | 12 | concerned Larry Nassar? |
| 11:24:05 | 13 | A  I assert the Fifth. |
| 11:24:06 | 14 | Q  Does anybody currently working at USA Gymnastics, |
| 11:24:11 | 15 | to your knowledge, know the contents of those |
| 11:24:17 | 16 | documents? |
| 11:24:19 | 17 | A  I assert the Fifth. |
| 11:24:20 | 18 | Q  Why weren't those documents produced to Congress |
| 11:24:23 | 19 | the first time they were requested? |
| 11:24:28 | 20 | A  I assert the Fifth. |
| 11:24:28 | 21 | Q  Were those documents produced to Congress the first |
| 11:24:31 | 22 | time they were requested? |
| 11:24:33 | 23 | A  I assert the Fifth. |
| 11:24:34 | 24 | Q  Did you ever speak with Rhonda Faehn about those |
| 11:24:40 | 25 | documents? |

47

EXHIBIT 11
026

11:24:40 1    A  I assert the Fifth.

11:24:40 2    Q  Did you tell Rhonda Faehn that you gave those

11:24:46 3       documents to Steve Penny?

11:24:49 4    A  I assert the Fifth.

11:24:50 5    Q  Did you tell Rhonda Faehn that you brought those

11:24:53 6       documents into Steve Penny's office?

11:24:55 7    A  I assert the Fifth.

11:25:09 8    Q  Did you ever speak with Kerry Perry about those

11:25:13 9       documents?

11:25:14 10   A  I assert the Fifth.

11:25:14 11   Q  When you spoke to Kerry Perry about those

11:25:17 12      documents, did you tell her that those documents

11:25:20 13      were no longer in possession of USA Gymnastics?

11:25:23 14   A  I assert the Fifth.

11:25:25 15   Q  If they weren't in possession of USA Gymnastics

11:25:27 16      when you spoke with Kerry Perry, where were those

11:25:32 17      documents, if you know?

11:25:34 18   A  I assert the Fifth.

11:25:34 19   Q  Who would have known where those documents were if

11:25:37 20      you didn't prior to the time you spoke with Kerry

11:25:43 21      Perry?

11:25:44 22   A  I assert the Fifth.

11:25:45 23   Q  Were you aware that Kerry Perry was going to

11:25:47 24      testify in front of Congress regarding those

11:25:50 25      documents?

EXHIBIT 11
027

```
11:25:51  1    A  I assert the Fifth.
11:25:52  2    Q  Did you have any meetings with Kerry Perry to
11:25:55  3       prepare her for that testimony to Congress?
11:25:58  4    A  I assert the Fifth.
11:25:59  5    Q  When Kerry Perry testified to Congress, she stated
11:26:02  6       that USA Gymnastics did not have those documents
11:26:06  7       unequivocally.  Did you tell her after that hearing
11:26:09  8       that USA Gymnastics did in fact have those
11:26:12  9       documents?
11:26:13 10    A  I assert the Fifth.
11:26:14 11    Q  Did Kerry Perry know that those documents were in
11:26:16 12       possession of USA Gymnastics prior to going to that
11:26:20 13       hearing?
11:26:22 14    A  I assert the Fifth.
11:26:22 15    Q  Did you tell Kerry Perry that those documents were
11:26:25 16       in the possession of USA Gymnastics prior to Kerry
11:26:27 17       Perry going to that hearing?
11:26:32 18    A  I assert the Fifth.
11:26:35 19    Q  Did Steve Penny tell you to tell Kerry Perry that
11:26:39 20       the documents no longer existed?
11:26:42 21    A  I assert the Fifth.
11:26:43 22    Q  When Steve Penny resigned, did he take those
11:26:46 23       documents with him?
11:26:47 24    A  I assert the Fifth.
11:26:50 25    Q  Who was Steve Penny's assistant just prior to the
```

EXHIBIT 11
028

11:26:56 1    time he resigned?

11:26:58 2    A  I assert the Fifth.

11:26:58 3    Q  Did you ever speak with Renee Jamison about those

11:27:01 4       documents that you took from the ranch and brought

11:27:04 5       to the USAG headquarters?

11:27:10 6    A  I assert the Fifth.

11:27:10 7    Q  Did you ever tell Rhonda Faehn that Steve Penny had

11:27:15 8       instructed you to bring the documents back from the

11:27:18 9       ranch?

11:27:19 10   A  I assert the Fifth.

11:27:26 11   Q  Did Steve Penny keep those documents under lock and

11:27:29 12      key?

11:27:30 13   A  I assert the Fifth.

11:27:31 14   Q  Were those documents maintained by Steve Penny at

11:27:34 15      the USAG office or at some other location such as a

11:27:39 16      storage unit or his home?

11:27:42 17   A  I assert the Fifth.

11:27:43 18   Q  Did you ever email with Steve Penny about those

11:27:46 19      documents?

11:27:46 20   A  I assert the Fifth.

11:27:47 21   Q  Did you ever send text messages to Steve Penny

11:27:50 22      about those documents?

11:27:53 23   A  I assert the Fifth.

11:27:54 24   Q  You understand that when I say "those documents,"

11:27:58 25      I'm referring to the documents removed from the

EXHIBIT 11
029

| | | |
|---|---|---|
| 11:27:59 | 1 | ranch and brought back to USA Gymnastics. Did you |
| 11:28:04 | 2 | ever text Steve Penny about those documents? |
| 11:28:06 | 3 | A I assert the Fifth. |
| 11:28:07 | 4 | Q Or email Steve Penny about those documents? |
| 11:28:10 | 5 | A I assert the Fifth. |
| 11:28:12 | 6 | Q Did you ever email Gary Warren about those |
| 11:28:14 | 7 | documents? |
| 11:28:15 | 8 | A I assert the Fifth. |
| 11:28:17 | 9 | Q Did you ever email Rhonda Faehn about those |
| 11:28:19 | 10 | documents? |
| 11:28:20 | 11 | A I assert the Fifth. |
| 11:28:22 | 12 | Q Did you ever email Renee Jamison about those |
| 11:28:25 | 13 | documents? |
| 11:28:26 | 14 | A I assert the Fifth. |
| 11:28:26 | 15 | Q Did you ever email Kerry Perry about those |
| 11:28:28 | 16 | documents? |
| 11:28:30 | 17 | A I assert the Fifth. |
| 11:28:30 | 18 | Q Did you ever text message Kerry Perry about those |
| 11:28:34 | 19 | documents? |
| 11:28:34 | 20 | A Yes. |
| 11:28:35 | 21 | Q Did you ever text message Rhonda Faehn about those |
| 11:28:39 | 22 | documents? |
| 11:28:39 | 23 | A I assert the Fifth. |
| 11:28:40 | 24 | Q Did you ever text message Renee Jamison about those |
| 11:28:43 | 25 | documents? |

51

EXHIBIT 11
030

| | | |
|---|---|---|
| 11:28:44 | 1 | A  I assert the Fifth. |
| 11:28:45 | 2 | Q  **Did you frequently interact with Renee Jamison** |
| 11:28:48 | 3 | **regarding USA Gymnastics matters?** |
| 11:28:51 | 4 | A  I assert the Fifth. |
| 11:28:53 | 5 | Q  **Did you ever speak with Renee Jamison about Larry** |
| 11:28:56 | 6 | **Nassar?** |
| 11:28:56 | 7 | A  I assert the Fifth. |
| 11:28:56 | 8 | Q  **Did you ever speak with Renee Jamison about Steve** |
| 11:29:00 | 9 | **Penny's handling of the complaints about Larry** |
| 11:29:04 | 10 | **Nassar?** |
| 11:29:04 | 11 | A  I assert the Fifth. |
| 11:29:06 | 12 | MR. CUNNY:  Are you okay? |
| 11:29:08 | 13 | MR. DOWNEY:  Just sneeze.  Yep. |
| 11:29:10 | 14 | Q  **Did you ever speak with Gary Warren about the** |
| 11:29:15 | 15 | **complaints about Larry Nassar?** |
| 11:29:16 | 16 | A  I assert the Fifth. |
| 11:29:17 | 17 | Q  **When were you first made aware of the complaints of** |
| 11:29:20 | 18 | **Larry Nassar?** |
| 11:29:20 | 19 | A  I assert the Fifth. |
| 11:29:23 | 20 | Q  **Did you ever contact anyone at the USOC regarding** |
| 11:29:26 | 21 | **the complaints about Larry Nassar?** |
| 11:29:29 | 22 | A  I assert the Fifth. |
| 11:29:29 | 23 | Q  **Did you ever speak with anyone at the USOC** |
| 11:29:32 | 24 | **regarding the documents that were taken from the** |
| 11:29:35 | 25 | **ranch?** |

52

EXHIBIT 11
031

| | | |
|---|---|---|
| 11:29:36 | 1 | A I assert the Fifth. |
| 11:29:38 | 2 | Q Did you ever speak with any of the attorneys for |
| 11:29:41 | 3 | the USOC about the documents that were taken from |
| 11:29:45 | 4 | the ranch? |
| 11:29:48 | 5 | A I assert the Fifth. |
| 11:29:56 | 6 | Q Did you ever speak with local law enforcement |
| 11:29:58 | 7 | regarding Steve Penny's involvement with them in |
| 11:30:04 | 8 | reporting allegations of sexual abuse? |
| 11:30:09 | 9 | A I assert the Fifth. |
| 11:30:10 | 10 | Q Do you know an FBI agent named Jay Abbott? |
| 11:30:15 | 11 | A I assert the Fifth. |
| 11:30:15 | 12 | Q Were you on any calls or any -- were you on any |
| 11:30:24 | 13 | calls or any emails regarding an FBI agent named |
| 11:30:30 | 14 | Jay Abbott? |
| 11:30:34 | 15 | A I assert the Fifth. |
| 11:30:34 | 16 | Q Do you know any local law enforcement that Steve |
| 11:30:37 | 17 | Penny would interact with regarding allegations of |
| 11:30:41 | 18 | sexual abuse? |
| 11:30:42 | 19 | A I assert the Fifth. |
| 11:30:44 | 20 | Q Do you know if Steve Penny reviewed the documents |
| 11:30:50 | 21 | that were brought back to the USA Gymnastics |
| 11:30:56 | 22 | headquarters for information regarding Larry |
| 11:30:58 | 23 | Nassar? |
| 11:30:59 | 24 | A I assert the Fifth. |
| 11:31:00 | 25 | Q Did the documents retrieved from the Karolyi Ranch |

53

EXHIBIT 11
032

11:31:04 1    and brought to USA Gymnastics concern sexually

11:31:07 2    abusive treatments that Nassar was performing on

11:31:10 3    young girls?

11:31:11 4  A  I assert the Fifth.

11:31:13 5  Q  When Steve Penny reviewed those documents, if he

11:31:14 6    did, do you know if he made a report to law

11:31:17 7    enforcement?

11:31:19 8  A  I assert the Fifth.

11:31:20 9  Q  Do you know if Steve Penny promptly transmitted

11:31:23 10    those documents to law enforcement?

11:31:25 11  A  I assert the Fifth.

11:31:26 12  Q  Do you know if Steve Penny promptly transmitted

11:31:28 13    those documents to Congress?

11:31:31 14  A  I assert the Fifth.

11:31:32 15  Q  Do you know if Steve Penny spoke with Jay Abbott

11:31:37 16    about those documents?

11:31:39 17  A  I assert the Fifth.

11:31:40 18  Q  Do you know if Steve Penny was trying to keep it

11:31:42 19    quiet that those documents existed?

11:31:44 20  A  I assert the Fifth.

11:31:45 21  Q  Do you know if Steve Penny was enlisting the help

11:31:48 22    of local law enforcement to help him keep it quiet?

11:31:52 23  A  I assert the Fifth.

11:31:53 24  Q  Do you know which local law enforcement agency

11:31:56 25    Steve Penny would work with in reporting sexual

54

EXHIBIT 11
033

| | | |
|---|---|---|
| 11:31:58 | 1 | abuse of minors that occurred in USA Gymnastics? |
| 11:32:03 | 2 | A  I assert the Fifth. |
| 11:32:05 | 3 | Q  Were you at all involved in the handling of the |
| 11:32:08 | 4 | Marvin Sharp matter? |
| 11:32:10 | 5 | A  I assert the Fifth. |
| 11:32:10 | 6 | Q  Did Steve Penny indicate that there was any |
| 11:32:12 | 7 | connection between Larry Nassar and Marvin Sharp at |
| 11:32:16 | 8 | any point to you? |
| 11:32:17 | 9 | A  I assert the Fifth. |
| 11:32:23 | 10 | Q  Did any of the records at the ranch pertain to |
| 11:32:26 | 11 | Marvin Sharp? |
| 11:32:28 | 12 | A  I assert the Fifth. |
| 11:32:33 | 13 | Q  Did you ever speak to Gary Warren about Marvin |
| 11:32:37 | 14 | Sharp? |
| 11:32:40 | 15 | A  I assert the Fifth. |
| 11:32:42 | 16 | Q  Did you ever speak to Rhonda Faehn about Marvin |
| 11:32:49 | 17 | Sharp? |
| 11:32:51 | 18 | A  I assert the Fifth. |
| 11:32:52 | 19 | Q  Did Steve Penny ever indicate to you that he didn't |
| 11:32:54 | 20 | want information about Larry Nassar getting into |
| 11:32:56 | 21 | the hands of law enforcement? |
| 11:33:02 | 22 | A  I assert the Fifth. |
| 11:33:03 | 23 | Q  Did Steve Penny ever indicate to you that he had |
| 11:33:06 | 24 | destroyed any records pertaining to Larry Nassar? |
| 11:33:10 | 25 | A  I assert the Fifth. |

**JILIO-RYAN Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
034

11:33:11 1 Q Did Steve Penny ever indicate to you that he had

11:33:13 2   instructed anyone at USAG to destroy records

11:33:19 3   relating to Larry Nassar?

11:33:20 4 A I assert the Fifth.

11:33:21 5 Q Did Steve Penny ever indicate to you that he had

11:33:28 6   individuals at the ranch destroy records pertaining

11:33:32 7   to Larry Nassar?

11:33:34 8 A I assert the Fifth.

11:33:34 9 Q When you got those records from the ranch, do you

11:33:38 10   know if records had been destroyed prior to you

11:33:40 11   obtaining that subset of documents you received?

11:33:43 12 A I assert the Fifth.

11:33:50 13 Q Were you aware that there was an ongoing criminal

11:33:53 14   investigation by the Walker County Rangers when you

11:33:58 15   obtained those records from the ranch?

11:34:01 16 A I assert the Fifth.

11:34:03 17 Q Did Steve Penny make you aware of this?

11:34:07 18 A I assert the Fifth.

11:34:09 19 Q Have you spoken with Steve Penny since he's been

11:34:12 20   indicted?

11:34:15 21 A I assert the Fifth.

11:34:16 22 Q Have you spoken with any of Steve Penny's lawyers

11:34:19 23   since he's been indicted?

11:34:22 24 A I assert the Fifth.

11:34:22 25 Q Have you provided any statements to representatives

56

EXHIBIT 11
035

11:34:28  1    of Steve Penny since he's been indicted?

11:34:31  2  A  I assert the Fifth.

11:34:33  3  Q  At any point did you provide a statement to anyone

11:34:36  4     at USA Gymnastics regarding your involvement with

11:34:40  5     the records taken from the ranch?

11:34:42  6  A  I assert the Fifth.

11:34:46  7  Q  Is it your understanding that the criminal charges

11:34:51  8     of Steve Penny stem from him having instructed you

11:34:55  9     to go to the ranch?

11:34:59 10  A  I assert the Fifth.

11:35:02 11  Q  Did you ever provide any statement to Walker County

11:35:09 12     Texas Rangers?

11:35:11 13  A  I assert the Fifth.

11:35:12 14  Q  Have you ever spoken with the Marion County

11:35:14 15     prosecutor regarding Steve Penny?

11:35:18 16  A  I assert the Fifth.

11:35:20 17  Q  Have you ever spoken with any local law enforcement

11:35:24 18     regarding Steve Penny?

11:35:26 19  A  I assert the Fifth.

11:35:36 20  Q  After Kerry Perry testified, did you contact her

11:35:40 21     and indicate to her that the documents still

11:35:43 22     existed that she testified about?

11:35:47 23  A  I assert the Fifth.

11:35:48 24  Q  All right.  When Ms. Perry was asked that there

11:36:19 25     would be no chance that those documents exist

57

11:36:21  1   within your custody at USA Gymnastics unless they

11:36:22  2   were provided to us -- unless they're included in

11:36:26  3   the list -- in the million documents you provided

11:36:28  4   us.

11:36:28  5        And Ms. Perry responded, Right.

11:36:31  6        Senator Moran then said, Otherwise, you can

11:36:35  7   assure me that they don't exist within your

11:36:36  8   custody?

11:36:37  9        Perry then said, To my knowledge, they do not

11:36:38 10   exist in our custody.

11:36:40 11        When Kerry Perry made those statements, were

11:36:44 12   you aware that those were not true statements

11:36:48 13   regardless of whether Ms. Perry knew them to be

11:36:50 14   true or not?

11:36:52 15  A  I assert the Fifth.

11:36:57 16  Q  When certain documents were subsequently discovered

11:37:02 17   in the last couple weeks, do you know if those were

11:37:07 18   the same documents that you took from the ranch?

11:37:09 19  A  I assert the Fifth.

11:37:10 20  Q  Do you know if there's any way of knowing whether

11:37:11 21   those are the same documents you took from the

11:37:13 22   ranch?

11:37:14 23  A  I assert the Fifth.

11:37:21 24  Q  Were you contacted after the discovery of those

11:37:23 25   documents by anyone at USA Gymnastics?

EXHIBIT 11
037

| | | |
|---|---|---|
| 11:37:27 | 1 | A  I assert the Fifth. |
| 11:37:28 | 2 | Q  Were you the person who discovered those documents? |
| 11:37:31 | 3 | A  I assert the Fifth. |
| 11:37:32 | 4 | Q  Did you always know where those documents were? |
| 11:37:35 | 5 | A  I assert the Fifth. |
| 11:37:49 | 6 | Q  Prior to March of 2018, did you speak with anybody |
| 11:37:58 | 7 | at USOC and tell them that those documents existed? |
| 11:38:03 | 8 | A  I assert the Fifth. |
| 11:38:11 | 9 | Q  When, to your knowledge, was the USOC made aware |
| 11:38:16 | 10 | that those documents were taken from the ranch? |
| 11:38:19 | 11 | A  I assert the Fifth. |
| 11:38:20 | 12 | MS. KIES:  This is Marianne.  I know we have a |
| 11:38:23 | 13 | running objection as to foundation, but I'd like to |
| 11:38:25 | 14 | specifically insert an objection here. |
| 11:38:29 | 15 | A  I assert the Fifth. |
| 11:38:30 | 16 | Q  Okay.  I just want to make sure the record's clear. |
| 11:38:35 | 17 | When those records were taken from the ranch, |
| 11:38:37 | 18 | were you aware that the ranch was an Olympic |
| 11:38:42 | 19 | training site? |
| 11:38:43 | 20 | A  I assert the Fifth. |
| 11:38:44 | 21 | Q  Was anyone from the USOC present at the ranch when |
| 11:38:50 | 22 | those documents were taken? |
| 11:38:51 | 23 | A  I assert the Fifth. |
| 11:38:52 | 24 | Q  Did anyone from the USOC assist in gathering those |
| 11:38:56 | 25 | documents from the ranch? |

59

EXHIBIT 11
038

| | | |
|---|---|---|
| 11:38:57 | 1 | A  I assert the Fifth. |
| 11:38:58 | 2 | Q  Do you know if Gary Warren was in contact with |
| 11:39:00 | 3 | anyone from the USOC regarding the gathering of |
| 11:39:04 | 4 | those documents? |
| 11:39:04 | 5 | A  I assert the Fifth. |
| 11:39:05 | 6 | Q  Do you know if Steve Penny was in contact with |
| 11:39:08 | 7 | anybody from USOC regarding the gathering of the |
| 11:39:10 | 8 | documents from the ranch? |
| 11:39:12 | 9 | A  I assert the Fifth. |
| 11:39:14 | 10 | Q  Do you know if Steve Penny ever spoke with Scott |
| 11:39:18 | 11 | Blackman about the gathering of documents from the |
| 11:39:21 | 12 | ranch? |
| 11:39:22 | 13 | A  I assert the Fifth. |
| 11:39:23 | 14 | Q  Do you know if that conversation ever happened, |
| 11:39:25 | 15 | meaning, happened when the documents were |
| 11:39:27 | 16 | instructed to be taken or at some time after? |
| 11:39:31 | 17 | A  I assert the Fifth. |
| 11:39:37 | 18 | Q  Did you ever speak with employees of the USOC |
| 11:39:39 | 19 | regarding those documents that were taken from the |
| 11:39:42 | 20 | ranch? |
| 11:39:43 | 21 | A  I assert the Fifth. |
| 11:39:47 | 22 | Q  Did you ever speak with Sarah Hirschland regarding |
| 11:39:52 | 23 | those documents? |
| 11:39:52 | 24 | A  I assert the Fifth. |
| 11:39:54 | 25 | Q  Do you know if a request was ever made by |

60

EXHIBIT 11
039

| | | |
|---|---|---|
| 11:39:56 | 1 | Ms. Hirschland to speak about those documents |
| 11:40:00 | 2 | removed from the ranch? |
| 11:40:02 | 3 | A  I assert the Fifth. |
| 11:40:08 | 4 | Q  Had you ever been involved in another -- or a |
| 11:40:13 | 5 | report of childhood sexual abuse that was reported |
| 11:40:17 | 6 | to USA Gymnastics or Steve Penny? |
| 11:40:19 | 7 | A  I assert the Fifth. |
| 11:40:22 | 8 | Q  Were you ever in any way made aware of the |
| 11:40:31 | 9 | practices by which Steve Penny would report |
| 11:40:34 | 10 | childhood sexual abuse? |
| 11:40:36 | 11 | A  I assert the Fifth. |
| 11:40:37 | 12 | Q  Were you aware of whether Steve Penny had a point |
| 11:40:40 | 13 | person at the local police department in which he |
| 11:40:45 | 14 | could report childhood sexual abuse? |
| 11:40:50 | 15 | A  I assert the Fifth. |
| 11:40:51 | 16 | Q  Do you have any knowledge of that relationship? |
| 11:40:53 | 17 | A  I assert the Fifth. |
| 11:40:57 | 18 | Q  What was USAG's travel budget in March of 2018? |
| 11:41:04 | 19 | A  I assert the Fifth. |
| 11:41:05 | 20 | Q  What was its travel budget in the year prior, 2017? |
| 11:41:09 | 21 | A  I assert the Fifth. |
| 11:41:09 | 22 | Q  What's its travel budget in 2016? |
| 11:41:13 | 23 | A  I assert the Fifth. |
| 11:41:16 | 24 | Q  Did you pay for any travel of any Californians to |
| 11:41:21 | 25 | go to the Karolyi Ranch? |

61

EXHIBIT 11
040

| | | |
|---|---|---|
| 11:41:23 | 1 | A  I assert the Fifth. |
| 11:41:25 | 2 | Q  Did you ever coordinate or pay for the travel of |
| 11:41:28 | 3 |    Larry Nassar to go to California? |
| 11:41:31 | 4 | A  I assert the Fifth. |
| 11:41:31 | 5 | Q  Did you ever pay for travel of Aly Raisman to go to |
| 11:41:36 | 6 |    the ranch? |
| 11:41:39 | 7 | A  I assert the Fifth. |
| 11:41:39 | 8 | Q  Did you ever pay for any travel of Jordyn Wieber to |
| 11:41:43 | 9 |    go to the ranch? |
| 11:41:43 | 10 | A  I assert the Fifth. |
| 11:41:44 | 11 | Q  Did you ever pay for any travel of Mattie Larson to |
| 11:41:47 | 12 |    go to the ranch? |
| 11:41:48 | 13 | A  I assert the Fifth. |
| 11:41:48 | 14 | Q  Did you ever pay for any travel of Jamie Dantzscher |
| 11:41:52 | 15 |    to go to the ranch? |
| 11:41:53 | 16 | A  I assert the Fifth. |
| 11:42:02 | 17 | Q  Aside from the Texas Rangers, were you aware of any |
| 11:42:09 | 18 |    other ongoing criminal investigations involving USA |
| 11:42:16 | 19 |    Gymnastics or USA Gymnastics' agents besides from |
| 11:42:19 | 20 |    the Walker Texas Rangers? |
| 11:42:23 | 21 | A  I assert the Fifth. |
| 11:42:25 | 22 | Q  Do you know if the FBI was looking into USAG's |
| 11:42:31 | 23 |    handling of the Larry Nassar matter? |
| 11:42:32 | 24 | A  I assert the Fifth. |
| 11:42:34 | 25 | Q  Did Steve Penny ever talk to you about his fears |

EXHIBIT 11
041

| | | |
|---|---|---|
| 11:42:35 | 1 | about the FBI handling the Larry Nassar matter? |
| 11:42:39 | 2 | A  I assert the Fifth. |
| 11:42:43 | 3 | Q  Did Steve Penny ever indicate to you that he was |
| 11:42:45 | 4 | concerned that offices outside of Indianapolis -- |
| 11:42:49 | 5 | the Indianapolis FBI office would be handling the |
| 11:42:53 | 6 | Larry Nassar matter? |
| 11:42:55 | 7 | A  I assert the Fifth. |
| 11:42:59 | 8 | Q  Did Steve Penny ever discuss with you the prospect |
| 11:43:03 | 9 | of Jay Abbott taking over Larry Buendorf's role at |
| 11:43:10 | 10 | the USOC? |
| 11:43:12 | 11 | A  I assert the Fifth. |
| 11:43:13 | 12 | Q  Do you know if that was ever discussed with Scott |
| 11:43:15 | 13 | Blackman? |
| 11:43:16 | 14 | A  I assert the Fifth. |
| 11:43:16 | 15 | Q  Do you know if Jay Abbott was in any way handling |
| 11:43:26 | 16 | the Larry Nassar matter? |
| 11:43:27 | 17 | A  I assert the Fifth. |
| 11:43:32 | 18 | Q  Do you know if there was any policies by which all |
| 11:43:39 | 19 | reports of childhood sexual abuse were to flow |
| 11:43:44 | 20 | through Steve Penny before going to law |
| 11:43:46 | 21 | enforcement? |
| 11:43:48 | 22 | A  I assert the Fifth. |
| 11:43:48 | 23 | Q  Was that what Steve Penny required is that all |
| 11:43:51 | 24 | reports of sexual abuse go through him prior to |
| 11:43:54 | 25 | being reported to law enforcement? |

63

EXHIBIT 11
042

| | | |
|---|---|---|
| 11:43:57 | 1 | A  I assert the Fifth. |
| 11:44:07 | 2 | **Q  Did Steve Penny warn you that when he was sending** |
| 11:44:10 | 3 | **you to the Karolyi Ranch that he was putting you in** |
| 11:44:15 | 4 | **jeopardy criminally?** |
| 11:44:16 | 5 | A  I assert the Fifth. |
| 11:44:19 | 6 | **Q  Did anybody at USAG inform you that you were being** |
| 11:44:25 | 7 | **placed into jeopardy criminally by going to the** |
| 11:44:29 | 8 | **ranch and obtaining those documents?** |
| 11:44:32 | 9 | A  I assert the Fifth. |
| 11:44:32 | 10 | **Q  Did Steve Penny indicate to you that those** |
| 11:44:35 | 11 | **documents concern the Larry Nassar matter** |
| 11:44:48 | 12 | **whatsoever?** |
| 11:44:49 | 13 | A  I assert the Fifth. |
| 11:44:50 | 14 | MR. CUNNY:  I might take another quick break, |
| 11:44:52 | 15 | and I don't think I have a ton more. |
| 11:44:54 | 16 | THE VIDEOGRAPHER:  Okay.  It's 11:44.  Off the |
| 11:44:58 | 17 | record. |
| 11:44:58 | 18 | (A brief recess was taken.) |
| 11:49:10 | 19 | THE VIDEOGRAPHER:  It's now 11:49.  We're back |
| 11:49:11 | 20 | on the record. |
| 11:49:12 | 21 | BY MR. CUNNY: |
| 11:49:13 | 22 | **Q  All right.  Miss, you understand you're still under** |
| 11:49:17 | 23 | **oath?** |
| 11:49:17 | 24 | A  Yes. |
| 11:49:18 | 25 | **Q  Still pledge to tell the truth?** |

64

EXHIBIT 11
043

| | | |
|---|---|---|
| 11:49:20 | 1 | A   Yes. |
| 11:49:20 | 2 | Q   All right.  Have you ever heard of a local Indiana |
| 11:49:24 | 3 | law enforcement officer named Bruce Smith? |
| 11:49:27 | 4 | A   I assert the Fifth. |
| 11:49:28 | 5 | Q   Are you aware that Mr. Penny had a personal |
| 11:49:33 | 6 | relationship with this law enforcement officer? |
| 11:49:35 | 7 | A   I assert the Fifth. |
| 11:49:36 | 8 | Q   Did Mr. Penny and this officer work together to |
| 11:49:39 | 9 | lessen the public backlash against USA Gymnastics |
| 11:49:44 | 10 | relating to the Nassar scandal? |
| 11:49:49 | 11 | A   I assert the Fifth. |
| 11:49:49 | 12 | Q   Were you made aware of the reasons for which Rhonda |
| 11:49:53 | 13 | Faehn was fired? |
| 11:49:54 | 14 | A   I assert the Fifth. |
| 11:49:54 | 15 | Q   Were you made aware that Rhonda's firing had |
| 11:49:57 | 16 | anything to do with the Larry Nassar scandal? |
| 11:50:02 | 17 | A   I assert the Fifth. |
| 11:50:06 | 18 | Q   When Ms. Faehn testified in front of Congress that |
| 11:50:11 | 19 | you were asked to bring back medical records from |
| 11:50:15 | 20 | the ranch, was she telling the truth? |
| 11:50:18 | 21 | A   I assert the Fifth. |
| 11:50:22 | 22 | Q   Specifically, did you ever speak with Ms. Faehn |
| 11:50:28 | 23 | about those comments that she made to Congress? |
| 11:50:33 | 24 | A   I assert the Fifth. |
| 11:50:33 | 25 | Q   When's the last time you spoke with Rhonda Faehn? |

65

EXHIBIT 11
044

| | | |
|---|---|---|
| 11:50:38 | 1 | A  I assert the Fifth. |
| 11:50:41 | 2 | Q  Were you aware of any internal investigations going |
| 11:50:47 | 3 | on within USA Gymnastics about the Larry Nassar |
| 11:50:52 | 4 | matter when you went to obtain the records from the |
| 11:50:56 | 5 | ranch? |
| 11:50:57 | 6 | A  I assert the Fifth. |
| 11:51:15 | 7 | Q  Were the records that were brought back from the |
| 11:51:19 | 8 | ranch brought back under the policies and |
| 11:51:22 | 9 | procedures of USA Gymnastics? |
| 11:51:25 | 10 | A  I assert the Fifth. |
| 11:51:26 | 11 | Q  Meaning, were there periodic times where you or |
| 11:51:30 | 12 | someone else from USA Gymnastics would go to the |
| 11:51:32 | 13 | ranch, gather all the documents, and bring them |
| 11:51:35 | 14 | back to the ranch? |
| 11:51:36 | 15 | A  I assert the Fifth. |
| 11:51:36 | 16 | Q  Bring them back to USA Gymnastics' headquarters, I |
| 11:51:41 | 17 | mean. |
| 11:51:42 | 18 | A  I assert the Fifth. |
| 11:51:42 | 19 | Q  Those documents that were at the ranch, do you know |
| 11:51:45 | 20 | how far back they dated? |
| 11:51:47 | 21 | A  I assert the Fifth. |
| 11:51:48 | 22 | Q  Did they date back prior to the year 2000? |
| 11:51:52 | 23 | A  I assert the Fifth. |
| 11:51:52 | 24 | Q  Did they date back prior to the year 1994? |
| 11:51:55 | 25 | A  I assert the Fifth. |

66

EXHIBIT 11
045

| | | |
|---|---|---|
| 11:52:12 | 1 | Q Did Steve Penny instruct any individuals at USA |
| 11:52:17 | 2 | Gymnastics to triage documents pertaining to, |
| 11:52:22 | 3 | specifically, inappropriate medical procedures |
| 11:52:24 | 4 | provided by Larry Nassar? |
| 11:52:27 | 5 | A I assert the Fifth. |
| 11:52:29 | 6 | Q Did Steve Penny ever indicate to you that he was |
| 11:52:31 | 7 | working with local law enforcement to keep the |
| 11:52:35 | 8 | Nassar scandal quiet? |
| 11:52:41 | 9 | A I assert the Fifth. |
| 11:52:45 | 10 | Q Do you know how Steve Penny met Bruce Smith? |
| 11:52:49 | 11 | A I assert the Fifth. |
| 11:52:50 | 12 | Q Do you know how Steve Penny met Jay Abbott? |
| 11:52:54 | 13 | A I assert the Fifth. |
| 11:52:56 | 14 | Q Did you ever speak with either of those law |
| 11:52:58 | 15 | enforcement agents? |
| 11:52:59 | 16 | A I assert the Fifth. |
| 11:53:07 | 17 | Q Did Steve Penny ever indicate to you that he was |
| 11:53:09 | 18 | concerned in November of 2016 that mandatory |
| 11:53:16 | 19 | reports of suspected sexual abuse were not made by |
| 11:53:21 | 20 | Larry Nassar -- were not made by USA Gymnastics |
| 11:53:23 | 21 | officials regarding Larry Nassar? |
| 11:53:25 | 22 | A I assert the Fifth. |
| 11:53:27 | 23 | Q Did Steve Penny indicate to you that the reason you |
| 11:53:29 | 24 | were being sent to the ranch was to get evidence |
| 11:53:32 | 25 | that would have shown that USA Gymnastics had a |

EXHIBIT 11
046

11:53:36 1    reasonable suspicion to report abuse?

11:53:38 2  A  I assert the Fifth.

11:53:40 3  Q  **Was Steve Penny also instructing you to go to the**

11:53:43 4     **ranch in order to obtain documents for which would**

11:53:49 5     **have shown that USOC, being an official training**

11:53:54 6     **site at the Karolyi Ranch, also had a reasonable**

11:53:57 7     **suspicion to report suspected abuse about Larry**

11:54:00 8     **Nassar?**

11:54:01 9  A  I assert the Fifth.

11:54:03 10        MS. KIES:  This is Marianne.  Again, I'd like

11:54:05 11     to interpose specifically an objection here as to

11:54:08 12     form and foundation.

11:54:09 13  Q  **Okay.  Did the USOC -- were there specific records**

11:54:15 14     **kept at the ranch for the USOC for Olympians and**

11:54:20 15     **other Olympic athletes?**

11:54:24 16  A  I assert the Fifth.

11:54:25 17  Q  **If there were, were those documents, too, taken**

11:54:28 18     **when you brought them back to USA Gymnastics?**

11:54:31 19  A  I assert the Fifth.

11:54:32 20  Q  **Did you bring any documents to Colorado Springs**

11:54:34 21     **regarding USOC?**

11:54:36 22  A  I assert the Fifth.

11:54:38 23  Q  **Do you know if those documents were ever**

11:54:39 24     **transmitted from the USAG headquarters to Colorado**

11:54:45 25     **Springs?**

EXHIBIT 11
047

| | | |
|---|---|---|
| 11:54:46 | 1 | A  I assert the Fifth. |
| 11:54:46 | 2 | Q  And when I say "Colorado Springs," I'm specifically |
| 11:54:50 | 3 | referring to the USOC's headquarters in Colorado |
| 11:54:54 | 4 | Springs. |
| 11:54:55 | 5 | Do you know if that transfer of documents ever |
| 11:54:56 | 6 | occurred from USAG to USOC? |
| 11:55:01 | 7 | A  I assert the Fifth. |
| 11:55:01 | 8 | Q  Were there any medical professionals at the ranch |
| 11:55:04 | 9 | that you interacted with when you went to go get |
| 11:55:07 | 10 | those records? |
| 11:55:08 | 11 | A  I assert the Fifth. |
| 11:55:08 | 12 | Q  Did you ever speak with Debbie Van Horn about those |
| 11:55:11 | 13 | records? |
| 11:55:12 | 14 | A  I assert the Fifth. |
| 11:55:12 | 15 | Q  Have you spoken with Debbie Van Horn since she's |
| 11:55:15 | 16 | been indicted? |
| 11:55:17 | 17 | A  I assert the Fifth. |
| 11:55:18 | 18 | Q  Have you ever spoken with Debbie Van Horn? |
| 11:55:23 | 19 | A  I assert the Fifth. |
| 11:55:24 | 20 | Q  Have you ever spoken with Larry Nassar? |
| 11:55:26 | 21 | A  I assert the Fifth. |
| 11:55:27 | 22 | Q  When's the first time you spoke with Larry Nassar? |
| 11:55:30 | 23 | A  I assert the Fifth. |
| 11:55:31 | 24 | Q  When is the last time you've spoken with Larry |
| 11:55:33 | 25 | Nassar? |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
048

```
11:55:34  1    A  I assert the Fifth.

11:55:35  2    Q  Did you ever travel with Larry Nassar to events?

11:55:38  3    A  I assert the Fifth.

11:55:39  4    Q  Did you ever travel with Larry Nassar to any events

11:55:42  5       in California?

11:55:43  6    A  I assert the Fifth.

11:55:44  7    Q  Do you know if Steve Penny and Larry Nassar ever

11:55:47  8       traveled to events together?

11:55:51  9    A  I assert the Fifth.

11:55:52 10    Q  Do you know if Steve Penny was -- had any concerns

11:55:56 11       about Larry Nassar prior to June of 2015?

11:56:00 12    A  I assert the Fifth.

11:56:07 13    Q  Do you know if Steve Penny was ever made aware,

11:56:11 14       prior to June of 2015, of any complaints of sexual

11:56:15 15       misconduct about Larry Nassar?

11:56:21 16    A  I assert the Fifth.

11:56:21 17    Q  Did Steve Penny ever indicate to you that he had

11:56:23 18       called Michigan State University regarding Larry

11:56:26 19       Nassar?

11:56:27 20    A  I assert the Fifth.

11:56:33 21    Q  Did Steve Penny ever indicate to you that he had

11:56:35 22       called Michigan State and been apprised of any

11:56:38 23       complaints at Michigan State about Larry Nassar?

11:56:41 24    A  I assert the Fifth.

11:56:43 25    Q  Did Steve Penny ever tell you that he was going to
```

70

EXHIBIT 11
049

| | | |
|---|---|---|
| 11:56:45 | 1 | call Michigan State in June of 2015 to warn them |
| 11:56:52 | 2 | about Larry Nassar? |
| 11:56:54 | 3 | A  I assert the Fifth. |
| 11:56:54 | 4 | Q  Did Steve Penny ever instruct you not to tell |
| 11:56:57 | 5 | anyone about the complaints involving Larry Nassar |
| 11:56:59 | 6 | in June of 2015? |
| 11:57:01 | 7 | A  I assert the Fifth. |
| 11:57:02 | 8 | Q  In June of 2015, were you made aware that there |
| 11:57:04 | 9 | were complaints involving Larry Nassar? |
| 11:57:07 | 10 | A  I assert the Fifth. |
| 11:57:08 | 11 | Q  In June of 2015, were you instructed not to give |
| 11:57:11 | 12 | Larry Nassar any further travel expenses or |
| 11:57:15 | 13 | schedule any further travel for him? |
| 11:57:18 | 14 | A  I assert the Fifth. |
| 11:57:18 | 15 | Q  Did you, in fact, schedule any travel for Larry |
| 11:57:23 | 16 | Nassar after June of 2015? |
| 11:57:24 | 17 | A  I assert the Fifth. |
| 11:57:25 | 18 | Q  If you did schedule travel, were you made aware |
| 11:57:28 | 19 | whatsoever of any complaints involving Larry |
| 11:57:32 | 20 | Nassar? |
| 11:57:33 | 21 | A  I assert the Fifth. |
| 11:57:36 | 22 | Q  Did you ever speak with Ron Galimore about Larry |
| 11:57:39 | 23 | Nassar? |
| 11:57:39 | 24 | A  I assert the Fifth. |
| 11:57:40 | 25 | Q  Do you know who Ron Galimore is? |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
050

| | | |
|---|---|---|
| 11:57:43 | 1 | A  I assert the Fifth. |
| 11:57:46 | 2 | Q  Did you ever speak with Ron Galimore about Larry |
| 11:57:52 | 3 | Nassar in June of 2015 about Larry Nassar? |
| 11:57:55 | 4 | A  I assert the Fifth. |
| 11:57:57 | 5 | Q  Were you ever in a joint meeting between any USAG |
| 11:58:05 | 6 | executives and any USOC executives regarding Larry |
| 11:58:08 | 7 | Nassar? |
| 11:58:09 | 8 | A  I assert the Fifth. |
| 11:58:10 | 9 | Q  Did any USOC executives ever come to a USAG board |
| 11:58:16 | 10 | meeting to discuss Larry Nassar and the Larry |
| 11:58:18 | 11 | Nassar scandal? |
| 11:58:19 | 12 | A  I assert the Fifth. |
| 11:58:22 | 13 | Q  Did you ever go to a USOC board meeting with Steve |
| 11:58:26 | 14 | Penny to discuss the Larry Nassar scandal? |
| 11:58:31 | 15 | A  I assert the Fifth. |
| 11:58:32 | 16 | Q  Have you ever traveled with Steve Penny to |
| 11:58:34 | 17 | California? |
| 11:58:35 | 18 | A  I assert the Fifth. |
| 11:58:41 | 19 | Q  Have you ever attended a competition in California |
| 11:58:46 | 20 | for USA Gymnastics where Steve Penny was also |
| 11:58:49 | 21 | present? |
| 11:58:49 | 22 | A  I assert the Fifth. |
| 11:58:52 | 23 | Q  Did you attend the 2012 Olympic Trials in San Jose |
| 11:58:58 | 24 | with Steve Penny? |
| 11:58:59 | 25 | A  I assert the Fifth. |

72

EXHIBIT 11
051

| | | |
|---|---|---|
| 11:59:00 | 1 | Q Did you schedule the travel for Steve Penny to that |
| 11:59:03 | 2 | event? |
| 11:59:04 | 3 | A I assert the Fifth. |
| 11:59:06 | 4 | Q Did you schedule the travel for Larry Nassar to |
| 11:59:09 | 5 | that event? |
| 11:59:09 | 6 | A I assert the Fifth. |
| 11:59:10 | 7 | Q Did you schedule the travel for Jordyn Wieber to |
| 11:59:15 | 8 | that event? |
| 11:59:17 | 9 | A I assert the Fifth. |
| 11:59:17 | 10 | Q Did you schedule the travel for McKayla Maroney to |
| 11:59:21 | 11 | that event? |
| 11:59:22 | 12 | A I assert the Fifth. |
| 11:59:22 | 13 | Q Did you schedule the travel for Aly Raisman to that |
| 11:59:26 | 14 | event? |
| 11:59:27 | 15 | A I assert the Fifth. |
| 11:59:33 | 16 | Q Did Steve Penny ever tell you not to discuss the |
| 11:59:36 | 17 | allegations about Larry Nassar? |
| 11:59:38 | 18 | A I assert the Fifth. |
| 11:59:39 | 19 | Q Did Steve Penny ever tell you not to discuss the |
| 11:59:41 | 20 | allegations about Marvin Sharp? |
| 11:59:43 | 21 | A I assert the Fifth. |
| 11:59:44 | 22 | Q Did Steve Penny try to keep the allegations |
| 11:59:46 | 23 | regarding Larry Nassar quiet? |
| 11:59:49 | 24 | A I assert the Fifth. |
| 11:59:49 | 25 | Q Did you want to report the allegations about Larry |

EXHIBIT 11
052

| | | |
|---|---|---|
| 11:59:52 | 1 | Nassar but Steve Penny told you not to? |
| 11:59:54 | 2 | A  I assert the Fifth. |
| 11:59:55 | 3 | Q  Did you believe that it was your mandated duty |
| 12:00:00 | 4 | under the law of the state of Indiana to make |
| 12:00:03 | 5 | reports of suspected abuse if you received them? |
| 12:00:07 | 6 | A  I assert the Fifth. |
| 12:00:09 | 7 | Q  Did Steve Penny ever tell you not to uphold that |
| 12:00:12 | 8 | duty? |
| 12:00:13 | 9 | A  I assert the Fifth. |
| 12:00:14 | 10 | Q  Were you worried that if you didn't follow Steve |
| 12:00:16 | 11 | Penny's instructions, either to go to the ranch or |
| 12:00:18 | 12 | any other instructions, that your job would be in |
| 12:00:21 | 13 | jeopardy? |
| 12:00:22 | 14 | A  I assert the Fifth. |
| 12:00:30 | 15 | Q  Has Steve Penny ever offered you anything -- has he |
| 12:00:39 | 16 | ever offered you anything in order to go to the |
| 12:00:41 | 17 | ranch in order to obtain those documents, meaning, |
| 12:00:44 | 18 | anything monetarily or any tangible items? |
| 12:00:48 | 19 | A  I assert the Fifth. |
| 12:01:09 | 20 | Q  Are you currently the national teams |
| 12:01:13 | 21 | manager/program travel manager at USAG? |
| 12:01:22 | 22 | A  I assert the Fifth. |
| 12:01:23 | 23 | Q  Is your office at the USA Gymnastics headquarters? |
| 12:01:27 | 24 | A  I assert the Fifth. |
| 12:01:29 | 25 | Q  Do you have an office at the USAG headquarters? |

74

EXHIBIT 11
053

| | | |
|---|---|---|
| 12:01:33 | 1 | A   I assert the Fifth. |
| 12:01:33 | 2 | Q   Did Steve Penny require you to keep those documents |
| 12:01:35 | 3 | we talked about from the ranch in your office at |
| 12:01:37 | 4 | the USAG headquarters? |
| 12:01:39 | 5 | A   I assert the Fifth. |
| 12:01:39 | 6 | Q   Did you ever speak with Steve Penny's attorneys? |
| 12:01:47 | 7 | A   I assert the Fifth. |
| 12:01:47 | 8 | Q   Have you ever had a meeting with Steve Penny and |
| 12:01:50 | 9 | Scott Blackman? |
| 12:01:53 | 10 | A   I assert the Fifth. |
| 12:01:53 | 11 | Q   Have you ever had a meeting with Steve Penny and |
| 12:01:57 | 12 | Paul Parilla? |
| 12:01:58 | 13 | A   I assert the Fifth. |
| 12:01:59 | 14 | Q   Did you travel to California with Steve Penny in |
| 12:02:01 | 15 | 2016 regarding allegations about a California |
| 12:02:06 | 16 | gymnast being abused by Larry Nassar? |
| 12:02:09 | 17 | A   I assert the Fifth. |
| 12:02:10 | 18 | Q   Did you schedule that travel for Steve Penny? |
| 12:02:14 | 19 | A   I assert the Fifth. |
| 12:02:14 | 20 | Q   Do you know if Steve Penny's travel in 2016 to |
| 12:02:18 | 21 | California where he met with Paul Parilla was paid |
| 12:02:24 | 22 | for by USAG? |
| 12:02:26 | 23 | A   I assert the Fifth. |
| 12:02:29 | 24 | Q   Have you ever been at a board meeting where Larry |
| 12:02:31 | 25 | Nassar was discussed in the presence of Steve |

75

EXHIBIT 11
054

| | | |
|---|---|---|
| 12:02:35 | 1 | Penny? |
| 12:02:36 | 2 | A  I assert the Fifth. |
| 12:02:37 | 3 | Q  Were you ever at a board meeting where Steve Penny |
| 12:02:40 | 4 | urged individuals not to report Larry Nassar? |
| 12:02:43 | 5 | A  I assert the Fifth. |
| 12:02:44 | 6 | Q  And what I mean, "not report Larry Nassar," not |
| 12:02:48 | 7 | report him to the proper law enforcement |
| 12:02:50 | 8 | authorities? |
| 12:02:50 | 9 | A  I assert the Fifth. |
| 12:02:52 | 10 | Q  Did Steve Penny intentionally report the |
| 12:02:57 | 11 | allegations involving Larry Nassar to individuals |
| 12:03:01 | 12 | he knew within the FBI? |
| 12:03:05 | 13 | A  I assert the Fifth. |
| 12:03:06 | 14 | Q  Do you know if any local law enforcement knew of |
| 12:03:12 | 15 | allegations about Larry Nassar in June of 2015? |
| 12:03:16 | 16 | A  I assert the Fifth. |
| 12:03:16 | 17 | Q  Do you know if Steve Penny ever made any |
| 12:03:18 | 18 | communications to those local law enforcement |
| 12:03:21 | 19 | agencies in 2015? |
| 12:03:22 | 20 | A  I assert the Fifth. |
| 12:03:24 | 21 | Q  Do you know if Steve Penny was ever given any |
| 12:03:26 | 22 | advice from the local law enforcement agencies in |
| 12:03:28 | 23 | June of 2015? |
| 12:03:30 | 24 | A  I assert the Fifth. |
| 12:03:32 | 25 | Q  Do you know if Steve Penny ever had any in-person |

EXHIBIT 11
055

| | | |
|--|--|--|
|12:03:40|1|meetings with law enforcement, local law|
|12:03:43|2|enforcement, in June of 2015?|
|12:03:45|3|A  I assert the Fifth.|
|12:03:46|4|Q  Did Steve Penny ever have any communications,|
|12:03:49|5|meaning emails or text messages, that you were|
|12:03:53|6|copied on or privy to regarding Larry Nassar?|
|12:03:57|7|A  I assert the Fifth.|
|12:03:59|8|Q  Did Steve Penny -- did you have Mr. Smith's|
|12:04:03|9|number -- or Detective Smith, I believe?  Do you|
|12:04:12|10|have Bruce Smith's number?|
|12:04:14|11|A  I assert the Fifth.|
|12:04:15|12|Q  Do you have Jay Abbott's number?|
|12:04:17|13|A  I assert the Fifth.|
|12:04:18|14|Q  Did you ever coordinate any meetings between|
|12:04:22|15|Detective Smith or Agent Abbott regarding Larry|
|12:04:25|16|Nassar?|
|12:04:27|17|A  I assert the Fifth.|
|12:04:33|18|Q  Have you been interviewed by anyone in a federal|
|12:04:37|19|prosecutor's office about the Larry Nassar|
|12:04:39|20|investigation?|
|12:04:41|21|A  I assert the Fifth.|
|12:04:42|22|Q  Have you ever been interviewed by any federal|
|12:04:44|23|prosecutor about your involvement in taking records|
|12:04:49|24|from the ranch?|
|12:04:49|25|A  I assert the Fifth.|

77

EXHIBIT 11
056

| | | | |
|---|---|---|---|
| 12:04:50 | 1 | Q | Have you ever told anyone what you believed were |
| 12:04:52 | 2 | | contained in those records from the ranch? |
| 12:04:54 | 3 | A | I assert the Fifth. |
| 12:04:57 | 4 | Q | Did you speak with anyone other than your attorney |
| 12:05:00 | 5 | | today to prep for your deposition? |
| 12:05:03 | 6 | A | I assert the Fifth. |
| 12:05:08 | 7 | Q | Did you review any documents in preparation for |
| 12:05:10 | 8 | | your deposition here today? |
| 12:05:15 | 9 | A | I assert the Fifth. |
| 12:05:31 | 10 | Q | If you did review documents, did they refresh your |
| 12:05:32 | 11 | | recollection as to the subject matter contained in |
| 12:05:35 | 12 | | those documents? |
| 12:05:37 | 13 | A | I assert the Fifth. |
| 12:05:46 | 14 | Q | Were you ever given sexual harassment training at |
| 12:05:50 | 15 | | USA Gymnastics? |
| 12:05:50 | 16 | A | I assert the Fifth. |
| 12:05:51 | 17 | Q | Were you ever given training on how to identify |
| 12:05:57 | 18 | | suspected childhood sexual abuse while at USA |
| 12:06:03 | 19 | | Gymnastics? |
| 12:06:04 | 20 | A | I assert the Fifth. |
| 12:06:05 | 21 | Q | Did you ever tell Steve Penny in June of 2015 that |
| 12:06:07 | 22 | | he needed to report to law enforcement prior to |
| 12:06:11 | 23 | | enlisting Fran Sepler? |
| 12:06:16 | 24 | A | I assert the Fifth. |
| 12:06:17 | 25 | Q | Do you know who Fran Sepler is? |

EXHIBIT 11
057

| | | |
|---|---|---|
| 12:06:20 | 1 | A  I assert the Fifth. |
| 12:06:22 | 2 | **Q  Have you ever spoken with Fran Sepler?** |
| 12:06:25 | 3 | A  I assert the Fifth. |
| 12:06:27 | 4 | **Q  Have you ever spoken with Fran Sepler about Larry** |
| 12:06:30 | 5 | **Nassar?** |
| 12:06:30 | 6 | A  I assert the Fifth. |
| 12:06:32 | 7 | **Q  Have you ever been on a call with Fran Sepler and** |
| 12:06:34 | 8 | **Steve Penny?** |
| 12:06:35 | 9 | A  I assert the Fifth. |
| 12:06:37 | 10 | **Q  Have you ever spoken with Fran Sepler and Steve** |
| 12:06:40 | 11 | **Penny regarding Larry Nassar in the same meeting?** |
| 12:06:44 | 12 | A  I assert the Fifth. |
| 12:06:45 | 13 | **Q  Did you have any involvement with enlisting Fran** |
| 12:06:49 | 14 | **Sepler's services to investigate Larry Nassar?** |
| 12:06:52 | 15 | A  I assert the Fifth. |
| 12:06:53 | 16 | **Q  Did you personally ever speak with anybody at** |
| 12:06:58 | 17 | **Michigan State regarding the travel of Larry** |
| 12:07:00 | 18 | **Nassar?** |
| 12:07:00 | 19 | A  I assert the Fifth. |
| 12:07:01 | 20 | **Q  Did anyone at Michigan State ever make you aware of** |
| 12:07:05 | 21 | **complaints they had about Larry Nassar?** |
| 12:07:08 | 22 | A  I assert the Fifth. |
| 12:07:08 | 23 | **Q  If they did, in fact, make you aware of those** |
| 12:07:11 | 24 | **complaints, did you communicate those to anyone at** |
| 12:07:16 | 25 | **USA Gymnastics?** |

EXHIBIT 11
058

| | | |
|---|---|---|
| 12:07:16 | 1 | A  I assert the Fifth. |
| 12:07:23 | 2 | Q  Despite the news report about documents being |
| 12:07:27 | 3 | found, do you have -- do you know if those are the |
| 12:07:30 | 4 | same documents you took from the ranch? |
| 12:07:35 | 5 | A  I assert the Fifth. |
| 12:07:37 | 6 | Q  Do you know if those documents were recently |
| 12:07:39 | 7 | created or when those documents were created? |
| 12:07:42 | 8 | A  I assert the Fifth. |
| 12:07:43 | 9 | Q  Do you know who authored those documents? |
| 12:07:45 | 10 | A  I assert the Fifth. |
| 12:07:50 | 11 | Q  Were those USAG forms or some other forms that were |
| 12:07:52 | 12 | located? |
| 12:07:53 | 13 | A  I assert the Fifth. |
| 12:07:54 | 14 | Q  Who discovered those forms? |
| 12:07:56 | 15 | A  I assert the Fifth. |
| 12:07:57 | 16 | Q  Where did they discover those forms? |
| 12:07:59 | 17 | A  I assert the Fifth. |
| 12:08:11 | 18 | Q  Did you ever assist any -- assist Steve Penny, |
| 12:08:17 | 19 | Rhonda Faehn, or anyone from USA Gymnastics in |
| 12:08:21 | 20 | gathering documents to be given to Congress? |
| 12:08:26 | 21 | A  I assert the Fifth. |
| 12:08:28 | 22 | Q  Did you ever help gather documents to be given to |
| 12:08:32 | 23 | Congress? |
| 12:08:33 | 24 | A  I assert the Fifth. |
| 12:08:34 | 25 | Q  Regardless of whether you were told whether the |

80

EXHIBIT 11
059

| | | |
|---|---|---|
| 12:08:37 | 1 | documents were going to go to Congress or somewhere |
| 12:08:39 | 2 | else, did you ever assist in the preparation of |
| 12:08:42 | 3 | compiling documents to be sent to a third party |
| 12:08:45 | 4 | regarding the Larry Nassar scandal? |
| 12:08:48 | 5 | A  I assert the Fifth. |
| 12:08:54 | 6 | Q  Prior to sending those documents to Congress, did |
| 12:08:58 | 7 | you give notice to any of the individuals whose |
| 12:09:01 | 8 | records those were? |
| 12:09:03 | 9 | A  I assert the Fifth. |
| 12:09:05 | 10 | Q  Did USAG transmit any of my clients' records to |
| 12:09:09 | 11 | Congress? |
| 12:09:10 | 12 | A  I assert the Fifth. |
| 12:09:10 | 13 | Q  Specifically, did USAG send any of Aly Raisman's |
| 12:09:16 | 14 | records to Congress? |
| 12:09:18 | 15 | A  I assert the Fifth. |
| 12:09:18 | 16 | Q  Did USAG ever send Jordyn Wieber's records to |
| 12:09:23 | 17 | Congress? |
| 12:09:24 | 18 | A  I assert the Fifth. |
| 12:09:25 | 19 | Q  Did USAG ever send McKayla Maroney's records to |
| 12:09:30 | 20 | Congress? |
| 12:09:31 | 21 | A  I assert the Fifth. |
| 12:09:32 | 22 | Q  Did USAG ever send Mattie Larson's records to |
| 12:09:32 | 23 | Congress? |
| 12:09:34 | 24 | A  I assert the Fifth. |
| 12:09:35 | 25 | Q  Did USAG ever send Jamie Dantzscher's records to |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
060

| | | |
|---|---|---|
| 12:09:40 | 1 | Congress? |
| 12:09:41 | 2 | A I assert the Fifth. |
| 12:09:41 | 3 | Q Who at USA Gymnastics would be most informed about |
| 12:09:44 | 4 | the records that were sent to Congress? |
| 12:09:47 | 5 | A I assert the Fifth. |
| 12:09:49 | 6 | Q Does USA Gymnastics have a records depository at |
| 12:09:54 | 7 | its headquarters? |
| 12:09:55 | 8 | A I assert the Fifth. |
| 12:09:55 | 9 | Q Is there a basement or storage structure where all |
| 12:09:58 | 10 | records are kept? |
| 12:10:00 | 11 | A I assert the Fifth. |
| 12:10:00 | 12 | Q When hard records are kept nowadays, are they |
| 12:10:04 | 13 | scanned into a system for USA Gymnastics and |
| 12:10:07 | 14 | maintained at the facility or are they kept in hard |
| 12:10:10 | 15 | form only? |
| 12:10:12 | 16 | A I assert the Fifth. |
| 12:10:12 | 17 | Q If they are, in fact, scanned into a system to be |
| 12:10:16 | 18 | kept at USA Gymnastics, are the hard records then |
| 12:10:21 | 19 | destroyed? |
| 12:10:22 | 20 | A I assert the Fifth. |
| 12:10:23 | 21 | Q Is there any record-keeping process for insuring |
| 12:10:28 | 22 | that no records are destroyed before they're |
| 12:10:31 | 23 | preserved electronically? |
| 12:10:33 | 24 | A I assert the Fifth. |
| 12:10:33 | 25 | Q Does USA Gymnastics have servers at the |

EXHIBIT 11
061

| | | |
|---|---|---|
| 12:10:37 | 1 | headquarters for electronic documents? |
| 12:10:39 | 2 | A  I assert the Fifth. |
| 12:10:40 | 3 | Q  Do you have access to that server? |
| 12:10:41 | 4 | A  I assert the Fifth. |
| 12:10:42 | 5 | Q  If you don't have access, who has access to that |
| 12:10:45 | 6 | server? |
| 12:10:46 | 7 | A  I assert the Fifth. |
| 12:10:46 | 8 | Q  Did Steve Penny have access to that server? |
| 12:10:49 | 9 | A  I assert the Fifth. |
| 12:10:50 | 10 | Q  Does Steve Penny still have access to that server? |
| 12:10:54 | 11 | A  I assert the Fifth. |
| 12:10:54 | 12 | Q  To your knowledge, has USA Gymnastics been in |
| 12:10:57 | 13 | contact with Steve Penny in the last few months |
| 12:10:59 | 14 | regarding Larry Nassar? |
| 12:11:02 | 15 | A  I assert the Fifth. |
| 12:11:03 | 16 | Q  Do you know if USA Gymnastics is paying for Steve |
| 12:11:06 | 17 | Penny's defense, criminal defense? |
| 12:11:10 | 18 | A  I assert the Fifth. |
| 12:11:15 | 19 | Q  Do you know if the USOC has any ability to audit |
| 12:11:20 | 20 | the records maintained by USAG? |
| 12:11:24 | 21 | A  I assert the Fifth. |
| 12:11:25 | 22 | MS. KIES:  This is Marianne.  I'd just like to |
| 12:11:26 | 23 | specifically interpose an objection here as to |
| 12:11:28 | 24 | beyond the scope of the deposition. |
| 12:11:30 | 25 | Q  Do you know if USOC had access to the records at |

83

EXHIBIT 11
062

12:11:36  1          USA Gymnastics prior to June of 2015?

12:11:39  2     A    I assert the Fifth.

12:11:39  3     Q    Are you aware of any records maintained by USA

12:11:42  4          Gymnastics denoting that Larry Nassar was not

12:11:44  5          allowed at the ranch for a period of time?

12:11:48  6     A    I assert the Fifth.

12:11:49  7     Q    Are you aware of any records at USA Gymnastics

12:11:51  8          indicating that Larry Nassar was taking an

12:11:54  9          excessive amount of photographs of little girls at

12:11:57 10          the ranch?

12:11:58 11     A    I assert the Fifth.

12:11:59 12     Q    Were you ever made aware of any records that

12:12:02 13          contained information that Larry Nassar was taking

12:12:04 14          an excessive amount of photographs of little girls

12:12:07 15          at foreign competitions?

12:12:09 16     A    I assert the Fifth.

12:12:10 17     Q    Were those records also made available to USOC?

12:12:14 18     A    I assert the Fifth.

12:12:15 19     Q    Did the USOC, in fact, audit those records and view

12:12:19 20          those records prior to June of 2015?

12:12:22 21     A    I assert the Fifth.

12:12:27 22              MR. CUNNY:  I'll take one more quick break,

12:12:29 23          but I'm about done.

12:12:31 24              THE VIDEOGRAPHER:  Okay.  It's 12:12.  Off the

12:12:34 25          record.

                                                                    84

EXHIBIT 11
063

| | | |
|---|---|---|
| 12:12:34 | 1 | (A brief recess was taken.) |
| 12:18:23 | 2 | THE VIDEOGRAPHER: It's now 12:18. We're back |
| 12:18:25 | 3 | on the record. |
| 12:18:26 | 4 | BY MR. CUNNY: |
| 12:18:27 | 5 | Q All right. Miss, you understand you're still under |
| 12:18:30 | 6 | oath? |
| 12:18:30 | 7 | A Yes. |
| 12:18:31 | 8 | Q Still pledge to tell the truth? |
| 12:18:34 | 9 | A Yes. |
| 12:18:35 | 10 | Q All right. So prior to the Larry Nassar scandal, |
| 12:18:39 | 11 | had you been involved in the handling of any |
| 12:18:42 | 12 | childhood sexual abuse by USAG members? |
| 12:18:47 | 13 | A I assert the Fifth. |
| 12:18:49 | 14 | Q Was it part of your job duty to assist Steve Penny |
| 12:18:54 | 15 | in the investigation of childhood sexual abuse |
| 12:18:58 | 16 | allegations? |
| 12:19:00 | 17 | A I assert the Fifth. |
| 12:19:01 | 18 | Q Did you have any role on the disciplinary board or |
| 12:19:04 | 19 | committee, or however it's named, at USA Gymnastics |
| 12:19:09 | 20 | in revoking the membership of ineligible members? |
| 12:19:16 | 21 | A I assert the Fifth. |
| 12:19:18 | 22 | Q Were those proceedings ever instituted against |
| 12:19:22 | 23 | Larry Nassar prior to September of 2016? |
| 12:19:25 | 24 | A I assert the Fifth. |
| 12:19:27 | 25 | Q Did Steve Penny ever indicate to you that he had no |

EXHIBIT 11
064

| | | |
|---|---|---|
| 12:19:30 | 1 | intention of instituting formal proceedings against |
| 12:19:35 | 2 | Larry Nassar to make him on the permanently |
| 12:19:37 | 3 | ineligible list? |
| 12:19:40 | 4 | A  I assert the Fifth. |
| 12:19:40 | 5 | Q  Do you know why there wasn't an action instituted |
| 12:19:43 | 6 | against Larry Nassar being made permanently |
| 12:19:48 | 7 | ineligible to compete -- or treat USAG members? |
| 12:19:52 | 8 | A  I assert the Fifth. |
| 12:19:52 | 9 | Q  Was it because Steve Penny did not want that |
| 12:19:56 | 10 | information to become public after June of 2015? |
| 12:20:02 | 11 | A  I assert the Fifth. |
| 12:20:04 | 12 | Q  Was it -- did Steve Penny ever express to you that |
| 12:20:07 | 13 | it was the intention -- that it was his intention |
| 12:20:10 | 14 | to ensure that the allegations against Larry Nassar |
| 12:20:16 | 15 | were never made public? |
| 12:20:18 | 16 | A  I assert the Fifth. |
| 12:20:19 | 17 | Q  Did Steve Penny ever indicate to you whose idea it |
| 12:20:23 | 18 | was to make the settlement agreement with McKayla |
| 12:20:27 | 19 | Maroney confidential? |
| 12:20:29 | 20 | A  I assert the Fifth. |
| 12:20:33 | 21 | Q  Have you been made aware in your role at USA |
| 12:20:35 | 22 | Gymnastics of any other confidential settlements |
| 12:20:39 | 23 | regarding claims against Larry Nassar? |
| 12:20:42 | 24 | A  I assert the Fifth. |
| 12:20:42 | 25 | Q  If you have, when have those confidential |

EXHIBIT 11
065

| | | |
|---|---|---|
| 12:20:45 | 1 | settlements been entered into? |
| 12:20:47 | 2 | A  I assert the Fifth. |
| 12:20:48 | 3 | Q  Do any of those confidential settlements predate |
| 12:20:52 | 4 | June of 2015? |
| 12:20:54 | 5 | A  I assert the Fifth. |
| 12:20:54 | 6 | Q  Is it a USAG policy that any claim of sexual abuse |
| 12:21:01 | 7 | gets settled confidentially? |
| 12:21:04 | 8 | A  I assert the Fifth. |
| 12:21:04 | 9 | Q  If that is the case, is that the policy so that USA |
| 12:21:09 | 10 | Gymnastics won't face public scrutiny for childhood |
| 12:21:14 | 11 | sexual abuse occurring by its staff or agents? |
| 12:21:19 | 12 | A  I assert the Fifth. |
| 12:21:26 | 13 | Q  Do you know how Larry Nassar was compensated by USA |
| 12:21:31 | 14 | Gymnastics? |
| 12:21:31 | 15 | A  I assert the Fifth. |
| 12:21:31 | 16 | Q  Did you work at all with the USOC in arranging the |
| 12:21:34 | 17 | travel of Larry Nassar for Olympic or Pan American |
| 12:21:39 | 18 | events? |
| 12:21:40 | 19 | A  I assert the Fifth. |
| 12:21:42 | 20 | Q  Did USOC pay for Larry Nassar to attend any of |
| 12:21:45 | 21 | those events, or was that solely at the expense of |
| 12:21:48 | 22 | USOC? |
| 12:21:49 | 23 | A  I assert the Fifth. |
| 12:21:49 | 24 | Q  Did the USOC pay for any of Larry Nassar's travel |
| 12:21:53 | 25 | to the state of California, to your knowledge? |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
066

12:21:56   1    A   I assert the Fifth.

12:21:58   2            MS. KIES:  Object to foundation.

12:22:01   3    Q   Did the USOC ever indicate to you that they would

12:22:04   4        be paying the expenses for Larry Nassar when he

12:22:08   5        traveled to California?

12:22:09   6    A   I assert the Fifth.

12:22:16   7    Q   Did USOC, to your knowledge and given that you

12:22:20   8        handle travel arrangements for USAG staff, did the

12:22:24   9        USOC ever pay for Debbie Van Horn to go to

12:22:28  10        California to provide medical treatment at an

12:22:31  11        event?

12:22:32  12    A   I assert the Fifth.

12:22:33  13    Q   Specifically, did the USOC pay for Debbie Van Horn

12:22:36  14        to go to the 2012 Olympic Trials in San Jose?

12:22:42  15    A   I assert the Fifth.

12:22:43  16    Q   And prior to that and based on your position at

12:22:46  17        USAG, were you ever made aware that Debbie Van Horn

12:22:51  18        had viewed the treatments Larry Nassar was

12:22:55  19        performing on these girls?

12:22:58  20    A   I assert the Fifth.

12:22:59  21    Q   At any point were you made aware of the

12:23:01  22        treatments -- the category of treatments that Larry

12:23:05  23        Nassar was providing to gymnasts at USAG?

12:23:10  24    A   I assert the Fifth.

12:23:10  25    Q   Did anyone at USAG, to your knowledge, have any

EXHIBIT 11
067

12:23:17 1      information that Larry Nassar was performing an

12:23:21 2      intravaginal adjustment on these girls?

12:23:24 3   A  I assert the Fifth.

12:23:25 4   Q  Was there ever a review by a medical committee at

12:23:28 5      USAG or medical doctors volunteering with USAG of

12:23:33 6      these intravaginal treatments to your knowledge?

12:23:36 7   A  I assert the Fifth.

12:23:36 8   Q  Did Steve Penny ever discuss these intravaginal

12:23:39 9      treatments with you?

12:23:41 10  A  I assert the Fifth.

12:23:42 11  Q  Are you aware of any claims that Steve Penny had

12:23:53 12     obfuscated an investigation regarding childhood

12:23:56 13     sexual abuse in the past?

12:23:59 14  A  I assert the Fifth.

12:23:59 15  Q  Are you aware of any claims that Steve Penny had

12:24:03 16     hindered police investigations for childhood sexual

12:24:06 17     abuse in the past?

12:24:07 18  A  I assert the Fifth.

12:24:11 19  Q  Did Steve Penny ever indicate to you that he wanted

12:24:15 20     to hinder or otherwise hamper police investigations

12:24:20 21     into Larry Nassar?

12:24:21 22  A  I assert the Fifth.

12:24:22 23  Q  Was Steve Penny friends with Larry Nassar?

12:24:24 24  A  I assert the Fifth.

12:24:24 25  Q  Was Steve Penny friends with Marvin Sharp?

EXHIBIT 11
068

| | | |
|---|---|---|
| 12:24:27 | 1 | A  I assert the Fifth. |
| 12:24:27 | 2 | Q  Did anybody ever look into a connection between |
| 12:24:32 | 3 | those two individuals? |
| 12:24:34 | 4 | A  I assert the Fifth. |
| 12:24:35 | 5 | Q  Are you aware of when Marvin Sharp was first |
| 12:24:39 | 6 | reported to USA Gymnastics for sexual misconduct? |
| 12:24:45 | 7 | A  I assert the Fifth. |
| 12:24:45 | 8 | Q  Are you aware of when he was then finally reported |
| 12:24:48 | 9 | to law enforcement? |
| 12:24:50 | 10 | A  I assert the Fifth. |
| 12:24:54 | 11 | Q  Have you ever met Don McPherson? |
| 12:24:57 | 12 | A  I assert the Fifth. |
| 12:24:57 | 13 | Q  Did Don McPherson ever discuss with you allegations |
| 12:25:02 | 14 | about Larry Nassar? |
| 12:25:04 | 15 | A  I assert the Fifth. |
| 12:25:06 | 16 | Q  Did Don McPherson ever make you aware or Steve |
| 12:25:09 | 17 | Penny aware, to your knowledge, about allegations |
| 12:25:13 | 18 | pertaining to Larry Nassar that predated June of |
| 12:25:15 | 19 | 2015? |
| 12:25:16 | 20 | A  I assert the Fifth. |
| 12:25:18 | 21 | Q  Do you know who Don McPherson is? |
| 12:25:21 | 22 | A  I assert the Fifth. |
| 12:25:22 | 23 | Q  Does Don McPherson have any role with USA |
| 12:25:24 | 24 | Gymnastics, to your knowledge? |
| 12:25:28 | 25 | A  I assert the Fifth. |

EXHIBIT 11
069

| | | |
|---|---|---|
| 12:25:42 | 1 | Q  Have you been asked to testify before Congress? |
| 12:25:46 | 2 | A  I assert the Fifth. |
| 12:25:50 | 3 | Q  Have you been asked to testify at the trial of |
| 12:25:52 | 4 | Steve Penny? |
| 12:25:54 | 5 | A  I assert the Fifth. |
| 12:25:58 | 6 | Q  Have you been asked to testify at a preliminary |
| 12:26:01 | 7 | hearing or anything of that nature regarding Steve |
| 12:26:03 | 8 | Penny? |
| 12:26:04 | 9 | A  I assert the Fifth. |
| 12:26:06 | 10 | Q  Did you provide any documentation to law |
| 12:26:08 | 11 | enforcement at any point? |
| 12:26:11 | 12 | A  I assert the Fifth. |
| 12:26:13 | 13 | Q  Do you have emails regarding Larry Nassar? |
| 12:26:15 | 14 | A  I assert the Fifth. |
| 12:26:16 | 15 | Q  Do you have text messages regarding Larry Nassar? |
| 12:26:18 | 16 | A  I assert the Fifth. |
| 12:26:19 | 17 | Q  Do any of those emails or text messages have other |
| 12:26:26 | 18 | USAG personnel as the recipient? |
| 12:26:28 | 19 | A  I assert the Fifth. |
| 12:26:29 | 20 | Q  Do any of those text messages or emails have any |
| 12:26:34 | 21 | USOC, meaning U.S. Olympic Committee, as the |
| 12:26:40 | 22 | recipients? |
| 12:26:43 | 23 | A  I assert the Fifth. |
| 12:26:43 | 24 | Q  Have you received any emails or text messages from |
| 12:26:46 | 25 | the USOC regarding Larry Nassar? |

**JILIO-RYAN Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 11
070

| | | |
|---|---|---|
| 12:26:48 | 1 | A  I assert the Fifth. |
| 12:26:51 | 2 | Q  As you sit here today, do you know where the |
| 12:26:55 | 3 | documents are that you took from the ranch? |
| 12:26:59 | 4 | A  I assert the Fifth. |
| 12:27:00 | 5 | Q  As you sit here today, do you know what was |
| 12:27:03 | 6 | contained in those documents that you took from the |
| 12:27:06 | 7 | ranch? |
| 12:27:06 | 8 | A  I assert the Fifth. |
| 12:27:07 | 9 | Q  As you sit here today, do you know if those |
| 12:27:10 | 10 | documents are just a couple miles away at the USAG |
| 12:27:14 | 11 | headquarters? |
| 12:27:18 | 12 | A  I assert the Fifth. |
| 12:27:18 | 13 | Q  Did you review those documents before your |
| 12:27:21 | 14 | deposition today? |
| 12:27:22 | 15 | A  I assert the Fifth. |
| 12:27:24 | 16 | Q  Have those documents been sent to Ropes & Gray, to |
| 12:27:35 | 17 | your knowledge? |
| 12:27:36 | 18 | A  I assert the Fifth. |
| 12:27:37 | 19 | Q  Do you know if those documents -- I think I asked |
| 12:27:41 | 20 | you if they were sent to Deborah Daniels, but do |
| 12:27:44 | 21 | you know if those documents were sent to Deborah |
| 12:27:46 | 22 | Daniels? |
| 12:27:48 | 23 | A  I assert the Fifth. |
| 12:27:48 | 24 | Q  Do you know if USAG, if in fact they were sent to |
| 12:27:52 | 25 | Deborah Daniels, if they were returned in the same |

92

EXHIBIT 11
071

| | | |
|---|---|---|
| 12:27:55 | 1 | condition they were sent? |
| 12:27:56 | 2 | A  I assert the Fifth. |
| 12:27:57 | 3 | Q  Did Deborah Daniels take any of those documents and |
| 12:28:02 | 4 | not return them, to your knowledge? |
| 12:28:05 | 5 | A  I assert the Fifth. |
| 12:28:05 | 6 | Q  Are those documents reflected anywhere in Deborah |
| 12:28:08 | 7 | Daniels' report, to your knowledge? |
| 12:28:10 | 8 | A  I assert the Fifth. |
| 12:28:11 | 9 | Q  Did Deborah Daniels speak to you about those |
| 12:28:14 | 10 | documents and the removal from the ranch? |
| 12:28:17 | 11 | A  I assert the Fifth. |
| 12:28:18 | 12 | Q  To your knowledge, when did Deborah Daniels become |
| 12:28:21 | 13 | aware of those documents still existing? |
| 12:28:25 | 14 | A  I assert the Fifth. |
| 12:28:31 | 15 | Q  Do you know who Deborah Daniels is? |
| 12:28:34 | 16 | A  I assert the Fifth. |
| 12:28:37 | 17 | Q  Did you provide any written statements or |
| 12:28:39 | 18 | audio-recorded statements to Deborah Daniels? |
| 12:28:43 | 19 | A  I assert the Fifth. |
| 12:28:44 | 20 | Q  Or video recorded statements? |
| 12:28:45 | 21 | A  I assert the Fifth. |
| 12:28:46 | 22 | Q  Did you provide any audio or video-recorded |
| 12:28:50 | 23 | statement to any law enforcement agency? |
| 12:28:54 | 24 | A  I assert the Fifth. |
| 12:28:54 | 25 | Q  Did any of those statements concern Larry Nassar? |

EXHIBIT 11
072

| | | |
|---|---|---|
| 12:28:57 | 1 | A  I assert the Fifth. |
| 12:29:01 | 2 | Q  Are you aware of the reasons why Steve Penny |
| 12:29:04 | 3 | resigned his position at USA Gymnastics? |
| 12:29:08 | 4 | A  I assert the Fifth. |
| 12:29:10 | 5 | Q  Did Steve Penny's resignation have to do with the |
| 12:29:16 | 6 | removal of documents from the ranch to your |
| 12:29:18 | 7 | knowledge? |
| 12:29:18 | 8 | A  I assert the Fifth. |
| 12:29:19 | 9 | Q  Did Steve Penny's resignation from USA Gymnastics |
| 12:29:22 | 10 | have to do with allegations of sexual abuse at USA |
| 12:29:27 | 11 | Gymnastics? |
| 12:29:30 | 12 | A  I assert the Fifth. |
| 12:29:31 | 13 | Q  Did Steve Penny's resignation from USA Gymnastics |
| 12:29:34 | 14 | have anything to do with him being forced out by |
| 12:29:36 | 15 | the USOC? |
| 12:29:38 | 16 | A  I assert the Fifth. |
| 12:29:38 | 17 | Q  Are you aware of any communications between Steve |
| 12:29:40 | 18 | Penny and the board at the USOC, wherein the board |
| 12:29:48 | 19 | conditions USAG's certification as an NGB on Steve |
| 12:29:54 | 20 | Penny resigning? |
| 12:29:56 | 21 | A  I assert the Fifth. |
| 12:29:57 | 22 | Q  Were you made aware of the reasons for which USAG |
| 12:30:03 | 23 | was attempting to decertify USA Gymnastics? |
| 12:30:06 | 24 | A  I assert the Fifth. |
| 12:30:12 | 25 | Q  Did USOC specifically call you into a meeting |

94

EXHIBIT 11
073

12:30:18  1     regarding their decision to attempt to decertify

12:30:24  2     USAG?

12:30:24  3   A  I assert the Fifth.

12:30:24  4   Q  Did you ever speak with any of the board at USAG

12:30:32  5     regarding the decertification of USAG?

12:30:37  6   A  I assert the Fifth.

12:30:41  7   Q  Were there any discussions that, if decertified,

12:30:46  8     USAG would not be able to maintain its business?

12:30:50  9   A  I assert the Fifth.

12:30:55 10   Q  Was it ever discussed that the only way USAG could

12:31:00 11     stay in business is if it was an NGB?

12:31:04 12   A  I assert the Fifth.

12:31:04 13   Q  Are you present at board meetings?

12:31:12 14   A  I assert the Fifth.

12:31:13 15   Q  When's the last time you talked with Paul Parilla?

12:31:17 16   A  I assert the Fifth.

12:31:18 17   Q  Do you know who Paul Parilla is?

12:31:20 18   A  I assert the Fifth.

12:31:21 19   Q  When's the last time you've talked with Jay Binder?

12:31:24 20   A  I assert the Fifth.

12:31:25 21   Q  Have you ever talked with Jay Binder?

12:31:27 22   A  I assert the Fifth.

12:31:27 23   Q  When's the last time you spoke with Peter Vidmar?

12:31:31 24   A  I assert the Fifth.

12:31:31 25   Q  Did you ever speak with Peter Vidmar about Larry

95

EXHIBIT 11
074

| | | |
|---|---|---|
| 12:31:34 | 1 | Nassar? |
| 12:31:36 | 2 | A  I assert the Fifth. |
| 12:31:36 | 3 | Q  Did you ever speak with Jay Binder about Larry |
| 12:31:40 | 4 | Nassar? |
| 12:31:40 | 5 | A  I assert the Fifth. |
| 12:31:49 | 6 | Q  Did you ever speak with any other board members at |
| 12:31:52 | 7 | USAG regarding Larry Nassar? |
| 12:31:53 | 8 | A  I assert the Fifth. |
| 12:31:54 | 9 | Q  And when I say "other board members," I mean |
| 12:31:58 | 10 | anybody other than those that I just mentioned. |
| 12:32:01 | 11 | A  I assert the Fifth. |
| 12:32:03 | 12 | Q  Did you ever speak with any past presidents about |
| 12:32:05 | 13 | Larry Nassar? |
| 12:32:06 | 14 | A  I assert the Fifth. |
| 12:32:07 | 15 | Q  Did you ever speak with Kathy Scanlan about Larry |
| 12:32:11 | 16 | Nassar? |
| 12:32:13 | 17 | A  I assert the Fifth. |
| 12:32:17 | 18 | Q  Do you know what Steve Penny's role at USAG was |
| 12:32:21 | 19 | before he was president? |
| 12:32:22 | 20 | A  I assert the Fifth. |
| 12:32:23 | 21 | Q  Do you know if he received any complaints about |
| 12:32:25 | 22 | Larry Nassar in that role? |
| 12:32:26 | 23 | A  I assert the Fifth. |
| 12:32:28 | 24 | Q  Was it Steve Penny's custom and practice to |
| 12:32:33 | 25 | document reports about Larry Nassar or complaints |

EXHIBIT 11
075

| | | |
|---|---|---|
| 12:32:36 | 1 | about any USAG member? |
| 12:32:40 | 2 | A  I assert the Fifth. |
| 12:32:41 | 3 | Q  If he did document those allegations or complaints |
| 12:32:45 | 4 | about USAG members, where would Steve Penny keep |
| 12:32:49 | 5 | those documents? |
| 12:32:50 | 6 | A  I assert the Fifth. |
| 12:32:51 | 7 | Q  Do you know if they're handwritten or typewritten? |
| 12:32:54 | 8 | A  I assert the Fifth. |
| 12:33:15 | 9 | Q  Since you went to the ranch and retrieved those |
| 12:33:19 | 10 | documents, I believe in or around November of 2016, |
| 12:33:26 | 11 | have you been back to the ranch? |
| 12:33:27 | 12 | A  I assert the Fifth. |
| 12:33:31 | 13 | Q  Have you spoken to Martha or Bela Karolyi since |
| 12:33:35 | 14 | that time? |
| 12:33:37 | 15 | A  I assert the Fifth. |
| 12:33:37 | 16 | Q  Since this information came to light about your |
| 12:33:39 | 17 | removal of documents from the ranch as evidenced in |
| 12:33:42 | 18 | the congressional testimony, have you spoken with |
| 12:33:46 | 19 | anybody at the Karolyi Ranch regarding those |
| 12:33:48 | 20 | documents? |
| 12:33:52 | 21 | A  I assert the Fifth. |
| 12:33:53 | 22 | Q  Have you spoken with Kathy Kelly about the removal |
| 12:33:57 | 23 | of documents from the ranch? |
| 12:33:59 | 24 | A  I assert the Fifth. |
| 12:33:59 | 25 | Q  Have you spoken with Gary Warren about the removal |

97

EXHIBIT 11
076

| | | |
|---|---|---|
| 12:34:04 | 1 | of documents from the ranch? |
| 12:34:05 | 2 | A  I assert the Fifth. |
| 12:34:13 | 3 | Q  Do you know if the documents from the ranch were |
| 12:34:15 | 4 | destroyed? |
| 12:34:16 | 5 | A  I assert the Fifth. |
| 12:34:16 | 6 | Q  Do you know how they were destroyed? |
| 12:34:18 | 7 | A  I assert the Fifth. |
| 12:34:19 | 8 | Q  Were they burned? |
| 12:34:20 | 9 | A  I assert the Fifth. |
| 12:34:21 | 10 | Q  Were they shredded? |
| 12:34:22 | 11 | A  I assert the Fifth. |
| 12:34:24 | 12 | Q  Were they just thrown into a trash receptacle? |
| 12:34:29 | 13 | A  I assert the Fifth. |
| 12:34:40 | 14 | Q  Have you ever been instructed by Steve Penny, prior |
| 12:34:41 | 15 | to going to the ranch to obtain records, to go to |
| 12:34:48 | 16 | any other locations to obtain records for any |
| 12:34:51 | 17 | purpose? |
| 12:34:52 | 18 | A  I assert the Fifth. |
| 12:34:54 | 19 | Q  Did Steve Penny ever send you to Michigan State to |
| 12:34:56 | 20 | obtain records for Larry Nassar? |
| 12:35:00 | 21 | A  I assert the Fifth. |
| 12:35:00 | 22 | Q  Do you know if Steve Penny ever did get records |
| 12:35:03 | 23 | from Michigan State regarding Larry Nassar? |
| 12:35:05 | 24 | A  I assert the Fifth. |
| 12:35:13 | 25 | Q  Do you know if the records you took from the ranch |

98

EXHIBIT 11
077

12:35:18  1      were ever given to the Indianapolis Police

12:35:22  2      Department prior to March of 2017?

12:35:28  3   A  I assert the Fifth.

12:35:30  4   Q  Do you know if the records that were taken from the

12:35:33  5      ranch were ever given to the Indianapolis FBI prior

12:35:37  6      to March of 2017?

12:35:41  7   A  I assert the Fifth.

12:35:42  8   Q  Is it your understanding that Steve Penny resigned

12:35:44  9      in March of 2017 from USA Gymnastics?

12:35:47 10   A  I assert the Fifth.

12:35:50 11   Q  Did Steve Penny, to your knowledge, take those

12:35:52 12      documents with him after he resigned?

12:35:55 13   A  I assert the Fifth.

12:35:56 14   Q  Did Steve Penny write any memoranda to subsequent

12:36:01 15      leadership regarding those documents?

12:36:05 16   A  I assert the Fifth.

12:36:06 17   Q  Were you instructed to inform leadership of the

12:36:10 18      existence of those documents?

12:36:12 19   A  I assert the Fifth.

12:36:13 20   Q  Do you have any understanding of why Kerry Perry

12:36:15 21      didn't know where those documents were when she

12:36:18 22      testified to Congress?

12:36:19 23   A  I assert the Fifth.

12:36:24 24          MR. CUNNY:  I think I'm about done.  Does

12:36:26 25      anybody on the phone have further questions?

EXHIBIT 11
078

| | | |
|---|---|---|
| 12:36:35 | 1 | MR. AMUNDSON:  None. |
| 12:36:39 | 2 | THE REPORTER:  Anyone else? |
| 12:36:45 | 3 | MR. CUNNY:  Okay.  Hearing no requests for |
| 12:36:48 | 4 | further questions, obviously we're going to have to |
| 12:36:52 | 5 | bring a motion on the deposition transcript. |
| 12:36:55 | 6 | However, for handling of the transcript in the |
| 12:36:59 | 7 | meantime, I'd request that the court reporter be |
| 12:37:01 | 8 | relieved of her duties under the rules.  She will |
| 12:37:05 | 9 | prepare and bind a transcript, and she can send it |
| 12:37:09 | 10 | to counsel. |
| 12:37:10 | 11 | MR. DOWNEY:  Sure. |
| 12:37:11 | 12 | MR. CUNNY:  Counsel will receive that |
| 12:37:12 | 13 | transcript and make sure that the deponent reviews |
| 12:37:16 | 14 | it. |
| 12:37:16 | 15 | You'll have 30 days to review, and you can |
| 12:37:19 | 16 | make any changes you want to the transcript when |
| 12:37:22 | 17 | you get it.  However, I must caution you, if you |
| 12:37:24 | 18 | make a substantive change like you change a yes to |
| 12:37:28 | 19 | a no or the light was green and not red when I |
| 12:37:33 | 20 | drove through the intersection, something like |
| 12:37:34 | 21 | that, it can reflect negatively on your |
| 12:37:37 | 22 | credibility, and it can be commented upon at the |
| 12:37:40 | 23 | time of trial.  Okay? |
| 12:37:41 | 24 | THE WITNESS:  Okay. |
| 12:37:43 | 25 | MR. CUNNY:  Nevertheless, you can make any |

100

EXHIBIT 11
079

12:37:46 1    changes you see fit thereto.  There will be an

12:37:48 2    errata sheet that comes with the transcript.  It

12:37:52 3    should probably only be 100 pages or so, which

12:37:55 4    should be a pretty quick reading.  Make any changes

12:37:58 5    you want on the errata sheet.  Put the page, the

12:37:59 6    line, and what the change is.

12:38:01 7        You'll transmit the original transcript to

12:38:03 8    your counsel.  The court reporter will provide your

12:38:07 9    counsel with a self-addressed stamped envelope that

12:38:10 10   will send the original transcript to my office.

12:38:13 11       My office will retain custody of the original

12:38:15 12   transcript, and we'll lodge it upon reasonable

12:38:20 13   request for all purposes, including trial.  If the

12:38:22 14   original is lost, stolen, misplaced, or otherwise

12:38:24 15   unavailable, a certified copy can be used in lieu

12:38:27 16   thereof for all purposes, including trial.

12:38:29 17       If the transcript goes unsigned within the

12:38:31 18   30-day period, a certified copy of that transcript

12:38:36 19   can be used at the time of trial.

12:38:40 20       THE WITNESS:  Okay.

12:38:42 21       MR. CUNNY:  So stipulated on the phone?

12:38:46 22       MR. AMUNDSON:  Yeah, this is Steve Amundson.

12:38:49 23   So stipulated, and I don't need a copy.

12:38:55 24       MS. MATTHAI:  Edith Matthai.  So stipulated to

12:38:58 25   the extent that this transcript could ever be used

EXHIBIT 11
080

12:39:01  1      for anything.

12:39:03  2           MS. HOLM:  Margaret Holm.  So stipulated.  I

12:39:07  3      would like a copy of the transcript as well as the

12:39:12  4      video.

12:39:12  5           MS. KIES:  This is Marianne Kies from

12:39:17  6      Covington & Burling for USOC.  So stipulated.  I

12:39:19  7      would also like a copy of the transcript.

12:39:22  8           MR. CUNNY:  And I do want to put on the

12:39:23  9      record, I think it's apparent, but we will be

12:39:26 10      bringing a motion on this given the numerous

12:39:29 11      instructions not to answer.

12:39:30 12           I understand counsel's position with -- in

12:39:34 13      light of the criminal proceedings.  However, we do

12:39:36 14      believe there are non-inculpatory areas of inquiry

12:39:42 15      which we are entitled to get evidence upon.  So

12:39:45 16      we'll take that up at a later time, I presume?

12:39:49 17           MR. DOWNEY:  Certainly.

12:39:50 18           MR. CUNNY:  All right.

12:39:50 19           THE VIDEOGRAPHER:  It is now 12:39.  We are

12:39:52 20      off the record.

         21           (A discussion was held off the record.)

         22           MS. MERY:  This is Victoria Mery.  We will

         23      stipulate.

         24           MS. ADAME:  Vivian Adame.  We will stipulate.

         25      And we don't need a copy of the transcript.

EXHIBIT 11
081

1         MS. MERY:  The Karolyis will take a copy of

2   the transcript.  Thank you.

3         THE REPORTER:  Anyone else?  Mr. Downey, would

4   you like a copy of the transcript?

5         MR. DOWNEY:  Of course, electronic.

6         THE REPORTER:  Is there any rush?

7         MR. CUNNY:  Actually, yes.  I'll need to put

8   an expedite on that.

9         THE REPORTER:  When would you like the

10   transcript?

11         MR. CUNNY:  Can I get it on the 19th?

12         THE REPORTER:  Yes.

13         (The deposition concluded at 12:39 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 11
082

1

2

3

4

5

6

7

8

9

10          I, AMY SUE WHITE, state that I have read the

11     foregoing transcript of the testimony given by me at

12     my deposition on November 13, 2018, and that said

13     transcript constitutes a true and correct record of

14     the testimony given by me at said deposition except as

15     I have so indicated on the errata sheets provided

16     herein.

17

18     DATED:_____

19                              _____

20                              AMY SUE WHITE

21

22

23

24

25

104

EXHIBIT 11
083

```
 1   STATE OF INDIANA
 2   COUNTY OF HENDRICKS
 3
 4        I, Elizabeth T. Lindner, a Notary Public in
 5   and for said county and state, do hereby certify that
 6   the deponent herein was by me first duly sworn to tell
 7   the truth, the whole truth, and nothing but the truth
 8   in the aforementioned matter;
 9        That the foregoing deposition was taken on
10   behalf of the Plaintiffs; that said deposition was
11   taken at the time and place heretofore mentioned
12   between 10:33 a.m. and 12:39 p.m.;
13        That said deposition was taken down in
14   stenograph notes and afterwards reduced to typewriting
15   under my direction; and that the typewritten
16   transcript is a true record of the testimony given by
17   said deponent;
18        And thereafter presented to said witness for
19   signature; that this certificate does not purport to
20   acknowledge or verify the signature hereto of the
21   deponent.
22        I do further certify that I am a disinterested
23   person in this cause of action; that I am not a
24   relative of the attorneys for any of the parties.
25
```

EXHIBIT 11
084

# EXHIBIT "12"

**ASSIGNED TO THE** _278th_ **JUDICIAL DISTRICT COURT**

**INDICTMENT NO.** _28849_

___ **PER BOND SCHEDULE** ___ **BOND RECOMMMENDATION $** _No Bond_

_HRR  9-28-18_

**STATE OF TEXAS VS. STEPHEN D. PENNY, JR.**

**CHARGE:  37.09 PC - TAMPER WITH  PHYSICAL EVIDENCE/THIRD DEGREE FELONY**

**OFF CODE:  73990280**          **TRN NO.:**

**PID NO.: 3326101 -**            **CONTROL NO.: 2018-01241**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS**,

THE GRAND JURORS, duly selected, organized, sworn, and impaneled as such for the County of Walker, State of Texas, at the January Term, A.D. 2018, of the District Court for said County upon their oaths present in and to said Court, that on or about the 11th day of November, 2016, and anterior to the presentment of this indictment, in the County and State aforesaid Stephen D. Penny, Jr. did then and there, knowing that an investigation was in progress, to-wit: Texas Ranger investigation of allegations of sexual assault by Larry Nassar, intentionally or knowingly destroy or conceal records or documents, to-wit:  records and documents related to Larry Nassar kept at the Karolyi Ranch in Walker County, Texas, with intent to impair the availability as evidence in the investigation.

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

_____
Foreman of the Grand Jury

**FILED**
TIME 1:50
28 DAY OF _Sept_ 2018
**ROBYN FLOWERS**
District Clerk, Walker County
By _____
Deputy

EXHIBIT 12
001

**INDICTMENT NO.**_____

**STATE OF TEXAS VS. Stephen D Penny**

**OFFENSE:   TAMPER FABRICATING PHYSICAL EVIDENCE**

**Race:**              **Gender:** Male        **DOB:** 02/12/1964

**HT:**        **WT:**    Lbs.            **Hair Color:**

**Eye Color:    DL:**   TX-2340766714

**Agency:    Agency #:          State ID #:**

TRUE BILLED UPON THE INFORMATION OF

_____

_____

OTHER PENDING INDICTED CASES AGAINST DEFENDANT?

_____ YES        _____ NO

IF YES, CAUSE #'S _____

IS THIS A RE-INDICTMENT?

____ YES          ____ NO

IF YES, PREVIOUS CAUSE # _____

NAME OF CO-DEFENDANT(S), IF ANY, ***NOT*** NAMED IN INDICTMENT.

|  |  | CAUSE NO. | COURT |
|---|---|---|---|
| (1) | _____ | _____ | _____ |
| (2) | _____ | _____ | _____ |
| (3) | _____ | _____ | _____ |
| (4) | _____ | _____ | _____ |
| (5) | _____ | _____ | _____ |

SIGNED on this  28th  day of September, 2018.

_____
Attorney for the State of Texas

EXHIBIT 12
002

# EXHIBIT "13"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE


ALEXANDRA ROSE RAISMAN, AN     )
INDIVIDUAL,                    )
                               ) CIVIL CASE NO.
          Plaintiff,           ) 5:18-cv-02479-BLF
                               )
     -v-                       ) The Honorable
                               ) Beth Labson Freeman
UNITED STATES OLYMPIC          )
COMMITTEE, A BUSINESS ENTITY )
OF FORM UNKNOWN;               )
USA GYMNASTICS, AN INDIANA     )
BUSINESS ENTITY OF FORM        )
UNKNOWN; LARRY NASSAR, AN      )
INDIVIDUAL; STEVE PENNY, AN   )
INDIVIDUAL; PAUL PARRILLA, AN)
INDIVIDUAL; AND DOES 1         )
THROUGH 500,                   )
                               )
          Defendants.          )
_____)


                * CONFIDENTIAL PORTIONS *


        The videoconferenced and telephonic videotaped

deposition upon oral examination of RHONDA FAEHN, a

witness produced and sworn before me, Michele K.

Gustafson, CRR-RPR, Notary Public in and for the

County of Marion, State of Indiana, taken on behalf of

the Plaintiff at the offices of Stewart Richardson

Deposition Services, One Indiana Square, Suite 2425,

Indianapolis, Indiana, on October 24, 2018, at

10:10 a.m., pursuant to the Federal Rules of Civil

Procedure.

1

02:06:22 1    athlete training with the Karolyis, he just

02:06:24 2    purchased the land.

02:06:25 3    **Q  Sure.  As it currently exists, that's fine.**

02:06:29 4    A  Okay.  We had approximately eight camps when I

02:06:34 5    arrived in 2015 -- that was my first camp was, I

02:06:42 6    believe, the end of May -- so eight in 2016, eight

02:06:53 7    in 2017.  So about 20 -- 20 to 24 times, somewhere

02:06:59 8    in there.

02:06:59 9    **Q  Okay.  So in general, you're familiar with the**

02:07:01 10    **grounds; correct?**

02:07:02 11    A  Yes.

02:07:02 12    **Q  Okay.  Was there a fire pit at the Ranch?**

02:07:05 13    A  Excuse me?

02:07:07 14        MS. MERY:  Objection.  This is way outside the

02:07:09 15    scope of jurisdictional discovery.

02:07:11 16        MR. MANLY:  That's what you think.

02:07:12 17    **Q  Go ahead.  Was there a fire pit at the Ranch?**

02:07:14 18    A  What's a fire pit?

02:07:16 19    **Q  A place where you burn logs for a fire.**

02:07:19 20    A  I don't know.

02:07:20 21    **Q  Okay.  Who was the -- who was in charge of the**

02:07:23 22    **Ranch for USA Gymnastics, if anybody?**

02:07:26 23    A  Gary Warren.

02:07:27 24    **Q  Okay.  And do you remember your Senate testimony**

02:07:35 25    **you were asked about whether you were aware that**

152

EXHIBIT 13
002

| | | |
|---|---|---|
| 02:07:40 | 1 | records were removed from the Ranch? |
| 02:07:43 | 2 | A Yes. |
| 02:07:43 | 3 | Q Okay. Are you aware of -- and you testified that |
| 02:07:46 | 4 | you know that Amy White was directed to go to the |
| 02:07:49 | 5 | Ranch by Steve Penny; correct? |
| 02:07:50 | 6 | A Yes. |
| 02:07:51 | 7 | Q And she removed certain records; correct? |
| 02:07:54 | 8 | A Yes. |
| 02:07:54 | 9 | Q Okay. Were you there when that happened? |
| 02:07:56 | 10 | A No. |
| 02:07:56 | 11 | Q How do you know that happened? |
| 02:08:00 | 12 | A In the -- I believe it was March of 2018, of this |
| 02:08:05 | 13 | year, I'd received a phone call message from the |
| 02:08:10 | 14 | reporter from the OC Register asking if I -- no, |
| 02:08:18 | 15 | asking if he could speak with me. And |
| 02:08:21 | 16 | USA Gymnastics' policy was I -- any -- I was to go |
| 02:08:26 | 17 | through Leslie King, and I asked her if she could |
| 02:08:30 | 18 | please reach out to him and find out what questions |
| 02:08:33 | 19 | he had. And -- |
| 02:08:34 | 20 | Q And Leslie King -- |
| 02:08:36 | 21 | A Is the director of communications. |
| 02:08:37 | 22 | Q And she was at the senior staff meetings; correct? |
| 02:08:40 | 23 | A Yes. |
| 02:08:40 | 24 | Q And she's also in the core group who knew about |
| 02:08:43 | 25 | Nassar; correct? |

153

EXHIBIT 13
003

| | | | |
|---|---|---|---|
| 02:08:44 | 1 | A | I don't know when she found out, but she was not |
| 02:08:49 | 2 | | initially -- |
| 02:08:51 | 3 | Q | Okay.  So she wasn't at the meeting with the |
| 02:08:53 | 4 | | lawyers? |
| 02:08:53 | 5 | A | No. |
| 02:08:54 | 6 | Q | All right.  Fair enough. |
| 02:08:55 | 7 | A | So she reached out to the reporter.  And he |
| 02:09:02 | 8 | | asked -- said that he had been -- he had |
| 02:09:06 | 9 | | information that I was the -- an individual that |
| 02:09:09 | 10 | | had removed records -- medical records from the |
| 02:09:14 | 11 | | Ranch, and I asked Leslie to please respond to him |
| 02:09:20 | 12 | | that absolutely that I was not and I had never |
| 02:09:25 | 13 | | heard of that. |
| 02:09:26 | 14 | Q | Okay.  All right.  So -- and that was true, you |
| 02:09:32 | 15 | | didn't remove records from the Ranch; correct? |
| 02:09:34 | 16 | A | Correct. |
| 02:09:34 | 17 | Q | You never destroyed anything from the Ranch; |
| 02:09:37 | 18 | | correct? |
| 02:09:37 | 19 | A | No.  That's correct, yes. |
| 02:09:38 | 20 | Q | Okay.  My -- that was a bad question. |
| 02:09:41 | 21 | A | Yeah, yeah. |
| 02:09:41 | 22 | Q | All right.  And you've never destroyed documents or |
| 02:09:43 | 23 | | data in connection with your work at USA Gymnastics |
| 02:09:47 | 24 | | at any point; correct? |
| 02:09:48 | 25 | A | That's correct. |

EXHIBIT 13
004

| | | |
|---|---|---|
| 02:09:50 | 1 | Q All right. So you responded to Leslie King, tell |
| 02:09:59 | 2 | him that's not true? |
| 02:10:01 | 3 | A Correct. |
| 02:10:01 | 4 | Q Okay. And then -- okay. So how did you find out |
| 02:10:04 | 5 | that somebody, in fact, had done that? |
| 02:10:07 | 6 | MS. MATTHAI: Lacks foundation. Calls for |
| 02:10:08 | 7 | speculation. |
| 02:10:08 | 8 | Q You may answer. |
| 02:10:09 | 9 | A I asked Rachel Brazo if she had heard of anything, |
| 02:10:17 | 10 | because -- |
| 02:10:17 | 11 | Q Go ahead, please. |
| 02:10:19 | 12 | A -- because of I had a reporter thinking I did |
| 02:10:23 | 13 | something, and she said that Amy White had. |
| 02:10:27 | 14 | Q Okay. Forgive me. Would you spell Brazo for the |
| 02:10:31 | 15 | court reporter? |
| 02:10:31 | 16 | A B-r-a-z-o. |
| 02:10:34 | 17 | Q Okay. And Amy White is W-h-i-t-e? |
| 02:10:38 | 18 | A W-h-i-t-e, uh-huh. |
| 02:10:41 | 19 | Q Okay. And Olivia, just for save time, Olivia Gill |
| 02:10:44 | 20 | is, how is that spelled? |
| 02:10:48 | 21 | A I don't even know. |
| 02:10:48 | 22 | Q Okay. All right. So you went to -- she said |
| 02:10:54 | 23 | Amy White had removed records? |
| 02:10:56 | 24 | A Yes. |
| 02:10:56 | 25 | Q And what was Mr. -- Ms. Brazo's position at |

EXHIBIT 13
005

| | | |
|---|---|---|
| 02:11:00 | 1 | USA Gymnastics? |
| 02:11:01 | 2 | A  I believe she was -- she was John Hewett's -- she |
| 02:11:08 | 3 | did all the accounting budgets for the programs but |
| 02:11:12 | 4 | she also helped with rhythmic, so I'm not sure |
| 02:11:16 | 5 | exactly what her title was. |
| 02:11:18 | 6 | Q  Okay.  And how did she know that Amy White had done |
| 02:11:21 | 7 | that? |
| 02:11:22 | 8 | MS. MATTHAI:  Lacks foundation.  Calls for |
| 02:11:23 | 9 | speculation. |
| 02:11:24 | 10 | A  I don't know. |
| 02:11:26 | 11 | MS. HOLM:  Join the objection. |
| 02:11:27 | 12 | Q  Okay. |
| 02:11:28 | 13 | MS. MERY:  Join. |
| 02:11:28 | 14 | Q  So did you ask Amy if she had done that? |
| 02:11:31 | 15 | A  Yes. |
| 02:11:31 | 16 | Q  Okay.  And what did Amy say? |
| 02:11:33 | 17 | A  She said yes, that she was there for a camp and |
| 02:11:36 | 18 | that Steve Penny had called her or she -- I don't |
| 02:11:42 | 19 | know how -- which one.  This is just from -- |
| 02:11:46 | 20 | Q  Your memory? |
| 02:11:47 | 21 | A  -- my memory and her telling me, so I don't know |
| 02:11:49 | 22 | firsthand.  That he asked her to bring back any -- |
| 02:11:58 | 23 | anything -- any records or medical information from |
| 02:12:03 | 24 | the Ranch. |
| 02:12:04 | 25 | Q  So she said bring back records and medical |

02:12:07 1   information?

02:12:08 2  A  I believe so.

02:12:09 3  Q  Okay.  So did you ask her if she did that?

02:12:12 4  A  Yes.

02:12:13 5  Q  And what'd she say?

02:12:13 6  A  She said yes.

02:12:15 7  Q  She -- did she tell you how she did it?

02:12:17 8  A  Yes.

02:12:18 9  Q  What'd she say?

02:12:19 10  A  She said she -- that he asked her to go to Target

02:12:22 11     and buy -- or somewhere and buy a large suitcase.

02:12:28 12     And she filled the suitcase, as well as, she said,

02:12:35 13     I believe, that Gary Warren brought some boxes from

02:12:41 14     a shed or . . .  And she took those to the airport

02:12:48 15     after the camp was over.

02:12:51 16  Q  Okay.  So she transported them on a plane?

02:12:54 17  A  Yes.

02:12:55 18  Q  Okay.

02:12:55 19  A  Through checked baggage, I believe.

02:12:57 20  Q  All right.  Have you heard from any source that she

02:13:00 21     kept the receipt for that?

02:13:02 22  A  Well, yes.  Because she said that her credit card,

02:13:06 23     her USA credit card, like, wouldn't work.

02:13:11 24  Q  Because it was so much money?

02:13:12 25  A  No.  I don't know.  I don't know why it didn't.

157

EXHIBIT 13
007

02:13:16  1    Q   So she had to pay for it and needed to be

02:13:18  2        reimbursed?

02:13:19  3    A   Yes.

02:13:20  4    Q   Okay.  Do you know how much it was?

02:13:21  5    A   No.

02:13:21  6    Q   Okay.  Okay.  So -- and when approximately did you

02:13:29  7        hear that story from Amy White?

02:13:32  8    A   I believe it was springtime, around March of this

02:13:36  9        year.

02:13:37  10   Q   March of '18?

02:13:38  11   A   I believe so.

02:13:38  12   Q   And Mr. Penny had already departed at the -- the

02:13:42  13       organization at that point?

02:13:43  14   A   Yeah.  He was a year earlier.

02:13:46  15   Q   Okay.  Did you go back to Leslie King and report to

02:13:50  16       her what you'd found out?

02:13:51  17   A   I went to Kerry Perry and told her.

02:13:54  18   Q   Okay.  And what did Ms. Perry say?

02:13:57  19   A   She said that she was going to -- I don't remember

02:14:01  20       if it was -- I don't remember exactly what she was

02:14:03  21       going to do.

02:14:05  22   Q   Okay.  Well, as you can imagine, this is important.

02:14:08  23   A   Yes.

02:14:09  24   Q   So I'm going to try and probe your memory a little

02:14:11  25       bit.  Okay?

158

EXHIBIT 13
008

| | | | |
|---|---|---|---|
| 02:14:12 | 1 | A | Okay. |
| 02:14:12 | 2 | Q | And I appreciate your candor here. |
| 02:14:14 | 3 | A | Yeah. |
| 02:14:15 | 4 | Q | So when she -- when Amy White told you that, did |
| 02:14:21 | 5 | | you have the -- did you sense that she thought that |
| 02:14:24 | 6 | | she had done something wrong or she had just -- was |
| 02:14:29 | 7 | | doing what she was told? |
| 02:14:32 | 8 | | MS. MATTHAI: Objection. Lacks foundation. |
| 02:14:33 | 9 | | Calls for speculation. |
| 02:14:34 | 10 | | MS. MERY: Join. |
| 02:14:35 | 11 | A | I can't speak on how she felt. |
| 02:14:37 | 12 | Q | I'm asking how your impression of her was. Did you |
| 02:14:40 | 13 | | reach that conclusion one way or the other? Was |
| 02:14:43 | 14 | | she nervous? Was she not nervous? |
| 02:14:46 | 15 | | MS. MATTHAI: Same objection. |
| 02:14:47 | 16 | A | I think she was doing as she was told, and I think |
| 02:14:57 | 17 | | that all -- as well she was nervous after -- I |
| 02:15:05 | 18 | | believe after the fact. |
| 02:15:07 | 19 | Q | After what had come out? |
| 02:15:10 | 20 | A | I think more so after she -- she shared that if |
| 02:15:16 | 21 | | she -- when she spoke with her husband, just what |
| 02:15:20 | 22 | | if -- not what if -- with her credit card not |
| 02:15:24 | 23 | | working, she just seemed a little nervous. |
| 02:15:27 | 24 | Q | Okay. When did he tell her to do that? Just when |
| 02:15:30 | 25 | | did she bring those back? |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902 info@jilioryan.com**

EXHIBIT 13
009

| | | |
|---|---|---|
| 02:15:32 | 1 | A  I don't know. |
| 02:15:33 | 2 | MS. MERY:  Objection.  Vague. |
| 02:15:34 | 3 | Q  Okay.  Was this in 2016? |
| 02:15:38 | 4 | A  I -- she didn't give us -- I don't know the exact |
| 02:15:40 | 5 | date of when he asked her to do this. |
| 02:15:43 | 6 | Q  Do you have any idea of the time frame, even the |
| 02:15:46 | 7 | year? |
| 02:15:48 | 8 | A  She said it was during a camp, and I think she did |
| 02:15:54 | 9 | either acro camp, so I believe it was during an |
| 02:15:58 | 10 | acro camp. |
| 02:16:00 | 11 | Q  Okay.  And this was after Dr. Nassar had been |
| 02:16:03 | 12 | fired; correct? |
| 02:16:04 | 13 | A  I believe so. |
| 02:16:08 | 14 | Q  Okay. |
| 02:16:11 | 15 | A  Yeah. |
| 02:16:11 | 16 | Q  And did Mr. Penny -- did she tell you Mr. -- why |
| 02:16:14 | 17 | Mr. Penny wanted her to get the records? |
| 02:16:16 | 18 | A  No. |
| 02:16:17 | 19 | MS. MATTHAI:  Objection.  Lacks foundation. |
| 02:16:18 | 20 | Calls for speculation. |
| 02:16:19 | 21 | Q  Did she give you any idea?  Did he tell her why? |
| 02:16:23 | 22 | A  No. |
| 02:16:23 | 23 | Q  Okay.  So she went -- and Gary Warren -- she told |
| 02:16:28 | 24 | you that Gary Warren brought boxes to her? |
| 02:16:31 | 25 | A  Yes. |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 13
010

| | | |
|---|---|---|
| 02:16:31 | 1 | **Q   So Gary Warren obviously -- did she tell you that** |
| 02:16:35 | 2 | **Gary Warren was instructed by Mr. Penny to do that?** |
| 02:16:38 | 3 | A   She did not. |
| 02:16:39 | 4 | **Q   Did you speak to Gary Warren about this?** |
| 02:16:41 | 5 | A   I e-mailed Gary and asked if -- I believe if he |
| 02:16:48 | 6 | provided or gave documents to her. |
| 02:16:50 | 7 | **Q   And what'd he say?** |
| 02:16:51 | 8 | A   He said yes, he gave her everything.  And I believe |
| 02:16:55 | 9 | as well he mentioned that I don't know if she did |
| 02:17:04 | 10 | or someone had the docu -- his -- all of his |
| 02:17:08 | 11 | documents that he had on his computer. |
| 02:17:12 | 12 | **Q   Did he tell you that he burned documents in -- at** |
| 02:17:15 | 13 | **the Ranch in the fire pit?** |
| 02:17:17 | 14 | A   No. |
| 02:17:17 | 15 | **Q   Have you heard that from anybody?** |
| 02:17:18 | 16 | A   No. |
| 02:17:24 | 17 | **Q   Okay.** |
| 02:17:25 | 18 | A   But I do remember now there is a fire pit up at the |
| 02:17:28 | 19 | lodge. |
| 02:17:29 | 20 | **Q   Okay.  And do you know if anybody burned documents?** |
| 02:17:34 | 21 | A   No. |
| 02:17:35 | 22 | **Q   All right.** |
| 02:17:35 | 23 | A   I've never heard that. |
| 02:17:37 | 24 | **Q   Never heard that, okay.  So when Ms. White got back** |
| 02:17:40 | 25 | **to the office with the documents, who did she give** |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 13
011

| | | | |
|---|---|---|---|
| 02:17:43 | 1 | | them to, according to her? |
| 02:17:45 | 2 | A | She told me that she gave them to Steve Penny. |
| 02:17:48 | 3 | Q | And did she say how she did that?  Did she give |
| 02:17:52 | 4 | | them to the office or . . .? |
| 02:17:54 | 5 | A | She brought them to the office. |
| 02:17:56 | 6 | Q | And gave them to him? |
| 02:17:58 | 7 | A | Yes. |
| 02:17:59 | 8 | Q | Did anybody from USA Gymnastics, to your knowledge, |
| 02:18:01 | 9 | | contact Mr. Penny and ask him about this? |
| 02:18:04 | 10 | A | I don't know. |
| 02:18:05 | 11 | Q | Okay.  So let's go back to your conversation with |
| 02:18:08 | 12 | | Kerry Perry. |
| 02:18:09 | 13 | A | Yeah. |
| 02:18:10 | 14 | Q | You talked to Amy White? |
| 02:18:12 | 15 | A | Yes. |
| 02:18:12 | 16 | Q | And Miss Faehn, you're obviously disturbed by the |
| 02:18:16 | 17 | | story; correct? |
| 02:18:17 | 18 | A | Yes. |
| 02:18:19 | 19 | Q | Because it doesn't -- it's -- well, when you heard |
| 02:18:21 | 20 | | the story, what did you think? |
| 02:18:27 | 21 | A | I thought that if those documents are back here |
| 02:18:32 | 22 | | that they would -- that he would turn them over to |
| 02:18:36 | 23 | | the authorities or the attorneys and they would |
| 02:18:41 | 24 | | know where to go. |
| 02:18:42 | 25 | Q | Okay.  And did you ask if those documents still |

162

EXHIBIT 13
012

02:18:45 1    existed?

02:18:46 2    A    Did I ask who?

02:18:48 3    Q    Anybody.

02:18:51 4    A    Well, no, because there was nobody there left --

02:18:56 5    Q    Okay.

02:18:57 6    A    -- that -- to ask.

02:18:58 7    Q    So did Miss-- did anybody tell you what happened

02:19:04 8         with the documents that were --

02:19:07 9    A    No.

02:19:07 10   Q    Okay.  So did Mr. Warren or Ms. White tell you that

02:19:18 11        or did you know that the Texas law enforcement had

02:19:21 12        been to the Ranch before the documents were moved

02:19:26 13        seeking access?

02:19:28 14            MS. MATTHAI:  Objection.  Lacks foundation.

02:19:30 15            MS. MERY:  Join.

02:19:31 16            MS. MATTHAI:  It's also vague and ambiguous.

02:19:32 17   Q    You may answer.

02:19:34 18   A    Amy told me that -- I believe that the

02:19:36 19        Texas Rangers were there.

02:19:38 20   Q    Okay.  And after they left --

02:19:40 21   A    Yes.

02:19:40 22   Q    -- she was directed to remove the documents by

02:19:42 23        Mr. Penny?

02:19:43 24   A    Yes, I believe so.

02:19:44 25   Q    Okay.  And not -- that did not sound good, did it,

EXHIBIT 13
013

02:19:48 1    to you?

02:19:49 2        MS. MATTHAI:  Objection.  Argumentative.

02:19:50 3    Lacks foundation.

02:19:52 4        MS. MERY:  Join.

02:19:54 5        MS. MATTHAI:  Incomplete hypothetical.

02:19:57 6  Q  You may answer.

02:19:58 7  A  Yes, that was concerning.

02:19:58 8  Q  Yeah.  Because it -- on its face it looks like

02:20:01 9    somebody's trying to hide something from law

02:20:02 10   enforcement; correct?

02:20:03 11       MS. MATTHAI:  Lacks foundation, incomplete

02:20:05 12   hypothetical, and argumentative.

02:20:07 13 Q  You may answer.

02:20:09 14 A  I don't -- yeah, I don't -- it's -- it was -- I

02:20:13 15   don't understand that.

02:20:14 16 Q  You don't understand why he would do that?

02:20:17 17 A  Yes.

02:20:17 18 Q  Yeah.  You were suspicious; correct?

02:20:21 19 A  It's con -- yes.

02:20:22 20 Q  Okay.  And you had nothing to do with that,

02:20:25 21   Ms. Faehn, and I'm not implying in any way that you

02:20:27 22   did.

02:20:28 23 A  No.

02:20:28 24 Q  Okay.  You didn't know about it until Amy White

02:20:30 25   told you; right?

164

EXHIBIT 13
014

| | | |
|---|---|---|
| 02:20:31 | 1 | A That's correct. |
| 02:20:31 | 2 | Q I think you and I can disagree about a lot of |
| 02:20:33 | 3 | things, but you didn't have anything to do with |
| 02:20:35 | 4 | those documents being removed; correct? |
| 02:20:37 | 5 | A That's correct. |
| 02:20:39 | 6 | Q All right.  And when you -- when you found out, you |
| 02:20:43 | 7 | went to the president of the organization and told |
| 02:20:44 | 8 | her; right? |
| 02:20:45 | 9 | A Yes, that's correct. |
| 02:20:46 | 10 | Q Because you were concerned that there -- that it |
| 02:20:49 | 11 | was important and that you were even concerned that |
| 02:20:51 | 12 | somebody may have violated the law; right? |
| 02:20:54 | 13 | A That's correct. |
| 02:20:55 | 14 | Q Okay.  And when you told her that, what did you |
| 02:20:57 | 15 | expect Ms. Perry to do? |
| 02:21:00 | 16 | A I expected her to know what she was supposed to do |
| 02:21:08 | 17 | legally and speak with -- to speak -- to find out |
| 02:21:16 | 18 | or to tell the attorneys and the law what |
| 02:21:21 | 19 | information that she just learned. |
| 02:21:23 | 20 | Q Okay.  And what did she do? |
| 02:21:25 | 21 | A I don't know. |
| 02:21:26 | 22 | Q Okay.  Did she ever -- did any of the lawyers -- |
| 02:21:30 | 23 | did -- Strike that. |
| 02:21:33 | 24 | Did anybody from USA Gymnastics ever interview |
| 02:21:36 | 25 | you about that and those documents before you left? |

165

EXHIBIT 13
015

| | | | |
|---|---|---|---|
| 02:21:39 | 1 | A | No. |
| 02:21:40 | 2 | Q | So after you spoke to Kerry Perry, I take it no one |
| 02:21:43 | 3 | | from USA Gymnastics -- not staff, not lawyers, |
| 02:21:47 | 4 | | nobody -- ever spoke to you again about those |
| 02:21:50 | 5 | | documents? |
| 02:21:51 | 6 | A | That's correct. |
| 02:21:51 | 7 | Q | Okay.  When you spoke to Ms. Perry, where did that |
| 02:21:55 | 8 | | conversation take place about the documents? |
| 02:21:59 | 9 | A | In her office. |
| 02:22:00 | 10 | Q | Okay.  Did you close the door? |
| 02:22:03 | 11 | A | I don't remember. |
| 02:22:04 | 12 | Q | Okay.  But you asked -- where was your office in |
| 02:22:07 | 13 | | the building relative to hers? |
| 02:22:09 | 14 | A | The exact opposite end of the hallway. |
| 02:22:12 | 15 | Q | Okay.  How long of a walk to her office from yours? |
| 02:22:15 | 16 | A | There's approximately 10 to 12 offices in between, |
| 02:22:23 | 17 | | so . . . |
| 02:22:24 | 18 | Q | Okay.  So, you know, fifteen-second walk, |
| 02:22:27 | 19 | | twenty-second walk? |
| 02:22:29 | 20 | A | Yeah, yes. |
| 02:22:29 | 21 | Q | Okay.  And you went in? |
| 02:22:30 | 22 | A | Uh-huh. |
| 02:22:31 | 23 | Q | And did you call her Kerry or Ms. Perry or what? |
| 02:22:34 | 24 | A | Kerry. |
| 02:22:35 | 25 | Q | Madam President? |

166

EXHIBIT 13
016

| | | |
|---|---|---|
| 02:22:36 | 1 | A No, Kerry. |
| 02:22:37 | 2 | Q Okay. All right. Kerry, I just learned this from |
| 02:22:41 | 3 | Amy White? |
| 02:22:42 | 4 | A Yes. |
| 02:22:43 | 5 | Q Here's what she told me? |
| 02:22:44 | 6 | A (The witness nodded.) |
| 02:22:45 | 7 | Q What was her affect that you observed when she told |
| 02:22:48 | 8 | you that -- when you told her that? |
| 02:22:49 | 9 | A She said oh, that's not good. |
| 02:22:54 | 10 | Q Okay. She say oh, shit? |
| 02:22:56 | 11 | A No. |
| 02:22:57 | 12 | Q Okay. |
| 02:22:59 | 13 | A I would remember, because I don't very rarely |
| 02:23:02 | 14 | swear, so I'd remember that. |
| 02:23:03 | 15 | Q That's the difference between you and me. Good for |
| 02:23:06 | 16 | you. I'm kidding, for the record. |
| 02:23:08 | 17 | A (The witness smiled.) |
| 02:23:10 | 18 | Q Okay. All right. She said that's not good? |
| 02:23:12 | 19 | A Yes. |
| 02:23:13 | 20 | Q All right. And then what did she say? |
| 02:23:15 | 21 | A She wrote -- I believe she wrote something down, |
| 02:23:23 | 22 | and that was it. |
| 02:23:23 | 23 | Q Is the next time you were asked by anybody other |
| 02:23:26 | 24 | than your counsel about that issue was |
| 02:23:30 | 25 | Senator Moran at the hearings? |

167

EXHIBIT 13
017

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE


| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, AN INDIVIDUAL, | ) ) |
| | ) CIVIL CASE NO. |
| Plaintiff, | ) 5:18-cv-02479-BLF |
| | ) |
| -v- | ) The Honorable |
| | ) Beth Labson Freeman |
| UNITED STATES OLYMPIC | ) |
| COMMITTEE, A BUSINESS ENTITY | ) |
| OF FORM UNKNOWN; | ) |
| USA GYMNASTICS, AN INDIANA | ) |
| BUSINESS ENTITY OF FORM | ) |
| UNKNOWN; LARRY NASSAR, AN | ) |
| INDIVIDUAL; STEVE PENNY, AN | ) |
| INDIVIDUAL; PAUL PARRILLA, AN | ) |
| INDIVIDUAL; AND DOES 1 | ) |
| THROUGH 500, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


* CONFIDENTIAL PORTIONS *


The videoconferenced and telephonic videotaped
deposition upon oral examination of RHONDA FAEHN, a
witness produced and sworn before me, Michele K.
Gustafson, CRR-RPR, Notary Public in and for the
County of Marion, State of Indiana, taken on behalf of
the Plaintiff at the offices of Stewart Richardson
Deposition Services, One Indiana Square, Suite 2425,
Indianapolis, Indiana, on October 24, 2018, at
10:10 a.m., pursuant to the Federal Rules of Civil
Procedure.

1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION

3

4
    ALEXANDRA ROSE RAISMAN, AN      )
5   INDIVIDUAL,                     )
                                    )
6              Plaintiff,           )
                                    )
7          -v-                      ) CAUSE NO.
                                    ) 5:18-CV-02479-BLF
8                                   )
    UNITED STATES OLYMPIC           )
9   COMMITTEE, A BUSINESS ENTITY    )
    OF FORM UNKNOWN;                )
10  USA GYMNASTICS, AN INDIANA      )
    BUSINESS ENTITY OF FORM         )
11  UNKNOWN; LARRY NASSAR, AN       )
    INDIVIDUAL; STEVE PENNY, AN     )
12  INDIVIDUAL; PAUL PARRILLA, AN)
    INDIVIDUAL; AND DOES 1          )
13  THROUGH 500,                    )
                                    )
14             Defendants.          )
    _____)
15

16

17        I, RHONDA FAEHN, state that I have read the
    foregoing transcript of the testimony given by me at
18  my deposition on October 24, 2018, and that said
    transcript constitutes a true and correct record of
19  the testimony given by me at said deposition except as
    I have so indicated on the errata sheets provided
20  herein.

21

22

23                    _____

24                    RHONDA FAEHN

25

                                                            281

                                          EXHIBIT 13
                                          029

1  STATE OF INDIANA

2  COUNTY OF MARION

3

4         I, Michele K. Gustafson, CRR-RPR, a

5  Notary Public in and for said county and state, do

6  hereby certify that the deponent herein was by me

7  first duly sworn to tell the truth, the whole truth,

8  and nothing but the truth in the aforementioned

9  matter;

10        That the foregoing deposition was taken on

11 behalf of the Plaintiff; that said deposition was

12 taken at the time and place heretofore mentioned

13 between 10:10 a.m. and 4:54 p.m.;

14        That said deposition was taken down in

15 stenograph notes and afterwards reduced to typewriting

16 under my direction; and that the typewritten

17 transcript is a true record of the testimony given by

18 said deponent;

19        And thereafter presented to said witness for

20 signature; that this certificate does not purport to

21 acknowledge or verify the signature hereto of the

22 deponent.

23        I do further certify that I am a disinterested

24 person in this cause of action; that I am not a

25 relative of the attorneys for any of the parties.

EXHIBIT 13
028

1        IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my notarial seal this 29th day of

3    October, 2018.

4

5

6

7    _____

8

9

10

11

12    My commission expires:
      August 31, 2025

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 13
029

# EXHIBIT "14"

# PRESS RELEASE
# FOR IMMEDIATE RELEASE

On September 28, 2018, a Walker County Grand Jury convened to continue their ongoing investigation of the Karolyi Ranch and those individuals who may have committed offenses related to the conduct of Dr. Larry Nassar at that location.

The grand jury returned the following indictment:

**Steve Penny**
Tampering with Evidence – Third Degree Felony

Upon indictment, the 278th Judicial District Court issued a warrant for Penny's arrest in Cause Number 28849. If convicted, the range of punishment is 2 to 10 years in prison and up to a $10000 fine.

According to the indictment, Steve Penny, the former president of USA Gymnastics, is alleged to have tampered with evidence during the investigation of sexual assault allegations against Dr. Larry Nassar. The indictment alleges that Penny ordered the removal of documents from the Karolyi Ranch in Walker County, Texas that were related to the activities of Nassar at the ranch. The indictment further alleges that the removal of the documents was done for the purpose of impairing the ongoing investigation by destroying or hiding the documents. During the investigation by the Texas Rangers and the Walker County Sheriff's Office, several sources reported that Penny ordered the removal of the documents from the ranch after learning that an investigation was underway. The investigation revealed that the documents were delivered to Penny at the USAG Headquarters in Indianapolis, Indiana. To date, those records have not been recovered and the location of the records is unknown. The Texas Rangers and the detectives believe that those records are material to their investigation and that the removal of the records by Penny prevented them from reviewing documents that would have helped in their investigation of Nassar as well as assisted with the investigation of other offenses that may have occurred at the Karolyi Ranch.

On October 17, 2018, the United States Marshals Smoky Mountain Fugitive Task Force arrested Penny in Gatlinburg, Tennessee. He is currently being held there awaiting extradition to Walker County, Texas. The Walker County District Attorney's Office, the Walker County Sheriff's Office and the Texas Rangers appreciate the assistance of the US Marshals in locating Penny.

# EXHIBIT "15"

ALAN K. BRUBAKER, State Bar No. 70298
abrubaker@wingertlaw.com
COREY C. GARRARD, State Bar No. 308003
cgarrard@wingertlaw.com
WINGERT GREBING BRUBAKER & JUSKIE LLP
One America Plaza, Suite 1200
600 West Broadway
San Diego, CA 92101
(619) 232-8151; Fax (619) 232-4665

Attorneys for Specially Appearing Defendant
KATHY SCANLAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| JANE JD DOE, an individual,<br><br>　　　　Plaintiff,<br><br>v.<br><br>DOE 1, an individual; DOE 2, an Indiana Business entity of form unknown; DOE 3, an individual; DOE 4, an individual; DOE 5, an individual; and DOES 6 through 500,<br><br>　　　　Defendants. | Case No. 2:18-cv-1136-JLS (KES)<br><br>**DECLARATION OF KATHY SCANLAN**<br><br>Ctrm.: 10A<br>Judge: Hon. Josephine L. Staton |

I, KATHY SCANLAN, declare:

　　1.　　I am a party to this case and a party to the action styled *Jane AJ Doe v. Doe 1, et al.* (Case No. 30-2107- 00899357-CU-PO-CJC; Coordinated Proceeding No. JCCP 4943), and a potential party to the action styled *Jane EL Doe v. Doe 1, et al.* (Case No. BC706935). I am personally familiar with the content of this Declaration and generally with the facts of the referenced actions and if called upon could and would competently testify to its content.

　　2.　　From August 1, 1994 to August 1, 1998 I was the president of USA

EXHIBIT 15
001

WINGERT GREBING BRUBAKER & JUSKIE LLP

WINGERT GREBING BRUBAKER & JUSKIE LLP

1  Gymnastics ("USAG"). As president my job duties included oversight of complaints of

2  sexual misconduct by professional members and of the process for investigating and

3  disciplining those violating the USAG Code of Ethics. Ultimately, my job duties

4  included ensuring the safety of minors at National and International events held by

5  USAG.

6          3.      During my tenure as president, I communicated frequently with the United

7  States Olympic Committee ("USOC") regarding various USOC oversight functions the

8  USOC performed, including audits of USAG policies and general governance reviews

9  of USAG policies and procedures. Shortly after I began at USAG, I learned of the issue

10  of sexual abuse of minor athletes in the sport, having reviewed complaints of sexual

11  misconduct lodged with USAG. My first encounter with this issue involved a

12  disciplinary process that took place before I became President in which the member was

13  banned from membership in USAG because of sexual abuse of a minor. I dealt with

14  this case in the appeals process.

15          4.      I expressed concerns to USOC that sexual abuse was an issue in USAG and

16  specifically informed Sandy Knapp in her capacity as Chair of USAG and the rest of the

17  Board of Directors. USOC suggested USAG's process of revoking memberships,

18  investigating professional members of suspected or alleged sexual acts or misconduct

19  with minors, and banning professional members from the sport contradicted USOC

20  policies. Despite communicating concerns about sexual misconduct in the sport

21  (specifically by adult professional members of USAG) to USOC, the USOC

22  discouraged USAG from using its established process to investigate and ban these

23  members. USOC's challenge to USAG disciplining professional members in this

24  fashion (specifically impeding the ability to ban, suspend or investigate a member)

25  would have inhibited me from adequately protecting minor members. I however

26  continued to apply USAG's Code of Ethics and processes for investigating sexual abuse

27  claims and making appropriate disciplinary decisions. These measures helped protect

28  minor members of USAG from predators.

WINGERT GREBING BRUBAKER & JUSKIE LLP

5.     During my tenure as president of USAG the organization followed certain rules and regulations imposed by the USOC. The USOC provided financial support (in grants and funding) to USAG in part based on USAG's conformance with various directives and governance reviews. If USAG did not comply with various USOC directives, USAG could be subjected to discipline by the USOC, which could include reformation of policies at USAG, withdrawal of funding at USAG, or withdrawal of grants to USAG. Ultimately, USOC had the power to revoke USAG's charter as a National Governing Body, which was another circumstance through which USOC could exert control over USAG.

6.     When sexual abuse was reported to have occurred I was made aware. I actively encouraged and expected any individual associated with USAG who witnessed or suspected abuse to make me aware. Upon being made aware of alleged abuse I ensured USAG investigative and disciplinary procedures were commenced and I tracked those procedures.

7.     As president of USAG, if a professional member of USAG was accused of engaging in sexual misconduct with a minor, I expected to be made aware of such accusations and I tracked the status of the disciplinary process. During my tenure at USAG I knew of perhaps 12 to 20 allegations of misconduct by professional members. To my knowledge these were all the complaints of alleged sexual misconduct by members .

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 15 day of October, 2018, at Seattle, Washington.


By: _____
      KATHY SCANLAN

# EXHIBIT "16"

| | |
|---|---|
| **To:** | Larry Buendorf[                    ] |
| **From:** | Steve Penny |
| **Sent:** | Fri 7/15/2016 12:00:57 AM |
| **Subject:** | Re: Your successor |

Thanks Bueny.

Regards,
Steve

Sent from my AT&T iPhone from somewhere in this wonderful world!

On Jul 14, 2016, at 4:42 PM, Larry Buendorf <                    > wrote:

> Thanks Steve.....my position will probably be advertised in June -August 2017 with a selection in September and onboarding to begin in October. I will remain to train through the 2018 Winter Games and then hand over the reins in April 2018...you can tell him to watch for the advertisement next year. See you in Rio....
>
>
>
> <_NewComposite_Email_2de9bb96-c4be-4faa-a00f-6daef61c126e.png>
>
> **Larry Buendorf | Chief Security Officer**
> United States Olympic Committee
> 1 Olympic Plaza
> Colorado Springs, Colorado 80909
> +1 719-866-4571[o]

---

**From:** Steve Penny
**Sent:** 7/14/2016 5:30 PM
**To:** Larry Buendorf
**Subject:** Your successor

Hey Larry,

Looking forward to seeing you in Rio.

I wanted to let you know that I found a great guy who might be the perfect fit for your role when you decide to leave. His name is Jay Abbott and he is the senior agent in charge at the FBI office in Indianapolis. Let me know if you would like to speak with him.

Regards,

Steve

Sent from my AT&T iPhone from somewhere in this wonderful world!

EXHIBIT 16

USOC-001-00002148