1

2  , JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)

3  ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)

4  **MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612

5  Telephone: (949) 252-9990
Fax: (949) 252-9991

6

7  Attorneys for Plaintiff, ALEXANDRA ROSE RAISMAN

8

9  **UNITED STATES DISTRICT COURT**

10  **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE**

11

12  ALEXANDRA ROSE RAISMAN, an
individual.                                          Civil Case No. 5:18-cv-02479-BLF

13

14          Plaintiff,                               [The Honorable Beth Labson Freeman]

15      v.                                           **NOTICE OF PLAINTIFF ALEXANDRA
ROSE RAISMAN'S NOTICE OF
OPPOSITION AND OPPOSITION TO**

16  UNITED STATES OLYMPIC COMMITTEE,    **DEFENDANT UNITED STATES
a Business Entity of form unknown; USA       OLYMPIC COMMITTEE'S MOTION TO
GYMNASTICS, an Indiana Business Entity of    DISMISS PURSUANT TO *FRCP* 12(b)(2),**

17  Form Unknown; LARRY NASSAR, an           **(6); MEMORANDUM OF POINTS AND
individual, STEVE PENNY, an individual,      AUTHORITIES**

18  PAUL PARRILLA, an individual, and DOES
1 through 500.                               **Hon. Judge Beth Labson Freeman**

19
        Defendants.                          [Filed concurrently with Declaration of Alex E.

20                                           Cunny]

21                                           Complaint filed: February 28, 2018

22
                                            Hearing:    January 10, 2019

23                                          Time:       9:00 a.m.
                                            Judge:      Honorable Beth Labson Freeman

24                                          Courtroom: 3

25

26  ///

27  ///

28  ///

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TO THE COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that the Plaintiff Alexandra Rose Raisman (the "Plaintiff") hereby files the instant Opposition to Defendant United States Olympic Committee's ("USOC") Motion to Dismiss made pursuant to *Federal Rule of Civil Procedure* ("*FRCP*") 12(b)(2) and 12(b)(6). The instant Motion should be denied, as the USOC is amenable to personal jurisdiction in California, and each cause of action is properly pleaded against USOC:

1.) The USOC, a federally-chartered organization, is subjected to personal jurisdiction in California, on both (1) general jurisdiction on the basis that USOC has conducted substantial, continuous and systemic business in California for over 20 years, and (2) specific jurisdiction bases, in light of the fact the Plaintiff was sexually abused at a USOC event in San Jose, California, USOC had **actual knowledge** that former Dr. Larry Nassar was molesting gymnasts prior to the 2012 Olympic Trials where the Plaintiff was abused, but nevertheless, allowed Nassar to treat and abuse her at that event;

2.) USOC, as an entity, is liable for Dr. Larry Nassar's ("Nassar") molestations under *Civil Code* §51.9 - Sexual Harassment in a Defined Relationship, as it ratified the conduct of Nassar, its agent, pursuant to the holding of *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1068;

3.) The Negligence Causes of Action (Hiring/Retention/Supervision) are properly pleaded against USOC, as USOC stood *in loco parentis* with the Plaintiff, an Olympian transported across the planet and molested by USOC's physician, Larry Nassar;

4.) The Complaint adequately alleges a cause of action for Intentional Infliction of Emotional Distress (IIED), as the act of allowing a known child molester to be around children in one's care within intimate, unsupervised settings is reasonably construed as "extreme" and/or "outrageous" conduct, and was "directed at" Plaintiff;

5.) The Cause of Action for violation of "Masha's Law" (35 U.S.C.§§2255) is properly pleaded, USOC routinely transported minors across state and international borders, and, while doing so, exposing them to Nassar, a known risk and threat to Plaintiff's

**NOTICE OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

1  safety. In addition, USOC's agents, Debbie Van Horn and John Geddert, were actually
2  aware of molestations and "aided and abetted" in such. Thus, USOC is strictly liable
3  for Nassar's molestations;

4  6.) There existed a fiduciary duty between the USOC and the Plaintiff, as the USOC paid
5  the Plaintiff funds for competing, and USOC maintained a special, trusting and
6  confidential relationship with Plaintiff, making both Causes of Action 5 and 6 properly
7  pleaded against USOC;

8  7.) USOC engaged in deceptive and unfair business practices by representing physician
9  Larry Nassar as a fit and upstanding physician, which its agents knew to be untrue. As
10  such, USOC benefitted from this misrepresentation and, therefore, engaged in unfair
11  business practices pursuant to California *Business & Professions Code* §17200.

12  This Opposition is grounded in this notice, the attached Memorandum of Points and
13  Authorities, the Declaration of Alex E. Cunny and exhibits attached thereto, the records and files
14  in this action, and upon such further evidence and argument as may be presented prior to or at the
15  time of hearing on the Application.

17  Dated: November 21, 2018                    MANLY, STEWART & FINALDI

19                                    By: _____
                                           ALEX E. CUNNY, Esq.
20                                         Attorneys for Plaintiff,
                                           ALEXANDRA ROSE RAISMAN

**NOTICE OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S
MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

*(left margin, rotated)* MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF CONTENTS**

I.    **INTRODUCTION AND FACTUAL BACKGROUND** .........................
........................................................................................................ 1

    A.    **THE PLANTIFF AND HER SEXUAL ABUSE BY NASSAR.** .............
........................................................................................................ 1

    B.    **NASSAR, HIS ABUSIVE HISTORY AND USOC'S KNOWLEDGE AND CONCEALMENT OF ABUSE.** ........................................ 2

    C.    **USOC STOOD *IN LOCO PARENTIS* TO THE PLAINTIFF.** ............. …
.....................................................................................................5

    D.    **USOC'S SYSTEMIC CONTACTS WITH CALIFORNIA.** ...................5

        1.    **The USOC Has Maintained Employees, An Office in California, And Frequent Conducts Board of Directors Meetings in California.** .6

        2.    **USCO Receives Systemic Funding from Sources in California.**. 7

        3.    **After the 1984 Olympic Games in Los Angeles, the USOC Gave Half of its Surplus to LA84 and Half To The United States Olympic Endowment**.....................................................................7

        4.    **Repeated USCO and California Interactions Relented to Los Angeles 2028**...............................................................................8

        5.    **USOC's Failure to Register with the California Secretary of State**................................................................................9

II.   **ARGUMENT**.............................................................................9

    A.    **CONDUCTS SYSTEMIC BUSINESS IN CALIFORNIA THAT ARE SUBSTANTIAL AND CONTINUOUS, THUS, IS AMENABLE TO SUIT**............................................................................9

        1.    **In its Attempts to Skirt Personal Jurisdiction, USOC Misinterprets *Daimler AG v. Bauman* (2014) and Holding of *Martinez v. Aero Caribbean* (2014).**...................................................... 11

        2.    **USOC Violated *Corporations Code* §2203, Subjecting USOC to Personal Jurisdiction in California Under the Language of the Statute.**
........................................................................................... 13

    B.    **THE COURT CAN ASSERT SPECIFIC JURISDICTION OVER USOC, AS USOC HELD AN EVENT IN CALIFORNIA WHERE THE PLAINTIFF WAS ABUSED.** ........................................................... 13

        1.    ***The USOC Directed A Known Child Molester To California, Where He Sexually Abused The Plaintiff And Other Young Women and Girls, Thus, Availing Itself to Jurisdiction Under The "Effects Test"*** .....
........................................................................................... 14

        2.    **USOC Controlled The 2012 Olympic Trials in San Jose, Where the Plaintiff Was Molested by Nassar, Thus, Committed A Tort Within**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

iv

**TABLE OF CONTENTS**

**TABLE OF CONTENTS (CONTINUED)**

the State……………………………………………………………15

C.    A MOTION TO DISMISS CAN ONLY BE GRANTED IF IT APPEARS "BEYOND DOUBT" THAT NO SET OF FACTS CAN BE ALLEGED TO STATE A CLAIM.……………………………………………… 16

D.    THE NEGLIGANCE CAUSES OF ACTION ARE PROPERLY MAINTAINED.……………………………………………… 17

    1.    The USOC Was In a Special Relationship With The Plaintiff, As Foreseeability Of Abuse of Minors In Amateur Sports Is Foreseeable and Was Foreseeable.………………………………………… 17

    2.    The Acts Of Nassar Were Foreseeable, As USOC Had Notice of His Abuse Propensities, And USOC's Knowledge of Abusers In Amateur Sports………………………………………………………18

    3.    The Element of Breach Has Been Properly Pleaded…………18

    4.    Causation Is A Question of Fact, Which Has Been Properly Pleaded………………………………………………………19

    5.    Nassar Was USOC's Agent, As Pleaded…………………………..19

E.    *CIVIL CODE* §51.9 IS PROPERLY MAINTAINED AGAINST THE USOC…………………………………………………… 20

F.    MASHA'S LAW'S CIVIL REMEDY IS PROPERLY MAINTAINED AGAINST USOC UNDER *Morton v. De Oliveira* 984 F.2d 289 (9th Cir. 1993)…………… ……………………………………………… 20

G.    THE IIED CAUSE OF ACTION IS PROPERLY MAINTAINED.…… 21

    1.    USOC's Conduct Was Done With Reckless Disregard For The Safety Of Minors…………………………………………………21

    2.    Allowing Nassar To Be Around The Plaintiff Is Extreme and Outrageous In Light of USOC's Knowledge About……………22

    3.    The Conduct of USOC Was "Directed At" The Plaintiff…………23

H.    THE *B&PC* §17200 CAUSE OF ACTION IS PROPERLY MAINTAINED…………………………………………………… 23

    1.    USOC's Conduct Was Done With Reckless Disregard For The Safety Of Minors…………………………………………………23

I.    THE BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD CASUSES OF ACTION ARE PROPERLY MAINTAINED……………24

J.    USOC'S CONDUCT WAS "MALICIOUS", "OPPRESSIVE" AND "FRAUDULENT", WARRANTING AN AWARD OF PUNITIVE DAMAGES………………………………………………………24

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**v**

1

**TABLE OF CONTENTS (CONTINUED)**

2

**K.** **IN THE ALTERNATIVE, PLAINTIFF RESPECTFULLY REQUEST LEAVE…**……………………………………………………..25

3

**II.** **CONCLUSION**………………………………………………………… 25

4

5

6

7

8

9

10

11

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

## FEDERAL LAW

18 U.S.C. § 220503(2)……………………………………………………………………2

*Federal Rule of Civil Procedure* 12(b)(6)................................................................ 1, 16

*American Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.* 484

       F.3d 554, (D.C. Cir. 2007) ................................................................ 21

*Calder v. Jones*, 465 U.S. 783 (1984) ....................................................... 14

*Daimler AG v. Bauman* (2014) 571 U.S. 117 ........................................ 11, 12

*Dann v. Studebaker-Packard Corp.* 288

       F.2d 201, 215–16 (6th Cir. 1961)............................................... 17

*Gehling v. St. George's School of Medicine, Ltd.*, 773

       F.2d 539, 541 (3rd Cir. 1985) .................................................. 10

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 ................... 16

*Hess v. Pawloski* (1927) 274 U.S. 352............................................................ 15

*Hurst v. Buczek Enterprises, LLC* 870

       F.Supp.2d 810 .......................................................... 13

*Int'l Shoe Co. v. Wash.*, (1945) 326 U.S. 310 ............................................... 9

*J. I. Case Co. v. Borak* (1964) 377 U.S. 426.............................................. 17

*McDonald v. Coldwell Banker* (9th Cir. 2008) 543

       F.3d 498 .......................................................... 23

*McGee v. International Life Ins. Co.* 355 U.S. 220, 223 (1957)...................... 16

*Morton v. De Oliveira* (9th Cir. 1993) 984

       F.2d 289 .......................................................... 21

*Motors, Ltd.v. Consumers Union of U.S., Inc.* (C.D. Cal. 1998) 12 F.Supp.2d 1034................... 23

*Niece v. Sears, Roebuck & Co.* (N.D. Okla. 1968) 293 F.Supp. 792........................... 16

*Provident Nat. Bank v. California Federal Sav. & Loan Ass'n* (3rd Cir. 1982) 819.................. 10

**MANLY, STEWART & FINALDI**
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF AUTHORITIES**

## TABLE OF AUTHORITIES (CONTINUED)

*Travelers Indem. Co. v. Dammann & Co., Inc.* 594

      F.3d 238, 256 (3d Cir. 2010)......................................................... 25

*U.S. v. Frank B. Killian Co.* 10 O.O.2d 40 (6th Cir. 1959) ...................................... 17

## CALIFORNIA LAW

*Business & Professions Code*, §17200 ............................................................ 23

*Code of Civil Procedure* § 51.9 ........................................................................ 20

*Code of Civil Procedure* § 410.10 ...................................................................... 9

*Corporations Code* §2203 .................................................................................. 1

*Angie M v. Superior Court*, (1995) 37 Cal.App.4th 1217 .......................... 22, 25

*Archdiocese of Milwaukee v. Superior Court* 112 Cal.App.4th 423 (2003) ............ 1, 15

*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254 ............................. 23

*Barbara A. v. John G.*, (1983) 145 Cal.App.3d 369 ...................................... 24

*Blegen v. Superior Court*, (1981) 125 Cal. App. 3d 959 ............................... 25

*Burger King Co. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ........................ 9, 14

*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861 .................. 18

*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094 ...................... 20

*Christensen v. Superior Court*, (1991) 54 Cal.3d 868 .......................... 21,23

*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 ..................... 22

*Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670 .............. 13

*Daily v. Los Angeles Unified School District* (1970) 2 Cal.3d 741 ............ 18, 19

*Doe v. United States Youth Soccer Association, Inc.* (2017) 8 Cal.App.5th 1118 ......... 17

*Hesse v. Best Western Int'l, Inc.*, 32 Cal.App.4th 404 (1995) .......................... 14

*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 ...................... 17

*KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023 ................ 21, 22

*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448 ................ 19

*Martinez v. Aero Caribbean*, 764 F.3d 1062 (2014)................................. 11, 12

*Mesmer v. White*, (1953) 121 Cal. App. 2d 665.................................................. 24

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF AUTHORITIES**

1

## TABLE OF AUTHORITIES (CONTINUED)

2    *Mock v. Michigan Millers Mutual Ins. Co.*, (1992) 4 Cal. App. 4th 306 ...................................... 25

3    *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833 ........................................ 20

4    *Olson v. Cohen* (2003) 106 Cal.App.4th 1209 ........................................ 23

5    *Pavlovich v. Superior Court*, 29 Cal.4th 262, 268 (2002). ........................................ 9, 14

6    *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437, 447 (1952) .................................... 9

7    *Phyllis P.*v. Superior Court 183 Cal.App.3d 1193 ...................................... 22, 23

8    *Secrest Machine Corp. v. Superior Court*, 33 Cal.3d 664(1983).................................... 14

9    *Trerice v. Blue Cross of California*, (1989) 209 Cal. App. 3d 878................................... 22

10    *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269 ............................. 19

11    *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980) ...................................... 9, 14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MANLY, STEWART & FINALDI**
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**TABLE OF AUTHORITIES**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION AND FACTUAL BACKGROUND

"*The Olympic Community failed the people it was supposed to protect*."
- Rick Adams, employee of USOC, testimony to Congress in March of 2017.

Alexandra Rose Raisman ("Plaintiff"), a two-time Olympian, who was repeatedly molested by the Defendants USA Gymnastics ("USAG") and USOC, team doctor Larry Nassar ("Nassar'), brings claims against USOC and USAG for facilitating the sexual abuse she suffered. USOC challenges jurisdiction in this matter, despite the fact that its agents **knew that Nassar was a child molester prior to the Plaintiff being abused at the Olympic Trials in San Jose, California, in 2012, knew that abuse had been systemic in the sport of Gymnastics since the Plaintiff's <u>birth</u> and nevertheless sent Nassar to be in contact with the Plaintiff.** *Archdiocese of Milwaukee v. Superior Court* 112 Cal.App.4th 423 (2003). The USOC, which claims it is not subjected to General Jurisdiction, owned a 155-acre facility in Chula Vista, California, for over 20 years during the Plaintiff's abuse, which is **USOC's largest landholding**. This entity, that admits it has derived 16% of its revenue from contributions from California over the past 20 years, **has never registered itself as a Foreign entity doing business in California**, thus is subjected to personal jurisdiction under *Corporations Code* ("*C.C.C.*") §2203.

As to the *FRCP* 12(b)(6), the facts dictate that USOC is legally responsible for the molestation of the Plaintiff, as USOC undertook the safety and care of the Plaintiff in transporting her across state and international borders. USOC permitted the Plaintiff to be treated by a notorious child-molester, Nassar, despite numerous warnings known to USOC. These warnings, had they been heeded, would have prevented the Plaintiff's abuse, but were ignored and the abuse continued. The Plaintiff respectfully requests that the Court deny the instant Motion.

## A.     THE PLAINTIFF AND HER SEXUAL ABUSE BY NASSAR.

Plaintiff is a three time Olympic Gold Medalist, who trained and competed on behalf of the United States for the USAG and USOC. Complaint, ("Compl.") ¶1, Exhibit ("Ex.") "1" to Declaration of Alex Cunny ("Cunny Decl."). During her time competing as an elite gymnast in the sport she loved, the Plaintiff was molested repeatedly by Nassar from in or around 2010 to

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

2012, and again, in or around 2015 during non-optional medical treatment. <u>Compl.</u>, ¶5, Ex. 1. To abuse the Plaintiff, Nassar used his trusted position as a doctor to gain access to the Plaintiff, tell the Plaintiff she suffered from a medical condition, and then inserted his ungloved fingers into her vagina without warning and without consent. <u>Compl.</u>, ¶5, 37. The sexual abuse suffered by the Plaintiff was not known to be illegitimate or sexually abusive, at the time, as she believed it was how such medical treatment should have been provided. *Id.* at ¶1,3,37. The sexual abuse occurred at numerous events and specifically, in California at a USOC event: the 2012 Olympic Trials in San Jose, California. <u>Declaration of Alexandra Raisman</u> ("<u>Raisman Decl.</u>"), ¶5-6, Ex. "2" to <u>Cunny Decl</u>. Furthermore, the sexual abuse of the Plaintiff occurred at the Karolyi Ranch, which **was an Olympic Training Site from 2011 forward.** <u>Compl.</u>, ¶8. As a result, the Plaintiff continues to suffer from depression, anxiety, and sequelae related to the abuse. *Id.* at ¶¶3,58-60.

Under the Ted Stevens Amateur Sports Act (TSASA), USOC is responsible to "coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition, to foster productive working relationships among sports-related organizations"… 36 U.S.C. § 220503(2). USOC maintains "**exclusive jurisdiction directly** and **through constituent members or committees**, **over—(A) all matters pertaining to United States participation in the Olympic Games, the Paralympic Games, and the Pan-American Games, including representation of the United States in the games… and the organization of the Olympic Games,** the Paralympic Games, and the Pan-American Games when held in the United States." *Id.* at § 220503(A)-(B). **The USOC was responsible for the 2012 Olympic Trials for Women's gymnastics in San Jose, California**. *Id.*; <u>Deposition of Lee Johnson</u>, ("<u>Johnson Depo.</u>") 53:21-25,28:24-25,29:1-2,54:7-13,58:21-24,61:1-3, Ex. "3" to <u>Cunny Decl.</u>

**B.    NASSAR, HIS ABUSIVE HISTORY AND USOC'S KNOWLEDGE AND CONCEALMENT OF ABUSE.**

Nassar was the team physician for USAG from 1996 until 2015, and began as a trainer in 1986. <u>Compl.</u>, ¶24. Nassar was also retained by USOC and was an Osteopathic physician to provide care and athletic training to athletes for USOC and USAG. *Id.* Through this position of trust, Nassar perpetrated his abuse upon the Plaintiff, despite USOC and USAG concealing Nassar's abusive history and misrepresenting Nassar as being a safe physician. *Id.*

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

The Nassar abuse scandal was not the first time USOC became aware of abuse allegations in amateur sports. **In or around 1994, <u>and only months after the Plaintiff was born</u>, USAG President Kathy Scanlan was made aware of the serious threat posed to amateur athletes in gymnastics.** <u>Declaration of Scanlan</u>, ("<u>Scanlan Decl.</u>"), ¶2-3, Ex. "4" to <u>Cunny Decl.</u> These issues were communicated to USOC, though little was done. *Id.* at ¶¶4-5.

**In October of 1999,** the USOC was made aware, in writing, that sexual abuse of gymnasts was a prevalent problem within the sport and that these athletes were at a foreseeable risk. <u>Compl.</u>, ¶44, Ex. "A" to <u>Compl</u>, Ex. "1". Former USAG president Robert Colarossi informed USOC that it had implemented a "…fundamentally flawed process…" for discipline of members and that the USOC's process had an "…apparent indifference to the welfare of young children manifest in the Committee's actions." *Id.* Colarossi and Scanlan testified that USOC was made aware, by USAG, that child molestation in gymnastics, by USAG professional members, was a problem that needed to be fixed. <u>Declaration of Scanlan</u> ("<u>Scanlan Decl.</u>") ¶6-7, Ex. "4" to <u>Cunny Decl.</u>; <u>Deposition of Colarossi</u> ("<u>Colarossi Depo.</u>") 28:8-15, 125:3-5, Ex. "5" to <u>Cunny Decl</u>. USOC was pregnant with this knowledge when the Plaintiff first competed at USOC. <u>Compl.</u>, ¶¶1, 5, 44.

**In 2011**, while driving in a car with the USOC Team Coach, John Geddert ("Geddert"), another Olympian, McKayla Maroney, with the Plaintiff present, stated in the presence of Geddert that Nassar was "fingering" her. ("<u>Raisman Decl.</u>") ¶5, Ex. "2" to <u>Cunny Decl.</u>. Though he heard what was said, USOC agent Geddert made no report to law enforcement, and did nothing with the information. *Id.*

**In January of 2012**, Debbie Van Horn, an employee of USAG at that time and a former USOC employee, serving at The Ranch, and other locations including USOC events, **<u>knew that Nassar was placing his ungloved hands into the vaginas of athletes</u>**. <u>Compl.</u>, ¶10; <u>Walker County Criminal Indictment of Debbie Van Horn</u>, ("<u>Van Horn Indictment</u>") Ex."6" to <u>Cunny Decl.</u>; <u>Deposition of Dr. William Moreau</u>, 81:22-25, 82:44-7, Ex. "7" to <u>Cunny Decl.</u>. Though being present for these sexually abusive treatments performed by Nassar, **Van Horn did nothing to report this sexually abusive conduct**, and Van Horn was charged criminally as an accomplice

**3**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

to the abuse. <u>Compl.</u>, ¶44; <u>Van Horn Indictment</u>, Ex. "6"; <u>Deposition of Jordyn Wieber</u>, ("Weiber Depo."), 34:19-24, 35:19-23, Ex. "8" to <u>Cunny Decl.</u>. USOC and its agents, including Geddert and Van Horn, had knowledge that Nassar was sexually abusing athletes, but did nothing about it.

**In June of 2015**, an athlete came forward at the Karolyi Ranch and reported their abuse to USAG officials. <u>Deposition of Paul Parilla, Volume II</u>, 458:7-459:19, Ex. "9" to <u>Cunny Decl.</u> Scott Blackmun, the USOC's president, **was made aware of this information, but no law enforcement report was made by Blackmun.** <u>Deposition of Larry Probst</u>, 175:13-176:1, Ex. "10" to <u>Cunny Decl.</u> When Probst was asked whether he asked anyone at USAG about the complaints of a USAG doctor he heard in 2016, he stated, "I did not. **Not my job.**" *Id.* at 66:6-69:23 [Emphasis added at 69:21]. Subsequent to Nassar's abuse being made public in September of 2016, Rick Adams, Chief of Athlete and NGBs Services at USOC testified before Congress:

> "The U.S. Olympic Committee leads the diverse network of Olympic sports organizations in the United States, and **we must therefore take responsibility for its failures. We do take responsibility, and we apologize to any young athlete who has ever faced abuse**….**The abuse should have been detected, it should have been prevented, and it should have been promptly reported. The Olympic community failed** and must do better." <u>Congressional Testimony</u>, p. 1, 5, Ex. "11" [Emphasis Added], *see also* <u>Deposition of Rick Adams</u> ("Adams Depo.") 163:5-165:14, Ex. "12" to <u>Cunny Decl.</u>

The sexual abuse perpetrated by Nassar against the Plaintiff and many other women and girls, was done while Nassar was in their personal living quarters, alone. <u>Compl.</u>, ¶37(c); <u>Wieber Depo.</u>, 45:18-47:2, Ex. "8". This was directly against USAG policy (under Mandate of the USOC), but was never reported and no procedures were in-place to ensure this never happened. <u>Compl.</u>, ¶¶9,20,55(b). The USOC never audited these practices of USAG, to ensure that USAG was operating safely, nor did USOC ever ensure its oversight of these programs. <u>Compl.</u>, ¶20.

**In November 2016**, Steve Penny, former president of USAG, directed an individual (Amy White) to go to the Karolyi Ranch, and collect documents, given law enforcement wanted to search the facility, pertaining to Nassar. <u>Congressional Hearing Record, July 24, 2018-Testimony of Kerry Perry</u>, p.035-037, Ex. "13" to <u>Cunny Decl.</u> Ms. White purchased suitcases and brought scores of documents back from the Karolyi Ranch with her. *Id.* At deposition Ms. White invoked her 5th Amendment rights as to all USAG questioning. <u>Deposition of Amy White</u>,

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

1   Ex. "144" to <u>Cunny Decl.</u> Penny was indicted in September of 2018 for this conduct. [1]<u>Indictment</u>

2   <u>of Steve Penny</u>, Ex. "15" to <u>Cunny Decl.</u>[2] Former USAG employee, Rhonda Faehn, testified that

3   she told now-former president Kerry Perry about what Ms. White had done with the documents.

4   <u>Deposition of Rhonda Faehn</u> ("<u>Faehn Depo</u>"), 152:17-167:9, Ex. "16" to <u>Cunny Decl.</u> Ms. Perry

5   responded: "…**oh, that's not good**." *Id.* at 167:9 [emphasis added]. When asked whether a USOC

6   employees should report information received about childhood sexual abuse to law enforcement,

7   Probst responded, "I suspect that that would be one approach that could be taken" and later stated,

8   "I think it depends on the circumstances." *Id.* at 75:2-77:9.

**C.    <u>USOC STOOD *IN LOCO PARENTIS* TO THE PLAINTIFF.</u>**

   The Plaintiff attended events that were "hosted, sanctioned, supervised, and/or endorsed

by, under the supervision of, chartered, and/or under the mandate of …USOC", thus the USOC

stood *in loco parentis* with her. <u>Compl.</u>, ¶¶4-5,8, Ex. "1". USOC controlled all Olympics,

Olympic trials and World Artistic Gymnastics Championships that the Plaintiff attended, thus,

had a duty to protect her. *Id.* at ¶¶9-10, USOC promogulated safety rules for minors, including

that they should be protected at Olympic Training Centers, mandating NGBs like USAG, enforce

safety protocols for their athletes, and ensuring the safety of gymnasts at the Karolyi Ranch and

other locations. *Id.* at ¶¶9,13,55(b). As an entity that employs individuals who have direct contact

with children, **the USOC's agents and employees were "mandated reporters."** *Id.* at ¶18.

**D.    <u>USOC'S SYSTEMIC CONTACTS WITH CALIFORNIA.</u>**

   In 1995, the USOC purchased a 155-acre site located in Chula Vista, California, which it

designated as an "Olympic Training Center" ("OTC"). <u>Adams Depo</u>, 55:15-21, 72:13-17, 73:11-

17. Ex. "12". This 155-acre facility (**the USOC's single largest OTC**) was twice as big as both

of its other two OTCs ***combined*** (Lake Placid OTC at 29 acres; Colorado Springs OTC at 35

acres). <u>Deposition of Walt Glover</u>, 42: 16-25, 43:1-2, Ex. "19" to <u>Cunny Decl.</u>; <u>OTC Printouts</u>,

Ex. "20" to <u>Cunny Decl.</u> At Chula Vista OTC ("CVOTC"), the 155-acre campus contained

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

---

[1] Contrary to the Congressional Statements of Ms. Perry, news reports of November 8, 2018 indicate that USAG located some documents that may have been "missing." <u>Indianapolis Star Article</u>, Ex. "17" to <u>Cunny Decl.</u> It is unclear whether these are the same documents.

[2] As an ongoing issue, Mr. Penny has refused to sit for deposition despite being planned. <u>Certificate of Non-Appearance</u>, Ex. "18" to <u>Cunny Decl.</u>; <u>Cunny Decl.</u>, ¶3.

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

offices, a medical clinic, housing for athletes, and competition facilities for athletes. Adams Depo, 73:11-17, 110:21-111:3, Ex. "12". Prior to the facility's sale in January of 2017, CVOTC had 25-30 employees working at the facility, **in addition to** volunteers and independent contractors hired to provide services; 25-30 employees that included "senior management". Adams Depo, 59:12-60:1, 64:21-65:1, Ex. "12". The medical clinic was affiliated with a San Diego-based medical group, which included an agreement between USOC Medical Clinic and the University of California, San Diego, for "in-kind" medical services at CVOTC. Moreau Depo, 51:11-13, 164:20-169:5, Ex. "7" to Cunny Decl. The USOC staff at the medical clinic had no privileges at local hospitals and relied upon this group. *Id.* at 170:9-22, 171:6-19. USOC owned CVOTC for approximately 22 years, when the location was sold in January 2017. Adams Depo, 61:19-62:12, 71:14-71:24, Ex. "12". The CVOTC was **one** of only **two** pieces of land owned by USOC. Glover Deposition, 144:11-25, 145:15, 146:4-10, 146:14-18, Ex. "19".

After selling CVOTC in January 2017, USOC maintains 10 to 12 employees at CVOTC, USOC maintains offices at the facility, operates the medical clinic at CVOTC, and, following the sale in January 2017, CVOTC is not "materially different as a site." Adams Depo 62:17-21, 90:13-18, 91:12-25, Ex. "12". The USOC's land sale contract with Chula Vista provides that the Superior Court of California, **is where any award rendered can be enforced in the dispute provision clause**. Contract Between USOC and Chula Vista, Ex. "21" to Cunny Decl. During its over 20-year ownership of CVOTC, USOC has spent **over $130,000,000 on expenses for the CVOTC.** CVOTC Expenses, Ex. "22" to Cunny; Glover Deposition, 52:10-23, Ex."19". Further, USOC "Training Sites" in California, where USOC marks are used and a vetting process occurs. Adams Depo, 92:1-95:7, 238:25-239:15, Ex. "12"; Training Site Designation Plan, Ex. "23" to Cunny Decl. Beyond CVOTC, California is home to the Velodrome; a 125-acre facility which is designated as a USOC Training Site. Team USA Website, "Training Sites," Ex. "24" to Cunny Decl.; VELO Sports Center Website, Ex. "25" to Cunny Decl.. Further, 2 of the 7 "podium" training sites for USA Diving Olympians are located in California. Johnson Depo, 62:11-63:25; Team USA: Diving, "Podium Centers", Ex. "26" to Cunny Decl.

  1.   **The USOC Has Maintained Employees, An Office in California, And Frequently Conducts Board of Directors Meetings In California.**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**6**

In December 31, 2008, USOC maintained offices in six (6) states (one being California) and employed 54 employees (12.5% of USOC's total employees) in California; with 8.6% of its "Executive/Senior Level Officials & Managers and First/Mid-Level Officials &Managers" employed in California. Quadrennial Report, 2005-08, p. 19, Ex. "27" to Cunny Decl. In December 31, 2012, USOC had offices in only three (3) states and Washington, D.C., again California being one of the three. Quadrennial Report, 2009-12, p. 2 of Ex. "F," Ex. "28" to Cunny Decl. At this time, 11.2% of its employees were based out of California (52 of 468), with approximately 5% of its "Officials and Managers" being Californians. *Id.* at p.8 of Ex. "F." In December 2016, USOC maintained the same three office locations as the prior quadrennial and had 11.25% (52 of 462) of its employees in California. *See* Quadrennial Report, 2013-16, p. 5 of Ex. "C," Ex. "29" to Cunny Decl. In December 2016, approximately 6.3% of USOC's "Executive/Senior Level and First/Mid-Level Officials and Managers" were employed in California. *Id.* at p. 6 of 14. USOC's former CFO, Walt Glover, admitted that USOC pays California employment taxes for its California employees. Glover Depo., 68:8-18, Ex. "19". USOC hosts board meetings, frequently, in California. Probst Depo., 31:20-18, Ex. "10".

**2.    USOC Receives Systemic Funding from Sources in California.**

From 1994 until present, USOC has maintained a constant flow of revenue from California sources. Spreadsheet Breakdown of Revenue, Ex."30" to Cunny Decl.; Glover Depo., 81:8-20, 83:3-13, 83:15-25, 84:5-14, 84:24-25, 85:1-3, Ex. "19". Other than 1994 and 1995, all revenue from California exceeded 10% of USOC's total revenues from solicitations. *Id.* From 1994 until 2017, 14 of those years were marked by 15% or more of revenue coming from California. *Id.* In 2012, 2013 and 2015, revenue from California exceeded 20%. *Id*. In 2013, **28.9% of the revenues received by USOC came from California**. *Id.* In total, USOC has derived 16% of these contributions **from California in the last 23 years.** *Id.*

**3.    After the 1984 Olympic Games in Los Angeles, the USOC Gave Half of its Surplus to LA84 And Half To The United States Olympic Endowment.**

Starting in 1984 or shortly thereafter, USOC made a significant financial contribution to LA84. Walshe Depo, 91:1-10. Following the approximate $300 million surplus from the 1984 Olympic games in Los Angeles, "LA 84 Foundation received a block of… 150 million [dollars]."

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1   *Id.* In 1984, the USOC created the United States Olympic Endowment, ("USOE") with

2   $111,400,000 obtained from the 1984 Los Angeles Olympics. Quadrennial Report, 2009-12, p.26,

3   Ex. "28"; Glover Depo. 34:9-12, 37:2-5, Ex. "19". Over the years, USOE has made significant

4   contributions to the USOC, including grants totaling the following amounts in the following

5   years: $9,318,675 in 2012 (p. 76 of 2012 Form 990, Ex. "31" to Cunny Decl.), $8,576,768 in

6   2011 (p.71 of 2011 Form 990 Ex. "32" to Cunny Decl.), $9,622,957 in 2013 (p.73 of 2013 Form

7   990 Ex. "33" to Cunny Decl.), $3,321,498 in 2015. p. 67 of 2015 Form 990, Ex."34" to Cunny

8   Decl. Moreover, the fundraising branch of USOC[3], has an employee, Christine Walshe, paid by

9   USOC, who is responsible for large donations made to USOC **and is employed within**

10  **California, and is USOPF's agent for service**. Adams Depo, 146:16-21, 146:23-25, 147:6-9,

11  Ex. "12"; Walshe Depo, 19:18-25, 20:1, 20:2-4, 75:11-13, Ex. " ; Registration of Foreign

12  Corporation, for USOPF, in California, Ex. "35" to Cunny Decl. While incorporated in Colorado,

13  USOPF's 36 of the 82 Board of Director seats are filled by Californians. Website of USOPF

14  Board of Directors, Ex. "36" to Cunny Decl.

15      **4.    Repeated USOC and California Interactions Related to Los Angeles 2028.**

16      The USOC is engaged in a California Joint Venture for the 2028 summer Olympics in Los

17  Angeles. United States Olympic and Paralympic Properties ("USOPP"), Registration, Ex. "37" to

18  Cunny Decl; Probst Depo., 42:22-25, 43:1-3, 43:22-25, 44:1, 47:12-14. **The USOPP is a**

19  **California Partnership, where the Los Angeles Organizing Committee and USOC are**

20  **partners.** *Id.*; Probst Depo., 116:17-25, 117:1-6. Even while vetting options for the 2024

21  Olympics, Mr. Wasserman, Chairman of LA 2028 committee, "reviewed sharpening the strengths

22  of L.A.'s size and geography to enable more and better contact between the atmosphere of the

23  Games and the L.A. residents and visitors." Probst Depo, 60:21-25. Probst, has met "many times"

24  with Los Angeles Mayor "Eric Garcetti regarding the LA 2028 Olympics." Probst Depo, 64: 10-

25  14. He noted that "Eric [Garcetti] was intimately involved in the effort to secure the LA28 games.

26  So I've interacted with him many, many times." Probst Depo, 64: 17-19. Based on projections,

27

28

---

[3] It is called the United States Olympic and Paralympic Foundation's ("USOPF").

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

1    the USOPP is expecting revenues of **$5 billion from the LA2028 Olympics.** <u>Glover Depo</u>,

2    125:2-19, Ex. "19".

3         **5.**     <u>**USOC's Failure to Register with the California Secretary of State.**</u>

4         Glover testified that the USOC solicited funds from California ever since his employment

5    began **in the early 2000's.** <u>Glover Depo.</u>, 75:14-21, 76:1-5, 101:18-25, 102:1-6, 102:11-23, Ex.

6    "19". When asked where USOC's registration paperwork was, Mr. Glover did not know, and just

7    assumed it had been filed. *Id.* at 103:17-25, 104:1, 104:3-10. USOC admits that no registration

8    paperwork exists. <u>USOC Response to RFA, Set Two</u>, No. 27, Ex. "38".

9         **II.**     **ARGUMENT**

10   **A.**     <u>**USOC CONDUCTS SYSTEMIC BUSINESS IN CALIFORNIA THAT ARE SUBSTANTIAL AND CONTINUOUS, THUS, IS AMENABLE TO SUIT.**</u>

11        California may exercise personal jurisdiction over a nonresident entity if the entity has

12   certain minimum contacts with the forum state so that the maintenance of the suit does not offend

13   traditional notions of fair play and substantial justice. *Code of Civil Procedure* ("*C.C.P.*") §

14   410.10; *Int'l Shoe Co. v. Wash.*, (1945) 326 U.S. 310; *Pavlovich v. Superior Court*, 29 Cal.4th

15   262, 268 (2002). The key to whether exercise of personal jurisdiction comports with due process

16   is whether the defendant established minimum contacts in the forum state–it applies equally to

17   individual and corporate defendants; the court's inquiry must focus on the relationship among the

18   defendant, the forum, and the litigation. *Burger King Co. v. Rudzewicz*, 471 U.S. 462, 474 (1985);

19   *see also World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). As to general

20   jurisdiction (compared with "specific" jurisdiction), a corporate defendant can be haled into a

21   non-resident state when its contacts are "…sufficiently substantial and of such a nature as to

22   permit [the state] to entertain a cause of action against a foreign corporation…" *Perkins v.*

23   *Benguet Consol. Min. Co.*, 342 U.S. 437, 447 (1952). Recent cases relied upon by USOC are

24   distinct, in light of the business that USOC was running systemically from California. For

25   "general jurisdiction" to apply to a person or entity, the U.S. Supreme Court has determined that

26   "the defendant's conduct and connection with the forum State [should be] such that [it] should

27   reasonably anticipated being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*,

28   444 U.S. 286, 297 (1980).

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**9**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

USOC operated its **largest training facility** CVOTC in California for over two decades. USOC had local agreements with vendors, hired Californians, and even agreed that it would be bound by California law in the land sale agreement. In December 2012, USOC maintained offices in only three states and the District of Columbia, one of those states being California. Throughout this duration, 11.2% of USOC's employees were based out of California (52 of 468), with approximately 5% of its "Officials and Managers" being Californians. *Id.* at p.8 of Ex. "F." In 2012, 2013 and 2015, revenue from California exceeded 20%, and, in 2013, **28.9% of the revenues received by USOC came from California**. *Id.* For the last few years and over the next decade until 2028, USOC and California entities are engaged in intimate collaborations—as part of an officially-registered joint venture for purposes of facilitating the 2028 Olympic Games in Los Angeles. Probst Depo, 60:21-25, 64: 17-19. Any **one** of these facts would be sufficient to create a reasonable expectation that USOC may appear in a California court. Their compounding presence is clear evidence of multifaceted, continuous, and substantial operations in California.

*Provident Nat. Bank v. California Federal Sav. & Loan Ass'n* (3rd Cir. 1982) 819 F.2d 434[4] notes that in order to avail oneself to a state's jurisdiction, "the nonresident's contacts to the forum must be continuous and substantial." *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 541 (3rd Cir. 1985). *Provident* contextualizes the application of this standard to a federally-chartered organization with reach across the United States, and whether a California organization had availed itself to Pennsylvania. The case explores the contacts of California Federal, "a savings and loan association federally chartered and headquartered in California with 138 branch offices in California, 37 branch offices in Florida, 13 branch offices in Georgia, and 6 branch offices in Nevada." *Id.* at 435-36. *Provident* notes, in critical part:

> "During the relevant period in which abuse is alleged, between 700 and 1000 of California Federal's depositors resided in Pennsylvania, representing only about .066% of its almost one million depositors. The Pennsylvania depositors contributed about $10 million to California Federal's total of $14 billion in deposits (about .071%). Only about $10 million of California Federal's total outstanding loans of $12 billion (about .083%) were traceable to Pennsylvania residents…. California Federal maintained no Pennsylvania office,

[4] "Both under the terms of its charter and as a result of its multi-state, if not nationwide activities, the USOC cannot be considered to be 'localized' in Colorado. The USOC simply does not exhibit the narrow geographic scope required to support a finding of localization." *Burton v. U.S. Olympic Comm.*, 574 F. Supp. 517, 521 (C.D. Cal. 1983).

**10**

employees, agents, mailing address, or telephone number. It had not applied to do business in Pennsylvania, did no advertising in Pennsylvania, and paid no taxes there. Three Pennsylvania financial institutions, however, serviced $10.2 million of loans for California Federal." *Provident Nat. Bank*, 819 F.2d at 436.

As a federally-chartered organization, the court found these business activities "establish[d] that California Federal carried on a continuous and systematic part of its general business within the Commonwealth of Pennsylvania sufficient to confer *in personam* jurisdiction over it upon the district court." *Id.* at 438. USOC is a federally-chartered organization with operations in California that are more prominent than California Federal's operations in Pennsylvania. USOC's assertion that is not subject to general jurisdiction in California fails to recognize the systemic contacts that are expected of a federally-chartered organization.

   1.   **In its Attempts to Skirt Personal Jurisdiction, USOC Misinterprets *Daimler AG v. Bauman* (2014) and Holding of *Martinez v. Aero Caribbean* (2014).**

USOC's reliance on *Daimler AG v. Bauman* (2014) 571 U.S. 117 and the "tag jurisdiction" case of *Martinez v. Aero Caribbean*, 764 F.3d 1062 (2014) are misplaced. In *Daimler*, the Supreme Court overturned the Ninth Circuit's ruling that a subsidiary's (MBUSA) contacts to a *foreign corporation*[5] (Daimler) were insufficient to impute those contacts to the parent corporation, for claims brought by foreign plaintiffs. *Id.* at 134-35. The Court then stated, even assuming *arguendo* that the contacts of the subsidiary were imputable to the Daimler company, and its "…slim contacts with the State hardly render it at home there." *Id.* at 136. In relying solely on the MBUSA's contacts with California, the Court stated that the "subsidiary of Daimler **incorporated in Delaware** with its principal **place of business in New Jersey**. MBUSA distributes Daimler-manufactured vehicles to independent dealerships throughout the United States, **including California.**" *Id.* at 121. The only other information presented in the Court's opinion itself was that approximately 10% of Daimler's U.S. sales (MBUSA's) were in California, which, in turn, only accounted for 2.4% of its sales worldwide. *Id.* at 123. Indeed, MBUSA—Daimler's wing for U.S. sales— was not even named as a co-defendant in the case. *Id.* at fn.12. Moreover, an underlying concern in crafting *Daimler*'s opinion is that Daimler was a foreign corporation, and there were greater multinational concerns at-issue. *Id.* at 140.

[5] "Foreign corporation" is reference to non-US corporations, not a non-forum entity.

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**11**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Daimler's commercial role did not result in general jurisdiction for the company. *Daimler*, 571 U.S. at 123. The distinction with the present case centers on the fact that Daimler's presence in California, as "the largest supplier of luxury vehicles to the California market," was large *relative to other companies*. *Id*. Here, USOC's presence in California is large *relative to itself*. As noted above, CVOTC, a 155-acre facility **was twice as big as both of USOC's other two OTCs combined**. At CVOTC, the 155-acre campus contained offices, a medical clinic, housing for athletes, and competition facilities for athletes. Adams Depo, 73:11-17, 110:21-111:3, Ex. "12." Prior to the facility's sale in January of 2017, CVOTC had 25-30 employees working at the facility, in addition to volunteers and independent contractors hired to provide services; 25-30 employees that included "senior management." Adams Depo, 59:12-60:1, 64:21-65:1, Ex. "12." Meanwhile, Daimler's California operations "sales account for 2.4% of Daimler's worldwide sales." *Id*. at 123. Since general jurisdiction seeks to identify where *a company* is "essentially at home," it makes sense that this analysis would be a *company-based* inquiry, clearly distinguishing entities USOC and Daimler. While USOC views *Daimler* as its "silver-bullet" to averting general jurisdiction, the case is distinguishable on its facts, facts that USOC cannot escape, including the workforce it maintains in California, its California landholding, and its repeated accessing of California revenue streams. *Martinez* is even further afield as the *Martinez* court explicitly stated:

> [*Martinez*] is not such an exceptional case. [Defendant] ATR [Avions de Transport Régional] is organized and has its principal place of business in France. It has no offices, staff, or other physical presence in California, and it is not licensed to do business in the state. [citation omitted]. Its California contacts are minor compared to its other worldwide contacts." *Martinez*, *supra*, (9th Cir. 2014) 764 F.3d at 1070.

In *Martinez*, the company was not licensed to do business in California, and it had no office or other physical presence there." *Id*. at 1065. The Court went on to say that its only other contacts between the company and California consisted of cursory contacts, insufficient to constitute general jurisdiction. *Martinez* 764 F.3d at 1071. Again, attempts to draw parallels between USOC's California operations and ATR are poorly analogized. By contrast, USOC maintained offices in California, a regulated medical clinic in California, operated a 155-acre facility for 22 years, employed approximately 10% of its staff in California (including management), paid employment taxes, and even received over 28% of its revenue from California

**12**

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

one year. Indeed, USOC's own congressional mandate requires it "to coordinate and develop amateur athletic activity in the United States," with California not being exempted from its mandate. Unlike *Martinez*, where Defendant ATR had only fleeting, incidental contacts with California, USOC expanded and sustained principal training operations into the state.

**2.   USOC Violated *Corporations Code* §2203, Subjecting USOC to Personal Jurisdiction in California Under the Language of the Statute.**

*C.C.C.* §2203 provides: "[a]ny foreign corporation which transacts intrastate business and which does not hold a valid certificate from the Secretary of State may be subject to a penalty … and **the foreign corporation, by transacting unauthorized intrastate business, shall be deemed to consent to the jurisdiction of the courts of California in any civil action arising in this state in which the corporation is named a party defendant**." *Id.* §2203 [emphasis added]. "Intrastate business transactions" is defined as "entering into repeated and successive transactions of its business in this state, other than interstate or foreign commerce." *Id.* at §191(a). "Whether a company transacts intrastate business is a question committed to the 'peculiar facts' of each case." *Hurst v. Buczek Enterprises, LLC* 870 F.Supp.2d 810, 819 (N.D. Cal. 2012). In *Hurst*, the court held that a New York corporation, which hired a California contractor to maintain California properties for customers, was engaged in "transacting intrastate business." *Id.* at 819; *see* Form 990-2006, Ex. "40"; Glover Depo., 75:14-21,76:1-5,  101:18-25,102:1-6,102:11-23,135:1-24,141:1-10 Ex. "19". USOC had construction projects in California, which is intrastate commerce. *Gen. Ry. Signal Co. v. Commonwealth of Virginia ex rel. State Corp. Comm'n*, 246 U.S. 500, 509–10 (1918). USOC admits it never registered as a foreign corporation in California, admits to soliciting funds from California for decades, and its status as a "federally-chartered" organization does not spare it from complying with California law. USOC Response to RFA, Set Two, No. 27, Ex. "38"; Glover Depo. 75:14-21,76:1-5, Ex. "19"; *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 678. Thus, USOC is availed to jurisdiction.

**B.   THE COURT CAN ASSERT SPECIFIC JURISDICTION OVER USOC, AS USOC HELD AN EVENT IN CALIFORNIA WHERE THE PLAINTIFF WAS ABUSED.**

For specific jurisdiction, a party must have only sufficient "minimum contacts" to be haled into California Courts. *Vons Companies*, *supra*, at 446. Under the specific jurisdiction

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

doctrine, a party is said to have had such minimum contacts when that party purposefully avails itself of the privilege of conducting activities in the state, thereby invoking the benefits of that state's laws. *See Hesse v. Best Western Int'l, Inc.*, 32 Cal.App.4th 404, 410 (1995); *Pavlovich*, *supra*, at 268. A non-resident party that purposefully avails itself of the benefits of the state is deemed to be on notice that it may be subject to litigation in the state. *Vons Companies*, *supra*, at 446-447, *citing World-Wide Volkswagen*, *supra* at 292. Unlike general jurisdiction, in order to exercise specific jurisdiction, the controversy in question must arise out of or be related to the party's contacts with that state. *Vons Companies*, *supra*, at 446, *citing Burger King Corp.*, *supra*, at 472. In determining whether a party has "purposefully availed" itself of the benefits of a state, the courts have applied several tests. One is if the party has deliberately engaged in "significant activities" within the state. *Vons Companies*, *supra* at 446. Another is if the party has "purposefully directed" his activity at the state's residents. *Vons Companies*, *supra*, at 446, citing *Burger King*, *supra*, 471 U.S. at 475-476. Another is where the party "causes effects" within the state. *Secrest Machine Corp. v. Superior Court*, 33 Cal.3d 664, 669 (1983).

Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Vons Companies*, *supra*, at 447-448, *citing Burger King*, *supra*, at 476, *and International Shoe*, *supra*, at 320. Courts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and "the shared interest of the several States in furthering fundamental substantive social policies." *Vons Companies*, *supra*, at 447-448.

1.    **The USOC Directed A Known Child Molester To California, Where He Sexually Abused The Plaintiff And Other Young Women and Girls, Thus, Availing Itself To Jurisdiction Under The "Effects Test".**

In *Calder v. Jones*, 465 U.S. 783 (1984), the case establishing the "effects test", out-of-state defendants can be hailed into California, even in the event that their tortious conduct (in that case allegedly libelous publications) were written in Florida and only distributed in California. In *Calder*, the plaintiff was a California resident and filed a libel suit in California, for publications

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

that were written and edited by several defendants in Florida, including a publisher, a reporter (South), and the editor (Calder), who were all Florida residents. *Id.* at 784-85. The publisher and the distributing company both submitted to California jurisdiction, though the reporter and editor, both submitted challenges to personal jurisdiction. *Id.* The reporter made several trips to California per year, whereas the editor had only been to California on two separate occasions, **both occasions being unrelated to the libel action.** *Id.* The Court went on to hold that, "[i]n this case, petitioners are primary participants **in an alleged wrongdoing intentionally directed at a California resident**, and jurisdiction over them is proper on that basis." *Id.*[Emphasis Added].

*Archdiocese of Milwaukee*, 112 Cal. App. 4th at 438 held that an entity cannot escape jurisdiction in California, when they direct a known pedophile to the State to be around children. *Id.* at 438. In *Archdiocese*, a known pedophile (Widera) was excardinated from the Milwaukee Archdiocese and then subsequently sent to parishes in California. *Id.* at 432. The perpetrator then molested children in California. *Id.* at 432-33. In holding the Archdiocese of Milwaukee amenable to suit in California, the court held that, "[t]he nature of the Milwaukee Archdiocese's conduct—sending a pedophile priest directly into California—meant the Milwaukee Archdiocese's conduct would harm California residents." *Id.* at 440. USOC's own agent (Debbie Van Horn) had actual knowledge that Nassar was penetrating athletes without consent or a glove, though she never reported the conduct. <u>Compl.</u>, ¶10; <u>Criminal Indictment (Van Horn)</u>, Ex. "6". This is in addition to Geddert, an Olympic Coach, knowing that Ms. Maroney had previously disclosed that she was penetrated by Nassar. <u>Raisman Decl.</u>, ¶4-5, Ex. "2". Indeed, this knowledge occurred in January of 2012 or earlier, before the Plaintiff was molested in San Jose. *Id.* This is purposeful aiming on behalf of USOC, which subjects it to jurisdiction.

**2.    USOC Controlled The 2012 Olympic Trials in San Jose, Where the Plaintiff Was Molested by Nassar, Thus, Committed A Tort Within the State.**

In *Hess v. Pawloski* (1927) 274 U.S. 352, the Court held that a nonresident who got into a car accident in the forum state, was allowed to be sued in that forum state. *Id.* at 356. Moreover, "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. [citations omitted] The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**15**

1  when he died." *McGee v. International Life Ins. Co.* 355 U.S. 220, 223 (1957). As seen in

2  *McGee*, a single insurance contract was sufficient to confer jurisdiction on the insurance

3  company, despite the fact that the insurance company had no office or agent in California and

4  "never solicited or done any insurance business in California apart from the policy involved

5  here." *Id.* at 220. Nevertheless, the Court found jurisdiction was properly asserted and that the

6  Texas company could be haled into California court. *Id.* at 224.

7      As in *Hess*, *supra*, 274 U.S. 352, the unsurprising proposition that a nonresident must be

8  held to answer in a state where they were involved in a car accident, is directly analogous to the

9  situation at-bar, as the USOC coordinated the 2012 Olympic Trials in San Jose. <u>Johnson Depo.</u>,

10  53:21-25, 28:24-25, 29:1-2, Ex. "3". This single transaction is sufficient to assert jurisdiction over

11  the USOC, given that, "[t]hese residents would be at a severe disadvantage if they were forced to

12  follow the insurance company to a distant State in order to hold it legally accountable." *Id.* at 223.

13  As pleaded, it was responsible. <u>Compl.</u>, ¶4, Ex. "1". Plaintiff was molested by Nassar in San Jose.

14  <u>Raisman Decl.</u>, ¶_, Ex. "2". As noted in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466

15  U.S. 408, 415, specific jurisdiction is proper when "a nonresident corporate defendant… has

16  certain minimum contacts with the forum such that the maintenance of the suit does not offend

17  traditional notions of fair play and substantial justice." The 2012 Olympic Trials operated as a

18  USOC-event where USOC's physician molested Plaintiff—the action "arising out of" USOC's

19  conduct in California. USOC's "exclusive jurisdiction" over this event, and its federal mandate to

20  provide "proper medical supervision" of athletes, avails it to jurisdiction. Sec. 220503(A)-(B),(E).

21  **C.**  **<u>A MOTION TO DISMISS CAN ONLY BE GRANTED IF IT APPEARS "BEYOND DOUBT" THAT NO SET OF FACTS CAN BE ALLEGED TO STATE A CLAIM.</u>**

22      *FRCP* 12(b)(6) provides that, "[e]very defense to a claim for relief in any pleading must

23  be asserted in the responsive pleading if one is required. But a party may assert the following

24  defenses by motion:… (6) failure to state a claim upon which relief can be granted…" "The

25  function of a motion to dismiss is to test the law of a claim, not the facts which support it." *Niece*

26  *v. Sears, Roebuck & Co.* (N.D. Okla. 1968) 293 F.Supp. 792, 794. "Such motions, it must be

27  remembered, have been characterized as 'mere formal motions directed only to the face of the

28  complaint.' As a general rule, they are not favored and should be granted sparingly and with

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**16**

1   caution only where it appears to a certainty that no set of facts could be proven at trial which

2   would entitle a plaintiff to any relief." *Dann v. Studebaker-Packard Corp.* 288 F.2d 201, 215–16

3   (6th Cir. 1961) *disapproved of on other grounds by J. I. Case Co. v. Borak* (1964) 377 U.S. 426.

4   "And in furtherance of this policy it has recently been declared to be 'the accepted rule that a

5   complaint should not be dismissed for failure to state a claim **unless it appears beyond doubt**

6   **that the plaintiff can prove no set of facts in support of his claim which would entitle him to**

7   **relief.**" *U.S. v. Frank B. Killian Co.* 10 O.O.2d 40 (6th Cir. 1959). Here, the Plaintiff's well-

8   pleaded allegations are to be accepted as true, and the complaint is to be liberally construed by the

9   Court. Under this standard, the Plaintiff each cause of action has been sufficiently pleaded.

10  **D.      THE NEGLIGENCE CAUSES OF ACTION ARE PROPERLY MAINTAINED.**

11           USOC claims that (1) sexual abuse of minors in youth sports organizations is

12  "unforeseeable" thus, it is not in a special relationship with the Plaintiff, (2) Nassar's conduct was

13  not foreseeable, (3) there is no breach and no causation and (4) Nassar was not USOC's agent.

14  This "shotgun approach" to a Motion to Dismiss fails on all accounts:

15       **1.   The USOC Was In a Special Relationship With The Plaintiff, As Foreseeability**
             **Of Abuse of Minors In Amateur Sports Is Foreseeable and Was Foreseeable.**

16           "Generally, a greater degree of care is owed to children because of their lack of capacity

17  to appreciate risks and avoid danger. ([Citation omitted].) Consequently, California courts have

18  frequently recognized special relationships between children and their adult caregivers that give

19  rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties."

20  *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 410[emphasis added]. The

21  Court in *Juarez* further explains the relationships where a special duty exists, including pre-

22  schools, a school district to a mother of a student, and wife of sex offender who had children play

23  at their home. *Id.* at 410. The case of *USYSA* dismantles USOC's arguments, which involved a

24  minor soccer member who participated in soccer programs with a national organization. *Doe v.*

25  *United States Youth Soccer Association, Inc.* (2017) 8 Cal.App.5th 1118. In *USYSA*, the court

26  stated: "[i]n sum, we conclude that, as in *Juarez*, **there was a special relationship between**

27  **defendants and plaintiff.**" *Id.*[Emphasis Added]. In finding the existence of a "special

28  relationship" between the US Youth Soccer and the plaintiff, the court held that there is

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**17**

1    "…nothing in the present record indicating that defendants were in any way involved in the

2    sexual assault of plaintiff or knew that Fabrizio would harm her." *Id.* at 1137. The **Court still**

3    **found a special relationship** with the plaintiff. More-so than the *USYSA* case, the Plaintiff here

4    was in a custodial relationship with USOC, where she attended the USOC's Olympic Training

5    Site at the Ranch, and events across state lines that were sponsored by USOC. Compl., ¶¶8-9, Ex.

6    "1". Incredibly, USOC received reports as early as 1994 about abuse, but still thinks abuse is **not**

7    **foreseeable in amateur sports.** USOC wants it both ways; claiming that it is at the forefront of

8    athlete safety with "SafeSport", while on the other hand, acting bewildered that any child has ever

9    been abused in their programs. Under *USYSA*, the abuse was foreseeable.

10       2.    <u>**The Acts Of Nassar Were Foreseeable, As USOC Had Notice of His Abusive**</u>
         <u>**Propensities, And USOC's Knowledge of Abusers In Amateur Sports.**</u>

11           USOC says Nassar's abuse was not foreseeable, despite allegations being pleaded that

12   they knew or should have known of such. Compl. ¶¶15, 17, 43-44, 47, 55(a),(g), 67. Plaintiff

13   pleaded specific facts of warning of Nassar being a pedophile, though this was not relied upon by

14   USOC in its Motion. *Id.* at ¶¶1, 17. In 2012, the California Supreme Court issued the definitive

15   opinion concerning the liability of a public school district for the negligent acts of its staff in the

16   hiring, supervision or retention of employees who abuse students. *C.A. v. William S. Hart Union*

17   *High School Dist.* (2012) 53 Cal.4th 861. In *C.A.*, the Court considered whether a public school

18   district may be found vicariously liable for the acts of its employees "w*ho allegedly knew, or*

19   *should have known"* of an abusive teacher's propensities "and nevertheless hired, retained and

20   inadequately supervised her." *Id.*, p. 865. The Court concluded that a negligence claim predicated

21   upon such allegations is "a viable one." *Id.* The "determination of whether the supervision is

22   adequate, that is, whether it amounts to due care, is a question of fact for the jury." *Daily v. Los*

23   *Angeles Unified School District* (1970) 2 Cal.3d 741, 750, fn. 6. USOC was given the Colarossi

24   letter, its agent, Debbie Van Horn who was tasked at working at USOC events a mandated

25   reporter, viewed the abuse and did not report, and therefore clearly had inquiry notice of Nassar's

26   abusive tendencies**.** USOC's argument fails on each basis.

27       3.    <u>**The Element of Breach Has Been Properly Pleaded.**</u>

28

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1  "The existence of a legal duty to use reasonable care in a particular factual situation is a

2  question of law for the court to decide. ([citation omitted].)  **However, the elements of breach of**

3  **that duty and causation are ordinarily questions of fact for the jury's determination**."

4  *Vasquez v. Residential Investments, Inc.* 118 Cal.App.4th 269, 278 (2004) [Emphasis Added].

5  Plaintiff has pleaded that USOC breached its duty to her, by failing to inform her, failing to warn

6  her, and failing to protect her from Nassar, who was a known child molester. Compl., ¶¶1, 17, Ex.

7  "1". This is a question of fact to be resolved by the jury, not by the Court.

8  **4.      Causation Is A Question of Fact, Which Has Been Properly Pleaded.**

9  "The first component of causation in fact generally is a question of fact for the jury.

10  Causation in fact is shown if the defendant's act or omission is 'a substantial factor' in bringing

11  about the plaintiff's injury. …This issue ordinarily may not be resolved on summary judgment."

12  *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 288. Plaintiff has pleaded

13  causation against USOC, as its acts permitted Nassar to maintain his role with USOC (and

14  USAG) where he continued to abuse the Plaintiff. Compl., ¶¶97-98, 99, Ex. "1".

15  **5.      Nassar Was USOC's Agent, As Pleaded.**

16  Contrary to USOC's conclusory statements, Nassar was pled as an agent of USOC,

17  specifically that he was "retained by…USOC…as an Osteopathic Physician and certificated

18  athletic trainer to provide care, treatment, and athletic training to …USOC, and its participants."

19  Compl., ¶24. Furthermore, Steve Penny expressly characterizes Larry Nassar as a *physician who*

20  *volunteered with USAG and the USOC*, making him an agent as a matter of law. Declaration of

21  Steve Penny, ("Penny Decl."), ¶16, Ex. "39". In *Secci*, the Court held that even though drivers

22  were not their employees, there **was sufficient evidence of their agency, thus, those acts were**

23  **attributable to the principal.** *Id.* at 862. Moreover, in the realm of the protection of children,

24  courts have long imposed liability against entities that are responsible for the safety of children,

25  even if the perpetrator was not an employee. *Leger v. Stockton Unified School Dist.* (1988) 202

26  Cal.App.3d 1448, 1453 (liable when student was "battered by nonstudent"); *Daily v. Los Angeles*

27  *Unified School District* (1970) 2 Cal.3d 741(slap-boxing fight between children); *M.W.,* 110

28  Cal.App.4th at 519 (minor to minor molestation case). Nassar was USOC's agent. Compl., ¶24.

**E.      *CIVIL CODE §51.9 IS PROPERLY MAINTAINED AGAINST THE USOC.***

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION
TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

USOC claims the *Civil Code* § 51.9 claim is improper against it because it didn't ratify Nassar's conduct. However, this is patently against the allegations of the Complaint. *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110 controverts USOC's position. There are two avenues to hold a corporation vicariously liable for the acts of its agents: *respondeat superior* and ratification. *C.R.,* 169 Cal. App. 4th at 1110. Ratification is:

> "…an alternate theory to respondeat superior… The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. **Whether an employer has ratified an employee's conduct is generally a factual question.**" *C.R*, 169 Cal. App.4th at 1110 [emphasis added.]

"If the employer, after knowledge of *or opportunity to learn of the agent's misconduct,* continues the wrongdoer in service, the employer may become an abettor and may make himself liable in punitive damages." *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 852 [emphasis added]. In *C.R.*, a nursing facility hired an employee who worked with patients. Despite repeated communication of complaints, it took no action against the perpetrator and, resultantly, "…condoned and ratified his actions by allowing him to continue working despite the repeated acts of sexual harassment…" *Id.* Under *C.R.*, USOC can be held liable for its ratification of Nassar's acts of sexual harassment, as Nassar was pleaded as USOC's agent (*see supra* Section II(d)(5)), and that USOC had knowledge that he was an abuser, but nevertheless, allowed him to remain in secluded contact with the Plaintiff. Compl., ¶¶55(a)-(b),(g),15,17,43-44,47,67. Further, there was a concealment by USOC, in failing to inform the Plaintiff that Nassar was a molester and destroying records at the Karolyi Ranch. These allegations are sufficient to show ratification.

## F.   MASHA'S LAW'S CIVIL REMEDY IS PROPERLY MAINTAINED AGAINST USOC UNDER *MORTON V. DE OLIVEIRA* 984 F.2D 289 (9TH CIR. 1993)

18 U.S.C. § 2255 provides, "[a]ny person who, while a minor, was a victim of a violation of section 1589… and **who suffers personal injury as a result of such violation**…may sue in any appropriate United States District Court…" 18 U.S.C.A. § 2255 [Emphasis Added]. Plaintiff has suffered violations under §§2423(b), 2423(c), as a result of the molestations that occurred internationally, perpetrated by Nassar. Compl., ¶¶73-74. USOC conclusorily claims that the Masha Law claim is "completely meritless" as it applies to USOC, though it fails to analyze *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891,894 (11th Cir. 2004) or provide any meaningful analysis.

In *Celebrity Cruises,* the Court analyzed the Ninth Circuit case of *Morton v. De Oliveira* (9th Cir. 1993) 984 F.2d 289, regarding its common carrier status and upholding strict liability for a cruise ship: "… **The Ninth Circuit noted that this absolute liability rule 'for crew member assaults cannot be traced to obsolete concepts,' but that 'it is a widely adopted rule that common carriers owe such an absolute duty to their passengers**." *Celebrity Cruises*, 394 F.3d at 906[emphasis added]. The court stated that prior courts were "…unconcerned with whether the specific mode of transport was a ship or a train." *Id.* at 906. There is no meaningful distinction between what USOC does and a common carrier. USOC is an organization that necessarily engages in interstate commerce and transport of these gymnasts. Compl., ¶73-75, Ex. "1". The gymnasts here have equal, if not more, compelling needs to be protected, as they (1) are under the direct control of USOC just like a ship or train, and (2) these are largely minors being transported without their parents to foreign jurisdictions. *Id.* at ¶¶73-75. The D.C. Circuit analyzed non-traditional common carriers: "One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population. And business may be turned away either because it is not of the type normally accepted or because the carrier's capacity has been exhausted." *American Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.* 484 F.3d 554, 557 (D.C. Cir. 2007). Under *Celebrity Cruises*, the USOC acts in essentially the same capacity. As such, *Celebrity Cruises*, in conjunction with *Morton*, explains why USOC is strictly liable for the Plaintiff's assaults under 18 U.S.C. §2255.

## G.     THE IIED CAUSE OF ACTION IS PROPERLY MAINTAINED.

A successful IIED claim must establish: 1) extreme and outrageous conduct; 2) intent to cause, or reckless disregard to causing, emotional distress; 3) severe emotional distress; and 4) actual and proximate causation. *Christensen v. Superior Court*, (1991) 54 Cal.3d 868, 903. Additionally, the conduct must be "directed at" the Plaintiff. *Id.*

### 1.     USOC's Conduct Was Done With Reckless Disregard For The Safety Of Minors.

"[I]t is not essential to liability that a trier of fact find a malicious or evil purpose. It is enough that defendant 'devoted little or no thought' to probable consequences of his conduct." *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1031-32. In *KOVR-TV, Inc.*, the

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

Court held that there was sufficient evidence for both "outrageous" prong of IIED, as well as the intent provision of IIED, when a news reporter arrived at the scene of a crime, and interviewed the next-door neighbors who were minors. *KOVR-TV, Inc.,* 31 Cal.App.4th at 1027. The Court reasoned that the conduct engaged in was sufficiently intentional and/or reckless, to warrant a finding that the intent element was satisfied. *Id.* The USOC was apprised of overt sexual behavior of Nassar, yet did nothing to stop Nassar and even concealed such knowledge. Compl., ¶¶10,17, Ex. "1". USOC was in a "special relationship" with the Plaintiff, was required to keep her safe, but outrageously, allowed her to continue to be molested and not report to law enforcement. *Id.* Reckless disregard is sufficient for a finding of IIED, which is clearly met by these allegations.

### 2. Allowing Nassar To Be Around The Plaintiff Is Extreme and Outrageous In Light of USOC's Knowledge About

"Conduct, to be outrageous, must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." *Trerice v. Blue Cross of California*, (1989) 209 Cal. App. 3d 878, 883. **The outrageousness of defendant's conduct normally presents an issue of fact to be determined by the trier of fact.** *Angie M v. Superior Court*, (1995) 37 Cal.App.4th 1217, 1226. Courts have held conduct may be determined to be outrageous by three alternative criteria: **(1) abuses a relation or position which gives him power to damage the plaintiff's interest**; **(2) knows the plaintiff is susceptible to injuries through mental distress**; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, n. 7. In *Phyllis P.*, 183 Cal.App.3d 1193, IIED claims have been allowed to proceed for the failure of childcare personnel to protect a minor while in school. *Id.* allowing Nassar, after having known that he was penetrating gymnasts and being alone with them (Compl., ¶¶10,37, Ex. "1"), still allowed the Plaintiff to get treatment from Nassar is solitude. *Id.* at ¶¶1-2,37-38. Further, USOC had a culture of abuse and institutional knowledge that minors were at-risk for being abused, but it did nothing effective to stop the abuse, or otherwise warn the Plaintiff. *Id.* at ¶¶15-18.

### 3. The Conduct of USOC Was "Directed At" The Plaintiff.

"It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware."

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**22**

*Christensen*, 54 Cal.3d at 903. In *Phyllis P.*, a child (Ciera) was being molested by another child at school (Dario). *Phyllis P.,* 183 Cal.App.3d at 1195. The school administrators were informed that Dario was "playing games" with Ciera, chose not to tell Ciera's mother, and the abuse continued. *Id.* Here, USOC directed its conduct at the Plaintiff, who was under their care, being treated by their agent, who **USOC knew was abusive.** Compl., ¶55(a), (c), Ex. "1". USOC directed its conduct at the Plaintiff, who could not appreciate the risk. Compl., ¶56, Ex. "1".

## H.   THE *B&PC* §17200 CAUSE OF ACTION IS PROPERLY MAINTAINED.

"[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…" *B&P Code*, §17200. An unfair business practice "offends an established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker* (9th Cir. 2008) 543 F.3d 498, 506. Whether a given course of conduct is a "business practice" under the statute is a **factual inquiry, dependent on the circumstances of each case.** *Isuzu Motors, Ltd.v. Consumers Union of U.S., Inc.* (C.D. Cal. 1998) 12 F.Supp.2d 1034, 1048. The "unfair" standard is intentionally broad, as is explained in *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266-67: "The legislature intended this 'sweeping language' to include 'anything that can properly be called a business practice and that at the same time is forbidden by law'" *Id.* Plaintiff has pleaded that USOC engaged in a policy whereby her safety was compromised, so that the USOC could win medals and collect money. Compl., ¶¶1, Ex. "1". This is evidenced by the concealment of Nassar's abuse in 2015, the complaints received by USOC agents who should have reported (Van Horn, in particular, Compl, ¶10), and the culture that prioritized the Plaintiff's earning potential for USOC, over her safety. Compl., ¶¶1, 10, Ex. "1".

### 1.   *BP&C §17202 Provides For Injunctive Relief, As A Remedy For "Unfair Competition", Thus The Remedy Is Available To The Plaintiff.*

"Notwithstanding Section 3369 of the *Civil Code*, preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition." *B&PC* §17202. "A UCL action is equitable in nature, and the court may consider equitable factors in deciding which, if any, remedies authorized by the UCL should be awarded." *Olson v. Cohen* (2003) 106 Cal.App.4th 1209, 1214. The argument to the contrary is unfounded, and the reliance on a "new"

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave. Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

safe sport program is simply meritless. <u>Motion</u>, 23,4-7. Specific relief can be granted.

## I.   THE BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD CAUSES OF ACTION ARE PROPERLY MAINTAINED.

USOC claims Breach of Fiduciary Duty and Constructive Fraud fail because there is no fiduciary duty between it and Plaintiff. USOC argues that it, an inanimate entity, is not a mandated reporter, thus was not in a fiduciary relationship with the Plaintiff, however, it ignores the allegations in the Complaint. <u>Compl.</u>, ¶18. "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Barbara A. v. John G.*, (1983) 145 Cal.App.3d 369, 383. The court in *Barbara A.* points out, a fiduciary relationship "ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he or she voluntarily accepts or assumes to accept the confidence, can take no advantage from his or her acts relating to the interests of the other party without the latter's knowledge or  consent." *Id.* at 382. Plaintiff has alleged a fiduciary relationship, where USOC held a position of power over her, which was used to withhold information about Nassar. <u>Compl.</u>, ¶94, 97, Ex. "1". USOC next claims there was no misstatement made to the Plaintiff. "Misstatement or suppression of facts is not fraudulent ***unless*** motivated by an intent to deceive…or unless it amounts to a breach of duty (§ 1573). The question of actual fraud is always one of fact." *Mesmer v. White*, (1953) 121 Cal. App. 2d 665, 671. By trusting that Nassar was safe, the Plaintiff was relying on a false statement, in light of the incentive that USOC had to keep Nassar's abuse quiet, and avoid public scrutiny. <u>Compl.</u>, ¶55(a),(c),(h)-(l),61, Ex. "1". Next, USOC claims that Plaintiff has not alleged the breach adequately. USOC knew or should have known that Nassar was molesting athletes, and breached their duties to the Plaintiff. *Id.* at ¶¶94,97. Thus, these claims are proper.

## J.   USOC'S CONDUCT WAS "MALICIOUS", "OPPRESSIVE" AND "FRAUDULENT", WARRANTING AN AWARD OF PUNITIVE DAMAGES.

"A plaintiff may recover punitive damages in an action for the breach of an obligation not arising out of contract **where the defendant has been guilty of oppression, fraud, or malice.**

1  [Citation Omitted] 'Malice' exists when the defendant intends to cause injury to the plaintiff or

2  the defendant engages in despicable conduct with willful and conscious disregard of the rights or

3  safety of others. [citation omitted] 'Oppression' exists when the defendant in conscious disregard

4  of a person's rights engages in despicable conduct subjecting that person to cruel and unjust

5  hardship." *Angie M. v. Superior Court*, (1995) 37 Cal. App. 4th 1217, 1227-28. "Where, as here,

6  **the complaint pleads sufficient facts to apprise the defendant of the basis upon which relief**

7  **is sought**, and to permit the drawing of appropriate legal conclusions at trial, absence of the labels

8  'wilful,' 'fraudulent,' 'malicious' and 'oppressive' from the complaint, does not defeat the claim

9  for punitive damages." *Blegen v. Superior Court*, (1981) 125 Cal. App. 3d 959, 963. "Despicable

10  conduct is conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it

11  would be looked down upon and despised by ordinary decent people." *Mock v. Michigan Millers*

12  *Mutual Ins. Co.*, (1992) 4 Cal. App. 4th 306, 331. Repeatedly exposing childrento a sexual

13  abuser, is exactly the "vile, base, contemptible, miserable, wretched or loathsome" conduct that

14  "ordinary and decent people" would despise. *Id.* at 331. The facts show that USOC acted with

15  reckless disregard for the safety of the Plaintiff, warranting punishment. Compl., ¶¶1,6,8,10,24.

16  **K.    IN THE ALTERNATIVE, PLAINTIFF RESPECTFULLY REQUESTS LEAVE.**

17  "In this Court, 'if a complaint is vulnerable to [*FRCP*] 12(b)(6) dismissal, a district court

18  must permit a curative amendment, unless an amendment would be inequitable or futile."

19  *Travelers Indem. Co. v. Dammann & Co., Inc.* 594 F.3d 238, 256 (3d Cir. 2010). In the event the

20  Court disagrees with the Plaintiff's positions, the Plaintiff requests leave to amend in order to

21  plead further facts to cure any deficiencies. Cunny Decl., ¶4.

22  **III.    CONCLUSION**

23  The Plaintiff respectfully requests that the Court deny the instant Motion, as each cause of

24  action is sufficiently supported by the allegations, and that jurisdiction is proper in California.

25  Dated: November 21, 2018                                    **MANLY, STEWART & FINALDI**

26

27                                                             By:    _____
                                                                      ALEX E. CUNNY, Esq.
                                                                      Attorneys for Plaintiff,
28                                                                    ALEXANDRA ROSE RAISMAN

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave Suite 800
Irvine, California 92612
Telephone:   (949) 252-9990

1

2
JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)

3
ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)

4
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612

5
Telephone: (949) 252-9990
Fax: (949) 252-9991

6

7
Attorneys for Plaintiff, ALEXANDRA ROSE RAISMAN

8

9
**UNITED STATES DISTRICT COURT**

10
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE**

11

**MANLY, STEWART & FINALDI**
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

12

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual. | Civil Case No. 5:18-cv-02479-BLF |
| Plaintiff, | [The Honorable Beth Labson Freeman] |
| v. | **DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO DEFENDANT UNITED STATES OLYMPIC COMMITTEE'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6); MEMORANDUM OF POINTS AND AUTHORITIES** |
| UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual, STEVE PENNY, an individual, PAUL PARRILLA, an individual, and DOES 1 through 500. | |
| Defendants. | **Hon. Judge Beth Labson Freeman** |
| | [Filed concurrently with Notice of Motion.] |
| | Complaint filed: February 28, 2018 |
| | Hearing:      January 10, 2019 |
| | Time:          9:00 a.m. |
| | Judge:         Honorable Beth Labson Freeman |
| | Courtroom: 3 |

26
///

27
///

28
///

**DECLARATION OF ALEX E. CUNNY**

I, ALEX E. CUNNY, hereby declare:

1.      I am an attorney duly licensed to practice law in the State of California.  I am an attorney with Manly, Stewart & Finaldi, attorneys of record for ALEXANDRA ROSE RAISMAN (hereinafter, the "Plaintiff"), in the above-entitled matter. I am personally familiar with the facts of this case and the contents of this Declaration, and if called upon, could and would competently testify as to its contents.

2.      This Declaration is made in support of the Plaintiff's Opposition to Defendant United States Olympic Committee's Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2) and 12(b)(6).

3.      The deposition of Defendant Steven Penny was planned to occur on October 23, 2018. After Penny was indicted in the State of Texas, Walker County, in September, pertaining to the allegations in the criminal indictment attached as Exhibit "15", he was arrested just prior to his deposition that was scheduled and agreed to proceed. On October 18, 2018, Penny's counsel indicated that he would not be appearing for deposition. Furthermore, Penny filed an *ex parte* Application to Stay these proceedings, based upon his Fifth Amendment rights. Plaintiff's counsel was unable to obtain his testimony *in this matter*, despite the fact he was deposed in the *Jane LM Doe* matter prior to the filing of the instant case. As such, in the event the Court believes the evidence set forth is insufficient to develop the record, Plaintiff's counsel requests leave to obtain the testimony of Penny, who will undoubtedly have relevant information pertaining to the claims by USOC, including the fact that Penny has provided a declaration indicating that Nassar was a volunteer for both USOC and USAG. Penny Declaration, ¶16, Ex. "39".

4.      Since this matter was first filed in February of 2018, discovery has been proceeding and developments surrounding the "Nassar Scandal" have been evolving. As such, there are ample further, specific facts that can be further alleged with respect to a number of areas of the Complaint, including the removal of records from the Karolyi Ranch, indictments of Steve Penny and Debra Van Horn, and other information that has subsequently come to light (either through discovery or publicly) that would be relevant, should further facts be requested to be

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**2**

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(2), (6)**

pleaded.

5.      Attached hereto as Exhibit "1" is a true and correct copy of Plaintiff Alexandra Raisman's Complaint, which is the operative complaint in the instant Action.

6.      Attached hereto as Exhibit "2" is a true and correct copy of the Declaration of Alexandra Raisman. This declaration is being provided in support of Ms. Raisman's current Opposition as well as the Opposition to Defendant Penny's Motion to Dismiss, under *Federal Rule of Civil Procedure* 12(b)(2).

7.      Attached hereto as Exhibit "3" is a true and correct copy of the relevant portions of the Deposition of Lee Johnson.

8.      Attached hereto as Exhibit "4" is a true and correct copy of the Declaration of Kathy Scanlan.

9.      Attached hereto as Exhibit "5" is a true and correct copy of the relevant portions of the Deposition of Robert Colarossi.

10.     Attached hereto as Exhibit "6" is a true and correct copy of the Walker County Criminal Indictment of Debbie Van Horn. This indictment was obtained from the clerk of the Walker County Court, who provided a certified copy of the document to my office. In light of the e-filing requirements, we have scanned a true and correct copy of that document that was received from Walker County, as well as the seal of that document. Pursuant to *FRCP* 201(b), the Plaintiff makes a request that the Court judicially notice this document as it is an official court record from the State of Texas and is not be reasonably questioned as to its accuracy.

11.     Attached hereto as Exhibit "7" is a true and correct copy of the relevant portions of the Deposition of Dr. William Moreau.

12.     Attached hereto as Exhibit "8" is a true and correct copy of the relevant portions of the Deposition of Jordyn Wieber. This deposition was designated as "confidential" by the parties present at the deposition in a separate matter (*Jane LM Doe v. USA Gymnastics*), though subsequent to this, Ms. Wieber has publicly disclosed her abuse and has filed a lawsuit. Plaintiff's counsel met and conferred with counsel who were present at that deposition (previously), and received agreement to file publicly.

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

13.     Attached hereto as Exhibit "9" is a true and correct copy of the relevant portions of the Deposition of Paul Parilla, volume II. This deposition was taken in another matter, prior to the date of the filing of the instant action.

14.     Attached hereto as Exhibit "10" is a true and correct copy of the relevant portions of the Deposition of Larry Probst.

15.     Attached hereto as Exhibit "11" is a true and correct copy of the Written Congressional Testimony of Rick Adams, supplied to Congress for the March 28, 2017 Hearing before the Senate Committee on the Judiciary. This testimony was obtained from the following Senate Committee Website in its entirety:

https://www.judiciary.senate.gov/imo/media/doc/03-2817%20Adams%20Testimony.pdf

Furthermore, this written testimony of Rick Adams was marked as Exhibit "13" to the deposition of Mr. Adams, and authenticated at page-lines 163:5-165:14 of Exhibit "12" *infra*.

16.     Attached hereto as Exhibit "12" is a true and correct copy of the relevant portions of the Deposition of Rick Adams.

17.     Attached hereto as Exhibit "13" is a true and correct copy of Congressional Hearing Record (July 24, 2018)—Testimony of Kerry Perry. This testimony was obtained from the following website that records and catalogues congressional hearings:

https://www.c-span.org/video/?448858-1/michigan-state-president-john-engler-denies-offering-payment-abuse-survivor

This recording was then transcribed by the certified shorthand reporter, whose attestation is attached thereto.

18.     Attached hereto as Exhibit "14" is a true and correct copy of the relevant portions of the Deposition of Amy White. This deposition, considering the numerous instructions not to answer, is relevant to Plaintiff's inability to obtain evidence surrounding the alleged concealment of records at the Karolyi Ranch, and necessity for the deposition testimony of Penny.

19.     Attached hereto as Exhibit "15" is a true and correct copy of the Indictment of Steve Penny. This indictment was obtained from the clerk of the Walker County Court, who provided a certified copy of the document to my office. In light of the e-filing requirements, we

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**4**

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO *FRCP* 12(b)(2), (6)**

1   have scanned a true and correct copy of that document that was received from Walker County, as

2   well as the seal of that document. Pursuant to *FRCP* 201(b), the Plaintiff makes a request that the

3   Court judicially notice this document as it is an official court record from the State of Texas and

4   is not be reasonably questioned as to its accuracy.

5   20.   Attached hereto as Exhibit "16" is a true and correct copy of the relevant portions

6   of the Deposition of Rhonda Faehn.

7   21.   Attached hereto as Exhibit "17" is a true and correct copy of the Indianapolis Star

8   Article from November 8, 2018 entitled, "'Missing' USA Gymnastics records may have been

9   found in Indianapolis". This document was retrieved on November 20, 2018 from the following

10  website:

11  https://www.indystar.com/story/news/investigations/2018/11/08/usa-gymnastics-larry-

12  nassar-sexual-abuse-scandal-steve-penny-missing-records-maybe-found/1932219002/

13  22.   Attached hereto as Exhibit "18" is a true and correct copy of the Certificate of

14  Non-Appearance that was taken by Plaintiff's counsel on October 23, 2018 for the deposition of

15  Penny.

16  23.   Attached hereto as Exhibit "19" is a true and correct copy of the relevant portions

17  of the Deposition of Walt Glover.

18  24.   Attached hereto as Exhibit "20" is a true and correct copy of the Olympic Training

19  Center printouts from the USOC's website. Specifically, these printouts are for the Lake Placid

20  facility, obtained on November 20, 2018 from the following website:

21  https://www.teamusa.org/about-the-usoc/olympic-training-centers/lpotc/about

22  Further, this printout was accessed for the Colorado Springs Facility, from the USOC

23  website, on November 20, 2018:

24  https://www.teamusa.org/about-the-usoc/olympic-training-centers/csotc/about

25  These printouts are attached as a single exhibit, Exhibit "20".

26  25.   Attached hereto as Exhibit "21" is a true and correct copy of the agreement

27  between USOC and Chula Vista, which was produced by the USOC as Bates Number document:

28  USOC-LIT-0000182-200.

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**5**

1       26.      Attached hereto as Exhibit "22" is a true and correct copy of the CVOTC

2   Expenses, which was produced by the USOC as Bates Number document: USOC-LIT-0000968.

3       27.      Attached hereto as Exhibit "23" is a true and correct copy of Training Site

4   Designation Plan. This document was referenced within the deposition of Rick Adams, Exhibit

5   "12" *supra*, and was obtained from the USOC's website on November 20, 2018 (in addition to

6   previous dates as well):

7       www.teamusa.org/~/media/US--Olympic-and-Paralympic-Designation-Plan-2016.pdf

8       28.      Attached hereto as Exhibit "24" is a true and correct copy of the Team USA

9   Website, "Training Sites." This document was obtained from the USOC's website on November

10  20, 2018:

11      https://www.teamusa.org/Team-USA-Athlete-Services/Training-Sites

12      29.      Attached hereto as Exhibit "25" is a true and correct copy of the VELO Sports

13  Center Website. This document was obtained from the Stubhub Center's website on November

14  20, 2018 found at the following location:

15      http://www.stubhubcenter.com/velo

16      30.      Attached hereto as Exhibit "26" is a true and correct copy of Team USA: Diving,

17  "Podium Centers." This document was accessed from USOC's website, at the following web

18  address, on November 20, 2018:

19      https://www.teamusa.org/USA-Diving/Resources/Podium-Centers

20      31.      Attached hereto as Exhibit "27" is a true and correct copy of the Quadrennial

21  Report, 2005-2008, Pg. 19. This is a publicly available document that is Congressionally

22  mandated to be drafted by USOC every four years. This document was accessed on November

23  20, 2018 from the USOC's website:

24      https://www.teamusa.org/Footer/Legal/Governance-Documents

25      32.      Attached hereto as Exhibit "28" is a true and correct copy of the Quadrennial

26  Report, 2009-2012, Pg. 2. This is a publicly available document that is Congressionally mandated

27  to be drafted by USOC every four years. This document was accessed on November 20, 2018

28  from the USOC's website:

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**6**

1    https://www.teamusa.org/Footer/Legal/Governance-Documents

2        33.    Attached hereto as Exhibit "29" is a true and correct copy of the Quadrennial

3    Report, 2013-2016, Pg. 5. This is a publicly available document that is Congressionally mandated

4    to be drafted by USOC every four years. This document was accessed on November 20, 2018

5    from the USOC's website:

6        https://www.teamusa.org/Footer/Legal/Governance-Documents

7        34.    Attached hereto as Exhibit "30" is a true and correct copy of the Spreadsheet

8    Breakdown of Revenue, which was produced by the USOC as Bates Number document: USOC-

9    LIT-0000969.

10       35.    Attached hereto as Exhibit "31" is a true and correct copy of Form 990 (2012), Pg.

11   76, which was produced by the USOC as Bates Number document: USOC-LIT-0000965.

12       36.    Attached hereto as Exhibit "32" is a true and correct copy of Form 990 (2011), Pg.

13   71, which was produced by the USOC as Bates Number document: USOC-LIT-0000618.

14       37.    Attached hereto as Exhibit "33" is a true and correct copy of Form 990 (2013), Pg.

15   73, which was produced by the USOC as Bates Number document: USOC-LIT-0000690.

16       38.    Attached hereto as Exhibit "34" is a true and correct copy of Form 990 (2015), Pg.

17   67, which was produced by the USOC as Bates Number document: USOC-LIT-0000826.

18       39.    Attached hereto as Exhibit "35" is a true and correct copy of the Registration of

19   Foreign Corporation, for USOPF, in California. This is a document obtained from the Secretary

20   of State's business search feature at the following website on November 20, 2018:

21       https://businesssearch.sos.ca.gov/CBS/Detail

22       40.    Attached hereto as Exhibit "36" is a true and correct copy of the Website of

23   USOPF Board of Directors. This is a document obtained from the following website on

24   November 20, 2018, that is believed to be owned and operated by the USOPF and/or the USOC:

25       https://www.teamusa.org/us-olympic-and-paralympic-foundation/usopf-board-of-directors

26       41.    Attached hereto as Exhibit "37" is a true and correct copy of the United States

27   Olympic and Paralympic Properties ("USOPP"), Registration form that was filed with the

28   Secretary of State. This is a document obtained from the Secretary of State's business search

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave, Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**7**

1    feature at the following website on November 20, 2018:

2         https://businesssearch.sos.ca.gov/CBS/Detail

3         42.    Attached hereto as Exhibit "38" is a true and correct copy of the USOC Response

4    to RFA, Set Two, specifically referencing Response to Request No. 27.

5         43.    Attached hereto as Exhibit "39" is a true and correct copy of the Declaration of

6    Steve Penny that was filed in support of his Motion to Dismiss the instant Action under *FRCP*

7    12(b)(2).

8         44.    Attached hereto as Exhibit "40" is a true and correct copy of the relevant portions

9    of the Form 990 from 2006 for the USOC, which was produced by the USOC as "USOC-LIT-

10   00002248".

11        45.    Attached hereto as Exhibit "41" is a true and correct copy of the Agreement

12   between USAG and USOC, regarding the 2012 Olympic Trials in San Jose, which was produced

13   by the USOC as "USOC-LIT-0000166-181."

14        46.    Attached hereto as Exhibit "42" is a true and correct copy of the Agreement

15   between USOC and Easton Sports Development Foundation, A California Company, regarding

16   the construction of housing at the Chula Vista Olympic Training Center, which was produced by

17   the USOC as "USOC-LIT-0000217-237."

18        47.    Attached hereto as Exhibit "43" is a true and correct copy of the Agreement

19   between USOC and USA Cycling regarding an Olympic event in California, which was produced

20   by the USOC as "USOC-LIT-0000201-216."

21

22        I hereby declare under penalty of perjury under the laws of the state of California that the

23   foregoing is true and correct.

24

25        Executed this November 21, 2018 at Irvine, California.

26

27                                        By: _____
                                              ALEX E. CUNNY, Esq.,
28                                            Declarant

**DECLARATION OF ALEX E. CUNNY IN SUPPORT OF PLAINTIFF ALEXANDRA
ROSE RAISMAN'S OPPOSITION TO USOC'S MOTION TO DISMISS PURSUANT TO
*FRCP* 12(b)(2), (6)**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

# EXHIBIT "1"

E-FILED
2/28/2018 3:09 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV323989
Reviewed By: G. Reyes

1  JOHN C. MANLY, Esq. (State Bar No. 149080)
   VINCE W. FINALDI, Esq. (State Bar No. 238279)
2  ALEX CUNNY (State Bar No. 291567)
   **MANLY, STEWART & FINALDI**
3  19100 Von Karman Ave., Suite 800
   Irvine, CA 92612
4  Telephone: (949) 252-9990
   Fax: (949) 252-9991
5
   Attorneys of Record for Plaintiff, ALEXANDRA ROSE
6  RAISMAN, an individual

7

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **IN AND FOR THE COUNTY OF SANTA CLARA**

10

11  ALEXANDRA ROSE RAISMAN, an          | Case No.:              18CV323989
    individual.                         |
12                                      | Judge: _____
                                        | Department: _____
13          Plaintiff,

14      v.                              | **COMPLAINT FOR DAMAGES FOR:**

15  UNITED STATES OLYMPIC COMMITTEE,    | 1) **SEXUAL HARASSMENT (**<u>C.C.</u>** §
    a Business Entity of form unknown; USA |    51.9);**
16  GYMNASTICS, an Indiana Business Entity of | 2) **MASHA'S LAW (18** <u>U.S.C.</u> **§§2255,
    Form Unknown; LARRY NASSAR, an      |    2423(b), 2423(c))**
17  individual, STEVE PENNY, an individual, | 3) **INTENTIONAL INFLICTION OF
    PAUL PARRILLA, an individual, and DOES |    EMOTIONAL DISTRESS;**
18  1 through 500.                      | 4) **UNFAIR BUSINESS PRACTICES
                                        |    (***CAL. BUS. & PROF. CODE*** §17200);**
19          Defendants.                 | 5) **BREACH OF FIDUCIARY DUTY;**
                                        | 6) **CONSTRUCTIVE FRAUD;**
20                                      | 7) **NEGLIGENCE;**
                                        | 8) **NEGLIGENT SUPERVISION**
21                                      | 9) **NEGLIGENT RETENTION/
                                        |    HIRING;**
22                                      | 10) **NEGLIGENT FAILURE TO
                                        |    WARN;**
23                                      | 11) **GENDER VIOLENCE (***C.C.*** §52.4);**
                                        | 12) **SEXUAL BATTERY.**
24
                                        | [Filed pursuant to *C.C.P.* §340.1]
25
                                        | **DEMAND FOR JURY TRIAL.**
26

27      **COMES NOW**, Plaintiff ALEXANDRA ROSE RAISMAN (hereinafter referred to as

28  "Plaintiff" or "ALY RAISMAN") who complains and alleges as follows:

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-1-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
001

## GENERAL ALLEGATIONS AS TO THE PARTIES

1.      This case arises from the serial molestation, sexual abuse and harassment of ALY RAISMAN, three-time Olympic gold medalist, by her trusted team physician and former Olympic Team Doctor Defendant Lawrence "Larry" Gerard Nassar ("NASSAR"), while ALY RAISMAN was a young girl and woman, competing for the honor of her country. These molestations of the Plaintiff occurred over several continents, on numerous occasions, and could have been prevented, had Defendants USA Gymnastics ("USAG"), the United States Olympic Committee ("USOC") or former president of USAG, Defendant STEVE PENNY ("PENNY") had taken the mandate of ALY RAISMAN's safety, and numerous other minors in their care, seriously. Despite having knowledge that NASSAR had been sexually abusive towards minor, been left in solitary contact with minor girls, and having been notified that NASSAR was a pedophile (or could have learned of such through reasonable diligence), Defendants USAG, USOC, PENNY and DOES 1 through 500 instead put their quest for money and medals, above the safety of the Plaintiff and other minor competitive athletes; athletes who were responsible for the financial success and prosperity of those Defendants. The Plaintiff, ALY RAISMAN, began her gymnastics career at the tender age of two (2) years old, and gained her inspiration from watching and re-watching a VHS tape of the "Magnificent Seven" at the 1996 Olympics held in Atlanta, Georgia and who won the Women's Team Final. Since that time, ALY RAISMAN dedicated her childhood to the pursuit of honoring that legacy, competing in the Olympics, and winning a gold medal for her country. The Plaintiff accomplished this monumental goal by the age of eighteen (18) years old, all while being serially molested by her confidant and trusted physician, NASSAR, under the watch of Defendants USOC, USAG, PENNY and DOES 1 through 500.

2.      Despite having the power, authority, and mandate to do so, the Defendants USAG, USOC, PENNY and DOES 1 through 500 never intervened to discipline Defendant NASSAR, never ensured that Defendants USAG and NASSAR were following Defendant USOC rules and mandates, and through the express disregard for the safety of minors, allowed Defendant NASSAR to continue in his position of trust, power and access to ALY RAISMAN, as well as numerous

///

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 752-9900

EXHIBIT 1
002

other elite minor athletes who competed with ALY RAISMAN. After Defendant NASSAR was only finally removed from his position at USAG, he continued to sexually abuse minors in his role as a physician for over a year.

3. To this day, ALY RAISMAN continues to suffer depression, anxiety and fear stemming from her abuse by Defendant NASSAR, which affects her daily life, including but not limited to the Plaintiff not trusting medical professionals, not trusting adult males, and constantly suffering from feelings of fear, anxiety, and depression. In addition to this psychological and physical trauma suffered by ALY RAISMAN, the Plaintiff continued to train for years in pain, believing that Defendant NASSAR was properly treating her physical ailments associated with her sport. When she was young, ALY RAISMAN always felt guilty for thinking NASSAR was weird, and questioned why she did not like the purported best gymnastics doctor in the world, though she did not understand the purported medical treatment she was receiving, at that time, was sexual abuse. Upon learning that this was not legitimate treatment, the Plaintiff suffered further humiliation, guilt, shame, and disgust.

**THE PLAINTIFF**

**ALY RAISMAN**

4. The Plaintiff ALY RAISMAN is now a young adult female who currently resides in the State of Massachusetts, who was born on May 25, 1994. The Plaintiff ALY RAISMAN was formerly an elite minor gymnast who was sexually abused by NASSAR believing this was medical treatment, while competing in National and International Competitions, including but not limited to competitions in California, Japan, the Karolyi Ranch in Huntsville, Texas (and other locations across the United States and internationally, including in Europe, Asia and Australia) that were hosted, sanctioned, supervised, and/or endorsed by, under the supervision of, chartered, and/or under the mandate of Defendants USAG, USOC, and DOES 1 through 500. During many of these events, the Defendants USOC, USAG, PENNY, and DOES 1 through 500, took care, custody and control of Plaintiff ALY RAISMAN and stood *in loco parentis* with her and her parents. Defendants USOC, PENNY and USAG had a duty to protect ALY RAISMAN from known or foreseeable dangers, such as Defendant NASSAR, and to promptly investigate, censure, discipline,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-3-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
003

and/or remove Defendant NASSAR; and/or take remedial actions; actions they never took until after the cessation of ALY RAISMAN's abuse.

5.      The Plaintiff was an elite level gymnast and member of Team USA who competed and trained in National and International competitions on behalf of the United States. These National and International competitions and trainings occurred in places including, but not limited to: Santa Clara County in California, the "Karolyi Ranch" located in Huntsville, Texas and other locations across the United States and internationally, including the most elite competitions occurred in Asia, Australia, and Europe. During many of these competitions, the Plaintiff was subjected to sexual harassment, sexual assault, sexual abuse and molestation by Defendant NASSAR, including but not limited to competitions and trainings that occurred in Santa Clara County in California, at the Karolyi Ranch in Huntsville, Texas, in Japan, and other locations across the United States and internationally, including Europe and Australia. The Plaintiff was sexually abused on numerous occasions and at numerous locations in or around 2010 through in or around 2012, and in 2015. This sexual abuse of the Plaintiff occurred at events where Defendants USAG, USOC, PENNY and DOES 1 through 500 were responsible to supervise the Plaintiff, ensure proper medical procedures and protocols were followed, warn the Plaintiff of known dangers, and to provide for her safety.

6.      This action is brought pursuant to *Code of Civil Procedure* §340.1, which governs the statutes of limitations arising from childhood sexual abuse. As a victim of childhood sexual abuse, and a young adult under the age of 26 years old, thus, ALY RAISMAN's action is timely.

## DEFENDANTS

## DEFENDANT, UNITED STATES OLYMPIC COMMITTEE ("USOC")

7.      Defendant USOC, at all times mentioned herein, was and is a business entity of form unknown, having its principal place of business in the State of Colorado and is headquartered in Colorado Springs, Colorado. The USOC is a federally chartered nonprofit corporation, which was reorganized by the Ted Stevens Amateur Sports Act, originally enacted in 1978. As advertised on its website, "[t]he USOC has two primary responsibilities in its oversight of Olympic and Paralympic sport in the United States. The first is to generate resources in support of its mission,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-4-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
004

which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end." Furthermore, Defendant "...**USOC is committed to creating a safe and positive environment for athletes' physical, emotional and social development and to ensuring that it promotes an environment free of misconduct.**" Under the Ted Stevens Amateur Sports Act, 36 *U.S.C.* §§220501, *et seq.* (hereinafter, "Ted Stevens Act") Defendant USOC had a mandatory obligation to ensure that before granting NGBs, including USAG, a sanction to host National or International events, that they provide "**proper medical supervision will be provided for athletes who will participate in the competition.**" 36 *U.S.C.* §§220525(b)(4)(E).

8.    For in or around 2011 through the cessation of the Plaintiff's sexual abuse by Defendant NASSAR, the "Karolyi Ranch" was designated as being the United States' Olympic Training Center, thus, was required to follow all protocols, mandates, policies, bylaws, rules, and/or practices of Defendant USOC (as well as Defendant USAG).

9.    During all relevant times during ALY RAISMAN's abuse, Defendant USOC was responsible for ensuring that the Karolyi Ranch, provided adequate supervision for the minors competing thereat, reasonable safety protocols ensuring the safety of those minors, and reasonable supervision, training, and oversight procedures for all medical care provided to gymnasts at the Karolyi Ranch, including training of staff on identification of sexual abuse, proper procedures, use of proper medical care, and staffing of ample medical personnel to ensure proper care of all minor gymnasts, including the Plaintiff ALY RAISMAN. Despite these duties under the law, Defendant USOC implemented virtually no safety protocols or procedures at the Karolyi Ranch, and failed to provide any supervision for minor gymnasts training at the Karolyi Ranch.

10.    At all times relevant to the Plaintiff's sexual abuse at the hands of NASSAR, Defendant USOC was responsible for the Plaintiff's supervision while competing at the Olympics, the Olympic Trials, and the World Artistic Gymnastics Championships and trainings for such. Despite being the body responsible for the Plaintiff's safety during these events, including, being responsible for her supervision, medical care, and well-being, Defendant USOC provided entirely inadequate or effective measures to ensure her protection from the risk of sexual abuse, either at

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9900

-5-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
005

the events or in her living quarters, where sexual abuse by NASSAR occurred. Despite competing in Australia, Japan, the United Kingdom and the Netherlands (among other international sites), the Plaintiff ALY RAISMAN was either provided no supervision while medical treatment was performed in her living quarters by NASSAR or USAG employee Debbie Van Horn was present for such treatment. Based on information, and therefore belief, despite Ms. Van Horn being represented as a qualified medical professional, she was not properly trained to supervise NASSAR, not given mandate to do so, and was otherwise present for sexually abusive treatments that NASSAR would perform, without reporting such to law enforcement or the proper authorities. This is how and why NASSAR was allowed solitary access to these minors, including the Plaintiff ALY RAISMAN, or alternatively, was allowed to abuse minors (such as the Plaintiff) in the presence of USAG staff (Ms. Van Horn).

11.     In 2010, during the Plaintiff ALY RAISMAN's sexual abuse at the hands of NASSAR, Defendant USOC convened what it termed the "Working Group for Safe Training Environments" in order to address, among many things, physical and sexual abuse of amateur athletes in National Governing Bodies ("NGB"). It was not until 2011, after this commission met, that Defendant USOC hired an individual to head its "SafeSport" program and not until 2012 that a "SafeSport" Handbook was adopted and promulgated safeguards and safety protections for minor athletes, from the ravages of sexual abuse. Despite only instituting these SafeSport policies in 2012, Defendant USOC was acutely aware of the ravages of sexual abuse posed to minors in amateur sports, **for at least a decade prior to this SafeSport program being created**, as they were informed by former Defendant USAG President, Robert "Bob" Colarossi. *See infra.*

12.     As a requirement for NGBs, such as Defendant USAG, to remain in "good standing" with Defendant USOC, Defendant USOC policies require that USAG "…l) comply with the safe sport policies of the corporation and with the policies and procedures of the independent safe sport organization designated by the corporation to enhance safe sport practices and to investigate and resolve safe sport violations (no exceptions to this requirement shall be allowed unless granted by the CEO, or his or her designee, after allowing the [NGB] or PSO to present the reasons for such exception)…" The Plaintiff is informed and believes, and on that basis alleges,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9900

EXHIBIT 1
006

that the Safe Sport program was introduced in or around 2011, and that such policies have become more stringent over the years. Nevertheless, the Defendant USOC continued to fail to adequately enforce these policies against Defendant NASSAR, and has continually failed to uphold said policies through proper reporting, supervision, mandates on NGBs (including Defendant USAG), and other preventative procedures. Even as the SafeSport policies state today herein, Defendant USOC still failed to uphold these policies and procedures, had they been in-place at the commencement of ALY RAISMAN's sexual abuse. Defendant USOC has and had a culture and atmosphere that conceals known and suspected sexual abusers, which transcends all policies and procedures that are set in-place. For this reason, Defendant USOC has a practice and culture of ignoring its own internal rules and mandates for NGBs, in order to protect its reputation and blind itself to known abusers within the ranks of NGBs for which it is responsible.

13.     Moreover, the Defendant USOC currently promulgates the SafeSport policies that prevent "...USOC employees, coaches, contracted staff, volunteers, board members, committee and task force members, and other individuals working with athletes or other sport participants while at an OTC, whether or not they are employees of the USOC" and "...[a]thletes training and/or residing at a USOC Olympic Training Center" from engaging in sexually abusive misconduct, including "child sexual abuse" and "sexual misconduct." *See* USOC Safe Sport Policies, Section II(c). SafeSport policy also has policies for identifying "grooming" behaviors, which it defines as, "...the most common strategy used by offenders to seduce their victims."

14.     Subsequent to sometime in 2012, Plaintiff is informed and believes and on that basis alleges that these policies (or prior versions that were similar or less restrictive) were in effect at Defendant USOC, and applied to Defendant USAG. Despite the existence of these policies after 2012, Defendant USOC allowed Defendant NASSAR to continue to participate with minor children at Defendant USAG, the NGB for Women's Gymnastics, and failed to adequately enforce these policies, or mandate that Defendant USAG enforce these policies. Due to its systemic and knowing failure to enforce these policies, the Plaintiff was sexually harassed, abused, and molested by Defendant NASSAR; an individual who was subject to these policies. Plaintiff is informed, and on that basis, believes that Defendant USAG was at all times in "good standing" with Defendant

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 1
007

USOC, despite failing to adhere to, and enforce the SafeSport policies, which it violated by allowing Defendant NASSAR access to minor gymnasts, including the Plaintiff ALY RAISMAN. Furthermore, in failing to report suspected child abuse of Defendant NASSAR and/or failing to enforce policies and procedures to prevent said sexual abuse of minors, the Defendant USOC prevented the Plaintiff and her parents from avoiding the sexual abuse of the Plaintiff and/or ceasing it sooner.

15.      Further, Defendant USOC was required to ensure that NGBs, including Defendant USAG, ensure that "**proper safety precautions have been taken to protect the personal welfare of the athletics and spectators at the competition.**" 36 *U.S.C.* §§220525(b)(4)(F). Moreover, as part of an NGB's mandate from the Defendant USOC, it was to, "**encourage and support research, development, and dissemination of information in the areas of sports medicine and sports safety.**" 36 *U.S.C.* §220524(9). Had Defendant USOC performed its mandate reasonably, diligently, and in accord with its duty to protect minor children under both Federal and California Law, Defendant NASSAR would have been investigated, sanctioned, and/or removed from Defendants USAG, USOC, and others, and never have been placed in solitary contact with the Plaintiff. Defendant USOC never adequately or reasonably enforced these policies, thus, the sexual abuse perpetrated by Defendant NASSAR on the Plaintiff, as well as hundreds of other minor girls, was a natural, probable and foreseeable outgrowth of Defendant USOC's dereliction of its duties. Defendant USOC willfully blinded itself and its officers, agents, employees, and servants, to ravages of sexual abuse that were rampant in amateur sports and in organizations for which it was responsible to supervise, including Defendant USAG.

16.      In March of 2017, under the United States Senate Judiciary Committee's inquiry into the failure of the Defendants USAG and USOC in protecting gymnasts from sexual assault, specifically centered around Defendant NASSAR, the Defendant USOC's president publicly admitted, "[t]he Olympic community failed the people it was supposed to protect."

17.      Plaintiff is informed, and believes, and on that basis alleges that Defendant USOC was aware, at the highest levels of its organization, that Defendant NASSAR had molested Olympian and National Team level gymnasts who participated with Defendant USAG, an NGB

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-8-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
008

under Defendant USOC's charter, while Defendant NASSAR was permitted to return to his medical practice at Michigan State University ("MSU") without MSU being warned, advised or otherwise contacted by Defendants USOC or USAG regarding Defendant USOC's knowledge of NASSAR's sexual abuse of elite, minor gymnasts. Plaintiff is informed and believes, and on that basis alleges that despite having actual knowledge of Defendant NASSAR's molestation of minor gymnasts as early as 2015, Defendant USOC concealed their involvement with Defendant USAG, concealed its knowledge of Defendant NASSAR's sexual misconduct with minor children, and ultimately, misdirected the United States Senate into believing that Defendant USOC had only failed to protect minor gymnasts through lack of oversight. Plaintiff is informed and believes, and on that basis alleges, that Defendant USOC knew that NASSAR had been removed from Defendant USAG for allegations of child molestation as early as 2015 (as it was Defendant USOC's custom and practice to necessarily learn of reports of child molestation by a NGB employee, like those made to Defendant USAG in 2015) given that Defendant USOC was responsible for the supervision of Defendant USAG. Nonetheless, Defendant USOC had representatives present at the March 2017 Senate Judiciary Committee Hearing and concealed their prior knowledge of Defendant NASSAR being a pedophile and sexual abuser; leaving the Senators, those present, and the public with the false impression that Defendant USOC simply failed to implement proper procedures to prevent abuse. During this hearing, and as early as 2015, Defendants USOC, USAG and PENNY had knowledge that Defendant NASSAR had abused young girls, and that he continued to sexually abuse young girls for over another year at MSU, without notifying, informing, or otherwise communicating this knowledge to MSU.

18.     Under California *Penal Code* § 11165.7, Defendant USOC is an organization whose employees, agents, and/or servants are legally "mandated reporters", considering that Defendant USOC is a youth recreational program and Defendant USOC's employees' duties require direct contact and supervision of children.

## DEFENDANT, USA GYMNASTICS ("USAG")

19.     USAG, at all times mentioned herein, was and is a business entity of form unknown, having its principal place of business in the State of Indiana. Plaintiff is informed and believes,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

and on that basis alleges that USAG was incorporated in the state of Texas and/or Arizona. Defendant USAG is the NGB for gymnastics in the United States, as designated and permitted by Defendant USOC under the Ted Stevens Amateur Sports Act, and selects and trains the United States gymnastics teams for the Olympics and World Championships, promotes and develops gymnastics locally and nationally, and serves as a resource center for members, clubs, fans and gymnasts throughout the United States. USAG has more than 174,000 athletes and professional members, more than 148,000 athletes registered in competitive programs, as well as more than 25,000 professional, instructor and club members. Approximately 4,000 competitions and events throughout the United States are sanctioned annually by USAG. USAG was the primary entity owning, operating and controlling the activities and behavior of its employee agents, including, but not limited to NASSAR. USAG is also the entity that selects gymnasts for the US National and Olympic Teams.

20.     The bylaws of Defendant USAG, or similar bylaws previously enacted, were made in conformance and under the mandate of Defendant USOC, and were intentioned at protecting minor gymnasts, including ALY RAISMAN from the ravages of sexual abuse, molestation and harassment; a known, foreseeable and palpable risk posed to minor athletes in amateur sports. Nevertheless, despite these bylaws, rules, policies and procedures purportedly being in effect at Defendant USAG, Defendant USOC never ensured, audited or checked to confirm that these policies were effective and being implemented properly, adequately and in conformance with the standard of care. Had Defendant USOC upheld its duties under Federal Law (specifically, the Ted Stevens Act) in ensuring National Team members, including the Plaintiff ALY RAISMAN, were provided proper medical care and supervision, and that they were properly supervised at competitions and the National Training Center (the Karolyi Ranch in Huntsville, Texas), then the dozens of molestations suffered by ALY RAISMAN and numerous other gymnasts could have been avoided.

21.     Under California *Penal Code* § 11165.7, USAG is an organization whose employees, agents, and/or servants are legally "mandated reporters", considering that Defendant

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-10-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
010

1    USAG is a youth recreational program and USAG's employees' duties require direct contact and

2    supervision of children.

3                    **DEFENDANT, STEPHEN "STEVE" PENNY**

4          22.    Defendant STEVE PENNY (hereinafter "PENNY") at all times mentioned herein

5    was and is an adult male individual, who Plaintiff is informed and believes lived in the State of

6    Indiana during the period of time during which the sexual abuse and harassment alleged herein

7    took place and is currently a citizen of the State of Indiana. Defendant PENNY was the President

8    of Defendant USAG charged with the overall management and strategic planning for the

9    organization. Plaintiff is informed and believes and, on that basis, alleges that Defendant PENNY

10   oversaw a wide-ranging, calculated concealment of numerous instances, complaints, and

11   allegations of sexual abuse and misconduct among the participants and members of Defendant

12   USAG. Through this conduct, Defendant PENNY's actions and inactions enabled and ratified the

13   sexual abuse by Defendant NASSAR against Plaintiff and other participants and members of

14   Defendant USAG and fueled the ongoing concealment of abuse at Defendant USAG, making it

15   more unlikely for victims (such as the Plaintiff) to obtain much needed medical and/or

16   psychological treatment. Plaintiff is informed and believes that Defendant PENNY served as

17   President of Defendant USAG from in or around 2005 to 2017. At all times herein alleged,

18   Defendant PENNY was an employee, agent, and/or servant of Defendant USAG, and/or was under

19   their complete control and/or active supervision.

20                    **DEFENDANT, PAUL PARILLA**

21         23.    Defendant PAUL PARILLA (hereinafter "PARILLA") at all times mentioned

22   herein was and is an adult male individual, who Plaintiff is informed and believes lived in the State

23   of California, County of Orange, during the period of time during which the sexual abuse and

24   harassment of ALY RAISMAN by NASSAR alleged herein took place and is currently a citizen

25   of the State of California. Defendant PARILLA was a board member of USAG from in or around

26   1999 to 2018, and was Chairman of the USAG board from approximately 2015 to in or around

27   January of 2018. Plaintiff is informed and believes and, on that basis, alleges that Defendant

28   PARILLA oversaw a wide-ranging, calculated concealment of numerous instances, complaints,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-11-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
011

and allegations of sexual abuse and misconduct among the participants and members of Defendant USAG. Through this conduct, Defendant PARILLA's actions and inactions enabled and ratified the sexual abuse by Defendant NASSAR against Plaintiff and other participants and members of Defendant USAG and fueled the ongoing concealment of abuse at Defendant USAG, making it more unlikely for victims (such as the Plaintiff) to obtain much needed medical and/or psychological treatment. Plaintiff is informed and believes that Defendant PARILLA served as Chairman of the Board from 2015 to present. At all times herein alleged, Defendant PARILLA was an employee, agent, and/or servant of Defendant USAG, and/or was under their complete control and/or active supervision.

## DEFENDANT, LARRY NASSAR

24.     Defendant NASSAR, the Perpetrator, at all times mentioned herein was and is an adult male individual, who lived in the State of Michigan during the period of time during which the sexual abuse, harassment, and molestation of the Plaintiff alleged herein took place and is currently a citizen of the State of Michigan. Plaintiff is informed and believes that the NASSAR was accepted onto the staff of USAG as a trainer in 1986 and then as the National Medical Director and the National Team Physician for the women's gymnastics team in 1996. NASSAR was also responsible for coordinating the care for USAG and for participants and members at every national and international competition, and would routinely travel to National and International competitions. NASSAR continued to function in this capacity at USAG until in or around the middle of 2015. Moreover, it is upon information and belief, that as the National Team Doctor for USAG, which was chartered via Defendant USOC, NASSAR was the individual responsible for maintaining USAG's compliance with the medical requirements, policies and procedures set forth by Defendant USOC. Nevertheless, Defendant USOC failed to provide supervision, oversight, and any meaningful inhibition to limit NASSAR's access to minor children. Defendant NASSAR was retained by Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500 as an Osteopathic Physician and certified athletic trainer to provide care, treatment, and athletic training to the Defendants USAG and USOC, and its participants, many of which were minors while in his care. It was through this position of trust and confidence, that Defendant NASSAR exploited ALY

EXHIBIT 1
012

RAISMAN, in perpetrating his sexual abuse and harassment upon her. All of the sexually abusive and harassing conduct alleged herein was done for Defendant NASSAR's sexual gratification and was based upon the gender of ALY RAISMAN.

25.     It is on information and reasonable belief that NASSAR, using his apparent authority and position within Defendant USAG and USOC over the minor participants in his charge, that Defendant NASSAR sexually abused and harassed multiple other members of the United States Women's Olympic Gymnastics Team and National teams, over the nearly 30 years in which Defendant NASSAR has been affiliated with Defendants USAG, USOC and DOES 1 through 500.

26.     At all times herein alleged, NASSAR was an employee, agent, and/or servant of USAG, Defendant USOC, and DOES 1 through 500, and/or was under their complete control and/or active supervision.

27.     In the event DOE 1 be prosecuted and convicted of a felony for the conducted alleged herein, the Plaintiff requests leave to amend the instant Complaint, such that a request for attorneys' fees can be made against DOE 1 pursuant to *Code of Civil Procedure* § 1021.4.

### DEFENDANTS, DOE 1 THROUGH 500

28.     Defendants DOES 1 through 500, inclusive, and each of them, are sued herein under said fictitious names. Plaintiff is ignorant as to the true names and capacities of DOES 1 through 500, whether individual, corporate, associate, or otherwise, and therefore sue said Defendants by such fictitious names. When their true names and capacities are ascertained, Plaintiff will request leave of Court to amend this Complaint to state their true names and capacities herein.

29.     Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500, inclusive, are sometimes collectively referred to herein as "Defendants" and/or as "All Defendants"; such collective reference refers to all specifically named Defendants as well as those fictitiously named herein.

30.     Plaintiff is informed and believe, and on that basis, allege that at all times mentioned herein, each Defendant was responsible in some manner or capacity for the occurrences

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 752-9900

-13-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
013

herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by all said Defendants.

31.     At all times mentioned herein, each and every Defendant NASSAR was an employee, agent, and/or servant of USAG, Defendant USOC, and DOES 1 through 500, inclusive, and/or was under their complete control and/or active supervision. Defendants and each of them are individuals, corporations, partnerships and/or other entities that engaged in, joined in, and conspired with other Defendants and wrongdoers in carrying out the tortuous and unlawful activities described in this Complaint.

32.     Plaintiff is informed and believe, and on that basis, allege that at all times mentioned herein, there existed a unity of interest and ownership among Defendants and each of them such that any individuality and separateness between Defendants, and each of them, ceased to exist. Defendants and each of them were the successors-in-interest and/or alter egos of the other Defendants, and each of them, in that they purchased, controlled, dominated and operated each other without any separate identity, observation of formalities, or other manner of division.  To continue maintaining the facade of a separate and individual existence between and among Defendants, and each of them, would serve to perpetrate a fraud and injustice.

33.     Plaintiff is informed and believes, and on that basis, alleges that at all times mentioned herein, Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500 were the agents, representatives and/or employees of each and other. In doing the things hereinafter alleged, Defendants and each of them were acting within the course and scope of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent.

34.     Plaintiff is informed and believes, and on that basis alleges that at all times mentioned herein, Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500 were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each other, and the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9900

EXHIBIT 1
014

and consent of each and every other Defendant and that said conduct was thereafter ratified by each and every other Defendant, and that each of them is jointly and severally liable to Plaintiff.

## SEXUAL ABUSE OF ALY RAISMAN AND RESULTING LIFELONG DAMAGES

35.    By his position within the Defendants' institutions, Defendants and NASSAR demanded and required that Plaintiff respect Defendant NASSAR, in his position as team physician for USAG, authorized by USOC.

36.    NASSAR did sexually abuse, harass and molest the ALY RAISMAN, who was a minor child at the time of the acts at-issue.

37.    The sexual harassment and abuse of Plaintiff by the Perpetrator (NASSAR), outlined below, took place while Defendant the Perpetrator (NASSAR) was the team physician of Defendant USAG and under the control of Defendants USOC, PENNY, PARILLA, and DOES 1 through 500. Plaintiff was a participant and member of Defendants USAG, USOC, and DOES 1 through 500, while the Perpetrator (NASSAR) was serving as an agent and employee of Defendants in his capacity as team physician:

    a.    In his capacity as team physician with Defendants USOC, USAG, and DOES 1 through 500, the Perpetrator (NASSAR) was given custody and supervision of minors, including Plaintiff. The Perpetrator (NASSAR) used this position to coerce children to concede to his sexual suggestions, using his authority and position of trust to exploit them physically, sexually, and emotionally;

    b.    Plaintiff became a member and participant of USAG, and a part of the Junior National Team for USAG in 2009. Plaintiff soon formed a relationship with the Perpetrator (NASSAR), USAG's team physician. At this time, in or around 2010, the Perpetrator (NASSAR) commenced the process of "grooming" Plaintiff for later physical, sexual and emotional abuse. Plaintiff is informed and believes the Perpetrator (NASSAR) would use the guise of care, athletic training, osteopathy, and kinesiology to normalize intimate, inappropriate, and sexually abusive contact with Plaintiff. Plaintiff is informed and believes the Perpetrator (NASSAR) would enter the living quarters of the Plaintiff ALY RAISMAN and other gymnasts at the Karolyi Ranch, hotel rooms at meets, in training rooms, and at other locations, placing Plaintiff under the impression this inappropriate contact was part of treatment. During this period, Plaintiff was a patient under the Perpetrator's (NASSAR) direct supervision and control.

    c.    Plaintiff is informed and believes the Perpetrator's (NASSAR) physical and sexual abuse of Plaintiff commenced after the grooming of Plaintiff began, and occurred dozens of times while the team was traveling and before and after competitive meets from in or around 2010 to 2012, and in or around 2015. Specifically, the Plaintiff was sexually abused by NASSAR in Texas at the Karolyi Ranch, in Santa Clara County in California, and at numerous locations around the country, as well as internationally in Australia, Japan, in the United Kingdom and in the Netherlands. During this period, Plaintiff was a participant, member, and patient under the Perpetrator's (NASSAR) and Defendants' direct supervision and control.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-15-

**COMPLAINT FOR DAMAGES**

EXHIBIT 1

015

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

Using his position as team physician, the Perpetrator (NASSAR) would interact with Plaintiff under the guise of providing her care and treatments necessary for her to compete as a world-class, Olympic medal-winning gymnast. Under these circumstances, the Perpetrator (NASSAR) placed his bare hand on and near the Plaintiff's unclothed vagina and anus, on multiple occasions, in Plaintiff's assigned living quarters, without any supervision or a chaperone. Further, NASSAR, on numerous occasions, had an erection while performed the claimed medical treatment. Plaintiff is informed and believes that the Perpetrator's (NASSAR) sexual abuse, molestation, and harassment of Plaintiff occurred on the premises of Defendants USAG, USOC, in hotels around the world, and various other locations including, but not limited to in living quarters, in training facilities, in gyms.

38.     Plaintiff is informed and believes, and on that basis alleges, that such conduct by Defendant NASSAR was based upon Plaintiff's gender, and was done for Defendant NASSAR's sexual gratification. These actions upon ALY RAISMAN were performed by Defendant NASSAR without the free consent of Plaintiff, as ALY RAISMAN was a young child, and could therefore not give valid legal consent.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS BY PLAINTIFF

39.     At all times material hereto, Plaintiff was a minor participant and member of Defendant USAG, USOC and DOES 1 through 500, and was under their complete control, dominion, and supervision. Defendant NASSAR worked for, was employed by, and an agent/servant of Defendants USAG, USOC and DOES 1 through 500 when NASSAR came into contact with ALY RAISMAN.

40.     At all times material hereto, Defendant NASSAR was under the direct supervision, management, agency and control of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, inclusive. Defendant NASSAR was the team physician of Defendant USAG and for Team USA, under the dominion of Defendant USOC. While a team physician at Defendant USAG, NASSAR's employment duties included coordinating the care for Defendant USAG at every national and international competition, providing individual care and providing for the physical needs and well-being of participants and members of Defendant USAG (and in accord with Defendant USOC policies, procedures, and mandates), and care including but not limited to osteopathic adjustments and kinesiology treatment to participants and members of Defendant USAG, which included ALY RAISMAN. ALY RAISMAN was a participant and member of Defendant USAG, and it is under these circumstances that ALY RAISMAN came to be under the

-16-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
016

1   direction and control of Defendant NASSAR, who used his position of authority and trust to molest

2   and sexually abuse ALY RAISMAN.

3         41.    As a member and participant of Defendant USAG and USOC while NASSAR was

4   a team physician, the ALY RAISMAN was under Defendant NASSAR's direct supervision,

5   control and care, which created a special, confidential, and fiduciary relationship between ALY

6   RAISMAN, her parents, and Defendant NASSAR. Because of such relationship, Defendant

7   NASSAR owed Plaintiff a special duty of care. Additionally, as the employers and supervisors of

8   NASSAR, with knowledge that he was in contact with and providing care to children, Defendants

9   USAG, USOC, PENNY, PARILLA, and DOES 1 through 500 were also in a special, confidential,

10   and fiduciary relationship with Plaintiff, owing her a duty of care.

11         42.    By assigning Defendant NASSAR as team physician of Defendant USAG under

12   the mandated and control of Defendants USOC and DOES 1 through 500, Defendant USOC

13   represented to the community and participants and members of Defendant USAG that NASSAR

14   was safe, trustworthy, and of high moral and ethical repute, such that parents of participants and

15   members need not worry about having NASSAR interact with, and provide care to their minor

16   children. Defendants did so in order to preserve their own public image and reputation, so they

17   could retain past participants and members and recruit new participants and members, thus

18   allowing donations and other financial support to continue flowing into their coffers for financial

19   gain.

20         43.    Plaintiff is informed and believes, and on that basis, alleges that Defendants USAG,

21   USOC and DOES 1 through 500 knew or should have known that Defendant NASSAR had

22   engaged in unlawful sexually-related conduct in the past, and/or was continuing to engage in such

23   conduct. Defendants had a duty to disclose these facts to ALY RAISMAN and her parents, but

24   negligently and/or intentionally suppressed, concealed or failed to disclose this information. The

25   duty to disclose this information arose by the special, trusting, confidential, fiduciary relationship

26   between Defendants and Plaintiff.

27         44.    Plaintiff is informed and believes, and on that basis, alleges that Defendants knew

28   or should have known that sexually abusive staff, such as Defendant NASSAR, were violating

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-17-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
017

Defendants USOC and USAG policies, without enforcement or abatement, and were continually allowed to be in contact with minor children, such as ALY RAISMAN. As early as 1999, Defendant USOC was placed on notice by former Defendant USAG president Bob Colarossi, who wrote a letter to the USOC, explaining that the safety procedures and policies that USOC required USAG to follow, were part of a "…fundamentally flawed process…" and that at USOC there was an "…**apparent indifference to the welfare of young children manifest in the Committee's actions.**" *See* Exhibit A as the Letter from Robert Colarossi to USOC. It was not until 11 years later, that Defendant USOC created the SafeSport program and issued a handbook detailing specific procedures for preventing sexual abuse of minors, and access to minors by sexual abusers. Despite instituting this handbook and program, Defendant USOC maintained its course and culture of ignoring abuse, ignoring its internal policies and procedures, and placing minors in the way of danger.

45.     Plaintiff is informed and believes and, on that basis, alleges Defendants knew of, or should have known of, Defendants NASSAR's propensity and disposition to engage in sexual misconduct with minors before he sexually abused and molested ALY RAISMAN, and knew of the probability that NASSAR would molest minors with whom he came into contact, such as ALY RAISMAN.

46.     Defendant failed to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Defendant NASSAR in the future, including avoiding placement of Defendant NASSAR in a position where contact and interaction with children is an inherent function. Defendants ignored and suppressed the past sexual misconduct Defendant NASSAR had engaged in, and concealed that information from ALY RAISMAN and her family.

47.     Plaintiff is informed and believes, and on that basis alleges, that Defendants were apprised, knew or should have known of and/or were put on notice of Defendant NASSAR's past sexual abuse of children, past claims and/or investigations, and his propensity and disposition to engage in such unlawful activity and unlawful sexual activity with minor participants and members such that Defendants knew or should have known that Defendant NASSAR would commit wrongful sexual acts with participants and members, including ALY RAISMAN. Plaintiff is

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 1
018

1    informed and believes, and on that basis alleges that personnel and/or employment records and

2    other records of Defendants' reflect numerous incidents of inappropriate sexual contact and

3    conduct with minor participants and members by Defendant NASSAR and other professionals,

4    employees, assistants, agents, supervisors and others, including incidents occurring both on and

5    off the physical premises of such Defendants and at national and international meets. Based on

6    these records, Defendants knew and/or should have known of Defendant NASSAR's history of

7    sexual abuse, past claims and/or past investigations, and his propensity and disposition to engage

8    in unlawful activity and unlawful sexual activity with participants and members such that

9    Defendants knew or should have known that Defendant NASSAR would commit wrongful sexual

10   acts with those minor participants and members, including ALY RAISMAN.

11        48.    Plaintiff is informed and believes, and on that basis alleges, that Defendant

12   NASSAR was repeatedly informally censured, disciplined and/or reprimanded by Defendants

13   USAG, USOC, PENNY, PARILLA, and DOES 1 through 500, for taking an inordinate number

14   of photographs of young girls, who were gymnasts. This conduct by Defendant NASSAR was in

15   direct contravention of his duties set forth by the Defendants USAG, USOC, PENNY, PARILLA,

16   and DOES 1 through 500, and was not communicated to the Plaintiff or her family. This conduct

17   was not further investigated, was not reported to law enforcement or child welfare authorities, and

18   was never communicated to the Plaintiff, her parents or other gymnasts, in direct violation of

19   Defendant USAG's mandate under the Defendant USOC's policies, procedures and rules.

20   Subsequent to NASSAR's initial arrest in 2016, thousands of images of child pornography were

21   located by Federal law enforcement on his electronic devices, and Defendant NASSAR pleaded

22   guilty to such possession of child pornography in July of 2017. Had Defendants USOC, USAG,

23   PENNY, PARILLA, and DOES 1 through 500 effectively implemented their safety policies and

24   procedures, damage to the Plaintiff could have been minimized and NASSAR's conduct could

25   have been stopped earlier, but it was not.

26        49.    Because of the relationship between Plaintiff and Defendants, Defendants had an

27   obligation and duty under the law not to hide material facts and information about NASSAR's

28   past, and his deviant sexual behavior and propensities. Additionally, Defendants had an affirmative

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-19-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
019

duty to inform, warn, and institute appropriate protective measures to safeguard minors who were reasonably likely to come in contact with Defendant NASSAR, including ALY RAISMAN at the time. Defendants willfully refused to notify, give adequate warning and implement appropriate safeguards, thereby creating the peril that ultimately damaged ALY RAISMAN.

50.     Plaintiff is informed and believes, and on that basis alleges, that prior to ALY RAISMAN's sexual abuse by Defendant NASSAR, Defendants engaged in a pattern and practice of employing sexual abusers. Defendants concealed these facts from participants and members, their parents, the Plaintiff's community, the gymnastics community, the public at large, other NGB's, the United States government, various local governments, and law enforcement agencies.

51.     As is set forth herein, Defendants and each of them have failed to uphold numerous mandatory duties required of them by state and federal law, as well as their own internal written policies and procedures, including:

- Duty to use reasonable care to protect participants and members from known or foreseeable dangers

- Duty to inform the Plaintiff ALY RAISMAN and her parents of the known risks to the health and well-being of their daughter while in Defendant's USAG and/or USOC sponsored, authorized, and supervised programs, events and trainings;

- Duty to enact policies and procedures that are not in contravention of the Federal Civil Rights Act, section 1983 and the 14th amendment of the United States Constitution;

- Duty to protect participants and members and staff, and provide adequate supervision;

- Duty to ensure that any direction given to participants and members is lawful, and that adults act fairly, responsible and respectfully towards participants and members;

- Duty to properly train staff so that they are aware of their individual responsibility for creating and maintaining a safe environment;

- Duty to review the criminal history of applicants and current employees;

- Duty to provide diligent supervision over minors;

- Duty to act promptly and diligently and not ignore or minimize problems.

- Duty to report suspected incidents of child abuse and more specifically childhood sexual abuse (*Penal Code* sections 11166, 11167).

- Duty to provide adequate and safe medical care pursuant to 36 U.S.C. §§220525(b)(4)(E).

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-20-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
020

52.      Defendants and each of them had and have a duty to protect participants and members, including ALY RAISMAN. Defendants were required to, and failed, to provide adequate supervision, and failed to be properly vigilant in seeing that supervision was sufficient at Defendants USAG and USOC to ensure the safety of ALY RAISMAN and others.

53.      Despite having a duty to do so, Defendants failed to adequately train and supervise all staff to create a positive and safe environment, specifically including training to perceive, report and stop inappropriate sexual conduct by other members of the staff, specifically including NASSAR with children.

54.      Defendants failed to enforce their own rules and regulations designed to protect the health and safety of the participants and members. Further, they failed to adopt and implement safety measures, policies and procedures designed to protect minor children such as Plaintiff's child from the sexually exploitive and abusive acts of their agents and employees such as NASSAR.

55.      Plaintiff is informed and believes and, on that basis, alleges that as part of Defendants' conspiratorial and fraudulent attempt to hide NASSAR's propensity to sexually abuse children, and prior sexual misconduct with children, from public scrutiny and criminal investigation, Defendants implemented various measures designed to make NASSAR's conduct harder to detect and ensure minors with whom he came into contact, such as ALY RAISMAN, would be sexually abused, including:

   a.      Permitting NASSAR to remain in a position of authority and trust after Defendants knew or should have known that he was a molester of children;

   b.      Placing NASSAR in a separate and secluded environment, at USAG and USOC authorized camps and events, including assigning him unfettered access and control over minor participants and members that included individual and private examinations, private osteopathic adjustments without a chaperone, and allowing NASSAR to physically and sexually interact with the children, including ALY RAISMAN;

   c.      Failing to disclose NASSAR's prior record of misconduct, sexual abuse, harassment and molestation and his propensity to commit such acts towards participants and members in USAG's and USOC's program, the public at large, and law enforcement;

   d.      Allowing NASSAR's unsupervised and un-controlled access to minors, including ALY RAISMAN;

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-21-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
021

e.  Holding out NASSAR to ALY RAISMAN, other participants and members of USAG and USOC, and the public at large as a trustworthy and honest person of high ethical and moral repute who was capable and worthy of being granted unsupervised access to the children of USAG;

f.  Failing to investigate or otherwise confirm or deny such facts about NASSAR including prior arrests, charges, claims and investigations for sexual abuse;

g.  Failing to inform, or concealing from Plaintiff and law enforcement officials the fact that ALY RAISMAN and others were or may have been sexually abused, harassed and molested, after Defendants knew or should have known that NASSAR may have sexually abused ALY RAISMAN or others, thereby enabling ALY RAISMAN to continue to be endangered and sexually abused, harassed, molested, and/or creating the circumstance where ALY RAISMAN and others were less likely to receive proper medical treatment, thus exacerbating the harm to ALY RAISMAN;

h.  Holding out NASSAR to Plaintiff and to the community as being in good standing and trustworthy;

i.  Cloaking NASSAR's prior sexual misconduct with children within the facade of normalcy, thereby disguising the nature of his sexual abuse and contact with minors;

j.  Failing to take reasonable steps and to implement reasonable safeguards to avoid acts of unlawful sexual conduct by NASSAR such as avoiding placement of NASSAR in functions or environments in which his solitary contact with children was inherent;

k.  Failing to put in place a system or procedure to supervise or monitor physicians, athletic trainers, and agents to insure they do not molest or abuse minors in Defendants' care.

l.  Failing to investigate Nassar's background adequately.

m.  Allowing NASSAR to practice medicine without a Texas medical license at the National Training Center.

n.  Failing to implement any reasonable, meaningful, or adequate supervision policies, practices or procedures at the National Training Center, which would have prevented NASSAR solitary access to minors, including the Plaintiff.

56.  By his position within the Defendants' institutions, NASSAR attained a position of influence over ALY RAISMAN, her parents, and others. Defendants' conduct created a situation of peril that was not, and could not be appreciated by ALY RAISMAN. By virtue of Defendants' conspiratorial and fraudulent conduct, and in keeping with their intent to fail to disclose and hide NASSAR's past and present conduct from the community, the public at large and law enforcement, Defendants allowed NASSAR to remain in a position of influence where his unsupervised or negligently supervised conduct with minor participants and members made the molestation and abuse of minor participants and members possible.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-22-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
022

57.     During the period ALY RAISMAN was being sexually abused and harassed by NASSAR, Defendants had the authority and ability to prevent such abuse by removing Defendant NASSAR from his position as team physician at Team USA, USAG and in his status with the USOC. They failed to do so, allowing the abuse to occur and to continue unabated. Plaintiff is informed and believes and, on that basis, alleges that this failure was a part of Defendants' conspiratorial plan and arrangement to conceal NASSAR's wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal, to avoid the disclosure of their tolerance of child sexual molestation and abuse, to preserve a false appearance of propriety, and to avoid investigation and action by public authority including law enforcement. Such actions were motivated by a desire to protect the reputation of Defendants and protect the monetary support of Defendants, while fostering an environment where such abuse could continue to occur.

58.     As a direct result of the sexual harassment and abuse that ALY RAISMAN suffered from Defendant NASSAR, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failing to inform the ALY RAISMAN (or her parents) of the danger posed to her by NASSAR, Plaintiff has had difficulty in meaningfully interacting with others, including those in positions of authority over Plaintiff including physicians, athletic supervisors, athletic trainers, as well as their servants and agents. Plaintiff has been limited in her ability to meaningfully interact with others due to the trauma of childhood sexual abuse, and the upset of having known that they could have prevented such, had Defendants conveyed the appropriate information. This inability to interact creates conflict with Plaintiff's values of trust and confidence in others, and has caused Plaintiff substantial emotional distress, anxiety, nervousness and fear. As a direct result of this conduct, Plaintiff suffered immensely, including, but not limited to, encountering issues with a lack of trust, various negative psychological and emotional sequelae, depressive symptoms, anxiety, and nervousness. Having been one of the most famous gymnasts in United States (and World) history, ALY RAISMAN lost millions of dollars in economic damages, as a result of her sexual abuse at the hands of NASSAR, and continues to suffer from such loss.

59.     As a direct and proximate result of Defendants' tortious acts, omissions, wrongful conduct and breaches of their duties, Plaintiff's employment and professional development has

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-23-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
023

1   been adversely affected. Plaintiff has lost wages, endorsements, and many financial opportunities

2   and will continue to lose wages in an amount to be determined at trial. Plaintiff has suffered

3   substantial economic injury, all to Plaintiff's general, special and consequential damage in an

4   amount to be proven at trial, but in no event less than the minimum jurisdictional amount of this

5   Court.

6       60.    As a further direct and proximate result of Defendants' wrongful actions, as herein

7   alleged, Plaintiff has been hurt in their health, strength and activity. Plaintiff has sustained

8   permanent and continuing injury to their nervous system and person, which has caused and

9   continues to cause great mental, physical and nervous pain, suffering, fright, upset, grief, worry

10   and shock in an amount according to proof at trial but in no event less than the jurisdictional

11   minimum requirements of this Court.

12       61.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

13   USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500 acted willfully and

14   maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as

15   to constitute malice and/or oppression under California *Civil Code* section 3294. Plaintiff is

16   informed and believes, and on that basis alleges, that specifically, the Defendants acted in concert,

17   and under their authority as child care providers, with reckless disregard for the concern of the

18   minor participants in its charge, in order to further financially benefit their respective business'

19   growth. The Defendants acted intentionally in creating an environment that harbored molesters,

20   put the vulnerable minor participants at-risk of harm, ignored clear warning signs and their duties

21   to report sexual abusers and molesters in their ranks, to maintain a façade of normalcy, in order to

22   maintain its funding and provide further financial growth of Defendants USAG, USOC, and

23   PENNY and PARILLA, individually, on the international level. The safety of the minor

24   participants that were entrusted to Defendant USAG and represented as being protected through

25   Defendant USOC, was compromised due to Defendants desire to maintain the status quo of the

26   Defendants USAG and USOC organizations, and avoid any public scrutiny for its misconduct.

27   Plaintiff is informed, and on that basis alleges, that these willful, malicious, and/or oppressive acts,

28   as alleged herein above, were ratified by the officers, directors, and/or managing agents of the

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

-24-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
024

Defendants. Plaintiff is therefore entitled to recover punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500.

## FIRST CAUSE OF ACTION
## SEXUAL HARASSMENT: CIVIL CODE § 51.9
## (Plaintiff ALY RAISMAN Against Defendants USAG, USOC, NASSAR and DOES 1 through 500)

62. The Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

63. During the Plaintiff ALY RAISMAN's time as a minor gymnast under the care, control and/or mandate of Defendants USOC, USAG and DOES 1 through 500, NASSAR recklessly and wantonly made sexual advances, solicitations, requests, demands for sexual compliance of a hostile nature based on the Plaintiff ALY RAISMAN's gender that were unwelcome, pervasive and severe. NASSAR intentionally, recklessly and wantonly did acts which resulted in harmful and offensive contact with intimate parts of the Plaintiff ALY RAISMAN's person, including but not limited to NASSAR using the authority and trust inherent in his position as an Olympic Doctor to exploit her physically, psychologically and emotionally. These acts were done for NASSAR's sexual gratification; all while NASSAR was acting in the course and scope of his agency/employment with Defendants USAG, USOC, and DOES 1 through 500.

64. The incidents of abuse outlined herein above took place while the Plaintiff ALY RAISMAN was under the care of NASSAR, in his capacity and position as an Olympic Doctor, while acting specifically on behalf of Defendants USOC, and DOES 1 through 500.

65. Because of the Plaintiff ALY RAISMAN's young age, nature of her competitive sport, and relationship with NASSAR as a gymnast at Defendant USAG (under the control and authority of Defendants USOC and USAG), the Plaintiff ALY RAISMAN was unable to easily terminate her doctor-patient relationship with NASSAR.

66. Because of NASSAR's position of authority over Plaintiff ALY RAISMAN, and the Plaintiff ALY RAISMAN's mental and emotional state, and her young age under the age of consent, Plaintiff ALY RAISMAN was unable to, and did not give meaningful consent to such acts.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-25-

EXHIBIT 1
025

1    67.    Even though Defendants USAG, USOC and DOES 1 through 500 knew or should

2   have known of these activities by NASSAR, Defendants USOC, USAG, and DOES 1 through 500

3   did nothing to investigate, supervise or monitor NASSAR to ensure the safety of Plaintiff ALY

4   RAISMAN. Defendants USAG, USOC and DOES 1 through 500 ratified the sexual misconduct

5   of NASSAR by retaining him in employment after discovering, or ignoring the facts that would

6   have led them to discover, his misconduct.

7    68.    Defendants USOC, USAG, and DOES 1 through 500's conduct was a breach of

8   their duties to the Plaintiff ALY RAISMAN.

9    69.    As a result of the above-described conduct, Plaintiff ALY RAISMAN suffered and

10   continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations

11   of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of

12   enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be

13   prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

14   loss of earnings and earning capacity, and has incurred and will continue to incur expenses for

15   medical and psychological treatment, therapy, and counseling.

16    70.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

17   USOC, USAG, NASSAR and DOES 1 through 500, acted willfully and maliciously with the intent

18   to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or

19   oppression under California *Civil Code* section 3294. Plaintiff is informed, and on that basis

20   alleges, that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified

21   by the officers, directors, and/or managing agents of the Defendants USOC, USAG, and DOES 1

22   through 500. Plaintiff is therefore entitled, to the recovery of punitive damages, in an amount to be

23   determined by the court, against Defendants USOC, USAG, and DOES 1 through 500.

### SECOND CAUSE OF ACTION
**MASHA'S LAW (18 <u>U.S.C.</u> §§2255, 2423(b), 2423(c))**
**(Plaintiff ALY RAISMAN Against Defendants USAG, USOC, NASSAR and DOES 1**
**through 500)**

26    71.    Plaintiff re-alleges and incorporates by reference herein each and every allegation

27   contained herein above as though fully set forth and brought in this cause of action.

28

EXHIBIT 1
026

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

72.     Under 18 U.S.C. §§2255, the Plaintiff ALY RAISMAN has a private right of action against NASSAR, and any defendants who are vicariously and/or strictly responsible for NASSAR while abroad perpetrating his sexual assaults against ALY RAISMAN, including Defendants USOC, USAG, and DOES 1 through 500. *See Doe v. Celebrity Cruises, Inc.* (11th Cir. 2004) 394 F.3d 891, 894.

73.     Plaintiff ALY RAISMAN is a victim of the federal crime codified as 18 U.S.C. §2423(b), which was perpetrated by NASSAR and provides, "[a] person who travels in interstate commerce or travels into the United States, **or a United States citizen … who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.**"

74.     Furthermore, Plaintiff ALY RAISMAN is a victim of the federal crime codified as 18 U.S.C. §2423(c), which was perpetrated by NASSAR and provides, "**[a]ny United States citizen … who travels in foreign commerce** or resides, either temporarily or permanently, in a foreign country, **and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both**."

75.     As alleged herein, Defendant NASSAR travelled with ALY RAISMAN to Europe, Australia, Japan, and across state lines, wherein he sexually harassed, abused, and molested her, when she was under the age of 18 years old and as previously stated herein. Defendant NASSAR travelled with ALY RAISMAN for the sole purpose of engaging in this elicit sexual conduct with her.

76.     As a result of the above-described conduct, the Plaintiff ALY RAISMAN suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-0900

EXHIBIT 1
027

77.     In subjecting Plaintiff to the wrongful treatment herein described, Defendants USOC, USAG, and DOES 1 through 500, acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression under California *Civil Code* section 3294.   Plaintiff is informed, and on that basis alleges, that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified by the officers, directors, and/or managing agents of the Defendants USAG, USOC and DOES 1 through 500. Plaintiff is therefore entitled, upon proper application to the court, to the recovery of punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, and DOES 1 through 500.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, NASSAR, PENNY, PARILLA, and DOES 1 through 500)

78.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

79.     Defendants USAG, USOC, PENNY, PARILLA, and DOES 1 through 500's conduct toward Plaintiff, as described herein, was outrageous and extreme.

80.     A reasonable person would not expect or tolerate Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 putting NASSAR in positions of authority at Defendants USAG, USOC, or DOES 1 through 500, which enabled NASSAR to have access to minors including Plaintiff ALY RAISMAN, so that he could commit wrongful sexual acts with her, including the conduct described herein above. Plaintiff had great trust, faith and confidence in in Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, which, by virtue of NASSAR and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's wrongful conduct, turned to fear.

81.     Moreover, by failing to report NASSAR or honor any of their legal reporting obligations and by failing to promptly notify the parents of Plaintiff ALY RAISMAN of the abuse of their daughter, Defendants USOC and DOES 1 through 500 knew that Plaintiff would be directly harmed. Under the holding in *Phyllis P.* case, a special relationship and a duty to notify the parents of Plaintiff was stated. Such duty being independent of any duty Defendants USOC, USAG,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-28-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
028

PENNY, PARILLA, and DOES 1 through 500 owed to Plaintiff ALY RAISMAN and is a direct duty owed to the Plaintiff's parents and was thereby created with Plaintiff's parents, whereby Plaintiff's parents are intended or direct victims of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failures and can recover for any emotional distress proximately caused thereby. Specifically, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had knowledge of NASSAR's dangerous propensities to sexually abuse children, yet concealed and failed to disclose to Plaintiff ALY RAISMAN this information.

82. A reasonable person would not expect or tolerate Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 to be incapable of supervising and preventing employees of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, including NASSAR, from committing wrongful sexual acts with minor gymnasts including Plaintiff ALY RAISMAN, or to properly supervise NASSAR to prevent such abuse from occurring, or to promptly notify parents or authorities.

83. Defendants USOC, USAG, PENNY, PARILLA, NASSAR, and DOES 1 through 500's conduct described herein was intentional and malicious and done for the purpose of causing, or with the substantial certainty that it would cause Plaintiff ALY RAISMAN and her parents, to suffer humiliation, mental anguish and emotional and physical distress.

84. As a result of the above-described conduct, Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

85. In subjecting Plaintiff to the wrongful treatment herein described, Defendants USOC, USAG, PENNY, PARILLA, NASSAR and DOES 1 through 500 acted willfully and maliciously with the intent to harm Plaintiff ALY RAISMAN, and in conscious disregard of Plaintiff's rights, so as to constitute malice and oppression under California *Civil Code* section

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

3294. Plaintiff is therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, in a sum to be shown according to proof.

**FOURTH CAUSE OF ACTION**
**UNFAIR BUSINESS PRACTICES (*BUSINESS & PROFESSIONS CODE* §17200)**
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)**

86.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

87.     Plaintiff is informed and believes and, on that basis,, alleges that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 have engaged in unlawful, unfair and/or deceptive business practices including allowing NASSAR to engage in repeated harassment of participants and members, including Plaintiff ALY RAISMAN, and failing to take all reasonable steps to prevent harassment and abuse from occurring. The unlawful, unfair and deceptive business practices also included failing to adequately investigate, vet, and evaluate individuals for employment with Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, refusing to design, implement, and oversee policies regarding sexual harassment and abuse of children in a reasonable manner that is customary in similar educational environments. Plaintiff is informed and believes and, on that basis, alleges that Defendants USOC, USAG, and DOES 1 through 500 have engaged in unlawful, unfair and deceptive business practices including concealing sexual harassment, abuse and/or molestation claims by participants and members, such as Plaintiff ALY RAISMAN, so as to retain other participants and members within Defendants USAG, who were not apprised of such illicit sexual misconduct by NASSAR.

88.     Plaintiff is informed and believes, and on that basis alleges that Defendants USOC USAG, PENNY, PARILLA, and DOES 1 through 500 engaged in a common scheme, arrangement or plan to actively conceal allegations against sexual abusers who were employees, agents, members, and/or participants at Defendants USAG, USOC, and DOES 1 through 500, such that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 could maintain their public image, and avoid detection of such abuse and abusers. Plaintiff is informed and believes and thereon alleges that Defendants USOC, USAG, and DOES 1 through 500 actively concealed

-30-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
030

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1  these allegations, such that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through

2  500 would be insulated from public scrutiny, governmental oversight, and/or investigation from

3  various law enforcement agencies, all done in order to maintain the false sense of safety for

4  participants and their families and to perpetuate the program financially.

5        89.    By engaging in unlawful, unfair and deceptive business practices, Defendants

6  USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 benefitted financially to the

7  detriment of its competitors, who had to comply with the law.

8        90.    Unless restrained, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

9  through 500 will continue to engage in the unfair acts and business practices described above,

10  resulting in great and irreparable harm to Plaintiff and/or other similarly situated participants and

11  members.

12        91.    Plaintiff seeks restitution for all amounts improperly obtained by Defendants

13  USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 through the use of the above-

14  mentioned unlawful business practices, as well as the disgorgement of all ill-gotten gains and

15  restitution on behalf of Plaintiff and all other similarly situated participants and members who were

16  also subjected to Defendant's illegal and unfair business practices.

17        92.    Pursuant to section 17203 of the California *Business and Professions Code* and

18  available equitable powers, Plaintiff is entitled to a preliminary and permanent injunction,

19  enjoining Defendants USOC, USAG, and DOES 1 through 500 from continuing the unlawful and

20  unfair business practices described above. Further, Plaintiff seeks the appointment of a court

21  monitor to enforce its orders regarding client safety. In addition, Plaintiff is entitled to recover

22  reasonable attorneys' fees pursuant to the California *Business and Professions Code* and section

23  1021.5 of the *California Code of Civil Procedure*.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and**
**DOES 1 through 500)**

24

25

26        93.    Plaintiff re-alleges and incorporates by reference herein each and every allegation

27  contained herein above as though fully set forth and brought in this cause of action.

28

EXHIBIT 1
031

94.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, as childcare custodians representing that they would keep Plaintiff ALY RAISMAN safe, were in a fiduciary relationship with Plaintiff ALY RAISMAN, owing her a special duty of due care. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 are mandated reporters, or organizations required to comply with Mandated Reporting laws, with respect to claims of child abuse and child safety.

95.     Moreover, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff ALY RAISMAN a statutory, common law and constitutional duty to protect her and guarantee her safety while in their custody, care, and control.

96.     The Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 also owed a special duty to ALY RAISMAN's parents. As direct victims for failure to notify of abuse of their minor child (*See Phyllis P. v. Claremont Unified School District*, 183 Cal. App. 3d at 1193) which held that a school district had a special relationship with a parent because the parent was the "real and foreseeable" victim of the defendants' negligent conduct. Direct victims may bring claims where there was a negligent breach of a duty arising out of a preexisting relationship. Any breach committed by the Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 violates this special relationship and duty owed to Plaintiff ALY RAISMAN's parents.

97.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their fiduciary duty by failing to properly supervise NASSAR and take appropriate steps to prevent the lewd and lascivious conduct perpetrated by NASSAR against ALY RAISMAN. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 also failed to report NASSAR pursuant to USOC and USAG policy. Defendants USOC, USAG, and DOES 1 through 500 also failed to implement or follow appropriate policies and procedures to protect minors, including ALY RAISMAN. In addition, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to report NASSAR's abuse or promptly notify ALY RAISMAN's parents.

98.     The employees, servants, agents, volunteers or other representatives of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, respectively, willfully and

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

-32-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
032

1    intentionally ignored behavior in NASSAR and complaints against NASSAR that they should have

2    reported due to their responsibility as mandated reporters.

3        99.    As a result of the above-described conduct, Plaintiff suffered and continues to suffer

4    great pain of mind and body, shock, emotional distress, physical manifestations of emotional

5    distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

6    has suffered and continues to suffer and were prevented and will continue to be prevented from

7    performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings

8    and earning capacity, and has incurred and will continue to incur expenses for medical and

9    psychological treatment, therapy, and counseling.

10       100.    In subjecting Plaintiff to the wrongful treatment herein described, Defendants

11   USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 acted willfully and maliciously

12   with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute

13   malice and oppression under California *Civil Code* section 3294. Plaintiff is therefore entitled to

14   the recovery of punitive damages, in an amount to be determined by the court, against Defendants

15   USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, in a sum to be shown according to

16   proof.

17
### SIXTH CAUSE OF ACTION
### CONSTRUCTIVE FRAUD
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)

18

19       101.    Plaintiff re-alleges and incorporates by reference herein each and every allegation

20   contained herein above as though fully set forth and brought in this cause of action.

21       102.    By holding NASSAR out as an agent of Defendants USOC, USAG, PENNY,

22   PARILLA, and DOES 1 through 500, and by allowing him to undertake the physical care and

23   athletic training of minor children such as ALY RAISMAN, Defendants USOC, USAG, PENNY,

24   PARILLA, and DOES 1 through 500 entered into a confidential, fiduciary, and special relationship

25   with Plaintiff.

26       103.    By holding themselves out as professional organizations for woman's gymnastics,

27   undertaking to select and train national gymnastics teams, enforcing policies, rules, and procedures

28   for gymnasts' safety and facilitating competition both nationally and internationally of ALY

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 1
033

RAISMAN and other minor team participants and members, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 entered into a confidential, fiduciary and special relationship with Plaintiff and other minor gymnasts (as well as their families).

104.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their confidential, fiduciary duty and special duties to Plaintiff by the wrongful and negligent conduct described above and incorporated into this cause of action, and in so doing, gained an advantage over Plaintiff in matters relating to Plaintiff's safety, security and health. In particular, in breaching such duties as alleged, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were able to sustain their status as institutions (or individuals) of high moral repute, and preserve their reputation, all at the expense of Plaintiff's further injury and in violation of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's mandatory duties.

105.     By virtue of their confidential, fiduciary and special relationship with Plaintiff, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to:

    a.     Investigate or otherwise confirm or deny such claims of sexual abuse;

    b.     Reveal such facts to Plaintiff, the gymnastics community, the community at large, and law enforcement agencies;

    c.     Refuse to place NASSAR and other molesters in positions of trust and authority within Defendants USOC, USAG and DOES 1 through 500's institutions;

    d.     Refuse to hold out NASSAR and other molesters to the public, the community, minors, parents and law enforcement agencies as being in good standing and, trustworthy in keeping with him and his position as a team physician and authority figure;

    e.     Refuse to assign NASSAR and other molesters to positions of power within Defendants USOC, USAG, and DOES 1 through 500 and over minors; and

    f.     Disclose to Plaintiff, the public, the school community, minors, and law enforcement agencies the wrongful, tortious, and sexually exploitive acts that NASSAR had engaged in with children.

106.     Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's breach of their respective duties included:

    a.     Not making reasonable investigations of NASSAR;

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

b. Issuing no warnings about NASSAR;

c. Permitting NASSAR to routinely be alone with and in control of minors, unsupervised;

d. Not adopting a policy to prevent NASSAR from routinely having minors and participants and members in his unsupervised control;

e. Making no reports of any allegations of NASSAR's abuse of participants and members, or of minors prior to or during his employment and/or agency at Defendants USOC, USAG and DOES 1 through 500; and

f. Assigning and continuing to assign NASSAR to duties which placed him in positions of authority and trust over minors, positions in which NASSAR could easily isolate and sexually abuse minors.

107. At the time that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 engaged in such suppression and concealment of acts, such acts were done for the purpose of causing Plaintiff to forbear on her rights.

108. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's misconduct did reasonably cause Plaintiff to forbear on her rights.

109. The misrepresentations, suppressions and concealment of facts by Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were intended to and were likely to mislead Plaintiff and others to believe that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had no knowledge of any charges, claims or investigations against NASSAR, or that there were no other charges, claims or investigations of unlawful or sexual misconduct against NASSAR or others and that there was no need for them to take further action or precaution.

110. The misrepresentations, suppressions and concealment of facts by Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 was likely to mislead Plaintiff and others to believe that Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had no knowledge of the fact that NASSAR was a molester, and was known to commit wrongful sexual acts with minors, including with ALY RAISMAN.

111. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known at the time they suppressed and concealed the true facts regarding others' sexual molestations, that the resulting impressions were misleading.

112. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 suppressed and concealed the true facts regarding NASSAR with the purpose of: preventing

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-35-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
035

1  Plaintiff, and others, from learning that NASSAR and others had been and were continuing to

2  sexually harass, molest and abuse minors and others under NASSAR's and Defendants USOC,

3  USAG, PENNY, PARILLA, and DOES 1 through 500's control, direction, and guidance, with

4  complete impunity; inducing people, including ALY RAISMAN and other benefactors and donors

5  to participate and financially support Defendants USOC and DOES 1 through 500; USOC, USAG,

6  PENNY, PARILLA, and DOES 1 through 500's program and other enterprises of Defendants

7  USOC, USAG, and DOES 1 through 500; preventing further reports and outside investigations

8  into NASSAR and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's

9  conduct; preventing discovery of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1

10  through 500's own conduct; avoiding damage to the reputations of Defendants USOC, USAG,

11  PENNY and DOES 1 through 500; protecting Defendants USOC, USAG, PENNY, PARILLA,

12  and DOES 1 through 500's power and status in the community and the gymnastics community;

13  avoiding damage to the reputation of Defendants USOC, USAG, PENNY, PARILLA, and DOES

14  1 through 500, or Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's

15  institutions; and avoiding the civil and criminal liability of Defendants USOC, USAG, PENNY,

16  PARILLA, and DOES 1 through 500, of NASSAR, and of others.

17    113.    At all times mentioned herein, Defendants USOC, USAG, PENNY, PARILLA, and

18  DOES 1 through 500, with knowledge of the tortious nature of their own and NASSAR's conduct,

19  knowingly conspired and gave each other substantial assistance to perpetrate the

20  misrepresentations, fraud and deceit alleged herein—covering up the past allegations of sexual

21  misconduct lodged against NASSAR, and allowing NASSAR to remain in his position as a team

22  physician so they could maintain their reputations and continue with their positions within the

23  organization.

24    114.    The Plaintiff and others were misled by Defendants USOC, USAG, PENNY,

25  PARILLA, and DOES 1 through 500's suppressions and concealment of facts, and in reliance

26  thereon, were induced to act or induced not to act, exactly as intended by Defendants USOC,

27  USAG, PENNY, PARILLA, and DOES 1 through 500. Specifically, Plaintiff were induced to

28  believe that there were no allegations of criminal or sexual abuse against NASSAR and that he

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

EXHIBIT 1
036

was safe to be around children. Had Plaintiff known the true facts about NASSAR, they would have not participated further in activities of NASSAR, or continued to financially support Defendants USOC, USAG, and DOES 1 through 500's activities. They would have reported the matters to the proper authorities, to other minor participants and members and their parents so as to prevent future recurrences; they would not have allowed children, including the Plaintiff, to be alone with, or have any relationship with NASSAR; they would not have allowed children, including the Plaintiff, to attend or be under the control of Defendants USOC, USAG and DOES 1 through 500; they would have undertaken their own investigations which would have led to discovery of the true facts; and they would have sought psychological counseling for the Plaintiff, and for other children molested and abused by NASSAR.

115. By giving NASSAR the position of team physician, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 impliedly represented that NASSAR was safe and morally fit to give children care and provide osteopathic adjustments.

116. When Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 made these affirmative or implied representations and non-disclosures of material facts, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known that the facts were otherwise. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knowingly and intentionally suppressed the material facts that NASSAR had on numerous, prior occasions sexually, physically, and mentally abused minors and participants and members of Defendants USOC, USAG and DOES 1 through 500, including the Plaintiff, and knew of or learned of conduct, or should have known of conduct by NASSAR which placed Defendants USOC, USAG, and DOES 1 through 500 on notice that NASSAR had previously been suspected of felonies, including unlawful sexual conduct with minors, and was likely abusing children.

117. Because of Plaintiff's position on the outside of these organizations, and because of the status of NASSAR as a trusted, authority figure to Plaintiff and her family, ALY RAISMAN was vulnerable to NASSAR and the representations of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, both express and implied. NASSAR sought the Plaintiff out,

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-37-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
037

and was empowered by and accepted ALY RAISMAN's vulnerability. Plaintiff's vulnerability also prevented her from effectively protecting herself from the sexual advances of NASSAR.

118.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had the duty to obtain and disclose information relating to sexual misconduct of NASSAR.

119.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 misrepresented, concealed or failed to disclose information relating to sexual misconduct of NASSAR.

120.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew that they had misrepresented, concealed or failed to disclose information related to sexual misconduct of NASSAR.

121.   Plaintiff justifiably relied upon Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 for information relating to sexual misconduct of NASSAR.

122.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, in concert with each other and with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would misrepresent, conceal or fail to disclose information relating to the sexual misconduct of NASSAR, the inability of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 to supervise or stop NASSAR from sexually harassing, molesting and abusing ALY RAISMAN, and their own failure to properly investigate, supervise and monitor his conduct with minor participants and members.

123.   By so concealing, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 committed at least one act in furtherance of the conspiracy.

124.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

125.   In addition, when Plaintiff finally discovered the fraud of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and continuing thereafter, Plaintiff experienced recurrences of the above-described injuries. Plaintiff experienced extreme and severe mental anguish and emotional distress that Plaintiff had been the victim of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's fraud; that Plaintiff had not been able to help other minors being molested because of the fraud, and that Plaintiff had not been able, because of the fraud, to receive timely medical treatment needed to deal with the problems Plaintiff has suffered and continues to suffer as a result of the sexual harassment, molestation and abuse of ALY RAISMAN.

126.   In subjecting ALY RAISMAN to the wrongful treatment herein described, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression under California *Civil Code* section 3294. Plaintiff is informed, and on that basis, allege that these willful, malicious, and/or oppressive acts, as alleged herein above, were ratified by the officers, directors, and/or managing agents of these Defendants. Plaintiff is therefore entitled to recover punitive damages, in an amount to be determined by the court, against Defendants USOC, USAG, PENNY and DOES 1 through 500.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)**

127.   Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

128.   Prior to and after the first incident of the Perpetrator's (NASSAR) sexual harassment, molestation and abuse of Plaintiff, through the present, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, knew and/or should have known that the Perpetrator (NASSAR) had and was capable of sexually, physically, and mentally abusing and harassing Plaintiff or other victims.

129.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 and each of them had special duties to protect the minor Plaintiff and the other participants and

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-39-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
039

1   members, when such minors were entrusted to Defendants USOC, USAG, PENNY, PARILLA,

2   and DOES 1 through 500's care by their parents. Plaintiff's care, welfare and physical custody was

3   entrusted to Defendants USOC and DOES 1 through 500. Defendants USOC, USAG, PENNY,

4   PARILLA, and DOES 1 through 500 voluntarily accepted the entrusted care of Plaintiff. As such,

5   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff, a minor

6   child, a special duty of care that adults dealing with children owe to protect them from harm. The

7   duty to protect and warn arose from the special, trusting, confidential, and fiduciary relationship

8   between Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 and Plaintiff.

9       130.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

10  breached their duties of care to the minor Plaintiff by allowing the Perpetrator (NASSAR) to come

11  into contact with the minor Plaintiff and other participants and members, without supervision; by

12  failing to adequately hire, supervise and retain the Perpetrator (NASSAR) whom they permitted

13  and enabled to have access to Plaintiff; by concealing from Plaintiff, her family, and law

14  enforcement that the Perpetrator (NASSAR) was sexually harassing, molesting and abusing

15  minors; and by holding the Perpetrator (NASSAR) out to Plaintiff and her family as being of high

16  moral and ethical repute, in good standing and trustworthy.

17      131.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

18  breached their duties to Plaintiff by failing to investigate or otherwise confirm or deny such facts

19  of sexual abuse by the Perpetrator (NASSAR), failing to reveal such facts to Plaintiff, her parents,

20  the community and law enforcement agencies, and by placing the Perpetrator (NASSAR) into a

21  position of trust and authority, holding him out to Plaintiff, her parents, and the public as being in

22  good standing and trustworthy.

23      132.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

24  breached their duty to Plaintiff by failing to adequately monitor and supervise the Perpetrator

25  (NASSAR) and failing to prevent the Perpetrator (NASSAR) from committing wrongful sexual

26  acts with minors including Plaintiff. Defendants USOC, USAG, PENNY, PARILLA, and DOES

27  1 through 500's voluminous past records of sexual misconduct by the Perpetrator (NASSAR)

28  caused Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 to know, or

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

gave them information where they should have known, of the Perpetrator's (NASSAR) incapacity to serve as a team physician, providing for the physical care of minor females.

133.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### EIGHTH CAUSE OF ACTION
### NEGLIGENT SUPERVISION
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)

134.    Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

135.    By virtue of Plaintiff's special relationship with Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's relation to the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to provide reasonable supervision of the Perpetrator (NASSAR), to use reasonable care in investigating the Perpetrator's (NASSAR) background, and to provide adequate warning to Plaintiff, Plaintiff's family, and minor participants and members of the Perpetrator's (NASSAR) dangerous propensities and unfitness. As organizations and individuals responsible for, and entrusted with, the welfare of minor children, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had a duty to protect, supervise, and monitor both the Plaintiff from being preyed upon by sexual predators, and to supervise and monitor the Perpetrator (NASSAR) such that he would not be placed in seclusion with minor children, including the Plaintiff.

136.    As representatives of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, where many of the participants and members thereof are vulnerable minors entrusted to these Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, these

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-41-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
041

Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's agents expressly and implicitly represented that team physicians and staff, including the Perpetrator (NASSAR), were not a sexual threat to children and others who would fall under the Perpetrator's (NASSAR) influence, control, direction, and care.

137.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, by and through their respective agents, servants and employees, knew or should have known of the Perpetrator's (NASSAR) dangerous and exploitive propensities and that the Perpetrator (NASSAR) was an unfit agent. Despite such knowledge, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 negligently failed to supervise the Perpetrator (NASSAR) in his position of trust and authority as a team physician and authority figure over children, where he was able to commit wrongful acts of sexual misconduct against Plaintiff. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to provide reasonable supervision of the Perpetrator (NASSAR), failed to use reasonable care in investigating the Perpetrator (NASSAR), and failed to provide adequate warning to Plaintiff and Plaintiff's family of the Perpetrator's (NASSAR) dangerous propensities and unfitness. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 further failed to take reasonable steps to ensure the safety of minors, including Plaintiff, from sexual harassment, molestation, and abuse.

138.   At no time during the periods of time alleged did Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 have in place a reasonable system or procedure to investigate, supervise and monitor the team physician or staff, including the Perpetrator (NASSAR), to prevent pre-sexual grooming and sexual harassment, molestation and abuse of children, nor did they implement a system or procedure to oversee or monitor conduct toward minors and others in Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's care.

139.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were aware or should have been aware of how vulnerable children were to sexual harassment, molestation and abuse by teachers and other persons of authority within Defendants USOC and DOES 1 through 500's entities.

EXHIBIT 1
042

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

140.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were put on notice, knew and/or should have known that the Perpetrator (NASSAR) had previously engaged and was continuing to engage in unlawful sexual conduct with minors, and had committed other felonies, for his own personal sexual gratification, and that it was foreseeable that he was engaging, or would engage in illicit sexual activities with Plaintiff, and others, under the cloak of the authority, confidence, and trust, bestowed upon him through Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500.

141.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were placed on actual or constructive notice that the Perpetrator (NASSAR) had molested other minors and participants and members during his employment with Defendants USOC and DOES 1 through 500. Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were informed of molestations of minors committed by the Perpetrator (NASSAR) prior to Plaintiff's sexual abuse, and of conduct by the Perpetrator (NASSAR) that would put a reasonable person on notice of such propensity to molest and abuse children.

142.    Even though Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known of these illicit sexual activities by the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 did not reasonably investigate, supervise or monitor the Perpetrator (NASSAR) to ensure the safety of the minor participants and members.

143.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's conduct was a breach of their duties to Plaintiff.

144.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and each of them, breached their duty to Plaintiff by, *inter alia*, by failing to adequately monitor and supervise the Perpetrator (NASSAR) and stop the Perpetrator (NASSAR) from committing wrongful sexual acts with minors including Plaintiff.

145.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-43-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
043

enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## NEGLIGENCE *PER SE*-CONDUCT IN VIOLATION OF MANDATED REPORTING LAWS

146.   Under applicable law, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, by and through their employees and agents, were child care custodians and were under a duty to report known or suspected incidents of sexual molestation or abuse of minors to a child protective agency, and not to impede the filing of any such report.

147.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known that their team physician, the Perpetrator (NASSAR), and other staff of Defendants USOC, USAG, and DOES 1 through 500, had sexually molested, abused or caused touching, battery, harm, and/or other injuries to minors, including Plaintiff, giving rise to a duty to report such conduct.

148.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew, or should have known, in the exercise of reasonable diligence, that an undue risk to minors, including Plaintiff, existed because Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 did not comply with California's mandatory reporting requirements.

149.   By failing to report the continuing molestations and abuse by the Perpetrator (NASSAR), which Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known about, and by ignoring the fulfillment of the mandated compliance with the reporting requirements, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 created the risk and danger contemplated by the applicable mandated reporting laws, and as a result, unreasonably and wrongfully exposed Plaintiff and other minors to sexual molestation and abuse.

150.   Plaintiff was a member of the class of persons for whose protection applicable mandated reporting laws were specifically adopted to protect.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

-44-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
044

151.  Had Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 adequately reported the molestation of Plaintiff and other minors as required by applicable mandated reporting laws, further harm to Plaintiff and other minors would have been avoided.

152.  As a proximate result of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's failure to follow the mandatory reporting requirements, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 wrongfully denied Plaintiff and other minors the intervention of child protection services. Such public agencies would have changed the then-existing arrangements and conditions that provided the access and opportunities for the molestation of Plaintiff by the Perpetrator (NASSAR).

153.  The physical, mental, and emotional damages and injuries resulting from the sexual molestation of Plaintiff by the Perpetrator (NASSAR), were the type of occurrence and injuries that the applicable mandated reporting laws were designed to prevent.

154.  As a result, Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's failure to comply with the mandatory reporting requirements constituted a per se breach of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's duties to Plaintiff.

155.  Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and each of them, breached their duty to Plaintiff by, inter alia, by failing to adequately monitor and supervise the Perpetrator (NASSAR) and stop the Perpetrator (NASSAR) from committing wrongful sexual acts with minors including Plaintiff.

156.  As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### NINTH CAUSE OF ACTION
### NEGLIGENT HIRING/RETENTION
### (Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500)

-45-

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

1    157.   Plaintiff re-alleges and incorporates by reference herein each and every allegation

2    contained herein above as though fully set forth and brought in this cause of action.

3    158.   By virtue of Plaintiff's special relationship with Defendants USOC, USAG,

4    PENNY, PARILLA, and DOES 1 through 500, and Defendants USOC, USAG, PENNY,

5    PARILLA, and DOES 1 through 500's relation to the Perpetrator (NASSAR), Defendants USOC,

6    USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to not hire or retain

7    the Perpetrator (NASSAR), given his dangerous and exploitive propensities, which Defendants

8    USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known about

9    had they engaged in a reasonable, meaningful and adequate investigation of her background prior

10   to her hiring or retaining her in subsequent positions of employment.

11   159.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500

12   expressly and implicitly represented that the team staff, trainers, and team physicians, including

13   the Perpetrator (NASSAR), were not a sexual threat to children and others who would fall under

14   the Perpetrator's (NASSAR) influence, control, direction, and guidance.

15   160.   At no time during the periods of time alleged did Defendants USOC, USAG,

16   PENNY, PARILLA, and DOES 1 through 500 have in place a reasonable system or procedure to

17   investigate, supervise and monitor team staff, trainers, and team physicians, including the

18   Perpetrator (NASSAR), to prevent pre-sexual grooming or sexual harassment, molestation and

19   abuse of children, nor did they implement a system or procedure to oversee or monitor conduct

20   toward minors, participants and members and others in Defendants USOC, USAG, PENNY,

21   PARILLA, and DOES 1 through 500's care.

22   161.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were

23   aware or should have been aware and understand how vulnerable children were to sexual

24   harassment, molestation and abuse by teachers and other persons of authority within the control of

25   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 prior to Plaintiff's

26   sexual abuse by the Perpetrator (NASSAR).

27   162.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were

28   put on notice, and should have known that the Perpetrator (NASSAR) had previously engaged and

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 757-9900

-46-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
046

continued to engage in unlawful sexual conduct with minors and was committing other felonies, for his own personal gratification, and that it was, or should have known it would have been foreseeable that he was engaging, or would engage in illicit sexual activities with Plaintiff, and others, under the cloak of his authority, confidence, and trust, bestowed upon her through Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500.

163.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 were placed on actual or constructive notice that the Perpetrator (NASSAR) had molested or was molesting minors and participants and members, both before his employment within Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, and during that employment Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 had knowledge of inappropriate conduct and molestations committed by the Perpetrator (NASSAR) before and during his employment, yet chose to allow him to remain unsupervised where she sexually abused Plaintiff.

164.    Even though Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 knew or should have known of these sexually illicit activities by the Perpetrator (NASSAR), Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 failed to use reasonable care in investigating the Perpetrator (NASSAR) and did nothing to reasonably investigate, supervise or monitor the Perpetrator (NASSAR) to ensure the safety of the minor participants and members.

165.    Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500's conduct was a breach of their duties to Plaintiff.

166.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

-47-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
047

**TENTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO WARN, TRAIN, or EDUCATE**
**(Plaintiff ALY RAISMAN Against Defendants USOC, USAG, PENNY, PARILLA, and**
**DOES 1 through 500)**

167.   Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

168.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 owed Plaintiff a duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR) by properly warning, training or educating Plaintiff and other about how to avoid such a risk.

169.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR), such as the failure to properly warn, train or educate Plaintiff and other minor participants and members about how to avoid such a particular risk that the Perpetrator (NASSAR) posed—of sexual misconduct.

170.   Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500 breached their duty to take reasonable protective measures to protect Plaintiff and other minor participants and members from the risk of childhood sexual harassment, molestation and abuse by the Perpetrator (NASSAR), by failing to supervise and stop employees of Defendants USOC, USAG, PENNY, PARILLA, and DOES 1 through 500, including the Perpetrator (NASSAR), from committing wrongful sexual acts with minors, including Plaintiff.

171.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9090

### ELEVENTH CAUSE OF ACTION
### SEXUAL BATTERY: *Civil Code* § 1708.5
### (Plaintiff ALY RAISMAN Against DEFENDANT NASSAR)

172.    Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

173.    NASSAR, in doing the things herein alleged, including intending to subject Plaintiff to numerous instances of sexual abuse and harassment by NASSAR, during Plaintiff's time with USAG and USOC, beginning on or around 2010 to in or around 2012, and in or around 2015, including but not limited to instances of NASSAR groping and fondling the Plaintiff's vagina all while NASSAR acted in the course and scope of his agency/employment with Defendants, and each of them and were intended to cause harmful or offensive contact with Plaintiff's person, and did cause such harmful or offensive contact.

174.    NASSAR did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person, and would offend a reasonable sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable sense of personal dignity.

175.    Because of NASSAR's position of authority over Plaintiff, and Plaintiff's mental and emotional state, and Plaintiff's young age under the age of consent, Plaintiff was unable to, and did not, give meaningful consent to such acts.

176.    As a direct, legal and proximate result of the acts of NASSAR, Plaintiff sustained serious and permanent injuries to her person, all of his damage in an amount to be shown according to proof and within the jurisdiction of the Court.

177.    As a direct result of the sexual abuse by NASSAR, Plaintiff has difficulty in reasonably or meaningfully interacting with others, including those in positions of authority over Plaintiff including teachers, and supervisors, and in confidential, business, and familial relationships, due to the trauma of childhood sexual abuse inflicted upon her by NASSAR. This inability to interact creates conflict with Plaintiff's values of trust and confidence in others, and has caused Plaintiff substantial emotional distress, anxiety, nervousness and fear. As a direct result of the sexual abuse and harassment by NASSAR, Plaintiff suffered immensely, including, but not

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-49-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
049

1    limited to, encountering issues with a lack of trust, various psychological sequelae, depressive

2    symptoms, anxiety, and nervousness.

3        178.   Plaintiff is informed and based thereon alleges that the conduct of NASSAR was

4    oppressive, malicious and despicable in that it was intentional and done in conscious disregard for

5    the rights and safety of others, and were carried out with a conscious disregard of her right to be

6    free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to

7    California *Civil Code* section 3294, entitling Plaintiff to punitive damages against NASSAR in an

8    amount appropriate to punish and set an example of NASSAR.

9                          **THIRD CAUSE OF ACTION**
                              **GENDER VIOLENCE**
10    **(Plaintiff ALY RAISMAN Against DEFENDANT NASSAR)**

11        179.   Plaintiff re-alleges and incorporates by reference herein each and every allegation

12    contained herein above as though fully set forth and brought in this cause of action.

13        180.   NASSAR's acts committed against Plaintiff, as alleged herein, including the sexual

14    harassment and abuse of the Plaintiff constitutes gender violence and a form of sex discrimination

15    in that one or more of NASSAR's acts would constitute a criminal offense under state law that has

16    as an element the use, attempted use, or threatened use of physical force against the person of

17    another, committed at least in part based on the gender of the victim, whether or not those acts

18    have resulted in criminal complaints, charges, prosecution, or conviction.

19        181.   NASSAR's acts committed against Plaintiff, as alleged herein, including the sexual

20    harassment and abuse of the Plaintiff constitutes gender violence and a form of sex discrimination

21    in that NASSAR's conduct caused a physical intrusion or physical invasion of a sexual nature upon

22    Plaintiff under coercive conditions, whether or not those acts have resulted in criminal complaints,

23    charges, prosecution, or conviction.

24        182.   As a proximate result of NASSAR's acts, Plaintiff is entitled to actual damages,

25    compensatory damages, punitive damages, injunctive relief, any combination of those, or any other

26    appropriate relief. Plaintiff is also entitled to an award of attorney's fees and costs pursuant to *Civil*

27    *Code* § 52.4, against NASSAR.

28    ///

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 557-9990

-50-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
050

**WHEREFORE**, Plaintiff prays for a jury trial and for judgment against Defendants as follows:

## FOR ALL CAUSES OF ACTION

1.      For past, present and future non-economic damages in an amount to be determined at trial;

2.      For past, present and future special damages, including but not limited to past, present and future lost earnings, economic damages and others, in an amount to be determined at trial.

3.      Any appropriate statutory damages;

4.      For costs of suit;

5.      Punitive damages, according to proof, though not as to the Negligence Causes of Action (Causes of Action 7, 8, 9, and 10);

6.      For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

7.      For attorney's fees pursuant to California *Code of Civil Procedure* sections 1021.5, *et seq.*, or as otherwise allowable by law;

8.      For declaratory and injunctive relief, including but not limited to court supervision of Defendants USAG, and USOC; and

9.      For such other and further relief as the Court may deem proper.


Dated: February _28_, 2018                          **MANLY, STEWART & FINALDI**


By:  *John C. Manly*
        JOHN C. MANLY, Esq.
        Attorneys for Plaintiff ALY RAISMAN

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-51-
**COMPLAINT FOR DAMAGES**

EXHIBIT 1
051

**DEMAND FOR JURY TRIAL**

Plaintiff ALY RAISMAN hereby demands a trial by jury.

Dated: February 28, 2018                    MANLY, STEWART & FINALDI

                                   By:    *John C. Manly*
                                          JOHN C. MANLY, Esq.
                                          Attorneys for Plaintiff ALY RAISMAN

MANLY, STEWART & FINALDI
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

-1-
**DEMAND FOR JURY TRIAL**

EXHIBIT 1

052

# EXHIBIT "A"

EXHIBIT 1
053

10-Nov-2005  10:20   From-3172571300        T-172  P.002/010  F-624



# USA GYMNASTICS

October 11, 1999



Mr. William J. Hybl, President
Mr. Dick Schultz, Executive Director
Mr. Scott Blackmun, Deputy Executive Director
and General Counsel
United States Olympic Committee
One Olympic Plaza
Colorado Springs, CO 80909

Dear Bill, Dick and Scott:

I am reluctant, given the extraordinary demands being placed on each of you these days, to bring a matter directly to your attention. Unfortunately, I have concluded that I must. The recent experiences of USA Gymnastics with the USOC's Membership and Credentials Committee has been so troubling for our organization, and for me personally, that I feel compelled to share it with you.

On September 7, our Chair, Sandy Knapp, received a letter signed by Membership and Credentials Chairman, Steve Sobel, informing us that "USAG is not in compliance with National Governing Body and membership requirements." This communication is, in our view, the inevitable result of a fundamentally flawed process. Let me be direct; the professional and volunteer leadership of USA Gymnastics believes that the USOC's Membership and Credentials' audit process is badly broken and, perhaps more importantly, are deeply concerned by the apparent indifference to the welfare of young children manifest in the Committee's actions.

There is much about the accomplishments of USA Gymnastics during the past two decades in which we take great pride. Perhaps nothing gives us a greater sense of satisfaction, however, than our national leadership among sports organizations in attempting to protect young athletes from coming in contact with individuals who are unfit to have the honor of being called "coach". While other organizations have chosen to ignore the problem of child abuse in youth sports (see enclosed copy of recent cover story from the September 13 edition of *Sports Illustrated*), USA Gymnastics has investigated every charge and processed each complaint in an effort to protect the children who put their faith in us. To date we have devoted hundreds of thousands of dollars to this effort.

Pan American Plaza ▪ 201 South Capitol Avenue ▪ Suite 300 ▪ Indianapolis, IN 46225 ▪ Phone: 317–237–5050 ▪ Fax: 317–237–5069

EXHIBIT

7

PERGID 900-631-6889

EXHIBIT 1
054

Believing this to be an area in which there is no margin for error, USA Gymnastics established its rules and procedures with a single clear priority in mind – serving the best interests of the young people in our sport. In order to do that, we established procedures that allowed the president of USA Gymnastics to suspend immediately (pending a prompt resolution of the underlying allegation) any individual charged with a felony involving a statute designed to protect children (e.g. child molestation, statutory rape, battery or assault against a minor), and further allowed the president to deny or rescind the membership of any individual who was convicted or pleaded guilty to a felony. We believed when we created those rules (and continue to believe today) that our approach was the proper one. The Membership and Credentials Committee disagreed with us.

After extensive discussions and correspondence with representatives of the Committee by me and Sandy Knapp, the matter was referred to Jack Swarbrick and Scott. Following his discussions with Scott, Jack recommended to us that USAG agree to forego our ability to suspend individuals who had been charged with a crime, but retain our ability to deny the privilege of membership where the judicial process had resulted in a felony conviction. This was not a compromise we were thrilled with (it meant that an individual who is arrested for child molestation and freed on bond can go back to the gym and coach the next day), but one we were prepared to live with in the interest of getting the matter behind us. Remarkably, despite the good faith efforts of two people – Scott and Jack – infinitely more qualified to evaluate the situation than any member of the Membership and Credentials Committee, that Committee rejected this approach. What is particularly stunning about the Committee's decision is the nature of its rejection. We did not receive a measured response aimed, for example, at trying to distinguish cases involving a felony conviction where the nexus between the conviction and potential risk to children was tenuous, but rather were told merely that "a hearing must be provided for in all situations and... USAG could not except from the hearing process, and impose an immediate suspension on, those individuals who has been subjected to a prior non-USAG judicial or administrative hearing" (emphasis added).

In hindsight, I suppose we should not have been surprised by the position taken by the Committee. During the now nearly two years these discussions have dragged on, USA Gymnastics has repeatedly been urged by members of the Committee to resolve the problem by conducting bare-bones telephonic hearings immediately upon receipt of a complaint. This exaltation of form over substance is all too typical of the predisposition of this Committee. More importantly, it also ignores the various reasons why such an approach is untenable and poses significant risk to our organization. As the USOC learned in 1994, the intersection between the criminal justice system and the Amateur Sports Act can be an especially treacherous location.

I suspect that if USAG Gymnastics invested additional time and money, we could cobble together some sufficiently muddled amendment to our Bylaws that would satisfy the Membership and Credentials Committee. That is, however, a use of Federation resources I am no longer prepared to allow. Simply stated, we have no intention of dealing further on this matter with representatives of the Membership and Credentials Committee.

2

EXHIBIT 1
055

We welcome the opportunity to address this matter in other forums acceptable to the three of you, but in inviting that resolution want you to know that we are more resolute than ever in our determination to do whatever it takes to protect the children we serve.

In anticipation of future discussions, let us be absolutely clear about our position. USA Gymnastics has no reluctance to provide hearings to any athlete or professional member in circumstances where hearings are appropriate. In fact, we believe our grievance and member discipline procedures are more refined, and the number of hearings we have conducted in the past ten years is greater, than those of almost any other national governing body. All we want to be certain of here is that: 1) we do not have a circumstance where a panel of three volunteers is asked to reconsider and independently evaluate the factual circumstances that give rise to a felony conviction in a court of law of competent jurisdiction in this country; and 2) we do not allow the occasion of a delay in the timing of a hearing (regardless of the legitimate factors which may contribute to that delay) to put any USA Gymnastics' member gymnasts in a position where we believe their personal safety to be at risk. From our perspective, any risk is an unacceptable risk when it comes to protecting young athletes from abuse.

While the circumstances of this particular issue have undeniably inflamed the passions of those of us responsible for leading USA Gymnastics, these unhappy circumstances are all too indicative of our experiences with this Committee in recent years. In brief, I believe that this Committee has fundamentally lost its way and ought to be reconstituted or its purpose redefined. What ought to be a positive experience of helping national governing bodies conduct a self-audit designed to make them better organizations has turned into a hyper-technical review of governance documents by individuals whose qualifications to conduct such a review are tenuous at best.

Properly conducted, we believe the Membership and Credentials Committee review could be a positive and productive experience. As the Committee which reviews the core activities of each national governing body, the Membership and Credentials Committee is in a position to serve as a valuable information source for what is and isn't working in our industry. Unfortunately, they do not view that as their mission. So we come to the circumstance we have here. The Membership and Credentials Committee reviews national governing bodies who, regrettably, appear to have chosen to ignore the issue of coaching misconduct (but have acceptable hearing procedures in place) and decrees these governing bodies to be in compliance. Yet the national governing body who has taken the lead in this country in moving to protect its athletes against physical, sexual and emotional abuse, and who has provided its procedures for doing so in great detail, is found to be out of compliance because we refuse to conduct a hearing to determine whether an individual who has been convicted of child molestation ought to be allowed to be a professional member of our association. That is a process and a result that no longer deserves the support of the Olympic family.

Again, my apologies for having to add to your already crowded agendas, but, as I hope you can now appreciate, this is a matter about which we feel passionately. It is a matter that goes to the core of the relationship between the national governing body and its

3

EXHIBIT 1
056

18-Nov-2005  16:39   From-3172371800                                    T-172  P.003/010  F-624

athletes, and so is a matter that ought to be of central importance to the USOC.  As USA Gymnastics' experience demonstrates, this is not an issue that can be wished away.  The USOC can either position itself as a leader in the protection of young athletes or it can wait until it is forced to deal with the problem under much more difficult circumstances.  It is my sincere hope that the USOC will seize the opportunity presented by this dispute to follow the former course of action.

Thank you in advance for you attention to this matter.

Sincerely,

Robert Colarossi

Enclosure

CC:    Sandy Knapp
       Jack Swarbrick
       Michelle Dusserre-Farrell
       Gary Johansen
       Steve Sobel

EXHIBIT 1
057

# EXHIBIT "2"

JOHN C. MANLY, Esq. (State Bar No. 149080)
VINCE W. FINALDI, Esq. (State Bar No. 238279)
ALEX E. CUNNY (State Bar No. 291567)
JANE E. REILLEY (State Bar No. 314766)
**MANLY, STEWART & FINALDI**
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991

Attorneys of Record for Plaintiff, ALEXANDRA ROSE
RAISMAN, an individual

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OLYMPIC COMMITTEE, a Business Entity of Form Unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual; STEVE PENNY, an individual; PAUL PARRILLA, an individual; and DOES 1 through 500. | Civil Case No. 5:18-cv-02479-BLF<br><br>[The Honorable Beth Labson Freeman]<br><br>**DECLARATION OF PLAINTIFF ALEXANDRA RAISMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS STEVE PENNY AND UNITED STATES OLYMPIC COMMITTEE'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER *FEDERAL RULE OF CIVIL PROCEDURE* 12(B)(2)**<br><br>**Hon. Judge Beth Labson Freeman**<br><br>[Filed concurrently with Declaration of Alex E. Cunny]<br><br>Complaint filed: February 28, 2018<br><br>Hearing:　February 7, 2019<br>Time:　　9:00 a.m.<br>Judge:　　Honorable Beth Labson Freeman<br>Courtroom: 3 |

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

**1**

**DECLARATION OF ALEXANDRA RAISMAN IN SUPPORT OF OPPOSITIONS TO**
***FRCP* 12(B) MOTIONS BY USOC AND PENNY**

MANLY, STEWART & FINALDI
ATTORNEYS AT LAW
19100 Von Karman Ave., Suite 800
Irvine, California 92612
Telephone: (949) 252-9990

### DECLARATION OF ALEXANDRA RAISMAN

I, ALEXANDRA "ALY" RAISMAN, hereby declare:

1.     I am the Plaintiff in the action now-pending before the Northern District of California, in and for the San Jose Division, Case Number 5:18-cv-02479-BLF.

2.     This Declaration is made in support of Plaintiff's Opposition to Defendant Stephen "Steve" Penny's Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2) and in support of Defendant United States Olympic Committee's ("USOC") Motion to Dismiss pursuant to *Federal Rule of Civil Procedure* 12(b)(2), (6).

3.     In 2012, I attended the Olympic Trials for Women's Gymnastics ("2012 Trials"), which was held in San Jose, California. I competed at this event and earned a spot on the 2012 Olympic Team for Women's Gymnastics, which was subsequently held in London, England.

4.     During the 2012 Olympic Trials, while I was in San Jose, California, Dr. Lawrence Nassar ("Nassar') provided treatment to me as a doctor affiliated with USAG and USOC. During these treatments, Nassar sexually abused me by touching, penetrating and fondling my vagina, genital area, and anus with his ungloved hand, for his sexual pleasure.

5.     In 2011, when I was in Japan for the 2011 World Championships, I was in a car with the Olympic Team Coach, John Geddert, and my teammate, McKayla Maroney. During the car ride, McKayla began discussing how she felt uncomfortable with how Nassar had touched her, and she stated that Nassar was "fingering" her, meaning placing his fingers into her vagina. McKayla made this statement in front of John Geddert who clearly heard the statement. To my knowledge, no report was made about what McKayla stated in the car that day.

I hereby declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this November 21, 2018 at Irvine, California.

By:  _____

ALEXANDRA ROSE RAISMAN
Declarant

**2**

**DECLARATION OF ALEXANDRA RAISMAN IN SUPPORT OF OPPOSITIONS TO**
***FRCP* 12(B) MOTIONS BY USOC AND PENNY**

# EXHIBIT "3"

```
               SUPERIOR COURT OF CALIFORNIA
                    COUNTY OF ORANGE

COORDINATION PROCEEDINGS      ) HON. RANDALL J. SHERMAN
Special Title (Rule 3.550)    ) DEPT. CX105
                              ) JCCP NO. 4943
NASSAR CASES                  )


*******************************************************

             UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

ALEXANDRIA ROSE RAISMAN, an   )
individual,                   )
                              )
          Plaintiff,          )
                              )
        -v-                   ) CAUSE NO.
                              ) 5:18-cv-02479-BLF
UNITED STATES OLYMPIC         )
COMMITTEE, a Business Entity  )
of form unknown, et al.,      )
                              )
          Defendants.         )
*******************************************************
             UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE PCNE DOE, an             )
individual; and JOHN PCNE     )
DOE, an individual,           )
                              )
          Plaintiffs,         )
                              )
        -v-                   ) CAUSE NO.
                              ) 2:18-cv-03464-JLS-KES
USA GYMNASTICS, a Business    )
Entity of form unknown, et    )
al.,                          )
                              )
          Defendants.         )
*******************************************************
```

EXHIBIT 3
001

| 10:37:24 | 1 | | MR. JOLLEY:  Objection, vague and ambiguous. |
|---|---|---|---|
| 10:37:28 | 2 | Q | So other than the jobs we've just gone through, |
| 10:37:32 | 3 | | have you had any other jobs in the field of sports |
| 10:37:37 | 4 | | marketing that we haven't discussed yet? |
| 10:37:41 | 5 | A | Minor consulting over the years. |
| 10:37:47 | 6 | Q | For whom? |
| 10:37:49 | 7 | A | University of Kansas. |
| 10:37:53 | 8 | Q | Was that during the time that you were with USAG? |
| 10:37:57 | 9 | A | No, I don't believe so. |
| 10:38:03 | 10 | Q | All right.  So going back to your time at USAG, |
| 10:38:09 | 11 | | when you were first hired, who was the individual |
| 10:38:11 | 12 | | that hired you? |
| 10:38:14 | 13 | A | Steve Penny. |
| 10:38:15 | 14 | Q | And prior to that, did you know Steve Penny? |
| 10:38:19 | 15 | A | I did not. |
| 10:38:24 | 16 | Q | Had you ever met him before that? |
| 10:38:25 | 17 | A | I had never met him. |
| 10:38:27 | 18 | Q | And during your time as the marketing -- either |
| 10:38:30 | 19 | | senior marketing director or -- was it vice |
| 10:38:34 | 20 | | president of marketing? |
| 10:38:35 | 21 | A | Yes. |
| 10:38:37 | 22 | Q | Steve Penny oversaw all of your work there? |
| 10:38:39 | 23 | A | Yes. |
| 10:38:41 | 24 | Q | So specifically going to the 2012 Olympic Trials |
| 10:38:48 | 25 | | for gymnastics, those were held in San Jose; |

28

EXHIBIT 3
002

| | | |
|---|---|---|
| 10:38:53 | 1 | correct? |
| 10:38:55 | 2 | A   Yes. |
| 10:38:55 | 3 | Q   And you were responsible for marketing at that |
| 10:38:57 | 4 | event? |
| 10:38:58 | 5 | A   Yes. |
| 10:38:58 | 6 | Q   And did you actually attend that event? |
| 10:39:02 | 7 | A   Yes. |
| 10:39:04 | 8 | Q   Was Steve Penny at that event? |
| 10:39:06 | 9 | A   Yes. |
| 10:39:07 | 10 | Q   And when I say "that event," it's actually a whole |
| 10:39:11 | 11 | weekend long; correct? |
| 10:39:12 | 12 | A   Yes. |
| 10:39:18 | 13 | Q   And are you and the rest of, I'll just term it, the |
| 10:39:20 | 14 | senior management team at that event; in terms of |
| 10:39:23 | 15 | the COO, the CFO, is everybody at the event? |
| 10:39:27 | 16 | A   No. |
| 10:39:29 | 17 | Q   Who are the personnel that are at that event, |
| 10:39:32 | 18 | generally speaking? |
| 10:39:35 | 19 | A   Chief operating officer, chief executive officer, |
| 10:39:41 | 20 | vice president of marketing.  And I don't remember |
| 10:39:52 | 21 | seeing -- it would be my staff that would have been |
| 10:39:58 | 22 | there that I would have seen the most, head of |
| 10:40:01 | 23 | women's program, head of men's program. |
| 10:40:06 | 24 | Q   Leading up to that event, I assume there's quite a |
| 10:40:08 | 25 | bit of preparation that goes into it? |

29

EXHIBIT 3
003

| | | | |
|---|---|---|---|
| 10:40:10 | 1 | A | Yes. |
| 10:40:11 | 2 | Q | Are you conducting meetings in California for that |
| 10:40:16 | 3 | | event in terms of sponsorships, meeting with local |
| 10:40:19 | 4 | | agencies, things like that? |
| 10:40:22 | 5 | A | Not exactly. |
| 10:40:24 | 6 | Q | Okay.  What do you mean "not exactly"?  Are |
| 10:40:28 | 7 | | these -- |
| 10:40:29 | 8 | A | Yes, we would have a meeting or there would be |
| 10:40:31 | 9 | | planning meetings.  But it wouldn't be pitching -- |
| 10:40:37 | 10 | | I wouldn't be pitching local sponsors. |
| 10:40:43 | 11 | Q | Okay.  So when you have these planning meetings, |
| 10:40:45 | 12 | | who is in these planning meetings, generally? |
| 10:40:50 | 13 | A | USA Gymnastics staff, building staff, the local |
| 10:40:56 | 14 | | sports commission staff. |
| 10:41:02 | 15 | Q | Are these meetings held in California? |
| 10:41:04 | 16 | A | Yes. |
| 10:41:05 | 17 | Q | Do you know approximately how many planning |
| 10:41:07 | 18 | | meetings there were prior to the 2012 Trials in San |
| 10:41:10 | 19 | | Jose? |
| 10:41:11 | 20 | A | No. |
| 10:41:12 | 21 | Q | Do you have an estimate?  Was it more than five, |
| 10:41:14 | 22 | | less than three? |
| 10:41:17 | 23 | A | I can estimate.  More than five, less than ten. |
| 10:41:24 | 24 | Q | And in these meetings, is Steve Penny present? |
| 10:41:29 | 25 | A | At some. |

EXHIBIT 3
004

| | | |
|---|---|---|
| 10:51:37 | 1 | and/or feedback to someone on my staff. |
| 10:51:40 | 2 | Q When you say "creative," is that a term of art in |
| 10:51:43 | 3 | marketing? |
| 10:51:44 | 4 | A Yes. |
| 10:51:45 | 5 | Q What does that mean? |
| 10:51:47 | 6 | A The actual piece that has been created that would |
| 10:51:52 | 7 | at some point be placed in digital media, in |
| 10:51:56 | 8 | traditional media, printed out as a banner or a |
| 10:52:00 | 9 | flyer. And that would -- if you use the term |
| 10:52:04 | 10 | creative, it would encompass those things, those |
| 10:52:07 | 11 | elements. |
| 10:52:09 | 12 | Q So would it be fair to say that for the 2012 Trials |
| 10:52:15 | 13 | for USAG, whenever you wanted to use a USOC |
| 10:52:22 | 14 | insignia, logo, trademark, you had to submit it |
| 10:52:25 | 15 | through that process? |
| 10:52:26 | 16 | A Yes. |
| 10:52:40 | 17 | Q The marketing materials that you created or your |
| 10:52:44 | 18 | team created for the 2012 Trials, were those also |
| 10:52:48 | 19 | approved by Steve Penny before they went out? |
| 10:52:50 | 20 | A Yes. |
| 10:52:51 | 21 | Q And was there a formal approval process with |
| 10:52:54 | 22 | Mr. Penny; or was it just kind of show it to him, |
| 10:52:58 | 23 | make sure it looks good, and send it out? |
| 10:52:59 | 24 | A Yes. |
| 10:53:00 | 25 | Q Yes, as to -- |

38

EXHIBIT 3
005

| | | |
|---|---|---|
| 10:55:47 | 1 | A  Yes. |
| 10:55:49 | 2 | Q  Do you know if -- do you know who that was? |
| 10:55:52 | 3 | A  Yes. |
| 10:55:53 | 4 | Q  Who was it? |
| 10:55:54 | 5 | A  The director of marketing, Justin Hirnisey. |
| 10:56:00 | 6 | Q  And did that have with it a budget as well as an |
| 10:56:05 | 7 |    outline of what marketing was going to be |
| 10:56:08 | 8 |    happening? |
| 10:56:09 | 9 | A  Yes. |
| 10:56:10 | 10 | Q  Was that approved by Steve Penny? |
| 10:56:11 | 11 | A  Yes. |
| 10:56:11 | 12 | Q  And do you know when that was approved or generally |
| 10:56:18 | 13 |    when that was created? |
| 10:56:21 | 14 | A  No. |
| 10:56:22 | 15 | Q  Did you have any oversight over making that plan or |
| 10:56:26 | 16 |    critiquing that plan? |
| 10:56:28 | 17 | A  I would have had input. |
| 10:56:34 | 18 | Q  Did that plan have any consideration for the USOC |
| 10:56:41 | 19 |    in it to your memory?  Meaning, you know, part of |
| 10:56:45 | 20 |    the marketing budget is going to be split with |
| 10:56:50 | 21 |    USOC, the materials are going to contain USOC |
| 10:56:53 | 22 |    information, anything of that nature? |
| 10:56:56 | 23 |        MR. JOLLEY:  Objection, vague and ambiguous. |
| 10:56:57 | 24 |    Objection, document speaks for itself. |
| 10:57:00 | 25 | A  I don't recall. |

EXHIBIT 3
006

| | | |
|---|---|---|
| 11:13:05 | 1 | at 11:13 a.m. |
| 11:13:07 | 2 | BY MR. CUNNY: |
| 11:13:08 | 3 | Q  All right, sir.  You understand you're still under |
| 11:13:11 | 4 | oath? |
| 11:13:12 | 5 | A  Yes. |
| 11:13:13 | 6 | Q  During the 2012 Olympic Trials that were held in |
| 11:13:16 | 7 | San Jose, did you actually attend the events |
| 11:13:19 | 8 | themselves? |
| 11:13:20 | 9 | A  Yes. |
| 11:13:21 | 10 | Q  And was Steve Penny with you at those events? |
| 11:13:29 | 11 | A  Steve Penny attended the event.  I wouldn't say he |
| 11:13:34 | 12 | attended the event with me. |
| 11:13:36 | 13 | Q  Okay.  Was there a box for all of the USAG |
| 11:13:41 | 14 | executives or higher-ups, for lack of a better |
| 11:13:44 | 15 | term? |
| 11:13:44 | 16 | A  No. |
| 11:13:45 | 17 | Q  During those events, what would you be doing? |
| 11:13:48 | 18 | A  I would be hosting corporate partners, sponsors. |
| 11:13:56 | 19 | Q  And during those events, what would Steve Penny be |
| 11:14:00 | 20 | doing? |
| 11:14:01 | 21 | A  Typically he would be sitting on the production |
| 11:14:03 | 22 | table. |
| 11:14:06 | 23 | Q  And explain for me what the production table is. |
| 11:14:10 | 24 | A  It would be the table that returns parallel to the |
| 11:14:14 | 25 | vault runway where various elements of TV |

EXHIBIT 3
007

| | | |
|---|---|---|
| 11:14:20 | 1 | production, various employees may sit.  Special |
| 11:14:30 | 2 | guests may sit on the production table. |
| 11:14:33 | 3 | Q  Is that where Martha Karolyi would sit during those |
| 11:14:39 | 4 | events? |
| 11:14:40 | 5 | A  I believe so, yes. |
| 11:14:41 | 6 | Q  And is that at the actual -- I don't want to call |
| 11:14:47 | 7 | it a playing field -- but is that at the floor |
| 11:14:51 | 8 | height? |
| 11:14:51 | 9 | A  Yes. |
| 11:14:55 | 10 | Q  And are you interacting with Steve Penny at that |
| 11:14:57 | 11 | time in any way saying, oh, I'm talking to this |
| 11:15:01 | 12 | sponsor or I'm doing this? |
| 11:15:04 | 13 | A  Typically, no. |
| 11:15:06 | 14 | Q  Do you know what he's doing at those events, in |
| 11:15:09 | 15 | terms of his job and role? |
| 11:15:11 | 16 | A  No. |
| 11:15:15 | 17 | Q  Was it your understanding that Steve Penny was |
| 11:15:18 | 18 | overseeing Kathy Kelly at that point? |
| 11:15:25 | 19 | A  That would be my understanding. |
| 11:15:26 | 20 | Q  And do you know who Kathy Kelly is? |
| 11:15:28 | 21 | A  Yes. |
| 11:15:30 | 22 | Q  What was her job title in 2012 at the Trials -- |
| 11:15:34 | 23 | during the time of the Trials, I should say? |
| 11:15:45 | 24 | A  I believe vice president of women's program. |
| 11:15:49 | 25 | Q  So I assume Steve Penny, at that point, had a whole |

47

| | | |
|---|---|---|
| 11:15:56 | 1 | host of job duties that he was performing at that |
| 11:16:02 | 2 | event? |
| 11:16:02 | 3 | A  I would guess, yes. |
| 11:16:05 | 4 | Q  Was Steve Penny interacting with any of the |
| 11:16:08 | 5 | gymnasts at that event, to your knowledge? |
| 11:16:13 | 6 | A  Not to my knowledge. |
| 11:16:14 | 7 | Q  Was he doing press at that event, meaning, was he |
| 11:16:19 | 8 | giving on-camera interviews? |
| 11:16:23 | 9 | A  I don't recall seeing him do interviews. |
| 11:16:28 | 10 | Q  Would it be common for Steve Penny, during events |
| 11:16:32 | 11 | such as the Olympic Trials, U.S. Nationals, the |
| 11:16:36 | 12 | Secret Classic, to give on-camera interviews? |
| 11:16:40 | 13 | A  Yes. |
| 11:16:41 | 14 | MS. ROBIE:  Objection, beyond the scope of the |
| 11:16:43 | 15 | jurisdiction in the case in which Steve Penny is |
| 11:16:47 | 16 | involved. |
| 11:17:10 | 17 | Q  So during the 2012 Olympic Trials, Martha's sitting |
| 11:17:15 | 18 | at that production table; correct? |
| 11:17:18 | 19 | A  To the best of my recollection, yes. |
| 11:17:19 | 20 | Q  Okay.  And what's your understanding -- |
| 11:17:20 | 21 | MR. PFEIFFER:  And I would object just that |
| 11:17:21 | 22 | it's beyond the scope of the cases she's involved, |
| 11:17:24 | 23 | just to put that on the record. |
| 11:17:26 | 24 | Q  And what is she doing at that time, based on your |
| 11:17:29 | 25 | understanding? |

48

EXHIBIT 3
009

```
 1   STATE OF INDIANA
 2   COUNTY OF HENDRICKS
 3
 4        I, Elizabeth T. Lindner, a Notary Public in
 5   and for said county and state, do hereby certify that
 6   the deponent herein was by me first duly sworn to tell
 7   the truth, the whole truth, and nothing but the truth
 8   in the aforementioned matter;
 9        That the foregoing deposition was taken on
10   behalf of the Plaintiffs; that said deposition was
11   taken at the time and place heretofore mentioned
12   between 10:12 a.m. and 2:10 p.m.;
13        That said deposition was taken down in
14   stenograph notes and afterwards reduced to typewriting
15   under my direction; and that the typewritten
16   transcript is a true record of the testimony given by
17   said deponent;
18        And thereafter presented to said witness for
19   signature; that this certificate does not purport to
20   acknowledge or verify the signature hereto of the
21   deponent.
22        I do further certify that I am a disinterested
23   person in this cause of action; that I am not a
24   relative of the attorneys for any of the parties.
25
```

EXHIBIT 3
010

```
 1        IN WITNESS WHEREOF, I have hereunto set my

 2  hand and affixed my notarial seal this 5th day of

 3  September, 2018.

 4

 5

 6

 7

 8

 9

10

11  My commission expires:
    November 11, 2023
12
```

*Elizabeth T. Lindner*

Elizabeth T. Lindner
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. 673731
My Commission Expires Nov. 11, 2023

EXHIBIT 3
011

# EXHIBIT "4"

ALAN K. BRUBAKER, State Bar No. 70298
*abrubaker@wingertlaw.com*
COREY C. GARRARD, State Bar No. 308003
*cgarrard@wingertlaw.com*
WINGERT GREBING BRUBAKER & JUSKIE LLP
One America Plaza, Suite 1200
600 West Broadway
San Diego, CA 92101
(619) 232-8151; Fax (619) 232-4665

Attorneys for Specially Appearing Defendant
KATHY SCANLAN

*(left margin, vertical)* WINGERT GREBING BRUBAKER & JUSKIE LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| JANE JD DOE, an individual,<br><br>      Plaintiff,<br><br>v.<br><br>DOE 1, an individual; DOE 2, an Indiana Business entity of form unknown; DOE 3, an individual; DOE 4, an individual; DOE 5, an individual; and DOES 6 through 500,<br><br>      Defendants. | Case No. 2:18-cv-1136-JLS (KES)<br><br>**DECLARATION OF KATHY SCANLAN**<br><br>Ctrm.: 10A<br>Judge: Hon. Josephine L. Staton |

I, KATHY SCANLAN, declare:

1.    I am a party to this case and a party to the action styled *Jane AJ Doe v. Doe 1, et al.* (Case No. 30-2107- 00899357-CU-PO-CJC; Coordinated Proceeding No. JCCP 4943), and a potential party to the action styled *Jane EL Doe v. Doe 1, et al.* (Case No. BC706935).  I am personally familiar with the content of this Declaration and generally with the facts of the referenced actions and if called upon could and would competently testify to its content.

2.    From August 1, 1994 to August 1, 1998 I was the president of USA

EXHIBIT 4
001

1   Gymnastics ("USAG"). As president my job duties included oversight of complaints of

2   sexual misconduct by professional members and of the process for investigating and

3   disciplining those violating the USAG Code of Ethics.  Ultimately, my job duties

4   included ensuring the safety of minors at National and International events held by

5   USAG.

6       3.       During my tenure as president, I communicated frequently with the United

7   States Olympic Committee ("USOC") regarding various USOC oversight functions the

8   USOC performed, including audits of USAG policies and general governance reviews

9   of USAG policies and procedures.  Shortly after I began at USAG, I learned of the issue

10  of sexual abuse of minor athletes in the sport, having reviewed complaints of sexual

11  misconduct lodged with USAG.  My first encounter with this issue involved a

12  disciplinary process that took place before I became President in which the member was

13  banned from membership in USAG because of sexual abuse of a minor.  I dealt with

14  this case in the appeals process.

15      4.       I expressed concerns to USOC that sexual abuse was an issue in USAG and

16  specifically informed Sandy Knapp in her capacity as Chair of USAG and the rest of the

17  Board of Directors.  USOC suggested USAG's process of revoking memberships,

18  investigating professional members of suspected or alleged sexual acts or misconduct

19  with minors, and banning professional members from the sport contradicted USOC

20  policies.  Despite communicating concerns about sexual misconduct in the sport

21  (specifically by adult professional members of USAG) to USOC, the USOC

22  discouraged USAG from using its established process to investigate and ban these

23  members. USOC's challenge to USAG disciplining professional members in this

24  fashion (specifically impeding the ability to ban, suspend or investigate a member)

25  would have inhibited me from adequately protecting minor members.  I however

26  continued to apply USAG's Code of Ethics and processes for investigating sexual abuse

27  claims and making appropriate disciplinary decisions. These measures helped protect

28  minor members of USAG from predators.

WINGERT GREBING BRUBAKER & JUSKIE LLP

{00720713.DOCX}

2

**DECLARATION OF KATHY SCANLAN – Case No. 2:18-CV-1136-JLS (E$\cdots$)**

EXHIBIT 4

002

WINGERT GREBING BRUBAKER & JUSKIE LLP

1       5.      During my tenure as president of USAG the organization followed certain

2   rules and regulations imposed by the USOC. The USOC provided financial support (in

3   grants and funding) to USAG in part based on USAG's conformance with various

4   directives and governance reviews.  If USAG did not comply with various USOC

5   directives, USAG could be subjected to discipline by the USOC, which could include

6   reformation of policies at USAG, withdrawal of funding at USAG, or withdrawal of

7   grants to USAG.  Ultimately, USOC had the power  to revoke USAG's charter as a

8   National Governing Body, which was another circumstance through which USOC could

9   exert control over USAG.

10      6.      When sexual abuse was reported to have occurred I was made aware.  I

11  actively encouraged and expected any individual associated with USAG who witnessed

12  or suspected abuse to make me aware.  Upon being made aware of alleged abuse I

13  ensured USAG investigative and disciplinary procedures were commenced and I

14  tracked those procedures.

15      7.      As president of USAG, if a professional member of USAG was accused of

16  engaging in sexual misconduct with a minor, I expected to be made aware of such

17  accusations and I tracked the status of the disciplinary process. During my tenure at

18  USAG I knew of perhaps 12 to 20 allegations of misconduct by professional members.

19  To my knowledge these were all the complaints of alleged sexual misconduct by

20  members .

21      I declare under penalty of perjury under the laws of the state of California that the

22  foregoing is true and correct.

23  Executed this _15_ day of October, 2018, at Seattle, Washington.

24

25  By: _____

26  KATHY SCANLAN

27

28

EXHIBIT 4
003

# EXHIBIT "5"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

--oOo--

JANE LM DOE, an individual,      )
                                 )
        Plaintiff,               )
                                 )
    v.                           ) CASE NO. BC638724
                                 )
DR. LARRY NASSAR, an individual, )
et al.,                          )
                                 )
        Defendants.              )
_____)

Videotaped Deposition of

ROBERT COLAROSSI

VOLUME II

Monday, August 28, 2017

Reported by Christine Vandermeer, CSR No. 11110

Jilio-Ryan Court Reporters
ph. 714.424.9902  info@jilioryan.com

EXHIBIT 5
001

```
1                       APPEARANCES:

2

3        Appearing for the Plaintiff:

4                Manly, Stewart & Finaldi
                 BY:   JOHN C. MANLY and VINCE W. FINALDI
5                      Attorney At Law
                       19100 Von Karman Avenue, Suite 800
6                      Irvine, California  92612
                       (949) 252-9990
7

8        Appearing for Defendants All Olympia Gymnastics Center,
         Inc., Galina Marinova, and Artur Akopyan:
9
                 Michelman & Robinson, LLP
10               BY:   CRYSTAL FRYMAN (appearing telephonically)
                       Attorney At Law
11                     10880 Wilshire Boulevard, 19th Floor
                       Los Angeles, California  90024
12                     (310) 564-2670

13

         Appearing for Defendants USA Gymnastics, Robert Colarossi,
14       and Kathy Scanlan:

15               Sedgwick
                 BY:   ALISON BEANUM (appearing telephonically)
16                     Attorney At Law
                       2020 Main Street, Suite 1100
17                     Irvine, California  92614
                       (949) 852-8200
18

19       Appearing for Defendants USA Gymnastics and Robert
         Colarossi:
20
                 White & Amundson
21               BY:   DANIEL M. WHITE
                       Attorney At Law
22                     402 W. Broadway, Suite 1140
                       San Diego, California  92101
23                     (619) 239-0300

24

25
```

EXHIBIT 5
002

```
 1                    APPEARANCES (Continued):

 2

 3     Specially Appearing for Defendant Steve Penny:

 4           Robie & Matthai
             BY:  LEIGH P. ROBIE (appearing telephonically)
 5               Attorney At Law
                 500 South Grand Avenue, 15th Floor
 6               Los Angeles, California  90071
                 (213) 706-8000
 7

 8     Also Present:

 9           MATT MILLER, VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                                    3

EXHIBIT 5
003

| | | |
|---|---|---|
| 10:33:47 | 1 | against coaches or professional members or staff? |
| 10:33:50 | 2 | A    Not if it was investigated and found -- and found |
| 10:34:02 | 3 | that something had happened.  We actually published our |
| 10:34:05 | 4 | terminated members list. |
| 10:34:08 | 5 | Q    Okay.  So now, you said -- you've said -- you used |
| 10:34:20 | 6 | the term "corroborated" or in terms like that about |
| 10:34:24 | 7 | allegations. |
| 10:34:26 | 8 | Can you give me an example of something you |
| 10:34:29 | 9 | recall, without naming names, that was corroborated? |
| 10:34:32 | 10 | A    Yeah.  There was a particular case of -- I believe |
| 10:34:38 | 11 | it was in Texas.  There was a coach who was accused of |
| 10:34:44 | 12 | sexually molesting some of his athletes, and the girls got |
| 10:34:52 | 13 | together and signed a complaint and sent it in to the |
| 10:34:52 | 14 | office, and it was investigated, it was adjudicated, and |
| 10:34:56 | 15 | he was terminated. |
| 10:34:57 | 16 | Q    So unless a child signed a complaint, unless a |
| 10:35:05 | 17 | minor signed a complaint, USAG would not report it nor |
| 10:35:09 | 18 | investigate it; is that correct? |
| 10:35:10 | 19 | MR. WHITE:  Objection; lack of foundation, it was |
| 10:35:14 | 20 | -- excuse me, it misstates the witness's -- |
| 10:35:14 | 21 | MR. MANLY:  Well, please correct me if I'm wrong. |
| 10:35:16 | 22 | MR. WHITE:  Well, John, let me finish my |
| 10:35:18 | 23 | objection. |
| 10:35:18 | 24 | MR. MANLY:  Sorry.  I thought you were done. |
| 10:35:21 | 25 | MR. WHITE:  No.  That's fine.  I hesitated.  Lack |

28

EXHIBIT 5
004

| | | |
|---|---|---|
| 11:11:46 | 1 | Q    All right. |
| 11:11:46 | 2 | A    It just wasn't prevalent. |
| | 3 | Q    Okay. |
| 11:11:48 | 4 | A    And the majority of the time when we had -- when |
| 11:11:51 | 5 | we were made aware of an issue, it was not us reporting to |
| 11:11:55 | 6 | law enforcement, it was law enforcement reporting to us. |
| 11:11:58 | 7 | Q    So you didn't think this was a -- I'm not saying |
| 11:12:03 | 8 | you didn't think it was important, but you didn't think it |
| 11:12:06 | 9 | was that big of an issue in the sport, correct? |
| 11:12:09 | 10 | MR. WHITE:  Objection; misstates the witness's |
| 11:12:10 | 11 | testimony, it's argumentative as phrased. |
| 11:12:12 | 12 | Go ahead. |
| 11:12:13 | 13 | THE WITNESS:  I think it's horrible if one person |
| 11:12:15 | 14 | is abused.  I think it's -- it's absolutely horrible.  And |
| 11:12:23 | 15 | but what I'm -- what I'm saying is that it wasn't |
| 11:12:26 | 16 | prevalent enough that it was happening, you know, |
| 11:12:33 | 17 | frequently when I was -- when I was in charge.  We just |
| 11:12:36 | 18 | didn't get that many complaints that came out of the |
| 11:12:39 | 19 | general public or out of the professional ranks. |
| 11:12:42 | 20 | BY MR. MANLY: |
| 11:12:42 | 21 | Q    Okay.  If that's true, why did you write the |
| 11:12:49 | 22 | letter to the USOC about it? |
| 11:12:52 | 23 | A    That's a different question. |
| 11:12:57 | 24 | Q    Well, I know that.  That's why I asked it. |
| 11:12:59 | 25 | A    Yeah.  That's a different question.  We wrote the |

51

EXHIBIT 5
005

| | | |
|---|---|---|
| 11:13:01 | 1 | letter to the USOC because we wanted -- we wanted to be |
| 11:13:09 | 2 | able to suspend a membership without a hearing, and that |
| 11:13:15 | 3 | was our policy at that time, until we could fully |
| 11:13:22 | 4 | investigate and decide if this member's conduct was such |
| 11:13:27 | 5 | that he needed to -- he or she needed to be terminated as |
| 11:13:31 | 6 | a member of USA Gymnastics.  And the membership and |
| 11:13:35 | 7 | credentials committee told us that we couldn't do that |
| 11:13:39 | 8 | because of the Ted Stevens Amateur Sports Act. |
| 11:13:43 | 9 | Q    Okay.  And you sent an e-mail to the president of |
| 11:13:47 | 10 | the USOC, right? |
| 11:13:47 | 11 | A    A letter. |
| 11:13:48 | 12 | Q    A letter.  And you included Scott Blackman, |
| 11:13:50 | 13 | correct? |
| 11:13:51 | 14 | A    Um-hmm. |
| 11:13:52 | 15 | Q    Yes? |
| 11:13:52 | 16 | A    Yes. |
| 11:13:52 | 17 | Q    Did you talk to Mr. Blackman about this issue? |
| 11:13:54 | 18 | A    I did. |
| 11:13:56 | 19 | Q    Okay.  And you're friends, right? |
| 11:14:00 | 20 | A    I haven't seen Scott in a long time, but. |
| 11:14:04 | 21 | Q    Well, you were friends? |
| 11:14:04 | 22 | A    Yeah, we were, of sorts. |
| 11:14:06 | 23 | Q    And he -- well, are you not friends anymore? |
| 11:14:09 | 24 | A    No.  I worked for Scott. |
| 11:14:10 | 25 | Q    I understand. |

52

EXHIBIT 5
006

| | | | |
|---|---|---|---|
| 11:14:11 | 1 | A | Yeah. |
| 11:14:11 | 2 | Q | You were colleagues. |
| | 3 | A | Yeah, we were colleagues. |
| 11:14:13 | 4 | Q | Let me put it that way.  Okay. |

11:14:15  5        And he thought enough of you he offered you a job,

11:14:18  6   which is why you left USA Gymnastics, right?

11:14:21  7      A    That's correct.

11:14:21  8      Q    Okay.  So when you talked to him about it, you

11:14:22  9   know, did you say, listen, this is a big deal, we need to

11:14:24 10   deal with this?

11:14:24 11      A    So the first time I spoke to Scott about this was

11:14:29 12   actually onsite in Colorado Springs.  And we had sent the

11:14:36 13   letter that we sent to Dick Schultz and Bill Hybl.  And --

11:14:42 14   and Bill said -- he pulled me aside and said, "Membership

11:14:47 15   and credentials are going to make a motion tomorrow to

11:14:50 16   decertify USA Gymnastics."  And I said to Bill, "If you

11:14:56 17   want to have a conversation about being -- you know, about

11:15:01 18   not letting us enforce what we think is a really important

11:15:06 19   thing to be able to protect our athletes, and you want to

11:15:09 20   have that conversation in front of God, country, and the

11:15:13 21   national media, I'll see you tomorrow morning."  And Bill

11:15:15 22   turned to Scott Blackman and said, "Scott, you need to get

11:15:21 23   this resolved tonight so that membership and credentials

11:15:26 24   will withdraw their motion to decertify us."

11:15:30 25      Q    So who at membership and credentials was driving

53

EXHIBIT 5
007

| | | |
|---|---|---|
| 11:51:56 | 1 | Q    Okay.  But if there were, would it be reason -- if |
| 11:51:58 | 2 | there were such an unsafe situation and USA Gymnastics |
| 11:52:01 | 3 | became aware of that, you would expect -- it would not be |
| 11:52:06 | 4 | unreasonable in your view for a parent to expect that you |
| 11:52:09 | 5 | would notify them of that, correct? |
| 11:52:13 | 6 | A    That's correct. |
| 11:52:14 | 7 | Q    Okay.  All right.  Now, Larry Nassar was licensed |
| 11:52:18 | 8 | to practice medicine -- practice osteopathic medicine |
| 11:52:23 | 9 | where? |
| 11:52:23 | 10 | A    I believe in Michigan, but I'm not sure. |
| 11:52:26 | 11 | Q    Okay.  So he was routinely at the camps? |
| 11:52:33 | 12 | A    I don't recall. |
| 11:52:35 | 13 | Q    Okay.  Well, let me just represent to you that my |
| 11:52:39 | 14 | clients will testify that he was -- they -- they recall |
| 11:52:42 | 15 | him being at every camp, okay? |
| 11:52:45 | 16 | A    Okay. |
| 11:52:47 | 17 | Q    If that's so, let's assume for purposes that it -- |
| 11:52:49 | 18 | that it -- that is, those camps from '99 on were to -- all |
| 11:52:52 | 19 | occurred in Texas, right? |
| 11:52:54 | 20 | A    That's correct. |
| 11:52:57 | 21 | Q    Okay.  So to your knowledge, did Larry Nassar have |
| 11:52:59 | 22 | a license to practice osteopathic medicine or a license of |
| 11:53:05 | 23 | any type to practice medicine in Texas? |
| 11:53:06 | 24 | MR. WHITE:  Objection; lack of foundation, calls |
| 11:53:08 | 25 | for speculation, it's also irrelevant for the purposes of |

80

EXHIBIT 5
008

**CERTIFICATION**

**OF**

**CERTIFIED SHORTHAND REPORTER**


The undersigned certified shorthand reporter of the state of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date _____ SEP 0 8 2017 _____.



_Christine Vandermeer_
**Certificate No.: //// 0**

EXHIBIT 5
010

# EXHIBIT "6"

ASSIGNED TO THE ____ 218th ____ **JUDICIAL DISTRICT COURT**

**INDICTMENT NO.** __ 28737 __

__ **PER BOND SCHEDULE**      __ **BOND RECOMMMENDATION** $ 20,000 surety HRR

**STATE OF TEXAS VS.  DEBRA VAN HORN**

**CHARGE:  22.011(a)(2) - SEXUAL ASSAULT CHILD/SECOND DEGREE FELONY**
**OFF CODE: 11990002              TRN NO.:**        800
**PID NO.: 3314372 -          CONTROL NO.:  2018-00791**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS,**

THE GRAND JURORS, duly selected, organized, sworn, and impaneled as such for the County of Walker, State of Texas, at the January Term, A.D. 2018, of the District Court for said County upon their oaths present in and to said Court, that on or about the 1st day of January, 2012, and anterior to the presentment of this indictment, in the County and State aforesaid DEBRA VAN HORN did  then and there, acting as a party with one or more individuals, intentionally or knowingly cause the penetration of the female sexual organ of Ruth (a pseudonym) by defendant's finger, without the consent of Ruth (a pseudonym).

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

Foreman of the Grand Jury

FILED
TIME 11:45
29 DAY OF June 2018
ROBYN FLOWERS
District Clerk, Walker County
By _____ Deputy

EXHIBIT 6

001

**INDICTMENT NO.**_____

**STATE OF TEXAS VS.  Debra VanHorn**

**OFFENSE:   SEXUAL ASSAULT CHILD**

**Race:**  White         **Gender:**  Female      **DOB:**  08/13/1954

**HT:**         **WT:**    Lbs.          **Hair Color:**

**Eye Color:    DL:**

**Agency:    Agency #:          State ID #:**

TRUE BILLED UPON THE INFORMATION OF

_____ *Steve Jeter*

_____ *Tom Bean*

OTHER PENDING INDICTED CASES AGAINST DEFENDANT?

_____ YES      _____ NO

IF YES, CAUSE #'S _____

IS THIS A RE-INDICTMENT?

____ YES         ____ NO

IF YES, PREVIOUS CAUSE # _____

NAME OF CO-DEFENDANT(S), IF ANY, *NOT* NAMED IN INDICTMENT.

|  |  | CAUSE NO. | COURT |
|---|---|---|---|
| (1) | _____ | _____ | _____ |
| (2) | _____ | _____ | _____ |
| (3) | _____ | _____ | _____ |
| (4) | _____ | _____ | _____ |
| (5) | _____ | _____ | _____ |

SIGNED on this *29* day of ___*June*___, 20 *18*.

_____

Attorney for the State of Texas

EXHIBIT 6
002

# EXHIBIT "7"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
SANTA ANA
Civil Case No:  8:18-cv-01136-JLS-KES
The Honorable Josephine L. Staton

_____

VIDEO DEPOSITION OF WILLIAM MOREAU, D.C.
SEPTEMBER 13, 2018

_____

JANE JD DOE, an individual,

     Plaintiff,

v.

DOE 1, an individual; DOE 2, an Indiana business
entity of form unknown; DOE 3, an individual; DOE 4,
an individual; and DOES 6 through 500,

     Defendants.

_____

1

```
 1                    And in addition to that, they may
 2     have also provided supporting coverage for
 3     significant events that may have occurred in --
 4     around the Chula Vista Sports Medicine Clinic.
 5              Q.   Was there a specific medical facility
 6     that that medical clinic at Chula Vista had a
 7     connection to, like UCSD, or USD, or some school
 8     down there?
 9              A.   Well, not a school, but a group of
10     physicians.
11              Q.   What physician group was that?
12              A.   It's called "San Diego Sports
13     Medicine."
14              Q.   Okay.  And is that a group -- so,
15     when you say "group of physicians," is it a medical
16     practice group, or is it just a voluntary like
17     organization you join on the weekends or something?
18              A.   It's actually the name of a
19     professional corporation, I believe, within San
20     Diego, comprised of ten or more family practice
21     physicians with CAQs, or Certificates of Additional
22     Qualification, in Sports Medicine.
23              Q.   And so I guess what I'm getting at,
24     is that medical practice in San Diego?  San Diego
25     Sports Physicians?
```

51

EXHIBIT 7
002

1              Q.    (By Mr. Cunny)  Do you see what I'm

2      saying?

3              A.    I would like to think I do.  I

4      just -- I want to make sure that I'm clear.

5              Q.    Sure.

6              A.    As I recall, the USA Gymnastics space

7      was on a lower level floor; let's say like Floor 2.

8                    On Floor 2, there probably would have

9      been multiple future condominiums.  It was a big

10     building, right?

11                   So, if you go to Floor 2, and maybe

12     there was five or six condominium apartments or

13     suites on that floor, one of those apartment suite

14     complexes was dedicated to the services as I

15     described where USAG had a special place to provide

16     services.

17                   No athlete lived within that

18     condominium.

19                   To my recollection, most likely they

20     didn't even live on that floor.  They lived on

21     different floors.

22             Q.    Okay.  Are you aware of a USOC

23     medical service provider named Debbie Van Horn?

24             A.    Yes.

25             Q.    Okay.  And what was Debbie Van Horn's

81

EXHIBIT 7
003

1    **role at USOC, based on your understanding?**

2              A.   I believe that -- this would have

3    been prior to my employment at the USOC.

4              I -- she was a healthcare provider,

5    is the term we would use, as a full-time employee of

6    the United States Olympic Committee, I think serving

7    out of the Colorado Springs Olympic Training Center.

8              **Q.   Did that change at any point?**

9              A.   I couldn't explain -- I couldn't

10   explain exactly why, but as I -- my recollection

11   would be, immediately before I came, there was a

12   significant reduction in the overall United States

13   Olympic Committee staff, and I believe at that time

14   that she was dismissed from the company.  However,

15   that wasn't underneath my direction, and I don't

16   exactly know the details around that.  That's just

17   recollection.

18             **Q.   Okay.  Even though she was no longer**

19   **a full-time employee, did she still provide services**

20   **and treatment at USOC events, to your knowledge?**

21             MR. KAMIN:  I'm going to object at

22   this point.  I've allowed latitude for some

23   foundational questions around the London Olympics,

24   but you're now exceeding the scope of jurisdictional

25   discovery that's permissible in this deposition.

82

EXHIBIT 7
004

1    something of an association between San Diego Sports

2    Physicians and Chula Vista Olympic Training Site, at

3    this point, formerly Center.  Does that accurately

4    refrect -- reflect your prior testimony?

5              A.   No.

6              Q.   Okay.  What's wrong about what I just

7    said?

8              A.   It's San Diego Sports Medicine.

9              Q.   San Diego Sports Medicine.  Gotcha.

10             A.   You were saying "Physician," and I

11   just want to be accurate for you.

12             Q.   Sure.

13                  So, other than that association Chula

14   Vista has, are there other local organizations,

15   local to southern California, that it has

16   affiliations with?

17             A.   I don't know how to answer the

18   question.

19             Q.   Sure.

20                  Are there other organizations that

21   act similarly to the way San Diego Sports Medicine

22   does with Chula Vista, in terms of sharing

23   physicians, helping out?

24             A.   Yes.

25             Q.   Okay.  And what other associations or

164

EXHIBIT 7
005

1    organizations are those?

2              A.    Counselor, I don't want to assume

3    anything.

4                   When you say "Chula Vista," I'm

5    not -- I assume you're addressing the Chula Vista

6    Olympic Training Site, but I don't want to --

7              Q.    Currently "Site", formerly "Center,"

8    or if it changed over the years too, but whatever

9    that medical facility is.

10             A.    The United States Olympic Committee

11   has relationships -- contractual relationships, to

12   my knowledge, with two medical organizations in the

13   state of California; San Diego Sports Medicine,

14   which we previously described, and the University of

15   California San Diego.

16             Q.    Okay.  So, there is some affiliation

17   between UCSD and the Chula Vista Training Site?

18             A.    Specifically, the Chula Vista

19   Training Site, Sports Medicine Clinic.

20             Q.    Correct.

21             A.    I don't mean to parse with you.  I'm

22   just trying to be accurate.

23             Q.    Sure.

24             A.    Yes.  There's a relationship between

25   what we've called SDSM, San Diego Sports Medicine,

165

EXHIBIT 7
006

1    and the University of California San Diego, with the

2    Chula Vista Olympic Training Site Sports Medicine

3    Clinic under the auspices of the USOC.

4            Q.   Okay.  And can you describe for me

5    sort of the nature of that relationship?  Is there

6    money going back and forth?  Is there staff from

7    UCSD coming to the clinic?  How does that work?

8            A.   The University of California San

9    Diego is a regional partner to the National Medical

10   Network of the USOC.

11           How the deal works is UCSD receives

12   access to a mark as a Regional USOC Sports Medicine

13   Center, a partner, and in return for that, they

14   provide what's called "value in kind," or free

15   medical care for these 1,000 top athletes that we

16   described previously.

17           Q.   When you say they get access to a

18   mark, you're talking about the trademark of the

19   USOC?

20           A.   You know, as a doctor, I don't really

21   know sometimes the difference between a trademark

22   and mark, and those might mean different things to

23   you, but it's words, not symbols.

24           Q.   Sure.  You're not talking about some

25   guy named Mark, right?  It's some sort of insignia

EXHIBIT 7
007

1    or logo or something to do with USOC's --

2            A.    Correct.

3            Q.    -- signage, for lack of a better

4    term?

5            A.    Correct.

6            Q.    Okay.  Who drafted that agreement?

7            A.    USOC legal department.

8            Q.    And have you reviewed that agreement

9    before?

10           A.    Yes.

11           Q.    How recently?

12           A.    Last week.

13           Q.    Okay.  Did you review it in

14   preparation for your deposition here today?

15           A.    No.

16           Q.    When you reviewed that agreement, who

17   signed on behalf of the USOC?

18           A.    So, this agreement has several terms

19   to it, and I believe that the first term, when it

20   was first started, was for a four-year term.  And I

21   believe that Scott Blackman, as the CEO of the

22   United States Olympic Committee, would have signed

23   that one.

24                And, now, the reason I was looking at

25   that contract is it's up for renewal.  And so our

167

EXHIBIT 7
008

 1   new CEO would sign the new one.

 2                    And to be honest with you, I really

 3   don't know who signed the one last year in between.

 4            Q.    Okay.  So, when did this relationship

 5   begin, based on your understanding, between medical

 6   clinic and UCSD?

 7            A.    I would say approximately six years

 8   ago.  And I can get the exact date for you.  But I

 9   think it was about six years ago.

10                    Because the first term was four

11   years, then we had a one-year term, and now -- I

12   thought we had two one-year terms, and now another

13   term is renewing now.

14                    So, I can get that information for

15   you, but I'm going to say between five and six years

16   ago.

17            Q.    Okay.  Do you know who signed on

18   behalf of UCSD?

19            A.    Yes.

20            Q.    And who is that?

21            A.    The CEO of their health division.

22   Her name is Patty Maysent, M-A-Y-S-E-N-T.

23            Q.    All right.  And is she a California

24   resident, to your knowledge?

25            A.    Yes.

EXHIBIT 7
009

1        Q.    Have you met her in person before?

2        A.    Yes.

3        Q.    And did you negotiate the deal with

4    her, or did the attorneys do that?

5        A.    I did the negotiation.

6        Q.    Aside from what you discussed

7    regarding that contract, are any other services

8    provided from UCSD to the medical clinic at Chula

9    Vista?

10        A.    No.

11        Q.    Do you know if there's any licensure

12    terms in that agreement whereby those physicians who

13    are providing the in-kind services to the medical

14    clinic have to somehow record that with the state or

15    some other licensing body?

16        A.    I don't know that.

17        Q.    All right.  Other than UCSD and other

18    than San Diego Sports Medicine, are there any other

19    associations in the state of California that that

20    medical clinic has, similar to those I just

21    mentioned?

22        A.    Not to my knowledge.

23             Excuse me.  Can I ask you to -- can I

24    hear that last question one more time, please?

25             MR. CUNNY:  Can I have you read it?

169

EXHIBIT 7
010

1    I forgot what it was.

2              (The last question was read back).

3         A.   No change in my answer.

4         Q.   (By Mr. Cunny)   Okay.   Are there any

5    other contracts that you're aware of between the

6    medical clinic in Chula Vista and any other service

7    providers in the area for any sort of services?

8         A.   Yes.

9         Q.   Okay.   And what sorts of contracts

10   are those?

11        A.   I believe that we have a contract

12   with a company to remove blood borne pathogens,

13   needles and the likes of that.   I think the name of

14   that company is called Stericycle.

15             We may have a contract with a company

16   called LabCorp.   That's a laboratory service for

17   drawing and analyzing blood.   I don't know if it's

18   specific to that.

19             It's possible we could have other

20   lower level service type agreements that support

21   that clinic.   I don't know of any that I could

22   actually tell you right now.

23        Q.   Okay.   Have you heard of a company --

24   company called "Elite Athlete Services"?

25        A.   No.

EXHIBIT 7
011

1          Q.   Okay.  With respect to the -- you

2    understood that the Chula Vista Training Center was

3    sold in January of 2017?  Does that sound accurate?

4          A.   Yes.  I don't know the date, but I

5    know that it was sold to the City of Chula Vista.

6          Q.   Okay.  And so with respect to the

7    medical clinic, there's been no change in terms of a

8    company called Elite Athletic Services managing any

9    part of that facility, correct?

10         A.   Correct.

11         Q.   Okay.  Do any of the physicians or

12   any of the medical staff who work at the medical

13   clinic have any privileges with local hospitals?

14         A.   I can only speak to my staff.  What

15   San Diego Sports Medicine has for hospital

16   privileges would be an area I don't know about, but

17   my staff that are employees of the United States

18   Olympic Committee do not have hospital privileges in

19   the state of California.

20         Q.   Okay.  And do you handle any of the

21   finances in terms of leasing out space for the

22   medical clinic or any of the finances of the actual

23   physical facility getting run?

24         A.   Yes.

25         Q.   And what's the scope of your work as

171

EXHIBIT 7
012

1                    REPORTER'S CERTIFICATE

2

   STATE OF COLORADO )
3                    )
   COUNTY OF DENVER  )

4

5          I, Karen J. Hathcock, do hereby certify
   that I am a Registered Merit Reporter, Registered
   Professional Reporter and Notary Public within the
6  State of Colorado; that previous to the commencement
   of the examination, the deponent was duly sworn to
7  testify to the truth.

8          I further certify that this deposition was
   taken in shorthand by me at the time and place
9  herein set forth, that it was thereafter reduced to
   typewritten form and that the foregoing constitutes
10 a true and correct transcript.

11         I further certify that I am not related
   to, employed to, nor of counsel for any of the
12 parties or attorneys herein, nor otherwise
   interested in the result of the within action.

13

           In witness whereof, I have affixed my
14 signature and seal this 26th day of September,
   2018.

15

16         My commission expires July 8, 2022.

17

18

19

20

21             Karen J. Hathcock, RMR, RPR
               216-16th Street, Suite 650
22             Denver, Colorado  80202

23

24

25

EXHIBIT 7
013

# EXHIBIT "8"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES


JANE LM DOE, an individual,          )
                                     )
            Plaintiff,               )
                                     )
                                     )
                                     )
     vs.                             ) Case No.:  BC638724
                                     )
DR. LARRY NASSAR, an individual,     )
et al.,                              )
                                     )
            Defendants.              )
_____ )




            *** CONFIDENTIAL ***

        DEPOSITION OF JORDYN WIEBER

          Thursday, June 1, 2017






Reported by:

Jamie Jennings
CSR No. 13434

EXHIBIT 8
001

| | | |
|---|---|---|
| 10:53:12 | 1 | in California and Dr. Nassar was there -- well, the |
| 10:53:18 | 2 | way he -- the way he conducted -- did he ever treat |
| 10:53:23 | 3 | girls in their rooms? |
| 10:53:25 | 4 | A    Not at the national competitions; only when |
| 10:53:29 | 5 | he would travel with us to international |
| 10:53:32 | 6 | competitions. |
| 10:53:33 | 7 | Q    Okay.  If he was at a national competition, |
| 10:53:36 | 8 | where did he do the treatment? |
| 10:53:38 | 9 | A    Usually, in the arena, like, in the |
| 10:53:40 | 10 | medical -- designated, like, medical room. |
| 10:53:43 | 11 | Q    Was that a private area most of the time? |
| 10:53:45 | 12 | A    "Private" meaning what? |
| 10:53:47 | 13 | Q    Meaning it wasn't accessible to anybody. |
| 10:53:49 | 14 | It was a -- he could perform procedures by himself |
| 10:53:53 | 15 | with the athlete? |
| 10:53:54 | 16 | A    I guess he could, but, usually, there was |
| 10:53:57 | 17 | other doctors and trainers in there and multiple |
| 10:54:00 | 18 | athletes at one time. |
| 10:54:01 | 19 | Q    Okay.  Did he ever do this treatment to |
| 10:54:02 | 20 | you -- again, I apologize -- with other people |
| 10:54:06 | 21 | there? |
| 10:54:07 | 22 | A    Yes. |
| 10:54:07 | 23 | Q    Okay.  Who was there?  Debbie Van Horn? |
| 10:54:13 | 24 | A    I think so. |
| 10:54:15 | 25 | Q    And Debbie Van Horn is the long-time |

34

EXHIBIT 8
002

| | | |
|---|---|---|
| 10:54:18 | 1 | trainer for the national team? |
| 10:54:19 | 2 | A    Yeah. |
| 10:54:20 | 3 | Q    Who else? |
| 10:54:20 | 4 | A    I mean, I saw him -- because he lived 20 |
| 10:54:23 | 5 | minutes away from me, so I would see him at his real |
| 10:54:27 | 6 | office at Michigan State. |
| 10:54:29 | 7 | Q    Thank you for that.  So you'd go to the |
| 10:54:31 | 8 | clinic at Michigan State?  He'd do it there? |
| 10:54:34 | 9 | A    Yeah. |
| 10:54:34 | 10 | Q    Was somebody present there -- |
| 10:54:36 | 11 | A    Yeah, like, my mom or my sister, usually. |
| 10:54:38 | 12 | Q    Okay.  And they would sit in the chair at |
| 10:54:41 | 13 | the head of the treatment bed, typically? |
| 10:54:43 | 14 | A    I don't remember. |
| 10:54:43 | 15 | Q    Okay.  What I'm really focused on today is |
| 10:54:46 | 16 | traveling for USA Gymnastics. |
| 10:54:48 | 17 | A    Okay. |
| 10:54:49 | 18 | Q    Okay.  Thank you for that answer, though. |
| 10:54:51 | 19 | When -- so Debbie was -- when you were |
| 10:54:53 | 20 | traveling, okay, we'll get to the Ranch in a minute, |
| 10:54:56 | 21 | but when you were traveling international |
| 10:54:59 | 22 | competitions, Debbie Van Horn was in the room? |
| 10:55:01 | 23 | A    Usually, yes. |
| 10:55:02 | 24 | Q    Okay.  And she was familiar with the |
| 10:55:06 | 25 | procedure that he was doing? |

35

EXHIBIT 8
003

| | | |
|---|---|---|
| 11:03:41 | 1 | coming into your room at any competition? |
| 11:03:46 | 2 | A    No. |
| 11:03:48 | 3 | (Ms. Holm entered the proceedings.) |
| 11:03:51 | 4 | BY MR. MANLY: |
| 11:03:52 | 5 | Q    Do you know who was in charge of your |
| 11:03:54 | 6 | wellbeing as a youngster before you were 18 on the |
| 11:04:01 | 7 | tour at night? |
| 11:04:04 | 8 | A    We had a chaperone on the 2012 tour, |
| 11:04:10 | 9 | Jill Hicks. |
| 11:04:11 | 10 | Q    Jill Hicks? |
| 11:04:12 | 11 | A    Yeah. |
| 11:04:12 | 12 | Q    And when you say 2012, was that after the |
| 11:04:14 | 13 | Olympics? |
| 11:04:15 | 14 | A    You asked me about the tour. |
| 11:04:17 | 15 | Q    No.  I'm sorry.  I may have said tour, and |
| 11:04:19 | 16 | I misspoke.  My apologies. |
| 11:04:22 | 17 | A    Okay. |
| 11:04:22 | 18 | Q    What I'm asking you is did Dr. Nassar -- at |
| 11:04:28 | 19 | the Olympics, did he give people this treatment? |
| 11:04:31 | 20 | A    I think so. |
| 11:04:33 | 21 | Q    Okay.  And why do you think that? |
| 11:04:55 | 22 | A    I know that Aly had a back pain issue at |
| 11:04:59 | 23 | the Olympics, and I know that McKayla had, I think, |
| 11:05:03 | 24 | a hamstring, and there was one time where, like, we |
| 11:05:08 | 25 | had -- at the Olympics, we were -- our rooms were on |

45

EXHIBIT 8
004

| | | |
|---|---|---|
| 11:05:13 | 1 | the top level of this townhouse, and then the middle |
| 11:05:15 | 2 | level was where we had, like, our treatments.  It |
| 11:05:18 | 3 | was kind of this common area with like a TV and, |
| 11:05:21 | 4 | like, the training tables and everything.  And Aly |
| 11:05:24 | 5 | had told me that McKayla texted her, said, oh, he |
| 11:05:27 | 6 | was doing the treatment to her when she was alone, |
| 11:05:30 | 7 | so she asked Aly to come down just to -- so he would |
| 11:05:34 | 8 | stop doing it or something along those lines. |
| 11:05:38 | 9 | Q   **When did she tell me that?** |
| 11:05:40 | 10 | A   When did Aly tell me that? |
| 11:05:42 | 11 | Q   **Yeah.** |
| 11:05:42 | 12 | A   While we were there. |
| 11:05:44 | 13 | Q   **So was the -- did Aly complain about the** |
| 11:05:46 | 14 | **treatment to anybody?** |
| 11:05:48 | 15 | A   I don't remember. |
| 11:05:49 | 16 | Q   **Okay.  Did she complain about it to you?** |
| 11:05:52 | 17 | A   I don't remember. |
| 11:05:54 | 18 | Q   **Okay.  Well, let me have this straight.** |
| 11:05:59 | 19 | **Aly texted Ms. Maroney?** |
| 11:06:01 | 20 | A   No.  Other way around. |
| 11:06:03 | 21 | Q   **Oh, Ms. Maroney texted Aly that he was** |
| 11:06:05 | 22 | **doing the treatment to her and he was doing it alone** |
| 11:06:07 | 23 | **and she didn't want to be alone with him; is that** |
| 11:06:10 | 24 | **right?** |
| 11:06:10 | 25 | A   I think so. |

EXHIBIT 8
005

| | | |
|---|---|---|
| 11:06:11 | 1 | Q    Okay.  So she didn't like it? |
| 11:06:13 | 2 | A    Yes. |
| 11:06:14 | 3 | Q    Okay.  Did you ever hear her or any |
| 11:06:18 | 4 | other -- well, did you ever hear Ms. Maroney |
| 11:06:23 | 5 | complain about that to anybody, the treatment? |
| 11:06:26 | 6 | A    Not that I can remember.  She wasn't -- she |
| 11:06:28 | 7 | was closer with Aly at the time than me. |
| 11:06:31 | 8 | Q    Okay.  She complained to Aly about it? |
| 11:06:33 | 9 | A    I think so. |
| 11:06:34 | 10 | Q    Did you ever hear her complain to anybody |
| 11:06:39 | 11 | else? |
| 11:06:41 | 12 | A    Uh-uh.  No. |
| 11:06:42 | 13 | Q    Did anybody, to your knowledge, ever ask -- |
| 11:06:45 | 14 | who was the person that you could -- did you ever |
| 11:06:53 | 15 | hear -- sorry.  Let me straighten this out. |
| 11:06:59 | 16 | Did Aly go down? |
| 11:07:02 | 17 | A    I think so. |
| 11:07:03 | 18 | Q    Okay.  Now, you said you stayed in a |
| 11:07:08 | 19 | townhouse in London? |
| 11:07:10 | 20 | A    It was sort of -- it was in the Olympic |
| 11:07:12 | 21 | village, but it was kind of in the style of a |
| 11:07:14 | 22 | townhouse with, like, three different levels. |
| 11:07:17 | 23 | Q    Okay.  So it wasn't a townhouse in town? |
| 11:07:20 | 24 | A    No. |
| 11:07:20 | 25 | Q    It was in the Olympic village? |

EXHIBIT 8
006

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER


       The undersigned certified shorthand reporter of the state of California does hereby certify:

       That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

       That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

       In witness whereof, I have subscribed my name this date _____ JUN 0 8 2017 _____.


Certificate No.:

EXHIBIT 8
007

# EXHIBIT "9"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES


JANE LM DOE, an individual,      ) CASE NO.:BC638724
                                 )
             Plaintiff,          )
                                 )
        v.                       )
                                 )
DR. LARRY NASSAR, an individual, )
et al.,                          )
                                 )
             Defendants.         )
_____  )



VIDEOTAPED DEPOSITION OF

PAUL PARILLA

VOLUME II

FRIDAY, SEPTEMBER 15, 2017

8:47 A.M.

279

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 9
001

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              IN AND FOR THE COUNTY OF LOS ANGELES

 3

 4   JANE LM DOE, an individual,    ) CASE NO.:BC638724
                                    )
 5                 Plaintiff,       )
                                    )
 6            v.                    )
                                    )
 7   DR. LARRY NASSAR, an individual, )
     et al.,                        )
 8                                  )
                   Defendants.      )
 9   _____)

10

11

12

13

14

15

16

17

18

19

20

21       The deposition of PAUL PARILLA, taken on behalf of

22   the Plaintiff, before Louann Thibert, CSR No. 8152 for

23   the State of California, at 8:47 a.m., on Friday,

24   September 15, 2017 at Manly, Stewart & Finaldi, 19100 Von

25   Karman, Suite 800, Irvine, California.
```

EXHIBIT 9
002

01:57:47  1   not just with him but with -- with other references to

2   it.  So that -- and, of course, that's the information

3   that -- that I was given that he had shipped this

4   material to our lawyer Scott Himsel and it's my

01:58:04  5   understanding he got that material just a number of days

6   before we went to the FBI on July 28th.

7        Q    Okay.  Well, how did you -- how did Steve Penny

8   describe that video to the FBI, if at all?

9             MR. WHITE:  Objection; lack of foundation,

01:58:19 10   speculation.

11             THE WITNESS:  I don't recall him actually --

12             MR. WHITE:  Assuming facts not in evidence.  Go

13   ahead.

14             THE WITNESS:  I don't recall him actually

01:58:26 15   describing the video.  There were a number of things.

16   Some of them were kind of on irrelevant materials.  I

17   think he gave -- you know, there were like 10 or 11

18   things that were transmitted to Scott Himsel and which I

19   ended up putting on the hard drive to give to the FBI in

01:58:48 20   Los Angeles.  But Steve Penny and Scott Himsel had given

21   the information to the FBI in Indianapolis.  I didn't do

22   that.

23   BY MR. MANLY:

24        Q    Okay.  And did anybody after that report ever

01:59:03 25   follow up with the Indiana office of the FBI?

457

EXHIBIT 9
003

01:59:08  1     A    I was -- Mr. Penny told me on several occasions

 2  that he attempted and did follow up.

 3     **Q**    **With whom?**

 4     A    With --

01:59:18  5     **Q**    **Jay Abbott?**

 6     A    With Jay Abbott.

 7     **Q**    **Did anybody -- Mr. Abbott ever tell you or Mr.**

 8  **Penny in your presence that you were not to tell anybody**

 9  **about this?**

01:59:30 10     A    I heard Mr. Abbott say several times during the

11  course of the July 28th meeting that they did not want

12  USA Gymnastics or any of its personnel to take any action

13  that would interfere with their investigation that they

14  were going to launch based upon our report.

01:59:50 15     **Q**    **Okay.**  **Did you tell them that he was still**

16  **treating USAG members at Michigan State and at Twistars?**

17     A    We told the FBI.  I wasn't aware at the time

18  that he treated or even worked at Twistars.  It was just

19  totally unknown to me.  What we told the FBI that -- that

02:00:18 20  he had -- after we received the -- the June 2015 inquiry

21  about an athlete's concern between then and July 28th,

22  that Dr. Nassar had not performed any services for USA

23  Gymnastics.

24           We -- we -- he was going to attend the Secret

02:00:40 25  Classic meet in Chicago as a spectator, not as a -- as a

458

EXHIBIT 9
004

02:00:44  1   medical personnel and we asked him not to even do that

2   and he said -- he complied and didn't go.  And then he

3   was supposed to work as a medical provider at the

4   championships and we told him he was not to do that and

02:00:59  5   he complied.  Then, within days or right after we met

6   with the FBI, we told him that he was not going to

7   receive any further assignments from USA Gymnastics.

8        Q    Why did you tell him that?

9        A    Because he had been wanting to know what the

02:01:16  10  future was going to be with respect to him because

11  remember, we had asked him not to go to the Secret and

12  then we asked him not to go to the championships and, you

13  know, it was kind of like one assignment at a time.  And

14  then we told him, no, you're not going to be doing

02:01:34  15  anything further for us.

16       Q    So did you tell him why?

17       A    I didn't.  I had no communications with him.

18  This was all being handled by Steve Penny and Scott

19  Himsel, so I don't know what they told him.

02:01:47  20       Q    So what is your understanding of the reason he

21  was no longer going to get assignments from USA

22  Gymnastics?

23       A    Because he was under -- going to be under

24  investigation by the FBI.

02:02:00  25       Q    For what?

EXHIBIT 9
005

## CERTIFICATION

### OF

### CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the state of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date _____ SEP 2 8 2017 _____ .

Certificate No.: 8152

EXHIBIT 9
006

# EXHIBIT "10"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE


JORDYN MARIE WIEBER, an
individual,

          Plaintiff,

      vs.                      Civil Case No.
                                2:18-cv-03462-JLS-KESx

UNITED STATES OLYMPIC COMMITTEE, a
Business Entity of form unknown; USA
GYMNASTICS, an Indiana Business
Entity of Form Unknown; MICHIGAN
STATE UNIVERSITY, a Business Entity of
Form Unknown; LARRY NASSAR, an
individual, PAUL PARRILLA, an
individual, and DOES 1 through 500,

          Defendants.

_____/




VIDEOTAPED DEPOSITION OF

LARRY PROBST

Friday, October 26, 2018




REPORTED BY:

DEBRA J. SKAGGS, CSR 7857

EXHIBIT 10
001

| | | |
|---|---|---|
| 10:33:24 | 1 | A.        It's a significant amount of time. |
| 10:33:28 | 2 | Q.        Aside from board meetings, I assume you deal |
| 10:33:31 | 3 | with other business relating to the USOC? |
| 10:33:35 | 4 | A.        My role was primarily the international |
| 10:33:42 | 5 | relations piece of the overall responsibility.  So I |
| 10:33:46 | 6 | spent a lot of time on airplanes, traveling to foreign |
| 10:33:50 | 7 | countries, meeting with the leadership of the IOC, |
| 10:33:57 | 8 | attending various competitions, meetings, IOC sessions. |
| 10:34:06 | 9 | And as I said, extensively traveling. |
| 10:34:09 | 10 | Q.        Okay.  I assume you did conduct some of your |
| 10:34:12 | 11 | business from -- actually, did you have an office in |
| 10:34:16 | 12 | California when you were chairman of USOC? |
| 10:34:22 | 13 | A.        I have an office at Electronic Arts. |
| 10:34:23 | 14 | Q.        Okay.  And you -- sorry. |
| 10:34:24 | 15 | A.        Where I'm the chairman. |
| 10:34:26 | 16 | Q.        Okay.  And did you utilize that office to |
| 10:34:28 | 17 | conduct some of your USOC business? |
| 10:34:31 | 18 | A.        Occasionally, yes. |
| 10:34:33 | 19 | Q.        Was there a different location that you would |
| 10:34:35 | 20 | use as an office or, for lack of a better term -- |
| 10:34:40 | 21 | A.        My home. |
| 10:34:40 | 22 | Q.        Your home? |
| 10:34:41 | 23 | A.        (Nods head.) |
| 10:34:42 | 24 | Q.        Okay.  So you'd work out of your home |
| 10:34:45 | 25 | regarding your duties as chairman at USOC? |

31

EXHIBIT 10
002

| | | |
|---|---|---|
| 10:48:25 | 1 | Q.        And have you ever attended board meetings in |
| 10:48:27 | 2 | the State of California for the USOC? |
| 10:48:30 | 3 | A.        Yes. |
| 10:48:31 | 4 | Q.        And why are those board meetings -- why have |
| 10:48:35 | 5 | they been held in California, to your understanding? |
| 10:48:38 | 6 | A.        The most recent ones that have been held in |
| 10:48:41 | 7 | California have been so that we could interact with the |
| 10:48:45 | 8 | leadership of the organizing committee for the Los |
| 10:48:49 | 9 | Angeles games. |
| 10:48:51 | 10 | Q.        Okay.  And do you know -- you personally |
| 10:48:58 | 11 | interact with the L.A. -- is it called LA28? |
| 10:49:01 | 12 | A.        Yes. |
| 10:49:02 | 13 | Q.        Do you personally interact with their |
| 10:49:04 | 14 | leadership committee? |
| 10:49:06 | 15 | A.        Occasionally. |
| 10:49:08 | 16 |          MS. KUBOTA:  Objection.  Vague. |
| 10:49:08 | 17 |          MR. CUNNY:  Q.  Okay.  And who is -- who |
| 10:49:11 | 18 | do you define as being on that leadership committee? |
| 10:49:13 | 19 | A.        Casey Wasserman and Gene Sykes. |
| 10:49:21 | 20 | Q.        Where does Gene Sykes live? |
| 10:49:23 | 21 | A.        Los Angeles. |
| 10:49:26 | 22 | Q.        And is there an entity that was created for |
| 10:49:34 | 23 | that organizing committee? |
| 10:49:37 | 24 | A.        Yeah.  It's called the organizing committee |
| 10:49:38 | 25 | for the Los Angeles 2028 Games. |

42

EXHIBIT 10
003

**Probst, Larry**
**Nassar Cases**

| | | |
|---|---|---|
| 10:49:41 | 1 | Q.        And the USOC is a partner in that; correct? |
| 10:49:44 | 2 | A.        We are a partner in the joint venture between |
| 10:49:46 | 3 | the organizing committee and the USOC. |
| 10:49:52 | 4 | Q.        And describe for me -- you may have already, |
| 10:49:55 | 5 | but I just want to make sure I get the question on the |
| 10:49:57 | 6 | record. |
| 10:49:59 | 7 |           Describe for me the -- what the joint |
| 10:50:03 | 8 | venture -- what that joint venture does exactly. |
| 10:50:08 | 9 | A.        It's basically responsible for generating |
| 10:50:10 | 10 | revenue to support the 2028 Games. |
| 10:50:17 | 11 | Q.        Is there a home office or corporate office at |
| 10:50:20 | 12 | that entity? |
| 10:50:22 | 13 | A.        It would be in Los Angeles. |
| 10:50:25 | 14 | Q.        Have you been to that office? |
| 10:50:26 | 15 | A.        Yes. |
| 10:50:27 | 16 | Q.        Where in Los Angeles is it? |
| 10:50:31 | 17 | A.        I'm not sure of the exact address. |
| 10:50:34 | 18 | Q.        Do you know if it's Santa Monica -- |
| 10:50:36 | 19 | A.        It's not Santa Monica. |
| 10:50:37 | 20 | Q.        How frequently do you have -- actually, strike |
| 10:50:46 | 21 | that. |
| 10:50:46 | 22 |           I assume you have joint meetings between USOC |
| 10:50:50 | 23 | personnel as well as the L.A. leadership committee from |
| 10:50:54 | 24 | time to time? |
| 10:50:56 | 25 | A.        Meetings take place between the USOC |

43

EXHIBIT 10
004

| | | |
|---|---|---|
| 10:50:58 | 1 | leadership and the leadership of LA 2028, yes. |
| 10:51:03 | 2 | Q.        How frequently are those -- have those |
| 10:51:06 | 3 | meetings been, say, over the last year? |
| 10:51:14 | 4 | Actually, better question.  When did those |
| 10:51:16 | 5 | meetings first start? |
| 10:51:19 | 6 | A.        They probably first started after Los Angeles |
| 10:51:23 | 7 | was officially awarded the 2028 Games. |
| 10:51:26 | 8 | Q.        And when was that? |
| 10:51:29 | 9 | A.        It was -- I believe it was in the summer of |
| 10:51:37 | 10 | 2017. |
| 10:51:40 | 11 | Q.        So it started a little over a year ago, maybe? |
| 10:51:43 | 12 | A.        Yes. |
| 10:51:45 | 13 | Q.        Okay.  So in that last year, how many times |
| 10:51:48 | 14 | have you had joint meetings between USOC personnel as |
| 10:51:52 | 15 | well as L.A. organizing leadership? |
| 10:51:56 | 16 | A.        It's difficult for me to answer because I |
| 10:51:58 | 17 | don't participate in most of those meetings. |
| 10:52:01 | 18 | Q.        Okay.  When you do participate, what's your |
| 10:52:03 | 19 | role in those meetings? |
| 10:52:06 | 20 | A.        Acting as the chair of the USOC. |
| 10:52:11 | 21 | Q.        And as a chair of the USOC, do you have |
| 10:52:14 | 22 | specific goals or responsibilities that you have to |
| 10:52:19 | 23 | address with respect to that committee? |
| 10:52:21 | 24 | MS. KUBOTA:  Objection.  Compound. |
| 10:52:24 | 25 | THE WITNESS:  Well, the goal is to make sure |

EXHIBIT 10
005

| | | |
|---|---|---|
| 10:55:08 | 1 | the beginning of 2019, and they will begin selling |
| 10:55:12 | 2 | sponsorships at that time. |
| 10:55:21 | 3 | Q.        And when you say "they," you mean the |
| 10:55:23 | 4 | organizing committee? |
| 10:55:24 | 5 | A.        The joint venture. |
| 10:55:25 | 6 | Q.        The joint venture. |
| 10:55:33 | 7 | Do you know who is a CEO of the joint venture, |
| 10:55:38 | 8 | if there is one? |
| 10:55:39 | 9 | A.        They just hired a woman named Kathy Carter. |
| 10:55:44 | 10 | Q.        Do you know where she lives? |
| 10:55:46 | 11 | A.        New York. |
| 10:55:56 | 12 | Q.        And does the USOC have any individuals on the |
| 10:56:00 | 13 | board of that joint venture? |
| 10:56:04 | 14 | A.        Yes. |
| 10:56:05 | 15 | Q.        And who is on the board of that joint venture |
| 10:56:07 | 16 | from the USOC? |
| 10:56:10 | 17 | A.        The chairman and the CEO. |
| 10:56:14 | 18 | Q.        Did we -- I apologize.  Did we already say who |
| 10:56:17 | 19 | the chairman was? |
| 10:56:18 | 20 | A.        Me. |
| 10:56:19 | 21 | Q.        Oh. |
| 10:56:20 | 22 | And who is the CEO? |
| 10:56:22 | 23 | A.        Sarah Hirshland. |
| 10:56:25 | 24 | Q.        And she's a current chairman of -- or CEO of |
| 10:56:32 | 25 | USOC? |

47

EXHIBIT 10
006

| | | |
|---|---|---|
| 11:24:14 | 1 | MS. KUBOTA:  Objection.  Vague. |
| 11:24:18 | 2 | THE WITNESS:  If they don't rectify the |
| 11:24:21 | 3 | particular problem or address the particular issue, they |
| 11:24:26 | 4 | could -- they could potentially be decertified. |
| 11:24:29 | 5 | MR. CUNNY:  Q.  During that time they're |
| 11:24:32 | 6 | on probation, are they prevented from certain |
| 11:24:36 | 7 | activities or performing certain functions? |
| 11:24:41 | 8 | A.      I'm not capable of answering that question. |
| 11:24:44 | 9 | Q.      **Would that be something I'd ask Alan Ashley?** |
| 11:24:49 | 10 | A.      Yes.  Or Rick Adams. |
| 11:24:53 | 11 | Q.      **Does the board have to approve probationary** |
| 11:24:57 | 12 | **status or non-probationary status?** |
| 11:25:01 | 13 | A.      Typically, there would be a recommendation |
| 11:25:07 | 14 | from the management team that would be endorsed by the |
| 11:25:12 | 15 | board. |
| 11:25:15 | 16 | Q.      **Have you ever -- during the time you were** |
| 11:25:21 | 17 | **chairman -- you've been chairman at USOC, have you ever** |
| 11:25:26 | 18 | **decertified an NGB?** |
| 11:25:28 | 19 | A.      We have not. |
| 11:25:30 | 20 | Q.      **Do you know if, in the history of USOC, any** |
| 11:25:34 | 21 | **NGBs have ever been decertified?** |
| 11:25:38 | 22 | A.      I don't know. |
| 11:25:46 | 23 | Q.      **All right.  Going back to the Olympic bid --** |
| 11:25:51 | 24 | A.      Are we done with this document? |
| 11:25:53 | 25 | Q.      **Yeah, we can -- actually, one last thing in** |

60

EXHIBIT 10
007

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | (Reporter clarification.)                                    |
| 11:29:38 | 2  | MR. CUNNY:  -- in other ways?                                |
| 11:29:39 | 3  | MR. CUNNY:  Q.  Who specifically on the                      |
| 11:29:41 | 4  | organizing committee's job is that?                          |
| 11:29:44 | 5  | A.      I'm not sure.                                         |
| 11:29:46 | 6  | **Q.      Is there a task force or a committee within**      |
| 11:29:48 | 7  | **the committee?**                                           |
| 11:29:50 | 8  | A.      I presume so, but I don't -- I don't know any        |
| 11:29:52 | 9  | of those details.                                            |
| 11:29:55 | 10 | **Q.      Have you ever met with Eric Garcetti regarding**  |
| 11:29:57 | 11 | **the LA 2028 Olympics?**                                    |
| 11:30:00 | 12 | A.      Yes.                                                  |
| 11:30:00 | 13 | **Q.      On how many occasions?**                          |
| 11:30:05 | 14 | A.      Many times.                                           |
| 11:30:08 | 15 | **Q.      And again, I hate to push you.  More than 10?**   |
| 11:30:10 | 16 | **More than 20?  More than 100?**                           |
| 11:30:16 | 17 | A.      Eric was intimately involved in the effort to        |
| 11:30:24 | 18 | secure the LA28 games.  So I've interacted with him          |
| 11:30:30 | 19 | many, many times.                                            |
| 11:30:32 | 20 | **Q.      Okay.  Have you ever discussed Larry Nassar**    |
| 11:30:34 | 21 | **with Mr. Garcetti?**                                       |
| 11:30:37 | 22 | A.      I don't think so.                                     |
| 11:30:39 | 23 | **Q.      Has he ever asked about Larry Nassar?**          |
| 11:30:42 | 24 | A.      Not that I recall.                                    |
| 11:30:46 | 25 | **Q.      Has athlete safety been one of the issues that** |

64

EXHIBIT 10
008

| | | |
|---|---|---|
| 11:32:12 | 1 | **Q.** **Have you ever discussed Larry Nassar with** |
| 11:32:14 | 2 | **Scott Blackmun?** |
| 11:32:16 | 3 | **A.** Yes. |
| 11:32:16 | 4 | **Q.** **On how many occasions?** |
| 11:32:19 | 5 | **A.** Multiple times. |
| 11:32:20 | 6 | **Q.** **Okay. When was the first time you talked** |
| 11:32:22 | 7 | **about Larry Nassar with Scott Blackmun?** |
| 11:32:24 | 8 | **A.** The first time I heard Larry Nassar's name was |
| 11:32:28 | 9 | during the Olympic games in Rio in 2016. |
| 11:32:32 | 10 | **Q.** **Did you hear that from Scott Blackmun?** |
| 11:32:38 | 11 | **A.** I probably first heard it from the |
| 11:32:43 | 12 | communications person at the USOC.  Patrick Sandusky. |
| 11:32:48 | 13 | **Q.** **Did you ask him how he had heard that** |
| 11:32:51 | 14 | **information?** |
| 11:32:52 | 15 | **A.** It's his job to follow the media and -- and be |
| 11:32:59 | 16 | up to speed on any kind of articles relative to the USOC |
| 11:33:04 | 17 | or the Olympics. |
| 11:33:05 | 18 | **Q.** **Okay. So prior to the Rio Olympics, you had** |
| 11:33:08 | 19 | **not spoken -- strike that.** |
| 11:33:11 | 20 | **Prior to the Rio Olympics, Scott Blackmun had** |
| 11:33:14 | 21 | **never mentioned Larry Nassar's name to you; correct?** |
| 11:33:17 | 22 | **A.** Correct. |
| 11:33:19 | 23 | **Q.** **When was the first time Scott Blackmun talked** |
| 11:33:22 | 24 | **to you about Larry Nassar?** |
| 11:33:24 | 25 | **A.** I'm sure we had a conversation during the |

66

| | | |
|---|---|---|
| 11:33:27 | 1 | Olympic games in Rio. |
| 11:33:30 | 2 | Q.      Okay.  So you heard from Mr. Sandusky and then |
| 11:33:33 | 3 | you spoke to Mr. Blackmun; correct? |
| 11:33:35 | 4 | A.      That's probably correct. |
| 11:33:38 | 5 | Q.      Okay.  Did Mr. Blackmun tell you that he knew |
| 11:33:40 | 6 | about the allegations about Dr. Nassar? |
| 11:33:43 | 7 | A.      He did not. |
| 11:33:43 | 8 | Q.      What did he say? |
| 11:33:46 | 9 | A.      We were all surprised by the article in the |
| 11:33:52 | 10 | Indianapolis Star, and so I don't recall the specific |
| 11:33:57 | 11 | conversation, but I'm sure that -- you know, that we |
| 11:34:01 | 12 | talked about what had been revealed in that article. |
| 11:34:06 | 13 | Q.      Okay.  And so when -- just to make sure we're |
| 11:34:09 | 14 | talking about the same thing. |
| 11:34:10 | 15 | The article involving Rachael Denhollander |
| 11:34:13 | 16 | disclosing that she had been sexually abused by Larry |
| 11:34:17 | 17 | Nassar in September of 2016 is the article you're |
| 11:34:19 | 18 | referring to; correct? |
| 11:34:21 | 19 | A.      I'm referring to an article that appeared in |
| 11:34:26 | 20 | the Indianapolis Star, and I believe it appeared while |
| 11:34:29 | 21 | we were in Rio at the Olympic games -- |
| 11:34:32 | 22 | Q.      Okay. |
| 11:34:32 | 23 | A.      -- but I'm not certain of the dates. |
| 11:34:33 | 24 | Q.      Have you ever heard the name Rachael |
| 11:34:35 | 25 | Denhollander? |

EXHIBIT 10
010

**Probst, Larry**
**Nassar Cases**

| | | |
|---|---|---|
| 11:34:36 | 1 | A.      Yes. |
| 11:34:36 | 2 | Q.      **And do you know that she was the first public** |
| 11:34:38 | 3 | **accuser of Larry Nassar?** |
| 11:34:47 | 4 | A.      Okay.  I'm not sure that she was the first |
| 11:34:54 | 5 | person.  But if you're suggesting that, fine. |
| 11:34:59 | 6 | Q.      Okay.  **Is there somebody else that comes to** |
| 11:35:00 | 7 | **mind?** |
| 11:35:01 | 8 | A.      No. |
| 11:35:03 | 9 | Q.      Okay.  **So you read the article after** |
| | 10 | **Mr. -- did you read the article after Mr. Sandusky asked** |
| | 11 | **you -- or told you this information?** |
| 11:35:14 | 12 | A.      I can't specifically recall reading the |
| 11:35:17 | 13 | article. |
| 11:35:18 | 14 | Q.      Okay.  **But regardless, at some point you spoke** |
| 11:35:22 | 15 | **with Scott Blackmun; correct?**  **Shortly thereafter.** |
| 11:35:26 | 16 | A.      I'm sure that we had a conversation after that |
| 11:35:28 | 17 | article was published. |
| 11:35:30 | 18 | Q.      Okay.  **Did you talk to Steve Penny at the Rio** |
| 11:35:32 | 19 | **Olympics about it?** |
| 11:35:34 | 20 | A.      No. |
| 11:35:35 | 21 | Q.      **Why not?** |
| 11:35:37 | 22 | A.      I didn't have much interaction with Steve |
| 11:35:39 | 23 | Penny. |
| 11:35:41 | 24 | Q.      Okay.  **But it -- the allegation was that a** |
| 11:35:46 | 25 | **doctor at USA Gymnastics was molesting gymnasts;** |

68

EXHIBIT 10
011

11:35:51 1   correct?  That's what you understood the allegation to

11:35:54 2   be?

11:35:55 3   A.      I don't recall specifically what was in that

11:35:57 4   article.

11:35:59 5   Q.      Okay.  Did you have any understanding that it

11:36:01 6   had to do with Larry Nassar molesting gymnasts?

11:36:06 7   A.      My recollection is that's what was in that

11:36:09 8   article.  But I'm not certain that I read the article

11:36:12 9   while I was in Rio.

11:36:14 10   Q.      Okay.  Given that Mr. Sandusky had, you know,

11:36:21 11   heard about this article and had presented it to you.

11:36:24 12   You understood it had something to do with either USA

11:36:27 13   Gymnastics or the United States Olympic Committee and an

11:36:32 14   Olympic doctor; correct?

11:36:35 15   A.      Our understanding was that it was specifically

11:36:38 16   about USA Gymnastics.

11:36:41 17   Q.      Okay.  And so what I'm asking is when you

11:36:46 18   heard that it had something to do with USA Gymnastics,

11:36:50 19   did you speak with anybody at USA Gymnastics about, you

11:36:52 20   know, what's going on?

11:36:53 21   A.      I did not.  Not my job.

11:36:55 22   Q.      Okay.

11:36:55 23   A.      That's Scott Blackmun's job.

11:36:59 24   Q.      So going back to when you spoke to

11:37:01 25   Mr. Blackmun after you got this information.  Did you

EXHIBIT 10
012

| | | |
|---|---|---|
| 11:43:06 | 1 | Q.        Sure. |
| 11:43:07 | 2 | So prior to September of 2016, if an employee |
| 11:43:12 | 3 | of USOC had received information about childhood sexual |
| 11:43:17 | 4 | abuse, would you have expected them to report that to |
| 11:43:22 | 5 | law enforcement? |
| 11:43:24 | 6 | MS. KUBOTA:  Same objection. |
| 11:43:26 | 7 | THE WITNESS:  I would -- I would expect them |
| 11:43:29 | 8 | to instruct the person who provided that information to |
| 11:43:36 | 9 | report it to law enforcement. |
| 11:43:39 | 10 | MR. CUNNY:  Q.  Okay.  But my question was |
| 11:43:42 | 11 | a little more specific as to the actual USOC member. |
| 11:43:46 | 12 | Would you have expected them personally to |
| 11:43:48 | 13 | have reported that to law enforcement? |
| 11:43:51 | 14 | MS. KUBOTA:  Objection. |
| 11:43:51 | 15 | I think you misspoke.  I think you said |
| 11:43:53 | 16 | "member."  There -- I mean, there are members, but your |
| 11:43:56 | 17 | first question was employee. |
| 11:43:57 | 18 | MR. CUNNY:  Q.  Okay.  Yeah.  So what I'm |
| 11:44:00 | 19 | asking is specifically about that USOC employee who |
| 11:44:02 | 20 | received that information.  Would you have expected |
| 11:44:04 | 21 | that employee specifically to have made a report to |
| 11:44:07 | 22 | law enforcement? |
| 11:44:09 | 23 | MS. KUBOTA:  Objection.  Lack of foundation. |
| 11:44:10 | 24 | Incomplete hypothetical. |
| 11:44:16 | 25 | THE WITNESS:  If they received that |

75

EXHIBIT 10
013

| | | |
|---|---|---|
| 11:44:19 | 1 | information from the CEO of an NGB, I would expect them |
| 11:44:25 | 2 | to instruct that individual to report it to law |
| 11:44:27 | 3 | enforcement. |
| 11:44:28 | 4 | MR. CUNNY:  Q.  And -- okay.  And |
| 11:44:29 | 5 | that's -- that wasn't -- respectfully, that wasn't |
| 11:44:32 | 6 | my question. |
| 11:44:32 | 7 | My question is if an employee of USOC received |
| 11:44:35 | 8 | the information, regardless of where they received it |
| 11:44:37 | 9 | from, would you have expected them personally to have |
| 11:44:40 | 10 | reported it to law enforcement? |
| 11:44:43 | 11 | MS. KUBOTA:  Same objections. |
| 11:44:46 | 12 | THE WITNESS:  I suspect that that would be one |
| 11:44:53 | 13 | approach that could be taken. |
| 11:44:56 | 14 | MR. CUNNY:  Q.  Okay.  So that employee, |
| 11:45:04 | 15 | if they receive that information, reporting to law |
| 11:45:07 | 16 | enforcement would be one of several things they |
| 11:45:10 | 17 | could do; correct? |
| 11:45:11 | 18 | A.      Yes. |
| 11:45:12 | 19 | **Q.      And you wouldn't necessarily expect them to** |
| 11:45:15 | 20 | **report to law enforcement; right?** |
| 11:45:17 | 21 | A.      I think it depends on the circumstances. |
| 11:45:22 | 22 | **Q.      What specific facts or information would it** |
| 11:45:24 | 23 | **depend upon?** |
| 11:45:25 | 24 | MS. KUBOTA:  Objection.  Incomplete |
| 11:45:27 | 25 | hypothetical.  Lack of foundation. |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 10
014

**Probst, Larry**
**Nassar Cases**

| | | |
|---|---|---|
| 11:45:30 | 1 | THE WITNESS:  Again, if an NGB CEO -- and in |
| 11:45:36 | 2 | this particular case, if Steve Penny reported to Scott |
| 11:45:40 | 3 | Blackmun that there was an issue in his organization, I |
| 11:45:47 | 4 | would have expected Scott Blackmun to say, "You need to |
| 11:45:50 | 5 | report that directly to law enforcement immediately." |
| 11:45:53 | 6 | MR. CUNNY:  Q.  Okay.  But you wouldn't |
| 11:45:54 | 7 | have expected Scott Blackmun to report it himself; |
| 11:45:57 | 8 | correct? |
| 11:45:58 | 9 | A.       Correct. |
| 11:46:02 | 10 | Q.       Do you know what Scott Blackmun did to ensure |
| 11:46:05 | 11 | Mr. Penny reported to law enforcement? |
| 11:46:08 | 12 | A.       I do not. |
| 11:46:08 | 13 | Q.       Do you know if Scott Blackmun in any way |
| 11:46:10 | 14 | instructed Mr. Buendorf, the chief of security at USOC, |
| 11:46:15 | 15 | to follow up on it? |
| 11:46:16 | 16 | A.       I do not. |
| 11:46:17 | 17 | Q.       Do you know what information Scott Blackmun |
| 11:46:19 | 18 | got from Steve Penny?  Regarding -- |
| 11:46:24 | 19 | A.       Not specifically. |
| 11:46:25 | 20 | Q.       Okay.  Do you know if there were |
| 11:46:26 | 21 | communications between Scott Blackmun and Steve Penny? |
| 11:46:30 | 22 | A.       I don't have any details on that. |
| 11:46:31 | 23 | Q.       Do you know if Scott Blackmun was ever |
| 11:46:33 | 24 | contacted by law enforcement regarding Steve Penny's |
| 11:46:36 | 25 | report? |

77

EXHIBIT 10
015

| | | |
|---|---|---|
| 01:25:02 | 1 | Mr. Sykes -- is he the CEO of the organizing |
| 01:25:05 | 2 | committee that you're aware of? |
| 01:25:10 | 3 | A.      He is currently, yes. |
| 01:25:11 | 4 | Q.      And Brian Nelson.  Who is Brian Nelson? |
| 01:25:13 | 5 | A.      I believe he is their counsel. |
| 01:25:15 | 6 | Q.      Oh, okay. |
| 01:25:20 | 7 |         And when you say "their counsel" -- |
| 01:25:21 | 8 | A.      The organizing committee. |
| 01:25:22 | 9 | Q.      Okay.  So the last page of that document, |
| 01:25:25 | 10 | there is a letter from the -- it appears from the United |
| 01:25:30 | 11 | States Olympic Committee based on the address in the top |
| 01:25:34 | 12 | right-hand corner. |
| 01:25:35 | 13 |         Do you see that? |
| 01:25:36 | 14 | A.      Yes. |
| 01:25:37 | 15 | Q.      And have you seen this letter before? |
| 01:25:39 | 16 | A.      No. |
| 01:25:41 | 17 | Q.      So the letter reads "To Whom It May Concern: |
| 01:25:43 | 18 | The United States Olympic Committee, 'USOC,' hereby |
| 01:25:48 | 19 | consents to the use of the trade name United States |
| 01:25:50 | 20 | Olympic and Paralympic Properties, 'USOPP,' in the State |
| 01:25:56 | 21 | of California." |
| 01:25:58 | 22 |         Do you know what the USOPP is? |
| 01:26:02 | 23 | A.      It's the joint venture. |
| 01:26:03 | 24 | Q.      Oh, that's the name of the joint venture? |
| 01:26:05 | 25 | A.      (Nods head.) |

116

EXHIBIT 10
016

**Probst, Larry**
**Nassar Cases**

| | | |
|---|---|---|
| 01:26:06 | 1 | Q.        Okay.   It says "The USOC is one of the two |
| 01:26:12 | 2 | partners in the formation of this legal entity." |
| 01:26:14 | 3 | Do you know how much the -- or what the USOC |
| 01:26:18 | 4 | interest in that entity is, in terms of percentage? |
| 01:26:20 | 5 | Or... |
| 01:26:22 | 6 | A.        It's a joint venture. |
| 01:26:24 | 7 | Q.        Okay.   It says "Accordingly, the USOPP is |
| 01:26:30 | 8 | authorized to use the Olympic trademarks and |
| 01:26:33 | 9 | terminology, both in its name and in doing business." |
| 01:26:36 | 10 | And that's all true and accurate; correct? |
| 01:26:38 | 11 | A.        Yes. |
| 01:26:39 | 12 | Q.        The USOC gave permission to use the marks of |
| 01:26:42 | 13 | the United States -- |
| 01:26:44 | 14 | A.        To the joint venture. |
| 01:26:44 | 15 | Q.        To the joint venture; correct? |
| 01:26:47 | 16 | A.        Correct. |
| 01:26:48 | 17 | Q.        All right. |
| 01:27:03 | 18 | Another document.   I think we're up to 16. |
| 01:27:06 | 19 | THE REPORTER:  That's correct. |
| 01:27:07 | 20 | (Plaintiff's Exhibit 16 marked |
| 01:27:07 | 21 | for identification.) |
| 01:27:07 | 22 | MR. CUNNY:   Q.   Show the marked copy to |
| 01:27:08 | 23 | the witness.   Give two copies for counsel. |
| | 24 | And the question I'm going to pose to you is |
| | 25 | whether or not you've ever seen this document in front of |

117

02:51:11  1   conversation.

02:51:11  2          MR. CUNNY:   Q.   Have you ever learned from

02:51:12  3   any source as to whether Scott Blackmun actually

02:51:16  4   asked Steve Penny -- when Steve Penny told him about

02:51:19  5   the allegation -- Scott Blackmun asked him what the

02:51:25  6   identity of the perpetrator was?

02:51:26  7          MS. KUBOTA:   Objection.   Vague.   Do you

02:51:29  8   understand that?

        9          MS. ROBIE:   Assumes facts.

02:51:33 10          MR. CUNNY:   Q.   Did Scott Blackmun ever

02:51:34 11   ask Steve Penny "Who is the perpetrator?"

02:51:37 12   A.          I have no idea.

02:51:38 13   Q.          Okay.   Well, Scott Blackmun got information

02:51:43 14   that children may have been molested, and he didn't ask

02:51:46 15   the identity of the perpetrator?

02:51:48 16          MS. KUBOTA:   Objection.   That's argumentative.

02:51:49 17   It's been asked and answered.

02:51:52 18          MR. CUNNY:   Q.   You can answer.

02:51:53 19   A.          I don't know.

02:51:54 20   Q.          Okay.   Well did anybody look into that?

02:51:57 21          MS. KUBOTA:   Same objections.   It's

02:51:58 22   argumentative.   You know, we've gone over this ground

02:52:01 23   earlier today.

02:52:04 24          MR. CUNNY:   Q.   Okay.   You can answer.

02:52:06 25   A.          That's the purpose of the Ropes & Gray

                                                              175

EXHIBIT 10
018

02:52:08   1    <u>investigation.</u>

02:52:09   2              MR. CUNNY:  Okay.  That's all I've got.

02:52:13   3              MS. KUBOTA:  So I want to just make a comment

02:52:15   4    about your comments to me earlier today.

02:52:20   5              So I was --

         6              MS. ROBIE:  Ms. Kubota?

02:52:25   7              MS. KUBOTA:  Yes.

         8              MS. ROBIE:  Before you do that, can I ask the

         9    witness one other question?

02:52:28  10              This is Leigh Robie.

02:52:29  11              MS. KUBOTA:  Yes, please.

        12                    FURTHER EXAMINATION

        13    BY MS. ROBIE:

02:52:31  14    <u>**Q.       Mr. Probst, when did Mr. Penny go to law**</u>

02:52:35  15    <u>**enforcement?**</u>

02:52:36  16              MS. KUBOTA:  I'm going to object for lack of

02:52:37  17    foundation.

02:52:41  18              THE WITNESS:  Do you want me to answer it?

02:52:42  19              MS. KUBOTA:  Yeah, go ahead.  I mean, if you

02:52:43  20    know.

02:52:44  21              <u>THE WITNESS:</u>  <u>I answered this multiple times.</u>

02:52:45  22              <u>My understanding is that it took Mr. Penny</u>

02:52:49  23    <u>five weeks to notify law enforcement after the</u>

02:52:57  24    <u>conversation that he first had with Scott Blackmun in</u>

02:52:59  25    <u>the summer of 2015.</u>

EXHIBIT 10
019

1               CERTIFICATE OF REPORTER

2

3          I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

4     Shorthand Reporter in and for the State of California, do

5     hereby certify:

6          That prior to being examined, the witness named

7     in the foregoing deposition was by me duly sworn to

8     testify to the truth, the whole truth, and nothing but

9     the truth.

10         That said deposition was taken before me at the

11    time and place set forth and was taken down by me in

12    shorthand and thereafter reduced to computerized

13    transcription under my direction and supervision, and I

14    hereby certify the foregoing deposition is a full, true

15    and correct transcript of my shorthand notes so taken.

16         And I further certify that I am neither counsel

17    for nor related to any party to said action nor in any

18    way interested in the outcome thereof.

19         IN WITNESS WHEREOF, I have hereunto subscribed

20    my name this 14th day of November, 2018.

21

22

23

24    _____

25         DEBRA J. SKAGGS, CSR No. 7857

EXHIBIT 10
020

# EXHIBIT "11"

 

Statement of

Rick Adams
Chief of Paralympic Sport and National Governing Body Organizational Development
United States Olympic Committee

before the

Committee on the Judiciary
United States Senate

hearing on

Protecting Young Athletes from Sexual Abuse
March 28, 2017

Good morning Chairman Grassley, Senator Feinstein, and members of the Committee. I am Rick Adams, and I serve as the Chief of Paralympic Sport and National Governing Body Organizational Development for the United States Olympic Committee. My responsibilities include the Olympic Committee's oversight and management of our SafeSport initiative. SafeSport is the term that we use for our ongoing efforts to strengthen the Olympic and Paralympic communities' response to issues related to sexual and other abuse of athletes, including young athletes.

The stories of abuse that we have heard today and elsewhere are appalling, disheartening, and unacceptable. The Olympic community failed the people it was supposed to protect. The U.S. Olympic Committee leads the diverse network of Olympic sports organizations in the United States, and we must therefore take responsibility for its failures. We do take responsibility, and we apologize to any young athlete who has ever faced abuse.

We recognize the difficulty of stepping forward to share your stories, and it is our obligation to build on your courage and bravery to make real and lasting changes. That includes changes to our policies and protocols, and also changes to the environment that discouraged victims from reporting abuse. We must look for ways to improve protections for young athletes, and we are grateful for this Committee's interest in being a leader in that effort.

The U.S. Olympic Committee recently reached an important milestone in our effort to protect athletes with the launch of the U.S. Center for SafeSport at the beginning of this month. The launch of the Center is the most recent step in our seven-year effort to implement reforms directed at preventing sexual and other abuse of youth athletes in the Olympic community.



EXHIBIT
13
ADAMS
PENGAD 800-631-6989

EXHIBIT 4
001

2

The Center for SafeSport will be responsible for investigating and resolving allegations of sexual abuse associated with the National Governing Bodies, which are the 47 independent entities recognized by the U.S. Olympic Committee to manage the training and development in each Olympic or Pan American sport. The Center's activities will be guided by a SafeSport Code, which I have appended to my testimony, that covers everything from harassment and hazing to physical and sexual misconduct.

The U.S. Olympic Committee requires each National Governing Body to participate in the Center for SafeSport as a condition of being recognized by the U.S. Olympic Committee. Now that the Center is open – and the U.S. Olympic Committee's policies and procedures related to the Center are now effective – the governing bodies are in the process of amending their individual bylaws to require allegations of abuse to be reported to the Center. We anticipate that all National Governing Bodies will complete this process in the coming weeks. Many have already completed the process and are now obligated and prepared to send allegations of abuse to the Center.

The U.S. Olympic Committee's regular and periodic audits of the independent National Governing Bodies include auditing of the organizations' compliance with the requirements of SafeSport. Additionally, we are announcing today that we are in the process of selecting an independent auditor to conduct a unique one-time audit of all National Governing Bodies and the Committee itself to ensure that the new SafeSport requirements have been fully implemented across the Olympic and Paralympic community.

The approach that we have taken with the Center for SafeSport is similar to the approach that we previously adopted in establishing the U.S. Anti-Doping Agency in 1999. The U.S. Anti-Doping Agency has been very successful at concentrating expertise and ensuring independence in investigations of doping issues. By following this model in the creation of the U.S. Center for SafeSport, we will also bring expertise and independence to our efforts to prevent abuse of youth athletes.

We strongly support S. 534, the Protecting Young Victims from Sexual Abuse Act, which was introduced by the Chairman, the Ranking Member, and a number of additional Senators a few weeks ago, and the goals that it advances. The key provisions of the bill require National Governing Bodies and their personnel to report suspected incidents of child abuse and sexual abuse to law enforcement. This requirement complements the rules that the U.S. Olympic Committee established in the SafeSport program. It is important to us that this legislation complements our efforts and permits us to continue to implement the structural reforms we have adopted.

Specifically, under section 8.7(l) of the U.S. Olympic Committee's bylaws, each National Governing Body must comply with the Committee's policies related to SafeSport and, additionally, the policies and procedures of the U.S. Center for SafeSport. These provisions require all National Governing Bodies and their personnel to report suspected sexual abuse to the Center and to law enforcement. The Center has exclusive authority within the Olympic community to investigate and resolve violations involving sexual misconduct. Additionally, the Center has discretionary authority to assume responsibility for the investigation and resolution of

EXHIBIT 4
002

other violations of the Code; if not exercised, the applicable governing body retains the authority and obligation to investigate and resolve the allegation.

In addition to the Code, the U.S. Center for SafeSport has adopted practices and procedures and procedural rules for arbitration that govern its investigation and resolution of alleged violations. These important procedural improvements centralize and clarify the process by which allegations of abuse are investigated and resolved.  By adopting clear procedures that apply to all investigations by the Center, we seek to ensure a fair process that permits swift actions to protect children.

Mr. Chairman and Senator Feinstein, we appreciate your leadership in this area.  A single instance of child or sexual abuse is one too many.  With the launch of the U.S. Center for SafeSport, we have dramatically reformed and improved the Olympic and Paralympic communities' ability to prevent abuse and strengthened the protections that we can jointly achieve for young athletes.

**U.S. Olympic Committee and National Governing Bodies**

The U.S. Olympic Committee was founded in 1894.  It serves as both the National Olympic Committee and National Paralympic Committee for the United States.  The Olympic Committee is responsible for the training and funding of U.S. teams for the Olympic, Paralympic, Youth Olympic, Pan American, and Parapan American Games, and serving as a steward of the Olympic movement throughout the country.

In 1978, the Amateur Sports Act (now called the Ted Stevens Olympic and Amateur Sports Act) appointed the U.S. Olympic Committee as the coordinating body for all Olympic athletic activity in the United States.  Pursuant to the statute, the U.S. Olympic Committee supports athletes through funding, health insurance, tuition grants, marketing opportunities, and career services. The Committee supports the Olympic Training Centers and Olympic Training Sites for athletic training, conditioning, sports medicine, and nutrition assistance.  The Committee also oversees the process by which U.S. cities bid to host the Olympic and Paralympic Games, the Youth Olympic Games, and the Pan/Parapan American Games.

The Ted Stevens Act also authorizes the U.S. Olympic Committee to recognize a National Governing Body for any sport that is included in the various Olympic Games.  The Olympic Committee may recognize only one such governing body for each sport (except as it may relate to the Paralympics).  Once selected, that organization takes on a number of obligations related to amateur athletic activity in that sport in the United States, including sanctioning and conducting competitions, and recommending teams to represent the United States in the Olympic Games. The National Governing Bodies also oversee the training and development of athletes in their respective sports.

Today, there are 47 organizations that have been recognized by the U.S. Olympic Committee as National Governing Bodies.  There is a large degree of variation among these 47 independent organizations.  For example, U.S. Soccer manages national soccer activities that range from local recreational soccer programs for children to the U.S. National Men's and Women's soccer teams. These diverse soccer programs include thousands of coaches and officials and hundreds of

EXHIBIT 4
003

4

thousands of athletes.  Olympic activity, therefore, is a small part of U.S. Soccer's focus and activities.  Conversely, USA Pentathlon is a smaller organization and Olympic activities are a primary focus of the organization.

Because each National Governing Body is the primary organization that manages and oversees the activities of coaches and athletes, each organization has its own rules and procedures related to athletes and coaches.  On key areas of governance, however, the U.S. Olympic Committee uses its designation authority under the Ted Stevens Act to require each National Governing Body to adopt certain standards.  And in challenging areas that affect the entire Olympic community, we have gone even further to establish entities that are independent of any individual National Governing Body and dedicated to addressing specific challenging topics.  This is the approach that we took in response to doping issues in the late 1990s, and it is the approach we are taking with the U.S. Center for SafeSport today.

**U.S. Center for SafeSport**

The U.S. Olympic Committee has long worked with the National Governing Bodies on efforts to protect youth athletes from sexual and other abuses.  In 2010, the Committee determined that the issue warranted renewed attention following public reports of sexual abuse cases concerning swimmers.  The Committee convened a working group to study the problem and make specific recommendations for improvements to the U.S. Olympic Committee board.  Nina Kemppel, a four-time Olympic skier and current board member of the U.S. Olympic Committee, chaired the working group.  The working group produced six comprehensive recommendations for action by the U.S. Olympic Committee:  Increase its leadership role; lead by example; develop training materials; develop resources for use by local clubs and organizations; standardize services that promote safe training environments; and encourage National Governing Bodies to adopt policies to address sexual and physical misconduct.

Since then, the U.S. Olympic Committee has implemented each of the working group's recommendations.  As it was implementing the working group's recommendations, the U.S. Olympic Committee concluded that the Olympic sports program would benefit from an independent entity dedicated to protecting youth athletes' safety.  In June 2014, the Committee's board approved the creation of an independent SafeSport entity and began the process of establishing the U.S. Center for SafeSport.  In September 2015, the Committee established the Center's nominating and governance committee.  In January 2016, the first board of the Center was seated and held its first meeting.  In June 2016, the Committee's board approved the launch of the Center.  In November 2016, the Center selected its first chief executive officer, Shellie Pfohl, who previously served as the executive director of the President's Council on Fitness, Sports, and Nutrition.  In March 2017, the Center officially opened.

**USA Gymnastics**

Finally, Mr. Chairman and Senator Feinstein, I would like to take a moment to discuss the very serious issues that have been brought to light concerning USA Gymnastics. We share your deep concerns about USA Gymnastics' handling of allegations of abuse, and we supported Steve Penny's decision to resign.  We hope that his resignation will offer an opportunity for the organization to implement significant change.  The abuse should have been detected, it should

EXHIBIT 4
004

5

have been prevented, and it should have been promptly reported. The Olympic community failed and must do better.

The Center for SafeSport seeks to address one of the issues that this case highlights: The barriers and disincentives that victims may face when seeking to report abuse. The Center creates an independent path for reporting and an independent system for investigating and resolving cases of sexual abuse. With the Center, we have created a system that removes the investigation and resolution of allegations of sexual abuse from the control of any National Governing Body, including USA Gymnastics, and a resource dedicated to education and awareness of the importance of reporting abuse. We believe that these changes will significantly improve the protection of youth athletes from sexual and other abuses.

Our work in this area will never be done. We must continue to look for ways to protect our young athletes. We will be open to new ideas and approaches. We will continue to look for additional ways to strengthen protections, including supporting your important legislation to require National Governing Bodies and associated personnel to report allegations of abuse.

*      *      *

Thank you again for the opportunity to be here today, and I would be happy an answer your questions.

EXHIBIT 4
005

# EXHIBIT "12"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

SANTA ANA

Civil Case No. 8:18:cv-01136-JLS-KES

_____

VIDEO DEPOSITION OF RICK ADAMS

September 12, 2018

_____

JANE JD DOE, an individual,

Plaintiff,

vs.

DOE 1, an individual; DOE 2, an Indiana

business entity of form unknown; DOE 3,

an individual; DOE 4, an individual; DOE 5,

an individual; and Does 6 through 500,

Defendants.

_____

1

EXHIBIT 12
001

| | | |
|---|---|---|
| 11:38:06 | 1 | Q    There's an Olympic training center |
| 11:38:09 | 2 | in Colorado Springs? |
| 11:38:10 | 3 | A    Yes. |
| 11:38:10 | 4 | Q    And there is one in Chula Vista, |
| 11:38:13 | 5 | California, correct? |
| 11:38:14 | 6 | A    That's not correct. |
| 11:38:14 | 7 | Q    So in 2014, USOC did not have an |
| 11:38:21 | 8 | Olympic training center in Chula Vista, |
| 11:38:21 | 9 | California? |
| 11:38:21 | 10 | A    Sorry.  I mis - - I thought you |
| 11:38:21 | 11 | meant now. |
| 11:38:21 | 12 | Q    No. |
| 11:38:24 | 13 | A    I'm sorry.  In 2014 we had a - - |
| 11:38:27 | 14 | Chula Vista was a training center at that point. |
| 11:38:28 | 15 | Q    Okay.  And it's 155 acres, or it was |
| 11:38:34 | 16 | 155 acres? |
| 11:38:34 | 17 | A    It is. |
| 11:38:34 | 18 | Q    And USOC during your tenure had that |
| 11:38:40 | 19 | Olympic training center from whenever you started |
| 11:38:43 | 20 | in that role, up until January of 2017, correct? |
| 11:38:47 | 21 | A    That's correct. |
| 11:38:49 | 22 | Q    So when you say you oversaw the |
| 11:38:52 | 23 | Olympic training centers, what do you mean by |
| 11:38:54 | 24 | that?  And again, you might not have said |
| 11:38:59 | 25 | overseen.  But what was your role with respect to |

EXHIBIT 12
002

| | | |
|---|---|---|
| 11:50:36 | 1 | A    They were in charge - - they were |
| 11:50:39 | 2 | charged with, you know, overseeing all - - all of |
| 11:50:43 | 3 | the operations at their particular facility, |
| 11:50:48 | 4 | which would, you know, be - - would be |
| 11:50:51 | 5 | programming, housing, food service.  You know, |
| 11:50:57 | 6 | all of the various things that occur at a |
| 11:51:00 | 7 | training center, they would ultimately be |
| 11:51:02 | 8 | responsible for. |
| 11:51:03 | 9 | Q    Okay.  Things like garbage service, |
| 11:51:06 | 10 | janitorial, staffing? |
| 11:51:09 | 11 | A    Yes. |
| 11:51:09 | 12 | Q    When you first began in that role |
| 11:51:14 | 13 | we're talking about in 2014, how many employees |
| 11:51:21 | 14 | were based out of the Chula Vista office? |
| 11:51:26 | 15 | A    I believe the number is somewhere |
| 11:51:30 | 16 | in the 25 to 30 range. |
| 11:51:33 | 17 | Q    And when we talk about those |
| 11:51:38 | 18 | employees, does that 25 to 30 include all higher |
| 11:51:45 | 19 | level employees, like Mr. Lamb, all the way down |
| 11:51:49 | 20 | to cleaning crews and, you know, maybe volunteers, |
| 11:51:56 | 21 | things like that?  Or better question, who does |
| 11:51:59 | 22 | that 25 to 30 range encompass? |
| 11:52:03 | 23 | A    It would encompass all the |
| 11:52:06 | 24 | employees, meaning senior management to, you |
| 11:52:11 | 25 | know, food service staff.  It would not include |

59

EXHIBIT 12
003

| | | |
|---|---|---|
| 11:52:15 | 1 | volunteers. |
| 11:52:17 | 2 | **Q     Would it be common for USOC to staff** |
| 11:52:25 | 3 | **the Chula Vista Training Center during the time** |
| 11:52:28 | 4 | **you started overseeing it, when you began in 2014,** |
| 11:52:33 | 5 | **with several volunteers?** |
| 11:52:35 | 6 | A     I do not think that would be |
| 11:52:38 | 7 | common. |
| 11:52:38 | 8 | Q     Okay.  Did it have - - the Chula |
| 11:52:42 | 9 | Vista Training Center at that time, did it have an |
| 11:52:44 | 10 | intern program for medical students at the |
| 11:52:47 | 11 | facility? |
| 11:52:48 | 12 | A     I don't know that. |
| 11:52:50 | 13 | Q     Who would know that information? |
| 11:52:54 | 14 | A     My best guess would be that Bill |
| 11:52:57 | 15 | Moreau would know that or HR. |
| 11:53:00 | 16 | Q     Would Mr. Lamb know that? |
| 11:53:04 | 17 | A     He would know that. |
| 11:53:09 | 18 | Q     So with respect to the training |
| 11:53:12 | 19 | center in Chula Vista, the 25 to 30 employees, |
| 11:53:21 | 20 | would they get paid directly from headquarters in |
| 11:53:27 | 21 | Colorado Springs, or was there a separate account |
| 11:53:31 | 22 | or something in California that they get paid |
| 11:53:34 | 23 | from? |
| 11:53:35 | 24 | A     I don't - - I don't know if there |
| 11:53:37 | 25 | was a separate account.  I would believe they |

EXHIBIT 12
004

| | | |
|---|---|---|
| 11:53:43 | 1 | were paid out of Colorado Springs, but it's not |
| 11:53:46 | 2 | something I'm really familiar with. |
| 11:53:49 | 3 | **Q       Who would know that information?** |
| 11:53:50 | 4 | A       Human resources at the USOC would |
| 11:53:54 | 5 | know that. |
| 11:53:54 | 6 | **Q       Did the training center in Chula** |
| 11:54:00 | 7 | **Vista have its own human resources department?** |
| 11:54:04 | 8 | A       It did not. |
| 11:54:07 | 9 | **Q       Did the USOC pay various employment** |
| 11:54:14 | 10 | **taxes to the State of California on behalf of** |
| 11:54:17 | 11 | **those employees?** |
| 11:54:17 | 12 | A       I don't know that. |
| 11:54:19 | 13 | **Q       Again, who would I contact to get** |
| 11:54:22 | 14 | **that information?** |
| 11:54:22 | 15 | A       I would - - I would go to - - I |
| 11:54:26 | 16 | think HR could get it, but it would probably - - |
| 11:54:30 | 17 | I would say through finance, through people in |
| 11:54:33 | 18 | payroll. |
| 11:54:34 | 19 | **Q       So at some point, USOC sold the** |
| 11:54:54 | 20 | **Chula Vista Training Center, correct?** |
| 11:54:57 | 21 | A       Yes. |
| 11:54:57 | 22 | **Q       And does January of 2017 sound about** |
| 11:55:01 | 23 | **right?** |
| 11:55:01 | 24 | A       It does. |
| 11:55:03 | 25 | **Q       Were you involved with the sale of** |

61

EXHIBIT 12
005

| | | |
|---|---|---|
| 11:55:05 | 1 | that training center? |
| 11:55:06 | 2 | A     I was. |
| 11:55:06 | 3 | Q     Okay.  And that was sold to the City |
| 11:55:08 | 4 | of Chula Vista? |
| 11:55:10 | 5 | A     It was. |
| 11:55:11 | 6 | Q     And when it was sold to the City of |
| 11:55:18 | 7 | Chula Vista, it then became a USOC training site, |
| 11:55:22 | 8 | correct? |
| 11:55:22 | 9 | A     It did. |
| 11:55:23 | 10 | Q     Did USOC maintain employees at that |
| 11:55:30 | 11 | USOC training site? |
| 11:55:31 | 12 | A     We did. |
| 11:55:32 | 13 | Q     The same 25 to 30 employees? |
| 11:55:36 | 14 | A     No. |
| 11:55:36 | 15 | Q     Fewer? |
| 11:55:38 | 16 | A     It's fewer. |
| 11:55:40 | 17 | Q     And how many fewer are we talking? |
| 11:55:45 | 18 | A     I believe the number now is in the |
| 11:55:48 | 19 | ten to twelve range. |
| 11:55:49 | 20 | Q     Again, that excludes any volunteers? |
| 11:55:53 | 21 | A     It does. |
| 11:55:54 | 22 | Q     And it's my understanding that when |
| 11:55:58 | 23 | it was a training center, there was a medical |
| 11:56:01 | 24 | clinic or facility at that training center, |
| 11:56:05 | 25 | correct? |

62

EXHIBIT 12
006

| | | |
|---|---|---|
| 11:57:16 | 1 | back to your oversight over those individual |
| 11:57:19 | 2 | directors, what sorts of things were you doing to |
| 11:57:23 | 3 | help them manage those facilities?  I guess, were |
| 11:57:27 | 4 | you working on personnel issues?  Were you working |
| 11:57:30 | 5 | on growth and sponsorship issues or something |
| 11:57:33 | 6 | else? |
| 11:57:34 | 7 | A    It was - - it was essentially just |
| 11:57:37 | 8 | working with them on any areas that they - - you |
| 11:57:41 | 9 | know, they deemed to either have questions in or |
| 11:57:47 | 10 | challenges.  You know, I was there in a |
| 11:57:50 | 11 | supervisory role to support them in the |
| 11:57:52 | 12 | operations of running their - - you know, their |
| 11:57:56 | 13 | training centers. |
| 11:57:57 | 14 | Q    And those training centers weren't |
| 11:58:01 | 15 | independently incorporated, were they? |
| 11:58:04 | 16 | A    I don't know that. |
| 11:58:05 | 17 | Q    Do you know who would know that |
| 11:58:09 | 18 | information? |
| 11:58:10 | 19 | A    I would guess that our legal - - |
| 11:58:14 | 20 | you know, our legal team should know that. |
| 11:58:16 | 21 | Q    Those 25 to 30 employees we |
| 11:58:34 | 22 | discussed, does that include independent |
| 11:58:39 | 23 | contractors that would be brought in for various |
| 11:58:42 | 24 | services or does that exclude them? |
| 11:58:45 | 25 | A    In my - - in my opinion, when I |

64

| | | |
|---|---|---|
| 11:58:49 | 1 | give you the number, I'm excluding them. |
| 11:58:52 | 2 | Q    Okay.  So say like, for example, |
| 11:58:58 | 3 | Cintas comes in and cleans the kitchen.  You're |
| 11:59:01 | 4 | not counting them in those 25 to 30 people? |
| 11:59:04 | 5 | A    No. |
| 11:59:04 | 6 | Q    Were there any other job duties you |
| 11:59:12 | 7 | had in managing those individuals at the - - who |
| 11:59:16 | 8 | were directors of the training centers that we |
| 11:59:22 | 9 | haven't discussed already? |
| 11:59:23 | 10 | A    No. |
| 11:59:23 | 11 | Q    And was that duty in addition to |
| 11:59:28 | 12 | what you were already doing in your prior job, or |
| 11:59:31 | 13 | was that a standalone new set of responsibilities? |
| 11:59:35 | 14 | A    That was in addition to what I had |
| 11:59:37 | 15 | been doing. |
| 11:59:38 | 16 | Q    Okay.  And again, did you take over |
| 11:59:40 | 17 | for anybody - - actually, I think we discussed |
| 11:59:43 | 18 | that.  Yeah, you took over for Mike English and |
| 11:59:49 | 19 | Charlie Huebner? |
| 11:59:51 | 20 | A    Yes. |
| 11:59:51 | 21 | Q    And was that their job beforehand to |
| 11:59:56 | 22 | manage the Chula Vista, Lake Placid and Colorado |
| 12:00:01 | 23 | facilities? |
| 12:00:02 | 24 | A    My understanding is that it would |
| 12:00:04 | 25 | have been Mike English's job.  He was solely |

65

EXHIBIT 12
008

| | | |
|---|---|---|
| 12:07:14 | 1 | Q      That contract between Elite Athlete |
| 12:07:20 | 2 | Services and USOC, USOC pays Elite Athlete |
| 12:07:26 | 3 | Services to manage that facility or vice-versa? |
| 12:07:26 | 4 | A      We do not pay them to manage the |
| 12:07:29 | 5 | facility. |
| 12:07:30 | 6 | Q      Okay.  Do they pay you anything, |
| 12:07:31 | 7 | Elite Athlete Services, and by you, I mean USOC, |
| 12:07:36 | 8 | from their management of that facility? |
| 12:07:39 | 9 | A      Not to my knowledge. |
| 12:07:40 | 10 | Q      Does the City of Chula Vista pay or |
| 12:07:44 | 11 | give any royalties to the USOC from that facility |
| 12:07:44 | 12 | currently? |
| 12:07:47 | 13 | A      Not to my knowledge. |
| 12:07:47 | 14 | Q      That facility was a training center |
| 12:07:55 | 15 | prior to you starting in 2014 in that new role, |
| 12:07:59 | 16 | correct? |
| 12:08:00 | 17 | A      Yes. |
| 12:08:00 | 18 | Q      And it was built in the mid '90s, |
| 12:08:03 | 19 | right? |
| 12:08:04 | 20 | A      I believe it was built in 1995. |
| 12:08:12 | 21 | Q      And from 1995 until January of 2017, |
| 12:08:16 | 22 | USOC, did they actually own the land that that |
| 12:08:20 | 23 | training facility was built upon? |
| 12:08:22 | 24 | A      That's my understanding. |
| 12:08:23 | 25 | Q      And did they - - and when I say |

EXHIBIT 12
009

| | | |
|---|---|---|
| 12:08:32 | 1 | they, USOC.  And again, this happened several |
| 12:08:35 | 2 | years before you were there.  But to your |
| 12:08:37 | 3 | knowledge, did USOC pay to have all those |
| 12:08:41 | 4 | buildings built on that property and the |
| 12:08:43 | 5 | facilities created or did some other organization |
| 12:08:48 | 6 | do that? |
| 12:08:48 | 7 | A     I'm just not sure how that happened |
| 12:08:52 | 8 | back then. |
| 12:08:52 | 9 | Q     Okay.  Do you know who would have |
| 12:08:54 | 10 | that information? |
| 12:08:54 | 11 | A     I think - - I think the best |
| 12:08:58 | 12 | resource there would be the City of Chula Vista. |
| 12:09:01 | 13 | Q     Do you know how much USOC purchased |
| 12:09:10 | 14 | that land for? |
| 12:09:11 | 15 | A     I do not. |
| 12:09:12 | 16 | Q     Do you know who they purchased that |
| 12:09:14 | 17 | land from? |
| 12:09:14 | 18 | A     No, I don't. |
| 12:09:15 | 19 | Q     Do you know how much that land was |
| 12:09:18 | 20 | sold for in 2017? |
| 12:09:20 | 21 | A     I believe our agreement with the |
| 12:09:23 | 22 | City was for a dollar. |
| 12:09:25 | 23 | Q     And in selling that for a dollar, |
| 12:09:33 | 24 | did USOC retain rights to train athletes at that |
| 12:09:40 | 25 | facility? |

72

EXHIBIT 12
010

| | | |
|---|---|---|
| 12:09:40 | 1 | A    Yes. |
| 12:09:41 | 2 | Q    Were you a signatory to that land |
| 12:09:48 | 3 | sale? |
| 12:09:50 | 4 | A    I don't think I was.  I - - |
| 12:09:53 | 5 | Q    Okay.  That agreement was with the |
| 12:09:57 | 6 | City of Chula Vista, though? |
| 12:09:59 | 7 | A    I believe the agreement was between |
| 12:10:01 | 8 | the USOC and the City of Chula Vista.  And I just |
| 12:10:06 | 9 | don't recall who - - how many signatures or who |
| 12:10:10 | 10 | was signing what documents. |
| 12:10:16 | 11 | Q    And was it your understanding from |
| 12:10:18 | 12 | 1995 until January of 2017, that the Chula Vista |
| 12:10:25 | 13 | facility was operated solely by USOC, or was there |
| 12:10:31 | 14 | some other organization that came in and ran it |
| 12:10:33 | 15 | for a period of time? |
| 12:10:34 | 16 | A    I'm not aware of anyone else that |
| 12:10:37 | 17 | ran it. |
| 12:10:37 | 18 | Q    You mentioned earlier in some of |
| 12:10:48 | 19 | your experience at the hockey league, East Coast |
| 12:10:53 | 20 | Hockey League, that part of your job duties were |
| 12:10:55 | 21 | to get local involvement into those teams.  You |
| 12:11:04 | 22 | know, teams might want to change cities.  So you |
| 12:11:08 | 23 | worked with individuals who are owners of teams or |
| 12:11:12 | 24 | localities in bringing about interest. |
| 12:11:15 | 25 | Did that same thing occur at the |

73

EXHIBIT 12
011

| | | |
|---|---|---|
| 12:34:03 | 1 | facility that has, you know, housing, |
| 12:34:06 | 2 | transportation, food services, things of that |
| 12:34:08 | 3 | nature. |
| 12:34:08 | 4 | Q       What does G&A stand for? |
| 12:34:12 | 5 | A       General and administrative. |
| 12:34:13 | 6 | Q       Okay.  And now how much money, if |
| 12:34:20 | 7 | any, does USOC put into that facility? |
| 12:34:24 | 8 | A       We invested approximately 3.5 |
| 12:34:29 | 9 | million for training.  Training, again, access to |
| 12:34:36 | 10 | certain amounts of assets there that we can use |
| 12:34:41 | 11 | for athlete housing and field use and all of |
| 12:34:44 | 12 | that. |
| 12:34:44 | 13 | Q       And even now that it's a training |
| 12:34:49 | 14 | site, does USOC maintain offices at that facility? |
| 12:34:54 | 15 | A       I believe there are a couple of the |
| 12:34:58 | 16 | Sport Performance staff that offices there.  So I |
| 12:35:04 | 17 | believe that we do still have a small footprint |
| 12:35:08 | 18 | in that regard. |
| 12:35:09 | 19 | Q       When that center was turned from a |
| 12:35:13 | 20 | center into a site and the land sale occurred - - |
| 12:35:16 | 21 | actually, I'll go back and I'll strike that. |
| 12:35:18 | 22 | The reason that was turned from an |
| 12:35:21 | 23 | Olympic training center into an Olympic training |
| 12:35:24 | 24 | site was because of the land sale.  Do I have that |
| 12:35:28 | 25 | right? |

EXHIBIT 12
012

| | | |
|---|---|---|
| 12:35:28 | 1 | A    Yeah, I think that's reasonable. |
| 12:35:36 | 2 | We don't have any ownership in any of the sites. |
| 12:35:40 | 3 | So I think once we didn't own it, the marks |
| 12:35:47 | 4 | changed from center to site. |
| 12:35:49 | 5 | Q    **Okay.  Okay.  Was there a reason** |
| 12:35:53 | 6 | **that is not - - is the only reason it's not** |
| 12:35:56 | 7 | **considered an Olympic training center anymore is** |
| 12:36:00 | 8 | **because USOC doesn't own it, or was there some** |
| 12:36:04 | 9 | **other decision made that we don't want it to be** |
| 12:36:07 | 10 | **called an Olympic training center?** |
| 12:36:09 | 11 | A    There wasn't any other reasons.  I |
| 12:36:13 | 12 | think it's just a - - it's been the way that |
| 12:36:19 | 13 | sites and centers have historically been.  Those |
| 12:36:22 | 14 | marks have been allocated.  I'm not sure there |
| 12:36:27 | 15 | was some more to it than that. |
| 12:36:29 | 16 | Q    **Other than delegating some of the** |
| 12:36:31 | 17 | **management of the facility to - - is it AGS, AES?** |
| 12:36:38 | 18 | A    It's Elite Athlete Services, EAS. |
| 12:36:41 | 19 | Q    **Yeah.  All right.  Other than** |
| 12:36:42 | 20 | **delegating some of the management functions to** |
| 12:36:46 | 21 | **EAS, does that function any differently than an** |
| 12:36:49 | 22 | **Olympic training center?  Than it did as an** |
| 12:36:54 | 23 | **Olympic training center, I should say?** |
| 12:36:57 | 24 | A    I don't think it would be |
| 12:37:02 | 25 | materially different as a site. |

91

EXHIBIT 12
013

01:43:43   1          Q    Okay.  I'll have you turn to Page 15

01:43:45   2   of that document.  Again, this is Exhibit 9, the

01:43:48   3   2005 to 2008 quadrennial report.  And at the top

01:43:53   4   of Page 15, it says USOC professional staff as of

01:43:58   5   December 31st, 2008.  The USOC has staff offices

01:44:02   6   in six states, Colorado, Michigan, California,

01:44:03   7   Illinois, New York and District of Columbia.

01:44:05   8              Do you see that?

01:44:09   9          A    I do.

01:44:09  10          Q    Okay.  And based on reading this

01:44:13  11   document, and, again, your knowledge inside of the

01:44:18  12   USOC and your years of being there, it references

01:44:21  13   California as having an office.  Do you know what

01:44:24  14   office in December of 2008 this report was

01:44:28  15   referencing?

01:44:29  16          A    I don't.

01:44:30  17          Q    Okay.  Do you know if it was a

01:44:31  18   different office than what was located at Chula

01:44:36  19   Vista?

01:44:36  20          A    I don't.

01:44:37  21          Q    Do you know how long that office was

01:44:40  22   located at Chula Vista for?

01:44:42  23          A    Well, I would assume since 1995,

01:44:48  24   whenever we opened the center, that there would

01:44:51  25   have been officing at the - - at the training

110

EXHIBIT 12
014

| | | |
|---|---|---|
| 01:44:54 | 1 | center. |
| 01:44:54 | 2 | Q    Okay. |
| 01:44:55 | 3 | A    In Chula Vista. |
| 01:44:56 | 4 | Q    Okay.  Got you.  So I'm going to |
| 01:44:59 | 5 | flip ahead a little bit to Page 19.  And at the |
| 01:45:07 | 6 | top of the page, it says a. USOC staff.  It says |
| 01:45:07 | 7 | racial and ethnic comparisons for USOC staff |
| 01:45:14 | 8 | include all job and ethnicity categories according |
| 01:45:19 | 9 | to EEOC guidelines and reporting requirements, as |
| 01:45:22 | 10 | of December 31st, 2008, are as follows. |
| 01:45:27 | 11 | And this has a table that says USOC |
| 01:45:27 | 12 | staff, all job and ethnicity categories, race and |
| 01:45:34 | 13 | ethnicity.  On the left-hand side of the table, it |
| 01:45:36 | 14 | has six different states or cities. |
| 01:45:42 | 15 | Do you see that, the left side of |
| 01:45:47 | 16 | the table? |
| 01:45:47 | 17 | A    Yes. |
| 01:45:47 | 18 | Q    Okay.  And when this refers to |
| 01:45:51 | 19 | staff, it says USOC staff, all job and ethnicity |
| 01:45:56 | 20 | categories.  Do you know if that refers to all |
| 01:45:59 | 21 | employees of USOC or some subset of employees? |
| 01:46:03 | 22 | A    I don't know about that one - - I |
| 01:46:07 | 23 | don't know specifically what that would be |
| 01:46:10 | 24 | defined as. |
| 01:46:11 | 25 | Q    Okay.  Do you know who at USOC |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 12
015

| | | |
|---|---|---|
| 02:38:05 | 1 | Foundation. |
| 02:38:05 | 2 | Q    Do you know if he has any job duties |
| 02:38:07 | 3 | with the USOPF? |
| 02:38:09 | 4 | A    I believe he does, but I don't know |
| 02:38:15 | 5 | the specifics of what those might be. |
| 02:38:17 | 6 | Q    Okay.  When did Mr. Glover leave |
| 02:38:21 | 7 | USOC, to your knowledge? |
| 02:38:22 | 8 | A    To the best of my knowledge, he |
| 02:38:24 | 9 | left in 2016. |
| 02:38:31 | 10 | Q    Okay.  In January of 2014, he was |
| 02:38:37 | 11 | still at the USOC.  Does that sound right? |
| 02:38:42 | 12 | A    That sounds right. |
| 02:38:44 | 13 | Q    Okay.  Do you know a lady named |
| 02:38:48 | 14 | Kristine Walsh? |
| 02:38:49 | 15 | A    I do. |
| 02:38:49 | 16 | Q    And who is Kristine Walsh in terms |
| 02:38:52 | 17 | of her relationship to USOC or USOPF? |
| 02:39:00 | 18 | A    Kristine Walsh works in |
| 02:39:03 | 19 | development, I belive major gifts. |
| 02:39:06 | 20 | Q    With USOC? |
| 02:39:07 | 21 | A    Yes, but I'm not sure - - yeah, the |
| 02:39:12 | 22 | answer is yes. |
| 02:39:13 | 23 | Q    Okay.  Do you know if she works for |
| 02:39:15 | 24 | USOPF? |
| 02:39:17 | 25 | A    That's the part I don't know, how |

146

EXHIBIT 12
016

| | | |
|---|---|---|
| 02:39:19 | 1 | that whole employment - - I don't know how the |
| 02:39:23 | 2 | employment works as between those that are in |
| 02:39:25 | 3 | development.  So I'm not sure exactly how that |
| 02:39:30 | 4 | works with Kristine and the others that work for |
| 02:39:34 | 5 | development. |
| 02:39:34 | 6 | Q     Okay.  Does Kristine live in |
| 02:39:37 | 7 | California? |
| 02:39:37 | 8 | A     Yes. |
| 02:39:38 | 9 | Q     Okay.  Do you know if she's an agent |
| 02:39:41 | 10 | for service of process of the USOPF out in |
| 02:39:45 | 11 | California? |
| 02:39:46 | 12 | A     I don't know. |
| 02:39:46 | 13 | Q     I don't want to re-ask you the same |
| 02:39:59 | 14 | question, but aside from the offices that were |
| 02:40:05 | 15 | held at Chula Vista Training Center or held - - or |
| 02:40:09 | 16 | held at - - are at the Chula Vista Training |
| 02:40:12 | 17 | Center, have you ever been aware of any other |
| 02:40:14 | 18 | offices that USOC had or maintained in the state |
| 02:40:17 | 19 | of California, other than those two individuals |
| 02:40:20 | 20 | who may work out of their home or lease some |
| 02:40:24 | 21 | space? |
| 02:40:25 | 22 | A     I'm not familiar with it.  I would |
| 02:40:27 | 23 | - - I'm not familiar with it, whether we have |
| 02:40:30 | 24 | offices, places other than that. |
| 02:40:32 | 25 | Q     Do you know who the CEO of the USOPF |

147

EXHIBIT 12
017

Adams, Rick
Doe vs. Doe 1

| | | |
|---|---|---|
| 03:01:21 | 1 | at USOC? |
| 03:01:23 | 2 | A    I don't know. |
| 03:01:23 | 3 | (Exhibit 13 was marked for |
| 03:01:23 | 4 | identification.) |
| 03:01:23 | 5 | Q    I'm going to give to you Exhibit 13, |
| 03:01:26 | 6 | which I believe is - - I'll be asking you about |
| 03:01:29 | 7 | it.   I believe it is a copy of testimony you |
| 03:01:33 | 8 | submitted to Congress.   Please look it over and |
| 03:01:38 | 9 | make sure I printed a true and correct copy. |
| 03:02:03 | 10 | A    It appears to be what you have |
| 03:02:06 | 11 | indicated it as. |
| 03:02:06 | 12 | Q    Okay.   And this was a document you |
| 03:02:09 | 13 | submitted to the United States Senate Committee on |
| 03:02:15 | 14 | the Judiciary, correct? |
| 03:02:17 | 15 | A    Yes. |
| 03:02:19 | 16 | Q    And this was in anticipation of a |
| 03:02:23 | 17 | hearing on March 28th, 2017 for a hearing |
| 03:02:27 | 18 | regarding protecting young athletes from sexual |
| 03:02:30 | 19 | abuse? |
| 03:02:30 | 20 | A    Correct. |
| 03:02:31 | 21 | Q    Did you prepare this document or was |
| 03:02:34 | 22 | it prepared by counsel or a combination of both? |
| 03:02:39 | 23 | MR. KAMIN:   Objection, calls for |
| 03:02:40 | 24 | attorney/client privileged information.   I'll |
| 03:02:43 | 25 | instruct my client not to answer. |

163

EXHIBIT 12
018

| | | |
|---|---|---|
| 03:02:45 | 1 | BY MR. CUNNY: |
| 03:02:45 | 2 | Q    Okay.   When you - - did you |
| 03:02:56 | 3 | personally submit this document to the Committee |
| 03:03:01 | 4 | on the Judiciary? |
| 03:03:03 | 5 | A    Help me understand.   What does that |
| 03:03:08 | 6 | mean? |
| 03:03:08 | 7 | Q    Sure.   So I'm not trying to |
| 03:03:11 | 8 | understand what you talked about with your |
| 03:03:13 | 9 | counsel. |
| 03:03:14 | 10 | MR. KAMIN:  By the way, just for the |
| 03:03:15 | 11 | record, that's the scope of my objection. |
| 03:03:15 | 12 | MR. CUNNY:  Sure. |
| 03:03:17 | 13 | MR. KAMIN:  It's not to suggest he |
| 03:03:19 | 14 | - - you know, this is not his testimony or it was |
| 03:03:21 | 15 | not submitted on his behalf.  Obviously, it was. |
| 03:03:21 | 16 | MR. CUNNY:  Sure. |
| 03:03:21 | 17 | BY MR. CUNNY: |
| 03:03:24 | 18 | Q    So I guess my question is, you had a |
| 03:03:27 | 19 | chance to review this document before it was |
| 03:03:29 | 20 | submitted to the Senate Committee, correct? |
| 03:03:33 | 21 | A    Yes. |
| 03:03:33 | 22 | Q    And you ensured all the information |
| 03:03:37 | 23 | in this document was true and correct before it |
| 03:03:40 | 24 | was submitted, correct? |
| 03:03:41 | 25 | A    Yes. |

EXHIBIT 12
019

| | | |
|---|---|---|
| 04:52:28 | 1 | time, so I don't what - - I don't know what - - I |
| 04:52:31 | 2 | don't know how that transaction came about. |
| 04:52:32 | 3 | Q Okay. Do you know who - - so at |
| 04:52:37 | 4 | that time, you are not yet supervising those |
| 04:52:41 | 5 | managers of the training centers, correct? |
| 04:52:43 | 6 | A Correct. |
| 04:52:43 | 7 | Q And was the Karolyi Ranch a training |
| 04:52:50 | 8 | center or was it a training site? |
| 04:52:50 | 9 | A It was a training site. |
| 04:52:52 | 10 | Q And did USOC, do they have a person |
| 04:52:56 | 11 | who does the due diligence on training sites, in |
| 04:53:00 | 12 | terms of looking at facilities, safety procedures, |
| 04:53:05 | 13 | other sorts of protections for athletes? |
| 04:53:08 | 14 | A We do. |
| 04:53:08 | 15 | Q And who does that? |
| 04:53:10 | 16 | A That is now done by Aron McGuire. |
| 04:53:14 | 17 | Q In 2011, who was that done by? |
| 04:53:19 | 18 | A I believe it would have been done |
| 04:53:22 | 19 | by a lady named Alisha McConnell. |
| 04:53:26 | 20 | Q And does she still work at USOC? |
| 04:53:33 | 21 | A She does not. |
| 04:53:34 | 22 | Q How long ago did she leave? |
| 04:53:37 | 23 | A I believe she left approximately a |
| 04:53:42 | 24 | year ago. |
| 04:53:43 | 25 | Q And do you have any knowledge of |

238

EXHIBIT 12
020

04:53:48  1    that vetting process that was conducted in 2011 or

04:53:53  2    subsequent vetting processes that happened

04:53:55  3    periodically?

04:53:56  4         A    I do not.

04:53:57  5         Q    After a training site is designated

04:54:00  6    a USOC training site, are there subsequent

04:54:03  7    processes to ensure their compliance?

04:54:08  8         A    They submit annual reports.  I

04:54:13  9    believe they are annual.  And there may be - -

04:54:17 10    there may be a quarterly report as well.  But

04:54:19 11    essentially, the report is aggregating

04:54:24 12    information about usage and information that the

04:54:27 13    high performance teams might want to get.

04:54:30 14         Q    Do you know if Ms. McConnell ever

04:54:38 15    reviewed any statements by Ms. Dominique Muchiano

04:54:46 16    prior to evaluating the Karolyi Ranch at the USOC

04:54:51 17    training site?

04:54:52 18              MR. KAMIN:  Objection, beyond the

04:54:54 19    scope.

04:54:54 20              THE WITNESS:  I don't know if that

04:54:55 21    happened.

04:54:56 22    BY MR. CUNNY:

04:54:56 23         Q    Okay.  Have you met Kathy Scanlon?

04:55:06 24         A    The name sounds familiar, but I

04:55:10 25    would need some context.

EXHIBIT 12
021

1    STATE OF COLORADO)

2                    )ss.   REPORTER'S CERTIFICATE

3    COUNTY OF COSTILLA)

4        I, Linda S. Overdeer, do hereby certify that I

5    am Shorthand Reporter and Notary Public within the

6    State of Colorado; that previous to the

7    commencement of the examination, the deponent was

8    duly sworn to testify to the truth.

9        I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth, that it was thereafter reduced

12   to typewritten form, and that the foregoing

13   constitutes a true and correct transcript.

14       I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties

16   or attorneys herein, nor otherwise interested in

17   the result of the within activity.

18       In witness whereof, I have affixed my

19   signature this 21st day of September, 2018.

20

21       My commission expires June 10, 2021.

22

23        LINDA S OVERDEER
          NOTARY PUBLIC
          STATE OF COLORADO
24        NOTARY ID 20054023286
          MY COMMISSION EXPIRES JUNE 10, 2021

25    \                                    Linda S. Overdeer
                                           216 - 16th Street, Suite 650
                                           Denver, Colorado 80202

# EXHIBIT "13"

# Senate Commerce, Science and Transportation Subcommittee on Consumer Protection, Product Safety, Insurance and Data Security Holds Hearing on Protecting Amateur Athletes

LIST OF PANEL MEMBERS AND WITNESSES

MORAN:

Our Subcommittee will come to order. Again, the Ranking Member, Senator Blumenthal is enroute. We've been joined by couple of our colleagues. I'm going to begin with my opening statement.

I apologize to our witnesses and to our audience for tardiness in start time. We had two votes on the Senate floor. I don't think there are further votes this afternoon, so I doubt that we would be intruded any additional time from the Committee.

So, good afternoon. Welcome to today's Subcommittee hearing.

In January, this Subcommittee launched an investigation to examine cultural and systemic issues regarding abuse in the Olympic movement following the horrific revelations that former USA Gymnastics team doctor Larry Nassar sexually abused and assaulted hundreds of athletes over a span of two decades, even well after numerous survivors alerted authorities about his actions.

This Subcommittee, which exercises jurisdiction over the U.S. Olympic Committee and amateur sports, is fully committed to ensuring the health and safety of all American athletes, and today marks the third hearing in our ongoing investigation.

EXHIBIT 13
001

I'd like to first acknowledge the incredible statement made at last week's ESPY Awards, watching over 100 survivors take the stage to accept the Arthur Ashe Courage Award. If any of you haven't had a chance to see that ceremony, I encourage you to do so.

The actions, these brave actions of our young athletes who shed light on their painful pasts have invigorated a national calling for change. And I'm glad to have so many of them with us this afternoon.

Since initiating our bipartisan investigation, this Subcommittee has held two critical hearings in which the Members of the Committee and the American public heard from distinct witness panels on their experiences related to procedural missteps and cultural inaction experienced within these troubled organizations.

In the first hearing, we heard testimony from four survivors of abuse across different Olympic sports who shared personal experiences about the systemic practices that have safeguarded perpetrators - have safeguarded perpetrators, have both inhibited victims from coming forward, and have prevented victims' reports from coming to light.

All of the survivors we've met have highlighted the institutional failures that have allowed these heinous acts to continue, which we recommit ourselves to fixing by being here today.

Once again, I'd like to echo my appreciation for those survivors and the many others who've spoken to us and to our staff regarding their painful experiences.

EXHIBIT 13
002

Their insightful recommendations on what needs to be done to correct these failures are certainly appreciated and continue to be considered as this Committee works toward thoughtful and lasting change.

In the second hearing, we called on former USA Gymnastics CEO Steve Penny, former Women's Program Director of USA Gymnastics, Rhonda Faehn, and former Michigan State University President Dr. Lou Anna (ph) Simon to provide testimony and answer questions on how rampant abuse that took place in the hands of Nassar was able to perpetuate for as long as it did.

I would also like to note that Scott Blackmun, the former President of U.S. Olympic Committee, and Martha Karolyi, the former National Team Coordinator for USA Gymnastics, were invited to attend but declined for medical reasons.

There were a number of significant details that came to light from the questions this Committee posed in that hearing, including USA Gymnastics' mishandling of critical medical records, lack of communication to and within Michigan State University related to sexual abuse reports against their employee, and most significant, the complete lack of cooperation demonstrated by Mr. Penny in his refusal to answer questions.

From these findings, along with continued analysis of lengthy documentation produced by USA Gymnastics, U.S. Olympic Committee and Michigan State University, we continue to pursue answers to many serious questions that remain for the current executives of these organizations.

Most importantly, we expect to hear today which aspects of their systems and cultures have changed, and how they plan to implement serious reforms moving forward.

EXHIBIT 13
003

Joining us today is Mr. John Engler, Interim President of Michigan State University, Ms. Susanne Lyons, the Acting CEO of U.S. Olympic Committee, Ms. Kerry Perry, President and CEO of USA Gymnastics, and Mr. Xiao, Chair of the U.S. Olympic Committee Athlete Advisory Council.

It is my expectation we will receive full cooperation of today's panel in answering the Subcommittee's questions to the best of their abilities.

We are also honored to welcome the Chairman and Ranking Member of the Senate Judiciary Committee, Senator Chuck Grassley of Iowa and Senator Dianne Feinstein of California, to the Subcommittee to provide opening testimony.

Given their leadership and work with Chairman Thune of the Commerce Committee to enact the Protecting Young Victims from Sexual Abuse and SafeSport Authorization Act of 2017, let me also add the Ranking Member of the Commerce Committee, Senator Nelson, their testimony today will be invaluable in helping this Subcommittee further raise awareness and identify solutions that will make a difference.

We have explored U.S. Center for SafeSports in our conversations and we appreciate the role that they do and may play. Let me thank you, Senators, Senator Grassley and Senator Feinstein for your efforts in this regard in the past and the time you've taken to prepare and present your testimony today.

I conclude my opening remarks by emphasizing the bipartisan approach that this Subcommittee has taken in its comprehensive investigation. With the consultation of law enforcement, survivors and advocates, we have worked closely together to identify meaningful reforms in the best interests of athletes and their families.

EXHIBIT 13
004

During Aly Raisman's powerful speech last week at the ESPY Awards, she reminded survivors of abuse. She said "You are not alone."

We are here today to remind all survivors this. We are listening. We are committed to change and we'll make certain the next generation of athletes are free to compete and represent our nation without fear of abuse.

In regard to that bipartisanship, I want to recognize my Ranking Member, Senator Blumenthal and his willingness to work closely with me and Members of this Committee to see that our work is well done.

With that, I recognize Senator Blumenthal for his opening statement.

BLUMENTHAL:

Thank you Senator Moran and thank you for your leadership on this Subcommittee and, most particularly, on this issue.

We had a remarkable event this morning.

We heard voices and saw faces of young athletes of all different ages, all different parts of the country who suffered at the hands of Larry Nassar but equally so at the hands of the United States Olympics Committee and USA Gymnastics and Michigan State University, not only the immediate perpetrator of this unspeakably cruel and brutal criminal conduct but also all of the organizations and individuals who were complicit by their silence or by their looking the other way, which was much easier to do.

EXHIBIT 13
005

Last week, similarly in a remarkable display of unity, resilience, strength, more than a 140 heroic survivors came to the ESPY Awards and they were honored with the Arthur Ashe Award for Courage.

No one better deserves it than they.

These young women have come forth bravely, sacrificing their privacy, fighting through efforts to silence them directly and overtly, stop their voices and then, in effect, re-victimize them.

That's a term of scientific art that has very apt application here. They have been re-victimized by this whole process. And they have risked their athletic careers and reputations to shed light on the heinous crimes committed by Nassar.

But he is only one of numerous perpetrators here.

And the main point is that USOC and USAG in effect prioritized medals and money over athlete safety. They concealed the shocking pervasiveness of abuse across many sports as well as their own woefully inadequate systems to address and prevent it.

And Michigan State University - officials looked the other way while athletes reported abuse over two decades. I am concerned that there has been continuing failure, loopholes and lapses.

And I am also concerned about the efficacy and independence of the U.S. Center for SafeSports, the lack of transparency and responsibility on the part of USOC and USAG, at the most basic level, the amount of empathy and support that officials at MSU have shown for survivors.

EXHIBIT 13
006

At the last press conference we had, before this one, one of the survivors said to me when I asked her, what she would ask if she were sitting here.

And she said she would want to know why wasn't one enough? Why was it two or three or 140 or more, hundreds around the country? Why wasn't one enough for these organizations to take action? And the fact is that there were many, many more than one.

These institutions have to answer to themselves, their own constituencies. They have to answer to history for their glaring failure. The system continues to be badly broken. And now we are at a turning point.

I said this morning when 80 of these wonderful, smart, accomplished athletes each said in introducing herself, USOC and USAG and MSU failed me that I don't want to be at an event in a year or three or five years from now and have the refrain be (ph) and Congress failed me.

We have an obligation to do more and do better.

So we're going to continue with these hearings. And we are going to support action. More than words, action is necessary. As the saying goes, actions speak louder than words. In fact, in this instance, words are not enough. You are not alone but we need to honor your pain with action.

And I want to thank all of you. I look at this audience and I see many of you, the survivors here again. You have not only been brave and passionate but you have been so patient and energetic in this cause.

EXHIBIT 13
007

I also want to mention again, as I did this morning, the role of the press in giving voice to these survivors, organizations like the IndyStar, the New York Times, USA Today deserve our thanks at a time when we need that free press more than ever.

And finally, my thanks again to Senator Moran for his leadership, Chairman Thune, and Ranking Member Nelson and, of course, to the two of our colleagues who will begin today because Senator Feinstein and Senator Grassley have helped to lead this effort.

MORAN:

Senator Blumenthal, thank you very much.

We do now turn to the two senators from the Judiciary Committee, the Chairman, Senator Grassley and the Ranking Member Senator Feinstein.

Senator Grassley, you're recognized for your testimony.

GRASSLEY:

Yes. Well, of course good afternoon and thank you, Mr. Chairman, for convening this hearing and giving Senator Feinstein and me the opportunity to participate.

From my part, as a parent, and as a grandparent, I can think of no issue of greater importance than keeping children safe from sexual predators. The abuse scandal that's the focus of today's hearing is a grim reminder of that fact.

Unfortunately, USA Gymnastics and Michigan State University aren't the only institutions that have made headlines over the years due to sexual abuse of young athletes. Other institutions also have struggled with this issue.

EXHIBIT 13
008

Sexual abuse, in any form, is an especially troubling crime because its victims suffer both physical and mental trauma that can last a lifetime. When the abuse is by a coach or a team doctor and the victim is a minor, the betrayal of the trust is even greater.

When as here, there were adults who were in a position to intervene, but they failed to act, it's a particularly tragic situation.

The doctor you've referred to, Dr. Nassar, the former National Team Doctor for USA Gymnastics, abused hundreds of victims over the period of years. The significant sentences he received ensure that he'll never again hurt a young gymnast or any other child.

But we must do more to prevent these horrific crimes from happening again. Congressional oversight of the FBI falls within the jurisdiction of Senator Feinstein and my Committee.

And after hearing one gymnast's complaint about the FBI's handling of the allegations against Nassar, I wrote the FBI Director to request a briefing on the Bureau's involvement in this case.

My Committee staff spoke with the FBI yesterday, and we were advised that the FBI's handling of this investigation has been referred to the Justice Department Office of Inspector General.

And where I have of - particularly in this office, have respect for the Inspector General, sometimes I see this as a move maybe to protect the FBI from some embarrassment, at least immediate embarrassment.

EXHIBIT 13
009

Our Committee convened its own hearing on the importance of protecting amateur athletes last year. Also last year, I joined Senator Feinstein in introducing the bill entitled Protecting Young Victims from Sexual Abuse and Safe Sports Authorization Act.

This new law requires amateur athletics governing bodies to immediately report suspected sexual abuse to the authorities. Our Judiciary Committee approved this measure and then worked closely with your Committee and Chairman Thune for on additional changes, before the President signed the final version in February.

And I thank this Committee for that cooperation.

The new law also authorizes the U.S. Center for SafeSports to respond to instances of sexual misconduct within the U.S. Olympics and Paralympic community. And since its inception, SafeSport has fielded more than 1,200 misconduct allegations and issued sanctions against 300 individuals.

Its website, safesports.org, has a searchable database that enables the public to find out if someone's been banned from a sport or otherwise disciplined.

Just in the last month, I've convened two other Judiciary Committee hearings on the topic of sexual violence. I've learned that we still need to do more to educate adults who are in a position to protect children. We also must reduce opportunities for predators to exploit victims.

For example, in many or most instances, adult coaches, trainers, and doctors shouldn't be left alone while working with young athletes.

EXHIBIT 13
010

I'll conclude by thanking you again, Chairman Moran, for your leadership on the Consumer Affairs Subcommittee. In holding several hearings on this issue, you've given a voice to people that until lately didn't have a voice or sexual abuse victims.

Thank you.

MORAN:

Senator Grassley, thank you very much. Thank you for your appearance today and your words. Senator Feinstein.

FEINSTEIN:

Thanks very much, Mr. Chairman. Members, thank you for being here.

It was about or it's (ph) well over a year ago that I had a meeting in my conference room with a group of women. And I walked in and Senator Grassley, I looked at faces with expressions that I had never seen before.

And I realized that it was something really serious. And in the course of that discussion, events were related we did a bill. Others joined. That bill has passed and we have taken a giant step forward.

Last week in an extraordinary moment broadcast for the whole world to see, U.S. Olympic Gymnasts, Aly Raisman, Jordyn Wieber, Jamie Dantzscher, along with a 100 athletes took the stage at the ESPY Awards to accept the Arthur Ashe Courage Award. It was an incredibly moving presentation.

EXHIBIT 13
011

And I thought about that time in my office when these frightened faces were in front of me and the survivors, many of whom are here today, radiate today remarkable grace, beauty, and strength.

I wonder if they would stand so that we might recognize them in this hearing room.

(APPLAUSE)

Thank you.

(APPLAUSE)

These Sister Survivors took the stage after having endured hellish abuse over many years. This abuse was compounded by the toll it has taken on them to come forward to tell their story, tell their truth despite certain institutions' repeated attempts to silence them.

Their solidarity and courage in coming forward, I marvel at it.

I've worked with Chairman Grassley, Chairman Thune, Ranking Member Nelson to protect future victims through the Protecting Victims from Sexual Abuse Act. And I so appreciate the support of my colleagues.

But the fact is revelations regarding institutional failures continue to force these victims from having to relive their experience over and over again.

There must be a full and transparent accounting of what Michigan State University, the U.S. Olympic Committee, USA Gymnastics and the FBI all knew and did about Dr. Larry Nassar while he continued to abuse young girls.

EXHIBIT 13
012

Earlier this month, Judiciary Chairman Chuck Grassley, Senator Blumenthal and I wrote a letter to the FBI Director Chris Wray requesting information about why after the FBI received information about Dr. Nassar in July of 2015, the FBI failed to intervene while dozens of athletes continued to be treated and abused by Dr. Nassar.

Similarly, despite reports that officials within Michigan State University, the U.S. Olympic Committee and USA Gymnastics knew that Dr. Nassar was alleged to have abused athletes he was allowed to continue to treat and molest young victims.

Even after Dr. Nassar was finally arrested and prosecuted, hundreds of victims and their parents were never notified, contacted, or informed by these institutions about how they could obtain information about all that had happened to their children.

To this day, many families of these survivors have yet to be contacted by officials at these institutions.

Indeed, it appears that these institutions undertook massive public relations campaigns to preserve themselves rather than rallying to the side of these survivors and their families.

And let me say that is unacceptable.

Last year, when we worked on the Protecting Victims from Sexual Abuse Act, the overarching principle for me was the question of how can we best support and empower survivors.

I believe each of the bill's supporters had the same intention.

EXHIBIT 13
013

Tragically, it does not appear that Michigan State, the USOC, USA Gymnastics or even the FBI adhered to the same guiding principle. Instead there have been disturbing revelations of cover-up and trying to silence vulnerable victims.

Some victims were pressured to sign non-disclosure statements to silence them from coming forward. I and other senators are looking closely at this issue.

Ultimately, these institutions must all continue to re-examine their mission and focus to truly serve as a beacon to lift up the wellbeing of athletes rather than to profit off them and protect the bottom line.

Who can forget when Jessica Howard testified last year in our Committee, Mr. Chairman, that USA Gymnastics officials stated its priority was "Money and medals" and not the wellbeing of young athletes in their care.

As lawmakers, we must make sure, Mr. Chairman, that these institutions are held accountable. So again, I would like to thank you Mr. Chairman, Ranking Member Blumenthal, and particularly, those Members who've taken the time to be here today, and to the Sister Survivors here with us again, I want to say thank you to them.

Thank you, Mr. Chairman.

MORAN:

Senator Feinstein, thank you very much.

I know you and Senator Grassley have a lot on your plate today and I appreciate the emphasis you've placed on the topic that this Subcommittee is paying a lot of attention to (ph).

EXHIBIT 13
014

FEINSTEIN:

Thank you, thanks very much.

MORAN:

You're welcome.

We'll call our other witnesses to the table please.

I call the Honorable John Engler, the Interim President of Michigan State University, Ms. Susanne Lyons, the Acting Chief Executive Officer of the United States Olympic Committee and Ms. Kerry Perry, President and Chief Executive Officer of USA Gymnastics, Mr. Han Xiao, the Chairman of the Athletes' Advisory Council.

(UNKNOWN)

Hi.

MORAN:

Welcome. (OFF-MIKE) President Engler - Governor Engler, we'll start with you. Welcome.

ENGLER:

Well, thank you Mr. Chairman and Ranking Member Blumenthal and Members of the Subcommittee, thank you for your invitation to discuss the important matter of protecting young athletes.

EXHIBIT 13
015

For me, next week will mark six months of service as Interim President, Michigan State. When I arrived on campus, Nassar was already behind bars. His crimes had shocked the MSU community and the nation.

The statements and testimony of survivors before your Subcommittee and the courts have saddened all of us. Our hearts go out to them and we are truly sorry for that a former faculty member perpetrate these crimes through his associations with MSU, USA Gymnastics, the U.S. Olympic Committee and others.

We all failed the survivors.

At MSU, my commitment is to make sure this never happens again. We are seeking to simultaneously deliver what justice and healing we can for the survivors and put strong accountability measures in place to ensure that MSU is safe.

As Senator Blumenthal just stated, actions are critical. I made clear from day one that we would do everything we could to cooperate with the several investigations and to seek to resolve the numerous legal claims.

In May, I was pleased to announce that the MSU Board of Trustees and the many law firms representing more than 300 survivors had agreed to an historic $500 million global settlement. The MSU parties have signed the agreement and it is now being finalized with the signatures of the survivors.

We are proud of this settlement but we have always believed that the legal settlement is only one part of the necessary response. From the start, we've made organizational changes geared toward improving safety and accountability.

EXHIBIT 13
016

Our goal is to make Michigan State a campus that works aggressively to prevent sexual misconduct and assault and if prevention fails, has appropriate procedures in place to respond.

My written testimony details many of the actions we've taken and the progress we are making. Today, I'll touch on some of the most salient points.

Very early on and as a direct response to the abuse Nassar perpetrated, we put strong emphasis on ensuring the protection of minors and indeed everyone that comes to our clinics.

We strengthened and standardized protocols for patient consent for informing patients and parents of their rights and for requiring chaperones in the examination room.

In my first week, I acted to revoke the tenure of William Strampel, the former Dean who failed to supervise Nassar and failed to ensure compliance. Earlier this month, we reached an agreement, severed all of the former Dean's ties to our university.

We realigned our medical education and clinical operations to foster a healthy culture of safety and accountability. One important change, for example, the athletic trainers now report to the medical staff.

In the area of prevention, while MSU policies were found to be comprehensive and robust, we have followed through on a number of expert recommendations to improve the Title IX program as detailed in, again, my written testimony.

Early on, I appointed a Relationship Violence and Sexual Misconduct Expert Advisory Working Group consisting of nationally-recognized faculty and staff subject matter experts on our campus.

EXHIBIT 13
017

The Work Group has been soliciting inputs from across the university community, assessing ideas for improving services and making very specific recommendations that we have already implemented including strengthening our policy on mandatory reporting obligations.

Most recently, I created a new Office of Enterprise Risk Management, Ethics and Compliance. It is charged with overseeing the development of a framework for identifying, prioritizing and managing risk and ensuring that those who are in charge of compliance are doing their job.

For new students, we've improved our summer (ph) orientation programs to focus on the prevention of sexual misconduct. Over 7,400 students have already - incoming students have already been trained.

We also hope to reach into Michigan's high schools with prevention program in the coming school year.

In terms of personnel, we've added or budgeted for more than 30 (ph) new staff positions at the Title IX Office, Counseling and Psychiatric Services, the MSU Sexual Assault Program, Campus Police, and our new Office of Enterprise Risk Management, among others.

Let me just close by saying I'm proud of the way Michigan State community, my alma mater, have come together in this unbelievably difficult time to respond not only in support of the survivors but also to address the urgent issue of sexual misconduct and assault that is a serious challenge not just on every campus but in so many workplaces across America.

EXHIBIT 13
018

MSU is a great global institution, more than 50,000 students, all 50 states, 133 countries. This fall, we will welcome our largest most diverse freshman class in our university's history. While they're settling in the Board of Trustees Search Committee will be moving forward to identify a new President.

In my remaining time, I pledge to continue to implement meaningful reforms, administrative changes that increase safety, accountability and respect on the Michigan State campus.

I hope that our experiences, the lessons we have learned and the solutions we have identified may help other institutions a reckoning with the persistent problems of sexual assault and harassment is clearly enhanced (ph) for many institutions. We owe it to all survivors of the abuse everywhere to dedicate ourselves to finding effective solutions.

Thank you, Mr. Chairman, Ranking Member and Members for the opportunity to be with you today.

MORAN:

Thank you. Ms. Lyons.

LYONS:

Good afternoon Chairman Moran, Ranking Member Blumenthal, and the Members of the Subcommittee.

Last February, I agreed to serve as the Acting CEO of the U.S. Olympic Committee because I felt an obligation to help the organization address the critically important issues of athlete safety and empowerment.

EXHIBIT 13
019

Two weeks ago, we announced that Sarah Hirshland will be the next CEO of the Olympic Committee. She's joining us in the audience today because of the importance of this issue. And she looks forward to working with Congress as she leads and implements the reforms and the initiatives that the Olympic Committee has currently begun.

Like all of you, I was deeply saddened and angered by Larry Nassar's abuse. I heard the stories of victims and survivors in court, before this Committee, and last week in the moving ceremony at the ESPY's and as recently as the press conference today and many of those same athletes, as you know, are joining us in this room.

Some survivors shared stories of seeking help from the Olympic community and finding it unresponsive, needlessly complex, and fraught with risks to their Olympic dreams.

This is appalling and unacceptable. The Olympic community failed the people it was supposed to protect, and I apologize again to each and every one of them, and their families.

I want you to know your voices have been raised and we hear you. We have an obligation to do better and we will do better

When I became CEO, I announced a series of initiatives to address issues of abuse and other structural weaknesses and I'd like to update you on our efforts.

First, we accelerated our efforts with the Center for SafeSport and our own athlete safety programs. We doubled our grant to the Center enabling it to build on its investigative capabilities.

EXHIBIT 13
020

We also instituted new reporting requirements of our own requiring national governing bodies to report to us on ongoing investigations, unresolved complaints and banned and suspended members.

Second, we are working to increase the voice and the power of athletes. We engaged with the Athletes' Advisory Council to understand its priorities and recommendations. We are proposing changes to the role of the Athlete Ombudsman and we are creating a new athlete services department to assist with athlete grievances.

Third, we announced a governance review and launched a commission to study and report on engagement with athletes and with the national governing bodies.

This commission is headed by WNBA President, Lisa Borders. The commission will provide recommendations on potential changes to the Ted Stevens Act, the bylaws of the Olympic organizations as well as other policies.

Rebuilding USA Gymnastics is our fourth category of focus. And after we insisted that the previous CEO and then the entire board resign, we helped USA Gymnastics implement governance changes and elect a permanent board with a majority of independent directors.

USA Gymnastics has now completed all of the immediate requirements that we set in January for it to maintain its certification as a National Governing Body.

They know they still have a long way to go.

We will continue to support USA Gymnastics on its way to implementing a true change in culture.

EXHIBIT 13
021

A fifth category will develop when we receive the report of the independent investigation. The investigation focuses on both the Olympic Committee and USA Gymnastics. And we will make the report public in its entirety and take whatever actions are appropriately based on whatever the findings may be.

As Congress considers additional solutions I'd respectfully ask to offer some input.

First, Congress can support further funding of the Center for SafeSport. The Center's independence is critical to its success and expanding its sources of funding will strengthen that independence.

Second, the Olympic Committee encourages the Congress to look closely at the recommendations that will come from the Athlete and NGB Engagement Commission.

Third, the Safe Sport Act provides the Center with liability protection for sharing information on bans and suspensions. We ask Congress to consider extending those protections to bans and suspensions imposed by National Governing Bodies.

We have begun to make significant progress in strengthening protections for athletes but our collective efforts must not cease. We must support the victims and survivors, and honor those who have stood up against abuse. We promise to lead the Olympic community to bring real and lasting change.

I would be happy to answer your questions.

MORAN:

Thank you. Ms. Perry.

EXHIBIT 13
022

PERRY:

Chairman Moran, Ranking Member Blumenthal, and Members of the Subcommittee, thank you for inviting me to testify today.

I want to commend the Subcommittee for their excellent work aimed at preventing amateur athletes from abuse. This is your third hearing in the series, and it is incredibly important, because today we focus on what we are doing to provide a safe and empowered environment for our athletes.

As I have said before the House, I will say again today, on behalf of USA Gymnastics, I apologize to our athletes, many of whom are here today. What Larry Nassar did to these incredibly brave women is unconscionable.

I joined USA Gymnastics in December 2017 from outside the sport and the Olympic movement. My primary focus is to transform USA Gymnastics into an athlete-centric organization with a supportive and empowering culture that helps our athletes achieve their gymnastic dreams in a safe environment.

I have heard the heart-wrenching stories of these courageous athletes who have been harmed by those that should have been - they should have been able to trust.

I commit to you that I will keep their words and experiences at the core of every decision I make, every day, as the leader of this organization. Their stories have broken my heart, but also strengthened my resolve.

USA Gymnastics is on a new path, with new leadership, and a commitment to creating a culture that puts athletes first. Here are just a few of our decisive actions to put USA Gymnastics on a new course in the past months.

EXHIBIT 13
023

We closed the National Training Center at the Karolyi Ranch, and we are seeking proposals on a new high performance training and wellness facility.

We hired a new High Performance Team Coordinator for the Women's Program through a selection process that involved both athletes and coaches.

We created an Athlete Task Force where our former athletes are helping to shape our organization's future. Just last week, we announced the five core members, one of whom is a survivor of sexual abuse.

We expanded our Safe Sport department to include new regional positions to better support, train, educate and serve our members.

We are extensively revising our Safe Sport Policy.

We are educating and training our staff, Board, and members on the new Safe Sport Policy and a new Ethical Code of Conduct.

I am pleased to report that our staff and Board are 100 percent compliant with both. And beginning this season, all professional members must be Safe Sport certified as a condition of membership.

We continue to implement the Deborah Daniels recommendations. 86 percent of the recommendations are either implemented or in progress. Today, I'm announcing that we are making publicly available on our website exactly what we have done to implement these recommendations.

We made reporting of abuse easier with a dedicated toll-free number and online reporting.

EXHIBIT 13
024

We are participating in mediation in order to resolve the athletes' claims fairly and expeditiously.

We created an Athlete Assistance Fund, in cooperation with the National Gymnastics Foundation that provides the survivors of abuse with the needed financial resources for counseling and medical services.

These changes and others we have made are part of a cultural shift that reflects our commitment to prioritize the safety of all of our athletes and members and to become the standard-bearer of change.

At the same time, I have ideas that I would be happy to share with the Subcommittee regarding what changes Congress might consider to help USOC and all National Governing Bodies do more to further protect athletes.

I have traveled the country, listening to athletes, listening to survivors, listening to parents and listening to coaches. My mission is to ensure that USA Gymnastics emerges as a stronger, more empowered organization that is focused on our athletes, so that generations to come will be able to share their stories of how gymnastics positively impacted their lives.

I am testifying today on behalf of the new USA Gymnastics. Our incredible athletes have always been, and will continue to be, a great source of national pride.

We will be there for them to help them realize their potential in a safe and supportive environment. Athlete safety must be at the forefront of everything we do, every day.

Thank you. And I am happy to answer your questions.

MORAN:

EXHIBIT 13
025

Thank you. Mr. Han Xiao.

XIAO:

Chairman Moran, Ranking Member Blumenthal, and Members of the Committee, good afternoon and thank you for inviting me to testify here today.

My name is Han Xiao and I'm the elected Chair of the US Olympic Committee Athletes' Advisory Council, also known as the AAC.

In 1978, the U.S. Congress enshrined the AAC into U.S. law and designated it as the voice of the athletes of the United States. I am here before you today as the official spokesperson for elite athletes under the USOC umbrella, including U.S. Olympians and Paralympians.

My testimony will reflect what I believe is the most accurate opinion of the athletes who comprise Team USA. On behalf of these athletes, I want to thank you for exercising oversight of the Olympic and Paralympic system during this critical juncture.

America's gymnasts and their courageous testimony at the Nassar hearings have brought the national media and all of you in the Senate here today.

While establishing the U.S. Center for SafeSport is an important step in the right direction it should not be the only outcome of their suffering.

First, we cannot allow the U.S. Center for SafeSport to fail in its mission. The athlete abuse problem is far bigger than the USOC or any of us anticipated. The Center received its 1000th complaint of sexual abuse after just 15 months of opening its

EXHIBIT 13
026

doors. The Center needs increased funding so that it has the capacity to handle this case load as well as embark on critical education efforts.

To be successful SafeSport must have the technical expertise to conduct investigations and hearings and it must be able to preserve its full independence to retain the trust of athletes in the public.

The adjudication process for complaints must improve with input from subject matter experts. Right now, I fear that none of those criteria are being fully met. The sexual abuse of athletes is just one symptom of broader systemic issues that must be addressed to substantially empower and protect U.S. athletes moving forward.

Individual athletes have almost no power in our system, instead the USOC and National Governing Bodies hold the dreams of our athletes in their hands and athletes fear these coaches and administrators, armed with congressionally granted monopoly power will retaliate if they protest or dissent.

One failure to be compliant or obedient could mean the end of that athletic future. There is no other Olympic committee or Paralympic committee to appeal to, to get a chance to compete for America.

Our athletes aren't just powerless to remedy sexual abuse, they're also powerless to address financial injustices and many serious government issue - governance issues.

To combat this problem, I have made two major recommendations. First, I recommend establishing autonomous Inspector General's office reporting to Congress and the ASC.

EXHIBIT 13
027

The role of this office would be to hear athlete concerns confidentially without fear of retaliation about the governance and operation of the USOC and NGBs to independently investigate issues in the Olympic and Paralympic movements and so to determine necessary corrective actions.

Establishing this office and providing additional oversight would contribute greatly to a necessary cultural shift within our movement towards a focus on serving our - our country's athletes.

I also recommend the establishment of an athlete advocate. In 1998, Congress amended the Sports Act to require a new position, the athlete ombudsman. The position was meant to solve the recurring problem of athlete conflicts with their NGB or the USOC.

However, the ombudsman's office currently only advises of their rights, directs them to available resources and provides mediation services in most individual athlete's cases.

These are essential and invaluable functions for the athlete body. However, individual athletes and the ASC need independent legal advice and sophisticated, professional athlete advocacy. The athlete's Advocate's role would be to provide confidential legal advice to athletes and actively advocate for their rights and interests on a full time basis.

In addition to directly represents an athletes when necessary with a client attorney relationship, the athlete Advocate would work with other athlete representatives in the movement to raise repetitive issues with the USOC , NGBs and other organizations.

EXHIBIT 13
028

I've presented several other governance problems in my written statement along with more detailed information supporting my remarks today. I'd like to note however that we've been down this road many times before. In 1978, the amateur Sports Act was established imports to provide athletes with rights, however it also set up an unregulated monopoly.

In the 40 years since the 1978 Act, we have seen a cycle of scandals followed by internal USOC reforms. Now is the time to implement significant structural reforms to increase transparency and accountability, limit unnecessary bureaucratic expansion and shift power to athletes.

The USOC must reorient its primary mission for supporting the nation's Olympic and Paralympic athletes in service to this nation. Today's problems are not merely bad PR for the Olympic and Paralympic movement. Instead, it is time for Congress to enact structural changes that can bring about a cultural change.

If in another decade, with the Olympic and Paralympic Games coming back to the U.S., we find ourselves here again asking the same questions and searching for the same answers, we will have failed team USA athletes again, including the heroic gymnasts who have brought these issues for attention for now. Thank you for your time.

MORAN:

Mr. Xiao, thank you very much, I think, your testimony was very valuable to me, you and I've not met, we've not had a conversation, I didn't know, what you were going to say until I read your testimony and I find it valuable and useful and a good admonition that it's not a path we want to go down again.

EXHIBIT 13
029

We - we need to solve the problems today, thank you for being here. Let me start with the Ms. Lyon, excuse me, Ms. Lyons, Congress gave the Olympic committee, the NGBs and the U. S. Center for SafeSport immunity from defamation lawsuits unless a witness or entity speaks or acts with malice.

Congress clearly wants SafeSport to be able to publish the names of banned members who abuse children and I believe, if athletes and parents are to know they are safe in the knowledge of who has been banned, is absolutely essential.

When will USOC require that all NGB's make the list of their banned members public?

LYONS:

We also agree that one of the most powerful things that we can do is get the names of people who are banned and suspended in the public domain for parents, for potential employers, for anyone who works with the athletes community.

The Center for SafeSport is beginning serious work on this, they already have a searchable database for the cases that they personally have adjudicated, one of the many things that I mentioned in my opening statement and perhaps there's misunderstanding about this is the NGBs do not believe that they have that same limited liability that would protect them, if they make their names public and that's causing a bit of a road block at the moment.

So I think we need to investigate is that true and perhaps Congress can assess by ensuring that the NGB's feel that they do have that - that liability protection as well, they are in general very, very willing to make this information public and transparent

EXHIBIT 13
030

and they're working right now with us and with the Center to figure out how the database systems will work, to allow us all to seamlessly share that information.

But that is a stumbling block we'd like to overcome.

MORAN:

So today the - the database only includes at say - at U.S. SafeSport, those individuals that are involved in cases that have been referred to U.S. SafeSport since its creation?

LYONS:

That's correct and we also have, that the Center's publishing on a bi-weekly basis is what they're calling an adjudication log, that's actually a written log of all of the banned and suspended individuals that the NGVs have reported.

We know who they are and that's being updated every two weeks but it's not yet public.

MORAN:

So are - there is a list of banned coaches and employees?

LYONS:

Correct.

MORAN:

And who knows about that list?

EXHIBIT 13
031

LYONS:

At the moment, that's an internal list between the NGBs and the Center for SafeSport but the system that we're hoping to develop would allow that to become public.

MORAN:

Would there still be coaches who were on that banned list who are coaching or employees who are still employed?

LYONS:

Well, there certainly should not be and I think we just discovered, just in the past few days that there are still some weaknesses in the communication system that when someone is banned, not only does that individual needs to be notified immediately but anywhere where they are currently employed that we could possibly be aware of, also needs to be simultaneously advised.

We've discovered that there has been some lag in timing in that system that needs to be close.

MORAN:

So the point you're making is that if - if someone is banned, only the banned person, the coach or employee gets notified, not simultaneously is the employer notified?

LYONS:

The - the employer should be notified simultaneously. I read an article and I don't know, if this is factual that the employer of one of those individuals did not receive

EXHIBIT 13
032

notification until a few days later and that individual was still coaching in that interim period.

MORAN:

To your knowledge, what FBI checks have been run on current coaches or employees? Current process by which someone is investigated by the FBI?

LYONS:

Well, we have background checks, all of - all of these individuals go through standardized background checks and we have a standard list of things that needed to be checked. I'm not entirely sure if the FBI is a part of that.

MORAN:

When you say, all these folks, does that mean every coach, I don't what the - what the category would be of what type of employees but all NGBs.

LYONS:

For all NGBs, anyone who is authorized to have contact with athletes, it could be medical staff, it could be coaches, it could be trainers, they are all required every two years to undergo a background check.

MORAN:

Has there been any anonymous inquires, requesting anonymous information from athletes in which they can provide information about experiences they've had that are inappropriate?

EXHIBIT 13
033

LYONS:

I'm sorry, could you rephrase your question?

MORAN:

Has - has the athletes involved in the U.S. Olympics been - has there been enquiry by which they can anonymously respond about any experiences they've had, that would reflect the sexual abuse or other bad behavior?

LYONS:

Right, within the USOC and adjacent to the ASC, there's an athlete ombudsman who has a strong relationship with the ASC, any information that's provided to them is confidential, it does not have to be shared with the USOC as an entity.

And an athlete has the opportunity to reach out to the ombudsman and make known to them any information they have. If that information involves sexual abuse the ombudsman as required by law to report that to the Center immediately.

MORAN:

The questions I just ask you about banning coaches, investigations background checks and anonymous ability to report something to an ombudsman. When did that come into existence?

LYONS:

Well, the ombudsman has been in existence for quite a long time, it's been -

EXHIBIT 13
034

MORAN:

Including the times in which Nassar was doing the things he was doing.

LYONS:

Yes. One of the issues that I think, we need to all work on is education amongst the athlete population to even know that there is an ombudsman. We recently did some research that shows that many athletes are unaware of that position, not necessarily sure how to reach out to them.

Similarly they need to know how to reach out to the Center.

MORAN:

Ms. Perry, at our last hearing, Rhonda Faehn testified that Amy White, an employee of USA gymnastics was directed by Steve Penny, her boss to go to the curly ranch into take documents from the national training Center back to USAG headquarters in Indianapolis. Have - have you seen those documents?

PERRY:

Thank you Senator Moran so what I know is that that instruction, it was - it was told to me that that that instruction was given to Ms. White that Ms. White came back to the office with a suitcase and some boxes.

Where those documents went from there, I don't know, I was also told that there was not a sort of logging in, if you will, of those documents in the organization but those documents were given to then CEO, Steve Penny.

EXHIBIT 13
035

MORAN:

Do you know that those documents were given to - to Mr. Penny?

PERRY:

Of course, I wasn't there, Senator Moran, but that's what I was told.

MORAN:

And we've made enquiry of USA gymnastics so with an extensive request for documents, those documents have not been provided.

PERRY:

I know we've produced close to a million documents in production so those documents could be in there, they may not be but I - I don't know -I don't know where those documents are.

Miss - Steve Penny would know where those documents are.

MORAN:

There would be no chance of those documents exist within your custody at USA gymnastics unless they were provided to us unless they're included in the list that you - the million documents that you provided us?

PERRY:

Right.

EXHIBIT 13
036

MORAN:

Otherwise you can assure me that they don't exist within your custody?

PERRY:

To my knowledge, they do not exist in our custody.

MORAN:

Sir Blumenthal.

BLUMENTHAL:

Thanks Mr. Chairman. Mr. Engler, are you familiar with Kelly Lawrence.

ENGLER:

Yes.

BLUMENTHAL:

She's here today and she remembers a conversation with you in which you said, and I'm quoting her, ' Mr. Engler then looked directly at me and asked, quote, right now, if I wrote you a check for $250,000 would you take it? When I explained that it's not about the money for me and I just want to help, he said quote, well, give me a number, end quote', that's accurate, correct?

ENGLER:

No Sir, it is not.

EXHIBIT 13
037

BLUMENTHAL:

Well, you offered her money, did you not?

ENGLER:

No Sir.

BLUMENTHAL:

You never spoke to her about money?

ENGLER:

No Sir.

BLUMENTHAL:

Did you meet with her absent her attorney?

ENGLER:

Yes, at her request, at her mother's request.

BLUMENTHAL:

And there was no discussion of money at that meeting?

ENGLER:

There was not any discussion of any settlement, she is now part of the settlement that

has been requested -

EXHIBIT 13
038

BLUMENTHAL:

Was there in another meeting, discussion about paying her individually, in connection with her assailant?

ENGLER:

No.

BLUMENTHAL:

Let me ask you, Ms Lyons. You know, I've - I've listened to your apologies and I would have found them more credible if today were Thursday before the filing of an answer by your organization in court.

That answer in effect disclaimed any and all responsibility. Did you authorize the filing of that answer?

LYONS:

I did and -

BLUMENTHAL:

And are you aware, that in effect, it denies that the USOC had any responsibility for Larry Nassar?

LYONS:

EXHIBIT 13
039

That is not our intent, as publicly stated and I will state again that we believe we do have responsibility and accountability along with the rest of the movement in failings these athletes.

The questions in the motion to dismiss are a different set of questions about the legal liabilities and our relationship with Larry Nassar's different than the relationship of -

BLUMENTHAL:

The contention in your - excuse me for interrupting but my time is limited. In those court papers, your organization stated that there was no legal grounds to sue because. Nassar never worked for the federation nor were his crimes foreseeable?

In other words you couldn't anticipate, couldn't expect or suspect any crimes by him. Is that's the position of your organization?

LYONS:

Yes and I'm not a lawyer, that is the legal term whether something can be foreseeable and I think that the courts will have to determine if we have legal liability, we certainly have social and ethical liability.

BLUMENTHAL:

Well, in effect, you have said you have no reason and the plaintiffs have no reason to hold you accountable in a court of law, that's correct, right?

LYONS:

That's correct, from a legal perspective and the court can determine if -

EXHIBIT 13
040

BLUMENTHAL:

So in effect you've washed your hands off.

LYONS:

I'm sorry, if it would appear that that's the impression you've gotten, that is certainly not our intent, we are actively engaged in everything we can do to help keep athletes safe.

BLUMENTHAL:

Except being part of the legal process that will impose any sort of court orders, impose any kind of accountability or responsibility?

LYONS:

I think the court will determine, if we need to be part of those proceedings and if they determine we should be, we absolutely will be.

BLUMENTHAL:

Let me ask you, Ms. Perry, because your organization filed a similar filing. And I think in your case it was a motion to dismiss and that was on behalf of the new - the new USA gymnastics.

You said, in one of the parts of that motion to dismiss, when the issue was whether Nassar was - was a certified athletic trainer, osteopathic physician, national medical director and national team physician? The response was denied, that correct?

EXHIBIT 13
041

PERRY:

Senator Blumenthal, I'm not sure what motion to dismiss you're referring to or the timing of that or the timing of that statement.

BLUMENTHAL:

Well, it may have been an answer, I'm not sure whether it was an answer or a motion to dismiss but in either event you denied that contention, correct?

PERRY:

I don't - I'm not familiar with that, if there's a document that I can look at, I'm happy to read that and provide answers to you. I do know Senator Blumenthal -

BLUMENTHAL:

Well, let me ask you a different -

PERRY:

Yes.

BLUMENTHAL:

- way, isn't it true that he was a certified athletic trainer, Osteopathic physician, national medical director and national team physician?

PERRY:

I don't know all of his designations but I will say -

EXHIBIT 13
042

BLUMENTHAL:

But you work there, correct?

PERRY:

Yes, he - he was a volunteer and he had -

BLUMENTHAL:

But when you say, he was a volunteer, he was compensated, correct?

PERRY:

I - he was compensated for - from what I've been told, he was compensated for expenses and travel and they're like -

BLUMENTHAL:

And he received fringe benefits?

PERRY:

I don't know what fringe benefits that would have been but -

BLUMENTHAL:

And he received the stature and prestige of being announced as and I'm quoting, part of the USA gymnastics medical task force, to provide leadership and oversight of USA gymnastics practices procedures and protocols.

EXHIBIT 13
043

PERRY:

Senator Blumenthal, that was before my time, that designation and - but I - but here's what I think is important, is that from day one when I came on board, I made it very publicly known, that this organization is going to be making our every attempt we can, to resolve the situation.

The survivors are the most important thing and reason that I took this job because their voices and their courage moved me so much -

BLUMENTHAL:

And I'm out of time.

PERRY:

But I -

BLUMENTHAL:

And I accept your words.

PERRY:

Yes.

BLUMENTHAL:

But just last Friday, you filed this answer that strikes me as a blatant falsehood.

PERRY:

EXHIBIT 13
044

I'm not familiar with that action, Senator Blumenthal.

BLUMENTHAL:

Didn't you authorize it?

Perry: I not familiar with that - I would like to see that and be able to answer your question.

BLUMENTHAL:

Well -

PERRY:

A motion to dismiss -

BLUMENTHAL:

Are you here with counsel today.

PERRY:

I am.

BLUMENTHAL:

I would suggest that maybe your counsel should show it to you because you are testifying here. And both you and Ms. Lyons are responsible for those filings in court, not just for the legal position but the factual assertions.

EXHIBIT 13
045

And I hope that you will review them before you leave here.

BLUMENTHAL:

I will and Mr. Engler, I'm not sure, how to follow up on your denial of any conversation with Ms. Kelly Lawrence but I'm going to do so. Thank you Mr. Chairman.

MORAN:

Senator Peters.

PETERS:

Thank you Mr. Chairman, Ranking member, thank you again for this hearing, been to others hearing. You know, this morning I had an opportunity to hear directly from a number of very courageous survivors. And many of them are - are here in the in the audience for this hearing, right now.

Mr. Engler, in talking to them, they feel very strongly that you have not listened to them and if you have listened to them, you certainly haven't heard, what they have to say and the concerns that they've expressed.

And so today, as their Senator, I want to amplify their voices and ask some of the questions that they raised. First off, the - the Detroit news has reported that in the past 20 years - 20 years, at least 14 people, most of whom are or were MSU employees were notified of Nassar's behavior.

So in - in the interest of time, I'm just going to ask some yes or no questions, if you'd answer, yes or no, I'd appreciate it.

EXHIBIT 13
046

First yes or no have you subjected any of these individuals to any disciplinary action?

ENGLER:

Yes. The immediate action that I took with regard to Dean Strampel was an indication of my assessment that his leadership as Chair - as the Head of the -as Dean of the college of Osteopathic medicine fell far short of appropriate performance standards.

PETERS:

So you have one - just in time - when you had one individual you took the disciplinary action is Mr. Strampel?

ENGLER:

Well, I think, all of these happened, I arrived in February of 18 -

PETERS:

So no, you haven't, that's fine, so no is the answer. Mr. Strampel, I understand, you called in February for a revocation of his tenure.

ENGLER:

That's correct.

PETERS:

But that did not happen, he is actually allowed to retire according to -

ENGLER:

EXHIBIT 13
047

No, his tenure - that's correct his retirement has separated him from the University and so he is no longer connected anyway to the University.

PETERS:

Right, so he was allowed to retire and I was - he received $175,000 as well as part of the settlement, I understand -

ENGLER:

That was the settlement that we judged as more in the interests of the University and the survivors to have him gone and separated, versus a tenure proceeding which I hear, administrative procedures could run more than a year and would have cost much more than $170,000.

PETERS:

So that was - that situation, yes or no, beyond Nassar and Strampel, so no - no - no other person has been fired?

ENGLER:

And there is an ongoing investigation, I would - would remind the Senator, by the Attorney General of the State of Michigan, at the request of the Board of trustees, to see if anyone else should be subject to sanctions.

PETERS:

So all these individuals will be interviewed?

EXHIBIT 13
048

ENGLER:

I believe, they have been.

PETERS:

And that's done by the Attorney General's office?

ENGLER:

That is correct.

PETERS:

Yes or no, do you believe that there was a culture of enabling and covering up of the actions of a predator over 20 years, in MSU.

ENGLER:

Well, I wasn't there until February of 2018 but when I arrived, I felt that there are weaknesses in procedures and protocols. I felt that the shared governance model at University didn't lead to specific accountability and so I thought those weaknesses -

PETERS:

So there were problems, I need to keep moving if I could President.

ENGLER:

OK, but I would - if I can't answer the questions, I'm not allowed but -

EXHIBIT 13
049

PETERS:

Well, that was a yes or no and if you were not there, you think, yes, there were some issues, you -

ENGLER:

Well, there are issues for sure.

PETERS:

So you answered a yes, do you believe there's a job is to instill trust?

ENGLER:

Oh absolutely, I think trust and trust is done by accountability and people accepting responsibility for their roles, be that someone in charge of compliance in a medical school or someone in charge of you know, assuring that an investigation is done properly at the police department.

PETERS:

And I appreciate that and in addition to the - the - the - making sure there's accountability, it's also the people you put in place to instill trust, one thing that the survivors felt very strongly about, I think many of us believe is - is true, is that, you should bring outside perspective into the leadership, fresh eyes are very important.

Having national searches to bring in folks who are going to bring a different view on how things are happening in Michigan state it's important. We have seen you have

EXHIBIT 13
050

pledged or you pledged to do that for a national - for your athletic director, have a national search, that didn't happen.

You hired somebody from within the University, you also hired a Head of the Office for Civil rights and - and Title 9, someone who was actually assigned to defend Michigan State University against sexual assault lawsuits as opposed to being someone traditionally in many universities, someone who works with diversity and working with students is really a defender and a champion for students as opposed to the University.

So I - I think, for what came out very clear to me is in addition to some of your hiring decisions that I mentioned briefly, your lack of empathy and respect to survivors, especially for Kelly Lawrence which I think, Senator Blumenthal in your remaining time are going to ask more questions about that.

We also have a situation with Rachael Denhollander who you accused of receiving kickbacks for manipulating other survivors, are you willing to apologize to her?

ENGLER:

Oh, I've already done so.

PETERS:

Have you done that publicly, verbally?

ENGLER:

Yes, I have.

EXHIBIT 13
051

PETERS:

So Mr, Chairman, I'd like to enter into the record, a letter signed by over 120 survivors, written to members of the MSU's Board of trustees into the committee record, if I may.

MORAN:

Without objection.

PETERS:

I'd like to read a couple of brief passages, first passage in this letter signed by 120 survivors, we recognize that the greatest measure of an abusive culture is how survivors are viewed and whether perpetrators and enablers will be held accountable and that the environment in which they thrive remediated.

On all of these metrics, President Engler has only reinforced the culture of abuse at MSU and now they go on to say, we are here to tell you that all the organizational changes in policy and procedure enhancements in the world mean nothing, if there is not leadership that creates an environment where survivors feel safe to speak up and it is our position that MSU cannot move forward and become an institution of integrity and safety, until John Engler is no longer President and a new interim leader who will stand against the abusive culture is found.

And Mr. Chairman, I just have one last question and this is a question that came from Jessica Smith, who I met with, this morning, another one of courageous survivors and she had one question for you and I would like you to - to ask, especially after hearing excerpts from this letter, from 120 survivors and there's much more in that letter.

EXHIBIT 13
052

Her question was, if your presence is so harmful to survivors, why should you keep your job? Would you answer that, please?

ENGLER:

Absolutely, be happy to, under my leadership, accountability is being instilled across the University, we're seeing the number of complaints coming forward, people are being willing to bring complaints to the office of - is to select tighter line of investigation.

We have fixed the problems of the medical clinic now by strengthening the protocols, strengthening the Chaperone Policy, strengthened the billing and reporting procedures in the department, strengthened the evaluation of deans and the key personnel themselves.

Arrived at a $500 billion settlement to put some of the litigation behind, fully cooperate with all the investigations and we're also starting a process to bring a new President in.

You mentioned earlier appointment, you mentioned only two but there is a national search under way for the head of the title in office, you neglected to mention that, man is in interim there.

The Athletic Director was somebody chosen from outside the Athletic department, yes, he was part of the university but he was chosen with the strong support of your constituents in Michigan.

Constituents who include not only the football and the basketball and soccer and the golf coaches of the men's and the women's side but alumni supporters and everybody

EXHIBIT 13
053

who views that this man who has a legal degree and a Master's degree from Northwestern University has a strong commitment to compliance is exactly the right person to come in and be strong as a leader of the department.

And in having a national search, we would have found an outsider just as I found an insider of the department but we could not do a better job and he deserves your support and mine.

PETERS:

So the national search wasn't conducted, you said, you will do one for this other individual -

ENGLER:

I said, it is being done, Senator.

PETERS:

It is being done, yes, but that has been done and there is now a national search for a permanent President?

ENGLER:

Yes.

PETERS:

My understanding you will not be part of that search and if offered the position, you will not take it?

EXHIBIT 13
054

ENGLER:

I've got a candidate and I strongly support the Board's decision to move forward, they're in the process of hiring the search for and compiling the search committee. I would hope that they would have somebody very quickly and when that person arrives, you give them your support.

PETERS:

All right, thank you.

MORAN:

Senator Cortez Masto.

CORTEZ MASTO:

Thank you, Mr. Chair and - and Ranking member Blumenthal. Thank you for continuing your work and leadership to bring witnesses before this committee that can provide us real answers.

I know that members of the committee take this very seriously and are hard at work to provide more structured safeguards for Olympic athletes and then to the survivors in this room, I want to personally thank those who have stood together to present an image for the world and are standing up and telling their story.

I know it's not easy, but you are athletes with unimaginable strength and courage and I thank you for everything you do every day, for using your voices.

EXHIBIT 13
055

As elected leaders, we must remain committed to our obligation to demand reforms and provide for real thoughtful solutions that will make positive change. I remain committed to working with my colleagues, survivors, advocacy groups and many others to make fundamental changes to the governance and oversight of the amateur sport in this country.

And so, Ms. Lyons, let me start with you and I want to follow-up in a conversation with the Chair that you started with regarding the ban list. Can I ask you what are the consequences that the USOC outlines if a member club hires a coach or an individual on the banned list.

LYONS:

That's an excellent question. To my knowledge, we do not - we have the USOC do not have anything that is written as to what would happen if an outside club hired someone on the banned list.

Typically, the USOC is not aware of which coaches are at which clubs. That's generally something that the NGBs are much more aware of, but I think you point out a structural issue that is something we should look at.

MASTO:

So, Ms. Perry let me ask you this. What actions is USA Gymnastics taking to identify and remove coaches, athlete, directors, employees and officials who witnessed emotional and physical abuse of athletes and did not report child abuse to the authorities and did nothing to stop it.

PERRY:

EXHIBIT 13
056

So, we have made both are permanently ineligible list and are suspension list public on our website. There are several ways that we communicate that information out. Of course, we provide notice to the adverse party and we provide notice to the club owners and we also ask the club owner to provide notice to the membership in their club area.

And so ...

MASTO:

Let me ask you this, so you are actually taking action to identify and remove coaches, athlete, directors, employees and officials who witnessed emotional and physical abuse of these athletes and did not report the child abuse to authorities.

PERRY:

As long as we have a report and we're made aware of it, we are going to follow our safe sport policy and our bylaws, which allows us to take action. And again, depending on the nature of the misconduct if it's sexual misconduct that goes to the center if it's non-sexual misconduct that stays presently with the national governing body. And so, we have specific processes that we follow, some of that of course is governed by not only our bylaws and our safe sport policy but by the Ted Stevens Act. And so, we follow all of those processes to find it at the end of a hearing panel. For example, what their decision is and based on their decision in that hearing panel the action is taken.

MASTO:

EXHIBIT 13
057

So are you currently taking any actions to identify or remove current employees who knew about the sexual views and didn't do anything to report it and stayed silent.

PERRY:

Did you say current employees?

MASTO:

Yes.

PERRY:

So, right now, we are going through an independent investigation, the Ropes and Gray and that information I think is not only critical for this body and all of the investigations that are going on, but it's very critical for us, because it's important that we learn the facts around this and so you know if there are ...

MASTO:

All right. So, let me stop you there.

PERRY:

Sure.

MASTO:

I appreciate the filibuster, but I've only got five minutes and we'll follow-up with you. In the testimony offered by Mr. Rick Adams of the USOC in March of 2017. He testified that there was "an environment that discouraged victims from reporting

EXHIBIT 13
058

abuse" at NGBs including the USA. Do you agree with Mr. Adams' assessment of the culture at USA gymnastics prior to your tenure.

PERRY:

Senator, I saw immediately that we had to become an athlete centric organization.

MASTO:

Does that mean yes?

PERRY:

I saw immediately that this organization and probably very much other organizations need to focus their priorities on the safety of the athletes.

MASTO:

So, let me ask, is it Mr. Xiao, thank you very much. You've heard the opening statements of the individuals that are on the panel with you. Let me ask you this, is there anything that they have said that satisfies your concern that structural changes is going to occur.

XIAO:

I think that we're engaging in this process in good faith from the Athletes Advisory Council and will continue to provide our suggestions for structural changes. But in the end, as I said in my testimony, I do think that we've done this before. I think we've done independent commissions. We've done sweeping governance changes. We've done the tag (ph) commission not too long ago and here we are today.

EXHIBIT 13
059

MASTO:

That's my concern. So, did you hear anything different today that's going to change your mind - make you - or at least satisfy concerns that change ...

XIAO:

Personally, I don't think so. I think that there is not a feeling necessarily of the organization. I think it's a feeling of the entire system the way it is set up.

MASTO:

Thank you. I know my time has run out. Thank you.

MORAN:

Mr. Xiao, Ms. Cortez Masto went down a path that I was intending to go. Let me take what you just said, a step further. My question was and perhaps is, so we've heard testimony from Mr. Engler, Ms. Lyons, Ms. Perry. I would summarize their testimony and what we've heard from them in other meetings is that things are different today than they were. We take sexual abuse seriously. We put protocols in place. We have reporting requirements. We've created safe sport.

You were on the advisory committee, I would guess prior to Ms. Lyons, it would be about the same time of her arrival but is the world of Olympic athletes and the relationship between USA Olympics and the governing bodies, is it different today than it was at the time of Larry Nassar or is the only thing that's different today is that Larry Nassar is in prison.

XIAO:

EXHIBIT 13
060

I don't think that the only thing that's different is that Larry Nassar is in prison. I do think that in many cases, the presence of safe sport has pushed certain national governing bodies to do more to protect athletes. But I don't think that there has been necessarily a see change in the relationship between athletes and the NGBs or the athletes in the USOC.

MORAN:

And my understanding of your testimony is maybe putting words in your mouth, but part of that significant problem is the monopolistic nature of the U.S. Olympic Committee. So, when you say that there is things wrong that hasn't changed in the way that it needs to, the structure is flawed. The problem is the relationship between athletes and the U.S. Olympic Committee, which is their only option to compete and to perform. That's the story. I mean that's your testimony.

XIAO:

I think that's accurate.

MORAN:

Thank you. Let me ask Ms. Lyons, former president Scott Blackmun of the U.S. Olympic Committee stated in his written responses to questions for the record that a confidential memo summarizing the chronology of events relating to the athletes report of abuse in the summer of 2015 and the actions taken by USA Gymnastics including its engagement with the FBI was drafted by USAG. and forwarded to USOC in September 2015.

EXHIBIT 13
061

So, Mr. Blackmun's written response, his testimony was that there was a report forwarded from USAG. to the U.S. Olympic Committee in September of 2015 and that report indicated referral or conversation, engagements with the FBI. This document has not been provided to the Subcommittee for our review. Are you aware of the existence of this document and why was it not provided in our request of the USOC for documentation.

LYONS:

I am not aware of the existence of that document. I have not seen it. My understanding was that that initial - it was a conversation that informed Mr. Blackmun that USAG was informing the FBI and that was back I believe in July. I have not seen any document that would be a chronology of events that was produced in September.

MORAN:

If that document exists, would you know about it? If that document exists within your custody of the U.S. Olympic Committee would you know about it?

LYONS:

We would think from all of the search that we have done on keywords and the like that something that contain any of those keywords about gymnastics, Nassar et cetera should have been revealed if it existed.

MORAN:

Just like with the documents that were retrieved from the Crowley Ranch, we've yet to see - this is a document that I think would be very valuable to us and I would ask you

EXHIBIT 13
062

to pursue the possibility that it exists within your custody and provided if it does that I assume you're willing to do.

LYONS:

Absolutely, willing to do that.

MORAN:

Ms. Perry, do you know anything about that document?

PERRY:

I do not.

MORAN:

So, I suppose a copy could exist, it was forwarded from U.S. Gymnastics to the U.S. Olympic Committee. One would think there might be a document again. Same story with the Crowley Ranch documents, if it's in your custody, I assume you will pursue it further and provided if it exists.

PERRY:

Yes, sir.

MORAN:

Thank you.

PERRY:

EXHIBIT 13
063

Senator Moran, may I add because my attorney has just advised me of which document we're talking about.

MORAN:

Yes, ma'am.

PERRY:

I believe there was a document sent from Steve Penny to us at the time of Chief of Security Larry Bondar. And my understanding is that that document has been provided.

MORAN:

That is the document, it was provided to your security director, your security chief. I don't believe we have that document. And if again, I would ask you if you'd provided, if it does exist and apparently it does, so thank you for checking with your attorney and we would appreciate you providing it to the committee. Thank you.

Senator Blumenthal.

BLUMENTHAL:

Thanks Mr. Chairman. Mr. Engler, I want to be fair to you and give you a chance to go back to your previous answer. The comments made by Caeli Lawrence were in a public comment session. He recounted that conversation. And you deny that the meeting with her without her attorney in which you offered money took place. Correct.

EXHIBIT 13
064

ENGLER:

I did not deny there was a meeting. She waited for some 45 minutes with her mother to meet with me and I along with two women were on my staff, Carol that the family did meet with her.

BLUMENTHAL:

But there was no discussion. You deny any discussion of ...

ENGLER:

No. Our discussion was about, what is it among all of the actions we've taken, many of which were in my written testimony, is there anything else that from the survivor perspective could be done and the discussion was how do we hear from people about what is it that might help.

BLUMENTHAL:

So, no discussion of money. I want to be absolutely ...

ENGLER:

No discussion, yes, we were in settlement talks or no point in having a settlement with a single ...

BLUMENTHAL:

Did you consider it proper to meet with her without her attorney present. You need she was representing.

EXHIBIT 13
065

ENGLER:

That was up to her. I asked that question to her and her mother, if they could meet with me. It's appropriate, I could meet with them. But could they meet with me and they ask that would this be done privately that nothing be said, they could get in big trouble. It was not a problem on my side. It was an issue for them and I have met with others and ...

BLUMENTHAL:

You made no offer of money as she very specifically said, she didn't.

ENGLER:

No, I was not doing settlement negotiations with one plaintiff that would be.

BLUMENTHAL:

So, are you saying that she lied when she made that comment.

ENGLER:

I have said publicly, we have very different recollections. The people in the room that were part of the university have different recollections of that conversation that she has.

BLUMENTHAL:

Did you comment on the Williams Rampal (ph) in that meeting with her.

EXHIBIT 13
066

ENGLER:

I don't remember. I might have, because I think I might have mentioned the fact that we had already begun the tenure revocation. Did you say about the charges of misconduct against him that they were "no big deal".

BLUMENTHAL:

No, you deny that you said that.

ENGLER:

Absolutely. I mean we're revoking a gentleman's tenure. That's a big deal. And the actions that the failures of his leadership were a very big deal.

BLUMENTHAL:

Ms. Perry, earlier I referred to the answer that was filed on Thursday. And I also made mention of the motion to dismiss filed by the United States Olympic Committee.

I want to be clear, you are saying that Larry Nassar never worked for USA Gymnastics in a way that would make you in anyway legally responsible.

PERRY:

No. Senator Blumenthal, I'm not saying that at all. What I'm saying is that he was not an employee of USA Gymnastics. Of course, as the team doctor. Yes, there was definitely a relationship there with USA Gymnastics at the time and of course, I wasn't there. But that he was known as the team doctor for USA Gymnastics.

EXHIBIT 13
067

BLUMENTHAL:

But that seems contrary to what you have said in court. I mean in court you said, he in effect was like a volunteer who just happened to be there, and you have no responsibility for anything you did.

PERRY:

Senator.

BLUMENTHAL:

By the way that contention is belied by your own documents. I'm going to ask that the Chairman put in a record a statement of July 11, 2014, which describes "services" I mentioned it earlier.

MORAN:

Without objection.

PERRY:

Senator Blumenthal I've joined USA Gymnastics in December of 2017. So, I've been with USA Gymnastics for seven months. The legal actions and the statements that I believe you referred to, based on the date were made prior to my becoming the CEO of USA Gymnastics.

BLUMENTHAL:

Well, the court filing was on Thursday.

EXHIBIT 13
068

PERRY:

I have to look at that. Yes.

BLUMENTHAL:

Well, I would look at it really hard. Yes. And I would decide and I'm being very serious, whether your organization really wants to stand by that representation which in my view is entirely disingenuous and false and I want to add one more point. I don't know how athletes, parents or communities can trust an organization that says, Larry Nassar wasn't employed when in fact he was the team doctor.

PERRY:

Absolutely. He was - the only clarification I made was that he wasn't an employee. He was an employee of Michigan State. But I will find out about that. I have counsel here. I'm not aware of a motion to dismiss by USA Gymnastics, but I will get to the bottom of that and I do want to say this Senator Blumenthal that really from day ...

BLUMENTHAL:

I want to correct your misimpression, just to be clear. USA Gymnastics filed an answer. I'm not familiar with Michigan civil procedure.

PERRY:

OK.

BLUMENTHAL:

EXHIBIT 13
069

And apparently it was in the state court. But just so the record is clear. It was an answer. U.S. Olympic Committee filed a motion to dismiss.

PERRY:

OK.

BLUMENTHAL:

Ask about that.

PERRY:

Great. Thank you for clarifying that.

BLUMENTHAL:

Ms. Perry in a letter dated February 9, 2018 to Chairman Moran and me. You denied that USA Gymnastics used non-disclosure agreements as part of your investigations. Do you recall that letter?

PERRY:

Senator Blumenthal, I would have to look at that letter, but I don't recall denying.

BLUMENTHAL:

I have copies of it, I'm sure your counsel does.

PERRY:

EXHIBIT 13
070

Yes. So, there was a non-disclosure agreement that I think everybody is aware of that was put in place a few years ago prior to my being the CEO. And when I found out about that non-disclosure, I immediately instructed our legal team to release that individual from any non-disclosure agreement as I will not tolerate the silencing of any sexual abuse victims. And from that point on as well as I'm the new CEO, I said, there will not be any non-disclosure agreements that silence sexual victims as long as I'm leader of this organization.

BLUMENTHAL:

There was in fact with McKayla Maroney, a non-disclosure agreement which contained a clause that would find her $100,000 if she were to speak out about her abuse and are there any others.

PERRY:

I am not aware of any others prior to my being CEO, Senator Blumenthal, but again it's very important that everybody understands that that is not acceptable, and I released and made very public that this organization will not stand by that.

BLUMENTHAL:

And you would commit here that if there are any other agreements, you will release on behalf of your organization those individuals from that command.

PERRY:

I will not allow a survivor or a victim of sexual abuse to be silenced to be able to speak out about their sexual abuse. I absolutely commit to that.

EXHIBIT 13
071

BLUMENTHAL:

Going forward and retrospectively.

PERRY:

Absolutely.

BLUMENTHAL:

Have you ever discussed with - Mr. Perry - I'm sorry Mr. Perilla - Paul Perilla, the former USAG. board chairman, his involvement in the use of that non-disclosure agreement?

PERRY:

I was aware that he was involved in that situation, but to the extent that he made the decision or who made the decision. I'm not aware.

BLUMENTHAL:

Did you ever talk to him about it?

PERRY:

I asked him about it. Absolutely.

BLUMENTHAL:

And what did he say?

EXHIBIT 13
072

PERRY:

It was his recollection that that was something that was agreed upon by both parties. And that's pretty much the information he shared with me.

BLUMENTHAL:

And I have one last couple of questions. One last ...

MORAN:

One last couple of questions. Just so you know you're not putting one over on.

BLUMENTHAL:

You know I told the survivors this morning that I had a lot of questions. But I warned that we had only limited amounts of time. So, I thank the Chairman for allowing me unlimited remaining questions. No, I'm just kidding Mr. Chairman.

Are you familiar with a report in the Orange County Register of last. Well, actually of yesterday with regard to two coaches, two suspended coaches still working in Southern California Gymnastics Club. Their names are Colden Racier (ph) and Terry Gray (ph).

PERRY:

I am.

BLUMENTHAL:

Can you explain how they can be suspended, but USA Gymnastics still permits them.

EXHIBIT 13
073

PERRY:

Senator Blumenthal, I believe that the individual that wrote the article was absolutely correct in that. And I think to Mr. Xiao, am I pronouncing - Xiao. His point is, this illustrates a systemic and structural challenge that we have. And again, I look at it from outside the Olympic movement. But here's what happened with Mr. Gray (ph). Mr. Gray (ph) was a U.S. senator for Safe Sport case. And when the USA Gymnastics was instructed of the allegation, USA Gymnastics act acted swiftly and put that individual on an interim suspension. That interim suspension is on our website. So, it's public.

There was - I was told, there was notice given to the parties that should have been given to under the Ted Stevens Act. When you take anybody out of the field of play that individual is entitled to a hearing panel. That hearing panel heard the - so he was on interim suspension and USA Gymnastics acted swiftly.

So, the hearing panel occurred, and they reduced the consequence if you will down to no contact with a minor child.

BLUMENTHAL:

They're coaching minors now.

PERRY:

I'm sorry.

BLUMENTHAL:

They are coaching minors, aren't they?

EXHIBIT 13
074

PERRY:

So, this illustrates Senator Blumenthal one of the areas where I think Congress can really help us.

BLUMENTHAL:

And Mr. Xiao highlighted one of those areas. Mr. Xiao have you talked to Ms. Lyons about the structural reforms that you've suggested?

XIAO:

Some of them. Some of them are issues that the AAC has raised before and continues to brainstorm.

BLUMENTHAL:

And how has the U.S. Olympic Committee received those suggestions?

XIAO:

Ms. Lyons has engaged on many of those reforms.

BLUMENTHAL:

Have they adapted any?

XIAO:

EXHIBIT 13
075

Not fully. I think we are waiting for the athlete and NGB engagement working group to begin, which has been assembled, but I have not received information about when it's going to start work.

BLUMENTHAL:

So, nothing's happened.

XIAO:

Not that I've seen on most of the - most of the large-scale reforms.

BLUMENTHAL:

Thank you.

MORAN:

Senator Hassan. We're going to try to conclude this hearing in the near future and Senator Hassan you are recognized.

HASSAN:

Well, thank you very much, Mr. Chair. I want to thank you and Ranking Member Blumenthal for your continued attention to the issue of sexual abuse in the Olympic system. And I also just want to thank all of the survivors again for not only being here today, but for everything you've done to really focus the greater public on this horror. And on the treatment, you've all experienced. And I am grateful that you're extraordinarily harrowing stories are finally being heard. Thank you.

EXHIBIT 13
076

Thanks to the persistence of these young men and women. I'll start with a question to you Ms. Perry, and thanks to the tireless work of journalists like those at the Indianapolis Star Tribune. They made sure that these stories were heard when they published their expose in 2016.

But let's not forget that these athletes and their families have been trying to protect themselves and each other for a long time. And even today certain individuals are still attacking these men and women for sharing these incidents and for pursuing legal action.

USA Gymnastics engaged in an egregious response over the course of decades, keeping a file of complaints against more than 50 coaches hidden away in a drawer and refusing to report these complaints of sexual abuse, misconduct and potential child abuse to authorities.

Now, your testimony today focused on the very many things you're doing to reorganize leadership and structure. But I would like to hear from you Ms. Perry, what exactly are you planning to do to ensure that transparency, reporting and disclosure policies are in place, so young athletes are protected from this kind of abuse, so not just reorganizing, but how are you going to make sure that when somebody comes forward, not only are they respected, not only is there a process, but there is the kind of transparency is reporting and disclosure that we all know is so necessary in this area.

PERRY:

Thank you, Senator. I think that it is a - not only incredibly important that we address all of the things in an organization, the structure as you mentioned the systems, the

EXHIBIT 13
077

policies, but also the culture. And it's unacceptable. It's absolutely unacceptable that our athletes at any point in time could feel that their voices weren't important. And so, one of the things that - a lot of the things that we've done in a very short period of time is we've - not only through just the actions that I've taken speaking to survivors, asking them what do we do. And quite frankly, I'm very hopeful that more survivors will join our efforts.

But we are looking at everything from top to bottom. One of the things that I notice right away is that there was very inadequate trackings mechanisms in place. So, we began keeping track and a database of all complaints that came into the organization. And then we went and we're not - we're not going to wait, we're not going to wait for others, we're not going to wait. Whether the center takes on all forms of misconduct which quite frankly I think is a great idea. We started looking at investing in software programs similar to the center to say, we've got to get our handle on this.

So, we are launching the Maxine (ph) software program which is similar to what it's exactly what the center is using and it's my hope that they will talk, because I think one of the greatest challenges we have as a national governing body is our ability to understand what's going on at the center.

HASSAN:

So, I thank you for that. And I'm going to stop you there. I have one other question I want to ask and I'm sensitive to the length of the afternoon for everybody, but it's also really important that adults understand that they will be held legally responsible.

PERRY:

Absolutely.

EXHIBIT 13
078

HASSAN:

If they fail to report and disclose and take action.

PERRY:

Absolutely.

HASSAN:

And that is at the core of much of this, right.

PERRY:

Yes.

HASSAN:

So that it's not just about tracking. It's about letting people know that they have an obligation it's not optional.

PERRY:

Yes.

HASSAN:

Right. And that even if it damages the institution or other people's reputations. It's not optional, because protecting our athletes has to be the priority.

PERRY:

EXHIBIT 13
079

Absolutely, Senator. And I want you to know that the things that we're doing as an organization to make sure that that is not only our actions, but at each time a member - a professional member for example is registering for their - either a new application or renewing as a condition of their membership, they go through the Safe Sport course, which talks to them about those kinds of things.

HASSAN:

All right. Thank you. I want to just turn and with a little bit of indulgence from the Chair. Last question to Mr. Engler, please. One of the things that concerns me the most. It has been shocking, and saddening is that the individuals have come forward and they've not only had to relive their worst nightmares to tell their stories, but when they do they are often still not being believed or their motives and personal character are attacked. And I am sorry to say that you recently made remarks doing just that.

I am appalled by the email you sent earlier this year disparaging Ms. Van Hollander (ph), a gymnast who was abused by Dr. Larry Nassar under the watch of Michigan State and others. Your treatment of this issue raises concerns about how MSU will move forward here. Even with all the evidence, why did you doubt Ms. Van Hollander (ph)?

ENGLER:

The email of course was in the midst of our very difficult negotiation and it was private, it was never public, and it reflected, I guess just the passions of the moment about whether or not there were referral fees being paid. The reality is that our actions today I think have consistently shown our support for the survivors and that is what we have to create. We have to have a culture.

EXHIBIT 13
080

HASSAN:

I'm going to interrupt you Mr. Engler. I'm sorry. When you write an email referring to athletes as being manipulated. Not only are these strong accomplished smart athletes who have overcome enormous barriers in their lives to reach the pinnacle of their sport. They have survived unspeakable abuse and the notion that you would think they could be manipulated by trial lawyers and that you would speak of them that way. Is just deeply, deeply offensive. Private email or not, it reflects an attitude at the top of the institution that you are asking this committee, your current students, your current athletes, your alumni to trust. And I think you have some repair work today to put it mildly.

ENGLER:

Well, I think you're right. That's why I apologized.

HASSAN:

Well, thank you for the apology. I just - I want to know that we keep applauding survivors of abuse for coming forward. And then even though we say the right words, we haven't yet really taken a look at the adults in institutions who were in-charge and held them accountable. And what we do is we keep trying to make excuses for this unbelievable horror that these young people have experienced, and it really needs to stop. We need to take responsibility here. Michigan State needs to take responsibility. The committees need to take responsibility and we need to change laws and hold people accountable.

And I know that that's what this hearing is about. I know that that's what we're trying to do here. But at the end of the day, private email or not disparaging these survivors

EXHIBIT 13
081

takes all of the good work that so many people are trying to do to make sure this never happens again and moves us backwards.

ENGLER:

Senator, I appreciate that. As I said, that is why I apologize. I have three daughters aged 23, the exact same age as many of the survivors. And I know exactly what you're talking about. I recognize that my own family what could have happened. And I feel very deeply that's why we work so hard over the nearly six months I've been at Michigan State to fix the problem.

When you're in litigation with 11 firm's emotions, you'll get high instead of adversarial process. And I confess to getting very frustrated, but at the end of the day, we did get the settlement done. We have fixed the policies. We've strengthened accountability. Ms. Trevor I'd like to submit for the record, an executive order that I did create the Office of Risk Management, Ethics and Compliance. It's exactly - it's part of the actions that this Senator Blumenthal said, there is a lot of talk out there. There is a lot of support, but at Michigan State we are fixing the problem and you could not have a Larry Nassar again at Michigan State.

You've got a challenge I think on the part of all universities and a lot of organizations to fix the relationship between the sexes and how do we deal with assault and misconduct. But I would argue that we're done. We hope that what we've done at Michigan State can be a model for others. And I brought also two articles that are excellent articles one from Midland Daily News, a local paper, my own district. One from the Bleacher Report. These are survivor's testimonies just as you said were the media told the story. They got it out and it helps to explain how challenging this is to fix. But I feel this deeply from a personal standpoint and my actions have been

EXHIBIT 13
082

consistent with my belief that this should never ever happen again. None of these women should have to or no future women's will have to go through what these women have gone through.

HASSAN:

One might suggest that they never should have needed to sue the university in the first place. Thank you very much.

ENGLER:

I would agree with that. Thank you. Mr. Chairman may I submit these for the record?

MORAN:

Senator Hassan, thank you. The documents will be submitted to the record without objection.

ENGLER:

All right.

MORAN:

I'm going to try to ask just a couple of questions. Senator Blumenthal has agreed that I have now equal time to his excessive questions. But first of all, let me go back to Senator Blumenthal's question to you, Ms. Perry. I don't understand the flaw in the system that the two people that are coaching in Southern California, the flaw that allows them to do that is what?

EXHIBIT 13
083

PERRY:

So, the example that I gave Senator Moran is with the coach, his last name is Gray (ph). And we have our bylaws allow us to invoke immediate action called Interim suspension when we feel that our membership is in harm's way. In the Ted Stevens Act, anybody that is removed from the field of play is entitled to a hearing. So, we invoked the Interim suspension immediately. The hearing panel heard the interim suspension and said, we come back with this finding. We're going to reduce it from suspension to no contact with minor children.

So, you've got that at play and you also have the center which also is problematic in terms of this whole scenario that is in-charge of investigating and has complete jurisdiction over sexual misconduct. So, the information they give to us to present to the hearing panel is very limited.

So, you've got this system that's in place.

MORAN:

Is it a gymnastics club in Southern California that has allowed these coaches to coach.

PERRY:

That's correct. It's a member club.

MORAN:

A member of the USA gymnastics. Is that way to say that.

PERRY:

EXHIBIT 13
084

Yes.

MORAN:

OK. Apparently not. You were hesitant to agree with me.

PERRY:

Member of USA Gymnastics.

MORAN:

OK.

PERRY:

The coach. Right.

MORAN:

So, they've been notified that the restrictions on the coach is reduced to no contact with minors, but they're still coaching and at least according to Senator Blumenthal they're coaching minors.

PERRY:

They have to be according to the hearing panel recommendation that individual is still allowed to coach but has to have supervision.

MORAN:

EXHIBIT 13
085

Supervision.

PERRY:

Right.

MORAN:

So, they can coach with supervision. Why would any gymnastics group want that circumstance to be the case?

PERRY:

And this is exactly Senator Moran why we have such challenges, is that number one, we've got the U.S. Center for Safe Sport who has jurisdiction but cannot tell us the facts in great detail about that situation. So, if it's a misconduct, it goes right to the center. They inform us about it. USA Gymnastics makes a decision based on the limited information that the center has given to us. And we're going to err on the side of athlete safety every time. And so, this - so, we made a decision as an organization to put that individual on interim suspension, so they get removed from coaching. Right.

MORAN:

I understand the scenario.

PERRY:

Right.

EXHIBIT 13
086

MORAN:

I don't understand why the person is still coaching at the gymnastics club in Southern California. Having been censured in a way that prohibits him or her from having contact without supervision with young athletes.

PERRY:

But that's one of the challenges with the Ted Stevens Act is that prior to us, our ability to invoke interim measures that an individual that goes through the process if you will, an adverse party is entitled to a hearing.

MORAN:

All of which I understand the hearing occurred. The findings were held in the sense that something bad had happened or some reason for restricting this coach's capabilities to have contact with minors.

PERRY:

So, the hearing panel found that that they lessened the consequence from suspension and not ...

MORAN:

I understand all the facts. As you described.

PERRY:

Right.

EXHIBIT 13
087

MORAN:

But what keeps you from making certain that that group. First of all, I don't understand why a group would take the risk of hiring somebody in that circumstance. But secondly, what is your authority to do something about it when they do. And your answer to that is nothing, because the person presumably is being supervised.

PERRY:

No. So, our answer, USA Gymnastics answer is to put an individual on interim suspension. This is a sexual misconduct case. So, there is a lot of things that fall under sexual misconduct. So, when the center tells us about this case, the case went to the center and the center tells us about a case. We have very limited information given from the center and we have to make a decision at that point in time. Our decision is, do you put that individual on interim suspension or do you wait until the hearing process goes through at the center, because that's where it occurs.

And once the investigation and the disciplinary hearing takes place then if the center says - comes back and says, we're done with our finding, this is how we resolve this situation. All throughout that process, we don't know what's going on. And for the most part we have no idea how long it's going to take. So, in the meantime, we have this ...

MORAN:

So, these individuals or this individual can be there until there is a final determination by ...

PERRY:

EXHIBIT 13
088

By the center.

MORAN:

Center for Safe Sports.

PERRY:

That's true.

MORAN:

And that's what you're waiting on now.

PERRY:

And they're still in that process.

MORAN:

And when that finding occurs then what's your enforcement against the clubs?

PERRY:

So, then depending on the facts and I don't - we don't - I don't know the facts in this case.

MORAN:

Make this one more hypothetical.

PERRY:

EXHIBIT 13
089

Yes.

MORAN:

So, you have somebody who has been determined to be - it's inappropriate for them to be coaching the Center for Safe Sports. Hypothetically, a case has determined that, what prohibits a club from continuing to hire people who they should not hire.

PERRY:

So, there is two things. One is as a requirement of their membership, they have to. For example, in this case. If another club looks at hiring this individual and they're on a permanently an eligible list or they're on the suspension - they have to look at those lists that's a requirement of their continued membership. They have to do background screening. They have to get references. There is a series of things that that club owner has to do. And if for any reason they've hired somebody on a permanently eligible list in this situation, the organization has the right to revoke their membership as a club owner.

MORAN:

And the consequence of being a club that's no longer has membership with USAG is what?

PERRY:

The membership is a privilege that club still can operate their business, they just can't participate, and USA Gymnastics sanctioned kinds of events.

MORAN:

EXHIBIT 13
090

You were asked Ms. Perry about non-disclosure agreements. Ms. Lyons, any non-disclosure agreements at work at the USA Olympics, at U.S. Olympics.

LYONS:

No, I've asked that question and none to our knowledge.

MORAN:

And Mr. Engler, President Engler at Michigan State?

ENGLER:

No non-disclosure agreements. We don't disclose this leak.

MORAN:

In regard to reports about next steps, Ms. Lyons, the U.S. Olympic Committee has hired outside folks to review process procedure, find out the facts. I assume make recommendations to improve the circumstance. Is that all accurate? I'm describing that correctly?

LYONS:

Yes, we have a number of initiatives in the house.

MORAN:

When will we the public be able to see the results of that study for those studies.

LYONS:

EXHIBIT 13
091

There is a lot of interim things that will happen before those studies are completed, as you know we're doing a lot of interim steps, but the commission that is looking at the governance will begin and probably begin early September. We finalized - pretty much are finalizing the membership of that committee and I know that seems slow and moving as quickly as we can, but we want to make sure we have the right people we are looking at.

MORAN:

Is this the committee that Mr. Xiao was speaking of.

LYONS:

Yes, and he will be a member of that committee as well.

MORAN:

but you've hired a law firm to evaluate process and procedure. And when we last visited, I think we were expecting a report from that effort this summer.

LYONS:

I think you're referring to the Ropes and Gray investigation, which is not so much looking policies and procedures, it's looking at the who knew what when.

MORAN:

Yes.

LYONS:

EXHIBIT 13
092

And we expect probably in September. Our understanding is they've pretty much completed their investigations at the USOC. I think also that the USAG, they have a few more interviews to do a Center for Safety Sports. I believe they are almost close to finishing their investigation and then they would write their report. They've given us to understand probably early September is when we would look at.

MORAN:

Mr. Engler, there was conversations about the Michigan State Attorney General, the state of Michigan's Attorney General. I also think was there a legislative inquiry.

ENGLER:

There were a couple of different committees. They've wrapped up their work.

MORAN:

So, you're who what when where reports have been completed and are known publicly?

ENGLER:

That's correct. The attorney general we think is nearing the end. They've interviewed, I believe more than 100 people on campus. We don't know when that report will be done. We hope soon and that should be it for the state level reporting.

MORAN:

And Michigan State didn't hire anybody separate from the state efforts.

EXHIBIT 13
093

ENGLER:

We did not.

MORAN:

OK. And Ms. Perry at USA Gymnastics?

PERRY:

There are several investigations that are ongoing. One includes the Ropes and Gray, independent investigation. There are of course the congressional investigations and others. And according to Ms. Lyons and what we've been informed that Ropes and Gray should near its end around - and beginning of the fall.

MORAN:

In my view, certainly it would not be able to conclude our work until we see the who what when and where reports from your organizations. Let me - I think this is it, Senator Blumenthal for me. Center for Safe Sports. Just to want to give you further license.

Center for Safe Sports, I want to talk about it for a moment. This would be to Mr. Xiao and Ms. Lyons. One of the primary concerns that we've heard through are my conversations with athletes and our investigation is the belief or concern that the center is not truly independent from USOC. There is a resulting lack of trust on the part of the athletes, so they see the center as something created by the U.S. Olympic Committee and I'd like to hear from - I am going to start with you Mr. Xiao, is that an accurate assessment of where we are and what can we do about it.

EXHIBIT 13
094

XIAO:

As a collective I think there is a little bit of a concern, not necessarily with the board of the center of Safe Sports, but a little bit of the funding model, because to be honest not many entities have been interested in funding the Center for Safe Sports, as I understand. And so, a lot of the funding comes from the USOC and the national governing bodies.

MORAN:

And athletes I've talked to have expressed concern because the funding of the U.S. Olympic Committee of Safe Sports, but I also would say what you just said which is in the absence of the funding of the U.S. Olympic Committee. I doubt that the funding is there for Safe Sports.

XIAO:

And that's certainly a challenge and I think that's fair. The other issue that we're concerned about is the presence of former USOC staff members still operating in a staff capacity at the Center for Safe Sports, which raises some concerns for some people.

MORAN:

Say that sentence again. Make sure I understand.

XIAO:

EXHIBIT 13
095

There are staff members at Safe Sports, who were formerly staff members at the USOC committee. I can think of one. I don't know if there are others, but that certainly raised concerns within the community as well.

MORAN:

Ms. Lyons.

LYONS:

Just comment on the same question?

MORAN:

Yes.

LYONS:

Let me first say that I separate two parts of independence in terms of the investigations of the Center for Safe Sport is 100 percent independent. We have no insight into that and it is all completely confidential and there is no USOC employee who has any involvement with any of the ongoing investigations in any way.

There are areas where I think in the interest of all the athletes, the NGBs, the USOC and the center need to collaborate and that is things like creating these databases so that we can provide information and I think it is in helping to find additional funding, because they don't have enough to be successful at their mission. And much like you saw that which had its origins within the USOC, but then became a fully independent organization with not just funding from the USOC, but also from the government. We

EXHIBIT 13
096

think that that is really the evolution that the center needs to have so that it can truly become independent of any influence from us or anyone else.

MORAN:

Senator Blumenthal.

BLUMENTHAL:

I want to ask Mr. Chairman that we put in the record the article I referenced it earlier from the Orange County Register, dated yesterday.

MORAN:

Without objection.

BLUMENTHAL:

And just to point out that Ms. Perry it says that no notice of these individual's suspension was provided, is that true?

PERRY:

Senator Blumenthal, I checked into that this morning and I was told that notice was given through both an email and a first-class mail.

BLUMENTHAL:

So, you're saying that Terry Gray (ph) worked with the CIGA club in Southern California. And did so with notice despite Cathy (ph), the Director of that club saying,

EXHIBIT 13
097

"no notice was given to us nor Terry from USA Gymnastics prior to the list going out on line".

PERRY:

That individual. Yes. I'm sorry. I apologize Senator. I was told this morning because I quickly checked into that to make sure that notice was because that's part of our procedure. And I was told positively that both an e-mail and a letter was sent out.

BLUMENTHAL:

That's just not true. That's fake.

PERRY:

I was told I was told that they were sent out.

BLUMENTHAL:

You know we seem to have differences in accounts here. Mr. Engler I am not going to let this issue go.

PERRY:

I think it goes to the heart of why we're here in part because the survivors were disbelieved for so long. And I just want to say for the record, I believe Caylee Lawrence (ph) in her account - I regret that we're at this point in the testimony where there are differences in factual accounts of what happened. And I want to say, and I mean this as a lawyer and as a traveler, there are all kinds of defenses that the parties can make in court. But there is also a moral responsibility here.

EXHIBIT 13
098

And if the U.S. Olympic Committee and USA Gymnastics are really serious and sincere, they will put aside this characterization of Larry Nassar relationship to your organization that very respectfully let me say, disingenuously disclaim any legal responsibility. If you're serious and sincere, you will withdraw that answer and motion to dismiss, because you need to be part of the legal solution, not just come here and apologize and say, there is a new USA Gymnastics, because it is the new USA Gymnastics that file that answer and motion to dismiss on the part of the U.S. Olympic Committee.

PERRY:

Senator Blumenthal I am not aware of a motion to dismiss and I think you corrected that that it wasn't USA Gymnastics, but I will be very, and I want to reassure all of the senators and all of the survivors and everybody in this room that USA Gymnastics is absolutely dedicated and committed to legal resolution. And we've gone through mediation. We're going to continue until we get resolution. And you're absolutely right, we have a moral obligation.

BLUMENTHAL:

You have a moral obligation, but you also have a legal obligation.

PERRY:

And we have a legal obligation.

BLUMENTHAL:

EXHIBIT 13
099

And you will withdraw that answer and correct it or amend it, whatever the correct procedure is under those rules and you will accept that Larry Nassar worked for, was employed by, was an agent of, and therefore imposes that legal responsibility on USA Gymnastics.

PERRY:

And Senator Blumenthal, Larry Nassar was absolutely an agent of USA Gymnastics. I've never said any different than that as a team doctor and I will find out what that is that you're referring to. I don't know what legal action. I know that there wasn't a motion to dismiss, but I will find out what that was about it. It could be a lot of ...

BLUMENTHAL:

I am not saying that was a motion to dismiss.

PERRY:

Could it be a lot of different things.

BLUMENTHAL:

It was an answer. And I want to make clear, I'm not trying to impose pressure on you from this position, because you're entitled to your legal rights. Your lawyer is entitled to advise you as to those rights, you're entitled to assert those rights. But as part of your moral responsibility, in my view, with all due respect, it is also to accept legal responsibility because that will make you a part of the solution that will make you part of any court order. The same goes for United States Olympic Committee.

PERRY:

EXHIBIT 13
100

And Senator Blumenthal, I want to reinforce to you again that this organization under my leadership has and will be committed to legal resolution with our survivors. These are our athletes and we will do whatever it takes to get to that point.

BLUMENTHAL:

Thank you. And again, I want to thank the survivors who are here today. Your presence sends a powerful message and is an important statement. And again, my thanks to the Chairman of the Subcommittee, Senator Moran.

MORAN:

Senator Blumenthal, thank you very much. Let me as I have - never hearing that I've chaired ask the witnesses if they have anything they'd like to put on the record that they were unable to do so that they want to correct something they said or felt like there is something we need to know that we didn't ask about.

ENGLER:

I would simply say Mr. Chairman that I appreciate the opportunity to come here to clarify the issues. I understand there might be differences in interpretation, but the opportunity come here and talk about the changes we have made to put those on the record to talk about a $500 billion settlement. That's part of the healing is an opportunity that we very much appreciate. We're proud of what we've done. We're proud of what we're doing, and we think when we're done, universities around the country are going to look to Michigan State to say, what policies did you put in place and how might they help us.

MORAN:

EXHIBIT 13
101

Anyone else?

PERRY:

Senator Moran and Senator Blumenthal and all Senators, I want to thank you. This is an incredibly important time for our organization and we take it very seriously. These are our athletes and we're going to do whatever we can to earn back their trust. And I want to say that coming from outside the Olympic movement, there are things that I think we can address moving forward with the help of Congress and the funding of the center that will help us do everything we can in our power to prevent what happened. Thank you.

LYONS:

Mr. Chairman, I just like to say, I am coming to the end of my tenure as the CEO at the USOC. And I hope that in some way we have begun a journey that will get us to a new culture that is all about the athletes that they are the center of that and the reason that's happening is because of the brave voices of the women behind in this room and I hope that small amount of time that I've been able to devote to them yield some results in the future. Thank you.

XIAO:

I just like to say from the Athletes Advisory Council, we'll continue to do our job. We're going to continue to engage in good faith and all of the reform efforts here. But I also wanted to point out that the core problem here until that solves, there are just going to be more problems, more different symptoms that are going to arise. And the core problem being athlete representatives have heard administrators, staffers,

EXHIBIT 13
102

coaches, sometimes expressed the same sentiment which is athletes come and go, and athletes are replaceable. I'm told that changes were never going to get anywhere.

MORAN:

Thank you. Again, we thank you all for being here today. Thank you for testifying. We appreciate those in the audience today including the survivors. The hearing record will remain open for two weeks, during that time senators are asked to submit any questions for the record upon receipt. This will be questions to you or witnesses that witnesses are requested to submit their written answers to the committee as soon as possible, but no later than August 21st of 2018. This concludes the hearing and the hearing is now adjourned.

List of Panel Members and Witnesses
PANEL MEMBERS:

SEN. JERRY MORAN, R-KAN., CHAIRMAN

SEN. DEAN HELLER, R-NEV.

SEN. ROY BLUNT, R-MO.

SEN. TED CRUZ, R-TEXAS

SEN. DEB FISCHER, R-NEB.

SEN. JAMES M. INHOFE, R-OKLA.

SEN. MIKE LEE, R-UTAH

SEN. SHELLEY MOORE CAPITO, R-W.VA.

EXHIBIT 13
103

SEN. TODD YOUNG, R-IND.

SEN. JOHN THUNE, R-S.D., EX OFFICIO

SEN. RICHARD BLUMENTHAL, D-CONN., RANKING MEMBER

SEN. AMY KLOBUCHAR, D-MINN.

SEN. EDWARD J. MARKEY, D-MASS.

SEN. TOM UDALL, D-N.M.

SEN. TAMMY DUCKWORTH, D-ILL.

SEN. MAGGIE HASSAN, D-N.H.

SEN. CATHERINE CORTEZ MASTO, D-NEV.

SEN. BILL NELSON, D-FLA., EX OFFICIO

SEN. CHARLES E. GRASSLEY, R-IOWA

SEN. DIANNE FEINSTEIN, D-CALIF.

WITNESSES:

FORMER GOV. JOHN ENGLER, R-MICH., INTERIM PRESIDENT OF
MICHIGAN STATE UNIVERSITY

SUSANNE LYONS, ACTING CEO OF THE U.S. OLYMPIC COMMITTEE

KERRY PERRY, PRESIDENT AND CEO OF USA GYMNASTICS

EXHIBIT 13
104

AND HAN XIAO, CHAIRMAN OF THE ATHLETES' ADVISORY COUNCIL,

TESTIFY

EXHIBIT 13
105

# EXHIBIT "14"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

ALEXANDRIA ROSE RAISMAN, AN   )
INDIVIDUAL,                   )
                             )
          Plaintiff,          )
                             )
       -v-                    ) CAUSE NO.
                             ) 5:18-cv-02479-BLF
UNITED STATES OLYMPIC         )
COMMITTEE, A BUSINESS ENTITY )
OF FORM UNKNOWN, USA          )
GYMNASTICS, AN INDIANA        )
BUSINESS ENTITY OF FORM       )   The Honorable
UNKNOWN; LARRY NASSAR, AN     )   Beth Labson Freeman
INDIVIDUAL; STEVE PENNY, AN   )
INDIVIDUAL; PAUL PARRILLA, AN )
INDIVIDUAL; AND DOES 1        )
THROUGH 500,                  )
                             )
          Defendants.         )
_____)

        The telephonic videotaped deposition upon oral

examination of AMY SUE WHITE, a witness produced and

sworn before me, Elizabeth T. Lindner, RPR, Notary

Public in and for the County of Hendricks, State of

Indiana, taken on behalf of the Plaintiffs at Stewart

Richardson Deposition Services, One Indiana Square,

Suite 2425, Indianapolis, Indiana, on November 13,

2018, at 10:33 a.m., pursuant to all applicable rules.

1

EXHIBIT 14
001

| | | | |
|---|---|---|---|
| 10:48:32 | 1 | A | For which work? |
| 10:48:34 | 2 | Q | For the elementary school that you -- |
| 10:48:40 | 3 | A | No. |
| 10:48:40 | 4 | Q | Do you know if you were trained as a mandatory |
| 10:48:43 | 5 | | reporter when you worked at that school? |
| 10:48:47 | 6 | A | I do not know that. |
| 10:48:50 | 7 | Q | Do you know what a mandatory reporter is, or does |
| 10:48:56 | 8 | | that term -- |
| 10:48:58 | 9 | A | I've heard the term.  The exact definition of that |
| 10:49:01 | 10 | | term, I couldn't repeat verbatim, no. |
| 10:49:05 | 11 | Q | Okay.  And where had you heard that term before? |
| 10:49:12 | 12 | A | We did some work at USA Gymnastics with a child |
| 10:49:21 | 13 | | advocacy center recently, and I remember that term |
| 10:49:25 | 14 | | coming up. |
| 10:49:26 | 15 | Q | Okay.  And how recently are we talking? |
| 10:49:31 | 16 | A | I respectfully decline to answer that pursuant to |
| 10:49:35 | 17 | | the Fifth Amendment to the United States |
| 10:49:37 | 18 | | Constitution that protects -- protections provided |
| 10:49:41 | 19 | | to me by Ohio and Reiner. |
| 10:49:43 | 20 | | MR. CUNNY:  Okay.  And just to simplify |
| 10:49:46 | 21 | | things -- I can work this out with your counsel -- |
| 10:49:48 | 22 | | there will probably be several questions you're |
| 10:49:52 | 23 | | going to be invoking the Fifth Amendment on, I |
| 10:49:55 | 24 | | would presume.  In the event you do wish to invoke |
| 10:49:58 | 25 | | the Fifth Amendment, I would stipulate that she can |

23

EXHIBIT 14
002

| | | |
|---|---|---|
| 10:50:01 | 1 | just say "Fifth" to memorialize what she just said |
| 10:50:06 | 2 | so she doesn't have to say that a hundred times. |
| 10:50:10 | 3 | MR. DOWNEY:  Understood.  Yeah, you can just |
| 10:50:10 | 4 | say -- |
| 10:50:10 | 5 | THE WITNESS:  I just say "the Fifth." |
| 10:50:13 | 6 | MR. DOWNEY:  Well, I'd just say, "I'll assert |
| 10:50:15 | 7 | the Fifth."  I. |
| 10:50:16 | 8 | THE WITNESS:  Okay. |
| 10:50:16 | 9 | MR. DOWNEY:  Okay? |
| 10:50:17 | 10 | THE WITNESS:  Yes. |
| 10:50:17 | 11 | BY MR. CUNNY: |
| 10:50:19 | 12 | Q  Great.  I'll go back in time a little bit where |
| 10:50:21 | 13 | this might not be relevant, but you were at |
| 10:50:23 | 14 | Plainfield elementary for about a year you said? |
| 10:50:27 | 15 | A  One school calendar. |
| 10:50:29 | 16 | Q  Okay.  Where did you go after that? |
| 10:50:33 | 17 | A  National Travel Systems. |
| 10:50:37 | 18 | Q  Okay.  And was that a pre-existing company, or, |
| 10:50:40 | 19 | again, did you create the company? |
| 10:50:41 | 20 | A  No, it's a company located in Lubbock, Texas. |
| 10:50:49 | 21 | Q  Gotcha.  And you worked remotely from Indiana? |
| 10:50:51 | 22 | A  No.  I worked in Gymnastics' office for National |
| 10:50:55 | 23 | Travel Systems. |
| 10:50:56 | 24 | Q  Oh, okay.  So when you were at National Travel |
| 10:51:02 | 25 | Systems, that company dealt with in some way USA |

24

EXHIBIT 14
003

| | | |
|---|---|---|
| 10:51:07 | 1 | Gymnastics? |
| 10:51:10 | 2 | A  Yes, that is their client. |
| 10:51:11 | 3 | Q  Oh, okay.  Gotcha. |
| 10:51:13 | 4 | Do you know what year you started at National |
| 10:51:15 | 5 | Travel Systems? |
| 10:51:18 | 6 | A  2007. |
| 10:51:18 | 7 | Q  Okay.  And was USAG your client when you first |
| 10:51:25 | 8 | started at National Travel Systems? |
| 10:51:27 | 9 | A  Yes, among others. |
| 10:51:31 | 10 | Q  Okay.  In your role at National Travel Systems, you |
| 10:51:35 | 11 | serviced multiple clients? |
| 10:51:38 | 12 | A  Yes. |
| 10:51:39 | 13 | Q  And what would you do in terms of providing |
| 10:51:41 | 14 | services to those clients? |
| 10:51:49 | 15 | A  Book air, book car, hotel contracting, setting up |
| 10:51:53 | 16 | transportation movements, as far as busing goes, |
| 10:51:59 | 17 | for events. |
| 10:52:01 | 18 | Q  And how long did you work for National Travel |
| 10:52:03 | 19 | Systems? |
| 10:52:08 | 20 | A  I came on to USA Gymnastics' payroll six years ago, |
| 10:52:22 | 21 | roughly. |
| 10:52:23 | 22 | Q  Okay.  So would it be fair to say somewhere between |
| 10:52:27 | 23 | 2007 and maybe 2012, 2013 that you worked for |
| 10:52:30 | 24 | National Travel Systems? |
| 10:52:30 | 25 | A  Yes. |

EXHIBIT 14
004

| | | |
|---|---|---|
| 10:52:31 | 1 | Q  Okay.  And after you worked at National Travel |
| 10:52:35 | 2 |    Systems, were you doing the same job for USA |
| 10:52:42 | 3 |    Gymnastics? |
| 10:52:44 | 4 | A  Yes -- |
| 10:52:46 | 5 |        MR. DOWNEY:  We're going to assert the Fifth |
| 10:52:47 | 6 |    on the USA Gymnastics. |
| 10:52:51 | 7 | A  I assert the Fifth. |
| 10:52:53 | 8 | Q  Who hired you at USA Gymnastics? |
| 10:52:58 | 9 | A  I assert the Fifth. |
| 10:52:59 | 10 | Q  Who was your direct supervisor when you first began |
| 10:53:01 | 11 |    at USA Gymnastics? |
| 10:53:02 | 12 | A  I assert the Fifth. |
| 10:53:04 | 13 | Q  Did your direct supervisor change over time while |
| 10:53:08 | 14 |    you were at USA Gymnastics? |
| 10:53:09 | 15 | A  I assert the Fifth. |
| 10:53:11 | 16 | Q  Was Steve Penny your supervisor at USA Gymnastics |
| 10:53:14 | 17 |    when you first began? |
| 10:53:16 | 18 | A  I assert the Fifth. |
| 10:53:18 | 19 | Q  Was Steve Penny your supervisor the entire time you |
| 10:53:20 | 20 |    were at USA Gymnastics? |
| 10:53:21 | 21 | A  I assert the Fifth. |
| 10:53:23 | 22 | Q  Are you still employed at USA Gymnastics? |
| 10:53:26 | 23 | A  I assert the Fifth. |
| 10:53:28 | 24 | Q  What was your job title when you first began at USA |
| 10:53:32 | 25 |    Gymnastics? |

26

EXHIBIT 14
005

| | | |
|---|---|---|
| 10:53:33 | 1 | A  I assert the Fifth. |
| 10:53:36 | 2 | Q  When you first began at USA Gymnastics, were you |
| 10:53:39 | 3 | provided mandatory reporter training? |
| 10:53:43 | 4 | A  I assert the Fifth. |
| 10:53:44 | 5 | Q  When you first arrived at USA Gymnastics, were you |
| 10:53:47 | 6 | provided any training regarding document retention |
| 10:53:50 | 7 | policies? |
| 10:53:52 | 8 | A  I assert the Fifth. |
| 10:53:52 | 9 | Q  Do you know if USA Gymnastics had document |
| 10:53:56 | 10 | retention policies? |
| 10:53:57 | 11 | A  I assert the Fifth. |
| 10:53:59 | 12 | Q  Specifically, do you know if there were retention |
| 10:54:02 | 13 | policies for medical records at USA Gymnastics when |
| 10:54:04 | 14 | you first began? |
| 10:54:05 | 15 | A  I assert the Fifth. |
| 10:54:07 | 16 | Q  Did your understanding change over the years as to |
| 10:54:09 | 17 | that document retention policy for medical records, |
| 10:54:13 | 18 | specifically? |
| 10:54:13 | 19 | A  I assert the Fifth. |
| 10:54:16 | 20 | Q  Did USA Gymnastics keep medical records for the |
| 10:54:19 | 21 | girls who competed in their programs? |
| 10:54:22 | 22 | A  I assert the Fifth. |
| 10:54:23 | 23 | Q  Did you book any travel for Larry Nassar? |
| 10:54:26 | 24 | A  I assert the Fifth. |
| 10:54:28 | 25 | Q  Did you book any travel for Steve Penny? |

27

EXHIBIT 14
006

White, Amy
Nassar Cases

| | | | |
|---|---|---|---|
| 10:54:31 | 1 | A | I assert the Fifth. |
| 10:54:32 | 2 | Q | Did you book any travel for McKayla Maroney? |
| 10:54:34 | 3 | A | I assert the Fifth. |
| 10:54:36 | 4 | Q | Did you book any travel for Aly Raisman? |
| 10:54:39 | 5 | A | I assert the Fifth. |
| 10:54:40 | 6 | Q | Did you book any travel for Jordyn Wieber? |
| 10:54:42 | 7 | A | I assert the Fifth. |
| 10:54:42 | 8 | Q | Did you book any travel for Mattie Larson? |
| 10:54:43 | 9 | A | I assert the Fifth. |
| 10:54:45 | 10 | Q | Do you know who any of those individuals are with |
| 10:54:47 | 11 | | relation to USA Gymnastics or the United States |
| 10:54:50 | 12 | | Olympic Committee? |
| 10:54:52 | 13 | A | I assert the Fifth. |
| 10:54:57 | 14 | Q | Did USA Gymnastics provide you any sort of training |
| 10:55:00 | 15 | | regarding the retention of records at the company? |
| 10:55:06 | 16 | A | I assert the Fifth. |
| 10:55:07 | 17 | Q | Did USA Gymnastics provide you any sort of training |
| 10:55:09 | 18 | | on how to report suspected child abuse? |
| 10:55:14 | 19 | A | I assert the Fifth. |
| 10:55:16 | 20 | Q | Did you ever speak to Steve Penny about processes |
| 10:55:20 | 21 | | for reporting suspected child abuse at USA |
| 10:55:22 | 22 | | Gymnastics? |
| 10:55:23 | 23 | A | I assert the Fifth. |
| 10:55:24 | 24 | Q | Did Steve Penny ever tell you not to report |
| 10:55:27 | 25 | | suspected child abuse at USA Gymnastics? |

28

EXHIBIT 14
007

| | | |
|---|---|---|
| 10:55:29 | 1 | A  I assert the Fifth. |
| 10:55:30 | 2 | Q  Did you ever speak to Steve Penny about suspected |
| 10:55:33 | 3 | child abuse at USA Gymnastics? |
| 10:55:35 | 4 | A  I assert the Fifth. |
| 10:55:36 | 5 | Q  Did you ever speak to Steve Penny about complaints |
| 10:55:39 | 6 | he had received about Larry Nassar prior to June of |
| 10:55:43 | 7 | 2015? |
| 10:55:44 | 8 | A  I assert the Fifth. |
| 10:55:44 | 9 | Q  Did you ever speak to Steve Penny about complaints |
| 10:55:47 | 10 | that Larry Nassar was photographing young, minor |
| 10:55:52 | 11 | girls at the Karolyi Ranch in excess? |
| 10:55:56 | 12 | A  I assert the Fifth. |
| 10:55:56 | 13 | Q  Did you ever learn from any source that Larry |
| 10:56:01 | 14 | Nassar was photographing -- taking hundreds of |
| 10:56:04 | 15 | photographs of little girls at the ranch while he |
| 10:56:05 | 16 | was providing medical care for those girls? |
| 10:56:10 | 17 | A  I assert the Fifth. |
| 10:56:11 | 18 | Q  Did you ever speak to Steve Penny about Marvin |
| 10:56:12 | 19 | Sharp and any relation to Larry Nassar? |
| 10:56:18 | 20 | A  I assert the Fifth. |
| 10:56:18 | 21 | Q  Did you speak to Steve Penny whatsoever about |
| 10:56:22 | 22 | Marvin Sharp? |
| 10:56:24 | 23 | A  I assert the Fifth. |
| 10:56:25 | 24 | Q  Do you know who Marvin Sharp is? |
| 10:56:31 | 25 | A  I assert the Fifth. |

29

EXHIBIT 14
008

| | | |
|---|---|---|
| 10:56:31 | 1 | Q   When's the last time you've spoke with Steve Penny? |
| 10:56:37 | 2 | A   I assert the Fifth. |
| 10:56:37 | 3 | Q   Do you know why Steve Penny was in California |
| 10:56:40 | 4 | yesterday? |
| 10:56:42 | 5 | A   I assert the Fifth. |
| 10:56:52 | 6 | Q   Have you spoken with Steve Penny since |
| 10:56:55 | 7 | September 2016 about Larry Nassar? |
| 10:56:58 | 8 | A   I assert the Fifth. |
| 10:56:58 | 9 | Q   Have you spoken with Steve Penny since |
| 10:57:01 | 10 | September 2016 about the FBI's handling of the |
| 10:57:06 | 11 | Larry Nassar matter? |
| 10:57:07 | 12 | A   I assert the Fifth. |
| 10:57:08 | 13 | Q   Have you spoken with Steve Penny between June of |
| 10:57:12 | 14 | 2015 and September of 2016 regarding allegations |
| 10:57:16 | 15 | that Larry Nassar was abusing young girls? |
| 10:57:20 | 16 | A   I assert the Fifth. |
| 10:57:20 | 17 | Q   Have you spoken with the FBI regarding the |
| 10:57:22 | 18 | investigation into Larry Nassar? |
| 10:57:25 | 19 | A   I assert the Fifth. |
| 10:57:26 | 20 | Q   Have you spoken with anybody from law enforcement |
| 10:57:30 | 21 | regarding the investigation of Larry Nassar? |
| 10:57:33 | 22 | A   I assert the Fifth. |
| 10:57:33 | 23 | Q   Have you spoken with anybody from the Indianapolis |
| 10:57:36 | 24 | Police Department regarding Larry Nassar? |
| 10:57:38 | 25 | A   I assert the Fifth. |

30

EXHIBIT 14
009

| | | |
|---|---|---|
| 10:57:40 | 1 | Q  Have you spoken with anybody from the Department of |
| 10:57:41 | 2 | Child and Family Services regarding Larry Nassar? |
| 10:57:45 | 3 | A  I assert the Fifth. |
| 10:57:46 | 4 | Q  Have you spoken with anybody from Ropes & Gray |
| 10:57:48 | 5 | regarding Larry Nassar? |
| 10:57:51 | 6 | A  I assert the Fifth. |
| 10:57:52 | 7 | Q  Have you spoken with Debra Daniels regarding Larry |
| 10:57:55 | 8 | Nassar? |
| 10:57:55 | 9 | A  I assert the Fifth. |
| 10:57:56 | 10 | Q  Have you ever been to the Karolyi Ranch? |
| 10:58:03 | 11 | A  I assert the Fifth. |
| 10:58:04 | 12 | Q  Did you -- after the Larry Nassar allegations broke |
| 10:58:09 | 13 | in September of 2016, did you travel to the Karolyi |
| 10:58:12 | 14 | Ranch? |
| 10:58:15 | 15 | A  I assert the Fifth. |
| 10:58:15 | 16 | Q  Did Steve Penny instruct you to travel to the |
| 10:58:19 | 17 | Karolyi Ranch? |
| 10:58:21 | 18 | A  I assert the Fifth. |
| 10:58:22 | 19 | Q  Did USA Gymnastics pay for your travel to the |
| 10:58:24 | 20 | Karolyi Ranch? |
| 10:58:25 | 21 | A  I assert the Fifth. |
| 10:58:27 | 22 | Q  Did Steve Penny instruct you to go to the ranch to |
| 10:58:30 | 23 | retrieve documents after the Larry Nassar scandal |
| 10:58:34 | 24 | had broken in September of 2016? |
| 10:58:37 | 25 | A  I assert the Fifth. |

31

EXHIBIT 14
010

White, Amy
Nassar Cases

| | | |
|---|---|---|
| 10:58:37 | 1 | Q  Did you, in fact, go to the ranch to retrieve those |
| 10:58:41 | 2 | documents as requested by Steve Penny? |
| 10:58:43 | 3 | A  I assert the Fifth. |
| 10:58:45 | 4 | Q  Were you made aware that the Texas Rangers had |
| 10:58:51 | 5 | approached the ranch in attempts to find documents |
| 10:58:55 | 6 | that Steve Penny wanted you to retrieve from the |
| 10:58:57 | 7 | ranch? |
| 10:58:58 | 8 | A  I assert the Fifth. |
| 10:58:59 | 9 | Q  Who made you aware of the fact that the Texas |
| 10:59:01 | 10 | Rangers wanted documents at the ranch? |
| 10:59:04 | 11 | A  I assert -- |
| 10:59:07 | 12 | MS. MATTHAI:  Lacks foundation. |
| 10:59:10 | 13 | A  I assert the Fifth. |
| 10:59:12 | 14 | Q  Did Bela Karolyi call you after the Texas Rangers |
| 10:59:16 | 15 | had arrived at the ranch? |
| 10:59:19 | 16 | A  I assert the Fifth. |
| 10:59:20 | 17 | Q  Did Gary Warren call you after the Nassar scandal |
| 10:59:25 | 18 | broke to inform you that the Texas Rangers had |
| 10:59:29 | 19 | approached the ranch and wanted documents from that |
| 10:59:32 | 20 | facility? |
| 10:59:33 | 21 | A  I assert the Fifth. |
| 10:59:34 | 22 | Q  Did Kathy Kelly contact you or speak with you in |
| 10:59:37 | 23 | any way to indicate that the Texas Rangers had come |
| 10:59:41 | 24 | to the ranch and were looking for documents? |
| 10:59:45 | 25 | A  I assert the Fifth. |

32

EXHIBIT 14
011

```
10:59:45  1    Q  Did any of those individuals indicate to you that
10:59:49  2       they told the Texas Rangers to go away because they
10:59:53  3       didn't have a search warrant?
10:59:54  4    A  I assert the Fifth.
11:00:02  5    Q  Did Steve Penny instruct you to go to the ranch
11:00:05  6       expediently such that you could get the documents
11:00:08  7       before the Rangers could obtain a search warrant?
11:00:13  8    A  I assert the Fifth.
11:00:14  9    Q  Did Steve Penny give you money to buy suitcases to
11:00:18 10       bring back those documents?
11:00:21 11    A  I assert the Fifth.
11:00:21 12    Q  How many documents did you go to the ranch to
11:00:24 13       obtain?
11:00:26 14    A  I assert the Fifth.
11:00:27 15    Q  Where did you buy the suitcases in order to bring
11:00:31 16       the documents back from the ranch?
11:00:33 17    A  I assert the Fifth.
11:00:33 18    Q  What date did you go to the ranch to retrieve the
11:00:37 19       documents that Steve Penny instructed you to bring
11:00:39 20       back?
11:00:40 21    A  I assert the Fifth.
11:00:42 22    Q  Did Gary Warren pull the documents together for you
11:00:46 23       at the ranch for you to bring back to Indianapolis?
11:00:50 24    A  I assert the Fifth.
11:00:50 25    Q  What were your instructions in bringing those
```

EXHIBIT 14
012

| | | |
|---|---|---|
| 11:00:53 | 1 | documents back to Indianapolis? |
| 11:00:56 | 2 | A  I assert the Fifth. |
| 11:00:56 | 3 | Q  Were you instructed to preserve those documents at |
| 11:00:59 | 4 | any point by Steve Penny? |
| 11:01:02 | 5 | A  I assert the Fifth. |
| 11:01:04 | 6 | Q  Did you ever bring those documents back to |
| 11:01:06 | 7 | Indianapolis? |
| 11:01:07 | 8 | A  I assert the Fifth. |
| 11:01:09 | 9 | Q  Did Steve Penny tell you to destroy those documents |
| 11:01:12 | 10 | at the ranch? |
| 11:01:13 | 11 | A  I assert the Fifth. |
| 11:01:14 | 12 | Q  Was Gary Warren destroying any documents when you |
| 11:01:18 | 13 | got to the ranch? |
| 11:01:19 | 14 | A  I assert the Fifth. |
| 11:01:20 | 15 | Q  Was anybody destroying documents when you got to |
| 11:01:22 | 16 | the ranch? |
| 11:01:23 | 17 | A  I assert the Fifth. |
| 11:01:24 | 18 | Q  Did you speak to Gary Warren about the documents |
| 11:01:27 | 19 | that you were to obtain from the ranch? |
| 11:01:31 | 20 | A  I assert the Fifth. |
| 11:01:31 | 21 | Q  Did you speak with Rhonda Faehn prior to going to |
| 11:01:35 | 22 | the ranch about the documents that you would |
| 11:01:37 | 23 | retrieve? |
| 11:01:39 | 24 | A  I assert the Fifth. |
| 11:01:41 | 25 | Q  When you got to the ranch, where did you get the |

34

EXHIBIT 14
013

| | | |
|---|---|---|
| 11:01:44 | 1 | documents from?  Meaning, where were they located |
| 11:01:48 | 2 | specifically at the ranch? |
| 11:01:53 | 3 | A  I assert the Fifth. |
| 11:01:53 | 4 | Q  Did the ranch have depositories for medical records |
| 11:01:57 | 5 | that were on the premises? |
| 11:01:59 | 6 | A  I assert the Fifth. |
| 11:02:00 | 7 | Q  Were there any garages or sheds that you searched |
| 11:02:02 | 8 | in to obtain those documents? |
| 11:02:05 | 9 | A  I assert the Fifth. |
| 11:02:05 | 10 | Q  Did Kathy Kelly or Gary Warren assist you in |
| 11:02:09 | 11 | obtaining the documents from the ranch? |
| 11:02:11 | 12 | A  I assert the Fifth. |
| 11:02:12 | 13 | Q  Were you on any mutual communications, meaning |
| 11:02:17 | 14 | either copied or a direct recipient of emails, text |
| 11:02:23 | 15 | messages, between Gary Warren and Steve Penny about |
| 11:02:26 | 16 | what documents should be taken from ranch? |
| 11:02:30 | 17 | A  I assert the Fifth. |
| 11:02:31 | 18 | Q  Were those documents that were to be taken from the |
| 11:02:33 | 19 | ranch specifically pertaining to Larry Nassar and |
| 11:02:37 | 20 | his abusive medical treatments of little girls? |
| 11:02:40 | 21 | A  I assert the Fifth. |
| 11:02:41 | 22 | Q  What specific instructions regarding Larry Nassar's |
| 11:02:43 | 23 | documents did Steve Penny give you in retrieving |
| 11:02:47 | 24 | those from the ranch? |
| 11:02:48 | 25 | A  I assert the Fifth. |

35

EXHIBIT 14
014

| | | |
|---|---|---|
| 11:02:50 | 1 | Q   How many documents did you take from the ranch? |
| 11:02:52 | 2 | A   I assert the Fifth. |
| 11:02:53 | 3 | Q   Did you review those documents before you put them |
| 11:02:57 | 4 | into receptacles to bring them back to |
| 11:02:59 | 5 | Indianapolis? |
| 11:03:00 | 6 | A   I assert the Fifth. |
| 11:03:01 | 7 | Q   Did you in fact bring those documents in |
| 11:03:03 | 8 | receptacles back to Indianapolis? |
| 11:03:05 | 9 | A   I assert the Fifth. |
| 11:03:08 | 10 | Q   Did Martha Karolyi ever speak to you regarding the |
| 11:03:11 | 11 | documents that were to be removed from the Karolyi |
| 11:03:15 | 12 | Ranch? |
| 11:03:16 | 13 | A   I assert the Fifth. |
| 11:03:17 | 14 | MS. MERY:  Objection, assumes facts not in |
| 11:03:19 | 15 | evidence. |
| 11:03:20 | 16 | MR. CUNNY:  What was the objection? |
| 11:03:23 | 17 | MS. MERY:  Lacks foundation. |
| 11:03:24 | 18 | MR. CUNNY:  Oh, sorry.  Didn't hear it. |
| 11:03:27 | 19 | Q   Okay.  Did Martha Karolyi help you in searching for |
| 11:03:34 | 20 | documents located at the ranch? |
| 11:03:36 | 21 | A   I assert the Fifth. |
| 11:03:37 | 22 | MS. MERY:  Objection, lack of foundation. |
| 11:03:39 | 23 | Q   Did Bela assist you -- |
| 11:03:42 | 24 | MS. MATTHAI:  Alex, I'm going to -- |
| 11:03:46 | 25 | Q   -- in searching for documents that were located at |

EXHIBIT 14
015

| | | |
|---|---|---|
| 11:03:46 | 1 | the ranch? |
| 11:03:46 | 2 | MS. MATTHAI:  I'm going to ask to interrupt |
| 11:03:46 | 3 | for a second. |
| 11:03:46 | 4 | Alex, obviously the witness is going to be |
| 11:03:49 | 5 | taking the Fifth to all of these questions that you |
| 11:03:51 | 6 | are asking.  You are making a large number of |
| 11:03:55 | 7 | assumptions in your questions that are not true and |
| 11:03:59 | 8 | for which there are no foundations. |
| 11:04:02 | 9 | I think it just is going to clutter this |
| 11:04:04 | 10 | record if we all jump in as to every one of those |
| 11:04:05 | 11 | questions and assert the lack of foundation.  So |
| 11:04:08 | 12 | given the fact that the witness is not going to be |
| 11:04:10 | 13 | providing substantive answers, it seems to me we |
| 11:04:14 | 14 | should just agree there is a running objection on |
| 11:04:17 | 15 | this.  So if these questions ever come back at a |
| 11:04:20 | 16 | time when the issue in Texas has been cleared up |
| 11:04:22 | 17 | and they're actually going to be asked and |
| 11:04:25 | 18 | answered, we can reserve our foundation objections |
| 11:04:27 | 19 | to that period -- or at that time. |
| 11:04:31 | 20 | MR. CUNNY:  Yeah.  And I'd posit to you that |
| 11:04:34 | 21 | most of those objections -- lacks foundation, calls |
| 11:04:36 | 22 | for speculation -- those are preserved for the |
| 11:04:39 | 23 | record regardless of you making them.  So I'm fine |
| 11:04:43 | 24 | with that. |
| 11:04:44 | 25 | MS. MATTHAI:  Yeah.  Okay.  Thanks.  Because I |

37

EXHIBIT 14
016

| | | |
|---|---|---|
| 11:04:46 | 1 | just don't want to be objecting every time you're |
| 11:04:47 | 2 | saying something that I know is just not right. |
| 11:04:50 | 3 | MR. CUNNY:  Okay. |
| 11:04:53 | 4 | MS. MERY:  This is Victoria Mery.  I agree |
| 11:04:54 | 5 | with Edith.  You know, there are certain questions |
| 11:04:57 | 6 | I have to object to.  But if we have a running |
| 11:04:59 | 7 | objection on lack of foundation to this inquiry, |
| 11:05:02 | 8 | then that's fine with me. |
| 11:05:04 | 9 | MR. CUNNY:  Yeah, that's fine. |
| 11:05:07 | 10 | MS. HOLM:  This is Margaret Holm.  I agree. |
| 11:05:09 | 11 | MS. KIES:  This is Marianne Kies.  I agree. |
| 11:05:13 | 12 | MR. CUNNY:  Okay.  Is that good with you? |
| 11:05:14 | 13 | MR. DOWNEY:  That's fine with me. |
| 11:05:18 | 14 | MR. CUNNY:  Okay. |
| 11:05:18 | 15 | MR. AMUNDSON:  Alex, this is Steve Amundson. |
| 11:05:20 | 16 | As I was trying to ask, can we have the running |
| 11:05:23 | 17 | foundation that Edith just proposed retroactive to |
| 11:05:27 | 18 | when the witness started asserting the Fifth? |
| 11:05:31 | 19 | MR. CUNNY:  That's fine.  I mean, they're |
| 11:05:32 | 20 | preserved for the record anyway.  That's fine. |
| 11:05:38 | 21 | MR. AMUNDSON:  Well, I'm not so clear on that, |
| 11:05:40 | 22 | but let's -- we've got it on this record, so thank |
| 11:05:44 | 23 | you. |
| 11:05:44 | 24 | BY MR. CUNNY: |
| 11:05:44 | 25 | **Q   Okay.  When you arrived at the ranch to obtain** |

EXHIBIT 14
017

| | | |
|---|---|---|
| 11:05:48 | 1 | documents per the orders of Steve Penny, who met |
| 11:05:52 | 2 | you at the ranch? |
| 11:05:52 | 3 | A  I assert the Fifth. |
| 11:05:54 | 4 | Q  Did that person direct you to locations at the |
| 11:05:57 | 5 | ranch where those documents were held? |
| 11:06:00 | 6 | A  I assert the Fifth. |
| 11:06:01 | 7 | Q  Who was that individual that met you? |
| 11:06:04 | 8 | A  I assert the Fifth. |
| 11:06:05 | 9 | Q  How long, in terms of hours, days, were you at the |
| 11:06:09 | 10 | ranch collecting documents? |
| 11:06:12 | 11 | A  I assert the Fifth. |
| 11:06:13 | 12 | Q  Did you speak to whoever was gathering the |
| 11:06:16 | 13 | documents, if it wasn't you, about what the |
| 11:06:23 | 14 | documents contained? |
| 11:06:25 | 15 | A  I assert the Fifth. |
| 11:06:25 | 16 | Q  Were those medical records that you were collecting |
| 11:06:29 | 17 | at the ranch? |
| 11:06:31 | 18 | A  I assert the Fifth. |
| 11:06:31 | 19 | Q  Was it any records specifically pertaining to Jamie |
| 11:06:35 | 20 | Dantzscher that you obtained from the ranch? |
| 11:06:39 | 21 | A  I assert the Fifth. |
| 11:06:39 | 22 | Q  Was there any records specifically regarding Mattie |
| 11:06:43 | 23 | Larson that you were obtaining from the ranch? |
| 11:06:45 | 24 | A  I assert the Fifth. |
| 11:06:46 | 25 | Q  Were there any records specifically pertaining to |

EXHIBIT 14
018

| | | |
|---|---|---|
| 11:06:49 | 1 | McKayla Maroney that you were obtaining from the |
| 11:06:53 | 2 | ranch? |
| 11:06:55 | 3 | A  I assert the Fifth. |
| 11:06:55 | 4 | Q  Were there any records specifically relating to |
| 11:06:58 | 5 | Jordyn Wieber that you obtained from the ranch? |
| 11:07:03 | 6 | A  I assert the Fifth. |
| 11:07:04 | 7 | Q  How many pounds of documents were removed from the |
| 11:07:07 | 8 | ranch? |
| 11:07:08 | 9 | A  I assert the Fifth. |
| 11:07:09 | 10 | Q  When you traveled to the ranch, did USAG pay for |
| 11:07:14 | 11 | your trip there and back, or did you pay for it |
| 11:07:16 | 12 | through your own funds? |
| 11:07:19 | 13 | A  I assert the Fifth. |
| 11:07:19 | 14 | Q  Did Steve Penny instruct you to pay for it through |
| 11:07:21 | 15 | your own funds so it wouldn't be traced back to |
| 11:07:25 | 16 | USAG? |
| 11:07:26 | 17 | A  I assert the Fifth. |
| 11:07:29 | 18 | Q  Did anybody instruct you to pay for your travel or |
| 11:07:30 | 19 | the suitcases with your own money or cash such that |
| 11:07:34 | 20 | it wouldn't be traced back to USA Gymnastics? |
| 11:07:38 | 21 | A  I assert the Fifth. |
| 11:07:39 | 22 | Q  When you got to the ranch, who were the identities |
| 11:07:43 | 23 | of the individuals that you spoke with? |
| 11:07:47 | 24 | A  I assert the Fifth. |
| 11:07:48 | 25 | Q  Did you speak with any gymnasts at the ranch? |

40

EXHIBIT 14
019

| | | |
|---|---|---|
| 11:07:52 | 1 | A  I assert the Fifth. |
| 11:07:52 | 2 | Q  Was it during a national training camp that you |
| 11:07:55 | 3 | went to the ranch? |
| 11:07:57 | 4 | A  I assert the Fifth. |
| 11:07:58 | 5 | Q  Was it some other training camp at the ranch that |
| 11:08:00 | 6 | you attended? |
| 11:08:01 | 7 | A  I assert the Fifth. |
| 11:08:04 | 8 | Q  Did you speak with any of the medical staff when |
| 11:08:07 | 9 | you were at the ranch collecting documents? |
| 11:08:09 | 10 | A  I assert the Fifth. |
| 11:08:10 | 11 | Q  How many times had you been to the ranch prior to |
| 11:08:13 | 12 | the occasion that you traveled to the ranch to get |
| 11:08:16 | 13 | those documents? |
| 11:08:17 | 14 | A  I assert the Fifth. |
| 11:08:18 | 15 | Q  When I say "prior to the occasion," the occasion |
| 11:08:20 | 16 | where Steve Penny had directed you to go to the |
| 11:08:23 | 17 | ranch. |
| 11:08:24 | 18 | A  I assert the Fifth. |
| 11:08:29 | 19 | Q  Did any of the documents relate to Nassar's |
| 11:08:33 | 20 | volunteer background? |
| 11:08:36 | 21 | A  I assert the Fifth. |
| 11:08:36 | 22 | Q  Did any of the documents you were instructed to |
| 11:08:39 | 23 | look for pertain to Larry Nassar whatsoever? |
| 11:08:43 | 24 | A  I assert the Fifth. |
| 11:08:45 | 25 | Q  Did Steve Penny explain the reasons for which you |

41

EXHIBIT 14
020

| | | |
|---|---|---|
| 11:08:47 | 1 | were going to the ranch to get documents? |
| 11:08:49 | 2 | A  I assert the Fifth. |
| 11:08:51 | 3 | Q  Prior to you actually bringing the documents back, |
| 11:08:55 | 4 | did Steve Penny tell you what he was going to do |
| 11:08:56 | 5 | with the documents? |
| 11:08:57 | 6 | A  I assert the Fifth. |
| 11:08:58 | 7 | Q  Did Steve Penny tell you to bring him the |
| 11:09:00 | 8 | documents, or did he tell you to bring them to |
| 11:09:02 | 9 | somebody else at USAG? |
| 11:09:06 | 10 | A  I assert the Fifth. |
| 11:09:07 | 11 | Q  Did anybody review the documents before they were |
| 11:09:08 | 12 | gathered from the ranch? |
| 11:09:10 | 13 | A  I assert the Fifth. |
| 11:09:19 | 14 | Q  What date did you bring the documents back from the |
| 11:09:22 | 15 | ranch? |
| 11:09:24 | 16 | A  I assert the Fifth. |
| 11:09:25 | 17 | Q  Did all the documents come back at one time or did |
| 11:09:30 | 18 | you ship documents first and then bring documents |
| 11:09:32 | 19 | with you on the plane? |
| 11:09:35 | 20 | A  I assert the Fifth. |
| 11:09:40 | 21 | Q  Are you aware of there being a fire pit at the |
| 11:09:43 | 22 | ranch? |
| 11:09:44 | 23 | A  I assert the Fifth. |
| 11:09:44 | 24 | Q  Do you know if any documents were thrown into that |
| 11:09:47 | 25 | fire pit? |

42

EXHIBIT 14
021

White, Amy
Nassar Cases

```
11:09:48  1   A  I assert the Fifth.
11:09:48  2   Q  Do you know if anyone destroyed documents at the
11:09:52  3      ranch prior to you bringing certain documents back?
11:09:56  4   A  I assert the Fifth.
11:09:58  5   Q  At any point are you aware of documents that were
11:10:01  6      taken from the ranch being destroyed?
11:10:08  7   A  I assert the Fifth.
11:10:08  8   Q  Do you remember what time of day your flight was
11:10:10  9      back from the ranch with documents?
11:10:13 10   A  I assert the Fifth.
11:10:14 11   Q  Did you fly back into Indianapolis?
11:10:17 12   A  I assert the Fifth.
11:10:19 13   Q  When you flew back into Indianapolis and got your
11:10:22 14      luggage that contained the documents, where's the
11:10:27 15      first place that those documents were taken?
11:10:31 16   A  I assert the Fifth.
11:10:31 17   Q  Were those documents taken directly to USAG
11:10:37 18      headquarters?
11:10:38 19   A  I assert the Fifth.
11:10:38 20   Q  After you brought those to USAG headquarters,
11:10:43 21      assuming you did, did you review those documents?
11:10:47 22   A  I assert the Fifth.
11:10:47 23   Q  When those documents were brought back to USAG
11:10:50 24      headquarters, were you aware that the Texas Rangers
11:10:52 25      were conducting an ongoing investigation of the
```

43

EXHIBIT 14
022

| | | |
|---|---|---|
| 11:10:59 | 1 | Karolyi Ranch? |
| 11:11:00 | 2 | A  I assert the Fifth. |
| 11:11:00 | 3 | Q  Were you aware of who at USAG, if anyone, reviewed |
| 11:11:03 | 4 | those documents once they were brought back to the |
| 11:11:05 | 5 | USAG headquarters? |
| 11:11:10 | 6 | A  I assert the Fifth. |
| 11:11:12 | 7 | Q  When you brought those documents back to USAG |
| 11:11:15 | 8 | headquarters, where specifically in the building |
| 11:11:17 | 9 | did you bring them? |
| 11:11:20 | 10 | A  I assert the Fifth. |
| 11:11:20 | 11 | Q  Did you bring them into Steve Penny's office? |
| 11:11:23 | 12 | A  I assert the Fifth. |
| 11:11:24 | 13 | Q  Did Steve Penny tell you where to bring those |
| 11:11:25 | 14 | documents? |
| 11:11:26 | 15 | A  I assert the Fifth. |
| 11:11:33 | 16 | Q  Did you speak with Steve Penny when you came back |
| 11:11:36 | 17 | to the USAG headquarters with those documents? |
| 11:11:39 | 18 | A  I assert the Fifth. |
| 11:11:39 | 19 | Q  Were those documents cataloged into any USAG |
| 11:11:45 | 20 | databases or other document filing programs? |
| 11:11:51 | 21 | A  I assert the Fifth. |
| 11:11:51 | 22 | MR. CUNNY:  I want to take a quick break. |
| 11:11:59 | 23 | THE VIDEOGRAPHER:  It's 11:11.  Off the |
| 11:12:01 | 24 | record. |
| 11:12:02 | 25 | (A brief recess was taken.) |

44

EXHIBIT 14
023

| | | |
|---|---|---|
| 11:21:14 | 1 | THE VIDEOGRAPHER:  We're now back on the |
| 11:21:16 | 2 | record, 11:21. |
| 11:21:17 | 3 | BY MR. CUNNY: |
| 11:21:18 | 4 | Q  All right.  Miss, do you understand you're still |
| 11:21:24 | 5 | under oath? |
| 11:21:26 | 6 | A  Yes. |
| 11:21:26 | 7 | Q  When we left off, we were talking about -- so when |
| 11:21:29 | 8 | the documents were returned to Indianapolis, were |
| 11:21:32 | 9 | they returned to a specific room at USAG |
| 11:21:37 | 10 | headquarters? |
| 11:21:38 | 11 | A  I assert my Fifth. |
| 11:21:41 | 12 | Q  When they were returned to Indianapolis, did Steve |
| 11:21:45 | 13 | Penny tell you what to do with them? |
| 11:21:49 | 14 | A  I assert the Fifth. |
| 11:21:49 | 15 | Q  Were those documents given directly to Steve Penny |
| 11:21:53 | 16 | when they were returned to Indianapolis? |
| 11:21:57 | 17 | A  I assert the Fifth. |
| 11:21:58 | 18 | Q  When you gave those records either to Steve Penny |
| 11:22:01 | 19 | or you lodged them in some sort of filing room or |
| 11:22:05 | 20 | room at USA Gymnastics, did Steve Penny tell you |
| 11:22:10 | 21 | what he was going to do with those documents? |
| 11:22:13 | 22 | A  I assert the Fifth. |
| 11:22:13 | 23 | Q  Did he tell you whether or not he was going to have |
| 11:22:16 | 24 | anybody review those documents? |
| 11:22:19 | 25 | A  I assert the Fifth. |

45

EXHIBIT 14
024

| | | |
|---|---|---|
| 11:22:19 | 1 | Q  Did he tell you he was going to destroy those |
| 11:22:22 | 2 | documents? |
| 11:22:23 | 3 | A  I assert the Fifth. |
| 11:22:23 | 4 | Q  Do you know if those documents exist as of today's |
| 11:22:26 | 5 | date? |
| 11:22:26 | 6 | A  I assert the Fifth. |
| 11:22:28 | 7 | Q  Did anybody do an accounting of which documents |
| 11:22:31 | 8 | were retrieved when they were brought back to |
| 11:22:35 | 9 | Indianapolis? |
| 11:22:37 | 10 | A  I assert the Fifth. |
| 11:22:37 | 11 | Q  Is there any way of knowing, based on either |
| 11:22:41 | 12 | recordkeeping by you, by Steve Penny, by USA |
| 11:22:45 | 13 | Gymnastics, of whether all the documents you |
| 11:22:49 | 14 | brought back to the headquarters still exist? |
| 11:22:53 | 15 | A  I assert the Fifth. |
| 11:22:53 | 16 | Q  Were those documents ever given to Deborah Daniels? |
| 11:22:57 | 17 | A  I assert the Fifth. |
| 11:22:58 | 18 | Q  Were those documents ever given to Ropes & Gray? |
| 11:23:03 | 19 | A  I assert the Fifth. |
| 11:23:03 | 20 | Q  Were those documents ever given to Congress? |
| 11:23:06 | 21 | A  I assert the Fifth. |
| 11:23:07 | 22 | Q  Whose job was it to compile those documents for |
| 11:23:13 | 23 | Congress? |
| 11:23:14 | 24 | A  I assert the Fifth. |
| 11:23:24 | 25 | Q  Was it anybody's responsibility to look after those |

46

EXHIBIT 14
025

| | | |
|---|---|---|
| 11:23:33 | 1 | documents once they were brought back to USAG |
| 11:23:36 | 2 | headquarters? |
| 11:23:37 | 3 | A  I assert the Fifth. |
| 11:23:38 | 4 | Q  Do you know why Steve Penny wanted you to bring |
| 11:23:40 | 5 | those documents back to the USAG headquarters? |
| 11:23:44 | 6 | A  I assert the Fifth. |
| 11:23:45 | 7 | Q  Did Steve Penny indicate to you that there was |
| 11:23:47 | 8 | information in those documents about Larry Nassar? |
| 11:23:50 | 9 | A  I assert the Fifth. |
| 11:23:52 | 10 | Q  Did you speak with anybody at USA Gymnastics who |
| 11:23:57 | 11 | had reviewed those documents who told you that they |
| 11:24:01 | 12 | concerned Larry Nassar? |
| 11:24:05 | 13 | A  I assert the Fifth. |
| 11:24:06 | 14 | Q  Does anybody currently working at USA Gymnastics, |
| 11:24:11 | 15 | to your knowledge, know the contents of those |
| 11:24:17 | 16 | documents? |
| 11:24:19 | 17 | A  I assert the Fifth. |
| 11:24:20 | 18 | Q  Why weren't those documents produced to Congress |
| 11:24:23 | 19 | the first time they were requested? |
| 11:24:28 | 20 | A  I assert the Fifth. |
| 11:24:28 | 21 | Q  Were those documents produced to Congress the first |
| 11:24:31 | 22 | time they were requested? |
| 11:24:33 | 23 | A  I assert the Fifth. |
| 11:24:34 | 24 | Q  Did you ever speak with Rhonda Faehn about those |
| 11:24:40 | 25 | documents? |

EXHIBIT 14
026

| | | |
|---|---|---|
| 11:24:40 | 1 | A  I assert the Fifth. |
| 11:24:40 | 2 | Q  Did you tell Rhonda Faehn that you gave those |
| 11:24:46 | 3 | documents to Steve Penny? |
| 11:24:49 | 4 | A  I assert the Fifth. |
| 11:24:50 | 5 | Q  Did you tell Rhonda Faehn that you brought those |
| 11:24:53 | 6 | documents into Steve Penny's office? |
| 11:24:55 | 7 | A  I assert the Fifth. |
| 11:25:09 | 8 | Q  Did you ever speak with Kerry Perry about those |
| 11:25:13 | 9 | documents? |
| 11:25:14 | 10 | A  I assert the Fifth. |
| 11:25:14 | 11 | Q  When you spoke to Kerry Perry about those |
| 11:25:17 | 12 | documents, did you tell her that those documents |
| 11:25:20 | 13 | were no longer in possession of USA Gymnastics? |
| 11:25:23 | 14 | A  I assert the Fifth. |
| 11:25:25 | 15 | Q  If they weren't in possession of USA Gymnastics |
| 11:25:27 | 16 | when you spoke with Kerry Perry, where were those |
| 11:25:32 | 17 | documents, if you know? |
| 11:25:34 | 18 | A  I assert the Fifth. |
| 11:25:34 | 19 | Q  Who would have known where those documents were if |
| 11:25:37 | 20 | you didn't prior to the time you spoke with Kerry |
| 11:25:43 | 21 | Perry? |
| 11:25:44 | 22 | A  I assert the Fifth. |
| 11:25:45 | 23 | Q  Were you aware that Kerry Perry was going to |
| 11:25:47 | 24 | testify in front of Congress regarding those |
| 11:25:50 | 25 | documents? |

EXHIBIT 14
027

```
11:25:51  1   A   I assert the Fifth.
11:25:52  2   Q   Did you have any meetings with Kerry Perry to
11:25:55  3       prepare her for that testimony to Congress?
11:25:58  4   A   I assert the Fifth.
11:25:59  5   Q   When Kerry Perry testified to Congress, she stated
11:26:02  6       that USA Gymnastics did not have those documents
11:26:06  7       unequivocally.  Did you tell her after that hearing
11:26:09  8       that USA Gymnastics did in fact have those
11:26:12  9       documents?
11:26:13 10   A   I assert the Fifth.
11:26:14 11   Q   Did Kerry Perry know that those documents were in
11:26:16 12       possession of USA Gymnastics prior to going to that
11:26:20 13       hearing?
11:26:22 14   A   I assert the Fifth.
11:26:22 15   Q   Did you tell Kerry Perry that those documents were
11:26:25 16       in the possession of USA Gymnastics prior to Kerry
11:26:27 17       Perry going to that hearing?
11:26:32 18   A   I assert the Fifth.
11:26:35 19   Q   Did Steve Penny tell you to tell Kerry Perry that
11:26:39 20       the documents no longer existed?
11:26:42 21   A   I assert the Fifth.
11:26:43 22   Q   When Steve Penny resigned, did he take those
11:26:46 23       documents with him?
11:26:47 24   A   I assert the Fifth.
11:26:50 25   Q   Who was Steve Penny's assistant just prior to the
```

EXHIBIT 14
028

| | | |
|---|---|---|
| 11:26:56 | 1 | time he resigned? |
| 11:26:58 | 2 | A  I assert the Fifth. |
| 11:26:58 | 3 | Q  Did you ever speak with Renee Jamison about those |
| 11:27:01 | 4 | documents that you took from the ranch and brought |
| 11:27:04 | 5 | to the USAG headquarters? |
| 11:27:10 | 6 | A  I assert the Fifth. |
| 11:27:10 | 7 | Q  Did you ever tell Rhonda Faehn that Steve Penny had |
| 11:27:15 | 8 | instructed you to bring the documents back from the |
| 11:27:18 | 9 | ranch? |
| 11:27:19 | 10 | A  I assert the Fifth. |
| 11:27:26 | 11 | Q  Did Steve Penny keep those documents under lock and |
| 11:27:29 | 12 | key? |
| 11:27:30 | 13 | A  I assert the Fifth. |
| 11:27:31 | 14 | Q  Were those documents maintained by Steve Penny at |
| 11:27:34 | 15 | the USAG office or at some other location such as a |
| 11:27:39 | 16 | storage unit or his home? |
| 11:27:42 | 17 | A  I assert the Fifth. |
| 11:27:43 | 18 | Q  Did you ever email with Steve Penny about those |
| 11:27:46 | 19 | documents? |
| 11:27:46 | 20 | A  I assert the Fifth. |
| 11:27:47 | 21 | Q  Did you ever send text messages to Steve Penny |
| 11:27:50 | 22 | about those documents? |
| 11:27:53 | 23 | A  I assert the Fifth. |
| 11:27:54 | 24 | Q  You understand that when I say "those documents," |
| 11:27:58 | 25 | I'm referring to the documents removed from the |

50

EXHIBIT 14
029

| | | |
|---|---|---|
| 11:27:59 | 1 | ranch and brought back to USA Gymnastics.  Did you |
| 11:28:04 | 2 | ever text Steve Penny about those documents? |
| 11:28:06 | 3 | A  I assert the Fifth. |
| 11:28:07 | 4 | Q  Or email Steve Penny about those documents? |
| 11:28:10 | 5 | A  I assert the Fifth. |
| 11:28:12 | 6 | Q  Did you ever email Gary Warren about those |
| 11:28:14 | 7 | documents? |
| 11:28:15 | 8 | A  I assert the Fifth. |
| 11:28:17 | 9 | Q  Did you ever email Rhonda Faehn about those |
| 11:28:19 | 10 | documents? |
| 11:28:20 | 11 | A  I assert the Fifth. |
| 11:28:22 | 12 | Q  Did you ever email Renee Jamison about those |
| 11:28:25 | 13 | documents? |
| 11:28:26 | 14 | A  I assert the Fifth. |
| 11:28:26 | 15 | Q  Did you ever email Kerry Perry about those |
| 11:28:28 | 16 | documents? |
| 11:28:30 | 17 | A  I assert the Fifth. |
| 11:28:30 | 18 | Q  Did you ever text message Kerry Perry about those |
| 11:28:34 | 19 | documents? |
| 11:28:34 | 20 | A  Yes. |
| 11:28:35 | 21 | Q  Did you ever text message Rhonda Faehn about those |
| 11:28:39 | 22 | documents? |
| 11:28:39 | 23 | A  I assert the Fifth. |
| 11:28:40 | 24 | Q  Did you ever text message Renee Jamison about those |
| 11:28:43 | 25 | documents? |

51

EXHIBIT 14
030

| | | |
|---|---|---|
| 11:28:44 | 1 | A  I assert the Fifth. |
| 11:28:45 | 2 | **Q  Did you frequently interact with Renee Jamison** |
| 11:28:48 | 3 | **regarding USA Gymnastics matters?** |
| 11:28:51 | 4 | A  I assert the Fifth. |
| 11:28:53 | 5 | **Q  Did you ever speak with Renee Jamison about Larry** |
| 11:28:56 | 6 | **Nassar?** |
| 11:28:56 | 7 | A  I assert the Fifth. |
| 11:28:56 | 8 | **Q  Did you ever speak with Renee Jamison about Steve** |
| 11:29:00 | 9 | **Penny's handling of the complaints about Larry** |
| 11:29:04 | 10 | **Nassar?** |
| 11:29:04 | 11 | A  I assert the Fifth. |
| 11:29:06 | 12 | MR. CUNNY:  Are you okay? |
| 11:29:08 | 13 | MR. DOWNEY:  Just sneeze.  Yep. |
| 11:29:10 | 14 | **Q  Did you ever speak with Gary Warren about the** |
| 11:29:15 | 15 | **complaints about Larry Nassar?** |
| 11:29:16 | 16 | A  I assert the Fifth. |
| 11:29:17 | 17 | **Q  When were you first made aware of the complaints of** |
| 11:29:20 | 18 | **Larry Nassar?** |
| 11:29:20 | 19 | A  I assert the Fifth. |
| 11:29:23 | 20 | **Q  Did you ever contact anyone at the USOC regarding** |
| 11:29:26 | 21 | **the complaints about Larry Nassar?** |
| 11:29:29 | 22 | A  I assert the Fifth. |
| 11:29:29 | 23 | **Q  Did you ever speak with anyone at the USOC** |
| 11:29:32 | 24 | **regarding the documents that were taken from the** |
| 11:29:35 | 25 | **ranch?** |

52

EXHIBIT 14
031

```
11:29:36  1    A  I assert the Fifth.
11:29:38  2    Q  Did you ever speak with any of the attorneys for
11:29:41  3       the USOC about the documents that were taken from
11:29:45  4       the ranch?
11:29:48  5    A  I assert the Fifth.
11:29:56  6    Q  Did you ever speak with local law enforcement
11:29:58  7       regarding Steve Penny's involvement with them in
11:30:04  8       reporting allegations of sexual abuse?
11:30:09  9    A  I assert the Fifth.
11:30:10  10   Q  Do you know an FBI agent named Jay Abbott?
11:30:15  11   A  I assert the Fifth.
11:30:15  12   Q  Were you on any calls or any -- were you on any
11:30:24  13      calls or any emails regarding an FBI agent named
11:30:30  14      Jay Abbott?
11:30:34  15   A  I assert the Fifth.
11:30:34  16   Q  Do you know any local law enforcement that Steve
11:30:37  17      Penny would interact with regarding allegations of
11:30:41  18      sexual abuse?
11:30:42  19   A  I assert the Fifth.
11:30:44  20   Q  Do you know if Steve Penny reviewed the documents
11:30:50  21      that were brought back to the USA Gymnastics
11:30:56  22      headquarters for information regarding Larry
11:30:58  23      Nassar?
11:30:59  24   A  I assert the Fifth.
11:31:00  25   Q  Did the documents retrieved from the Karolyi Ranch
```

EXHIBIT 14
032

| | | |
|---|---|---|
| 11:31:04 | 1 | and brought to USA Gymnastics concern sexually |
| 11:31:07 | 2 | abusive treatments that Nassar was performing on |
| 11:31:10 | 3 | young girls? |
| 11:31:11 | 4 | A  I assert the Fifth. |
| 11:31:13 | 5 | Q  When Steve Penny reviewed those documents, if he |
| 11:31:14 | 6 | did, do you know if he made a report to law |
| 11:31:17 | 7 | enforcement? |
| 11:31:19 | 8 | A  I assert the Fifth. |
| 11:31:20 | 9 | Q  Do you know if Steve Penny promptly transmitted |
| 11:31:23 | 10 | those documents to law enforcement? |
| 11:31:25 | 11 | A  I assert the Fifth. |
| 11:31:26 | 12 | Q  Do you know if Steve Penny promptly transmitted |
| 11:31:28 | 13 | those documents to Congress? |
| 11:31:31 | 14 | A  I assert the Fifth. |
| 11:31:32 | 15 | Q  Do you know if Steve Penny spoke with Jay Abbott |
| 11:31:37 | 16 | about those documents? |
| 11:31:39 | 17 | A  I assert the Fifth. |
| 11:31:40 | 18 | Q  Do you know if Steve Penny was trying to keep it |
| 11:31:42 | 19 | quiet that those documents existed? |
| 11:31:44 | 20 | A  I assert the Fifth. |
| 11:31:45 | 21 | Q  Do you know if Steve Penny was enlisting the help |
| 11:31:48 | 22 | of local law enforcement to help him keep it quiet? |
| 11:31:52 | 23 | A  I assert the Fifth. |
| 11:31:53 | 24 | Q  Do you know which local law enforcement agency |
| 11:31:56 | 25 | Steve Penny would work with in reporting sexual |

EXHIBIT 14
033

| | | |
|---|---|---|
| 11:31:58 | 1 | abuse of minors that occurred in USA Gymnastics? |
| 11:32:03 | 2 | A  I assert the Fifth. |
| 11:32:05 | 3 | Q  Were you at all involved in the handling of the |
| 11:32:08 | 4 | Marvin Sharp matter? |
| 11:32:10 | 5 | A  I assert the Fifth. |
| 11:32:10 | 6 | Q  Did Steve Penny indicate that there was any |
| 11:32:12 | 7 | connection between Larry Nassar and Marvin Sharp at |
| 11:32:16 | 8 | any point to you? |
| 11:32:17 | 9 | A  I assert the Fifth. |
| 11:32:23 | 10 | Q  Did any of the records at the ranch pertain to |
| 11:32:26 | 11 | Marvin Sharp? |
| 11:32:28 | 12 | A  I assert the Fifth. |
| 11:32:33 | 13 | Q  Did you ever speak to Gary Warren about Marvin |
| 11:32:37 | 14 | Sharp? |
| 11:32:40 | 15 | A  I assert the Fifth. |
| 11:32:42 | 16 | Q  Did you ever speak to Rhonda Faehn about Marvin |
| 11:32:49 | 17 | Sharp? |
| 11:32:51 | 18 | A  I assert the Fifth. |
| 11:32:52 | 19 | Q  Did Steve Penny ever indicate to you that he didn't |
| 11:32:54 | 20 | want information about Larry Nassar getting into |
| 11:32:56 | 21 | the hands of law enforcement? |
| 11:33:02 | 22 | A  I assert the Fifth. |
| 11:33:03 | 23 | Q  Did Steve Penny ever indicate to you that he had |
| 11:33:06 | 24 | destroyed any records pertaining to Larry Nassar? |
| 11:33:10 | 25 | A  I assert the Fifth. |

EXHIBIT 14
034

| | | |
|---|---|---|
| 11:33:11 | 1 | Q  Did Steve Penny ever indicate to you that he had |
| 11:33:13 | 2 | instructed anyone at USAG to destroy records |
| 11:33:19 | 3 | relating to Larry Nassar? |
| 11:33:20 | 4 | A  I assert the Fifth. |
| 11:33:21 | 5 | Q  Did Steve Penny ever indicate to you that he had |
| 11:33:28 | 6 | individuals at the ranch destroy records pertaining |
| 11:33:32 | 7 | to Larry Nassar? |
| 11:33:34 | 8 | A  I assert the Fifth. |
| 11:33:34 | 9 | Q  When you got those records from the ranch, do you |
| 11:33:38 | 10 | know if records had been destroyed prior to you |
| 11:33:40 | 11 | obtaining that subset of documents you received? |
| 11:33:43 | 12 | A  I assert the Fifth. |
| 11:33:50 | 13 | Q  Were you aware that there was an ongoing criminal |
| 11:33:53 | 14 | investigation by the Walker County Rangers when you |
| 11:33:58 | 15 | obtained those records from the ranch? |
| 11:34:01 | 16 | A  I assert the Fifth. |
| 11:34:03 | 17 | Q  Did Steve Penny make you aware of this? |
| 11:34:07 | 18 | A  I assert the Fifth. |
| 11:34:09 | 19 | Q  Have you spoken with Steve Penny since he's been |
| 11:34:12 | 20 | indicted? |
| 11:34:15 | 21 | A  I assert the Fifth. |
| 11:34:16 | 22 | Q  Have you spoken with any of Steve Penny's lawyers |
| 11:34:19 | 23 | since he's been indicted? |
| 11:34:22 | 24 | A  I assert the Fifth. |
| 11:34:22 | 25 | Q  Have you provided any statements to representatives |

56

EXHIBIT 14
035

| | | |
|---|---|---|
| 11:34:28 | 1 | of Steve Penny since he's been indicted? |
| 11:34:31 | 2 | A  I assert the Fifth. |
| 11:34:33 | 3 | Q  At any point did you provide a statement to anyone |
| 11:34:36 | 4 | at USA Gymnastics regarding your involvement with |
| 11:34:40 | 5 | the records taken from the ranch? |
| 11:34:42 | 6 | A  I assert the Fifth. |
| 11:34:46 | 7 | Q  Is it your understanding that the criminal charges |
| 11:34:51 | 8 | of Steve Penny stem from him having instructed you |
| 11:34:55 | 9 | to go to the ranch? |
| 11:34:59 | 10 | A  I assert the Fifth. |
| 11:35:02 | 11 | Q  Did you ever provide any statement to Walker County |
| 11:35:09 | 12 | Texas Rangers? |
| 11:35:11 | 13 | A  I assert the Fifth. |
| 11:35:12 | 14 | Q  Have you ever spoken with the Marion County |
| 11:35:14 | 15 | prosecutor regarding Steve Penny? |
| 11:35:18 | 16 | A  I assert the Fifth. |
| 11:35:20 | 17 | Q  Have you ever spoken with any local law enforcement |
| 11:35:24 | 18 | regarding Steve Penny? |
| 11:35:26 | 19 | A  I assert the Fifth. |
| 11:35:36 | 20 | Q  After Kerry Perry testified, did you contact her |
| 11:35:40 | 21 | and indicate to her that the documents still |
| 11:35:43 | 22 | existed that she testified about? |
| 11:35:47 | 23 | A  I assert the Fifth. |
| 11:35:48 | 24 | Q  All right.  When Ms. Perry was asked that there |
| 11:36:19 | 25 | would be no chance that those documents exist |

57

| | | |
|---|---|---|
| 11:36:21 | 1 | within your custody at USA Gymnastics unless they |
| 11:36:22 | 2 | were provided to us -- unless they're included in |
| 11:36:26 | 3 | the list -- in the million documents you provided |
| 11:36:28 | 4 | us. |
| 11:36:28 | 5 | And Ms. Perry responded, Right. |
| 11:36:31 | 6 | Senator Moran then said, Otherwise, you can |
| 11:36:35 | 7 | assure me that they don't exist within your |
| 11:36:36 | 8 | custody? |
| 11:36:37 | 9 | Perry then said, To my knowledge, they do not |
| 11:36:38 | 10 | exist in our custody. |
| 11:36:40 | 11 | When Kerry Perry made those statements, were |
| 11:36:44 | 12 | you aware that those were not true statements |
| 11:36:48 | 13 | regardless of whether Ms. Perry knew them to be |
| 11:36:50 | 14 | true or not? |
| 11:36:52 | 15 | A  I assert the Fifth. |
| 11:36:57 | 16 | Q  When certain documents were subsequently discovered |
| 11:37:02 | 17 | in the last couple weeks, do you know if those were |
| 11:37:07 | 18 | the same documents that you took from the ranch? |
| 11:37:09 | 19 | A  I assert the Fifth. |
| 11:37:10 | 20 | Q  Do you know if there's any way of knowing whether |
| 11:37:11 | 21 | those are the same documents you took from the |
| 11:37:13 | 22 | ranch? |
| 11:37:14 | 23 | A  I assert the Fifth. |
| 11:37:21 | 24 | Q  Were you contacted after the discovery of those |
| 11:37:23 | 25 | documents by anyone at USA Gymnastics? |

EXHIBIT 14
037

| | | |
|---|---|---|
| 11:37:27 | 1 | A  I assert the Fifth. |
| 11:37:28 | 2 | Q  Were you the person who discovered those documents? |
| 11:37:31 | 3 | A  I assert the Fifth. |
| 11:37:32 | 4 | Q  Did you always know where those documents were? |
| 11:37:35 | 5 | A  I assert the Fifth. |
| 11:37:49 | 6 | Q  Prior to March of 2018, did you speak with anybody |
| 11:37:58 | 7 | at USOC and tell them that those documents existed? |
| 11:38:03 | 8 | A  I assert the Fifth. |
| 11:38:11 | 9 | Q  When, to your knowledge, was the USOC made aware |
| 11:38:16 | 10 | that those documents were taken from the ranch? |
| 11:38:19 | 11 | A  I assert the Fifth. |
| 11:38:20 | 12 | MS. KIES:  This is Marianne.  I know we have a |
| 11:38:23 | 13 | running objection as to foundation, but I'd like to |
| 11:38:25 | 14 | specifically insert an objection here. |
| 11:38:29 | 15 | A  I assert the Fifth. |
| 11:38:30 | 16 | Q  Okay.  I just want to make sure the record's clear. |
| 11:38:35 | 17 | When those records were taken from the ranch, |
| 11:38:37 | 18 | were you aware that the ranch was an Olympic |
| 11:38:42 | 19 | training site? |
| 11:38:43 | 20 | A  I assert the Fifth. |
| 11:38:44 | 21 | Q  Was anyone from the USOC present at the ranch when |
| 11:38:50 | 22 | those documents were taken? |
| 11:38:51 | 23 | A  I assert the Fifth. |
| 11:38:52 | 24 | Q  Did anyone from the USOC assist in gathering those |
| 11:38:56 | 25 | documents from the ranch? |

59

EXHIBIT 14
038

| | | |
|---|---|---|
| 11:38:57 | 1 | A  I assert the Fifth. |
| 11:38:58 | 2 | Q  Do you know if Gary Warren was in contact with |
| 11:39:00 | 3 |    anyone from the USOC regarding the gathering of |
| 11:39:04 | 4 |    those documents? |
| 11:39:04 | 5 | A  I assert the Fifth. |
| 11:39:05 | 6 | Q  Do you know if Steve Penny was in contact with |
| 11:39:08 | 7 |    anybody from USOC regarding the gathering of the |
| 11:39:10 | 8 |    documents from the ranch? |
| 11:39:12 | 9 | A  I assert the Fifth. |
| 11:39:14 | 10 | Q  Do you know if Steve Penny ever spoke with Scott |
| 11:39:18 | 11 |    Blackman about the gathering of documents from the |
| 11:39:21 | 12 |    ranch? |
| 11:39:22 | 13 | A  I assert the Fifth. |
| 11:39:23 | 14 | Q  Do you know if that conversation ever happened, |
| 11:39:25 | 15 |    meaning, happened when the documents were |
| 11:39:27 | 16 |    instructed to be taken or at some time after? |
| 11:39:31 | 17 | A  I assert the Fifth. |
| 11:39:37 | 18 | Q  Did you ever speak with employees of the USOC |
| 11:39:39 | 19 |    regarding those documents that were taken from the |
| 11:39:42 | 20 |    ranch? |
| 11:39:43 | 21 | A  I assert the Fifth. |
| 11:39:47 | 22 | Q  Did you ever speak with Sarah Hirschland regarding |
| 11:39:52 | 23 |    those documents? |
| 11:39:52 | 24 | A  I assert the Fifth. |
| 11:39:54 | 25 | Q  Do you know if a request was ever made by |

60

EXHIBIT 14
039

| | | |
|---|---|---|
| 11:39:56 | 1 | Ms. Hirschland to speak about those documents |
| 11:40:00 | 2 | removed from the ranch? |
| 11:40:02 | 3 | A  I assert the Fifth. |
| 11:40:08 | 4 | Q  Had you ever been involved in another -- or a |
| 11:40:13 | 5 | report of childhood sexual abuse that was reported |
| 11:40:17 | 6 | to USA Gymnastics or Steve Penny? |
| 11:40:19 | 7 | A  I assert the Fifth. |
| 11:40:22 | 8 | Q  Were you ever in any way made aware of the |
| 11:40:31 | 9 | practices by which Steve Penny would report |
| 11:40:34 | 10 | childhood sexual abuse? |
| 11:40:36 | 11 | A  I assert the Fifth. |
| 11:40:37 | 12 | Q  Were you aware of whether Steve Penny had a point |
| 11:40:40 | 13 | person at the local police department in which he |
| 11:40:45 | 14 | could report childhood sexual abuse? |
| 11:40:50 | 15 | A  I assert the Fifth. |
| 11:40:51 | 16 | Q  Do you have any knowledge of that relationship? |
| 11:40:53 | 17 | A  I assert the Fifth. |
| 11:40:57 | 18 | Q  What was USAG's travel budget in March of 2018? |
| 11:41:04 | 19 | A  I assert the Fifth. |
| 11:41:05 | 20 | Q  What was its travel budget in the year prior, 2017? |
| 11:41:09 | 21 | A  I assert the Fifth. |
| 11:41:09 | 22 | Q  What's its travel budget in 2016? |
| 11:41:13 | 23 | A  I assert the Fifth. |
| 11:41:16 | 24 | Q  Did you pay for any travel of any Californians to |
| 11:41:21 | 25 | go to the Karolyi Ranch? |

61

EXHIBIT 14
040

```
11:41:23  1    A  I assert the Fifth.
11:41:25  2    Q  Did you ever coordinate or pay for the travel of
11:41:28  3       Larry Nassar to go to California?
11:41:31  4    A  I assert the Fifth.
11:41:31  5    Q  Did you ever pay for travel of Aly Raisman to go to
11:41:36  6       the ranch?
11:41:39  7    A  I assert the Fifth.
11:41:39  8    Q  Did you ever pay for any travel of Jordyn Wieber to
11:41:43  9       go to the ranch?
11:41:43 10    A  I assert the Fifth.
11:41:44 11    Q  Did you ever pay for any travel of Mattie Larson to
11:41:47 12       go to the ranch?
11:41:48 13    A  I assert the Fifth.
11:41:48 14    Q  Did you ever pay for any travel of Jamie Dantzscher
11:41:52 15       to go to the ranch?
11:41:53 16    A  I assert the Fifth.
11:42:02 17    Q  Aside from the Texas Rangers, were you aware of any
11:42:09 18       other ongoing criminal investigations involving USA
11:42:16 19       Gymnastics or USA Gymnastics' agents besides from
11:42:19 20       the Walker Texas Rangers?
11:42:23 21    A  I assert the Fifth.
11:42:25 22    Q  Do you know if the FBI was looking into USAG's
11:42:31 23       handling of the Larry Nassar matter?
11:42:32 24    A  I assert the Fifth.
11:42:34 25    Q  Did Steve Penny ever talk to you about his fears
```

EXHIBIT 14
041

| | | |
|---|---|---|
| 11:42:35 | 1 | about the FBI handling the Larry Nassar matter? |
| 11:42:39 | 2 | A  I assert the Fifth. |
| 11:42:43 | 3 | Q  Did Steve Penny ever indicate to you that he was |
| 11:42:45 | 4 | concerned that offices outside of Indianapolis -- |
| 11:42:49 | 5 | the Indianapolis FBI office would be handling the |
| 11:42:53 | 6 | Larry Nassar matter? |
| 11:42:55 | 7 | A  I assert the Fifth. |
| 11:42:59 | 8 | Q  Did Steve Penny ever discuss with you the prospect |
| 11:43:03 | 9 | of Jay Abbott taking over Larry Buendorf's role at |
| 11:43:10 | 10 | the USOC? |
| 11:43:12 | 11 | A  I assert the Fifth. |
| 11:43:13 | 12 | Q  Do you know if that was ever discussed with Scott |
| 11:43:15 | 13 | Blackman? |
| 11:43:16 | 14 | A  I assert the Fifth. |
| 11:43:16 | 15 | Q  Do you know if Jay Abbott was in any way handling |
| 11:43:26 | 16 | the Larry Nassar matter? |
| 11:43:27 | 17 | A  I assert the Fifth. |
| 11:43:32 | 18 | Q  Do you know if there was any policies by which all |
| 11:43:39 | 19 | reports of childhood sexual abuse were to flow |
| 11:43:44 | 20 | through Steve Penny before going to law |
| 11:43:46 | 21 | enforcement? |
| 11:43:48 | 22 | A  I assert the Fifth. |
| 11:43:48 | 23 | Q  Was that what Steve Penny required is that all |
| 11:43:51 | 24 | reports of sexual abuse go through him prior to |
| 11:43:54 | 25 | being reported to law enforcement? |

EXHIBIT 14
042

| | | |
|---|---|---|
| 11:43:57 | 1 | A  I assert the Fifth. |
| 11:44:07 | 2 | Q  Did Steve Penny warn you that when he was sending |
| 11:44:10 | 3 |    you to the Karolyi Ranch that he was putting you in |
| 11:44:15 | 4 |    jeopardy criminally? |
| 11:44:16 | 5 | A  I assert the Fifth. |
| 11:44:19 | 6 | Q  Did anybody at USAG inform you that you were being |
| 11:44:25 | 7 |    placed into jeopardy criminally by going to the |
| 11:44:29 | 8 |    ranch and obtaining those documents? |
| 11:44:32 | 9 | A  I assert the Fifth. |
| 11:44:32 | 10 | Q  Did Steve Penny indicate to you that those |
| 11:44:35 | 11 |    documents concern the Larry Nassar matter |
| 11:44:48 | 12 |    whatsoever? |
| 11:44:49 | 13 | A  I assert the Fifth. |
| 11:44:50 | 14 |    MR. CUNNY:  I might take another quick break, |
| 11:44:52 | 15 |    and I don't think I have a ton more. |
| 11:44:54 | 16 |    THE VIDEOGRAPHER:  Okay.  It's 11:44.  Off the |
| 11:44:58 | 17 |    record. |
| 11:44:58 | 18 |    (A brief recess was taken.) |
| 11:49:10 | 19 |    THE VIDEOGRAPHER:  It's now 11:49.  We're back |
| 11:49:11 | 20 |    on the record. |
| 11:49:12 | 21 | BY MR. CUNNY: |
| 11:49:13 | 22 | Q  All right.  Miss, you understand you're still under |
| 11:49:17 | 23 |    oath? |
| 11:49:17 | 24 | A  Yes. |
| 11:49:18 | 25 | Q  Still pledge to tell the truth? |

EXHIBIT 14
043

| | | |
|---|---|---|
| 11:49:20 | 1 | A   Yes. |
| 11:49:20 | 2 | Q   All right.  Have you ever heard of a local Indiana |
| 11:49:24 | 3 | law enforcement officer named Bruce Smith? |
| 11:49:27 | 4 | A   I assert the Fifth. |
| 11:49:28 | 5 | Q   Are you aware that Mr. Penny had a personal |
| 11:49:33 | 6 | relationship with this law enforcement officer? |
| 11:49:35 | 7 | A   I assert the Fifth. |
| 11:49:36 | 8 | Q   Did Mr. Penny and this officer work together to |
| 11:49:39 | 9 | lessen the public backlash against USA Gymnastics |
| 11:49:44 | 10 | relating to the Nassar scandal? |
| 11:49:49 | 11 | A   I assert the Fifth. |
| 11:49:49 | 12 | Q   Were you made aware of the reasons for which Rhonda |
| 11:49:53 | 13 | Faehn was fired? |
| 11:49:54 | 14 | A   I assert the Fifth. |
| 11:49:54 | 15 | Q   Were you made aware that Rhonda's firing had |
| 11:49:57 | 16 | anything to do with the Larry Nassar scandal? |
| 11:50:02 | 17 | A   I assert the Fifth. |
| 11:50:06 | 18 | Q   When Ms. Faehn testified in front of Congress that |
| 11:50:11 | 19 | you were asked to bring back medical records from |
| 11:50:15 | 20 | the ranch, was she telling the truth? |
| 11:50:18 | 21 | A   I assert the Fifth. |
| 11:50:22 | 22 | Q   Specifically, did you ever speak with Ms. Faehn |
| 11:50:28 | 23 | about those comments that she made to Congress? |
| 11:50:33 | 24 | A   I assert the Fifth. |
| 11:50:33 | 25 | Q   When's the last time you spoke with Rhonda Faehn? |

EXHIBIT 14
044

| | | |
|---|---|---|
| 11:50:38 | 1 | A  I assert the Fifth. |
| 11:50:41 | 2 | Q  Were you aware of any internal investigations going |
| 11:50:47 | 3 | on within USA Gymnastics about the Larry Nassar |
| 11:50:52 | 4 | matter when you went to obtain the records from the |
| 11:50:56 | 5 | ranch? |
| 11:50:57 | 6 | A  I assert the Fifth. |
| 11:51:15 | 7 | Q  Were the records that were brought back from the |
| 11:51:19 | 8 | ranch brought back under the policies and |
| 11:51:22 | 9 | procedures of USA Gymnastics? |
| 11:51:25 | 10 | A  I assert the Fifth. |
| 11:51:26 | 11 | Q  Meaning, were there periodic times where you or |
| 11:51:30 | 12 | someone else from USA Gymnastics would go to the |
| 11:51:32 | 13 | ranch, gather all the documents, and bring them |
| 11:51:35 | 14 | back to the ranch? |
| 11:51:36 | 15 | A  I assert the Fifth. |
| 11:51:36 | 16 | Q  Bring them back to USA Gymnastics' headquarters, I |
| 11:51:41 | 17 | mean. |
| 11:51:42 | 18 | A  I assert the Fifth. |
| 11:51:42 | 19 | Q  Those documents that were at the ranch, do you know |
| 11:51:45 | 20 | how far back they dated? |
| 11:51:47 | 21 | A  I assert the Fifth. |
| 11:51:48 | 22 | Q  Did they date back prior to the year 2000? |
| 11:51:52 | 23 | A  I assert the Fifth. |
| 11:51:52 | 24 | Q  Did they date back prior to the year 1994? |
| 11:51:55 | 25 | A  I assert the Fifth. |

EXHIBIT 14
045

| | | |
|---|---|---|
| 11:52:12 | 1 | Q  Did Steve Penny instruct any individuals at USA |
| 11:52:17 | 2 | Gymnastics to triage documents pertaining to, |
| 11:52:22 | 3 | specifically, inappropriate medical procedures |
| 11:52:24 | 4 | provided by Larry Nassar? |
| 11:52:27 | 5 | A  I assert the Fifth. |
| 11:52:29 | 6 | Q  Did Steve Penny ever indicate to you that he was |
| 11:52:31 | 7 | working with local law enforcement to keep the |
| 11:52:35 | 8 | Nassar scandal quiet? |
| 11:52:41 | 9 | A  I assert the Fifth. |
| 11:52:45 | 10 | Q  Do you know how Steve Penny met Bruce Smith? |
| 11:52:49 | 11 | A  I assert the Fifth. |
| 11:52:50 | 12 | Q  Do you know how Steve Penny met Jay Abbott? |
| 11:52:54 | 13 | A  I assert the Fifth. |
| 11:52:56 | 14 | Q  Did you ever speak with either of those law |
| 11:52:58 | 15 | enforcement agents? |
| 11:52:59 | 16 | A  I assert the Fifth. |
| 11:53:07 | 17 | Q  Did Steve Penny ever indicate to you that he was |
| 11:53:09 | 18 | concerned in November of 2016 that mandatory |
| 11:53:16 | 19 | reports of suspected sexual abuse were not made by |
| 11:53:21 | 20 | Larry Nassar -- were not made by USA Gymnastics |
| 11:53:23 | 21 | officials regarding Larry Nassar? |
| 11:53:25 | 22 | A  I assert the Fifth. |
| 11:53:27 | 23 | Q  Did Steve Penny indicate to you that the reason you |
| 11:53:29 | 24 | were being sent to the ranch was to get evidence |
| 11:53:32 | 25 | that would have shown that USA Gymnastics had a |

EXHIBIT 14
046

| | | |
|---|---|---|
| 11:53:36 | 1 | reasonable suspicion to report abuse? |
| 11:53:38 | 2 | A  I assert the Fifth. |
| 11:53:40 | 3 | Q  Was Steve Penny also instructing you to go to the |
| 11:53:43 | 4 | ranch in order to obtain documents for which would |
| 11:53:49 | 5 | have shown that USOC, being an official training |
| 11:53:54 | 6 | site at the Karolyi Ranch, also had a reasonable |
| 11:53:57 | 7 | suspicion to report suspected abuse about Larry |
| 11:54:00 | 8 | Nassar? |
| 11:54:01 | 9 | A  I assert the Fifth. |
| 11:54:03 | 10 | MS. KIES:  This is Marianne.  Again, I'd like |
| 11:54:05 | 11 | to interpose specifically an objection here as to |
| 11:54:08 | 12 | form and foundation. |
| 11:54:09 | 13 | Q  Okay.  Did the USOC -- were there specific records |
| 11:54:15 | 14 | kept at the ranch for the USOC for Olympians and |
| 11:54:20 | 15 | other Olympic athletes? |
| 11:54:24 | 16 | A  I assert the Fifth. |
| 11:54:25 | 17 | Q  If there were, were those documents, too, taken |
| 11:54:28 | 18 | when you brought them back to USA Gymnastics? |
| 11:54:31 | 19 | A  I assert the Fifth. |
| 11:54:32 | 20 | Q  Did you bring any documents to Colorado Springs |
| 11:54:34 | 21 | regarding USOC? |
| 11:54:36 | 22 | A  I assert the Fifth. |
| 11:54:38 | 23 | Q  Do you know if those documents were ever |
| 11:54:39 | 24 | transmitted from the USAG headquarters to Colorado |
| 11:54:45 | 25 | Springs? |

68

EXHIBIT 14
047

| | | | |
|---|---|---|---|
| 11:54:46 | 1 | A | I assert the Fifth. |
| 11:54:46 | 2 | Q | And when I say "Colorado Springs," I'm specifically |
| 11:54:50 | 3 | | referring to the USOC's headquarters in Colorado |
| 11:54:54 | 4 | | Springs. |
| 11:54:55 | 5 | | Do you know if that transfer of documents ever |
| 11:54:56 | 6 | | occurred from USAG to USOC? |
| 11:55:01 | 7 | A | I assert the Fifth. |
| 11:55:01 | 8 | Q | Were there any medical professionals at the ranch |
| 11:55:04 | 9 | | that you interacted with when you went to go get |
| 11:55:07 | 10 | | those records? |
| 11:55:08 | 11 | A | I assert the Fifth. |
| 11:55:08 | 12 | Q | Did you ever speak with Debbie Van Horn about those |
| 11:55:11 | 13 | | records? |
| 11:55:12 | 14 | A | I assert the Fifth. |
| 11:55:12 | 15 | Q | Have you spoken with Debbie Van Horn since she's |
| 11:55:15 | 16 | | been indicted? |
| 11:55:17 | 17 | A | I assert the Fifth. |
| 11:55:18 | 18 | Q | Have you ever spoken with Debbie Van Horn? |
| 11:55:23 | 19 | A | I assert the Fifth. |
| 11:55:24 | 20 | Q | Have you ever spoken with Larry Nassar? |
| 11:55:26 | 21 | A | I assert the Fifth. |
| 11:55:27 | 22 | Q | When's the first time you spoke with Larry Nassar? |
| 11:55:30 | 23 | A | I assert the Fifth. |
| 11:55:31 | 24 | Q | When is the last time you've spoken with Larry |
| 11:55:33 | 25 | | Nassar? |

69

EXHIBIT 14
048

| | | |
|---|---|---|
| 11:55:34 | 1 | A  I assert the Fifth. |
| 11:55:35 | 2 | Q  Did you ever travel with Larry Nassar to events? |
| 11:55:38 | 3 | A  I assert the Fifth. |
| 11:55:39 | 4 | Q  Did you ever travel with Larry Nassar to any events |
| 11:55:42 | 5 | in California? |
| 11:55:43 | 6 | A  I assert the Fifth. |
| 11:55:44 | 7 | Q  Do you know if Steve Penny and Larry Nassar ever |
| 11:55:47 | 8 | traveled to events together? |
| 11:55:51 | 9 | A  I assert the Fifth. |
| 11:55:52 | 10 | Q  Do you know if Steve Penny was -- had any concerns |
| 11:55:56 | 11 | about Larry Nassar prior to June of 2015? |
| 11:56:00 | 12 | A  I assert the Fifth. |
| 11:56:07 | 13 | Q  Do you know if Steve Penny was ever made aware, |
| 11:56:11 | 14 | prior to June of 2015, of any complaints of sexual |
| 11:56:15 | 15 | misconduct about Larry Nassar? |
| 11:56:21 | 16 | A  I assert the Fifth. |
| 11:56:21 | 17 | Q  Did Steve Penny ever indicate to you that he had |
| 11:56:23 | 18 | called Michigan State University regarding Larry |
| 11:56:26 | 19 | Nassar? |
| 11:56:27 | 20 | A  I assert the Fifth. |
| 11:56:33 | 21 | Q  Did Steve Penny ever indicate to you that he had |
| 11:56:35 | 22 | called Michigan State and been apprised of any |
| 11:56:38 | 23 | complaints at Michigan State about Larry Nassar? |
| 11:56:41 | 24 | A  I assert the Fifth. |
| 11:56:43 | 25 | Q  Did Steve Penny ever tell you that he was going to |

EXHIBIT 14
049

| | | |
|---|---|---|
| 11:56:45 | 1 | call Michigan State in June of 2015 to warn them |
| 11:56:52 | 2 | about Larry Nassar? |
| 11:56:54 | 3 | A  I assert the Fifth. |
| 11:56:54 | 4 | Q  Did Steve Penny ever instruct you not to tell |
| 11:56:57 | 5 | anyone about the complaints involving Larry Nassar |
| 11:56:59 | 6 | in June of 2015? |
| 11:57:01 | 7 | A  I assert the Fifth. |
| 11:57:02 | 8 | Q  In June of 2015, were you made aware that there |
| 11:57:04 | 9 | were complaints involving Larry Nassar? |
| 11:57:07 | 10 | A  I assert the Fifth. |
| 11:57:08 | 11 | Q  In June of 2015, were you instructed not to give |
| 11:57:11 | 12 | Larry Nassar any further travel expenses or |
| 11:57:15 | 13 | schedule any further travel for him? |
| 11:57:18 | 14 | A  I assert the Fifth. |
| 11:57:18 | 15 | Q  Did you, in fact, schedule any travel for Larry |
| 11:57:23 | 16 | Nassar after June of 2015? |
| 11:57:24 | 17 | A  I assert the Fifth. |
| 11:57:25 | 18 | Q  If you did schedule travel, were you made aware |
| 11:57:28 | 19 | whatsoever of any complaints involving Larry |
| 11:57:32 | 20 | Nassar? |
| 11:57:33 | 21 | A  I assert the Fifth. |
| 11:57:36 | 22 | Q  Did you ever speak with Ron Galimore about Larry |
| 11:57:39 | 23 | Nassar? |
| 11:57:39 | 24 | A  I assert the Fifth. |
| 11:57:40 | 25 | Q  Do you know who Ron Galimore is? |

EXHIBIT 14
050

```
11:57:43   1    A   I assert the Fifth.
11:57:46   2    Q   Did you ever speak with Ron Galimore about Larry
11:57:52   3        Nassar in June of 2015 about Larry Nassar?
11:57:55   4    A   I assert the Fifth.
11:57:57   5    Q   Were you ever in a joint meeting between any USAG
11:58:05   6        executives and any USOC executives regarding Larry
11:58:08   7        Nassar?
11:58:09   8    A   I assert the Fifth.
11:58:10   9    Q   Did any USOC executives ever come to a USAG board
11:58:16  10        meeting to discuss Larry Nassar and the Larry
11:58:18  11        Nassar scandal?
11:58:19  12    A   I assert the Fifth.
11:58:22  13    Q   Did you ever go to a USOC board meeting with Steve
11:58:26  14        Penny to discuss the Larry Nassar scandal?
11:58:31  15    A   I assert the Fifth.
11:58:32  16    Q   Have you ever traveled with Steve Penny to
11:58:34  17        California?
11:58:35  18    A   I assert the Fifth.
11:58:41  19    Q   Have you ever attended a competition in California
11:58:46  20        for USA Gymnastics where Steve Penny was also
11:58:49  21        present?
11:58:49  22    A   I assert the Fifth.
11:58:52  23    Q   Did you attend the 2012 Olympic Trials in San Jose
11:58:58  24        with Steve Penny?
11:58:59  25    A   I assert the Fifth.
```

EXHIBIT 14
051

11:59:00  1   Q   Did you schedule the travel for Steve Penny to that
11:59:03  2       event?
11:59:04  3   A   I assert the Fifth.
11:59:06  4   Q   Did you schedule the travel for Larry Nassar to
11:59:09  5       that event?
11:59:09  6   A   I assert the Fifth.
11:59:10  7   Q   Did you schedule the travel for Jordyn Wieber to
11:59:15  8       that event?
11:59:17  9   A   I assert the Fifth.
11:59:17 10   Q   Did you schedule the travel for McKayla Maroney to
11:59:21 11       that event?
11:59:22 12   A   I assert the Fifth.
11:59:22 13   Q   Did you schedule the travel for Aly Raisman to that
11:59:26 14       event?
11:59:27 15   A   I assert the Fifth.
11:59:33 16   Q   Did Steve Penny ever tell you not to discuss the
11:59:36 17       allegations about Larry Nassar?
11:59:38 18   A   I assert the Fifth.
11:59:39 19   Q   Did Steve Penny ever tell you not to discuss the
11:59:41 20       allegations about Marvin Sharp?
11:59:43 21   A   I assert the Fifth.
11:59:44 22   Q   Did Steve Penny try to keep the allegations
11:59:46 23       regarding Larry Nassar quiet?
11:59:49 24   A   I assert the Fifth.
11:59:49 25   Q   Did you want to report the allegations about Larry

73

EXHIBIT 14
052

| | | |
|---|---|---|
| 11:59:52 | 1 | Nassar but Steve Penny told you not to? |
| 11:59:54 | 2 | A  I assert the Fifth. |
| 11:59:55 | 3 | Q  Did you believe that it was your mandated duty |
| 12:00:00 | 4 | under the law of the state of Indiana to make |
| 12:00:03 | 5 | reports of suspected abuse if you received them? |
| 12:00:07 | 6 | A  I assert the Fifth. |
| 12:00:09 | 7 | Q  Did Steve Penny ever tell you not to uphold that |
| 12:00:12 | 8 | duty? |
| 12:00:13 | 9 | A  I assert the Fifth. |
| 12:00:14 | 10 | Q  Were you worried that if you didn't follow Steve |
| 12:00:16 | 11 | Penny's instructions, either to go to the ranch or |
| 12:00:18 | 12 | any other instructions, that your job would be in |
| 12:00:21 | 13 | jeopardy? |
| 12:00:22 | 14 | A  I assert the Fifth. |
| 12:00:30 | 15 | Q  Has Steve Penny ever offered you anything -- has he |
| 12:00:39 | 16 | ever offered you anything in order to go to the |
| 12:00:41 | 17 | ranch in order to obtain those documents, meaning, |
| 12:00:44 | 18 | anything monetarily or any tangible items? |
| 12:00:48 | 19 | A  I assert the Fifth. |
| 12:01:09 | 20 | Q  Are you currently the national teams |
| 12:01:13 | 21 | manager/program travel manager at USAG? |
| 12:01:22 | 22 | A  I assert the Fifth. |
| 12:01:23 | 23 | Q  Is your office at the USA Gymnastics headquarters? |
| 12:01:27 | 24 | A  I assert the Fifth. |
| 12:01:29 | 25 | Q  Do you have an office at the USAG headquarters? |

74

EXHIBIT 14
053

| | | |
|---|---|---|
| 12:01:33 | 1 | A   I assert the Fifth. |
| 12:01:33 | 2 | Q   Did Steve Penny require you to keep those documents |
| 12:01:35 | 3 |     we talked about from the ranch in your office at |
| 12:01:37 | 4 |     the USAG headquarters? |
| 12:01:39 | 5 | A   I assert the Fifth. |
| 12:01:39 | 6 | Q   Did you ever speak with Steve Penny's attorneys? |
| 12:01:47 | 7 | A   I assert the Fifth. |
| 12:01:47 | 8 | Q   Have you ever had a meeting with Steve Penny and |
| 12:01:50 | 9 |     Scott Blackman? |
| 12:01:53 | 10 | A   I assert the Fifth. |
| 12:01:53 | 11 | Q   Have you ever had a meeting with Steve Penny and |
| 12:01:57 | 12 |     Paul Parilla? |
| 12:01:58 | 13 | A   I assert the Fifth. |
| 12:01:59 | 14 | Q   Did you travel to California with Steve Penny in |
| 12:02:01 | 15 |     2016 regarding allegations about a California |
| 12:02:06 | 16 |     gymnast being abused by Larry Nassar? |
| 12:02:09 | 17 | A   I assert the Fifth. |
| 12:02:10 | 18 | Q   Did you schedule that travel for Steve Penny? |
| 12:02:14 | 19 | A   I assert the Fifth. |
| 12:02:14 | 20 | Q   Do you know if Steve Penny's travel in 2016 to |
| 12:02:18 | 21 |     California where he met with Paul Parilla was paid |
| 12:02:24 | 22 |     for by USAG? |
| 12:02:26 | 23 | A   I assert the Fifth. |
| 12:02:29 | 24 | Q   Have you ever been at a board meeting where Larry |
| 12:02:31 | 25 |     Nassar was discussed in the presence of Steve |

EXHIBIT 14
054

| | | |
|---|---|---|
| 12:02:35 | 1 | Penny? |
| 12:02:36 | 2 | A  I assert the Fifth. |
| 12:02:37 | 3 | Q  Were you ever at a board meeting where Steve Penny |
| 12:02:40 | 4 | urged individuals not to report Larry Nassar? |
| 12:02:43 | 5 | A  I assert the Fifth. |
| 12:02:44 | 6 | Q  And what I mean, "not report Larry Nassar," not |
| 12:02:48 | 7 | report him to the proper law enforcement |
| 12:02:50 | 8 | authorities? |
| 12:02:50 | 9 | A  I assert the Fifth. |
| 12:02:52 | 10 | Q  Did Steve Penny intentionally report the |
| 12:02:57 | 11 | allegations involving Larry Nassar to individuals |
| 12:03:01 | 12 | he knew within the FBI? |
| 12:03:05 | 13 | A  I assert the Fifth. |
| 12:03:06 | 14 | Q  Do you know if any local law enforcement knew of |
| 12:03:12 | 15 | allegations about Larry Nassar in June of 2015? |
| 12:03:16 | 16 | A  I assert the Fifth. |
| 12:03:16 | 17 | Q  Do you know if Steve Penny ever made any |
| 12:03:18 | 18 | communications to those local law enforcement |
| 12:03:21 | 19 | agencies in 2015? |
| 12:03:22 | 20 | A  I assert the Fifth. |
| 12:03:24 | 21 | Q  Do you know if Steve Penny was ever given any |
| 12:03:26 | 22 | advice from the local law enforcement agencies in |
| 12:03:28 | 23 | June of 2015? |
| 12:03:30 | 24 | A  I assert the Fifth. |
| 12:03:32 | 25 | Q  Do you know if Steve Penny ever had any in-person |

76

EXHIBIT 14
055

| | | |
|---|---|---|
| 12:03:40 | 1 | meetings with law enforcement, local law |
| 12:03:43 | 2 | enforcement, in June of 2015? |
| 12:03:45 | 3 | A  I assert the Fifth. |
| 12:03:46 | 4 | Q  Did Steve Penny ever have any communications, |
| 12:03:49 | 5 | meaning emails or text messages, that you were |
| 12:03:53 | 6 | copied on or privy to regarding Larry Nassar? |
| 12:03:57 | 7 | A  I assert the Fifth. |
| 12:03:59 | 8 | Q  Did Steve Penny -- did you have Mr. Smith's |
| 12:04:03 | 9 | number -- or Detective Smith, I believe?  Do you |
| 12:04:12 | 10 | have Bruce Smith's number? |
| 12:04:14 | 11 | A  I assert the Fifth. |
| 12:04:15 | 12 | Q  Do you have Jay Abbott's number? |
| 12:04:17 | 13 | A  I assert the Fifth. |
| 12:04:18 | 14 | Q  Did you ever coordinate any meetings between |
| 12:04:22 | 15 | Detective Smith or Agent Abbott regarding Larry |
| 12:04:25 | 16 | Nassar? |
| 12:04:27 | 17 | A  I assert the Fifth. |
| 12:04:33 | 18 | Q  Have you been interviewed by anyone in a federal |
| 12:04:37 | 19 | prosecutor's office about the Larry Nassar |
| 12:04:39 | 20 | investigation? |
| 12:04:41 | 21 | A  I assert the Fifth. |
| 12:04:42 | 22 | Q  Have you ever been interviewed by any federal |
| 12:04:44 | 23 | prosecutor about your involvement in taking records |
| 12:04:49 | 24 | from the ranch? |
| 12:04:49 | 25 | A  I assert the Fifth. |

EXHIBIT 14
056

| | | | |
|---|---|---|---|
| 12:04:50 | 1 | Q | Have you ever told anyone what you believed were |
| 12:04:52 | 2 | | contained in those records from the ranch? |
| 12:04:54 | 3 | A | I assert the Fifth. |
| 12:04:57 | 4 | Q | Did you speak with anyone other than your attorney |
| 12:05:00 | 5 | | today to prep for your deposition? |
| 12:05:03 | 6 | A | I assert the Fifth. |
| 12:05:08 | 7 | Q | Did you review any documents in preparation for |
| 12:05:10 | 8 | | your deposition here today? |
| 12:05:15 | 9 | A | I assert the Fifth. |
| 12:05:31 | 10 | Q | If you did review documents, did they refresh your |
| 12:05:32 | 11 | | recollection as to the subject matter contained in |
| 12:05:35 | 12 | | those documents? |
| 12:05:37 | 13 | A | I assert the Fifth. |
| 12:05:46 | 14 | Q | Were you ever given sexual harassment training at |
| 12:05:50 | 15 | | USA Gymnastics? |
| 12:05:50 | 16 | A | I assert the Fifth. |
| 12:05:51 | 17 | Q | Were you ever given training on how to identify |
| 12:05:57 | 18 | | suspected childhood sexual abuse while at USA |
| 12:06:03 | 19 | | Gymnastics? |
| 12:06:04 | 20 | A | I assert the Fifth. |
| 12:06:05 | 21 | Q | Did you ever tell Steve Penny in June of 2015 that |
| 12:06:07 | 22 | | he needed to report to law enforcement prior to |
| 12:06:11 | 23 | | enlisting Fran Sepler? |
| 12:06:16 | 24 | A | I assert the Fifth. |
| 12:06:17 | 25 | Q | Do you know who Fran Sepler is? |

78

EXHIBIT 14
057

12:06:20  1    A   I assert the Fifth.

12:06:22  2    Q   Have you ever spoken with Fran Sepler?

12:06:25  3    A   I assert the Fifth.

12:06:27  4    Q   Have you ever spoken with Fran Sepler about Larry

12:06:30  5        Nassar?

12:06:30  6    A   I assert the Fifth.

12:06:32  7    Q   Have you ever been on a call with Fran Sepler and

12:06:34  8        Steve Penny?

12:06:35  9    A   I assert the Fifth.

12:06:37 10    Q   Have you ever spoken with Fran Sepler and Steve

12:06:40 11        Penny regarding Larry Nassar in the same meeting?

12:06:44 12    A   I assert the Fifth.

12:06:45 13    Q   Did you have any involvement with enlisting Fran

12:06:49 14        Sepler's services to investigate Larry Nassar?

12:06:52 15    A   I assert the Fifth.

12:06:53 16    Q   Did you personally ever speak with anybody at

12:06:58 17        Michigan State regarding the travel of Larry

12:07:00 18        Nassar?

12:07:00 19    A   I assert the Fifth.

12:07:01 20    Q   Did anyone at Michigan State ever make you aware of

12:07:05 21        complaints they had about Larry Nassar?

12:07:08 22    A   I assert the Fifth.

12:07:08 23    Q   If they did, in fact, make you aware of those

12:07:11 24        complaints, did you communicate those to anyone at

12:07:16 25        USA Gymnastics?

EXHIBIT 14
058

| | | | |
|---|---|---|---|
| 12:07:16 | 1 | A | I assert the Fifth. |
| 12:07:23 | 2 | Q | Despite the news report about documents being |
| 12:07:27 | 3 | | found, do you have -- do you know if those are the |
| 12:07:30 | 4 | | same documents you took from the ranch? |
| 12:07:35 | 5 | A | I assert the Fifth. |
| 12:07:37 | 6 | Q | Do you know if those documents were recently |
| 12:07:39 | 7 | | created or when those documents were created? |
| 12:07:42 | 8 | A | I assert the Fifth. |
| 12:07:43 | 9 | Q | Do you know who authored those documents? |
| 12:07:45 | 10 | A | I assert the Fifth. |
| 12:07:50 | 11 | Q | Were those USAG forms or some other forms that were |
| 12:07:52 | 12 | | located? |
| 12:07:53 | 13 | A | I assert the Fifth. |
| 12:07:54 | 14 | Q | Who discovered those forms? |
| 12:07:56 | 15 | A | I assert the Fifth. |
| 12:07:57 | 16 | Q | Where did they discover those forms? |
| 12:07:59 | 17 | A | I assert the Fifth. |
| 12:08:11 | 18 | Q | Did you ever assist any -- assist Steve Penny, |
| 12:08:17 | 19 | | Rhonda Faehn, or anyone from USA Gymnastics in |
| 12:08:21 | 20 | | gathering documents to be given to Congress? |
| 12:08:26 | 21 | A | I assert the Fifth. |
| 12:08:28 | 22 | Q | Did you ever help gather documents to be given to |
| 12:08:32 | 23 | | Congress? |
| 12:08:33 | 24 | A | I assert the Fifth. |
| 12:08:34 | 25 | Q | Regardless of whether you were told whether the |

EXHIBIT 14
059

| | | |
|---|---|---|
| 12:08:37 | 1 | documents were going to go to Congress or somewhere |
| 12:08:39 | 2 | else, did you ever assist in the preparation of |
| 12:08:42 | 3 | compiling documents to be sent to a third party |
| 12:08:45 | 4 | regarding the Larry Nassar scandal? |
| 12:08:48 | 5 | A  I assert the Fifth. |
| 12:08:54 | 6 | Q  Prior to sending those documents to Congress, did |
| 12:08:58 | 7 | you give notice to any of the individuals whose |
| 12:09:01 | 8 | records those were? |
| 12:09:03 | 9 | A  I assert the Fifth. |
| 12:09:05 | 10 | Q  Did USAG transmit any of my clients' records to |
| 12:09:09 | 11 | Congress? |
| 12:09:10 | 12 | A  I assert the Fifth. |
| 12:09:10 | 13 | Q  Specifically, did USAG send any of Aly Raisman's |
| 12:09:16 | 14 | records to Congress? |
| 12:09:18 | 15 | A  I assert the Fifth. |
| 12:09:18 | 16 | Q  Did USAG ever send Jordyn Wieber's records to |
| 12:09:23 | 17 | Congress? |
| 12:09:24 | 18 | A  I assert the Fifth. |
| 12:09:25 | 19 | Q  Did USAG ever send McKayla Maroney's records to |
| 12:09:30 | 20 | Congress? |
| 12:09:31 | 21 | A  I assert the Fifth. |
| 12:09:32 | 22 | Q  Did USAG ever send Mattie Larson's records to |
| 12:09:32 | 23 | Congress? |
| 12:09:34 | 24 | A  I assert the Fifth. |
| 12:09:35 | 25 | Q  Did USAG ever send Jamie Dantzscher's records to |

EXHIBIT 14
060

| | | |
|---|---|---|
| 12:09:40 | 1 | Congress? |
| 12:09:41 | 2 | A  I assert the Fifth. |
| 12:09:41 | 3 | Q  Who at USA Gymnastics would be most informed about |
| 12:09:44 | 4 | the records that were sent to Congress? |
| 12:09:47 | 5 | A  I assert the Fifth. |
| 12:09:49 | 6 | Q  Does USA Gymnastics have a records depository at |
| 12:09:54 | 7 | its headquarters? |
| 12:09:55 | 8 | A  I assert the Fifth. |
| 12:09:55 | 9 | Q  Is there a basement or storage structure where all |
| 12:09:58 | 10 | records are kept? |
| 12:10:00 | 11 | A  I assert the Fifth. |
| 12:10:00 | 12 | Q  When hard records are kept nowadays, are they |
| 12:10:04 | 13 | scanned into a system for USA Gymnastics and |
| 12:10:07 | 14 | maintained at the facility or are they kept in hard |
| 12:10:10 | 15 | form only? |
| 12:10:12 | 16 | A  I assert the Fifth. |
| 12:10:12 | 17 | Q  If they are, in fact, scanned into a system to be |
| 12:10:16 | 18 | kept at USA Gymnastics, are the hard records then |
| 12:10:21 | 19 | destroyed? |
| 12:10:22 | 20 | A  I assert the Fifth. |
| 12:10:23 | 21 | Q  Is there any record-keeping process for insuring |
| 12:10:28 | 22 | that no records are destroyed before they're |
| 12:10:31 | 23 | preserved electronically? |
| 12:10:33 | 24 | A  I assert the Fifth. |
| 12:10:33 | 25 | Q  Does USA Gymnastics have servers at the |

EXHIBIT 14
061

White, Amy
Nassar Cases

| | | |
|---|---|---|
| 12:10:37 | 1 | headquarters for electronic documents? |
| 12:10:39 | 2 | A  I assert the Fifth. |
| 12:10:40 | 3 | Q  Do you have access to that server? |
| 12:10:41 | 4 | A  I assert the Fifth. |
| 12:10:42 | 5 | Q  If you don't have access, who has access to that |
| 12:10:45 | 6 | server? |
| 12:10:46 | 7 | A  I assert the Fifth. |
| 12:10:46 | 8 | Q  Did Steve Penny have access to that server? |
| 12:10:49 | 9 | A  I assert the Fifth. |
| 12:10:50 | 10 | Q  Does Steve Penny still have access to that server? |
| 12:10:54 | 11 | A  I assert the Fifth. |
| 12:10:54 | 12 | Q  To your knowledge, has USA Gymnastics been in |
| 12:10:57 | 13 | contact with Steve Penny in the last few months |
| 12:10:59 | 14 | regarding Larry Nassar? |
| 12:11:02 | 15 | A  I assert the Fifth. |
| 12:11:03 | 16 | Q  Do you know if USA Gymnastics is paying for Steve |
| 12:11:06 | 17 | Penny's defense, criminal defense? |
| 12:11:10 | 18 | A  I assert the Fifth. |
| 12:11:15 | 19 | Q  Do you know if the USOC has any ability to audit |
| 12:11:20 | 20 | the records maintained by USAG? |
| 12:11:24 | 21 | A  I assert the Fifth. |
| 12:11:25 | 22 | MS. KIES:  This is Marianne.  I'd just like to |
| 12:11:26 | 23 | specifically interpose an objection here as to |
| 12:11:28 | 24 | beyond the scope of the deposition. |
| 12:11:30 | 25 | Q  Do you know if USOC had access to the records at |

83

EXHIBIT 14
062

12:11:36  1        USA Gymnastics prior to June of 2015?

12:11:39  2    A  I assert the Fifth.

12:11:39  3    Q  Are you aware of any records maintained by USA

12:11:42  4        Gymnastics denoting that Larry Nassar was not

12:11:44  5        allowed at the ranch for a period of time?

12:11:48  6    A  I assert the Fifth.

12:11:49  7    Q  Are you aware of any records at USA Gymnastics

12:11:51  8        indicating that Larry Nassar was taking an

12:11:54  9        excessive amount of photographs of little girls at

12:11:57 10        the ranch?

12:11:58 11    A  I assert the Fifth.

12:11:59 12    Q  Were you ever made aware of any records that

12:12:02 13        contained information that Larry Nassar was taking

12:12:04 14        an excessive amount of photographs of little girls

12:12:07 15        at foreign competitions?

12:12:09 16    A  I assert the Fifth.

12:12:10 17    Q  Were those records also made available to USOC?

12:12:14 18    A  I assert the Fifth.

12:12:15 19    Q  Did the USOC, in fact, audit those records and view

12:12:19 20        those records prior to June of 2015?

12:12:22 21    A  I assert the Fifth.

12:12:27 22        MR. CUNNY:  I'll take one more quick break,

12:12:29 23    but I'm about done.

12:12:31 24        THE VIDEOGRAPHER:  Okay.  It's 12:12.  Off the

12:12:34 25    record.

EXHIBIT 14
063

| | | |
|---|---|---|
| 12:12:34 | 1 | (A brief recess was taken.) |
| 12:18:23 | 2 | THE VIDEOGRAPHER:  It's now 12:18.  We're back |
| 12:18:25 | 3 | on the record. |
| 12:18:26 | 4 | BY MR. CUNNY: |
| 12:18:27 | 5 | Q  All right.  Miss, you understand you're still under |
| 12:18:30 | 6 | oath? |
| 12:18:30 | 7 | A  Yes. |
| 12:18:31 | 8 | Q  Still pledge to tell the truth? |
| 12:18:34 | 9 | A  Yes. |
| 12:18:35 | 10 | Q  All right.  So prior to the Larry Nassar scandal, |
| 12:18:39 | 11 | had you been involved in the handling of any |
| 12:18:42 | 12 | childhood sexual abuse by USAG members? |
| 12:18:47 | 13 | A  I assert the Fifth. |
| 12:18:49 | 14 | Q  Was it part of your job duty to assist Steve Penny |
| 12:18:54 | 15 | in the investigation of childhood sexual abuse |
| 12:18:58 | 16 | allegations? |
| 12:19:00 | 17 | A  I assert the Fifth. |
| 12:19:01 | 18 | Q  Did you have any role on the disciplinary board or |
| 12:19:04 | 19 | committee, or however it's named, at USA Gymnastics |
| 12:19:09 | 20 | in revoking the membership of ineligible members? |
| 12:19:16 | 21 | A  I assert the Fifth. |
| 12:19:18 | 22 | Q  Were those proceedings ever instituted against |
| 12:19:22 | 23 | Larry Nassar prior to September of 2016? |
| 12:19:25 | 24 | A  I assert the Fifth. |
| 12:19:27 | 25 | Q  Did Steve Penny ever indicate to you that he had no |

85

EXHIBIT 14
064

White, Amy
Nassar Cases

| | | |
|---|---|---|
| 12:19:30 | 1 | intention of instituting formal proceedings against |
| 12:19:35 | 2 | Larry Nassar to make him on the permanently |
| 12:19:37 | 3 | ineligible list? |
| 12:19:40 | 4 | A  I assert the Fifth. |
| 12:19:40 | 5 | Q  Do you know why there wasn't an action instituted |
| 12:19:43 | 6 | against Larry Nassar being made permanently |
| 12:19:48 | 7 | ineligible to compete -- or treat USAG members? |
| 12:19:52 | 8 | A  I assert the Fifth. |
| 12:19:52 | 9 | Q  Was it because Steve Penny did not want that |
| 12:19:56 | 10 | information to become public after June of 2015? |
| 12:20:02 | 11 | A  I assert the Fifth. |
| 12:20:04 | 12 | Q  Was it -- did Steve Penny ever express to you that |
| 12:20:07 | 13 | it was the intention -- that it was his intention |
| 12:20:10 | 14 | to ensure that the allegations against Larry Nassar |
| 12:20:16 | 15 | were never made public? |
| 12:20:18 | 16 | A  I assert the Fifth. |
| 12:20:19 | 17 | Q  Did Steve Penny ever indicate to you whose idea it |
| 12:20:23 | 18 | was to make the settlement agreement with McKayla |
| 12:20:27 | 19 | Maroney confidential? |
| 12:20:29 | 20 | A  I assert the Fifth. |
| 12:20:33 | 21 | Q  Have you been made aware in your role at USA |
| 12:20:35 | 22 | Gymnastics of any other confidential settlements |
| 12:20:39 | 23 | regarding claims against Larry Nassar? |
| 12:20:42 | 24 | A  I assert the Fifth. |
| 12:20:42 | 25 | Q  If you have, when have those confidential |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 14
065

| | | |
|---|---|---|
| 12:20:45 | 1 | settlements been entered into? |
| 12:20:47 | 2 | A  I assert the Fifth. |
| 12:20:48 | 3 | Q  Do any of those confidential settlements predate |
| 12:20:52 | 4 | June of 2015? |
| 12:20:54 | 5 | A  I assert the Fifth. |
| 12:20:54 | 6 | Q  Is it a USAG policy that any claim of sexual abuse |
| 12:21:01 | 7 | gets settled confidentially? |
| 12:21:04 | 8 | A  I assert the Fifth. |
| 12:21:04 | 9 | Q  If that is the case, is that the policy so that USA |
| 12:21:09 | 10 | Gymnastics won't face public scrutiny for childhood |
| 12:21:14 | 11 | sexual abuse occurring by its staff or agents? |
| 12:21:19 | 12 | A  I assert the Fifth. |
| 12:21:26 | 13 | Q  Do you know how Larry Nassar was compensated by USA |
| 12:21:31 | 14 | Gymnastics? |
| 12:21:31 | 15 | A  I assert the Fifth. |
| 12:21:31 | 16 | Q  Did you work at all with the USOC in arranging the |
| 12:21:34 | 17 | travel of Larry Nassar for Olympic or Pan American |
| 12:21:39 | 18 | events? |
| 12:21:40 | 19 | A  I assert the Fifth. |
| 12:21:42 | 20 | Q  Did USOC pay for Larry Nassar to attend any of |
| 12:21:45 | 21 | those events, or was that solely at the expense of |
| 12:21:48 | 22 | USOC? |
| 12:21:49 | 23 | A  I assert the Fifth. |
| 12:21:49 | 24 | Q  Did the USOC pay for any of Larry Nassar's travel |
| 12:21:53 | 25 | to the state of California, to your knowledge? |

EXHIBIT 14
066

12:21:56  1    A  I assert the Fifth.

12:21:58  2           MS. KIES:  Object to foundation.

12:22:01  3    Q  Did the USOC ever indicate to you that they would

12:22:04  4       be paying the expenses for Larry Nassar when he

12:22:08  5       traveled to California?

12:22:09  6    A  I assert the Fifth.

12:22:16  7    Q  Did USOC, to your knowledge and given that you

12:22:20  8       handle travel arrangements for USAG staff, did the

12:22:24  9       USOC ever pay for Debbie Van Horn to go to

12:22:28 10       California to provide medical treatment at an

12:22:31 11       event?

12:22:32 12    A  I assert the Fifth.

12:22:33 13    Q  Specifically, did the USOC pay for Debbie Van Horn

12:22:36 14       to go to the 2012 Olympic Trials in San Jose?

12:22:42 15    A  I assert the Fifth.

12:22:43 16    Q  And prior to that and based on your position at

12:22:46 17       USAG, were you ever made aware that Debbie Van Horn

12:22:51 18       had viewed the treatments Larry Nassar was

12:22:55 19       performing on these girls?

12:22:58 20    A  I assert the Fifth.

12:22:59 21    Q  At any point were you made aware of the

12:23:01 22       treatments -- the category of treatments that Larry

12:23:05 23       Nassar was providing to gymnasts at USAG?

12:23:10 24    A  I assert the Fifth.

12:23:10 25    Q  Did anyone at USAG, to your knowledge, have any

EXHIBIT 14
067

| | | |
|---|---|---|
| 12:23:17 | 1 | information that Larry Nassar was performing an |
| 12:23:21 | 2 | intravaginal adjustment on these girls? |
| 12:23:24 | 3 | A  I assert the Fifth. |
| 12:23:25 | 4 | Q  Was there ever a review by a medical committee at |
| 12:23:28 | 5 | USAG or medical doctors volunteering with USAG of |
| 12:23:33 | 6 | these intravaginal treatments to your knowledge? |
| 12:23:36 | 7 | A  I assert the Fifth. |
| 12:23:36 | 8 | Q  Did Steve Penny ever discuss these intravaginal |
| 12:23:39 | 9 | treatments with you? |
| 12:23:41 | 10 | A  I assert the Fifth. |
| 12:23:42 | 11 | Q  Are you aware of any claims that Steve Penny had |
| 12:23:53 | 12 | obfuscated an investigation regarding childhood |
| 12:23:56 | 13 | sexual abuse in the past? |
| 12:23:59 | 14 | A  I assert the Fifth. |
| 12:23:59 | 15 | Q  Are you aware of any claims that Steve Penny had |
| 12:24:03 | 16 | hindered police investigations for childhood sexual |
| 12:24:06 | 17 | abuse in the past? |
| 12:24:07 | 18 | A  I assert the Fifth. |
| 12:24:11 | 19 | Q  Did Steve Penny ever indicate to you that he wanted |
| 12:24:15 | 20 | to hinder or otherwise hamper police investigations |
| 12:24:20 | 21 | into Larry Nassar? |
| 12:24:21 | 22 | A  I assert the Fifth. |
| 12:24:22 | 23 | Q  Was Steve Penny friends with Larry Nassar? |
| 12:24:24 | 24 | A  I assert the Fifth. |
| 12:24:24 | 25 | Q  Was Steve Penny friends with Marvin Sharp? |

EXHIBIT 14
068

| | | |
|---|---|---|
| 12:24:27 | 1 | A  I assert the Fifth. |
| 12:24:27 | 2 | Q  Did anybody ever look into a connection between |
| 12:24:32 | 3 |    those two individuals? |
| 12:24:34 | 4 | A  I assert the Fifth. |
| 12:24:35 | 5 | Q  Are you aware of when Marvin Sharp was first |
| 12:24:39 | 6 |    reported to USA Gymnastics for sexual misconduct? |
| 12:24:45 | 7 | A  I assert the Fifth. |
| 12:24:45 | 8 | Q  Are you aware of when he was then finally reported |
| 12:24:48 | 9 |    to law enforcement? |
| 12:24:50 | 10 | A  I assert the Fifth. |
| 12:24:54 | 11 | Q  Have you ever met Don McPherson? |
| 12:24:57 | 12 | A  I assert the Fifth. |
| 12:24:57 | 13 | Q  Did Don McPherson ever discuss with you allegations |
| 12:25:02 | 14 |    about Larry Nassar? |
| 12:25:04 | 15 | A  I assert the Fifth. |
| 12:25:06 | 16 | Q  Did Don McPherson ever make you aware or Steve |
| 12:25:09 | 17 |    Penny aware, to your knowledge, about allegations |
| 12:25:13 | 18 |    pertaining to Larry Nassar that predated June of |
| 12:25:15 | 19 |    2015? |
| 12:25:16 | 20 | A  I assert the Fifth. |
| 12:25:18 | 21 | Q  Do you know who Don McPherson is? |
| 12:25:21 | 22 | A  I assert the Fifth. |
| 12:25:22 | 23 | Q  Does Don McPherson have any role with USA |
| 12:25:24 | 24 |    Gymnastics, to your knowledge? |
| 12:25:28 | 25 | A  I assert the Fifth. |

EXHIBIT 14
069

| | | | |
|---|---|---|---|
| 12:25:42 | 1 | Q | Have you been asked to testify before Congress? |
| 12:25:46 | 2 | A | I assert the Fifth. |
| 12:25:50 | 3 | Q | Have you been asked to testify at the trial of |
| 12:25:52 | 4 | | Steve Penny? |
| 12:25:54 | 5 | A | I assert the Fifth. |
| 12:25:58 | 6 | Q | Have you been asked to testify at a preliminary |
| 12:26:01 | 7 | | hearing or anything of that nature regarding Steve |
| 12:26:03 | 8 | | Penny? |
| 12:26:04 | 9 | A | I assert the Fifth. |
| 12:26:06 | 10 | Q | Did you provide any documentation to law |
| 12:26:08 | 11 | | enforcement at any point? |
| 12:26:11 | 12 | A | I assert the Fifth. |
| 12:26:13 | 13 | Q | Do you have emails regarding Larry Nassar? |
| 12:26:15 | 14 | A | I assert the Fifth. |
| 12:26:16 | 15 | Q | Do you have text messages regarding Larry Nassar? |
| 12:26:18 | 16 | A | I assert the Fifth. |
| 12:26:19 | 17 | Q | Do any of those emails or text messages have other |
| 12:26:26 | 18 | | USAG personnel as the recipient? |
| 12:26:28 | 19 | A | I assert the Fifth. |
| 12:26:29 | 20 | Q | Do any of those text messages or emails have any |
| 12:26:34 | 21 | | USOC, meaning U.S. Olympic Committee, as the |
| 12:26:40 | 22 | | recipients? |
| 12:26:43 | 23 | A | I assert the Fifth. |
| 12:26:43 | 24 | Q | Have you received any emails or text messages from |
| 12:26:46 | 25 | | the USOC regarding Larry Nassar? |

91

EXHIBIT 14
070

| | | |
|---|---|---|
| 12:26:48 | 1 | A  I assert the Fifth. |
| 12:26:51 | 2 | Q  As you sit here today, do you know where the |
| 12:26:55 | 3 | documents are that you took from the ranch? |
| 12:26:59 | 4 | A  I assert the Fifth. |
| 12:27:00 | 5 | Q  As you sit here today, do you know what was |
| 12:27:03 | 6 | contained in those documents that you took from the |
| 12:27:06 | 7 | ranch? |
| 12:27:06 | 8 | A  I assert the Fifth. |
| 12:27:07 | 9 | Q  As you sit here today, do you know if those |
| 12:27:10 | 10 | documents are just a couple miles away at the USAG |
| 12:27:14 | 11 | headquarters? |
| 12:27:18 | 12 | A  I assert the Fifth. |
| 12:27:18 | 13 | Q  Did you review those documents before your |
| 12:27:21 | 14 | deposition today? |
| 12:27:22 | 15 | A  I assert the Fifth. |
| 12:27:24 | 16 | Q  Have those documents been sent to Ropes & Gray, to |
| 12:27:35 | 17 | your knowledge? |
| 12:27:36 | 18 | A  I assert the Fifth. |
| 12:27:37 | 19 | Q  Do you know if those documents -- I think I asked |
| 12:27:41 | 20 | you if they were sent to Deborah Daniels, but do |
| 12:27:44 | 21 | you know if those documents were sent to Deborah |
| 12:27:46 | 22 | Daniels? |
| 12:27:48 | 23 | A  I assert the Fifth. |
| 12:27:48 | 24 | Q  Do you know if USAG, if in fact they were sent to |
| 12:27:52 | 25 | Deborah Daniels, if they were returned in the same |

EXHIBIT 14
071

| | | |
|---|---|---|
| 12:27:55 | 1 | condition they were sent? |
| 12:27:56 | 2 | A  I assert the Fifth. |
| 12:27:57 | 3 | Q  Did Deborah Daniels take any of those documents and |
| 12:28:02 | 4 | not return them, to your knowledge? |
| 12:28:05 | 5 | A  I assert the Fifth. |
| 12:28:05 | 6 | Q  Are those documents reflected anywhere in Deborah |
| 12:28:08 | 7 | Daniels' report, to your knowledge? |
| 12:28:10 | 8 | A  I assert the Fifth. |
| 12:28:11 | 9 | Q  Did Deborah Daniels speak to you about those |
| 12:28:14 | 10 | documents and the removal from the ranch? |
| 12:28:17 | 11 | A  I assert the Fifth. |
| 12:28:18 | 12 | Q  To your knowledge, when did Deborah Daniels become |
| 12:28:21 | 13 | aware of those documents still existing? |
| 12:28:25 | 14 | A  I assert the Fifth. |
| 12:28:31 | 15 | Q  Do you know who Deborah Daniels is? |
| 12:28:34 | 16 | A  I assert the Fifth. |
| 12:28:37 | 17 | Q  Did you provide any written statements or |
| 12:28:39 | 18 | audio-recorded statements to Deborah Daniels? |
| 12:28:43 | 19 | A  I assert the Fifth. |
| 12:28:44 | 20 | Q  Or video recorded statements? |
| 12:28:45 | 21 | A  I assert the Fifth. |
| 12:28:46 | 22 | Q  Did you provide any audio or video-recorded |
| 12:28:50 | 23 | statement to any law enforcement agency? |
| 12:28:54 | 24 | A  I assert the Fifth. |
| 12:28:54 | 25 | Q  Did any of those statements concern Larry Nassar? |

93

EXHIBIT 14
072

| | | | |
|---|---|---|---|
| 12:28:57 | 1 | A | I assert the Fifth. |
| 12:29:01 | 2 | Q | Are you aware of the reasons why Steve Penny |
| 12:29:04 | 3 | | resigned his position at USA Gymnastics? |
| 12:29:08 | 4 | A | I assert the Fifth. |
| 12:29:10 | 5 | Q | Did Steve Penny's resignation have to do with the |
| 12:29:16 | 6 | | removal of documents from the ranch to your |
| 12:29:18 | 7 | | knowledge? |
| 12:29:18 | 8 | A | I assert the Fifth. |
| 12:29:19 | 9 | Q | Did Steve Penny's resignation from USA Gymnastics |
| 12:29:22 | 10 | | have to do with allegations of sexual abuse at USA |
| 12:29:27 | 11 | | Gymnastics? |
| 12:29:30 | 12 | A | I assert the Fifth. |
| 12:29:31 | 13 | Q | Did Steve Penny's resignation from USA Gymnastics |
| 12:29:34 | 14 | | have anything to do with him being forced out by |
| 12:29:36 | 15 | | the USOC? |
| 12:29:38 | 16 | A | I assert the Fifth. |
| 12:29:38 | 17 | Q | Are you aware of any communications between Steve |
| 12:29:40 | 18 | | Penny and the board at the USOC, wherein the board |
| 12:29:48 | 19 | | conditions USAG's certification as an NGB on Steve |
| 12:29:54 | 20 | | Penny resigning? |
| 12:29:56 | 21 | A | I assert the Fifth. |
| 12:29:57 | 22 | Q | Were you made aware of the reasons for which USAG |
| 12:30:03 | 23 | | was attempting to decertify USA Gymnastics? |
| 12:30:06 | 24 | A | I assert the Fifth. |
| 12:30:12 | 25 | Q | Did USOC specifically call you into a meeting |

EXHIBIT 14
073

| | | |
|---|---|---|
| 12:30:18 | 1 | regarding their decision to attempt to decertify |
| 12:30:24 | 2 | USAG? |
| 12:30:24 | 3 | A  I assert the Fifth. |
| 12:30:24 | 4 | Q  Did you ever speak with any of the board at USAG |
| 12:30:32 | 5 | regarding the decertification of USAG? |
| 12:30:37 | 6 | A  I assert the Fifth. |
| 12:30:41 | 7 | Q  Were there any discussions that, if decertified, |
| 12:30:46 | 8 | USAG would not be able to maintain its business? |
| 12:30:50 | 9 | A  I assert the Fifth. |
| 12:30:55 | 10 | Q  Was it ever discussed that the only way USAG could |
| 12:31:00 | 11 | stay in business is if it was an NGB? |
| 12:31:04 | 12 | A  I assert the Fifth. |
| 12:31:04 | 13 | Q  Are you present at board meetings? |
| 12:31:12 | 14 | A  I assert the Fifth. |
| 12:31:13 | 15 | Q  When's the last time you talked with Paul Parilla? |
| 12:31:17 | 16 | A  I assert the Fifth. |
| 12:31:18 | 17 | Q  Do you know who Paul Parilla is? |
| 12:31:20 | 18 | A  I assert the Fifth. |
| 12:31:21 | 19 | Q  When's the last time you've talked with Jay Binder? |
| 12:31:24 | 20 | A  I assert the Fifth. |
| 12:31:25 | 21 | Q  Have you ever talked with Jay Binder? |
| 12:31:27 | 22 | A  I assert the Fifth. |
| 12:31:27 | 23 | Q  When's the last time you spoke with Peter Vidmar? |
| 12:31:31 | 24 | A  I assert the Fifth. |
| 12:31:31 | 25 | Q  Did you ever speak with Peter Vidmar about Larry |

95

EXHIBIT 14
074

White, Amy
Nassar Cases

| | | |
|---|---|---|
| 12:31:34 | 1 | Nassar? |
| 12:31:36 | 2 | A  I assert the Fifth. |
| 12:31:36 | 3 | Q  Did you ever speak with Jay Binder about Larry |
| 12:31:40 | 4 | Nassar? |
| 12:31:40 | 5 | A  I assert the Fifth. |
| 12:31:49 | 6 | Q  Did you ever speak with any other board members at |
| 12:31:52 | 7 | USAG regarding Larry Nassar? |
| 12:31:53 | 8 | A  I assert the Fifth. |
| 12:31:54 | 9 | Q  And when I say "other board members," I mean |
| 12:31:58 | 10 | anybody other than those that I just mentioned. |
| 12:32:01 | 11 | A  I assert the Fifth. |
| 12:32:03 | 12 | Q  Did you ever speak with any past presidents about |
| 12:32:05 | 13 | Larry Nassar? |
| 12:32:06 | 14 | A  I assert the Fifth. |
| 12:32:07 | 15 | Q  Did you ever speak with Kathy Scanlan about Larry |
| 12:32:11 | 16 | Nassar? |
| 12:32:13 | 17 | A  I assert the Fifth. |
| 12:32:17 | 18 | Q  Do you know what Steve Penny's role at USAG was |
| 12:32:21 | 19 | before he was president? |
| 12:32:22 | 20 | A  I assert the Fifth. |
| 12:32:23 | 21 | Q  Do you know if he received any complaints about |
| 12:32:25 | 22 | Larry Nassar in that role? |
| 12:32:26 | 23 | A  I assert the Fifth. |
| 12:32:28 | 24 | Q  Was it Steve Penny's custom and practice to |
| 12:32:33 | 25 | document reports about Larry Nassar or complaints |

96

EXHIBIT 14
075

| | | |
|---|---|---|
| 12:32:36 | 1 | about any USAG member? |
| 12:32:40 | 2 | A  I assert the Fifth. |
| 12:32:41 | 3 | Q  If he did document those allegations or complaints |
| 12:32:45 | 4 | about USAG members, where would Steve Penny keep |
| 12:32:49 | 5 | those documents? |
| 12:32:50 | 6 | A  I assert the Fifth. |
| 12:32:51 | 7 | Q  Do you know if they're handwritten or typewritten? |
| 12:32:54 | 8 | A  I assert the Fifth. |
| 12:33:15 | 9 | Q  Since you went to the ranch and retrieved those |
| 12:33:19 | 10 | documents, I believe in or around November of 2016, |
| 12:33:26 | 11 | have you been back to the ranch? |
| 12:33:27 | 12 | A  I assert the Fifth. |
| 12:33:31 | 13 | Q  Have you spoken to Martha or Bela Karolyi since |
| 12:33:35 | 14 | that time? |
| 12:33:37 | 15 | A  I assert the Fifth. |
| 12:33:37 | 16 | Q  Since this information came to light about your |
| 12:33:39 | 17 | removal of documents from the ranch as evidenced in |
| 12:33:42 | 18 | the congressional testimony, have you spoken with |
| 12:33:46 | 19 | anybody at the Karolyi Ranch regarding those |
| 12:33:48 | 20 | documents? |
| 12:33:52 | 21 | A  I assert the Fifth. |
| 12:33:53 | 22 | Q  Have you spoken with Kathy Kelly about the removal |
| 12:33:57 | 23 | of documents from the ranch? |
| 12:33:59 | 24 | A  I assert the Fifth. |
| 12:33:59 | 25 | Q  Have you spoken with Gary Warren about the removal |

97

EXHIBIT 14
076

| | | |
|---|---|---|
| 12:34:04 | 1 | of documents from the ranch? |
| 12:34:05 | 2 | A  I assert the Fifth. |
| 12:34:13 | 3 | Q  Do you know if the documents from the ranch were |
| 12:34:15 | 4 | destroyed? |
| 12:34:16 | 5 | A  I assert the Fifth. |
| 12:34:16 | 6 | Q  Do you know how they were destroyed? |
| 12:34:18 | 7 | A  I assert the Fifth. |
| 12:34:19 | 8 | Q  Were they burned? |
| 12:34:20 | 9 | A  I assert the Fifth. |
| 12:34:21 | 10 | Q  Were they shredded? |
| 12:34:22 | 11 | A  I assert the Fifth. |
| 12:34:24 | 12 | Q  Were they just thrown into a trash receptacle? |
| 12:34:29 | 13 | A  I assert the Fifth. |
| 12:34:40 | 14 | Q  Have you ever been instructed by Steve Penny, prior |
| 12:34:41 | 15 | to going to the ranch to obtain records, to go to |
| 12:34:48 | 16 | any other locations to obtain records for any |
| 12:34:51 | 17 | purpose? |
| 12:34:52 | 18 | A  I assert the Fifth. |
| 12:34:54 | 19 | Q  Did Steve Penny ever send you to Michigan State to |
| 12:34:56 | 20 | obtain records for Larry Nassar? |
| 12:35:00 | 21 | A  I assert the Fifth. |
| 12:35:00 | 22 | Q  Do you know if Steve Penny ever did get records |
| 12:35:03 | 23 | from Michigan State regarding Larry Nassar? |
| 12:35:05 | 24 | A  I assert the Fifth. |
| 12:35:13 | 25 | Q  Do you know if the records you took from the ranch |

98

EXHIBIT 14
077

12:35:18  1    were ever given to the Indianapolis Police

12:35:22  2    Department prior to March of 2017?

12:35:28  3  A  I assert the Fifth.

12:35:30  4  Q  Do you know if the records that were taken from the

12:35:33  5    ranch were ever given to the Indianapolis FBI prior

12:35:37  6    to March of 2017?

12:35:41  7  A  I assert the Fifth.

12:35:42  8  Q  Is it your understanding that Steve Penny resigned

12:35:44  9    in March of 2017 from USA Gymnastics?

12:35:47 10  A  I assert the Fifth.

12:35:50 11  Q  Did Steve Penny, to your knowledge, take those

12:35:52 12    documents with him after he resigned?

12:35:55 13  A  I assert the Fifth.

12:35:56 14  Q  Did Steve Penny write any memoranda to subsequent

12:36:01 15    leadership regarding those documents?

12:36:05 16  A  I assert the Fifth.

12:36:06 17  Q  Were you instructed to inform leadership of the

12:36:10 18    existence of those documents?

12:36:12 19  A  I assert the Fifth.

12:36:13 20  Q  Do you have any understanding of why Kerry Perry

12:36:15 21    didn't know where those documents were when she

12:36:18 22    testified to Congress?

12:36:19 23  A  I assert the Fifth.

12:36:24 24       MR. CUNNY:  I think I'm about done.  Does

12:36:26 25    anybody on the phone have further questions?

EXHIBIT 14
078

| | | |
|---|---|---|
| 12:36:35 | 1 | MR. AMUNDSON:  None. |
| 12:36:39 | 2 | THE REPORTER:  Anyone else? |
| 12:36:45 | 3 | MR. CUNNY:  Okay.  Hearing no requests for |
| 12:36:48 | 4 | further questions, obviously we're going to have to |
| 12:36:52 | 5 | bring a motion on the deposition transcript. |
| 12:36:55 | 6 | However, for handling of the transcript in the |
| 12:36:59 | 7 | meantime, I'd request that the court reporter be |
| 12:37:01 | 8 | relieved of her duties under the rules.  She will |
| 12:37:05 | 9 | prepare and bind a transcript, and she can send it |
| 12:37:09 | 10 | to counsel. |
| 12:37:10 | 11 | MR. DOWNEY:  Sure. |
| 12:37:11 | 12 | MR. CUNNY:  Counsel will receive that |
| 12:37:12 | 13 | transcript and make sure that the deponent reviews |
| 12:37:16 | 14 | it. |
| 12:37:16 | 15 | You'll have 30 days to review, and you can |
| 12:37:19 | 16 | make any changes you want to the transcript when |
| 12:37:22 | 17 | you get it.  However, I must caution you, if you |
| 12:37:24 | 18 | make a substantive change like you change a yes to |
| 12:37:28 | 19 | a no or the light was green and not red when I |
| 12:37:33 | 20 | drove through the intersection, something like |
| 12:37:34 | 21 | that, it can reflect negatively on your |
| 12:37:37 | 22 | credibility, and it can be commented upon at the |
| 12:37:40 | 23 | time of trial.  Okay? |
| 12:37:41 | 24 | THE WITNESS:  Okay. |
| 12:37:43 | 25 | MR. CUNNY:  Nevertheless, you can make any |

100

EXHIBIT 14
079

| | | |
|---|---|---|
| 12:37:46 | 1 | changes you see fit thereto.  There will be an |
| 12:37:48 | 2 | errata sheet that comes with the transcript.  It |
| 12:37:52 | 3 | should probably only be 100 pages or so, which |
| 12:37:55 | 4 | should be a pretty quick reading.  Make any changes |
| 12:37:58 | 5 | you want on the errata sheet.  Put the page, the |
| 12:37:59 | 6 | line, and what the change is. |
| 12:38:01 | 7 | You'll transmit the original transcript to |
| 12:38:03 | 8 | your counsel.  The court reporter will provide your |
| 12:38:07 | 9 | counsel with a self-addressed stamped envelope that |
| 12:38:10 | 10 | will send the original transcript to my office. |
| 12:38:13 | 11 | My office will retain custody of the original |
| 12:38:15 | 12 | transcript, and we'll lodge it upon reasonable |
| 12:38:20 | 13 | request for all purposes, including trial.  If the |
| 12:38:22 | 14 | original is lost, stolen, misplaced, or otherwise |
| 12:38:24 | 15 | unavailable, a certified copy can be used in lieu |
| 12:38:27 | 16 | thereof for all purposes, including trial. |
| 12:38:29 | 17 | If the transcript goes unsigned within the |
| 12:38:31 | 18 | 30-day period, a certified copy of that transcript |
| 12:38:36 | 19 | can be used at the time of trial. |
| 12:38:40 | 20 | THE WITNESS:  Okay. |
| 12:38:42 | 21 | MR. CUNNY:  So stipulated on the phone? |
| 12:38:46 | 22 | MR. AMUNDSON:  Yeah, this is Steve Amundson. |
| 12:38:49 | 23 | So stipulated, and I don't need a copy. |
| 12:38:55 | 24 | MS. MATTHAI:  Edith Matthai.  So stipulated to |
| 12:38:58 | 25 | the extent that this transcript could ever be used |

EXHIBIT 14
080

```
12:39:01  1      for anything.
12:39:03  2           MS. HOLM:  Margaret Holm.  So stipulated.  I
12:39:07  3      would like a copy of the transcript as well as the
12:39:12  4      video.
12:39:12  5           MS. KIES:  This is Marianne Kies from
12:39:17  6      Covington & Burling for USOC.  So stipulated.  I
12:39:19  7      would also like a copy of the transcript.
12:39:22  8           MR. CUNNY:  And I do want to put on the
12:39:23  9      record, I think it's apparent, but we will be
12:39:26 10      bringing a motion on this given the numerous
12:39:29 11      instructions not to answer.
12:39:30 12           I understand counsel's position with -- in
12:39:34 13      light of the criminal proceedings.  However, we do
12:39:36 14      believe there are non-inculpatory areas of inquiry
12:39:42 15      which we are entitled to get evidence upon.  So
12:39:45 16      we'll take that up at a later time, I presume?
12:39:49 17           MR. DOWNEY:  Certainly.
12:39:50 18           MR. CUNNY:  All right.
12:39:50 19           THE VIDEOGRAPHER:  It is now 12:39.  We are
12:39:52 20      off the record.
         21           (A discussion was held off the record.)
         22           MS. MERY:  This is Victoria Mery.  We will
         23      stipulate.
         24           MS. ADAME:  Vivian Adame.  We will stipulate.
         25      And we don't need a copy of the transcript.
```

EXHIBIT 14
081

```
 1         MS. MERY:  The Karolyis will take a copy of
 2    the transcript.  Thank you.
 3         THE REPORTER:  Anyone else?  Mr. Downey, would
 4    you like a copy of the transcript?
 5         MR. DOWNEY:  Of course, electronic.
 6         THE REPORTER:  Is there any rush?
 7         MR. CUNNY:  Actually, yes.  I'll need to put
 8    an expedite on that.
 9         THE REPORTER:  When would you like the
10    transcript?
11         MR. CUNNY:  Can I get it on the 19th?
12         THE REPORTER:  Yes.
13         (The deposition concluded at 12:39 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 14
082

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10          I, AMY SUE WHITE, state that I have read the

11   foregoing transcript of the testimony given by me at

12   my deposition on November 13, 2018, and that said

13   transcript constitutes a true and correct record of

14   the testimony given by me at said deposition except as

15   I have so indicated on the errata sheets provided

16   herein.

17

18   DATED:_____

19                            _____

20                            AMY SUE WHITE

21

22

23

24

25
```

104

EXHIBIT 14
083

1   STATE OF INDIANA

2   COUNTY OF HENDRICKS

3

4        I, Elizabeth T. Lindner, a Notary Public in

5   and for said county and state, do hereby certify that

6   the deponent herein was by me first duly sworn to tell

7   the truth, the whole truth, and nothing but the truth

8   in the aforementioned matter;

9        That the foregoing deposition was taken on

10  behalf of the Plaintiffs; that said deposition was

11  taken at the time and place heretofore mentioned

12  between 10:33 a.m. and 12:39 p.m.;

13       That said deposition was taken down in

14  stenograph notes and afterwards reduced to typewriting

15  under my direction; and that the typewritten

16  transcript is a true record of the testimony given by

17  said deponent;

18       And thereafter presented to said witness for

19  signature; that this certificate does not purport to

20  acknowledge or verify the signature hereto of the

21  deponent.

22       I do further certify that I am a disinterested

23  person in this cause of action; that I am not a

24  relative of the attorneys for any of the parties.

25

EXHIBIT 14
084

# EXHIBIT "15"

ASSIGNED TO THE ___278ᵗʰ___ JUDICIAL DISTRICT COURT

INDICTMENT NO.___28849___

__ PER BOND SCHEDULE      __ BOND RECOMMMENDATION $ No Bond
HRR  9-28-18

STATE OF TEXAS VS.  STEPHEN D.  PENNY, JR.

**CHARGE:  37.09 PC - TAMPER WITH  PHYSICAL EVIDENCE/THIRD DEGREE FELONY**
OFF CODE:  73990280          TRN NO.:
PID NO.: 3326101 -            CONTROL NO.: 2018-01241

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS**,

THE GRAND JURORS, duly selected, organized, sworn, and impaneled as such for the County of Walker, State of Texas, at the January Term, A.D. 2018, of the District Court for said County upon their oaths present in and to said Court, that on or about the 11th day of November, 2016, and anterior to the presentment of this indictment, in the County and State aforesaid Stephen D. Penny, Jr. did then and there, knowing that an investigation was in progress, to-wit: Texas Ranger investigation of allegations of sexual assault by Larry Nassar, intentionally or knowingly destroy or conceal records or documents, to-wit:  records and documents related to Larry Nassar kept at the Karolyi Ranch in Walker County, Texas, with intent to impair the availability as evidence in the investigation.

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

_____
Foreman of the Grand Jury

FILED
TIME 1:50
28 DAY OF SEPT 2018
ROBYN FLOWERS
District Clerk, Walker County
By_____
Deputy

EXHIBIT 15
001

**INDICTMENT NO.**_____

**STATE OF TEXAS VS.  Stephen D Penny**

**OFFENSE:   TAMPER FABRICATING PHYSICAL EVIDENCE**

**Race:**                **Gender:** Male        **DOB:** 02/12/1964

**HT:**        **WT:**   Lbs.            **Hair Color:**

**Eye Color:**   **DL:**  TX-2340766714

**Agency:   Agency #:**        **State ID #:**

TRUE BILLED UPON THE INFORMATION OF

_____

_____

OTHER PENDING INDICTED CASES AGAINST DEFENDANT?

          ____ YES        ____ NO

IF YES, CAUSE #'S _____

IS THIS A RE-INDICTMENT?

          ___ YES        ___ NO

IF YES, PREVIOUS CAUSE # _____

NAME OF CO-DEFENDANT(S), IF ANY, *NOT* NAMED IN INDICTMENT.

|  | | CAUSE NO. | COURT |
|---|---|---|---|
| (1) | _____ | _____ | _____ |
| (2) | _____ | _____ | _____ |
| (3) | _____ | _____ | _____ |
| (4) | _____ | _____ | _____ |
| (5) | _____ | _____ | _____ |

SIGNED on this  28th  day of September, 2018.

Attorney for the State of Texas

EXHIBIT 15
002

# EXHIBIT "16"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, AN INDIVIDUAL, | ) ) |
| | ) CIVIL CASE NO. |
| Plaintiff, | ) 5:18-cv-02479-BLF |
| | ) |
| -v- | ) The Honorable |
| | ) Beth Labson Freeman |
| UNITED STATES OLYMPIC COMMITTEE, A BUSINESS ENTITY OF FORM UNKNOWN; USA GYMNASTICS, AN INDIANA BUSINESS ENTITY OF FORM UNKNOWN; LARRY NASSAR, AN INDIVIDUAL; STEVE PENNY, AN INDIVIDUAL; PAUL PARRILLA, AN INDIVIDUAL; AND DOES 1 THROUGH 500, | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

\* CONFIDENTIAL PORTIONS \*

The videoconferenced and telephonic videotaped deposition upon oral examination of RHONDA FAEHN, a witness produced and sworn before me, Michele K. Gustafson, CRR-RPR, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiff at the offices of Stewart Richardson Deposition Services, One Indiana Square, Suite 2425, Indianapolis, Indiana, on October 24, 2018, at 10:10 a.m., pursuant to the Federal Rules of Civil Procedure.

1

| | | |
|---|---|---|
| 02:06:22 | 1 | athlete training with the Karolyis, he just |
| 02:06:24 | 2 | purchased the land. |
| 02:06:25 | 3 | Q  Sure.  As it currently exists, that's fine. |
| 02:06:29 | 4 | A  Okay.  We had approximately eight camps when I |
| 02:06:34 | 5 | arrived in 2015 -- that was my first camp was, I |
| 02:06:42 | 6 | believe, the end of May -- so eight in 2016, eight |
| 02:06:53 | 7 | in 2017.  So about 20 -- 20 to 24 times, somewhere |
| 02:06:59 | 8 | in there. |
| 02:06:59 | 9 | Q  Okay.  So in general, you're familiar with the |
| 02:07:01 | 10 | grounds; correct? |
| 02:07:02 | 11 | A  Yes. |
| 02:07:02 | 12 | Q  Okay.  Was there a fire pit at the Ranch? |
| 02:07:05 | 13 | A  Excuse me? |
| 02:07:07 | 14 | MS. MERY:  Objection.  This is way outside the |
| 02:07:09 | 15 | scope of jurisdictional discovery. |
| 02:07:11 | 16 | MR. MANLY:  That's what you think. |
| 02:07:12 | 17 | Q  Go ahead.  Was there a fire pit at the Ranch? |
| 02:07:14 | 18 | A  What's a fire pit? |
| 02:07:16 | 19 | Q  A place where you burn logs for a fire. |
| 02:07:19 | 20 | A  I don't know. |
| 02:07:20 | 21 | Q  Okay.  Who was the -- who was in charge of the |
| 02:07:23 | 22 | Ranch for USA Gymnastics, if anybody? |
| 02:07:26 | 23 | A  Gary Warren. |
| 02:07:27 | 24 | Q  Okay.  And do you remember your Senate testimony |
| 02:07:35 | 25 | you were asked about whether you were aware that |

152

| | | |
|---|---|---|
| 02:07:40 | 1 | records were removed from the Ranch? |
| 02:07:43 | 2 | A   Yes. |
| 02:07:43 | 3 | Q   Okay.   Are you aware of -- and you testified that |
| 02:07:46 | 4 | you know that Amy White was directed to go to the |
| 02:07:49 | 5 | Ranch by Steve Penny; correct? |
| 02:07:50 | 6 | A   Yes. |
| 02:07:51 | 7 | Q   And she removed certain records; correct? |
| 02:07:54 | 8 | A   Yes. |
| 02:07:54 | 9 | Q   Okay.   Were you there when that happened? |
| 02:07:56 | 10 | A   No. |
| 02:07:56 | 11 | Q   How do you know that happened? |
| 02:08:00 | 12 | A   In the -- I believe it was March of 2018, of this |
| 02:08:05 | 13 | year, I'd received a phone call message from the |
| 02:08:10 | 14 | reporter from the OC Register asking if I -- no, |
| 02:08:18 | 15 | asking if he could speak with me.   And |
| 02:08:21 | 16 | USA Gymnastics' policy was I -- any -- I was to go |
| 02:08:26 | 17 | through Leslie King, and I asked her if she could |
| 02:08:30 | 18 | please reach out to him and find out what questions |
| 02:08:33 | 19 | he had.   And -- |
| 02:08:34 | 20 | Q   And Leslie King -- |
| 02:08:36 | 21 | A   Is the director of communications. |
| 02:08:37 | 22 | Q   And she was at the senior staff meetings; correct? |
| 02:08:40 | 23 | A   Yes. |
| 02:08:40 | 24 | Q   And she's also in the core group who knew about |
| 02:08:43 | 25 | Nassar; correct? |

153

EXHIBIT 16
003

02:08:44  1   A   I don't know when she found out, but she was not

02:08:49  2       initially --

02:08:51  3   Q   Okay.  So she wasn't at the meeting with the

02:08:53  4       lawyers?

02:08:53  5   A   No.

02:08:54  6   Q   All right.  Fair enough.

02:08:55  7   A   So she reached out to the reporter.  And he

02:09:02  8       asked -- said that he had been -- he had

02:09:06  9       information that I was the -- an individual that

02:09:09 10       had removed records -- medical records from the

02:09:14 11       Ranch, and I asked Leslie to please respond to him

02:09:20 12       that absolutely that I was not and I had never

02:09:25 13       heard of that.

02:09:26 14   Q   Okay.  All right.  So -- and that was true, you

02:09:32 15       didn't remove records from the Ranch; correct?

02:09:34 16   A   Correct.

02:09:34 17   Q   You never destroyed anything from the Ranch;

02:09:37 18       correct?

02:09:37 19   A   No.  That's correct, yes.

02:09:38 20   Q   Okay.  My -- that was a bad question.

02:09:41 21   A   Yeah, yeah.

02:09:41 22   Q   All right.  And you've never destroyed documents or

02:09:43 23       data in connection with your work at USA Gymnastics

02:09:47 24       at any point; correct?

02:09:48 25   A   That's correct.

EXHIBIT 16
004

02:09:50  1    Q   **All right.  So you responded to Leslie King, tell**
02:09:59  2        **him that's not true?**
02:10:01  3    A   Correct.
02:10:01  4    Q   **Okay.  And then -- okay.  So how did you find out**
02:10:04  5        **that somebody, in fact, had done that?**
02:10:07  6            MS. MATTHAI:  Lacks foundation.  Calls for
02:10:08  7        speculation.
02:10:08  8    Q   **You may answer.**
02:10:09  9    A   I asked Rachel Brazo if she had heard of anything,
02:10:17 10        because --
02:10:17 11    Q   **Go ahead, please.**
02:10:19 12    A   -- because of I had a reporter thinking I did
02:10:23 13        something, and she said that Amy White had.
02:10:27 14    Q   **Okay.  Forgive me.  Would you spell Brazo for the**
02:10:31 15        **court reporter?**
02:10:31 16    A   B-r-a-z-o.
02:10:34 17    Q   **Okay.  And Amy White is W-h-i-t-e?**
02:10:38 18    A   W-h-i-t-e, uh-huh.
02:10:41 19    Q   **Okay.  And Olivia, just for save time, Olivia Gill**
02:10:44 20        **is, how is that spelled?**
02:10:48 21    A   I don't even know.
02:10:48 22    Q   **Okay.  All right.  So you went to -- she said**
02:10:54 23        **Amy White had removed records?**
02:10:56 24    A   Yes.
02:10:56 25    Q   **And what was Mr. -- Ms. Brazo's position at**

EXHIBIT 16
005

| | | |
|---|---|---|
| 02:11:00 | 1 | **USA Gymnastics?** |
| 02:11:01 | 2 | A  I believe she was -- she was John Hewett's -- she |
| 02:11:08 | 3 | did all the accounting budgets for the programs but |
| 02:11:12 | 4 | she also helped with rhythmic, so I'm not sure |
| 02:11:16 | 5 | exactly what her title was. |
| 02:11:18 | 6 | Q  **Okay.  And how did she know that Amy White had done** |
| 02:11:21 | 7 | **that?** |
| 02:11:22 | 8 | MS. MATTHAI:  Lacks foundation.  Calls for |
| 02:11:23 | 9 | speculation. |
| 02:11:24 | 10 | A  I don't know. |
| 02:11:26 | 11 | MS. HOLM:  Join the objection. |
| 02:11:27 | 12 | Q  **Okay.** |
| 02:11:28 | 13 | MS. MERY:  Join. |
| 02:11:28 | 14 | Q  **So did you ask Amy if she had done that?** |
| 02:11:31 | 15 | A  Yes. |
| 02:11:31 | 16 | Q  **Okay.  And what did Amy say?** |
| 02:11:33 | 17 | A  She said yes, that she was there for a camp and |
| 02:11:36 | 18 | that Steve Penny had called her or she -- I don't |
| 02:11:42 | 19 | know how -- which one.  This is just from -- |
| 02:11:46 | 20 | Q  **Your memory?** |
| 02:11:47 | 21 | A  -- my memory and her telling me, so I don't know |
| 02:11:49 | 22 | firsthand.  That he asked her to bring back any -- |
| 02:11:58 | 23 | anything -- any records or medical information from |
| 02:12:03 | 24 | the Ranch. |
| 02:12:04 | 25 | Q  **So she said bring back records and medical** |

EXHIBIT 16
006

| | | |
|---|---|---|
| 02:12:07 | 1 | information? |
| 02:12:08 | 2 | A   I believe so. |
| 02:12:09 | 3 | Q   Okay.   So did you ask her if she did that? |
| 02:12:12 | 4 | A   Yes. |
| 02:12:13 | 5 | Q   And what'd she say? |
| 02:12:13 | 6 | A   She said yes. |
| 02:12:15 | 7 | Q   She -- did she tell you how she did it? |
| 02:12:17 | 8 | A   Yes. |
| 02:12:18 | 9 | Q   What'd she say? |
| 02:12:19 | 10 | A   She said she -- that he asked her to go to Target |
| 02:12:22 | 11 | and buy -- or somewhere and buy a large suitcase. |
| 02:12:28 | 12 | And she filled the suitcase, as well as, she said, |
| 02:12:35 | 13 | I believe, that Gary Warren brought some boxes from |
| 02:12:41 | 14 | a shed or . . .   And she took those to the airport |
| 02:12:48 | 15 | after the camp was over. |
| 02:12:51 | 16 | Q   Okay.   So she transported them on a plane? |
| 02:12:54 | 17 | A   Yes. |
| 02:12:55 | 18 | Q   Okay. |
| 02:12:55 | 19 | A   Through checked baggage, I believe. |
| 02:12:57 | 20 | Q   All right.   Have you heard from any source that she |
| 02:13:00 | 21 | kept the receipt for that? |
| 02:13:02 | 22 | A   Well, yes.   Because she said that her credit card, |
| 02:13:06 | 23 | her USA credit card, like, wouldn't work. |
| 02:13:11 | 24 | Q   Because it was so much money? |
| 02:13:12 | 25 | A   No.   I don't know.   I don't know why it didn't. |

157

EXHIBIT 16
007

02:13:16  1   Q   So she had to pay for it and needed to be

02:13:18  2       reimbursed?

02:13:19  3   A   Yes.

02:13:20  4   Q   Okay.  Do you know how much it was?

02:13:21  5   A   No.

02:13:21  6   Q   Okay.  Okay.  So -- and when approximately did you

02:13:29  7       hear that story from Amy White?

02:13:32  8   A   I believe it was springtime, around March of this

02:13:36  9       year.

02:13:37 10   Q   March of '18?

02:13:38 11   A   I believe so.

02:13:38 12   Q   And Mr. Penny had already departed at the -- the

02:13:42 13       organization at that point?

02:13:43 14   A   Yeah.  He was a year earlier.

02:13:46 15   Q   Okay.  Did you go back to Leslie King and report to

02:13:50 16       her what you'd found out?

02:13:51 17   A   I went to Kerry Perry and told her.

02:13:54 18   Q   Okay.  And what did Ms. Perry say?

02:13:57 19   A   She said that she was going to -- I don't remember

02:14:01 20       if it was -- I don't remember exactly what she was

02:14:03 21       going to do.

02:14:05 22   Q   Okay.  Well, as you can imagine, this is important.

02:14:08 23   A   Yes.

02:14:09 24   Q   So I'm going to try and probe your memory a little

02:14:11 25       bit.  Okay?

EXHIBIT 16
008

**Faehn, Rhonda**
**Nassar Cases**

| | | | |
|---|---|---|---|
| 02:14:12 | 1 | A | Okay. |
| 02:14:12 | 2 | Q | And I appreciate your candor here. |
| 02:14:14 | 3 | A | Yeah. |
| 02:14:15 | 4 | Q | So when she -- when Amy White told you that, did |
| 02:14:21 | 5 | | you have the -- did you sense that she thought that |
| 02:14:24 | 6 | | she had done something wrong or she had just -- was |
| 02:14:29 | 7 | | doing what she was told? |
| 02:14:32 | 8 | | MS. MATTHAI:  Objection.  Lacks foundation. |
| 02:14:33 | 9 | | Calls for speculation. |
| 02:14:34 | 10 | | MS. MERY:  Join. |
| 02:14:35 | 11 | A | I can't speak on how she felt. |
| 02:14:37 | 12 | Q | I'm asking how your impression of her was.  Did you |
| 02:14:40 | 13 | | reach that conclusion one way or the other?  Was |
| 02:14:43 | 14 | | she nervous?  Was she not nervous? |
| 02:14:46 | 15 | | MS. MATTHAI:  Same objection. |
| 02:14:47 | 16 | A | I think she was doing as she was told, and I think |
| 02:14:57 | 17 | | that all -- as well she was nervous after -- I |
| 02:15:05 | 18 | | believe after the fact. |
| 02:15:07 | 19 | Q | After what had come out? |
| 02:15:10 | 20 | A | I think more so after she -- she shared that if |
| 02:15:16 | 21 | | she -- when she spoke with her husband, just what |
| 02:15:20 | 22 | | if -- not what if -- with her credit card not |
| 02:15:24 | 23 | | working, she just seemed a little nervous. |
| 02:15:27 | 24 | Q | Okay.  When did he tell her to do that?  Just when |
| 02:15:30 | 25 | | did she bring those back? |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 16
009

Faehn, Rhonda
Nassar Cases

02:15:32  1    A    I don't know.

02:15:33  2         MS. MERY:  Objection.  Vague.

02:15:34  3    Q    Okay.  Was this in 2016?

02:15:38  4    A    I -- she didn't give us -- I don't know the exact

02:15:40  5         date of when he asked her to do this.

02:15:43  6    Q    Do you have any idea of the time frame, even the

02:15:46  7         year?

02:15:48  8    A    She said it was during a camp, and I think she did

02:15:54  9         either acro camp, so I believe it was during an

02:15:58  10        acro camp.

02:16:00  11   Q    Okay.  And this was after Dr. Nassar had been

02:16:03  12        fired; correct?

02:16:04  13   A    I believe so.

02:16:08  14   Q    Okay.

02:16:11  15   A    Yeah.

02:16:11  16   Q    And did Mr. Penny -- did she tell you Mr. -- why

02:16:14  17        Mr. Penny wanted her to get the records?

02:16:16  18   A    No.

02:16:17  19        MS. MATTHAI:  Objection.  Lacks foundation.

02:16:18  20        Calls for speculation.

02:16:19  21   Q    Did she give you any idea?  Did he tell her why?

02:16:23  22   A    No.

02:16:23  23   Q    Okay.  So she went -- and Gary Warren -- she told

02:16:28  24        you that Gary Warren brought boxes to her?

02:16:31  25   A    Yes.

EXHIBIT 16
019

Faehn, Rhonda
Nassar Cases

| | | |
|---|---|---|
| 02:16:31 | 1 | Q  So Gary Warren obviously -- did she tell you that |
| 02:16:35 | 2 |    Gary Warren was instructed by Mr. Penny to do that? |
| 02:16:38 | 3 | A  She did not. |
| 02:16:39 | 4 | Q  Did you speak to Gary Warren about this? |
| 02:16:41 | 5 | A  I e-mailed Gary and asked if -- I believe if he |
| 02:16:48 | 6 |    provided or gave documents to her. |
| 02:16:50 | 7 | Q  And what'd he say? |
| 02:16:51 | 8 | A  He said yes, he gave her everything.  And I believe |
| 02:16:55 | 9 |    as well he mentioned that I don't know if she did |
| 02:17:04 | 10 |    or someone had the docu -- his -- all of his |
| 02:17:08 | 11 |    documents that he had on his computer. |
| 02:17:12 | 12 | Q  Did he tell you that he burned documents in -- at |
| 02:17:15 | 13 |    the Ranch in the fire pit? |
| 02:17:17 | 14 | A  No. |
| 02:17:17 | 15 | Q  Have you heard that from anybody? |
| 02:17:18 | 16 | A  No. |
| 02:17:24 | 17 | Q  Okay. |
| 02:17:25 | 18 | A  But I do remember now there is a fire pit up at the |
| 02:17:28 | 19 |    lodge. |
| 02:17:29 | 20 | Q  Okay.  And do you know if anybody burned documents? |
| 02:17:34 | 21 | A  No. |
| 02:17:35 | 22 | Q  All right. |
| 02:17:35 | 23 | A  I've never heard that. |
| 02:17:37 | 24 | Q  Never heard that, okay.  So when Ms. White got back |
| 02:17:40 | 25 |    to the office with the documents, who did she give |

161

EXHIBIT 16
020

**Faehn, Rhonda**
**Nassar Cases**

| | | |
|---|---|---|
| 02:17:43 | 1 | them to, according to her? |
| 02:17:45 | 2 | A  She told me that she gave them to Steve Penny. |
| 02:17:48 | 3 | Q  And did she say how she did that?  Did she give |
| 02:17:52 | 4 | them to the office or . . .? |
| 02:17:54 | 5 | A  She brought them to the office. |
| 02:17:56 | 6 | Q  And gave them to him? |
| 02:17:58 | 7 | A  Yes. |
| 02:17:59 | 8 | Q  Did anybody from USA Gymnastics, to your knowledge, |
| 02:18:01 | 9 | contact Mr. Penny and ask him about this? |
| 02:18:04 | 10 | A  I don't know. |
| 02:18:05 | 11 | Q  Okay.  So let's go back to your conversation with |
| 02:18:08 | 12 | Kerry Perry. |
| 02:18:09 | 13 | A  Yeah. |
| 02:18:10 | 14 | Q  You talked to Amy White? |
| 02:18:12 | 15 | A  Yes. |
| 02:18:12 | 16 | Q  And Miss Faehn, you're obviously disturbed by the |
| 02:18:16 | 17 | story; correct? |
| 02:18:17 | 18 | A  Yes. |
| 02:18:19 | 19 | Q  Because it doesn't -- it's -- well, when you heard |
| 02:18:21 | 20 | the story, what did you think? |
| 02:18:27 | 21 | A  I thought that if those documents are back here |
| 02:18:32 | 22 | that they would -- that he would turn them over to |
| 02:18:36 | 23 | the authorities or the attorneys and they would |
| 02:18:41 | 24 | know where to go. |
| 02:18:42 | 25 | Q  Okay.  And did you ask if those documents still |

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 16
021

| 02:18:45 | 1 | | existed? |
| 02:18:46 | 2 | A | Did I ask who? |
| 02:18:48 | 3 | Q | Anybody. |
| 02:18:51 | 4 | A | Well, no, because there was nobody there left -- |
| 02:18:56 | 5 | Q | Okay. |
| 02:18:57 | 6 | A | -- that -- to ask. |
| 02:18:58 | 7 | Q | So did Miss-- did anybody tell you what happened |
| 02:19:04 | 8 | | with the documents that were -- |
| 02:19:07 | 9 | A | No. |
| 02:19:07 | 10 | Q | Okay.  So did Mr. Warren or Ms. White tell you that |
| 02:19:18 | 11 | | or did you know that the Texas law enforcement had |
| 02:19:21 | 12 | | been to the Ranch before the documents were moved |
| 02:19:26 | 13 | | seeking access? |
| 02:19:28 | 14 | | MS. MATTHAI:  Objection.  Lacks foundation. |
| 02:19:30 | 15 | | MS. MERY:  Join. |
| 02:19:31 | 16 | | MS. MATTHAI:  It's also vague and ambiguous. |
| 02:19:32 | 17 | Q | You may answer. |
| 02:19:34 | 18 | A | Amy told me that -- I believe that the |
| 02:19:36 | 19 | | Texas Rangers were there. |
| 02:19:38 | 20 | Q | Okay.  And after they left -- |
| 02:19:40 | 21 | A | Yes. |
| 02:19:40 | 22 | Q | -- she was directed to remove the documents by |
| 02:19:42 | 23 | | Mr. Penny? |
| 02:19:43 | 24 | A | Yes, I believe so. |
| 02:19:44 | 25 | Q | Okay.  And not -- that did not sound good, did it, |

163

EXHIBIT 16
022

02:19:48  1      to you?

02:19:49  2           MS. MATTHAI:  Objection.  Argumentative.

02:19:50  3      Lacks foundation.

02:19:52  4           MS. MERY:  Join.

02:19:54  5           MS. MATTHAI:  Incomplete hypothetical.

02:19:57  6      Q  You may answer.

02:19:58  7      A  Yes, that was concerning.

02:19:58  8      Q  Yeah.  Because it -- on its face it looks like

02:20:01  9      somebody's trying to hide something from law

02:20:02 10      enforcement; correct?

02:20:03 11           MS. MATTHAI:  Lacks foundation, incomplete

02:20:05 12      hypothetical, and argumentative.

02:20:07 13      Q  You may answer.

02:20:09 14      A  I don't -- yeah, I don't -- it's -- it was -- I

02:20:13 15      don't understand that.

02:20:14 16      Q  You don't understand why he would do that?

02:20:17 17      A  Yes.

02:20:17 18      Q  Yeah.  You were suspicious; correct?

02:20:21 19      A  It's con -- yes.

02:20:22 20      Q  Okay.  And you had nothing to do with that,

02:20:25 21      Ms. Faehn, and I'm not implying in any way that you

02:20:27 22      did.

02:20:28 23      A  No.

02:20:28 24      Q  Okay.  You didn't know about it until Amy White

02:20:30 25      told you; right?

164

EXHIBIT 16
023

| | | | |
|---|---|---|---|
| 02:20:31 | 1 | A | That's correct. |
| 02:20:31 | 2 | Q | I think you and I can disagree about a lot of |
| 02:20:33 | 3 | | things, but you didn't have anything to do with |
| 02:20:35 | 4 | | those documents being removed; correct? |
| 02:20:37 | 5 | A | That's correct. |
| 02:20:39 | 6 | Q | All right.  And when you -- when you found out, you |
| 02:20:43 | 7 | | went to the president of the organization and told |
| 02:20:44 | 8 | | her; right? |
| 02:20:45 | 9 | A | Yes, that's correct. |
| 02:20:46 | 10 | Q | Because you were concerned that there -- that it |
| 02:20:49 | 11 | | was important and that you were even concerned that |
| 02:20:51 | 12 | | somebody may have violated the law; right? |
| 02:20:54 | 13 | A | That's correct. |
| 02:20:55 | 14 | Q | Okay.  And when you told her that, what did you |
| 02:20:57 | 15 | | expect Ms. Perry to do? |
| 02:21:00 | 16 | A | I expected her to know what she was supposed to do |
| 02:21:08 | 17 | | legally and speak with -- to speak -- to find out |
| 02:21:16 | 18 | | or to tell the attorneys and the law what |
| 02:21:21 | 19 | | information that she just learned. |
| 02:21:23 | 20 | Q | Okay.  And what did she do? |
| 02:21:25 | 21 | A | I don't know. |
| 02:21:26 | 22 | Q | Okay.  Did she ever -- did any of the lawyers -- |
| 02:21:30 | 23 | | did -- Strike that. |
| 02:21:33 | 24 | | Did anybody from USA Gymnastics ever interview |
| 02:21:36 | 25 | | you about that and those documents before you left? |

165

EXHIBIT 16
024

| | | |
|---|---|---|
| 02:21:39 | 1 | A No. |
| 02:21:40 | 2 | Q So after you spoke to Kerry Perry, I take it no one |
| 02:21:43 | 3 | from USA Gymnastics -- not staff, not lawyers, |
| 02:21:47 | 4 | nobody -- ever spoke to you again about those |
| 02:21:50 | 5 | documents? |
| 02:21:51 | 6 | A That's correct. |
| 02:21:51 | 7 | Q Okay.  When you spoke to Ms. Perry, where did that |
| 02:21:55 | 8 | conversation take place about the documents? |
| 02:21:59 | 9 | A In her office. |
| 02:22:00 | 10 | Q Okay.  Did you close the door? |
| 02:22:03 | 11 | A I don't remember. |
| 02:22:04 | 12 | Q Okay.  But you asked -- where was your office in |
| 02:22:07 | 13 | the building relative to hers? |
| 02:22:09 | 14 | A The exact opposite end of the hallway. |
| 02:22:12 | 15 | Q Okay.  How long of a walk to her office from yours? |
| 02:22:15 | 16 | A There's approximately 10 to 12 offices in between, |
| 02:22:23 | 17 | so . . . |
| 02:22:24 | 18 | Q Okay.  So, you know, fifteen-second walk, |
| 02:22:27 | 19 | twenty-second walk? |
| 02:22:29 | 20 | A Yeah, yes. |
| 02:22:29 | 21 | Q Okay.  And you went in? |
| 02:22:30 | 22 | A Uh-huh. |
| 02:22:31 | 23 | Q And did you call her Kerry or Ms. Perry or what? |
| 02:22:34 | 24 | A Kerry. |
| 02:22:35 | 25 | Q Madam President? |

166

| | | |
|---|---|---|
| 02:22:36 | 1 | A No, Kerry. |
| 02:22:37 | 2 | Q Okay. All right. Kerry, I just learned this from |
| 02:22:41 | 3 | Amy White? |
| 02:22:42 | 4 | A Yes. |
| 02:22:43 | 5 | Q Here's what she told me? |
| 02:22:44 | 6 | A (The witness nodded.) |
| 02:22:45 | 7 | Q What was her affect that you observed when she told |
| 02:22:48 | 8 | you that -- when you told her that? |
| 02:22:49 | 9 | A She said oh, that's not good. |
| 02:22:54 | 10 | Q Okay. She say oh, shit? |
| 02:22:56 | 11 | A No. |
| 02:22:57 | 12 | Q Okay. |
| 02:22:59 | 13 | A I would remember, because I don't very rarely |
| 02:23:02 | 14 | swear, so I'd remember that. |
| 02:23:03 | 15 | Q That's the difference between you and me. Good for |
| 02:23:06 | 16 | you. I'm kidding, for the record. |
| 02:23:08 | 17 | A (The witness smiled.) |
| 02:23:10 | 18 | Q Okay. All right. She said that's not good? |
| 02:23:12 | 19 | A Yes. |
| 02:23:13 | 20 | Q All right. And then what did she say? |
| 02:23:15 | 21 | A She wrote -- I believe she wrote something down, |
| 02:23:23 | 22 | and that was it. |
| 02:23:23 | 23 | Q Is the next time you were asked by anybody other |
| 02:23:26 | 24 | than your counsel about that issue was |
| 02:23:30 | 25 | Senator Moran at the hearings? |

EXHIBIT 16
026

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
 2                INDIANAPOLIS DIVISION

 3

 4
    ALEXANDRA ROSE RAISMAN, AN    )
 5  INDIVIDUAL,                   )
                                  )
 6             Plaintiff,         )
                                  )
 7        -v-                     ) CAUSE NO.
                                  ) 5:18-CV-02479-BLF
 8                                )
    UNITED STATES OLYMPIC         )
 9  COMMITTEE, A BUSINESS ENTITY  )
    OF FORM UNKNOWN;              )
10  USA GYMNASTICS, AN INDIANA    )
    BUSINESS ENTITY OF FORM       )
11  UNKNOWN; LARRY NASSAR, AN     )
    INDIVIDUAL; STEVE PENNY, AN   )
12  INDIVIDUAL; PAUL PARRILLA, AN )
    INDIVIDUAL; AND DOES 1        )
13  THROUGH 500,                  )
                                  )
14             Defendants.        )
    _____)
15

16

17          I, RHONDA FAEHN, state that I have read the
    foregoing transcript of the testimony given by me at
18  my deposition on October 24, 2018, and that said
    transcript constitutes a true and correct record of
19  the testimony given by me at said deposition except as
    I have so indicated on the errata sheets provided
20  herein.

21

22

23                      _____
                        RHONDA FAEHN
24

25
```

EXHIBIT 16
027

```
 1  STATE OF INDIANA
 2  COUNTY OF MARION
 3
 4       I, Michele K. Gustafson, CRR-RPR, a
 5  Notary Public in and for said county and state, do
 6  hereby certify that the deponent herein was by me
 7  first duly sworn to tell the truth, the whole truth,
 8  and nothing but the truth in the aforementioned
 9  matter;
10       That the foregoing deposition was taken on
11  behalf of the Plaintiff; that said deposition was
12  taken at the time and place heretofore mentioned
13  between 10:10 a.m. and 4:54 p.m.;
14       That said deposition was taken down in
15  stenograph notes and afterwards reduced to typewriting
16  under my direction; and that the typewritten
17  transcript is a true record of the testimony given by
18  said deponent;
19       And thereafter presented to said witness for
20  signature; that this certificate does not purport to
21  acknowledge or verify the signature hereto of the
22  deponent.
23       I do further certify that I am a disinterested
24  person in this cause of action; that I am not a
25  relative of the attorneys for any of the parties.
```

EXHIBIT 16
028

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and affixed my notarial seal this 29th day of

3     October, 2018.

4

5

6

7     _____

8

9

10

11

12    My commission expires:
      August 31, 2025

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 16
029

# EXHIBIT "17"

THANKSGIVING SALE
## 99¢ PER MONTH

Subscribe
(http://offers.indystar.com/specialoffer?
gps-
source=BENB&utm_medium=nanobarap12&utm_source=bounce-
exchange&utm_campaign=2018THANKS)

# As evidence mounted, IMPD child abuse investigator defended USA Gymnastics

**Marisa Kwiatkowski, Tim Evans and Tony Cook, Indianapolis Star**   Published 6:00 a.m. ET Nov. 11, 2018 | Updated 1:29 p.m. ET Nov. 11, 2018



Indianapolis police are investigating the conduct of a detective who worked behind the scenes to defend USA Gymnastics while it was in the midst of a broadening child sexual abuse scandal.

He was not just any detective.

Bruce Smith was supervisor of the Indianapolis Metropolitan Police Department's Child Abuse Unit at the time. He also is a friend of then-USA Gymnastics President and CEO Steve Penny.

Emails, texts and other communications obtained by IndyStar reveal Smith collaborated with Penny to deflect criticism of USA Gymnastics in 2016 and 2017 — as a growing number of survivors claimed the national governing body failed to protect them from child sexual abuse.

*(Photo: Vic Ryckaert/IndyStar)*

**USA Gymnastics probe:** 'Missing' records may have been found in Indianapolis (/story/news/investigations/2018/11/08/usa-gymnastics-larry-nassar-sexual-abuse-scandal-steve-penny-missing-records-maybe-found/1932219002/)

**A blind eye to sex abuse:** How USA Gymnastics failed to report cases (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/)

Even after Smith disclosed the friendship as a conflict of interest in 2015 and recused himself from investigating USA Gymnastics, he tried to influence the public's understanding of the situation, pushing his version of the story to reporters. He went as far as writing a press release defending USA Gymnastics — even sending draft language to Penny prior to forwarding it to officials at IMPD and the prosecutor's office.

BY BAYER

If you could cure the incurable, would you?

(https://eb2.3lift.com/pass?tl_clickthrough=true&redir=https%3A%2F%2Finsight.adsrvr.org%2Ftrack%2FcIk%3Fimp%3D9b
4817%26rcxt%3DOther%26tmpc%3D%26vrtd%3D%26osi%3D%26osv%3D%26daid%3D%26dnr%3D0%26vpb%3D%26svsc%3
nfLxIHcDd4NTM5YyIQCKDZi2oSCWRhMjVkdHRyayITCKDZi2oSDGRyMTNkc3RseXRyayIQCM2x1WoSCWRhMjVkdHRyayI
%2520Windows%26adpt%3Dtl_ltriplelift%26ipl%3D17610%26atst%3D1%26r%3Dhttps%3A%2F%2Fad.doubleclick.net%2Fdc

See more →

He told a reporter that IndyStar was "barking up the wrong tree" as it was preparing to write about Penny's four-year delay (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/) in reporting sexual abuse allegations against Indianapolis coach Marvin Sharp. In those unsolicited text messages, Smith dismissed the paper's source as "disgruntled."

**8** free articles left. Subscribe for 99¢/month.

EXHIBIT 17
001

**Support local journalism today**
**99¢ per month. Save 90%.**

**(https://subscribe.indystar.com/?
gps-
source=CP-UCAMBARD&utm_campaign=2018THANKS&utm_content=front-article-slot-3&utm_medium=ONSITE&utm_source=CP-CAMBARD&onSucc
nassar-sexual-abuse-
scandal-impd-
detective-bruce-
smith-conduct-under-
review%2F1693853002%2F)**

Smith also said he was friends with a public relations executive USA Gymnastics had hired to help combat some of the unfair and negative media that the organization has been getting.

Smith denies any wrongdoing.

And IMPD Officer Bruce Smith inserted himself in an ongoing crisis. Sometimes, that meant drafting a news release touting the virtues of USA Gymnastics, or penning emails that allowed him to communicate directly with Penny on IMPD's behalf. Other times, Smith inserted himself into the conversation.

Police detectives insist Smith's actions did not influence their decision not to investigate or prosecute USA Gymnastics officials. But lawyers representing the people accusing USA Gymnastics aren't buying it. They are critical of what they see as Indianapolis law enforcement's lack of interest in holding gymnastics officials accountable.

Law enforcement officials in Michigan and Texas were more aggressive in seeking information about individual and institutional failures that may have led to widespread abuse problems in gymnastics. But officials in Indianapolis — the city that calls itself the amateur sports capital of the world — acknowledged they did not so much as visit USA Gymnastics' downtown headquarters to investigate the organization's sexual abuse reporting practices. No search warrants were sought. No questions asked.

Even after it was publicly revealed that USA Gymnastics had quietly reviewed allegations against former team doctor Larry Nassar for five weeks before reporting him to the FBI, IMPD did not investigate the national governing body.

When confronted with details of Smith's interactions, Police Chief Bryan Roach directed Internal Affairs to investigate Smith "to ensure the department's standard of conduct was followed as it relates to protecting and serving the people of Indianapolis." IMPD also noted the press release drafted by Smith defending USA Gymnastics was never issued.

Roach declined an interview for this story, and provided a statement: "We take all allegations of misconduct seriously and will immediately begin an internal review of this information."

Buy Photo



**IMPD Chief of Police Bryan Roach has ordered a review of Lt. Bruce Smith's conduct.** *(Photo: Matt Kryger/IndyStar)*

Smith said he welcomes the investigation. He said he has an underlined exemplary record (https://www.documentcloud.org/documents/5031664-Bruce-Smith-personnel-file.html) with IMPD. He said he recused himself from investigating or discussing whether USA Gymnastics violated the law in 2011 by not reporting a complaint against Sharp. Smith said his support for USA Gymnastics was limited to its handling of Sharp, who was arrested for sexual misconduct in 2015 after a second complaint emerged, and killed himself in jail (/story/news/crime/2015/12/21/indianapolis-gymnastics-coach-marvin-sharpe-died-suffocation/77691840/).

"I stand by how I conducted myself during these events and so do my supervisors," Smith said in response to IndyStar questions.

But involvement by an officer who has recused himself due to a conflict of interest is "highly unusual" and ill-advised, according to Tom Tremblay, a former police chief who trains and advises police, prosecutors and others on issues related to sexual violence.

"Once he's recused himself from this," Tremblay said, "there is absolutely no way that as a police leader I would want him commenting on this in any way, shape or form."

## Marvin Sharp 'has a problem'

EXHIBIT 17
002

Police and prosecutors in Indianapolis had an opportunity to look into USA Gymnastics' handling of sexual abuse complaints in August 2015. That's when Penny reported an abuse allegation against Sharp directly to his friend Smith — and revealed he had not reported another allegation against Sharp four years earlier.

Penny and Smith knew each other through their daughters, who attended school together and were on the same gymnastics team.

Days later, IMPD arrested Sharp. The coach faced charges of sexual misconduct with a minor and possessing child pornography. He was accused of touching a gymnast's vagina and taking sexually explicit pictures of her beginning when she was 12 years old, police records show.

During the investigation of the 2015 case, Smith said detectives asked if USA Gymnastics had received any other complaints about Sharp.

Penny retrieved an email from the USA Gymnastics headquarters, and he and his attorney turned it over to Smith. The email had been sent to Penny in 2011 by longtime gymnastics judge Pat Warren. Yet, instead of forwarding it to authorities, Penny had filed it away.

Indiana law requires people to immediately report allegations of child abuse to police or the Department of Child Services. That raised a question: Had Penny violated the law?

Smith said he recused himself from that decision. But by the time of the 2015 investigation — four years after Penny received the 2011 email — it was a moot point. The two-year statute of limitations on Indiana's failure-to-report law had passed. So, prosecutors could not file a charge.

Authorities could, however, have investigated whether USA Gymnastics failed to report any other abuse allegations.

An examination might have revealed that USA Gymnastics had conducted its own investigation for five weeks before reporting Nassar to the FBI in Indianapolis. And that USA Gymnastics executives had a policy of not reporting child abuse allegations unless they were submitted in writing and signed by a survivor or survivor's parent.

But IMPD officials chose not to investigate. Later, they went further. They defended Penny's decision not to report the 2011 email.

Smith told IndyStar the allegations in Warren's email were "very vague" and did not provide adequate detail to justify an investigation. By 2011, Sharp had already made more than 100 pornographic images of six underage girls from his gym, federal court records (https://www.documentcloud.org/documents/5031666-Sharp-federal-records-2.html) show.

"We all have the benefit of hindsight now," Smith said, "but in real time there was no specific abuse allegation, no specific victim, and no detailed explanation on what was observed."

Smith said the email "essentially called Sharp creepy, the girls didn't like him, and the way he handled the girls in front of the parents was creepy."

But Warren's email, which was obtained by IndyStar (https://www.documentcloud.org/documents/5031668-Warren-letter-about-Marvin-Sharp.html), did provide several specific details. She described an incident she had witnessed and other situations. She included dates and names of the minors involved and other witnesses.

Warren's email described Sharp's treatment of one preteen girl: "Marvin literally put her on the podium, stomach down and her legs hanging over the edge … and picked her leotard up, put it in her crack and ice massaged her hamstring."

The email also said the mother of another girl told her Sharp instructed her 13-year-old daughter "to go into his office, take her leo off" and put on a T-shirt so he could massage her pelvic area to treat a pulled groin. Warren said the girl was uncomfortable with the request and called her mother, who picked up the girl and moved her to a new gym the next day.

"He has a problem," Warren told Penny in the email, "and should not be coaching children!"

Tremblay, the police consultant, said he disagrees with Indiana officials' contention that Warren's email was vague and lacked the detail needed to justify an investigation.

He said if he had been with a police department that received the email, it would have sparked an investigation. At the very least, he would have interviewed Warren and looked into the suspect.

Tremblay said the email described behaviors that are typical of child predators, including grooming, testing and isolation. And it was written by someone who appeared to have extensive experience in gymnastics.

"She's outlining, again, this long pattern of concerning behavior," Tremblay said, "and for me that's a big red flag."

## Bruce Smith says IndyStar reporters 'barking up the wrong tree'

In the summer of 2016, Smith took the lead in defending USA Gymnastics' handling of Warren's allegations against Sharp.

EXHIBIT 17
003



The first contact IndyStar reporters had with Smith came after they emailed then-Chief Troy Riggs about the Sharp case. Smith sent an unsolicited text message to a reporter who was not involved in IndyStar's gymnastics investigation.

"So whoever is doing the story on USA Gymnastics and Marvin Sharp is barking up the wrong tree," Smith wrote in a July 12, 2016, text message.

Smith's text said "the lady" who had written the email was "disgruntled."

When asked this year why he had reached out to IndyStar, Smith initially claimed it was because IndyStar had published unfair stories about USA Gymnastics. But the newspaper had not yet published its first gymnastics article. When that was pointed out, Smith acknowledged he was not sure what had prompted his text.

**Marvin Sharp faced charges of sexual misconduct with a minor and possessing child pornography.** *(Photo: Provided by Marion County Prosecutor's Office)*

Referring to Penny, however, he said: "I absolutely did not get direction from Steve to intervene."

Penny's attorney did not respond to questions for this article.

Emails between Smith, Penny and others at IMPD reveal that, despite his recusal, Smith continued working behind the scenes in support and defense of USA Gymnastics.

After IndyStar published its first story (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/) on USA Gymnastics in August 2016, Smith emailed Kendale Adams, then a public information officer with IMPD. He complained that IndyStar hadn't detailed the extent of USA Gymnastics' cooperation in the 2015 investigation that led to Sharp's arrest.

"I guess what we had to say just didn't fit their smear agenda," Smith said in the email (https://www.documentcloud.org/documents/5031671-IMPD-emails-3.html).



Adams, now a top aide to Police Chief Bryan Roach, responded: "Not at all. They had an agenda from day 1."

A day later, Smith emailed Penny (https://www.documentcloud.org/documents/5032147-Bruce-Smith-emails.html) what he called a "rough draft" of a press release Smith said he was writing for the IMPD media office. Smith's draft referred to the 2011 email as "so vague it would not have generated an investigation."

He went on to praise the organization. "USA Gymnastics response to the Marvin Sharp investigation reduced obsticals (sic) often present in child abuse cases," Smith wrote. "We would encourage others (sic) organizations to respond similarly."

Penny emailed his friend back.

**"They had an agenda from day 1," Lt. Kendale Adams said in an email regarding IndyStar.** *(Photo: Kelly Wilkinson /IndyStar)*

"Thanks. This is very helpful," Penny wrote. "If there is any chance to add a comment about IMPD impressions of our practices in a favorable manner, that would be great but if not, no worries. Thanks so much."



**Former USA Gymnastics President Steve Penny and Smith were friends.** *(Photo: Carolyn Kaster, AP)*

EXHIBIT 17
004

This year, Smith told IndyStar he sent the draft to Penny "to ensure my description of his actions were accurate." He said he did not make Penny's suggested revisions. But he did add one sentence (https://www.documentcloud.org/documents/5031670-IMPD-emails-2.html): "The procedures employed by USA Gymnastics regarding this matter was consistent with our expectations and best practices."

The emails obtained by IndyStar reveal Smith also sent the draft to Jeff Knoop at the Marion County prosecutor's office.

"Prosecutor agreed," Smith wrote in the Aug. 6, 2016, email (https://www.documentcloud.org/documents/5031670-IMPD-emails-2.html) to IMPD Major Richard Riddle. "Adjust whatever you need to."

Tremblay, the law enforcement consultant, said it was unusual that Smith would be allowed to draft the release "applauding" USA Gymnastics for its handling of the Sharp case. It "sounds like good judgment" on Smith's part to recuse himself in 2015 from any discussions about the situation, Tremblay said.



"And what he should've done," Tremblay added, "was continue to recuse himself from commenting about this."

**Tom Tremblay, a former police chief who trains and advises police, prosecutors and others on issues related to sexual violence.** *(Photo: Provided by Tom Tremblay)*

Aliya Wishner, the IMPD spokesperson, told IndyStar that Smith's work "drafting the document was outside of his official capacity as an investigator and not a standard IMPD practice."

"The draft was not considered in the best interest of the department and IMPD's internal processes ensured that the release was never issued," Wishner said.

Smith moved out of the Child Abuse Unit after being promoted from sergeant to lieutenant in January 2017.

That was the month an attorney hired by USA Gymnastics reached out to Smith via email (https://www.documentcloud.org/documents/5032197-Email-with-USA-Gymnastics-attorney.html). The attorney said Penny suggested Smith might have information "to help combat some of the unfair and negative media." Smith agreed to help. The attorney, who no longer represents USA Gymnastics, later interviewed him by phone.

## Steve Penny admits delay in reporting Larry Nassar

IMPD had another opportunity to investigate USA Gymnastics a few weeks later, but again chose not to do so.

On Feb. 16, 2017, Penny and then-USA Gymnastics board Chairman Paul Parilla acknowledged publicly they had waited more than five weeks to report Nassar to the FBI. Again, Indiana law requires immediate reporting, and in one case, the Indiana Supreme Court decided a school principal who waited four hours violated the law.

**Larry Nassar's cover story:** 'Can we just say i am sick?' (/story/news/2018/05/24/larry-nassar-being-investigated-sexual-abuse-usa-gymnastics-agreed-cover/599381002/)

By early 2017, there was growing evidence of a pattern of USA Gymnastics not immediately reporting sexual abuse allegations. It included the delay in reporting Nassar, the four-year delay in reporting the first complaint against Sharp and other failures revealed by an IndyStar investigation.

Yet Smith seemed incredulous when asked if IMPD investigated Penny's delay in reporting Nassar.

"You have got to be kidding me with this Larry Nassar question," Smith responded.

"IMPD did not investigate Larry Nassar. It was reported to the FBI. You know this! How would we have any knowledge of how long USA Gymnastics 'studied' the Larry Nassar case if we were not part of the investigation or have jurisdictional authority?"

IMPD's spokeswoman cited similar reasons.

"We are not aware of any report or allegation brought to IMPD or made publicly that indicates Larry Nassar committed any offense within IMPD's jurisdiction," Wishner told IndyStar in an email. "The Larry Nassar investigation was conducted by the FBI and agencies outside of the State of Indiana."

Wishner acknowledged that IMPD "does not need an official complaint, but there would need to be leading information to cause an investigation to be opened."

Other jurisdictions found such information in public statements.

In Texas, for example, officials said they decided to investigate Penny based on another former USA Gymnastics official's testimony at a congressional hearing. Penny was later indicted on a felony charge of tampering with evidence. He denies he broke the law.

Yet, IMPD told IndyStar it hasn't gone to USA Gymnastics' headquarters, sought a search warrant or questioned Penny or any other USA Gymnastics officials about anything other than the 2015 Sharp case.

EXHIBIT 17
005

The prosecutor's office also limited its focus to Sharp. In 2017, IndyStar asked the Marion County prosecutor's office whether it planned to investigate USA Gymnastics officials for not immediately reporting Nassar. The request for comment included a copy of USA Gymnastics' own timeline that showed the five-week delay.

"It would not be appropriate for our office to comment on this matter," spokeswoman Peg McLeish replied in a Feb. 17, 2017, email.

The statute of limitations expired that summer.

In 2018, IndyStar asked McLeish again about USA Gymnastics' delay in reporting Nassar. This time, she cited jurisdictional issues.

"In this particular instance we do not read the Indiana statute as requiring individuals to report alleged abuse which occurred in another state to the Indiana Department of Child Services or Indiana law enforcement," she said. "Our assumption is that USA Gymnastics operates nationwide and would have been subject to the jurisdiction of the state where the alleged abuse occurred."

A law professor at the Indiana University Robert H. McKinney School of Law in Indianapolis said Indiana's child abuse reporting law is vague on that point.

"There is nothing in the statute that makes it clear either way," said Shawn Marie Boyne. "As a matter of policy, I would think that mandatory reporters would have to report no matter where the child is located."

## Aly Raisman's mom: 'It's disgusting'

When the allegations against Sharp became public in 2015, Lynn Raisman said she thought for sure police and the FBI would connect the dots between Sharp and Nassar.

Raisman said her daughter, Olympic gold medalist Aly, attended camps where Sharp was coaching, and it appeared Sharp and Nassar were friends.

Knowing what she knows now, Raisman said she feels angry, horrified and betrayed.

"I don't understand the police officer," she said. "I don't understand the FBI."

IndyStar previously reported (/story/news/investigations/2018/10/18/usa-gymnastics-chief-steve-penny-approached-head-fbi-agent-job/1687527002/) that Penny had discussed a job opportunity with then-FBI agent W. "Jay" Abbott as the agency's Nassar investigation languished. Penny told Abbott the head of security for the U.S. Olympic Committee would be retiring and suggested Abbott might be interested in the position.

Penny's attorney Edith Matthai previously told IndyStar that "any suggestion that Steve had the conversation with Abbott in order to impact the FBI investigation is false and defamatory." She did not respond to questions about Penny's relationship with Smith.

Jon Little, an Indianapolis-based attorney whose practice is focused on representing abused athletes in Olympic sports, told IndyStar he has begged local officials for years to pursue an investigation into USA Gymnastics and Penny.

He pointed out that dozens of sexual misconduct complaint files compiled by USA Gymnastics are kept in Indiana. He said it was "appalling" that no one in Indiana has been prosecuted for failure to report.

"It's just insane to me," Little said. "So, yes, I think that there's for some reason, a complete lack of will, interest, whatever, at the Marion County prosecutor's office."

John Manly, a California attorney who represents 180 Nassar survivors in lawsuits against the organization, said it is "despicable" that no one from IMPD or the prosecutor's office has knocked on USA Gymnastics' door to ask for a single document.

"I find that disturbing and not a coincidence," Manly said. "And either they're incompetent or they're looking the other way. And either way, frankly, somebody ought to investigate them. Because, you know, every other jurisdiction — even tiny Walker County, Texas — has shown interest."

Raisman said she feels there still are people working at USA Gymnastics who knew about Nassar.

"It's disgusting that the police and the FBI aren't doing something to get to the bottom of who knew what when, who helped cover it up," Raisman said. "They shouldn't be working anymore. They shouldn't be working with children, period."

*Call IndyStar reporter Marisa Kwiatkowski at 317-444-6135. Follow her on Twitter: @IndyMarisaK.*

*Call IndyStar reporter Tim Evans at 317-444-6204. Follow him on Twitter: @starwatchtim.*

*Call IndyStar reporter Tony Cook at 317-444-6081. Follow him on Twitter: @indystartony.*

EXHIBIT 17

Read or Share this story: https://www.indystar.com/story/news/2018/11/11/usa-gymnastics-larry-nassar-sexual-abuse-scandal-impd-detective-bruce-smith-conduct-under-review/1693853002/

EXHIBIT 17
007

# EXHIBIT "18"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION SANTA ANA


JANE JD DOE, AN INDIVIDUAL,  )
                             )
          Plaintiff,         ) CIVIL CASE NO.
                             ) 8:18-cv-01136-JLS-KES
     -v-                     )
                             ) THE HONORABLE
                             ) JOSEPHINE L. STATON
DOE 1, AN INDIVIDUAL; DOE 2, )
AN INDIANA BUSINESS ENTITY OF)
FORM UNKNOWN; DOE 3, AN      )
INDIVIDUAL; DOE 4, AN        )
INDIVIDUAL; DOE 5, AN        )
INDIVIDUAL; AND DOES 6       )
THROUGH 500,                 )
                             )
          Defendants.        )
_____)


CERTIFICATE OF NOTARY AS TO FAILURE OF

DEPONENT STEVE PENNY

TO APPEAR FOR DEPOSITION



October 23, 2018



10:35 a.m. - 10:45 a.m.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 18
001

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4

 5     MCKAYLA MARONEY,                )
       an individual,                  )
 6                                     )
                    Plaintiff,         )
 7                                     )
            -vs-                       ) Case No.:
 8                                     ) 2:18:cv-03461-JLS-KESx
                                       )
 9     MICHIGAN STATE UNIVERSITY,      ) THE HONORABLE
       a Michigan Entity of Form       ) JOSEPHINE L. STATON
10     Unknown; and UNITED STATES      )
       OLYMPIC COMMITTEE,              )
11     a Business Entity of Form       )
       Unknown; USA GYMNASTICS, an     )
12     Indiana Business Entity of      )
       Form Unknown: LARRY NASSAR,     )
13     an individual and DOES 1        )
       through 500,                    )
14                                     )
                    Defendants.        )
15     _____)

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 18
002

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4      JANE PCNE DOE, an individual; )
        and JOHN PCNM DOE, an         )
 5      individual,                   )
                                      )
 6                    Plaintiffs,     )
                                      )
 7             -vs-                    ) Case No.:
                                      ) 2:18:cv-03461-JLS-KES
 8                                    )
        USA GYMNASTICS, a Business    ) THE HONORABLE
 9      Entity of Form Unknown; and   ) JOSEPHINE L. STATON
        UNITED STATES OLYMPIC         )
10      COMMITTEE, a Business Entity  )
        of Form Unknown; and DOES 3   )
11      through 500,                  )
                                      )
12                    Defendants.     )
        _____)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 18
003

```
 1                    UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

 3

 4     JORDYN MARIE WIEBER,             )
       an individual,                   )
 5                                      )
                    Plaintiff,          )
 6                                      )
           -vs-                         ) Case No.:
 7                                      ) 2:18:cv-03462-JLS-KESx
                                        )
 8     UNITED STATES OLYMPIC            ) THE HONORABLE
       COMMITTEE, a Business Entity     ) JOSEPHINE L. STATON
 9     of Form Unknown; USA            )
       GYMNASTICS, an Indiana           )
10     Business Entity of Form          )
       Unknown; Michigan State          )
11     University, a Business Entity    )
       of Form Unknown; LARRY NASSAR,)
12     STEVE PENNY, an individual;      )
       PAUL PARRILLA, an individual; )
13     and DOES 1 through 500,          )
                                        )
14                  Defendants.         )
       _____)

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 18
004

```
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                    SOUTHERN DIVISION, SANTA ANA

 4

 5     JANE LM DOE, an individual,    )
                                      )
 6                   Plaintiff,       )
                                      )
 7            -vs-                     ) Case No.:
                                      ) 8:18:cv:0117-JLS-KES
 8     DR. LARRY NASSAR, an           )
       individual; USA GYMNASTICS,    )
 9     an Indiana Business Entity of  ) THE HONORABLE
       Form Unknown; ROBERT           ) JOSEPHINE L. STATON
10     COLAROSSI, an individual;      )
       STEPHEN "STEVE" PENNY, an      )
11     individual; BELA KAROLYI,      )
       an individual; MARTHA          )
12     KAROLYI, an individual;        )
       KAROLYI TRAINING CAMPS, LLC,   )
13     a Texas Business Entity of     )
       Form Unknown; KAROLYI WORLD    )
14     GYMNASTICS, INC., a Texas      )
       Business Entity of Form        )
15     Unknown; KAROLYI'S ELITE,      )
       a Texas Business Entity of     )
16     Form Unknown; AOGC ALL         )
       OLYMPIA GYMNASTICS CENTER,     )
17     INC., a California Business    )
       Entity of Form Unknown;        )
18     GALINA MARINOVA; an            )
       individual; ARTUR AKOPYAN, an  )
19     individual; and DOES 1         )
       through 500,                   )
20                                    )
                     Defendants.      )
21     _____ )

22

23

24

25
```

EXHIBIT 18
005

```
 1                    UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

 3

 4
        ALEXANDRA ROSE RAISMAN, an     )
 5      individual,                    )
                                       )
 6                    Plaintiff,       )
                                       )
 7           -vs-                      ) Case No.:
                                       ) 5:18-cv-02479-BLF
 8      UNITED STATES OLYMPIC          )
        COMMITTEE, a Business          ) THE HONORABLE
 9      Entity of Form Unknown;        ) BETH LABSON FREEMAN
        USA GYMNASTICS, an Indiana     )
10      Business Entity of Form        )
        Unknown; LARRY NASSAR, an      )
11      individual; STEVE PENNY, an    )
        individual; PAUL PARRILLA,     )
12      an individual; and and DOES 1  )
        through 500,                   )
13                                     )
                      Defendants.      )
14      _____)

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 18
006

```
 1                      APPEARANCES

 2

 3     FOR THE PLAINTIFFS: (BY VIDEOCONFERENCE AND TELEPHONE)

 4          Alex E. Cunny, Esq.
            MANLY STEWART FINALDI
 5          19100 Von Karman Avenue
            Suite 800
 6          Irvine, CA 92612
            acunny@manlystewart.com
 7
       FOR THE DEFENDANT:
 8     STEVE PENNY

 9          Edith R. Matthai, Esq.
            ROBIE & MATTHAI
10          500 South Grand Avenue
            15th Floor
11          Los Angeles, CA 90071-2609
            ematthai@romalaw.com
12
       FOR THE DEFENDANT:
13     STEVE PENNY

14          Rusty Hardin, Esq.
            RUSTY HARDIN & ASSOCIATES
15          1401 McKinney Street
            Suite 2250
16          Houston, TX 77010

17
       FOR THE DEFENDANT: (BY TELEPHONE)
18     USA GYMNASTICS, AN INDIANA BUSINESS ENTITY OF FORM
       UNKNOWN; ROBERT COLAROSSI
19
            Margaret M. Holm, Esq.
20          CLYDE & CO
            2020 Main Street
21          Suite 1100
            Irvine, CA 92614-8234
22          margaret.holm@clydeco.us

23

24

25
```

7

EXHIBIT 18
007

```
1                    INDEX OF EXHIBITS

2
      NUMBER        DESCRIPTION                    PAGE
3
      Exhibit 1     AMENDED NOTICE OF TAKING CONTINUED  12
4                   DEPOSITION OF STEVE PENNY AND
                    REQUEST FOR PRODUCTION IN THE
5                   LM MATTER

6     Exhibit 2     AMENDED NOTICE OF TAKING CONTINUED  12
                    DEPOSITION OF STEVE PENNY AND
7                   REQUEST FOR PRODUCTION IN THE
                    JD MATTER
8
      Exhibit 3     AMENDED NOTICE OF TAKING CONTINUED  12
9                   DEPOSITION OF STEVE PENNY AND
                    REQUEST FOR PRODUCTION IN THE
10                  McKAYLA MARONEY MATTER

11    Exhibit 4     AMENDED NOTICE OF TAKING CONTINUED  12
                    DEPOSITION OF STEVE PENNY AND
12                  REQUEST FOR PRODUCTION IN THE
                    PCNE MATTER
13
      Exhibit 5     AMENDED NOTICE OF TAKING CONTINUED  12
14                  DEPOSITION OF STEVE PENNY AND
                    REQUEST FOR PRODUCTION IN THE
15                  RAISMAN MATTER

16    Exhibit 6     AMENDED NOTICE OF TAKING CONTINUED  12
                    DEPOSITION OF STEVE PENNY AND
17                  REQUEST FOR PRODUCTION IN THE
                    WIEBER MATTER
18

19

20

21

22

23

24

25
```

8

EXHIBIT 18
008

 1           MR. CUNNY:  We're on the record.  It's

 2      currently 7:35 in California time.  It's 10:35 in

 3      Indiana time.  We're here to take a certificate of

 4      nonappearance for the deposition of Steve Penny, to

 5      occur on October 23, 2018, at 10:00 a.m., at the

 6      Regus Business Centers located at

 7      201 North Illinois Street, 16th Floor,

 8      South Tower, Indianapolis, Indiana, 46204.

 9           We're taking a certificate of nonappearance.

10      Mr. Penny is not appearing for this deposition

11      based on the objections of his counsel.  I received

12      written objections last night as to the LM,

13      Raisman, and Wieber matters.  However, Ms. Matthai

14      indicated last Friday, I believe, on the 18th

15      that he would not be appearing for the deposition

16      today.

17           I want to put on the record as Exhibit 1 --

18      and I'll e-mail these to the court reporter.  All

19      counsel have been served with these notices, as to

20      the proofs on the notices.  So Exhibit 1 will be

21      the Amended Notice of Taking Continued Deposition

22      of Steve Penny and Request for Production in the LM

23      matter; the same Notice in the JD matter will be

24      marked as Exhibit 2; the Notice in the

25      McKayla Maroney matter for Steve Penny's deposition

EXHIBIT 18
009

1    will be marked as Exhibit 3; the Notice in the

2    PCNE Doe matter will be marked as Exhibit 4; the

3    Notice in the Raisman matter will be marked as

4    Exhibit 5; and the Notice in the Wieber matter will

5    be marked as Exhibit 6.

6        I was also informed that Mr. Penny will be

7    seeking a stay based on the Fifth Amendment civil

8    stay.  He filed an ex parte application.  Just to

9    put on the record, we believe in addition to the

10   areas regarding the recent criminal charges, we

11   believe there's lots of other discoverable areas

12   that do not pertain to the criminal charges pending

13   against Mr. Penny.  So we will be opposing that

14   stay and seeking responses at his deposition,

15   whether or not he wants to invoke for some of them

16   or not.

17       So with that, I'll turn it over to other

18   counsel who would like to be heard.

19       MS. MATTHAI:  Thank you.  This is

20   Edith Matthai, counsel for Mr. Penny.  As you

21   noted, I advised that Mr. Penny would not appear

22   for his deposition today in light of the charges

23   that have been filed in Texas.  I gave that advice

24   on October 18 at 8:30 a.m. and advised that he

25   would not appear here today.

EXHIBIT 18
010

1          Counsel is correct that we have filed an

2     ex parte application for a stay of the proceedings

3     as to Mr. Penny in those actions in which he has

4     been named as a defendant.  We've asked for

5     six months at this point and advised the Court that

6     should the Texas issues be resolved before the

7     expiration of that six-month period, we would, of

8     course, advise the Court and Counsel.

9          With that, I would ask that Mr. Hardin, who is

10    Mr. Penny's counsel in Texas, make any statement

11    which he wishes to make for the record.

12         MR. HARDIN:  Yes.  My name is Rusty Hardin,

13    and I'm an attorney licensed to practice in Texas.

14    I was contacted at the end of last week, probably

15    Friday, about whether or not I would be willing to

16    represent Mr. Penny.  I've talked to him over the

17    weekend and I've agreed to representing in the

18    criminal matter that is now pending in

19    Walker County, Texas, in which he's been indicted

20    for a third-degree felony of tampering with

21    evidence.

22         I would hope that rather than taking a

23    nonappearance in this deposition that you would

24    consider simply postponing this deposition until I

25    can become informed with it or not.  It may very

11

EXHIBIT 18
011

1   well be that I might have different advice to

2   Mr. Penny some weeks from now, once we understand

3   what the case is about.  He was indicted in a

4   sealed indictment that apparently was returned

5   September 28.  He did not know that there was a

6   pending indictment during that period of time, and

7   when he was arrested this past week in the middle

8   of the week on vacation with his family in

9   Tennessee, that was the first he had notice for it.

10  So there would be no opportunity before the middle

11  or end of last week for him to retain counsel, for

12  that counsel to become informed about the facts,

13  and to be able to give him informed advice about a

14  deposition.

15      I respectfully disagree that there are other

16  evidentiary matters he could be questioned about

17  that would not involve Walker County, and

18  therefore, apparently you have some concern or

19  disagreement with him being unwilling to testify at

20  this time.  I would assure you that once we become

21  familiar with the facts, I'll objectively look at

22  it as to how we advise him.  It may very well be

23  advice will remain the same, that until the

24  criminal matter is resolved he will be unavailable

25  for a deposition.  I think anyone can understand

12

EXHIBIT 18
012

```
 1        that.
 2            For the time being now, all I can advise him
 3        is on Tuesday after he was indicted on Wednesday
 4        probably, or became aware of one on Wednesday of
 5        last week, it is simply premature for him to appear
 6        for any deposition in any locale.  I hope that once
 7        I become familiar with the case we can give him
 8        informed advice, but right now we have asked him
 9        not to appear for this deposition.  I'll hope you
10        would recognize that it may be just advantage of
11        everyone to take a pause on seeking his deposition
12        while the cases move forward until he can receive
13        informed advice.
14            MR. CUNNY:  Peggy, do you have anything to put
15        on the record?
16            MS. HOLM:  I don't.
17            MR. CUNNY:  Okay.  I want to make just two
18        other points regarding Mr. Hardin getting up to
19        speed on the case.  One of the issues, obviously we
20        believe Mr. Penny's testimony is going to be
21        relevant not only to Mr. Penny but also to the USOC
22        as to jurisdictional matters but obviously merit
23        matters as well.  So for that reason further delay
24        in his deposition, we have motions to oppose and
25        relevant evidence to get in that respect.  Also, as
```

EXHIBIT 18
013

```
 1        to his invocation of the Fifth Amendment in the

 2        civil case, you know, regardless of what happens

 3        with the ex parte application to stay the case on

 4        Fifth Amendment grounds, he does have to invoke

 5        question by question if that stay is not granted.

 6             So as to those matters I suppose will be

 7        decided within the week, I would assume, but we'll

 8        go from there.

 9             MR. HARDIN:  I would ask you to consider that

10        I've noticed some comments in the media that

11        there's been criticism of Walker County for not

12        indicting him in more areas and for more bases or

13        so.  I'd like to respectfully suggest to you that

14        to say that you're going to insist on going forward

15        on a deposition so that you can get your

16        Fifth Amendment invocation on something that

17        happened so suddenly on anybody that's been noticed

18        for a deposition, I would hope in a sense of

19        civility that you would simply say, okay, we'll

20        back up and let's wait, this man has been hit with

21        a criminal indictment, he needs to get informed

22        advice, and trying to put him on the spot of

23        thinking about whether or not to take the Fifth now

24        appears to me to be a little unseemly.

25             I would ask for y'all to regather and decide
```

EXHIBIT 18
014

```
1     whether you want to reach out to me and talk about
2     another possible date, and at that time, if after
3     when that time arrives my advice to him is not to
4     testify, then at least it will be an informed
5     observation.  I quite frankly don't remember ever
6     an attorney insisting on taking a deposition of
7     somebody six days after he has been indicted.  In
8     fact, I can comfortably say in forty-three years
9     I've never seen it.  If you guys want to proceed
10    that way, then there's nothing I can do about it
11    except inform whichever judges are considering
12    these matters that I think what you're doing is
13    extremely unfair.
14         MR. CUNNY:  Okay.  Well, I have dispositive
15    motions pending from Mr. Penny himself seeking to
16    dismiss this action for which I have oppositions
17    due on November 21.  So I understand what you're
18    saying, but he's trying to get the case dismissed
19    as well.  He's trying to seek affirmative relief on
20    bases which we believe he is indicted for
21    destroying evidence on.  So obviously those two
22    issues are intertwined and, you know, we need to
23    get that information or implications or what have
24    you.
25         So if we could get another deposition on
```

15

EXHIBIT 18
015

1    calendar before November 16, which would give me

2    just a couple days to get the transcript back to

3    put anything into the opposition I need to, we

4    could work on that.  But if that's not in the

5    cards, then we're going to have to proceed with the

6    Court.

7        MS. MATTHAI:  Obviously if the stay is

8    granted, it will apply to the jurisdictional motion

9    as well as the timing of your opposition to it.  If

10   the issue of the timing of the jurisdictional

11   matter needs to be addressed, we will address it.

12   As you are well aware, this jurisdictional issue

13   has gone on for a very, very long time with

14   multiple continuances for multiple reasons.  Not

15   one sided, I might note.  So to the extent that

16   those issues need to be dealt with, we can deal

17   with those.

18       MR. HARDIN:  I would not be able to do it that

19   quickly just because of other commitments.  Part of

20   my problem here is this has been pending now for a

21   couple of years.  The investigations and everything

22   are something that I knew nothing about, still know

23   nothing about, and it's going to take while to get

24   up to speed with it.  So I'll just reiterate my

25   request that you postpone this deposition and

EXHIBIT 18
016

1    reconsider another time, but that's all I can do at

2    this moment.

3         MR. CUNNY:  All right.  Thank you.  We can go

4    off the record, if everybody agrees.

5         MS. MATTHAI:  Yes.

6         MS. HOLM:  Yes.

7         MR. HARDIN:  Yes.

8         MR. CUNNY:  All right.  Thank you.

9         THE REPORTER:  Thank you.

10        (Exhibits 1-6 were marked for identification.)

11

12

13

14

15        WHEREFORE, the undersigned reports said facts

16    to this Court for such action as the Court may deem

17    proper.

18                     _____

19

20                         Michele K. Gustafson
                            NOTARY PUBLIC SEAL
                             STATE OF INDIANA
                          Commission No. NP0702546
                       My Commission Expires Aug. 31, 2025

21

22                     County of Marion

23                     My Commission expires:
                       August 31, 2025

24

25

                                                              17

EXHIBIT 18
017

# EXHIBIT "19"

```
                  UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE


ALEXANDRA ROSE RAISMAN,           )
an individual,                    )
                                  ) CIVIL CASE NO.
     Plaintiff,                   ) 5:18-cv-02479-BLF
                                  )
vs.                               ) The Honorable
                                  ) Beth Labson Freeman
UNITED STATES OLYMPIC             )
COMMITTEE, a Business             )
Entity of Form Unknown;           )
USA GYMNASTICS, an Indiana        )
Business Entity of Form           )
Unknown; LARRY NASSAR,            )
an individual, STEVE PENNY,       )
an individual, PAUL PARILLA,      )
an individual, and DOES           )
1 through 500,                    )
                                  )
     Defendants.                  )
_____ )
```

PURSUANT TO NOTICE AND SUBPOENA, the videotaped deposition of WALTER GLOVER was taken on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, at Regus Business Centers, 102 South Tejon Street, Suite 1100, Colorado Springs, Colorado, on November 16, 2018, at 9:06 a.m., before Laura K. McMahon, Registered Professional Reporter and Notary Public within Colorado.

1

EXHIBIT 19
001

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |

1  changed its name in 2013, from the United States Olympic

2  Foundation to the United States Olympic Endowment, in

3  order to allow the United States Olympic and Paralympic

4  Foundation, the new organization, to have the name

5  "Foundation" in it, so there was not confusion.

09:33:45  6         The new organization, the United States

7  Olympic and Paralympic Foundation, was set up to raise

8  operating funds for the USOC.

09:33:54  9         Q    Okay.  Gotcha.  Do you know what the surplus

10  was, in terms of amount, that was used to create the

11  USOF at the time?

09:34:05 12         A    Approximately, 111 million.

09:34:11 13         Q    Okay.  And if I call it the USOE or the USOF,

14  you understand that to be, effectively, the same entity?

09:34:21 15         A    Yes.

09:34:21 16         Q    Okay.  So do you have any role in the USOE,

17  currently?

09:34:28 18         A    Yes.

09:34:28 19         Q    And when did your role begin with the USOE?

09:34:34 20         A    February 2016.

09:34:39 21         Q    Okay.  And is that a compensated role, without

22  telling me how much?

09:34:44 23         A    Yes.

09:34:47 24         Q    All right.  Prior to that date, did you have

25  inter -- any interaction with the USOE or USOF -- as the

34

EXHIBIT 19
003

09:37:59  1        A    Yes.

09:37:59  2        Q    And then they made a grant, to that new

        3    organization, of the -- I think 112 million or

        4    111 million?

09:38:09  5        A    Well, I said approximately 111 million.

09:38:11  6        Q    Okay.  Is that how that worked?

09:38:14  7        A    Yes.  The board of the USOC designated that

        8    money to that organization, and the staff was did

        9    separate -- as a separate 501(c)(3), support

       10    organization.

09:38:28 11        Q    Okay.  And when you say "support

       12    organization," what do you mean by that?

09:38:34 13             MR. JOLLEY:  Sorry, objection to the extent it

       14        calls for a legal conclusion.

09:38:38 15             When I object, you can go ahead and answer.  I

       16        just wanted to get my name on the record there.

09:38:44 17    BY MR. CUNNY:

09:38:45 18        Q    Sure.

09:38:45 19        A    There are -- 501(c)(3)'s can be public or

       20    private or -- and one of the classifications is what is

       21    -- what kind of charity a 501(c) is.  And in this case,

       22    it's a support organization, meaning it supports another

       23    organization, be it the USOC and the national governing

       24    bodies --

09:39:07 25        Q    Okay.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT 19
004

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
|            | 1  | approximately 1995 until the beginning of 2017, end of       |
|            | 2  | 2016, the USOC had an Olympic Training Center in Chula        |
|            | 3  | Vista; is that accurate?                                      |
| 09:45:31   | 4  | A    Yes.                                                     |
| 09:45:31   | 5  | Q    Okay.  Do you know how big, in terms of                 |
|            | 6  | acreage, that facility was?                                   |
| 09:45:44   | 7  | A    I don't recall the exact acreage.                        |
| 09:45:46   | 8  | Q    Okay.  If I represent to you that it was                 |
|            | 9  | 155 acres, does that sound -- would you take issue with       |
|            | 10 | that?                                                         |
| 09:45:57   | 11 | MR. JOLLEY:  Objection, asked and answered.                  |
| 09:45:59   | 12 | THE WITNESS:  I don't recall the -- the                      |
|            | 13 | number --                                                     |
| 09:46:01   | 14 | BY MR. CUNNY:                                                 |
| 09:46:01   | 15 | Q    Oh.                                                      |
| 09:46:01   | 16 | A    -- so I would hate to speculate.                         |
| 09:46:03   | 17 | Q    Sure.  And I don't want you to speculate                |
|            | 18 | today.  So there was an Olympic Training Center in Chula     |
|            | 19 | Vista, California.  There is an Olympic Training Center       |
|            | 20 | in Colorado Springs.  Correct?                                |
| 09:46:16   | 21 | A    Correct.                                                 |
| 09:46:21   | 22 | Q    And there is also an Olympic Training Center,           |
|            | 23 | currently, in Lake Placid, correct?                           |
| 09:46:22   | 24 | A    Correct.                                                 |
| 09:46:23   | 25 | Q    Okay.  Do you know which of those training              |

42

EXHIBIT 19
005

1  centers is largest, in terms of real estate?

09:46:31  2  A   It probably would have been Chula Vista.

09:46:35  3  Q   Okay.  Aside from those training centers, did

4  the USOC have any other land holdings anywhere in the

5  United States or -- or abroad -- that you're aware of?

09:46:51  6  MR. JOLLEY:  Objection to the characterization

7  in the question.

09:47:09  8  THE WITNESS:  The only property, that the USOC

9  may have had some rights to, which -- was I believe

10  112 acres, that are in the eastern part of the city

11  here, in Colorado Springs.

09:47:30  12  BY MR. CUNNY:

09:47:30  13  Q   Okay.  When you say they had "rights to," did

14  they own the property, meaning the USOC?

09:47:36  15  A   Well, it was the -- it's my understanding the

16  property was deeded to the USOC with -- with certain

17  restrictions -- and those restrictions had to do with

18  certain facilities being built there.  And since the

19  USOC did not build the -- those required facilities on

20  there -- i.e., I believe it was a Hall of Fame -- then

21  it was in dispute as to the USOC's clear title to that

22  property.

09:48:06  23  Q   Okay.  Do you know -- again, this might be

24  approximate -- but when that was deeded, with those

25  restrictions, to the USOC?

43

EXHIBIT 19
006

| | | |
|---|---|---|
| 09:59:20 | 1 | THE WITNESS: Yeah, I couldn't say that, |
| | 2 | unless I know exact -- like I say, I look at a |
| | 3 | document. I think I know what it's made up of. |
| | 4 | Unless I ask specific questions about what's in |
| | 5 | here, I could not attest to this being the exact |
| | 6 | total for Chula Vista. |
| 09:59:34 | 7 | BY MR. CUNNY: |
| 09:59:35 | 8 | Q    Okay, who replaced you as CFO at USOC? |
| 09:59:39 | 9 | A    Morane Kerek. |
| 09:59:44 | 10 | Q    Okay.  So, one last question about this |
| | 11 | document.  The last page has a grand total of |
| | 12 | 130,782,032.17.  Do you see that? |
| 09:59:56 | 13 | A    Yes. |
| 09:59:56 | 14 | Q    Does that sound about right for the total |
| | 15 | expenses, from 1994 until 2015, of what it took to |
| | 16 | operate the Chula Vista Olympic Training Center? |
| 10:00:08 | 17 | MR. JOLLEY: Objection, document speaks for |
| | 18 | itself. Objection, lacks foundation. Objection, |
| | 19 | calls for speculation. |
| 10:00:15 | 20 | THE WITNESS: Yeah, based on what you have |
| | 21 | before me here, you know, if I assume the numbers |
| | 22 | at the bottom are correct, if you add them all up, |
| | 23 | that's probably what you get. |
| 10:00:23 | 24 | BY MR. CUNNY: |
| 10:00:23 | 25 | Q    Okay.  All right, we can set that aside, real |

EXHIBIT 19
007

```
 1   was -- but that would have been through '12.  This would

 2   have been a through '12.  Yes, she would have been there

 3   in '12.  And -- 87 would have been '12.  That's -- that

 4   would have been the only one I can recall at that point

 5   in time.
```

10:27:40   6        **Q      Okay, is that Christine Walshe?**

10:27:42   7        A      Yes.

10:27:42   8        **Q      Okay.  When USOC had staff or employees in the**

           9   **state of California, did the USOC pay employment taxes**

          10   **for those individuals, in the state of California, or**

          11   **did they pay them through Colorado or something?**

10:28:00  12             MR. JOLLEY:  Objection, lacks foundation.

10:28:04  13             THE WITNESS:  USOC, no matter -- yeah, you

          14        would -- you would have to pay the employment -- if

          15        the person is residing and working in that state,

          16        you have got to -- you have to pay taxes for that

          17        state -- no matter whether it's California,

          18        New York, or District of Columbia.

10:28:19  19   BY MR. CUNNY:

10:28:19  20        **Q      Okay.  Gotcha.  Do you know -- did USOC, for**

          21   **those individuals in California -- and, again, not**

          22   **discussing individual specific salaries -- but did USOC**

          23   **send them a check from Colorado Springs, or were there**

          24   **financial institutions in California that it disbursed**

          25   **checks from?**
```

68

EXHIBIT 19
008

| | | |
|---|---|---|
| 10:36:29 | 1 | Q    Okay.  So same thing on Page 21.  It |
| | 2 | references California, and it has 42, as the number of |
| | 3 | administrative support workers, craft workers, |
| | 4 | operatives, professionals, service workers, and |
| | 5 | technicians.  Do you see that 42 number? |
| 10:36:47 | 6 | A    Yes. |
| 10:36:47 | 7 | Q    And, again, you don't have any reason to |
| | 8 | dispute that number, correct? |
| 10:36:51 | 9 | MR. JOLLEY:  Objection to the extent it calls |
| | 10 | for speculation. |
| 10:36:52 | 11 | THE WITNESS:  "Correct." |
| 10:36:53 | 12 | BY MR. CUNNY: |
| 10:36:54 | 13 | Q    All right.  We can set that aside, real quick. |
| | 14 | During your time at the United States Olympic Committee, |
| | 15 | were you aware that -- that the -- all right, were you |
| | 16 | aware that the Olympic Committee derived some revenue |
| | 17 | from the state of California over the years? |
| 10:37:35 | 18 | MR. JOLLEY:  Objection, vague and ambiguous. |
| 10:37:42 | 19 | THE WITNESS:  It's typical with a training |
| | 20 | center -- yes.  Well, revenue, yes.  That would be |
| | 21 | some sources. |
| 10:37:49 | 22 | It would be typical -- a training center would |
| | 23 | have some outside training clubs or -- or |
| | 24 | international sports -- that would come and use the |
| | 25 | facilities, that would pay fees. |

75

EXHIBIT 19
009

10:38:04  1           The USOC -- the USOPF today certainly solicits
        2       donations from individuals throughout the United
        3       States.  So, yes, it would be reasonable to assume
        4       California -- I mean as large as they are --
        5       revenue would come from that state, as well.
10:38:22  6           (Plaintiff's Exhibit Number 12 was marked)
10:38:22  7   BY MR. CUNNY:
10:38:22  8       Q    Okay.  I am going to -- I marked a document as
        9   Exhibit 12.  I'll give it to Counsel, as well.  And this
        10  was produced, I believe as an Excel spreadsheet, and
        11  it's printed on a -- a legal-sized piece of paper.  It's
        12  Bates Stamped 969 from the USOC.  And the question for
        13  you is whether you prepared this document.
10:38:54 14       A    I don't recall seeing this document before.
10:38:58 15       Q    Okay.  And I'll represent to you that this was
        16  produced by the USOC.  Have you ever seen this document
        17  before, to your knowledge?
10:39:22 18       A    I don't recall seeing the document.
10:39:27 19       Q    Okay.  So this document, the top of it, is
        20  titled, "U.S. Olympic Committee," "Estimated CA-related
        21  Revenue."
10:39:38 22           If -- when you were the CFO at USOC, was there
        23  a process by which you could obtain information about
        24  revenues from particular states?  Meaning, is it in
        25  QuickBooks or whatever accounting software you use?  Is

                                                                    76

EXHIBIT 19
010

1    it, I cannot say what the purpose was.

10:45:37  2  BY MR. CUNNY:

10:45:38  3      Q    Okay.  And, again, you don't know who prepared

4  this report, correct?

10:45:41  5      A    No.

10:45:43  6      Q    If we look on the left-hand side of it --

10:45:46  7      A    Uh-huh.

10:45:46  8      Q    -- there is a series of categories in that

9  column, and the first one says, under Revenue, USOC New

10  Activity.  Is the term "new activity" a term of art in

11  the accounting world?

10:46:05 12      A    That would -- that would generally refer to a

13  new program, that you -- or that you have started of

14  some type -- at some point in time, when it says --

15  that's -- that's how I would interpret it.

10:46:22 16           But, no, it's not a general term in the

17  accounting field.  It just -- I -- it -- it like -- I

18  would only be speculating that it's -- it's addressing

19  some -- in terms of new programs or -- or a new source

20  of revenue that came in during that period.

10:46:39 21      Q    Okay.  Gotcha.  And actually, I didn't read

22  below it.  It says "New Activity" equals outright

23  contributions and pledged commitments.

10:46:51 24           What are outright contributions and pledge

25  commitments, if they have a specific meaning at the

EXHIBIT 19
011

10:47:59  1        Q    Do you interpret it the same way?

10:48:07  2        A    Okay.

10:48:07  3        Q    So, if you go in that top one -- that talks

        4    about New Activity, it says CA New Activity -- do you

        5    know if that represents the amount of money that was

        6    obtained, solely, from California?

10:48:14  7             MR. JOLLEY:  Objection to the extent it calls

        8        for speculation.  Objection, lacks foundation.

10:48:30  9             THE WITNESS:  Assume?  I -- I would have to --

       10        I can't say.  I just assume, from the heading,

       11        that's what it's saying.  It's saying, hey, the

       12        total for USOC is the first line, and the second

       13        line is that piece from California.

10:48:42 14    BY MR. CUNNY:

10:48:43 15        Q    Okay.  Gotcha.  So the line, where it says CA

       16    New Activity -- you would interpret that as being

       17    revenue from California, correct?

10:48:51 18             MR. JOLLEY:  Objection, asked and answered.

       19        Objection, lacks foundation.  Objection to the

       20        extent it calls for speculation.

10:48:59 21             THE WITNESS:  Given -- I am assuming CA -- and

       22        CA normally stands for California when you

       23        abbreviate states -- and so I am assuming it's

       24        referring to the state of California there -- so,

       25        "CA" being California.

EXHIBIT 19
012

10:49:12  1   BY MR. CUNNY:

10:49:13  2        Q    Okay.   And then the bottom line appears to

          3   just be a percentage of the top two lines, correct?

10:49:19  4        A    Yes.   Yes.

10:49:20  5        Q    Okay.   So a percentage goes from as low as

          6   3.8 percent in 1995 and as high as 28.9 percent in 2013,

          7   correct?

10:49:31  8             MR. JOLLEY:   Same objections, and the document

          9        speaks for itself.

10:49:34 10             MR. CUNNY:   Did I give you one?   Yeah.

10:49:37 11             MR. JOLLEY:   You did, thank you.

10:49:44 12             THE WITNESS:   The answer is, yes, in terms of

         13        your question about what it appears to be.   Yes.

10:49:50 14   BY MR. CUNNY:

10:49:50 15        Q    Okay.   And then all of the columns, from 1994

         16   until 2015, appear to be added up on the right-hand

         17   side, in totals, correct?

10:49:58 18             MR. JOLLEY:   Objection, the document speaks

         19        for itself.

10:50:03 20             THE WITNESS:   Typically, when you prepare a

         21        document like this, and that total over there --

         22        that's what "Total" normally represents, yes.

10:50:09 23   BY MR. CUNNY:

10:50:10 24        Q    Okay.   And on the far right total, it appears

         25   that $84,306,852 was derived from California over that

                                                                    84

EXHIBIT 19
013

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | **time frame, correct?**                                     |
| 10:50:22 | 2  | MR. JOLLEY:   Same objections.                               |
| 10:50:24 | 3  | THE WITNESS:   "Yes."                                         |
| 10:50:25 | 4  | BY MR. CUNNY:                                                 |
| 10:50:26 | 5  | **Q   All right.   And, again, the percentage below**        |
|          | 6  | **it is just 84 million -- that 84 million number divided**  |
|          | 7  | **by the 512 million number, correct?**                      |
| 10:50:36 | 8  | **A   Yes.**                                                 |
| 10:50:38 | 9  | MR. JOLLEY:  Same objections.                                |
| 10:50:38 | 10 | THE WITNESS:   "Yes."                                         |
| 10:50:38 | 11 | BY MR. CUNNY:                                                 |
| 10:50:39 | 12 | **Q   Okay.   And then going down below, do you know**       |
|          | 13 | **what it -- what, if any, distinction there is between a**  |
|          | 14 | **Cash Payment and New Activity?**                           |
| 10:50:48 | 15 | MR. JOLLEY:   Objection, lacks foundation.                   |
|          | 16 | Objection, calls for speculation.                            |
| 10:51:30 | 17 | THE WITNESS:   Based on the -- the footings and              |
|          | 18 | the definitions they have here -- the -- the -- the          |
|          | 19 | top line, when you -- USOC New Activity, the 512 --          |
|          | 20 | would represent cash payments and pledges,                   |
|          | 21 | contri -- cash contributions and pledges -- which,           |
|          | 22 | pledges are not cash.                                        |
| 10:51:53 | 23 | The bottom portion, the -- where you see Cash                |
|          | 24 | Payments -- that would be cash payments that                 |
|          | 25 | represent -- came from the contri -- cash                    |

85

EXHIBIT 19
014

| | | |
|---|---|---|
| | 1 | designated officer for executing those documents. |
| 11:21:53 | 2 | **Q    Oh, okay.   So, in terms of the USOC, were you** |
| | 3 | **the same officer required for filings, or was that** |
| | 4 | **somebody else's job?** |
| 11:22:03 | 5 | A    I had the same responsibilities for the USOC. |
| 11:22:05 | 6 | **Q    Okay, so this document pertained to the USOPF.** |
| | 7 | **Was it your understanding that you had to file this** |
| | 8 | **statement with the State of California if you were going** |
| | 9 | **to be conducting any sort of solicitations in the state?** |
| 11:22:21 | 10 | A    That is correct.   So, given the date of -- of |
| | 11 | this, during this period -- we had just activated the |
| | 12 | USOPF, and we had to do file -- filings in any state we |
| | 13 | were going to do solicitation in -- and, again, each |
| | 14 | state requires different types of filing.   And this |
| | 15 | appears to be one, that was required for California, for |
| | 16 | us to initiate the setup of solicitation for the new |
| | 17 | corporation there. |
| 11:22:52 | 18 | **Q    Okay.   And based on your own understanding,** |
| | 19 | **were the requirements the same for the USOC, that you** |
| | 20 | **had to file this if you were going to do solicitations** |
| | 21 | **in the state?** |
| 11:23:01 | 22 | A    Yes, that -- and that would have been done -- |
| | 23 | and this is, typically, a one-time filing that's |
| | 24 | required.   It's not an annual for this (indicating). |
| | 25 | This triggers the annual reporting, but -- so the USOC's |

EXHIBIT 19
015

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |

was obviously done years before I assumed the position.
You only do -- you only do this filing, typically, once
(indicating), and you -- you -- unless you violate some
law, or whatever, and get the -- or lose your status as
a -- as a non-exempt -- a tax-exempt organization --
with the eligibility for solicitation in the state.

11:23:39  7    **Q    Okay.  As you sit here today, do you know if**
8    **the USOC ever filed one of these with the State of**
9    **California?**
11:23:49 10    A    I --
11:23:49 11    **Q    And when I say "one of these," S&DC, dash S**
12    **slash 9 -- S -- S slash N, excuse me -- Statement and**
13    **Designation by a Foreign Corporation.**
11:23:57 14         THE COURT REPORTER:  I'm sorry, "Statement and
15         Designation"?
11:23:57 16    BY MR. CUNNY:
11:24:01 17    **Q    By a Foreign Corporation.**
11:24:07 18    A    I -- I cannot say that in the affirmative.  I
19    can only say, understanding how the rules of the State
20    worked, and this was required to set up the USOPF, my
21    assumption would be, at some point this time,
22    previously, the USOC had to do the same thing with the
23    State of California.
11:24:30 24         I can only say, for the USOC, on an annual
25    basis we did the reporting that was required.  In this

102

EXHIBIT 19
016

```
            1    details.
11:54:59    2         Q    Gotcha.  So, on Page 2, of the document that I
            3    showed you, the first full paragraph below that heading
            4    says:  The 49-year-old, who has -- who has previously
            5    won the Woman in -- Women in Sports and Events' Woman of
            6    the Year Award, and was on last year's Forbes list of
            7    the Most Powerful Women in Sport, has been tasked with
            8    achieving more than $5 billion in revenue for the Games.
            9    She has also been named the chief -- chief executive --
           10    of the joint marketing venture between the USOC and
           11    LA 2028 - U.S. Olympic and Paralympic Properties.
11:55:40   12              Were you ever made aware that the $5 billion
           13    number was the revenue goal for the 2028 Olympics?
11:55:50   14              MR. JOLLEY:  I -- I will object it's beyond
           15         the scope of the jurisdictional discovery.  I am
           16         not going to instruct the witness.
11:55:56   17              THE WITNESS:  The number sounds in the
           18         ballpark, to what had been proposed back when I was
           19         with the USOC, so, it looks in the ballpark.
11:56:09   20    BY MR. CUNNY:
11:56:09   21         Q    Okay.  Gotcha.  And aside from sort of hearing
           22    through the USOC grapevine, did the U.S. -- do you
           23    currently have any role with the joint venture or the
           24    organizing committee or USOC, formally?
11:56:26   25         A    No.
```

125

EXHIBIT 19
017

12:22:21  1        Q    Okay.   And in creating the Form 990s,
          2   essentially you're putting all the expenses for the year
          3   into this document, including revenue, the expenses, all
          4   the financial information correct?
12:22:34  5        A    Yes.
12:22:34  6        Q    Okay.   So, on Page 2249, there is reference,
          7   in this Form 990, to TruGreen Landcare Regional.   Do you
          8   see that?
12:22:45  9        A    Yes.
12:22:46 10        Q    And was that one of the independent
         11   contractors that USOC utilized in performing services?
12:22:54 12             MR. JOLLEY:   Objection, vague and ambiguous.
12:22:58 13             THE WITNESS:   That was the contract the --
         14        that the USOC -- I believe they would use as the
         15        landscaping services for Chula Vista.
12:23:08 16   BY MR. CUNNY:
12:23:08 17        Q    Okay.   So, during this period -- and I can
         18   find which Form 990 this is -- but, during this period,
         19   the landscaping was over $500,000 for -- that was paid
         20   to TruGreen Landcare?
12:23:25 21             MR. JOLLEY:   Objection.   The document speaks
         22        for itself.
12:23:27 23             THE WITNESS:   Yes, that appears to be the
         24        case.   Yes.
12:23:30 25   BY MR. CUNNY:

EXHIBIT 19
018

**Glover, Walter**
**Nassar Cases**

| | | |
|---|---|---|
| 12:30:41 | 1 | **Q    So, I believe the first page of the document** |
| | 2 | **is 2180, and it has, on the top right-hand corner, a** |
| | 3 | **2006.  So would it comport with your recollection that** |
| | 4 | **the document, produced at 2248, would have been in the** |
| | 5 | **2006 Form 990 for USOC?** |
| 12:31:05 | 6 | A    I -- I believe it was around that time. |
| | 7 | That's what I recall, that we would have paid out those |
| | 8 | legal expenses.  And that's the firm.  That's -- that's |
| | 9 | why I recognize that firm's name as being the one we |
| | 10 | used for that purpose. |
| 12:31:20 | 11 | **Q    Gotcha.  Has the USOC -- aside from Manatt,** |
| | 12 | **Phelps & Phillips during the time that you were at** |
| | 13 | **USOC -- enlisted any other California law firms to** |
| | 14 | **represent it?** |
| 12:31:36 | 15 | MR. JOLLEY:  Other than current counsel? |
| 12:31:37 | 16 | BY MR. CUNNY: |
| 12:31:38 | 17 | **Q    Other than current counsel, obviously.** |
| 12:31:43 | 18 | A    There -- there may have been.  I mean, |
| | 19 | generally -- we -- we, generally, had used Colorado |
| | 20 | Springs-based attorneys, and then I -- I know we |
| | 21 | switched to Covington probably around 2009 or '10. |
| | 22 | That's the primary.  But prior to that, the primary -- |
| | 23 | primary USOC attorneys -- had been Colorado |
| | 24 | Springs-based. |
| 12:32:25 | 25 | **Q    And was it Bryan -- was it Bryan Cave** |

141

EXHIBIT 19
019

| | | |
|---|---|---|
| 12:35:44 | 1 | A    Yes. |
| 12:35:46 | 2 | Q    And in doing that calculation, that's one of |
| | 3 | the biggest expenses for USOC -- other than Member |
| | 4 | Support, right above it, correct? |
| 12:35:55 | 5 | A    Correct. |
| 12:36:02 | 6 | Q    Okay.  I want to turn your attention to |
| | 7 | Page 12 -- and specifically Parts 10a and b -- actually, |
| | 8 | just 10a.  After you have a second to review it, just |
| | 9 | let me know. |
| 12:36:25 | 10 | A    (Brief pause)  Okay. |
| 12:36:25 | 11 | Q    All right.  And so, specifically, on 10a, it |
| | 12 | says, "Land, buildings, and equipment:  Cost or other |
| | 13 | base" -- "other basis."  "Complete Part VI of |
| | 14 | Schedule D."  And then it says, 10a, 192 million, |
| | 15 | four-forty -- four-hundred-forty-nine-thousand, |
| | 16 | two-hundred-twenty-four dollars. |
| 12:36:46 | 17 | Do you see that? |
| 12:36:48 | 18 | A    Yes. |
| 12:36:49 | 19 | Q    What is included in all of that number, that |
| | 20 | 192 million?  Is that just the training centers, or is |
| | 21 | that something else included? |
| 12:37:11 | 22 | A    This would include all the building, land, and |
| | 23 | equipment, of the USOC.  It would include the -- the two |
| | 24 | training centers.  Lake Placid is a leased facility, but |
| | 25 | it would include all the equipment, furnishing, and |

144

EXHIBIT 19
020

1  fixtures, in there, and it includes the headquarters

2  building -- because, if you look at the number -- if you

3  go down to Line C -- 10c, if you go over and look at

4  10c -- you see that the -- the end of the year --

5  beginning-of-the-year value was -- was 60 million, the

6  end of the year was 96.

12:37:46  7           That was the -- the USOC recognized the

8  headquarters building.  It recognized the value of that

9  because it is called -- it's essentially a capital to

10  the lease.  And a capital lease is you put the value of

11  it on your balance sheet.

12:38:06  12           So that's why the value went up.  So, this

13  would include the training centers, all -- and the

14  headquarters building -- and all furniture and

15  fixtures --

12:38:16  16      Q    Okay.

12:38:16  17      A    -- and equipment, all the capital assets.

12:38:20  18      Q    Gotcha.  And so, in that 10c column, on the

19  left side, regarding the beginning of the year --

12:38:27  20      A    Uh-huh.

12:38:28  21      Q    Is that the depreciated value?

12:38:31  22      A    Yes.

12:38:31  23      Q    Basically, 10a minus 10b?

12:38:35  24      A    Yes.

12:38:35  25      Q    Okay.  And that depreciated value, the

EXHIBIT 19
021

1   $60,335,149, is -- includes Chula Vista, Colorado

2   Springs, and Lake Placid?

12:38:51  3     A   Yes.

12:38:51  4     Q   And you mentioned that Lake Placid was a

5   leased facility.  Did USOC ever own Lake Placid --

12:39:00  6     A   No.

12:39:00  7     Q   -- or any part of it?

12:39:02  8     A   No, it did not.  It only owns the -- the

9   fixture and equipment.  It does not own the buildings

10   nor the land.

12:39:11 11     Q   Okay.  And it has rights under the lease,

12   obviously, but it doesn't actually own the land?

12:39:17 13     A   Correct.

12:39:23 14     Q   So would it be fair to say that the USOC only

15   owns the land in the states of Colorado and

16   California -- during -- from '95 until January of 2017?

12:39:35 17        MR. JOLLEY:  Objection, vague and ambiguous.

12:39:44 18        THE WITNESS:  The only places, yes.

12:39:48 19   BY MR. CUNNY:

12:39:48 20     Q   Okay.  All right.  And Page 512, which is

21   Page 28 of the document -- I have Part VI.  If you could

22   review that, briefly.

12:40:16 23     A   (Brief pause)  Yes.

12:40:17 24     Q   Okay.  And is that a breakout of the

25   calculations that were done earlier?

EXHIBIT 19
022

C E R T I F I C A T E

STATE OF COLORADO  )
                   )   ss.
COUNTY OF EL PASO  )

        I, Laura K. McMahon, RPR, a
Professional Court Reporter and Notary Public within and
for the State of Colorado, do hereby certify that
previous to the commencement of the examination of the
Deponent, a witness, called for examination under the
Federal Rules of Civil Procedure, was duly sworn or
affirmed by me to testify the truth in relation to the
matters in controversy now pending and undetermined
between the said parties, so far as the Deponent should
be examined concerning the same;

        That said proceedings were taken in
shorthand by me, at the time and place heretofore set
forth, and was reduced to typewritten form under my
supervision;

        That the foregoing is a true
transcript of the questions asked, testimony given, and
the proceedings had;

        That I am neither attorney nor
counsel, nor in any way connected with any attorney or
counsel for any of the parties to said action, nor
otherwise interested in the outcome of this litigation.

        IN WITNESS WHEREOF, I have hereunto
set my hand this 17th day of November, 2018.

        My commission expires May 12, 2020.

                Laura K. McMahon, RPR

EXHIBIT 19
023

# EXHIBIT "20"

# About the Lake Placid Olympic Training Center



The U.S. Olympic Training Center in Lake Placid, N.Y., opened in 1982 and rests in the shadows of the Adirondack Mountains. In 1987, the New York Olympic Regional Development Authority assisted the USOC with improvements to the Lake Placid Olympic Training Center by building new housing, dining and gymnasium facilities. The renovation completed on 29 acres of land in 1989.

The LPOTC was the home of the 1932 and 1980 Olympic Winter Games. The center caters to biathlon, bobsled & skeleton, figure skating, hockey, luge, ski & snowboard and speed skating are the most frequent sports to train on complex. Other sports training at the center include boxing, canoe and kayak, judo, rowing, synchronized swimming, team handball, water polo and wrestling.

The LPOTC has since helped benefit thousands of Olympic hopefuls, numerous community groups and countless visitors from around the globe.



EXHIBIT 20
001

1/3



## Contact Us

Lake Placid Olympic Training Center

196 Old Military Road | Lake Placid, NY 12946
Phone: (518) 523-2603



(http://www.teamusa.org/about-the-usoc/olympic-training-centers/lpotc/visit)

## Visit Now (http://www.teamusa.org/about-the-usoc/olympic-training-centers/lpotc/visit)

Governance

EXHIBIT 20
002

**Resources**                                                          ›

**Get Involved**                                                       ›

©2018 United States Olympic Committee. All Rights Reserved.

EXHIBIT 20
003

# About the Colorado Springs Olympic Training Center

### Team USA At The OTC | Episode 1

In the series debut, we take a look at the results of Olympic Trials for canoe/kayak and weightlifting, and get a sneak peek at the sec...



The U.S. Olympic Complex in Colorado Springs is the flagship training center for the U.S. Olympic Committee and the Olympic Training Center programs. USA Swimming and USA Shooting have their national headquarters on complex. More than 15 other member organizations, as well as two international sports federations and the USOC headquarters are also located in Colorado Springs, Colorado.

The CSOTC is able to provide housing, dining, training facilities, recreational facilities and other services for more than 500 athletes and coaches at one time on the complex. Athletes are selected to train at the Colorado Springs Olympic Training Center by their respective National Governing Body.



**Resident Sports**
**The Colorado Springs Olympic Training Center is home to sport facilities and support services for the following summer Olympic, Paralympic, Pan American and Parapan American sports:**

EXHIBIT 20
004

Boxing
Cycling (Olympic and Paralympic)
Figure skating
Gymnastics
Paralympic Judo
Pentathlon
Shooting (Olympic and Paralympic)
Paralympic Swimming
Wrestling



## Contact Us

U.S. Olympic Training Center
1 Olympic Plaza | Colorado Springs, CO 80909
Phone: (719) 866-4618
Email: csotc.visitorcenter@usoc.org (mailto:csotc.visitorcenter@usoc.org)

EXHIBIT 20
005



(http://www.teamusa.org/about-the-usoc/olympic-training-centers/csotc/tours)

## Buy Your Tickets Now (http://www.teamusa.org/about-the-usoc/olympic-training-centers/csotc/tours)

**Governance** ⟩

**Resources** ⟩

**Get Involved** ⟩

©2018 United States Olympic Committee. All Rights Reserved.

EXHIBIT 20
006

# EXHIBIT "21"

**CONSULTING AGREEMENT**
**[Olympic Training Center, Chula Vista]**

This CONSULTING AGREEMENT ("Agreement") is entered into effective as of August 1, 2014 (the "Effective Date"), by and between the United States Olympic Committee, a federally chartered non-profit entity ("USOC"), the City of Chula Vista, a chartered municipal corporation ("City") and JMI Sports, a Delaware limited liability company ("Consultant" or "JMIS") with reference to the following facts:

A.     USOC and City are currently evaluating the desirability and feasibility of transferring ownership and/or operational control of the land, facilities and operations of Chula Vista Olympic Training Center ("CVOTC") from USOC to City.

B.     USOC and City agree that specialized consultant services are necessary and appropriate to assist with this evaluation.

C.     USOC believes that JMIS should be engaged for this purpose based on JMI's extensive and unique expertise in this area; City has evaluated JMIS's credentials and agrees to engage JMI as set forth herein.

D.     JMIS has indicated that it is willing and able to perform the consultant services desired on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for valuable consideration given and received, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do agree as follows:

I.     CONSULTANT SERVICES

Section 1.1     Status as Consultant.  USOC and City (sometimes referred to collectively herein as "USOC/City") hereby jointly retain Consultant to act as an independent contractor in rendering services to USOC/City as described herein.

Section 1.2     Defined Services.  At the direction of USOC and City, Consultant shall perform the services described on **Exhibit A** attached hereto ("Defined Services").  USOC/ City may from time to time, reduce the Defined Services to be performed by the Consultant under this Agreement. Upon doing so, USOC/City and Consultant agree to meet in good faith and confer for the purpose of negotiating a corresponding reduction in the compensation associated with the reduction.

Section 1.3     Additional Services.  In addition to performing the Defined Services, USOC/City may jointly request Consultant to perform additional consulting services related to the Defined Services ("Additional Services"), and upon doing so in writing with confirmation from each party, if they are within the scope of services offered by Consultant, Consultant shall perform same on a time and materials basis at the rates set forth in the "Rate Schedule" set forth in **Exhibit B** attached hereto, unless a separate fixed fee is otherwise agreed upon. All compensation for Additional Services

EXHIBIT 21
001

shall be paid monthly as billed. In the event USOC and City do not jointly identify and request Additional Services, each of the USOC and City may individually request Additional Services, provided however, that in such event the party specifically requesting the Additional Services shall be solely responsible for payment for such Additional Services monthly as billed ("Single Party Additional Services").

Section 1.4     USOC/City Contract Manager.     Consultant shall perform the Defined Services and any Additional Services at the joint direction of the USOC and City representative(s) designated by each party, respectively, in writing. Except as set forth in Section 1.3 above, in the event of conflicting direction, Consultant shall not proceed with any work until receiving consistent direction in writing from both the USOC and City designated representatives.

Section 1.5     Professional Standards.     Consultant shall perform the services described in this Section in accordance with commonly accepted professional standards for consultants in the same industry as Consultant.

Section 1.6     Other Contracts.     USOC/City shall not be prohibited from requesting like services from any other independent contractor during the term of this Agreement. Similarly, provided that such action does not interfere with Consultant's ability to perform its duties under this Agreement in a timely manner, or create a conflict of interest as provided in Section 8.13 hereof, below, Consultant may perform like services for others without restriction.

II.     TERM

Section 2.1     Term.     The term of this Agreement ("Term") shall commence on the Effective Date and shall terminate on January 31, 2015 unless otherwise terminated earlier as provided in Section VI, or extended as provided in Section 2.2, below.

Section 2.2     Extended Term.     To the extent USOC/City requests that Consultant continue to provide services similar to those described in **Exhibit A** after the date set for termination of this Agreement, the terms of this Agreement shall continue to control the relationship among the parties until such time as any party terminates the Agreement and the relationship.

III.     CONSULTING FEES

Section 3.1     Consulting Fee.     For Services rendered by Consultant under the terms of this Agreement, USOC/City shall pay Consultant in accordance with the milestones and rate schedule attached hereto as **Exhibit B**. Consultant shall receive no other compensation for the services provided hereunder, even if Consultant's services lead to a real estate transaction between USOC and City. Consultant expressly waives any and all claim to, any broker's fee, finder's fee or similar compensation in connection therewith.

8.27.14

EXHIBIT 21
002

Section 3.2        Payment Process.

(a) Invoice. Consultant must submit an invoice to both USOC and City before payment will be processed. An invoice must be submitted for every payment under the contract. Any billing submitted by Consultant shall contain sufficient information as to the propriety of the billing to permit USOC and City to evaluate that the amount due and payable is proper.

(b) Payment. Upon receipt and approval of a properly prepared invoice from Consultant, USOC and City shall compensate Consultant for all services rendered by Consultant according to the terms and conditions of this Agreement.

(c) Payment Not Final; Approval. Consultant understands and agrees that payment to the Consultant for any services or costs does not constitute a USOC/City final decision about whether those services or costs are allowable and eligible for payment hereunder and does not constitute a waiver of any violation of Consultant of the terms of the Agreement. The Consultant acknowledges that USOC and City will not make a final determination about the eligibility of any payment until the final payment has been made on the Project or the results of an audit of the Project requested by the City has been completed, whichever occurs latest. If USOC or City determines that the Consultant is not entitled to receive any portion of the compensation due or paid, USOC/City will notify the Consultant in writing, stating its reasons. The Consultant agrees that project closeout will not alter the Consultant's responsibility to return any funds due USOC/City as a result of later refunds, corrections, or other similar transactions; nor will project closeout alter the right of USOC/City to disallow costs and recover funds provided for the project on the basis of a later audit or other review. Upon notification to the Consultant that specific amounts are owed to USOC/City, whether for excess payments or disallowed costs, the Consultant agrees to remit promptly the amounts owed, including applicable interest.

(d) Cost Sharing. Consultant acknowledges and agrees that USOC and City have agreed to share the cost of Consultant's compensation for services rendered under this Agreement, and to cap City's responsibility for such cost as follows: For the first three months, the parties shall share costs 50/50 provided that City's costs for each month shall not exceed $10,000 per month. Unless otherwise communicated to Consultant in writing by both USOC and City, City's maximum payment obligation for Consultant's performance of the Defined Services under this Agreement shall be $35,000; USOC shall be solely responsible for any and all compensation due and payable to Consultant hereunder in excess of $35,000, provided however, that the foregoing shall not supercede the provisions set out in Section 1.3 above, and in the event the City requests any Single Party Additional Services, the City shall be solely responsible for such Single Party Additional Services regardless of how much the City may have already provided to Consultant.

EXHIBIT 21
003

IV.   NON-EMPLOYMENT AND NO BENEFITS

Section 4.1     Non-Employment. FOR THIS AGREEMENT AND FOR ALL OTHER PURPOSES, CONSULTANT SHALL BE CONSIDERED AN INDEPENDENT CONTRACTOR. NEITHER CONSULTANT, NOR ANY OF ITS PRINCIPAL(S), EMPLOYEES, SUBCONTRACTORS OR AGENTS SHALL BE CONSIDERED AN EMPLOYEE OF EITHER USOC OR CITY. If for any reason a court of law or other government agency determines that Consultant, its principal(s), employees, subcontractors, or agents should have been classified as employee(s) of the USOC or City for all or any part of the term during which Consultant is performing services for the USOC or City, Consultant agrees that Consultant, its principal(s), employees, subcontractors, or agents who should have been classified as employees shall be considered to have belonged to a category of employee specifically not entitled to benefits under any of the USOC's and/or City's, as the case may be, benefit programs. Further, Consultant understands, acknowledges, and agrees that this Agreement is not an offer of employment to Consultant, its principal(s), employees, subcontractors, or agents, that no such offer has been made, and that this Agreement outlines the full extent of the understanding among the parties.

Section 4.2     Notification to Consultant's Employees, Subcontractors and Agents. Consultant agrees to inform all of Consultant's principal(s), employees, subcontractors, and agents who perform pursuant to this Agreement, that under no circumstances are they, or will they be considered to be, employees of the USOC or City. Likewise, the parties recognize and understand that under no circumstances will the principal(s) employees, subcontractors or agents of Consultant, who perform pursuant to this Agreement, be considered to be employees of the USOC or the City.

Section 4.3     No Benefits. Neither Consultant, nor Consultant's principal(s), employees, agents or subcontractors shall participate in any insurance, incentive compensation, or other benefit programs which may be applicable to the employees of the USOC or the City. Specifically, Consultant understands and agrees that Consultant and its principal(s), employees, agents and subcontractors are not entitled to participate in any of the USOC's or the City's benefit plans.

Section 4.4     Vacation, Sick and Personal Leave. Neither Consultant, nor Consultant's principal(s), employees, agents or subcontractors shall earn, accrue or be entitled to vacation, or sick or personal leave.

Section 4.5     Workers' Compensation. **NEITHER CONSULTANT, NOR CONSULTANT'S PRINCIPAL(S), EMPLOYEES, AGENTS OR SUBCONTRACTORS SHALL BE COVERED UNDER THE USOC'S OR CITY'S WORKERS' COMPENSATION INSURANCE.** CONSULTANT IS RESPONSIBLE FOR OBTAINING AND MAINTAINING, OR OTHERWISE SECURING, APPROPRIATE WORKERS' COMPENSATION COVERAGE FOR ITS PRINCIPAL(S), EMPLOYEES, AGENTS AND SUBCONTRACTORS.

EXHIBIT 21
004

Section 4.6     Unemployment Compensation.  NEITHER CONSULTANT NOR CONSULTANT'S PRINCIPAL(S), EMPLOYEES, AGENTS OR SUBCONTRACTORS ARE ENTITLED TO UNEMPLOYMENT COMPENSATION BENEFITS DUE TO CONSULTANT'S PERFORMANCE OF CONSULTING SERVICES UNDER THIS AGREEMENT OR DUE TO TERMINATION OR NONRENEWAL OF THIS AGREEMENT.

Section 4.7     Employment Taxes.  **CONSULTANT IS RESPONSIBLE FOR ALL EMPLOYMENT TAXES, INCLUDING FEDERAL AND STATE TAXES AND UNEMPLOYMENT TAXES, FOR ITS PRINCIPAL(S), EMPLOYEES, AGENTS, AND SUBCONTRACTORS.**

V.     CONSULTANT'S OBLIGATIONS

Section 5.1     Non-Assignment.  USOC/City have specifically contracted for Consultant's services, and Consultant may not assign or delegate its obligations under this Agreement, either in whole or in part, to any person, firm or corporation (other than Consultant's own principal(s) or employees) without the prior written consent of USOC/City.  Consultant's breach of this provision shall be grounds for immediate termination of this Agreement.

Section 5.2     Equipment/Materials.  Consultant shall provide Consultant's own equipment, materials, appropriate assistance, and services for the performance of Consultant's services.

Section 5.3     Control.  Consultant shall control its own employees, agents and subcontractors and shall ensure that the services described in Section I, above, are performed in accordance with applicable law, recognized standards of practice and the terms of this Agreement.

Section 5.4     Other USOC Vendors.  Consultant agrees not to unreasonably refuse to work with USOC's other vendors, sponsors, and/or product donors when requested by the USOC.

Section 5.5     Indemnification.  To the maximum extent allowed by law, Consultant shall indemnify, protect, defend and hold harmless the City, and its elected and appointed officers, agents and employees, and the USOC, and its volunteers, committees, members, committee members, officers, directors, employees, and agents (collectively, the "Indemnified Parties") from and against any and all claims, demands, causes of action  (at law or in equity), costs, expenses, (including reasonable attorney's fees and court costs), liability, loss, damage or injury, to property or persons, including wrongful death (collectively, "Losses"), arising out of, or incident to, directly or indirectly, any alleged or actual acts, omissions, negligence, or willful misconduct of Consultant, its officials, officers, employees, agents, and contractors, relating to the performance of Contractor's scope of services under this Agreement, or the product of such performance.  Contractor's obligations under this Section shall include Losses arising from the active or passive

8.27.14                                      5

EXHIBIT 21
005

negligent acts or omissions of the Indemnified Parties when committed in combination with covered acts or omissions of Consultant, its employees, agents or officers, or any third party; but shall not include Losses arising from the sole negligence or sole willful misconduct of the Indemnified Parties. Consultant's obligations under this Section 5.5 shall survive the termination of this Agreement.

Section 5.6    Insurance. Consultant shall comply with the insurance requirements set forth in **Exhibit C** attached hereto. Consultant's obligations under Section 5.5, above, shall not by limited to insurance proceeds, if any, received by USOC or City, or any of their respective directors, officials, officers, employees, agents or volunteers.

Section 5.7    Taxes. CONSULTANT AGREES TO PAY ALL APPLICABLE STATE AND FEDERAL TAXES ON THE MONIES RECEIVED BY CONSULTANT UNDER THIS AGREEMENT. THE USOC AND THE CITY WILL EACH REPORT PAYMENTS TO CONSULTANT ON THE IRS FORM 1099.

Section 5.7    Records Retention; Access. During the course of the work and for three (3) years following completion, the Consultant agrees to maintain, intact and readily accessible, all data, documents, reports, records, contracts, and supporting materials relating to the Defined Services and any Additional Services. The Consultant agrees to permit, and require its subcontractors to permit City, the USOC or their respective authorized representatives, upon request, to inspect all project work, materials, payrolls, and other data, and to audit the books, records, and accounts of the Contractor and its subcontractors pertaining to the project. Consultant agrees that project closeout does not alter the reporting and record retention requirements of this Agreement.

VI.    TERMINATION

Section 6.1    Termination for Cause. USOC and City may terminate this Agreement upon written notice in the event Consultant is not reasonably performing the services, as determined in USOC/City's reasonable discretion. If warranted, the USOC/City will provide Consultant ten (10) days written notice to cure such default. In the event Consultant is given a cure period and does not cure or provide written assurance of its ability to cure the default within no more than twenty (20) days after USOC/City's original notice, the Agreement will terminate upon the expiration of the cure period.

Section 6.2    Termination for Convenience. Notwithstanding anything to the contrary contained herein, USOC/City jointly, or either USOC or City separately, may cancel and terminate this Agreement for convenience by giving Consultant not less than thirty (30) days prior written notice, which notice shall state the date of cancellation and termination.

8.27.14

EXHIBIT 21
006

Section 6.3      Compensation in the Event of Termination.  If Consultant's services are terminated, postponed or revised, or if it shall be discharged, for any reason, by convenience or otherwise, before all the Defined Services and any Additional Services requested have been completed, or if the Defined Services and any Additional Services for any reason shall be stopped or discontinued, Consultant shall be paid only for the portion of the Defined Services and Additional Services which have been satisfactorily completed at the time of such dismissal, termination, postponement, revision or stoppage.

Section 6.4      Notice.  Notice of termination shall be sent in accordance with Article VII below.

VII.   NOTICES

Section 7.1      Notices.  All notices given by one party to the other under this Agreement shall be in writing, mailed or delivered personally, by fax, or by overnight delivery to the other party at the following addresses:

If to the USOC/City:

The United States Olympic Committee
1 Olympic Plaza
Colorado Springs, CO 80909
Attn:  Chief Executive Officer
Fax:  (719) 866-4839

With a copy to the USOC General Counsel (at the same address and fax number)

AND

City of Chula Vista
276 Fourth Avenue
Chula Vista, CA 91910
Attn:     City Manager
Fax: (619) 409-5823

With a copy to the City Attorney (at the same address and fax number)

If to Consultant:

JMI Sports
629 J Street, Suite 205
San Diego, CA 92101
Attn: Erik Judson
Fax: (619) 756-6341

8.27.14

EXHIBIT 21
007

Any party may at any time, by proper notice, designate a different address or fax number to which notices shall be sent.

Mailed notices shall be sent by United States Mail, certified or registered, return receipt requested, postage prepaid. Notices shall be deemed to have been duly given and received (a) seventy-two hours after depositing the notice in the United States Mail, if mailed, (b) on the day after the date sent, if sent by overnight express mail, (c) on the day of delivery, if hand delivered, (d) on the date confirmed by fax confirmation, if sent by fax, and (e) on the date delivered, if by commercial delivery service.

VIII.   MISCELLANEOUS

Section 8.1   Applicable Law. The laws of the State of California shall govern the validity, performance and enforcement of this Agreement.

Section 8.2   Entire Agreement; Modifications. This Agreement and the attached Exhibits, which are incorporated herein by this reference, contain the entire agreement between the parties; any and all other agreements written or verbal with respect to the subject matter hereof are hereby superseded. This Agreement may not be modified except by an instrument in writing signed by all parties.

Section 8.3   Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

Section 8.4   Representations. The parties hereto acknowledge and agree that they have not relied upon any statements, representations, agreements, or warranties, except such as are expressed in this Agreement.

Section 8.5   Dispute Resolution. Any dispute concerning the interpretation of this Agreement, or the parties' obligations hereunder, shall be resolved by final binding arbitration submitted to the American Arbitration Association. Arbitration shall be conducted under the then-existing rules of the American Arbitration Association for Commercial Arbitration, except as amended herein. The place of the arbitration shall be in San Diego, California, unless otherwise agreed to by the parties. The arbitrator will be selected pursuant to the mutual agreement of the parties, and if the parties are unable to agree, the arbitrator will be designated by the Administrative Office of the American Arbitration Association. Any award rendered by the arbitrator shall be enforced, if necessary, in the Superior Court, County of San Diego. The arbitrator may award any relief recognized by California law, which could be awarded by the Superior Court, County of San Diego, including injunctive relief and attorneys' fees. The arbitrator may award reasonable attorneys' fees and costs as set forth in Section 8.6 below. Notwithstanding the foregoing, no arbitration shall be brought arising out of this Agreement against City unless a claim has first been presented in writing and filed with City and acted upon by City in accordance with the procedures set forth in Chapter 1.34 of the Chula Vista Municipal Code, as same

8.27.14

8

EXHIBIT 21
008

may from time to time be amended, the provisions of which are incorporated by this reference as if fully set forth herein, and such policies and procedures used by City in the implementation of same. To the extent a dispute involves allegations against both City and USOC, no arbitration shall be brought as to USOC until such time as the provisions set forth in the forgoing sentence as to claims against City have been completed.  Upon request by City, Consultant shall meet and confer in good faith with USOC and City for the purpose of resolving any dispute over the terms of this Agreement.

Section 8.6     Reimbursement of Attorneys' Fees and Costs.  In any dispute concerning this Agreement, in the event that any party must employ legal counsel to enforce its rights hereunder, then the prevailing party shall be entitled to reimbursement of all fees and costs, including reasonable attorneys' fees, from the non-prevailing party or parties, whether or not legal action or arbitration is instituted.

Section 8.7     Confidential Information.

(a) Consultant acknowledges that, in the course of providing services to USOC/City, Consultant and its principal(s), employees, agents and subcontractors may have access to information that is not known by, or generally available to, the public at large and which concerns the business or affairs of the USOC, or the National Governing Bodies or Paralympic Sports Organizations.  Consultant and its principal(s), employees, agents and subcontractors may also have access to information provided to USOC/City by third parties on a confidential basis (collectively, "Confidential Information").

(b) Consultant and its principal(s), employees, agents and subcontractors shall preserve and protect the confidentiality of Confidential Information and all physical forms thereof.  Neither Consultant nor its principal(s), employees, agents or subcontractors shall use any Confidential Information for Consultant's own benefit or for the benefit of any third party.

(c) All records, files, and documents (or copies thereof) which Consultant prepares, uses, or comes into contact with and which contain Confidential Information, will be and remain the sole property of the USOC and will not be disclosed to any third party without the prior written consent of the USOC.  The USOC shall have no obligation to identify specifically any information as to which the protections of this Section 8.7 apply.

(d) Should the USOC receive credible evidence to demonstrate satisfactorily to the USOC (at the USOC's sole discretion) that Consultant has breached the provisions of this Section, the USOC has the right to terminate this Agreement immediately and will pay Consultant for all service costs incurred through the date of termination.

(e) Upon expiration or termination of this Agreement for any reason, or upon request by the USOC, Consultant agrees to promptly return to the USOC all documents

8.27.14

9

EXHIBIT 21
009

and tangible forms of Confidential Information that Consultant may have obtained from the USOC, as well as all tangible forms of Confidential Information created by Consultant for the USOC prior to or during the term of this Agreement. Consultant shall not retain any documents or other materials, or any copies or excerpts in any form, which contain or pertain to any Confidential Information, unless otherwise authorized by the USOC in writing.

(f) USOC and City shall enter into a separate agreement that shall govern the USOC/City relationship with respect to confidential information.  The parties shall provide a copy of such agreement to Consultant.  To the extent that the terms of that separate agreement relate to and are consistent with Consultant's duties with respect to Confidential Information under this Agreement, as part of Consultant's duties hereunder, Consultant shall also comply with the terms of that agreement.

Section 8.8        Ownership of Work Product; Non-Infringement.

(a) USOC and City shall jointly own all documents, data, results, graphics, programs, or any other materials developed by Consultant as part of performance of the services provided to the USOC pursuant to this Agreement ("Work Product"), including copyrights to (or other intellectual property rights in) such Work Product.  To the extent that any Work Product is not the property of USOC/City by operation of the law (i.e., not a "work for hire"), Consultant hereby irrevocably assigns, transfers and conveys to the USOC/City all of Consultant's rights, title and interest in such Work Product.

(b) Consultant represents and warrants that the Work Product provided to USOC/City under this Agreement, and its use thereby, will not infringe upon or constitute a misappropriation of any copyright, patent, trademark, trade secret, or other proprietary right of any third party.

(c) USOC and City shall enter into a separate agreement that shall govern their relationship with respect to Work Product.  The parties shall provide a copy of such agreement to Consultant.  To the extent that the terms of that separate agreement relate to and are consistent with Consultant's duties with respect to Work Product under this Agreement, as part of Consultant's duties hereunder, Consultant shall also comply with the terms of that agreement.

Section 8.9        Non-Disparagement.  Consultant hereby agrees not to disparage the principals or agents of the USOC or City in any manner whatsoever during the term of this Agreement or after its completion or termination.  Consultant agrees that this Section 8.9 is a material part of this Agreement, and that, should Consultant breach these terms, the USOC and/or City, as the case may be, will have a claim against Consultant for damages, including the amounts paid to Consultant under the Agreement.

8.27.14

10

EXHIBIT 21
010

Section 8.10    Effect of End of Term or Termination.  Provisions of this Agreement relating to confidentiality and the nondisclosure of Confidential Information, ownership of Work Product, non-disparagement, indemnification and insurance shall survive the term or termination of this Agreement.

Section 8.11    Publicity.  Consultant shall not at any time disclose (other than to its officers, directors, employees and professional advisors with a need to know, as applicable) any of the draft or final Work Product produced under the terms of this Agreement, thee terms of this Agreement, or make any public announcement concerning this Agreement or Consultant's affiliation with the USOC and/or the City, without prior written consent of the USOC and City.  Any officer, director, employee, or professional advisor of Consultant receiving information about this Agreement that is not otherwise public shall treat such received information as confidential.  Further, nothing in this Agreement shall be construed as giving Consultant, its principal(s), employees, agents or subcontractors the right to advertise or publicize its affiliation or relationship with the USOC or to use Olympic terminology in any way to promote its services without the prior written consent of the USOC.

Section 8.12    No Third Party Beneficiary.  It is expressly understood and agreed that enforcement of the terms and conditions of this Agreement, and all rights of action relating to such enforcement, shall be strictly reserved to the USOC and City and the Consultant, and nothing contained in this Agreement shall give or allow any such claim or right of action by any other or third person on such Agreement, including but not limited to the either party's contractors, subcontractors, consultants, subconsultants and suppliers. It is the express intention of the USOC, City and the Consultant that any person other than the USOC, City or the Consultant receiving services or benefits under this Agreement shall be deemed to be an incidental beneficiary only.

Section 8.13    Conflicts.  Neither the Consultant nor any subconsultant shall have other interests which conflict with the interests of the USOC or City, including being connected with the sale or promotion of equipment or material which may be used by the USOC, and the Consultant warrants and represents that Consultant has diligently conducted a search and inventory of Consultant's economic interests, including making inquiries with any subconsultants, and has determined that neither Consultant, nor any of Consultant's subconsultants, to the best of Consultant's knowledge, has an economic interest which would conflict with Consultant's duties under this Agreement.   Consultant specifically warrants, represents and agrees that:

(a) Neither Consultant, nor Consultant's immediate family members, nor Consultant's employees or agents ("Consultant Associates") presently have any interest, directly or indirectly, whatsoever in any property which may be the subject matter of the Defined Services, or in any property within 2 radial miles from the exterior boundaries of any property which may be the subject matter of the Defined Services ("Prohibited Interest").

EXHIBIT 21
011

(b) No promise of future employment, remuneration, consideration, gratuity or other reward or gain has been made to Consultant or Consultant Associates in connection with Consultant's performance of this Agreement. Consultant promises to advise USOC/City of any such promise that may be made during the Term of this Agreement, or for twelve months thereafter.

(c) Consultant Associates shall not acquire any Prohibited Interest within the Term of this Agreement, or for twelve months after the expiration of this Agreement, except with the written permission of USOC and City.

(d) Consultant may not conduct or solicit any business for any party to this Agreement, or for any third party that may be in conflict with Consultant's responsibilities under this Agreement, except with the written permission of USOC and City.

If City designates Consultant as an "FPPC Filer," then, upon City's request, Consultant shall file with City a formal Statement of Economic Interests on a form provided.

Section 8.14      Time of the Essence.  The parties agree that in the performance of the terms, conditions and requirements of this Agreement by the Consultant, time is of the essence.

Section 8.15      Agreement Conflict.  To the extent of any conflict or inconsistency between the terms of this Agreement and any exhibit, this Agreement shall control.

Section 8.16      No Waiver.  No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or shall be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement.

Section 8.17      Execution. This Agreement may be executed in counterparts and upon such execution, shall be fully binding and effective, just as if both of the parties had executed and delivered a single counterpart of this Agreement.  Without limiting the manner in which execution of this Agreement may be accomplished, execution by any party may be effected by facsimile transmission or PDF e-mail transmission of a signature page of this Agreement executed by such party.  Any party which effects execution by facsimile transmission or PDF e-mail transmission of a signature page shall also promptly deliver to the other party the counterpart physically signed by such party, but the failure of any party to furnish such physically-signed counterpart shall not invalidate the execution of this Agreement effected by facsimile transmission or PDF e-mail transmission.

Section 8.18      Capacity of Parties. Each signatory and party to this Agreement warrants and represents to the other parties that it has legal authority and capacity and direction from its principal to enter into this Agreement, and that all necessary

8.27.14

12

EXHIBIT 21
012

resolutions or other actions have been taken so as to enable it to enter into this Agreement.

THIS AGREEMENT IS A LEGAL DOCUMENT, AND CONSULTANT SHOULD CONSULT AN ATTORNEY IF CONSULTANT DOES NOT FULLY UNDERSTAND THE TERMS AND CONDITIONS HEREOF.

**[Remainder intentionally left blank.  Signatures follow on next page]**

8.27.14

13

EXHIBIT 21
013

**[SIGNATURE PAGE TO CONSULTING AGREEMENT**
**[Olympic Training Center, Chula Vista]**

IN WITNESS WHEREOF, by signing below the parties hereto enter into this Agreement as of the Effective Date

THE UNITED STATES OLYMPIC COMMITTEE

By: _____
Rick Adams,
Chief of Sport Operations and NGB Relations

CITY OF CHULA VISTA

By: _____
Gary Halbert, City Manager

Approved as to Form:

_____
Glen R. Googins, City Attorney

CONSULTANT

By: _____
Erik Judson, Chief Executive Officer

8.27.14                                    14

EXHIBIT 21
014

## EXHIBIT A

### DEFINED SERVICES

Consultant shall perform the following specific services:

I.  *Preliminary Analysis: Identify Potential Solutions under Shared Strategic Objectives*-Both the US Olympic Committee and the City of Chula Vista have identified objectives in an effort to move forward in a way that best serves both entities. Consultant will review background materials and identify potential solutions in response to shared objectives.  Research should include Olympic Training Sites that operate additional uses (coexisting uses) to balance financial feasibility.

II. *Determine Short List of Potential Solutions*- Consultant shall provide alternatives to the City on potential operating models that are feasible, viable, and beneficial to the City's goals. This short list of recommendations will be used in public outreach.

III. *Initial Community and Stakeholder Outreach*- Consultant shall assist in "Initial" community and stakeholder outreach by helping the City:  identify the proper list of initial stakeholders, identify desired "outcomes" from these early meetings, create key talking points, and provide advice regarding answers to questions that arise.

    a. Stakeholders are key partners that require direct and early engagement. They might include, but are not limited to: National Governing Bodies utilizing the site, regional and local chambers of commerce, San Diego National Sports Foundation, Home Fed (University Developer), regional persons related to the San Diego Olympic Bid, Southwestern College, Recreation Commission, San Diego Sports Commission, Eastlake Company, and the San Diego Sports Innovators.

    b. Early outreach with the public is critical to provide transparency. Consultant shall assist with public messaging and be present at multiple public meetings, including one or more at the training center in order to better connect with nearby residents and businesses.

IV. *Feasibility Analysis*- Consultant shall research the feasibility of various operational and financial models.  This includes examination of future opportunities and limitations on the site. Feasibility Analysis shall include:

    a. Viability of coexisting uses

    b. Financial Feasibility

    c. Legal Impediments, and Potential Legal Structures

    d. Asset Analysis

V.  *Follow-up Community and Stakeholder Outreach*-Follow-up outreach will provide the USOC and the City with the necessary guidance and feedback to help make an informed decision. Consultant shall help the USOC and the City communicate strategic recommendations, key messages, and other next steps. Consultant shall assist with public messaging and be present at multiple public meetings.

EXHIBIT 21
015

VI.   ***Develop and Finalize Detailed Plan***- Consultant shall develop a written draft and final Plan to present to both the USOC and the City of Chula Vista that: meets shared objectives, is financially feasible, operationally viable, accepted by the local community, and supported by regional stakeholders.

VII.  ***Plan Approvals*** - The Consultant shall present findings to the USOC and the City Council in their deliberation regarding the future ownership of the site. The USOC and the City will evaluate the proposed operating alternative. Consultant shall participate in Council presentations or workshops, present analysis; share compilations of community feedback, and make strategic recommendations.

VIII. ***Develop Action Plan***- Consultant shall develop a written draft and final action plan to implement proposed transfer and operating model upon agreement between both the USOC and the City. Action Plan should include specific actions, timelines, and responsible parties.

**In connection with the above-described specific services, and in support of the overall Project, Consultant shall also perform the following general services:**

a.   Creation and regular updates of Project Timeline which provides for the completion of all tasks by no later than January 31, 2015

b.   Weekly conference call/meetings to keep Project team current on activity

c.   Creation or review/advice of relevant materials

d.   Advice regarding answers to questions from media, stakeholders or members of the public

e.   Ongoing guidance, advice and "trouble-shooting" as-needed, in relation to this topic and scope of services.

EXHIBIT 21
016

## EXHIBIT B

### COMPENSATION

**In General.**

**In consideration for all of the Defined Services provided by Consultant hereunder, USOC and City shall compensate Consultant with monthly fixed fee payments as follows:**

| | |
|---|---|
| August | $20,000 |
| September | $20,000 |
| October | $20,000 |
| November | $20,000 |
| December | $10,000 |
| January | $10,000 |

**Materials and Costs.**

**There shall be no additional payments or reimbursements for materials, travel, or other out of pocket expenses incurred by Consultant in the performance of services herein described; instead, the fixed fee payments described above shall be the maximum amount of compensation to which Consultant shall be entitled for performance of the Defined Services.**

**Additional Services.**

**Unless otherwise agreed by the parties in writing, the compensation due and payable to Consultant for any "Additional Services" provided by Consultant hereunder pursuant to the terms of Section 1.3 hereof shall be based upon the hours of work performed billed at the following hourly rates:**

| | |
|---|---|
| **Erik Judson** | **$375** |
| **Kacie Renc** | **$275** |
| **Reba Robinson** | **$125** |
| **Zach Davis** | **$125** |
| **Administrator(TBD)** | **$75** |

8.27.14

17

EXHIBIT 21
017

## EXHIBIT C

### INSURANCE

Without limiting any other obligation or liability of Consultant under this Agreement, Consultant agrees that upon execution and throughout the term of this Agreement, Consultant shall procure and maintain the following insurance coverage:

1.1 **Commercial General Liability Insurance** with limits of not less than One Million Dollars ($1,000,000) per occurrence/Two Million Dollars ($2,000,000) aggregate, which includes Bodily Injury and Property Damage, and Personal and Advertising Liability coverages. Said coverage shall waive subrogation in favor of USOC and City, and will name "United States Olympic Committee and its directors, officers, employees, volunteers, agents and representatives" and "the City of Chula Vista, its officers, officials, employees, agents, and volunteers" as "Additional Insureds" as respects this Agreement.

1.2 **Error and Omissions Liability Insurance** appropriate to the Consultant's business with limits of not less than One Million Dollars ($1,000,000) per occurrence/One Million Dollars ($1,000,000) in the aggregate.

1.3 **Workers Compensation** with statutory limits as applicable in any State in which Consultant conducts business (or **Employers Liability Insurance**, as applicable), with limits of not less than One Million Dollars ($1,000,000). Said coverage will waive subrogation in favor of USOC and City.

1.4 If Consultant (or its employees) uses a vehicle in the performance of its duties under this Agreement, Consultant will maintain **Automobile Liability Insurance** with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit per occurrence for all vehicles. Said coverage will waive subrogation in favor of USOC and City and name USOC and City as Additional Insureds" as respects this Agreement as specified in Section 1.1 of this Exhibit, above.

Certificate/Proof of Insurance

2.1 Upon executing this Agreement or commencing work under this Agreement, Consultant will provide and maintain a valid Certificate/Proof of Insurance evidencing all required coverage hereunder. Said Certificate of Insurance shall include evidence as necessary to demonstrate that all required conditions have been met. The USOC and City shall be designated as the Certificate Holders and the certificate should be sent to the attention of USOC and City Risk Management, divisions at their respective Addresses for Notice set forth in Section 7.1 of the Agreement.

2.2 Certificates shall indicate that the insurance policies required by this Agreement shall not be canceled by either party, except after thirty days' prior written notice to the USOC and City by the insurer, certified mail, return receipt requested.

Miscellaneous Requirements

3.1 Consultant shall be responsible for all deductibles, retentions, or other co-insurance.

3.2 Consultant shall provide for thirty (30) days written notice to the USOC if the policy is cancelled, non-renewed or materially changed prior to expiration and ten (10) days written notice of cancellation due to non-payment of a premium. All insurance policies shall be written by company(ies) qualified to conduct business in the State(s) in which Consultant conducts business and shall be reasonably acceptable to USOC/City.

3.3 **In the event that any required insurance is written on a claims-made basis**, such policy(ies) shall be maintained during the entire period of this Agreement with a retroactive date concurrent with or preceding the effective date of this Agreement, and for a period of not less than three (3) years following the termination or expiration of this Agreement.

8.27.14

18

EXHIBIT 21
018

3.4    The Consultant's General Liability insurance coverage must be primary insurance as it pertains to the City, its officers, officials, employees, agents, and volunteers.

3.5    Any insurance or self-insurance maintained by the USOC or City, or their respective officers, officials, employees, or volunteers is wholly separate from the insurance of the Consultant and in no way relieves the Consultant from its responsibility to provide insurance. Insurance provisions under this Article shall not be construed to limit the Consultant's obligations under this Agreement, including Indemnity.

3.6    Insurance is to be placed with licensed insurers admitted to transact business in the State of California with a current A.M. Best's rating of no less than A V. If insurance is placed with a surplus lines insurer, insurer must be listed on the State of California List of Eligible Surplus Lines Insurers (LESLI) with a current A.M. Best's rating of no less than A X. Exception may be made for the State Compensation Fund when not specifically rated.

EXHIBIT 21
019

# EXHIBIT "22"

Expenses        CVOTC
1994-2015

| Sum of amount | Column Labels | | | | |
|---|---|---|---|---|---|
| Row Labels | 1996 | 1997 | 1998 | 1999 | 2000 |
| 34210 | 1,781,743.52 | 1,637,509.71 | 792,239.88 | 678,455.30 | 674,802.18 |
| 34220 | 200,872.45 | 172,310.65 | 189,315.63 | 249,506.05 | 232,856.73 |
| 34240 | 608,012.72 | 823,068.00 | 896,345.51 | 1,149,263.85 | 1,119,760.26 |
| 34250 | 70,832.80 | 86,337.59 | 141,927.02 | 234,143.46 | 246,887.53 |
| 34260 | 1,128,475.06 | 1,249,853.61 | 1,327,062.09 | 1,328,264.74 | 1,249,700.03 |
| 34265 | | | | | |
| 34268 | 25,336.66 | 40,879.49 | 58,863.11 | 105,803.60 | 105,596.81 |
| 34270 | | | | 63,733.25 | 101,002.83 |
| 34280 | 131,575.76 | 144,464.52 | 145,162.67 | 212,317.68 | 260,555.43 |
| Grand Total | 3,946,848.97 | 4,154,423.57 | 3,550,915.91 | 4,021,487.93 | 3,991,161.80 |

EXHIBIT 22
001

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| 660,125.68 | 1,360,827.72 | 2,326,428.95 | 2,582,456.18 | 2,754,224.15 | 2,709,993.95 | 2,348,803.23 |
| (37,399.16) | 88,945.33 | 312,397.17 | 285,500.67 | 193,877.43 | 189,404.50 | 260,871.21 |
| 1,236,860.83 | 1,263,982.19 | 1,458,160.26 | 1,403,111.35 | 1,267,658.01 | 1,294,171.43 | 1,332,684.54 |
| 267,656.41 | 194,141.95 | 226,615.84 | 242,415.97 | 177,773.08 | 193,190.30 | 239,335.68 |
| 1,307,571.43 | 1,673,117.37 | 1,876,458.42 | 2,084,871.50 | 2,146,885.30 | 2,401,306.11 | 2,458,877.98 |
|  |  |  |  |  |  |  |
| 102,791.30 | 89,320.20 | 90,072.98 | 104,195.53 | 147,230.60 | 223,392.58 | 237,836.59 |
| 112,306.82 | 118,818.21 | 127,560.11 | 156,738.16 | 90,675.47 | 54,078.22 | 86,290.50 |
| 266,859.45 | 368,520.53 | 394,314.16 | 433,813.19 | 298,174.44 | 291,432.55 | 350,357.34 |
| 3,916,772.76 | 5,157,673.50 | 6,812,007.89 | 7,293,102.55 | 7,076,498.48 | 7,356,969.64 | 7,315,057.07 |

EXHIBIT 22
002

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| 2,293,929.89 | 2,177,876.77 | 2,507,604.87 | 2,785,258.82 | 2,670,932.60 | 2,862,147.91 | 2,911,859.57 |
| 211,716.84 | 162,261.64 | 255,993.84 | 277,952.07 | 338,955.85 | 388,219.77 | 350,229.82 |
| 1,482,369.22 | 1,313,970.10 | 1,321,939.48 | 1,616,621.85 | 1,533,325.38 | 1,751,708.84 | 1,876,324.06 |
| 249,322.13 | 236,431.36 | 285,560.72 | 281,685.04 | 307,406.61 | 298,253.79 | 297,590.17 |
| 2,521,659.33 | 2,306,656.74 | 2,178,694.67 | 2,254,386.92 | 2,100,327.69 | 2,310,244.82 | 2,288,103.22 |
| | | | 612,897.62 | 406,614.10 | 103,169.24 | 334,741.46 |
| 243,651.99 | 152,347.12 | 154,283.59 | 109,418.84 | 30,612.67 | 42,496.80 | 40,404.87 |
| 74,863.38 | 303,058.79 | 271,590.04 | 285,534.35 | 409,840.59 | 567,102.74 | 538,384.32 |
| 535,000.68 | 371,776.78 | 435,868.19 | 532,318.93 | 688,221.11 | 595,450.88 | 593,019.34 |
| 7,612,513.46 | 7,024,379.30 | 7,411,535.40 | 8,756,074.44 | 8,486,236.60 | 8,918,794.79 | 9,230,656.83 |

EXHIBIT 22
003

| 2015 | Grand Total |
|---|---|
| 2,808,984.77 | 41,326,205.65 |
| 380,687.83 | 4,704,476.32 |
| 1,791,521.14 | 26,540,859.02 |
| 205,957.60 | 4,483,465.05 |
| 2,184,548.67 | 38,377,065.70 |
| 18,791.88 | 1,476,214.30 |
| 47,649.12 | 2,152,184.45 |
| 707,677.75 | 4,069,255.53 |
| 603,102.52 | 7,652,306.15 |
| 8,748,921.28 | 130,782,032.17 |

EXHIBIT 22
004

# EXHIBIT "23"

# U.S. OLYMPIC AND/OR PARALYMPIC TRAINING SITE DESIGNATION PLAN
## ELITE ATHLETE TRAINING AND WORLD-CLASS COMPETITION FACILITIES

**An outline of the benefits of the U.S. Olympic and Paralympic Training Sites Designation and the necessary criteria for receiving the designation from the U.S. Olympic Committee**



**U.S. OLYMPIC**
TRAINING SITE



**U.S. OLYMPIC
AND PARALYMPIC**
TRAINING SITE



**U.S. PARALYMPIC**
TRAINING SITE

Training Sites & Community Partnerships
U.S. Olympic Committee
1 Olympic Plaza
Colorado Springs, CO 80909
719-866-4868     [phone]
719-866-2169     [fax]

## U.S. OLYMPIC AND PARALYMPIC TRAINING SITE MISSION STATEMENT

Access additional resources, services and facilities for athletes, National Governing Bodies ("NGBs"), U.S. Paralympics and/or High Performance Management Organizations (HPMOs) while providing an elite athlete training environment which positively impacts performance.

## PURPOSE

Collaborate with the Local Operator and NGBs/HPMOs in high performance planning and programming to provide additional world-class training facilities for athletes, as well as, to expand the capability and capacity of the United States to accommodate elite athlete training environments, host World Class competitions and events and potentially to host Olympic and or Paralympic Trials.

## GOALS

1. Expand the base and network of world-class training facilities for NGBs/HPMOs and athletes in the United States

2. Support the training and preparation of Team USA athletes by developing opportunities for access to world class training facilities and having those facilities clearly defined in NGB/ HPMO High Performance Plans

3. Reward NGBs/HPMOs and communities across the nation which have existing world-class Olympic/Paralympic sport facilities and services

4. Empower communities and NGBs/HPMOs across the nation to develop world-class Olympic/Paralympic sport facilities and services

5. Provide access to additional facilities that include comprehensive athlete services, including sports science as well as low cost housing and meals

6. Expand the U.S. Olympic and Paralympic movement through sport education and outreach by bringing the movement to the local level

7. Provide facilities for education and training opportunities

8. Expand the number of World Cups and international competitions in the United States to provide additional opportunities for the US athletes to compete in America

## BENEFITS OF A SITE DESIGNATION

1. National Recognition as a part of the U.S. Olympic and Paralympic Movement

2. Partnership with the USOC and access to USOC resources and information

3. National Governing Body (NGB) and High Performance Management Organization (HPMO) Partnership

4. Local delivery mechanism for Olympic and Paralympic sponsors

5. Open new doors and develop new partnerships in the community with Olympic/Paralympic terminology and marks

6. Attract top athletes and coaches

7. Attract world-class events to facility

8. Common goal for the community to focus on (commitment to America's elite athletes)

9. Leverage additional local funding opportunities

10. Media exposure

11. Annual Training Site Conference

12. Olympic Training Center resources and materials

13. References and recommendations from the Olympic/Paralympic Movement

14. Website Recognition

15. Promotional Materials from the USOC

16. Volunteer Opportunities

17. USOC Site Visits and community connections

18. Adecco Career Services and ACE (Athlete Career and Education) program assistance for athletes

19. Dedicated USOC Staff Liaisons

20. Government Relations assistance

21. Olympic Day hosting opportunities

22. Job postings on teamusa.org

23. Connection with U.S. Olympic and Paralympic Alumni Association

## USOC PROGRAM GUIDELINES

In order to receive the U.S. Olympic or Paralympic Training Site Designation, the USOC requires the following:

*Three- Year Business Plan —* The Local Operator must write a three year business plan based on the operating structure and background of the sports facility as well as the training partnership between the facility and NGB/HPMO.

**The Three-Year Business Plan should address and acknowledge the following areas of criteria:**

**1. NGB/HPMO Support —** The NGB/HPMO must be committed to running high level elite athlete programming at the selected facility as well as including the facility in the NGB/HPMO's High Performance Plan. The NGB/HPMO must execute the representation described in the contract.

**2. Local Operator —** The Local Operator must demonstrate its ability to work with NGB/HPMOs and the community and have competition management experience with NGB/HPMO events.

**3. Funding —** The Local Operator will hold the fiscal responsibility for the Training Site. The Local Operator must demonstrate ability to access community resources through foundation, government, corporate grants, as well as events and individual donations.

**4. Feeder Programs —** The Local Operator must be willing to develop or expand community youth programs. These community programs will help create or build an athlete pipeline in the community. Also, the Local Operator must be willing to host international exchanges for athlete development.

**5. Sponsorship —** The Local Operator cannot solicit or enter into any sponsorship with respect to the Site other than with existing USOC sponsors, as outlined in the contract. During contract negotiations, a list of current USOC sponsors will be provided. The Local Operator will have a limited right to use Olympic and/or Paralympic-related marks, as specified in the contract. All uses of Olympic and/or Paralympic-related marks, images or terminology must be pre-approved by the USOC.



EXHIBIT 23
002

**6. Support Services —** The Training Site is required to have an availability of support services, including sport science, strength and conditioning, nutrition, and sport psychology, in order to maximize the safety and quality of the programs. (Services required will be based on NGB and/or HPMO need). Additionally, the Local Operator must establish access points, preferred providers and fee structure in cooperation with USOC, the NGB and/or HPMO, including on site facilities to accommodate services.

**7. Additional Support Services —** It is highly recommended that athletes have access to healthy food options, discount community/entertainment activities, low cost housing, education possibilities, such as in-state tuition grants, and assistance with finding local employment opportunities.

**9. Transportation —** The Local Operator must use its best efforts to ensure accessible, safe and affordable transportation is available to athletes, so that they are able to access the Training Site at a reasonable cost and the program can continue to attract new athletes.

**10. High Level Coaches and Officials Recruitment, Training and Education —** The Local Operator must ensure that the Training Site provide these elements, including but not limited to top coaches who can train elite athletes as well as educate new local coaches.

**11. Reporting Structure —** The Local Operator is required to send quarterly reports and schedules outlining the measurable outcomes to the USOC for review and provide a copy of its Annual Report and financials to the USOC on a mutually agreeable annual basis.

**12. Measurable Outputs/Outcomes —** please refer to page 8

## APPLICATION OVERVIEW

In order to be considered for a U.S. Olympic and or Paralympic Training Site Designation, all interested facilities should provide a business plan with the following information in this order:

Contact Information:

- Facility Name
- Main Contact Person
- Address
- Phone
- Email
- Website

**Facility Information:**

- Facility Mission Statement

- Facility Description (which buildings, etc. are requested to be considered for the training site designation, i.e. where the athletic training is taking place)

- Executive Summary (provide a background on the facility, including the community's experience hosting NGB/HPMO and athlete events/programs)

- Vision (what the facility hopes to accomplish and provide to athletes in the next 5-10 years)

- Training information (provide an overview of the daily training activities, including sports, athletes, teams, coaches and any other information to give us a better understanding of your facility)

- Competition (provide an overview of all elite level competitions hosted at your facility over the past 3 years and any upcoming plans for the next 2 years)

- Feeder Programs (provide a list and explanation of all youth feeder programs, demonstrating the facility's commitment to develop or expand community youth sport programs and grow sport in the United States)

- Athlete Support Information (provide a list of all additional athlete support services provided by the facility and/or providers within the community. Indicate any reduced or waived fees for athletes. Examples include sports medicine, strength and conditioning, nutrition, sport psychology, massage, part-time jobs, and educational opportunities)

- Current Facility Access (what are the number of training days per athlete and per sport that are currently offered to NGB/HPMO National team athletes and at what cost to the athlete and NGB/HPMO)

- Proposed Facility Access (what additional access for athletes and NGB/HPMOs are you proposing to include in a potential partnership with the U.S. Olympic Committee and NGB/HPMO)

- Housing and Transportation (what housing and transportation options are available to athletes and at what cost to the athlete)

- Coaching and Support Staff (provide a list of all coaches including their NGB/HPMO certifications along with a breakdown of additional facility support staff)

- Roster of Facility Board Members

- Current Goals and Objectives of the Facility and Sport Program (may be part of your strategic plan or goals for the next two years)

- Do you perform background checks on those staff/coaches who have access to athletes? If so, what databases do you check and who is your background check provider?

- Athlete Safety Programs (Please provide an executive summary and description of your Athlete Safety Program and list where the policy can be found (i.e. code of conduct, employee handbook). Please also verify if your Athlete Safety Program meets the Minimum Standards Policy as included on page 9.)

**National Governing Body/High Performance Management Organization Partnership:**

- Please include a letter of recommendation/support from every National Governing Body/High Performance Management Organization your prospective site would like to have included in your plan/Training Site Designation in your application to become a U.S. Olympic and/or Paralympic Training Site. The recommendation should also reference the inclusion of the local operator/facility in the NGB/HPMO high performance plan and include the Training Site designation recommendation by both the NGB /HPMO Executive Director and High Performance Director/staff equivalent.

- NGB/HPMO Partnership Summary (please include a summary of how your facility works with a NGB/HPMO, including a list of all national team athletes and competitions hosted at your facility and any relevant information about the partnership). Please also include any data from an NGB/HPMO showing how your facility ties into the NGB/HPMO High Performance Plan, including elite training activity at the Training Site that facilitates scheduling, budgeting, and facility access (including access to any portions of the Local Operator's facilities that enhance athletic training (e.g., weight rooms, running trails, sports medicine clinics, etc.)

**Marketing and Development Information:**

- List all corporate sponsors of your facility and indicate what level of sponsorship they have, including signage and location of signage, website recognition, pouring rights, etc.

- List all sponsors of events at your facility (these may be corporate partners who sponsor individual events at your facility but are not considered sponsors of the facility itself)

- List any current or planned building naming rights at your facility

- Marketing Plan (please provide an overview of how your facility would plan to market and promote a U.S. Olympic and/or Paralympic Training Site Designation should you receive such a designation). Please be aware that there can be no third party association with the Olympic/Paralympic Designation nor may any USOC conflicting sponsors be associated in any way with the Olympic and or Paralympic Designation/Facility. For a complete list of USOC Corporate Partners, please visit http://www.teamusa.org/pages/sponsors



EXHIBIT 23
003

**Financial Information:**

- Training Sites are expected to be self-funded and operated. Please provide an audited facility budget for the previous two years , as well as the current year budget and future budget for next year. Your budget should be specific to the athlete facility/building where proposed Training Site/National Team training activity currently takes place.

**Insurance Information:**

Please provide a certificate of insurance verifying the following coverage:

- Commercial General Liability and Excess Liability Insurance with of not less than Five Million Dollars $5,000,000 per occurrence, which includes Bodily Injury and Property Damage, and Personal Injury and Advertising Liability coverages.

- Workers Compensation with statutory limits as applicable in any state in which the Local Operator conducts business and Employers Liability with limits of not less than One Million Dollars ($1,000,000).

- Automobile Liability Insurance with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit per occurrence for all owned, non-owned, hired, and permissive use vehicles.

**Additional Information:**

- Letters of reference/recommendation from athletes and local community leaders

- Photos and/or video of facility

## ROLE OF EACH PARTNER

**The USOC will provide:**

a. A staff liaison from the Training Sites and Community Partnerships division to answer questions regarding the USOC and provide USOC information on best practices, opportunities and events;

b. Program review (in collaboration with NGB/HPMO);

c. An annual conference for all U.S. Olympic/Paralympic Training Site Managers to discuss best practices and provide additional resources, such as sport performance, marketing, and educational information;

d. Use of an Olympic and/or Paralympic Mark as outlined in the contract;

e. Assistance in presenting sponsor opportunities to USOC partners;

f. Acknowledgment on USOC Website with a link to your website/local operator information;

g. Recognition of U.S. Olympic/Paralympic Training status and Olympic/Paralympic family ties to local government, community leaders via letters of support, phone calls and meetings provided by USOC Representatives.

**The Local Operator will provide:**

a. Business plan, funding, feeder programs, support services, transportation, quarterly reports and other requirements set forth in "USOC Program Guidelines" above;

b. A plan for training activity at the Training Site, in conjunction with USOC and NGB/HPMO partner;

c. Facilities of international and world class caliber, including maintenance and upkeep;

d. Sufficient space and storage, parking, and indoor sport and weight training facilities;

e. Adequate accessibility for persons with disabilities in compliance with Americans with Disabilities Act;

f. Office facilities and office equipment sufficient to support NGB/HPMO personnel and coaches during peak training and competition periods;

g. At least one full-time executive director, or comparable level executive whose responsibilities will include day-to-day operations of the Training Site;

h. Ongoing liaison with the relevant parks commissions, sports commissions, educational institutions, and other authorities in order to maximize training and competition opportunities for the NGB/HPMO and its athletes;

i. Letter of Understanding (LOU), or similar legal agreement, with the appropriate NGB/HPMO(s)

j. Measurable Outcomes noted on page 8;

k. Insurance in accordance with the contract.

**The NGB/HPMO will provide in agreement with the Local Operator:**

a. Signed representation that the Training Site is operating to the satisfaction of the NGB/HPMO;

b. Annual review of the Training Site;

c. Inclusion of the Training Site in its High Performance Plan which should include detailed elite level athlete training at the Local Operator (resident athlete training, camps, competitions and athlete development);

d. Coordination of shared use of office space, and equipment that the NGB/HPMO designates as necessary for training;

e. A liaison to the Training Site to arrange for scheduling changes, coordination of events, and other activities requiring mutual cooperation with the Local Operator;

f. Cooperation with the Local Operator in its efforts to raise funds for capital improvements which may be required for the use of the facility;

g. Commitment to running high level elite athlete programming in the selected community.

## RECOMMENDATIONS FOR SUCCESS

What has made the existing Training Sites successful?

- NGB/HPMO high performance planning integration/collaboration

- Community support – financial and other resources (Sports Commission, Convention and Visitor's Bureau)

- Athlete Services (education, activities, career services)

- Low cost housing options

- Transportation

- Activities and entertainment options

- Strength and conditioning facilities

- Education opportunities and in-state grants

- Healthy food options

- Pre-existing elite-level coaches, preferably trained and certified by the NGB/HPMO





EXHIBIT 23
004

- Pre-existing sport culture

- Year-round, sport specific training program focused on long-term athlete development

- Young athletes feeding into the NGB/HPMO National Team systems from community

- International competitions/exchanges

- Grant writer

- Internships

- Strong volunteer base

- Inclusion of government officials in events/VIP Invites

- Support Services such as sport science

- Support from the local media

- Athlete role models

- Partnership with local sports organizations including community based organizations and Parks and Recreation

## MEASURABLE OUTPUTS/OUTCOMES

If all of the designation criteria are met and a contract is signed, the contract is based on a renewal process, including detailed and specific NGB/HPMO high performance plan inclusion and meeting certain performance requirements listed below. The performance requirements shall be included within each quarterly and annual report.

- Tracking athletes' competitions and results

- Number of venues utilized for events, programs and outreach if other than main Site

- Financial expenditures as related to Site designation

- Number of National team athletes and training days provided by Site

- Number of certifications and educational trainings for local coaches

- Number of clinics and events hosted

- Number of community partnerships for sport development and sport performance

- Number of athletes utilizing facility Senior Elite/Junior/development athletes

## MINIMUM STANDARDS FOR ATHLETE SAFETY AT U.S. OLYMPIC AND/OR PARALYMPIC TRAINING SITES

The United States Olympic Committee requires that the Local Operator for each U.S. Olympic and/or Paralympic Training Site adopt an athlete safety program that includes, at a minimum, the following components:

1. Prohibited Conduct

   A policy which prohibits and defines the following misconduct:

   - Bullying

   - Hazing

   - Harassment (including sexual harassment)

   - Emotional Misconduct

   - Physical Misconduct

   - Sexual Misconduct (including child sexual abuse)

   The policy shall apply to (1) Training Site employees; and (2) individuals the Training Site formally authorizes, approves or appoints (a) to a position of authority over, or (b) to have frequent contact with, athletes.

   **Comment(s):**

   (a)   Prohibited misconduct shall include, without limitation:

   Romantic or sexual relationships, which began during the sport relationship, between athletes or other participants and those individuals (i) with direct supervisory or evaluative control, or (ii) are in a position of power and trust over the athlete or other participant. Except in circumstances where no imbalance of power exists, coaches have this direct supervisory or evaluative control and are in a position of power and trust over those athletes or participants they coach.

   The prohibition on romantic or sexual relationships does not include those relationships where it can be demonstrated that there is no imbalance of power. For example, this prohibition does not apply to a pre-existing relationship between two spouses or life partners. For factors that may be relevant to determining whether an imbalance of power exists, consult the USOC's Athlete Protection Policy.

   (b)   Local Operators are not required to prohibit misconduct as specifically categorized above. For example, a Local Operator may prohibit sexual harassment as "harassment," "sexual harassment," or under some other category or definition.

   We recommend that Local Operators define each particular type of misconduct in their athlete safety policies, however, Local Operators are free to use the definitions set forth in the USOC's Athlete Protection Policy, found in the USOC's SafeSport Policies at http://www.teamusa.org/About-the-USOC/Organization/Legal/Governance-Documents.aspx.

2. Criminal Background Checks

   Each Training Site shall require criminal background checks for those individuals it formally authorizes, approves or appoints (a) to a position of authority over, or (b) to have frequent contact with, athletes. For purposes of clarification, a Training Site is considered to formally authorize, approve or appoint an individual in instances where the Training Site has control over the appointment process.

3. Education & Training

   Beginning January 1, 2015 each Training Site shall require education and training concerning the key elements of their safety program for those individuals it formally authorizes, approves or appoints (a) to a position of authority over, or (b) to have frequent contact with, athletes.   Before January 1, 2015 each Training Site shall offer and encourage the same.

4. Reporting

   Each Training Site shall establish a procedure for reporting misconduct.



EXHIBIT 23
005

5. Enforcement

   a. Each Training Site shall have a grievance process, which is materially free of bias and conflicts of interest, to address allegations of misconduct following the report or complaint of misconduct which has not been adjudicated under a criminal background check.

   b. In cases where the Ted Stevens Act applies, each Training Site shall comply with the Act's requirements.

   c. The grievance process, whether by policy or operation of law, shall include the opportunity for review by a disinterested individual or body.

6. Other

   a. These minimum standards may be amended from time to time by the USOC.

   b. In implementing an athlete safety program, Training Sites shall be guided by the principle that supporting the health and safety of its athletes is a key element of its managerial capabilities.

   c. Failure to meet the minimum standards as set forth in this policy may result in disciplinary action by the USOC including, without limitation, the termination of the Training Site Designation.

   d. Exceptions to these minimum standards based on the organizational structure of the Training Site may be granted by the USOC on a case-by-case basis where appropriate, provided that such exceptions do not materially endanger athletes.

## CONTACT INFORMATION

Please contact the Training Sites and Community Partnerships division of the U.S. Olympic Committee for more information:

**Alicia McConnell**
Director, Training Sites and Community Partnerships
1 Olympic Plaza
Colorado Springs, CO 80909
Phone: 719-866-4868
Email: Alicia.mcconnell@usoc.org

## MARKS USAGE EXAMPLES

Apparel



*using USOC's mark as a secondary mark or the primary organization*

Brochure



Business card Composition





*Training Site with Organization mark*



EXHIBIT 23
006




**U.S. OLYMPIC**
TRAINING SITE


**U.S. OLYMPIC
AND PARALYMPIC**
TRAINING SITE


**U.S. PARALYMPIC**
TRAINING SITE

Training Sites & Community Partnerships
U.S. Olympic Committee
1 Olympic Plaza
Colorado Springs, CO 80909
719-866-4868     [phone]
719-866-2169     [fax]

**U.S. Olympic Committee Training Sites & Community Partnerships**

EXHIBIT 23   v3/12/15/50
007

# EXHIBIT "24"

EXHIBIT 23
008

# Training Sites



The U.S. Olympic Committee has partnered with elite athlete training centers to allow American athletes the best training venues and facilities for their sport development.

The mission of the U.S. Olympic and Paralympic Training Sites is to provide athletes and National Governing Bodies with access to additional resources, services and world-class facilities, while providing an elite athlete training environment that positively impacts performance.

The following training centers have received the U.S. Olympic and Paralympic Training Site designation and invested millions in facility, operating, staffing, equipment and athlete training costs. Most of these training sites have hosted U.S. Olympic and Paralympic Trials, or world cup and world championship events, further helping Team USA prepare for the Olympic and Paralympic Games.

Fact Sheet (/~/media/2018-other/011118-2017-TS-Fact-Sheet.pdf)
Designation Criteria (/~/media/TeamUSA/Media/TS_DesignationPlan_Dec16_F.pdf)

## U.S. Olympic and Paralympic Training Sites



**U.S. Olympic and Paralympic Training Sites**

03/21/2017

**ALABAMA**
Lakeshore Foundation
Birmingham, Alabama
Lakeshore.org (http://www.lakeshore.org/)

**CALIFORNIA**
Anschutz Southern California Sports Complex
Carson, California
StubHubCenter.com  (http://www.stubhubcenter.com/)

Chula Vista Elite Athlete Training Center
Chula Vista, California
TrainAtChulaVista.com  (https://trainatchulavista.com/)

**COLORADO**
World Arena Ice Hall
Colorado Springs, Colorado
WorldArena.com (http://www.broadmoorworldarena.com/icehall)

**FLORIDA**
U.S. Sailing Center
Miami, Florida
USSCMiami.org (https://usasailingcentermiami.org/)

**IDAHO**
Sun Valley Ski Education Foundation
Sun Valley, Idaho
SVSEF.org (https://svsef.org/)

**ILLINOIS**
University of Illinois – Disability Resources and Educational Services
Champaign, Illinois
Disability.Illinois.edu (http://www.disability.illinois.edu/)

**INDIANA**
Turnstone
Fort Wayne, Indiana
Turnstone.org (http://turnstone.org/)

**MICHIGAN**
Northern Michigan University
Marquette, Michigan
NMU.edu (http://www.nmu.edu/)

**NEW JERSEY**

EXHIBIT 23
010

Princeton National Rowing Association
West Windsor, New Jersey
RowPNRA.org (https://www.rowpnra.org/)

**NORTH CAROLINA**
U.S. National Whitewater Center
Charlotte, North Carolina
USNWC.org (https://usnwc.org/)

**OKLAHOMA**
University of Central Oklahoma Sport Performance
Edmond, Oklahoma
UCOTrainingSite.com (http://sites.uco.edu/wellness/sr/trainingsite/)

Oklahoma City Boathouse Foundation
Oklahoma City, Oklahoma
OKC-NHPC.org (https://www.riversportokc.org/training-site/)

**TENNESSEE**
East Tennessee State University
Johnson City, Tennessee
ETSU.edu (https://www.etsu.edu/ehome/) or SportScienceED.com (https://www.sportscienceed.com/)

**UTAH**
Utah Olympic Legacy Foundation
Park City, Utah
UtahOlympicLegacy.com
(https://utaholympiclegacy.org/)
**WISCONSIN**
The Pettit National Ice Center
Milwaukee, Wisconsin
ThePettit.com (http://thepettit.com/)

**High Performance Training Sites**
The U.S. Olympic Committee also provides training facilities for Team USA athletes to flawlessly continue their programs at the Olympic Games. These High-Performance Training Centers feature the same equipment the athletes train with at home – creating familiarity and taking away the stress of finding a place to train for proper implementation of their training program.

EXHIBIT 23
011

## Latest News

more › (https://www.teamusa.org/News)

Adam Rippon – Olympian, Advocate And Trailblazer – Retires From Competitive Figure Skating (https://www.teamusa.org/News/2018/November/20/Adam-Rippon-Olympian-Advocate-And-Trailblazer-Retires-From-Competitive-Figure-Skating)

Olympian And Next Olympic Hopeful Mentor Carlin Isles Shares The Keys To Being A Successful Athlete (https://www.teamusa.org/News/2018/November/20/Olympian-And-Next-Olympic-Hopeful-Mentor-Carlin-Isles-Shares-The-Keys-To-Being-A-Successful-Athlete)

The Week In Team USA Results: Nov. 5-13 (https://www.teamusa.org/News/2018/November/20/The-Week-In-Team-USA-Results-Nov-14-19)

Singing Katie Ledecky Impresses At Golden Goggles, As Fellow Stalwart Ryan Murphy Goes 3-For-3 In Awards (https://www.teamusa.org/News/2018/November/20/Singing-Katie-Ledecky-Impresses-At-Golden-Goggles)

How A Concussion Led To David Boudia's Diving Rebirth, This Time On The Springboard (https://www.teamusa.org/News/2018/November/20/How-A-Concussion-Led-To-David-Boudias-Diving-Rebirth-This-Time-On-The-Springboard)



**Governance**

EXHIBIT 23
012

Case 5:18-cv-02479-BLF   Document 103   Filed 11/21/18   Page 521 of 655

>

**Resources** >

**Get Involved** >

©2018 United States Olympic Committee. All Rights Reserved.

EXHIBIT 23
013

# EXHIBIT "25"

**VELO Sports Center**

# The VELO Sports Center is located on the 125-acre StubHub Center complex in the city of Carson, CA.

The VELO Sports Center is a 100,000 square foot, $15 million specially designed 250- meter indoor wood bicycle racing track. The VELO Sports Center is also a part of StubHub Center's partnership with the USOC as an Official U.S. Olympic Training Site and is a home track to USA Cycling's national track cycling program. The VELO Sports Center hosts training and international competitions for the world's elite cyclists, as well as classes open to the public, at any skill level.

As America's largest indoor velodrome, VELO sports center is committed to the growth of the sport of cycling. Youth, beginner, intermediate, and advanced training programs are available to those curious about cycling or for any aspiring Olympic and World Championship athletes.

EXHIBIT 25
001



(http://www.stubhubcenter.com/stadium-info/venues/velo/calendar)

**Calendar (http://www.stubhubcenter.com/stadium-info/venues/velo/calendar)**

More Info (http://www.stubhubcenter.com/stadium-info/venues/velo/calendar)

EXHIBIT 25
002



(http://www.stubhubcenter.com/stadium-info/venues/velo/getting-startedregistration)

## Getting Started + Registration (http://www.stubhubcenter.com/stadium-info/venues/velo/getting-startedregistration)

More Info (http://www.stubhubcenter.com/stadium-info/venues/velo/getting-startedregistration)

EXHIBIT 25
003



(http://www.stubhubcenter.com/stadium-info/venues/velo/membershipsession-description)

## Membership (http://www.stubhubcenter.com/stadium-info/venues/velo/membershipsession-description)

More Info (http://www.stubhubcenter.com/stadium-info/venues/velo/membershipsession-description)

EXHIBIT 25
004



(http://www.stubhubcenter.com/stadium-info/venues/velo/special-programming)

## Special Programming (http://www.stubhubcenter.com/stadium-info/venues/velo/special-programming)

More Info (http://www.stubhubcenter.com/stadium-info/venues/velo/special-programming)

- Velo Sports Center Seating Map (http://www.stubhubcenter.com/guest-services/seating-maps/velodrome)
- Racing Information (http://lavelodrome.org/)
- Events (http://www.stubhubcenter.com/velo)
- Contact Us (http://www.stubhubcenter.com/stadium-info/venues/velo/contact-us-1)
- Volunteer (http://www.stubhubcenter.com/stadium-info/venues/velo/volunteer)
- Youth Cycling Program (http://www.stubhubcenter.com/stadium-info/venues/velo/youth-cycling-program)
- Track Records (http://www.stubhubcenter.com/stadium-info/venues/velo/track-records)
- Track Cycling Glossary (http://www.stubhubcenter.com/stadium-info/venues/velo/track-cycling-glossary)

## Getting Here

Enter your Address

**StubHub Center**

# 18400 Avalon Boulevard

# Carson, California 90746

EXHIBIT 25
005

EXHIBIT 25
006

# EXHIBIT "26"

**Additional Resources for Athletes (/USA-Diving/Resources/Additional-Resources-for-Athletes)**

**Aerial Training Process (/USA-Diving/Resources/Aerial-Training-Process)**

**Background Screening Policy (/USA-Diving/Resources/Background-Screening-Policy)**

**More**                                                                                                           ⟩

USA Diving has established several Podium Centers throughout the country with the aim of developing and producing Olympic medalists – or putting the U.S. on the podium. When selecting the centers, USA Diving considered factors such as Olympic coaching experience, programs that have a history of producing world-class international-level athletes and have a willingness to serve as a resource to USA Diving members.

The following locations are currently designated as Podium Centers:

Austin, Texas
Bloomington, Indiana
Conroe, Texas
Los Angeles, California (University of Southern California)
Miami, Fla.
Stanford, Calif.
West Lafayette, Ind.

**About Us**                                                                                                    ⟩

©2018 United States Olympic Committee. All Rights Reserved.

EXHIBIT 26
001

# EXHIBIT "27"

**a.   USOC Staff**

Racial and ethnic comparisons for USOC staff include all job and ethnicity categories according to EEOC guidelines and reporting requirements, as of December 31, 2008, are as follows:

**USOC Staff, All Job and Ethnicity Categories**
**Race and Ethnicity**

| | White | Black/ African Am. | Hispanic or Latino | Asian | Hawaiian/ Pacific Islander | American Indian/Alaskan | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff Count | 267 | 23 | 21 | 5 | 1 | 2 | 9 | 328 |
| USOC Staff Percent | 81.40% | 7.01% | 6.40% | 1.52% | 0.30% | 0.61% | 2.74% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff Count | 28 | 3 | 15 | 3 | 2 | 0 | 3 | 54 |
| USOC Staff Percent | 51.85% | 5.56% | 27.78% | 5.56% | 3.7% | | 5.56% | |
| | | | | | | | | |
| **Illinois** | | | | | | | | |
| USOC Staff Count | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff Count | 42 | 1 | 0 | 1 | 0 | 0 | 1 | 45 |
| USOC Staff Percent | 93.33% | 2.22% | | 2.22% | | | 2.22% | |
| | | | | | | | | |
| **Michigan** | | | | | | | | |
| USOC Staff Count | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **Washington, DC & Salt Lake City UT** | | | | | | | | |
| USOC Staff Count | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| USOC Staff Percent | 100% | | | | | | | |

EXHIBIT 27
001

**USOC Staff, Executive/Senior Level Officials & Managers and First/Mid-Level Officials & Managers**
**Race and Ethnicity**

| | White | Black/ African Am. | Hispanic or Latino | Asian | Hawaiian/ Pacific Islander | American Indian/Alaskan | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff Count | 105 | 8 | 6 | 1 | 0 | 0 | 2 | 122 |
| USOC Staff Percent | 86.07% | 6.56% | 4.92% | .082% | | | 1.64% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff Count | 8 | 0 | 1 | 0 | 0 | 0 | 3 | 12 |
| USOC Staff Percent | 66.67% | | 8.33% | | | | 25.00% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff Count | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **Illinois** | | | | | | | | |
| USOC Staff Count | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **Washington, DC** | | | | | | | | |
| USOC Staff Count | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| USOC Staff Percent | 100% | | | | | | | |

EXHIBIT 27
002

**USOC Staff, Administrative Support Workers, Craft Workers, Operatives, Professionals, Service Workers and Technicians**
**Race and Ethnicity**

| | White | Black/ African Am. | Hispanic or Latino | Asian | Hawaiian/ Pacific Islander | American Indian/Alaskan | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff Count | 162 | 15 | 15 | 4 | 1 | 2 | 7 | 206 |
| USOC Staff Percent | 78.64% | 7.28% | 7.28% | 1.94% | .4% | .9% | 3.39% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff Count | 20 | 3 | 14 | 3 | 2 | 0 | 0 | 42 |
| USOC Staff Percent | 47.61% | 7.14% | 33.33% | 7.14% | 4.76% | | | |
| | | | | | | | | |
| **Illinois** | | | | | | | | |
| USOC Staff Count | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff Count | 39 | 1 | 0 | 1 | 0 | 0 | 1 | 42 |
| USOC Staff Percent | 92.86% | 2.38% | | 2.38% | | | 2.38% | |
| | | | | | | | | |
| **Michigan** | | | | | | | | |
| USOC Staff Count | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| USOC Staff Percent | 100% | | | | | | | |
| | | | | | | | | |
| **Washington, DC** | | | | | | | | |
| USOC Staff Count | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| USOC Staff Percent | 100% | | | | | | | |

EXHIBIT 27
003

# EXHIBIT "28"

# EXHIBIT F

**United States Olympic Committee**
Quadrennial Census Summary and Diversity and Inclusion Initiatives
June 1, 2013

The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. specifically calls for the USOC to submit a report on a quadrennial basis on the following requirements regarding the USOC:

- data concerning the participation of women, disabled individuals and racial and ethnic minorities in the administration of the USOC.
- description of USOC diversity initiatives including human resource programs and practices that facilitate a productive and diverse environment for all.

The U.S. Olympic and Paralympic Family embraces the spirit of difference for better athletic performance and business results.  The USOC has recognized and supported the value of diversity in persons and perspectives, and has sought to build a culture of diversity within the organization.  We have created a world-class Human Resource organization committed to supporting diversity initiatives throughout every component of the organization and now with establishment of a Diversity and Inclusion program, we feel strongly that we can continue to reach diverse communities.  We continue to lead by example for the entire organization as well as for the NGBs.

The best example of how seriously the USOC takes diversity is the composition of the USOC Board.  Of the USOC's 16 member Board, there are seven women and two African Americans.  Minority representation has been present on the Board since its restructuring in 2004.

This commitment to diversity extends to the management team and to senior professional positions.  We are cognizant of the changing demographics of our country and work to ensure our staff and leadership team reflects the diversity of our country.  For years, the USOC has employed a high percentage of women in professional positions and we are committed to continuing this trend.

We are confident our efforts will continue to produce results.  Our commitment to diversity and inclusion is reflected in the creation of the Director for Diversity and Inclusion position and the program to identify new ways to approach this important effort over the next quadrennium.  The USOC is a unique organization in the United States that carries out a tremendously important role.  It is an organization that should speak to every American.

## A.  USOC Statistical Census Data

This section provides the statistical data concerning the participation of women, disabled individuals and racial and ethnic minorities in the administration of the USOC.  The census data represents the 462 staff and 16 members of the Board at the end of the 2012 Quadrennium (December 31, 2012).

EXHIBIT 28
001

*USOC Professional Staff -* As of December 31, 2012, the USOC had staff offices in three states (Colorado, California, New York) and the District of Columbia. The USOC's headquarters and Colorado Springs Olympic Training Center are located in Colorado Springs, Colorado and were home to 73.38% of the total staff population. The census data collected relating to the USOC staff is separated into two groups according to EEO-1 job categories:

1) Officials and Managers, including CEO, CAO, Chiefs and Managing Directors, as well as most Directors, Associate Directors, Managers and Assistant Managers.
2) USOC Staff in EEO-1 categories - Administrative Support Workers, Craft Workers, Operatives, Professionals, Service Workers and Technicians.

*USOC Volunteers -* As of December 31, 2012, the volunteer population represented the USOC's Board of Directors, Audit Committee, Compensation Committee, Ethics Committee, Nominating and Governance Committee and the Paralympic Advisory Committee. The USOC Board consisted of 16 individuals, the Audit Committee consisted of five individuals, and the Compensation Committee consisted of five individuals, all of whom were also members of the Board of Directors.  The Nominating and Governance Committee consisted of five individuals, two of whom were members of the Board of Directors.  The Ethics Committee consisted of five members, one of whom was a member of the Board of Directors.  The USOC Paralympic Advisory Committee consisted of 12 members, one of whom was a member of the Board of Directors.  (**Exhibit H** - USOC Bylaws).  The USOC also uses volunteers across the organization for events, projects, and advisory commissions, but we do not track demographics for these groups.

## 1.    USOC Gender Profile

The USOC has seen some encouraging trends over the quadrennium regarding gender representation.  The most notable difference is at the Board level.  The overall number and percentage of women on the USOC Board increased, as did the number of women on the audit and ethics committees of the Board.  The representation of females in USOC executive level positions (Managing Director and above) doubled from 5 to 10 during the 2012 Quadrennium. Also, the numbers of women and men in professional positions are now equal: in the previous quad report, men held 64% of professional positions, while women held 36%.

EXHIBIT 28
002

**a. USOC Staff**

The gender profile for USOC staff, as of December 31, 2012, is as follows:
**United States Olympic Committee - Gender Profile**

|  | Male | Female | Total |
|---|---|---|---|
| **Executive/Senior Level Officials and Managers** | | | |
| USOC Staff | 15 | 10 | 25 |
| Percent of Total Staff | 3.25% | 2.16% | 5.41% |
|  | | | |
| **First/Mid Level Officials and Managers** | | | |
| USOC Staff | 56 | 57 | 113 |
| Percent of Total Staff | 12.12% | 12.34% | 24.46% |
|  | | | |
| **Administrative Support Workers** | | | |
| USOC Staff | 21 | 83 | 104 |
| Percent of Total Staff | 4.55% | 17.97% | 22.51% |
|  | | | |
| **Craft Workers** | | | |
| USOC Staff | 14 | 0 | 14 |
| Percent of Total Staff | 3.03% | 0.00% | 3.03% |
|  | | | |
| **Operatives** | | | |
| USOC Staff | 4 | 7 | 11 |
| Percent of Total Staff | 0.87% | 1.52% | 2.38% |
|  | | | |
| **Professionals** | | | |
| USOC Staff | 47 | 46 | 93 |
| Percent of Total Staff | 10.17% | 9.96% | 20.13% |
|  | | | |
| **Service Workers** | | | |
| USOC Staff | 54 | 42 | 96 |
| Percent of Total Staff | 11.69% | 9.09% | 20.78% |
|  | | | |
| **Technicians** | | | |
| USOC Staff | 4 | 2 | 6 |
| Percent of Total Staff | 0.87% | 0.43% | 1.30% |
|  | | | |
| **USOC Staff Count** | 215 | 247 | 462 |
| USOC Staff Percent | 46.54% | 53.46% | 100.00% |

3

EXHIBIT 28
003

**b. USOC Volunteers**

The gender profile for USOC volunteers, as of December 31, 2012, is as follows:
**USOC Volunteers – Gender Profile**

|  | Male | Female | Total |
|---|---|---|---|
| Board of Directors Count | 9 | 7 | 16 |
| Percent | 56.25% | 43.75% |  |
|  |  |  |  |
| Audit Committee Count | 2 | 3 | 5 |
| Percent | 40% | 60% |  |
|  |  |  |  |
| Compensation Committee Count | 2 | 3 | 5 |
| Percent | 40% | 60% |  |
|  |  |  |  |
| Ethics Committee Count | 3 | 2 | 5 |
| Percent | 60% | 40% |  |
|  |  |  |  |
| Nom./Governance Comm. Count | 3 | 2 | 5 |
| Percent | 60% | 40% |  |
|  |  |  |  |
| Paralympic Advisory Comm. Count | 9 | 3 | 12 |
| Percent | 75% | 25% |  |

**2.     USOC Summary of Practices Regarding Individuals with Disabilities**

    **a.  Employees and Volunteers** – Some of the most promising developments in USOC diversity over the quad have been seen among individuals with disabilities.  We believe the USOC's proactive recruitment practices were one of the most important drivers in the increased number of USOC employees with disabilities since 2004.  In March 2013, the USOC surveyed approximately 476 employees with a single question about whether they considered themselves disabled (defined as "substantially limited in a major life activity") to establish a benchmark for disabled USOC employees.  Of the 332 responses received, 304 (91.57%) said they were not disabled.  14 (4.22%) claimed to be disabled, and 14 (4.22%) elected not to self-identify.

    In addition to the trends we have seen in our estimates for USOC employees, we have also seen increased numbers of individuals with disabilities in important volunteer positions.  There are five individuals with physical disabilities on the Paralympic Advisory Committee.  Also, an individual with a disability was elected to a leadership position within the USOC's Athletes' Advisory Committee.

**3.     USOC Racial and Ethnic Minorities Profile**

Although we have had some changes in the ethnic and racial diversity of our staff, we feel confident that by implementing the Diversity Working Group recommendations including the hiring of a Director of Diversity and Inclusion we can more closely reflect the racial and ethnic diversity of the US.

EXHIBIT 28
004

### a.  USOC Staff

Racial and ethnic comparisons for USOC staff include all job and ethnicity categories according to EEOC guidelines and reporting requirements, as of December 31, 2012, are as follows:

**USOC Staff, All Job and Ethnicity Categories**
**Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 283 | 17 | 14 | 4 | 6 | 1 | 14 | 339 |
| Percent | 83.48% | 5.01% | 4.13% | 1.18% | 1.77% | 0.29% | 4.13% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 27 | 2 | 18 | 0 | 3 | 1 | 1 | 52 |
| Percent | 51.92% | 3.85% | 34.62% | 0.00% | 5.77% | 1.92% | 1.92% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 49 | 3 | 0 | 0 | 4 | 0 | 0 | 56 |
| Percent | 87.50% | 5.36% | 0.00% | 0.00% | 7.14% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Washington, DC** | | | | | | | | |
| USOC Staff | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| Percent | 80.00% | 20.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Staff** | | | | | | | | |
| USOC Staff | 8 | 0 | 1 | 0 | 0 | 0 | 1 | 10 |
| Percent | 80.00% | 0.00% | 10.00% | 0.00% | 0.00% | 0.00% | 10.00% | |
| | | | | | | | | |
| **Total Staff** | 371 | 23 | 33 | 4 | 13 | 2 | 16 | 462 |
| Percent | 80.30% | 4.98% | 7.14% | 0.87% | 2.81% | 0.43% | 3.46% | |

EXHIBIT 28
005

**USOC Staff: Officials and Managers**
**Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 98 | 6 | 2 | 0 | 1 | 0 | 5 | 112 |
| Percent | 87.50% | 5.36% | 1.79% | 0.00% | 0.89% | 0.00% | 4.46% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| Percent | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| Percent | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Washington, DC** | | | | | | | | |
| USOC Staff | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Percent | 75.00% | 25.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Staff** | | | | | | | | |
| USOC Staff | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 7 |
| Percent | 85.71% | 0.00% | 14.29% | 0.00% | 0.00% | 0.00% | 0.00% | |

EXHIBIT 28
006

**USOC Staff: Administrative Support Workers, Craft Workers, Operatives, Professionals, Service Workers and Technicians**
**Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 185 | 11 | 12 | 4 | 5 | 1 | 9 | 227 |
| Percent | 81.50% | 4.85% | 5.29% | 1.76% | 2.20% | 0.44% | 3.96% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 20 | 2 | 18 | 0 | 3 | 1 | 1 | 45 |
| Percent | 44.44% | 4.44% | 40.00% | 0.00% | 6.67% | 2.22% | 2.22% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 41 | 3 | 0 | 0 | 4 | 0 | 0 | 48 |
| Percent | 85.42% | 6.25% | 0.00% | 0.00% | 8.33% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Washington, DC** | | | | | | | | |
| USOC Staff | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Percent | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Staff** | | | | | | | | |
| USOC Staff | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| Percent | 66.67% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 33.33% | |

4. For the first time in 2012, the USOC surveyed its employees' veteran status according to VETS-100A categories to establish a benchmark for employment of veterans. As of 12/31/12, 6.49% of all USOC staff and 8.26% of Colorado staff were veterans.

EXHIBIT 28
007

### b. USOC Volunteers

Racial and ethnic distribution for the volunteer groups, as of December 31, 2012, is as follows:
**USOC Volunteers - Race and Ethnicity**

| Volunteers | White | Black | Hispanic | Asian | Two or More Races | Total |
|---|---|---|---|---|---|---|
| Board of Directors Count | 13 | 2 | 0 | 1 | 0 | 16 |
| Percent | 81.25% | 12.5% | 0% | 6.25% | 0% | |
| | | | | | | |
| Audit Committee Count | 3 | 1 | 0 | 1 | 0 | 5 |
| Percent | 60% | 20% | 0% | 20% | 0% | |
| | | | | | | |
| Compensation Committee Count | 4 | 1 | 0 | 0 | 0 | 5 |
| Percent | 80% | 20% | 0% | 0% | 0% | |
| | | | | | | |
| Ethics Committee Count | 4 | 1 | 0 | 0 | 0 | 5 |
| Percent | 80% | 20% | 0% | 0% | 0% | |
| | | | | | | |
| Nom./Governance Comm. Count | 5 | 0 | 0 | 0 | 0 | 5 |
| Percent | 100% | 0% | 0% | 0% | 0% | |
| | | | | | | |
| Paralympic Advisory Comm. Count | 11 | 1 | 0 | 0 | 0 | 12 |
| Percent | 91.67% | 8.33% | 0% | 0% | 0% | |

## B.  USOC Diversity and Inclusion Initiatives

*USOC Diversity and Inclusion Vision Statement:*
> **The U.S. Olympic and Paralympic Family embraces the spirit of differences for better athletic performance and business results.**

USOC Diversity and Inclusion is: MANY FACES, ONE TEAM and ONE MISSION.

The Olympic and Paralympic Movements can thrive in the United States only if the entire Olympic and Paralympic Family – including the USOC and the US NGBs – strives to reflect the changing face of the United States as a whole.  The USOC is dedicated to recruiting, hiring and promoting qualified applicants without regard to age, race, sex, color, religion, national origin, disability, veteran status, sexual orientation, gender identity or expression, genetic information or any other status protected by federal, state or local law, where applicable.  The USOC recognizes and supports the value of diversity in persons and perspectives.  Diversity initiatives are integrated into every aspect of the organization.  Below is a description of the diversity initiatives:

## 1.    USOC Human Resource Division Diversity and Inclusion Initiatives

The Human Resources Division of the USOC has policies and procedures that are intended to facilitate a productive environment for all employees.  The term "diversity" is broadly used to refer to many variables, including but not limited to, gender, national origin, race, religion and

EXHIBIT 28
008

# EXHIBIT "29"



**EXHIBIT C**
USOC Quadrennial Census Summary and Diversity & Inclusion Initiatives

The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220511(a), specifically calls for the USOC to submit a report on a quadrennial basis on the following requirements regarding the USOC:

- Data concerning the participation of women, disabled individuals, and racial and ethnic minorities in the administration of the USOC.
- Description of USOC diversity initiatives including human resource programs and practices that facilitate a productive and diverse environment for all.

The U.S. Olympic and Paralympic family embraces the spirit of difference for better athletic performance and business results. The USOC has recognized and supported the value of diversity in persons and perspectives, and has sought to build a culture of diversity within the organization. We have created a world-class human resources organization committed to supporting diversity initiatives throughout every component of the organization and with the establishment of a diversity and inclusion program, we feel strongly that we can continue to reach diverse communities.

The best example of how seriously the USOC takes diversity is the composition of the USOC board. Of the USOC's 16-member board, there are seven women and four racially diverse members. Minority representation has been present on the board since its restructuring in 2004.

This commitment to diversity extends to the management team and to senior professional positions. We are cognizant of the changing demographics of our country and work to ensure our staff and leadership team reflect the diversity of our country. For years, the USOC has employed a high percentage of women in professional positions, and we are committed to continuing this trend.

We are confident our efforts will continue to produce results. Our commitment to diversity and inclusion is reflected in the creation of the director of diversity and inclusion position and the program to identify new ways to approach this important effort over the next quadrennium. The USOC is a unique organization in the United States that carries out a tremendously important role. It is an organization that should speak to every American.

EXHIBIT 29
001



**A.  USOC Statistical Census Data**

This section provides the statistical data concerning the participation of women, disabled individuals, and racial and ethnic minorities in the administration of the USOC. The census data represents the 469 staff and 16 members of the board at the end of the 2013-16 quadrennium.

*USOC Professional Staff* - As of Dec. 31, 2016, the USOC had staff offices in three states (Colorado, California and New York) and the District of Columbia. The USOC's headquarters and U.S. Olympic Training Center in Colorado Springs, Colorado, were home to 73 percent of the total staff population. The census data collected relating to the USOC staff is separated into two groups according to EEO-1 job categories:

   1) USOC staff in executive/senior level, and first/mid-level officials and managers job categories, including CEO, chiefs and managing directors/vice presidents; most directors, associate directors and managers; and all who supervise other staff members.
   2) USOC staff in administrative support, craft workers, operatives, professionals, service workers and technicians job categories.

*USOC Volunteers* - As of Dec. 31, 2016, the volunteer population represented the USOC's board of directors, Audit Committee, Compensation Committee, Ethics Committee, Nominating and Governance Committee, and the Paralympic Advisory Committee. The USOC board consisted of 16 individuals, the Audit Committee consisted of five individuals, and the Compensation Committee consisted of five individuals, all of whom were also members of the board of directors. The Nominating and Governance Committee consisted of five individuals, two of whom were members of the board of directors. The Ethics Committee consisted of five members, one of whom was a member of the board of directors. The Paralympic Advisory Committee consisted of 12 members, one of whom was a member of the board of directors. (**Exhibit F** - USOC Bylaws). The USOC also uses volunteers across the organization for events, projects and advisory commissions, but does not track demographics for those groups.

**1.      USOC Gender Profile**

The USOC has seen some encouraging trends over the quadrennium regarding gender representation.  The most notable difference is at the Board level.  The overall number and percentage of women on the USOC Board increased, as did the number of women on the audit and ethics committees of the Board.  Male/female representation in First/Mid Level Officials and Managers and Professionals roles continues to be nearly equal.  Since the previous quad report, the overall number of females in the Executive/Senior Level Officials and Managers category dropped from 10 to 8, while males in this category increased from 15 to 18.

EXHIBIT 29
002



**a. USOC Staff**

The gender profile for USOC staff, as of December 31, 2016, is as follows:
**United States Olympic Committee - Gender Profile**

| | Male | Female | Total |
|---|---|---|---|
| **Executive/Senior Level Officials and Managers** | | | |
| USOC Staff | 18 | 8 | 26 |
| Percent of Total Staff | 3.84% | 1.71% | 5.54% |
| | | | |
| **First/Mid Level Officials and Managers** | | | |
| USOC Staff | 80 | 84 | 164 |
| Percent of Total Staff | 17.06% | 17.91% | 34.97% |
| | | | |
| **Administrative Support Workers** | | | |
| USOC Staff | 18 | 77 | 95 |
| Percent of Total Staff | 3.84% | 16.42% | 20.26% |
| | | | |
| **Craft Workers** | | | |
| USOC Staff | 11 | 0 | 11 |
| Percent of Total Staff | 2.35% | 0.00% | 2.35% |
| | | | |
| **Operatives** | | | |
| USOC Staff | 4 | 7 | 11 |
| Percent of Total Staff | 0.85% | 1.49% | 2.35% |
| | | | |
| **Professionals** | | | |
| USOC Staff | 34 | 44 | 78 |
| Percent of Total Staff | 7.25% | 9.38% | 16.63% |
| | | | |
| **Service Workers** | | | |
| USOC Staff | 45 | 33 | 78 |
| Percent of Total Staff | 9.59% | 7.04% | 16.63% |
| | | | |
| **Technicians** | | | |
| USOC Staff | 4 | 2 | 6 |
| Percent of Total Staff | 0.85% | 0.43% | 1.28% |
| | | | |
| **USOC Staff Count** | 214 | 255 | 469 |
| USOC Staff Percent | 45.63% | 54.37% | 100.00% |

EXHIBIT 29
003



**b. USOC Volunteers**

The gender profile for USOC volunteers, as of December 31, 2016, is as follows:
**USOC Volunteers – Gender Profile**

|  | Male | Female | Total |
|---|---|---|---|
| Board of Directors Count | 9 | 7 | 16 |
| Percent | 56.25% | 43.75% | |
| | | | |
| Audit Committee Count | 2 | 3 | 5 |
| Percent | 40% | 60% | |
| | | | |
| Compensation Committee Count | 2 | 3 | 5 |
| Percent | 40% | 60% | |
| | | | |
| Ethics Committee Count | 3 | 2 | 5 |
| Percent | 60% | 40% | |
| | | | |
| Nom./Governance Comm. Count | 3 | 2 | 5 |
| Percent | 60% | 40% | |
| | | | |
| Paralympic Advisory Comm. Count | 9 | 3 | 12 |
| Percent | 75% | 25% | |

**2.      USOC Summary of Practices Regarding Individuals with Disabilities**

**a.  Employees and Volunteers** – In the past quad, the number of USOC employees with self-disclosed disabilities dropped from 14 to 7, primarily due to ending the VA Adaptive Sports Grant in 2014.

In addition to the trends we have seen in our estimates for USOC employees, we have also seen increased numbers of individuals with disabilities in important volunteer positions.  There are five individuals with physical disabilities on the Paralympic Advisory Committee.  Also, an individual with a disability was elected to a leadership position within the USOC's Athletes' Advisory Committee.

**3.      USOC Racial and Ethnic Minorities Profile**

Although we have had some changes in the ethnic and racial diversity of our staff, we feel confident that by implementing the Diversity Working Group recommendations including the hiring of a Director of Diversity and Inclusion we can more closely reflect the racial and ethnic diversity of the US.

**a.  USOC Staff**

Racial and ethnic comparisons for USOC staff including all EEO job and ethnicity categories, as of December 31, 2016, are as follows:

EXHIBIT 29
004



**USOC Staff, All Job and Ethnicity Categories**
**Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 285 | 11 | 24 | 5 | 5 | 1 | 11 | 342 |
| Percent | 83.33% | 3.22% | 7.02% | 1.46% | 1.46% | 0.29% | 3.22% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 29 | 5 | 17 | 0 | 1 | 0 | 0 | 52 |
| Percent | 55.77% | 9.62% | 32.69% | 0.00% | 1.92% | 0.00% | 0.00% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 54 | 0 | 0 | 0 | 3 | 0 | 1 | 58 |
| Percent | 93.10% | 0.00% | 0.00% | 0.00% | 5.17% | 0.00% | 1.72% | |
| | | | | | | | | |
| **Washington, D.C.** | | | | | | | | |
| USOC Staff | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| Percent | 80.00% | 20.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Employees (Other States)** | | | | | | | | |
| USOC Staff | 11 | 0 | 1 | 0 | 0 | 0 | 0 | 12 |
| Percent | 91.67% | 0.00% | 8.33% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **USOC Staff Count** | 383 | 17 | 42 | 5 | 9 | 1 | 12 | 469 |
| Percent | 81.66% | 3.62% | 8.96% | 1.07% | 1.92% | 0.21% | 2.56% | |

EXHIBIT 29
005



**USOC Staff: Executive/Senior Level and First/Mid Level Officials and Managers
Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 126 | 5 | 6 | 2 | 3 | 1 | 8 | 151 |
| Percent | 83.44% | 3.31% | 3.97% | 1.32% | 1.99% | 0.66% | 5.30% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 10 | 0 | 2 | 0 | 0 | 0 | 0 | 12 |
| Percent | 83.33% | 0.00% | 16.67% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 16 | 0 | 0 | 0 | 1 | 0 | 0 | 17 |
| Percent | 94.12% | 0.00% | 0.00% | 0.00% | 5.88% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Washington, D.C.** | | | | | | | | |
| USOC Staff | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Percent | 66.67% | 33.33% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Staff** | | | | | | | | |
| USOC Staff | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 7 |
| Percent | 85.71% | 0.00% | 14.29% | 0.00% | 0.00% | 0.00% | 0.00% | |

EXHIBIT 29
006



**USOC Staff: Administrative Support Workers, Craft Workers, Operatives, Professionals, Service Workers and Technicians**
**Race and Ethnicity**

| | White | Black or African American | Hispanic or Latino | American Indian or Alaska Native | Asian | Native Hawaiian or Other Pacific Islander | Two or More Races | Total |
|---|---|---|---|---|---|---|---|---|
| **Colorado** | | | | | | | | |
| USOC Staff | 159 | 6 | 18 | 3 | 2 | 0 | 3 | 191 |
| Percent | 83.25% | 3.14% | 9.42% | 1.57% | 1.05% | 0.00% | 1.57% | |
| | | | | | | | | |
| **California** | | | | | | | | |
| USOC Staff | 19 | 5 | 15 | 0 | 1 | 0 | 0 | 40 |
| Percent | 47.50% | 12.50% | 37.50% | 0.00% | 2.50% | 0.00% | 0.00% | |
| | | | | | | | | |
| **New York** | | | | | | | | |
| USOC Staff | 38 | 0 | 0 | 0 | 2 | 0 | 1 | 41 |
| Percent | 92.68% | 0.00% | 0.00% | 0.00% | 4.88% | 0.00% | 2.44% | |
| | | | | | | | | |
| **Washington, D.C.** | | | | | | | | |
| USOC Staff | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Percent | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | | | | | | | | |
| **Remote Staff** | | | | | | | | |
| USOC Staff | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Percent | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |

4. For the first time in 2012, the USOC surveyed its employees to establish a benchmark for employment of veterans.  As of 12/31/12, 6.5% of all USOC staff and 8.3% of Colorado staff self-disclosed they were veterans.  As of 12/31/16, 3.2% of all USOC staff and 4.4% of Colorado staff self-disclosed they were veterans.  This decline in veteran numbers was primarily due to ending the VA Adaptive Sports Grant in 2014.

EXHIBIT 29
007



**b. USOC Volunteers**

Racial and ethnic distribution for the volunteer groups, as of December 31, 2016, is as follows:
**USOC Volunteers - Race and Ethnicity**

| Volunteers | White | Black | Hispanic | Asian | Two or More Races | Total |
|---|---|---|---|---|---|---|
| Board of Directors Count | 12 | 3 | 0 | 1 | 0 | 16 |
| Percent | 75% | 18.75% | 0% | 6.25% | 0% | |
| | | | | | | |
| Audit Committee Count | 3 | 1 | 0 | 1 | 0 | 5 |
| Percent | 60% | 20% | 0% | 20% | 0% | |
| | | | | | | |
| Compensation Committee Count | 4 | 1 | 0 | 0 | 0 | 5 |
| Percent | 80% | 20% | 0% | 0% | 0% | |
| | | | | | | |
| Ethics Committee Count | 4 | 1 | 0 | 0 | 0 | 5 |
| Percent | 80% | 20% | 0% | 0% | 0% | |
| | | | | | | |
| Nom./Governance Comm. Count | 5 | 0 | 0 | 0 | 0 | 5 |
| Percent | 100% | 0% | 0% | 0% | 0% | |
| | | | | | | |
| Paralympic Advisory Comm. Count | 11 | 1 | 0 | 0 | 0 | 12 |
| Percent | 91.67% | 8.33% | 0% | 0% | 0% | |

**B.  USOC Diversity and Inclusion Initiatives**

*USOC Diversity and Inclusion Vision Statement:*
> ***The U.S. Olympic and Paralympic Family embraces the spirit of differences for better athletic performance and business results.***

USOC Diversity and Inclusion is: MANY FACES, ONE TEAM and ONE MISSION.

The Olympic and Paralympic Movements can thrive in the United States only if the entire Olympic and Paralympic Family – including the USOC and the US NGBs – strives to reflect the changing face of the United States as a whole.  The USOC is dedicated to recruiting, hiring and promoting qualified applicants without regard to age, race, sex, color, religion, national origin, disability, veteran status, sexual orientation, gender identity or expression, genetic information or any other status protected by federal, state or local law, where applicable.  The USOC recognizes and supports the value of diversity in persons and perspectives.  Diversity initiatives are integrated into every aspect of the organization.  Below is a description of the diversity initiatives:

EXHIBIT 29
008



**1.      USOC Human Resources Division Diversity and Inclusion Initiatives**

The Human Resources Division of the USOC has policies and procedures that are intended to facilitate a productive environment for all employees.  The term "diversity" is broadly used to refer to many variables, including, but not limited to, age, race, sex, color, religion, national origin, disability, veteran status, sexual orientation, gender identity or expression, genetic information, or any other status protected by federal, state or local law.  The Human Resources Division promotes diversity and inclusion through both prevalent and best practice human resources programs and through a focus on management commitment, communication, statistical analysis, and employee training and development.  The USOC's equal employment opportunity policy reads as follows:

> "The United States Olympic Committee is dedicated to the principles of equal employment opportunity in any and all terms, conditions or privileges of employment including hiring, promotions, termination, training and compensation.  The USOC does not discriminate against applicants or employees on the basis of age, race, sex, color, religion, national origin, disability, veteran status, sexual orientation, gender identity or expression, genetic information or any other status protected by federal, state or local law, where applicable.  Furthermore, the USOC is committed to a work environment free of discrimination and harassment through respecting and valuing the diversity among employees and all those with whom the USOC does business."

**a. Traditional Human Resources Programs -** The USOC human resources programs and practices promote and support our commitment to diversity.

*Employee Handbook*
The employee handbook is a brief communication tool for employees which articulates the ethics, values and spirit of the Olympic Movement while providing general information on current policies and procedures.  The handbook references in detail state, local, Federal and USOC policy, including equal employment opportunity and anti-harassment principles.

*Equal Employment Opportunity Policy*
See policy above.

*USOC Total Rewards Philosophy*
The objectives of the USOC Total Rewards philosophy (as reviewed by the Compensation Committee of the Board of Directors annually) are:

- *To drive organizational performance and results through market competitive reward and benefit programs for employees*
- *To create consistency between all USOC locations by aligning them under one overall strategy*
- *To attract employees that represent "the right hire for the right position" and to increase retention through realization of Total Rewards*

EXHIBIT 29
009



*Recognition and Rewards Programs*
These programs reward and motivate performance that upholds the USOC's core values and standards for excellence.  Current programs include:

- The USOC Reward and Recognition Program provides cash awards to USOC team members for timely recognition of extraordinary results or behaviors.  It includes three award levels:  gold, silver and bronze.
- The USOC Star Performer Rewards Program provides limited cash rewards for high performers, with the aim of enhancing a pay for performance culture at the USOC.
- The High Five Program offers an opportunity for peer-to-peer public recognition of colleagues' actions that embody USOC core principles.

*Local and National Employment Advertising and Posting*
The USOC uses a variety of online and print outlets to distribute and communicate open jobs to the local and national community in addition to job postings on www.TeamUSA.org/careers.  Job openings are forwarded to NGBs, educational institutions, trade organizations and posted on sites such as, but not limited to, LinkedIn, Indeed.com, Monster.com and www.ncaa.com, advertised in print publications such as *The Colorado Springs Gazette, The Denver Post, Sports Business Daily, The Union Tribune, Sports and Spokes, The African American Voice* and *Hispania News*.

*Hiring and Promotion Practices*
The USOC is an equal opportunity employer and hires and promotes individuals based on their qualifications and ability to do the job.  The USOC further believes that hiring qualified individuals contributes to the overall strategic success of the organization, and each employee, while employed, is hired to perform and make significant achievements for the position.

*Code of Conduct*
The USOC Code of Conduct requires its volunteers and staff to conduct business with integrity, to maintain a standard of ethical conduct and to be guided by the knowledge that we are guardians of the Olympic values, spirit and ideals.  The Code of Conduct's guiding principles include conducting all dealings with integrity, honesty, and fairness, respecting the rights of all others including by avoiding discrimination or harassment, adhering to conflicts of interest and anti-bribery principles in dealings with others, and protecting confidential information.  The Code includes protections and easy means of reporting for whistleblowers. (**Exhibit G**).

*New Hire Orientation Program*
The New Hire orientation program on-boards all new employees into the organization so they can quickly and efficiently provide a valuable contribution. Employees are informed of policies and procedures, briefed on the USOC culture, make benefit decisions and familiarize themselves with the USOC's Code of Conduct.

Further, new employees attend a New Team Member Assimilation program.  At this program, the employees become familiar with the broader context of the organization, the global Olympic and Paralympic movements, the USOC leadership team and the Key USOC Behaviors that drive decision making.

EXHIBIT 29
010



*Performance Planning and Review*
The performance planning and review process is a mutually agreed upon documented appraisal plan that ties to both business results (goal achievement) and key behaviors.  The process includes goal setting, measuring key accountabilities and objective performance assessment by both team members and their leaders.  Assessments are performed annually for team members, and year-end reviews are maintained by Human Resources.

USOC Key Behaviors of *Customer Service, Communication,* and *Teamwork* were incorporated into USOC Performance Management in 2012.  *Judgment* was added to USOC Key Behaviors in 2015.  Team members' performance review ratings are based upon the expression of these behaviors through their work:

- Customer Service
  - Anticipates and responds to the needs of athletes, NGBs, USOC colleagues and other customers
  - Enhances customer success; suggests ways to improve processes and fulfill customer needs
  - Gains trust with constituents ethically and responsibly
  - Is accessible to constituents
- Communication
  - Clearly conveys and receives information in an honest, straightforward manner
  - Keeps others informed as appropriate
  - Influences others and resolves conflicts in a positive, ethical way; admits mistakes
- Teamwork
  - Builds trust by keeping commitments and promises
  - Collaborates and cooperates to get the job done
  - Is inclusive: values the opinions and beliefs of others
  - Assess impact of decisions on others
  - Treats others with respect through words and actions
- Judgment
  - Uses appropriate mix of experience, innovation and factual information to problem solve or make quality decisions in a timely manner
  - Roots decisions and solutions in the USOC mission and guiding principles
  - Gets required approvals when necessary

**b. Communication**
The establishment and implementation of a two-way employee communication plan provides a platform for communicating with employees both horizontally and vertically.  Current and future communication vehicles include, but are not limited to, all-employee meetings called "Town Halls", supervisor communication training, intranet, newsletters, bulletin boards, organization-wide email communiqués, social media vehicles, skip level meetings between the CEO and employees, and an anonymous employee hotline for reporting concerns.

EXHIBIT 29
011



**c. Statistical Analysis**

An essential element of a successful diversity initiative is evaluating results and measuring progress. Monthly reports analyzing our employment ratios are used to analyze and compare EEO statistics to that of our community.  Current program tracking includes EEO reporting and exit questionnaire tracking as well as hiring statistics, promotion statistics, turnover statistics, and compensation statistics.

**d. Training and Development**

Training and Development at the USOC is designed to reinforce the USOC's commitment to diversity while allowing employees the opportunity to obtain the awareness, skills, knowledge and ability to carry out their individual responsibilities. Team USA Academy of Learning and Leadership (the USOC's internal training department) runs programs that communicate the importance of a respectful work environment in maximizing the performance of every employee and enhancing the USOC's ability to attract, develop and retain the best and brightest talent. Training classes include (but are not limited to):  Civil Treatment for Leaders and Civil Treatment for Employees (both focused on ethical treatment of employees from harassment to diversity), Customer Service, Project Management, Leading Change, Business Case Training, Leading High Performing Teams, Candid Communication, Performance Management Training, Effective Communications and Human Relations, and Global Mindset and Business Practices.

*Intern Program*

The intern program is available to college students, covering fall, spring and summer semesters.  The USOC intern program is a robust and exceptionally competitive program designed to enhance personal and career growth by providing valuable experiences and contacts within the sports industry while bringing together students from around the country. University students nationwide are invited to apply.  Diversity statistics are considered when reviewing the entire intern class prior to extending the invitation to join the program, which promotes an inclusive environment.

**2.      F.L.A.M.E.® - Finding Leaders Among Minorities Everywhere**

Background – F.L.A.M.E. was created in 1994 to help educate, encourage and demonstrate to minority youth that any goal is attainable through adherence to the Olympic Ideals of Persistence, Vision, Focus, Discipline and Commitment.  Minority students from throughout the nation are encouraged to apply to participate in a comprehensive multi-day leadership program focused on educating and exposing youth to Olympism and the internal structure of the USOC. The program is held annually at the U.S. Olympic Complex in Colorado Springs and the average number of participants is 30.  2013 will mark the 20th anniversary of F.L.A.M.E.

Program Goals:  F.L.A.M.E. provides minority student opportunities for personal and professional growth through:

- exposure to diverse sports lifestyles outside their normal environment, and
- introductions to potential role models/leaders to whom they can relate and potentially emulate.

EXHIBIT 29
012



Participant Selection:  Participants are identified through a selection process coordinated by the F.L.A.M.E. program staff.  Each year, applications are distributed to various colleges and universities across the nation as well as USOC member organizations.  Applicants are required to complete the application form, provide essays and letters of recommendation, and demonstrate leadership in their pursuit of academic achievement, athletic excellence and community involvement.  Qualified applicants are undergraduate or graduate college students (ages 18-24).

Program Content: During the program, F.L.A.M.E. participants reside in the Olympic Training Center dormitories, eat at the Athlete Dining Hall, and have opportunities to interact with Olympians, Paralympians, and hopefuls daily.  The program agenda includes motivational presentations by Olympians and Paralympians, leadership seminars conducted by USOC and NGB staff leaders, networking and financial literacy workshops, Olympic and Paralympic sport demonstrations, field trips to local attractions and information on the USOC Internship Program.  Previous speakers at the F.L.A.M.E. program have included legendary athletes such as: gold medalist **Theresa Edwards** (Women's Basketball), 10,000 meter gold medalist **Billy Mills** (track & field, 1960), silver and gold medalist **Derek Parra** (speedskating, 1998, 2002) and Paralympic bronze and gold medalist **April Holmes** (track and field, 2004, 2008).

## 3.     USOC Diversity and Inclusion Initiatives

Diversity and Inclusion Program:  In May of 2012, the USOC hired its first Director for Diversity and Inclusion.  This hiring was the result of the recommendations of the USOC Diversity Working Group.  (The full recommendations can be found in **Exhibit H**.)  The goal of the USOC Diversity and Inclusion program is twofold: to increase performance and ensure long-term support for U.S. athletes and NGBs by harnessing the synergy of many diverse talents into a high-performing team.  The programs and initiatives currently in development or already implemented include:

   a.   NGB Diversity Champions:  Each NGB was asked to identify a "Diversity Champion" from within their NGB.  That NGB's Diversity Champion will serve as the point of contact for issues related to Diversity and Inclusion.  The Diversity Champions will be an integral part of sharing best practices within the NGBs and will assist the USOC in partnering with the NGB to ensure the full participation of all Americans.

   b.   Diversity and Inclusion Fund:  The USOC has begun raising dollars that will directly impact America's athletes and coaches.  The funds will go directly to NGBs and other programs designed to diversify the individuals participating in each sport, and will help to ensure inclusion and long-term competitive excellence for America's athletes, both at the elite and grassroots levels.

   c.   Employee Resource Groups:  The USOC has created guidelines and encourages the development of Employee Resource Groups (ERGs).  The development of ERGs is considered a best practice in the area of diversity and inclusion among top performing companies.  ERGs improve employee satisfaction and increase retention of high performers.  The first ERG for young professionals has been established and has had several meetings and events to date.

EXHIBIT 29
013



d.  NGB Diversity and Inclusion Toolkit:  The USOC is developing a "Diversity and Inclusion Toolkit" to assist the NGBs to ensure that their respective sports are inclusive of all Americans.  The Toolkit will include successful case studies, best practices and will collect successful NGB athlete and program initiatives.

e.  Athlete, Leader and Program Development:  The USOC and NGBs will actively reach out to and partner with relevant organizations to widen pathways for leaders, athletes and program development.

# EXHIBIT "30"

**U.S. Olympic Committee**
**Estimated CA-related Revenue**

| Revenue | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USOC New Activity | 4,666,422 | 20,114,917 | 13,087,988 | 9,032,835 | 10,218,201 | 12,015,241 | 16,784,781 | 15,667,860 | 12,238,584 | 31,468,971 | 20,675,337 | 21,505,667 | 22,848,854 | 31,960,036 | 38,224,012 | 38,778,655 | 59,869,133 | 44,527,784 | 48,664,196 | 44,678,913 | 18,562,071 | 14,413,295 | 552,483,123 |
| CA New Activity | 457,048 | 762,097 | 1,588,570 | 1,009,063 | 1,537,393 | 1,710,038 | 2,462,668 | 2,407,634 | 1,563,054 | 2,393,070 | 3,482,972 | 2,979,880 | 3,588,856 | 5,149,079 | 6,597,381 | 5,951,253 | 6,034,610 | 6,339,716 | 10,255,032 | 13,478,239 | 2,075,483 | 2,496,721 | 84,308,852 |
| PERCENT = CA | 9.4% | 3.8% | 12.1% | 11.2% | 15.0% | 14.3% | 14.7% | 15.4% | 12.8% | 15.5% | 16.8% | 13.9% | 15.7% | 16.1% | 17.3% | 15.3% | 16.4% | 14.2% | 21.1% | 28.9% | 11.5% | 17.3% | 16.5% |

*New Activity = Outright Contributions and Pledged Commitments*

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USOC Cash Payments | 4,666,422 | 20,114,917 | 13,087,988 | 9,002,727 | 10,227,921 | 12,015,241 | 16,784,781 | 15,257,418 | 12,157,457 | 15,444,782 | 20,709,185 | 20,050,644 | 21,321,073 | 28,859,351 | 53,521,831 | 32,553,943 | 28,828,123 | 31,463,682 | 42,717,341 | 31,936,601 | 23,928,945 | 16,847,125 | 461,265,394 |
| CA Cash Payments | 457,048 | 762,097 | 1,588,570 | 1,009,063 | 1,537,393 | 1,710,038 | 2,462,668 | 2,312,634 | 1,545,054 | 2,465,075 | 3,478,812 | 2,974,535 | 3,303,375 | 4,578,862 | 5,825,854 | 4,861,002 | 4,162,980 | 4,807,964 | 9,031,727 | 6,670,700 | 4,585,430 | 3,604,776 | 73,671,617 |
| PERCENT = CA | 9.4% | 3.8% | 12.1% | 11.2% | 15.0% | 14.3% | 14.7% | 15.2% | 12.7% | 15.6% | 16.8% | 14.8% | 15.5% | 15.9% | 17.5% | 14.9% | 14.4% | 15.3% | 21.2% | 20.9% | 19.2% | 21.4% | 16.0% |

*Cash Payments = Outright Contributions and Pledge Payments (net benefits)*

EXHIBIT 30
001

# EXHIBIT "31"

**Part V**   **Transactions With Related Organizations** (Complete if the organization answered "Yes" to Form 990, Part IV, line 34, 35b, or 36.)

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| a Receipt of (i) interest (ii) annuities (iii) royalties or (iv) rent from a controlled entity ................................................... | 1a | | X |
| b Gift, grant, or capital contribution to related organization(s) ................................................................................... | 1b | | X |
| c Gift, grant, or capital contribution from related organization(s) ............................................................................... | 1c | X | |
| d Loans or loan guarantees to or for related organization(s) ..................................................................................... | 1d | | X |
| e Loans or loan guarantees by related organization(s) ............................................................................................. | 1e | | X |
| | | | |
| f Dividends from related organization(s) ................................................................................................................. | 1f | | X |
| g Sale of assets to related organization(s) .............................................................................................................. | 1g | | X |
| h Purchase of assets from related organization(s) .................................................................................................... | 1h | | X |
| i Exchange of assets with related organization(s) .................................................................................................... | 1i | | X |
| j Lease of facilities, equipment, or other assets to related organization(s) ............................................................... | 1j | | X |
| | | | |
| k Lease of facilities, equipment, or other assets from related organization(s) ........................................................... | 1k | | X |
| l Performance of services or membership or fundraising solicitations for related organization(s) .............................. | 1l | | X |
| m Performance of services or membership or fundraising solicitations by related organization(s) .............................. | 1m | | X |
| n Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) ................................... | 1n | | X |
| o Sharing of paid employees with related organization(s) ......................................................................................... | 1o | | X |
| | | | |
| p Reimbursement paid to related organization(s) for expenses ................................................................................ | 1p | X | |
| q Reimbursement paid by related organization(s) for expenses ................................................................................ | 1q | X | |
| | | | |
| r Other transfer of cash or property to related organization(s) .................................................................................. | 1r | X | |
| s Other transfer of cash or property from related organization(s) .............................................................................. | 1s | | X |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of other organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| **(1)** United States Olympic Foundation | C | 9,016,623. | Fair Value |
| **(2)** United States Olympic Foundation | R | 302,052. | Fair Value |
| **(3)** | | | |
| **(4)** | | | |
| **(5)** | | | |
| **(6)** | | | |

EXHIBIT 31
001

# EXHIBIT "32"

**Part V**  **Transactions With Related Organizations** (Complete if the organization answered "Yes" to Form 990, Part IV, line 34, 35, 35a, or 36.)

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

|  |  | Yes | No |
|---|---|---|---|
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? |  |  |  |
| **a** Receipt of **(i)** interest **(ii)** annuities **(iii)** royalties or **(iv)** rent from a controlled entity | 1a |  | X |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b |  | X |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | X |  |
| **d** Loans or loan guarantees to or for related organization(s) | 1d |  | X |
| **e** Loans or loan guarantees by related organization(s) | 1e |  | X |
| **f** Sale of assets to related organization(s) | 1f |  | X |
| **g** Purchase of assets from related organization(s) | 1g |  | X |
| **h** Exchange of assets with related organization(s) | 1h |  | X |
| **i** Lease of facilities, equipment, or other assets to related organization(s) | 1i |  | X |
| **j** Lease of facilities, equipment, or other assets from related organization(s) | 1j |  | X |
| **k** Performance of services or membership or fundraising solicitations for related organization(s) | 1k |  | X |
| **l** Performance of services or membership or fundraising solicitations by related organization(s) | 1l |  | X |
| **m** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1m |  | X |
| **n** Sharing of paid employees with related organization(s) | 1n |  | X |
| **o** Reimbursement paid to related organization(s) for expenses | 1o |  | X |
| **p** Reimbursement paid by related organization(s) for expenses | 1p |  | X |
| **q** Other transfer of cash or property to related organization(s) | 1q |  | X |
| **r** Other transfer of cash or property from related organization(s) | 1r |  | X |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a)<br>Name of other organization | (b)<br>Transaction<br>type (a-r) | (c)<br>Amount involved | (d)<br>Method of determining<br>amount involved |
|---|---|---|---|
| **(1)** United States Olympic Foundation | C | 8,576,768. | Fair Value |
| **(2)** |  |  |  |
| **(3)** |  |  |  |
| **(4)** |  |  |  |
| **(5)** |  |  |  |
| **(6)** |  |  |  |

132163 01-23-12

71

Schedule R (Form 990) 2011

EXHIBIT 32
001

# EXHIBIT "33"

Schedule R (Form 990) 2013   United States Olympic Committee                                    13-1548339          Page **3**

| **Part V** | **Transactions With Related Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36. |

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|:---:|:---:|
| **1** | During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | |
| **a** | Receipt of **(i)** interest **(ii)** annuities **(iii)** royalties or **(iv)** rent from a controlled entity | 1a | | X |
| **b** | Gift, grant, or capital contribution to related organization(s) | 1b | | X |
| **c** | Gift, grant, or capital contribution from related organization(s) | 1c | X | |
| **d** | Loans or loan guarantees to or for related organization(s) | 1d | | X |
| **e** | Loans or loan guarantees by related organization(s) | 1e | | |
| | | | | |
| **f** | Dividends from related organization(s) | 1f | | X |
| **g** | Sale of assets to related organization(s) | 1g | | X |
| **h** | Purchase of assets from related organization(s) | 1h | | X |
| **i** | Exchange of assets with related organization(s) | 1i | | X |
| **j** | Lease of facilities, equipment, or other assets to related organization(s) | 1j | | X |
| | | | | |
| **k** | Lease of facilities, equipment, or other assets from related organization(s) | 1k | | X |
| **l** | Performance of services or membership or fundraising solicitations for related organization(s) | 1l | | X |
| **m** | Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | X |
| **n** | Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | X |
| **o** | Sharing of paid employees with related organization(s) | 1o | | X |
| | | | | |
| **p** | Reimbursement paid to related organization(s) for expenses | 1p | | X |
| **q** | Reimbursement paid by related organization(s) for expenses | 1q | | X |
| | | | | |
| **r** | Other transfer of cash or property to related organization(s) | 1r | X | |
| **s** | Other transfer of cash or property from related organization(s) | 1s | | X |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| **(a)** Name of related organization | **(b)** Transaction type (a-s) | **(c)** Amount involved | **(d)** Method of determining amount involved |
|---|:---:|---:|---|
| **(1)** United States Olympic Endowment | C | 9,309,931. | Fair Value |
| **(2)** United States Olympic Endowment | R | 313,026. | Fair Value |
| **(3)** | | | |
| **(4)** | | | |
| **(5)** | | | |
| **(6)** | | | |

332163 09-12-13

73

Schedule R (Form 990) 2013

EXHIBIT 33
001

# EXHIBIT "34"

Schedule R (Form 990) 2015   United States Olympic Committee                                    13-1548339            Page **3**

| Part V | Transactions With Related Organizations Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36. |

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | | Yes | No |
|---|---|---|---|---|
| 1 | During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| a | Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | X |
| b | Gift, grant, or capital contribution to related organization(s) | 1b | X | |
| c | Gift, grant, or capital contribution from related organization(s) | 1c | X | |
| d | Loans or loan guarantees to or for related organization(s) | 1d | | X |
| e | Loans or loan guarantees by related organization(s) | 1e | | X |
| f | Dividends from related organization(s) | 1f | | X |
| g | Sale of assets to related organization(s) | 1g | | X |
| h | Purchase of assets from related organization(s) | 1h | | X |
| i | Exchange of assets with related organization(s) | 1i | | X |
| j | Lease of facilities, equipment, or other assets to related organization(s) | 1j | | X |
| k | Lease of facilities, equipment, or other assets from related organization(s) | 1k | | X |
| l | Performance of services or membership or fundraising solicitations for related organization(s) | 1l | X | |
| m | Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | X |
| n | Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | X | |
| o | Sharing of paid employees with related organization(s) | 1o | | X |
| p | Reimbursement paid to related organization(s) for expenses | 1p | | X |
| q | Reimbursement paid by related organization(s) for expenses | 1q | X | |
| r | Other transfer of cash or property to related organization(s) | 1r | | X |
| s | Other transfer of cash or property from related organization(s) | 1s | | X |

2   If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a)<br>Name of related organization | (b)<br>Transaction type (a-s) | (c)<br>Amount involved | (d)<br>Method of determining amount involved |
|---|---|---|---|
| **(1)** United States Olympic and Paralympic Foundation | C | 3,321,498. | Fair Value |
| **(2)** United States Olympic and Paralympic Foundation | Q | 8,745,000. | Fair Value |
| **(3)** United States Olympic and Paralympic Foundation | L | 4,971,526. | Fair Value |
| **(4)** United States Olympic and Paralympic Foundation | N | 359,547. | Fair Value |
| **(5)** USOC HOSPITALITY, SERVICOS, COMERCIO, IMPORTACAO E EXPORTACAO LTDA. | B | 2,633,399. | Fair Value |
| **(6)** | | | |

EXHIBIT 34

001

# EXHIBIT "35"

| S&DC-S/N | **Statement and Designation by Foreign Corporation** | 3639196 |
|---|---|---|

To qualify a corporation from another state or country to transact intrastate business in California, fill out this form, and submit for filing along with:

- A **$100** filing fee (for a foreign stock corporation) or **$30** filing fee (for a foreign nonprofit corporation), and
- A certificate of good standing, issued within the last six (6) months by the agency where the corporation was formed. **Note:** If the corporation is a nonprofit, the certificate of good standing also must indicate the corporation is a nonprofit or nonstock corporation.
- A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

**Important!** Corporations in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.



**FILED**
**Secretary of State**
**State of California**

IPC **JAN 2 1 2014**

This Space For Office Use Only

**For questions about this form, go to** www.sos.ca.gov/business/be/filing-tips.htm.

**Corporate Name** (List the exact name of the corporation, as shown in the certificate of good standing. If the name of the corporation is not available for use in the State of California, the corporation must qualify under an assumed name. E.g., "[list the exact name] which will do business in California as [list the proposed assumed name]." For general corporate name requirements and restrictions in California, go to www.sos.ca.gov/business/be/name-availability.htm.)

①    United States Olympic and Paralympic Foundation

**Corporate History**

②    State or foreign country where this corporation was formed:   Colorado

**Service of Process** (List a California resident or an active 1505 corporation in California that agrees to be your agent to accept service of process in case your corporation is sued. You may list any adult who lives in California. You may **not** list your own corporation as the agent. **Do not** list an address if the agent is a 1505 corporation as the address for service of process is already on file.)

③   a.   Christine Walshe
        *Agent's Name*

    b.   26535 Ocean View Drive       Malibu        **CA**   90265
        *Agent's Street Address (if agent is **not** a corporation) - Do not list a P.O. Box*    *City (no abbreviations)*    *State*   *Zip*

The corporation named in Item 1 above irrevocably consents to service of process directed to it upon the agent designated a͟b͟o͟v͟e, and to service of process on the California Secretary of State if that agent or that agent's successor is ͟l͟onger authorized to act or cannot be found at the address given.

**Corporate Addresses**

④   a.   27 S. Tejon             Colorado Springs    CO    80903
        *Street Address of Principal Executive Office - Do not list a P.O. Box*    *City (no abbreviations)*    *State*   *Zip*

    b.   N/A                                      **CA**
        *Street Address of Principal Office in California, if any - Do not list a P.O. Box*    *City (no abbreviations)*    *State*   *Zip*

    c.   One Olympic Plaza          Colorado Springs    CO    80909
        *Mailing Address of Principal Executive Office, if different from 4a or 4b*    *City (no abbreviations)*    *State*   *Zip*

**Read and sign below:** This form must be signed by an officer of the foreign corporation.

▶ *Walter R. Glover*         Walter R. Glover        Treasurer
    Sign here                   Print your name here         Your business title

| Make check/money order payable to: **Secretary of State** | **By Mail** | **Drop-Off** |
|---|---|---|
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State Business Entities, P.O. Box 944260 Sacramento, CA 94244-2600 | Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |

Corporations Code §§ 2105, 2106, Revenue and Taxation Code § 23153
S&DC-STK/NP (REV 05/2013)                                  2013 California Secretary of State
www.sos.ca.gov/business/be

EXHIBIT
001

3639196

## OFFICE OF THE SECRETARY OF STATE
## OF THE STATE OF COLORADO

# CERTIFICATE

I, Scott Gessler, as the Secretary of State of the State of Colorado, hereby certify that, according to the records of this office,

### United States Olympic and Paralympic Foundation

is a **Nonprofit Corporation** formed or registered on 06/18/2013 under the law of Colorado, has complied with all applicable requirements of this office, and is in good standing with this office. This entity has been assigned entity identification number 20131354188.

This certificate reflects facts established or disclosed by documents delivered to this office on paper through 11/22/2013 that have been posted, and by documents delivered to this office electronically through 11/25/2013 @ 13:36:28.

I have affixed hereto the Great Seal of the State of Colorado and duly generated, executed, authenticated, issued, delivered and communicated this official certificate at Denver, Colorado on 11/25/2013 @ 13:36:28 pursuant to and in accordance with applicable law. This certificate is assigned Confirmation Number 8698711.



Secretary of State of the State of Colorado

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*End of Certificate\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Notice: A certificate issued electronically from the Colorado Secretary of State's Web site is fully and immediately valid and effective. However, as an option, the issuance and validity of a certificate obtained electronically may be established by visiting the Certificate Confirmation Page of the Secretary of State's Web site, http://www.sos.state.co.us/biz/CertificateSearchCriteria.do entering the certificate's confirmation number displayed on the certificate, and following the instructions displayed. Confirming the issuance of a certificate is merely optional and is not necessary to the valid and effective issuance of a certificate. For more information, visit our Web site, http://www.sos.state.co.us/ click Business Center and select "Frequently Asked Questions."*

EXHIBIT 35
002



**UNITED STATES
OLYMPIC COMMITTEE**
1 Olympic Plaza
Colorado Springs, CO 80909

December 5, 2013

Re: <u>Consent to the Use of the word "OLYMPIC" and "PARALYMPIC"</u>

To Whom it May Concern:

The United States Olympic Committee ("USOC") created the **U.S. Olympic and Paralympic Foundation** ("Foundation") as an entity to raise funds for the USOC.  The USOC is the sole corporate member of the Foundation.

Accordingly, the USOC hereby grants its consent to the Foundation's use of the term OLYMPIC and PARALYMPIC, whether in its trade name, for fundraising, or for any other purpose in keeping with its mission.  The Foundation has the permission of the USOC to register its name in any corporate/nonprofit filing required by any state or city.  Please accept this letter to indicate the USOC's consent, as may be required by federal, state or local law.

Very truly yours,

*Kelly C. Maser*

Kelly C. Maser
Associate General Counsel

EXHIBIT 35
003

# EXHIBIT "36"

# USOPF Board of Directors

**Dwight Anderson**
New York, NY

**Nancy & Tim Armstrong**
New York, NY

**John Babcock**
Pasadena, CA

**Andrew F. Barth**
Los Angeles, CA

**Cori & Tony Bates**
Los Altos, CA

**Ray Bingham**
Palo Alto, CA

**Michael Carter**
Wilmette, IL

**Kevin Clifford**
Los Angeles, CA

**Molly & Robert Cohen**
Denver, CO

**Robyn Coles & Dr. Tony Coles**
San Francisco, CA

**Gayla & Kevin Compton**
Palo Alto, CA

**Gordon Crawford**
Los Angeles, CA

**Joan Criswell**
Wilmette, IL

**Brian & Caryn Deevy**
Englewood, CO

**Gina & Dan Dickinson**
Northbrook, IL

**Dave Dollinger**
Redwood City, CA

EXHIBIT 36
001

**Kristin Ehrgood**
Washington, D.C.

**Scott Freidheim**
Aspen, CO

**Stephen C. Freidheim**
New York, NY

**William May Garland III**
Pacific Palisades, CA

**John Goldman**
Atherton, CA

**Gary F. Goldring**
Sherman, CT

**Joanie Hall**
Haverford, PA

**Jim Hirschmann**
Pasadena, CA

**Bill Hybl**
Colorado Springs, CO

**Jim Keller**
Manhattan Beach, CA

**Katherine Kendrick**
Los Angeles, CA

**Jonathan Ledecky**
New York, NY

**David Leuschen**
New York, NY

**Alicia Miñana & Robert Lovelace**
Hermosa Beach, CA

**John Macfarlane III**
New York, NY

**Lynda & John Marren**
Hillsborough, CA

**Aria Mehrabi**
Santa Monica, CA

EXHIBIT 36
002

USOPF Board of Directors

**Rob Merrilees**
Wilmette, IL

**Allison & Roberto Mignone**
New York, NY

**Joy & Thomas M. Mistele**
San Francisco, CA

**Corinne Nevinny**
Beverly Hills, CA

**Vadim Nikitine**
Washington, D.C.

**Kevin & Erica Penn**
New York, NY

**Greg Penner**
Atherton, CA

**David Poms**
Malibu, CA

**Tracey & Brad Powell**
Palo Alto, CA

**Anthony Pritzker**
Los Angeles, CA

**Michael Ray**
Ft. Wayne, IN

**Yucca & Gary Rieschel**
Seattle, WA

**Johnathan & Shannon Robertson**
Fort Lauderdale, FL

**Marti & Greg Rosenbaum**
Bethesda, MD

**Lizanne & Barry Rosenstein**
New York, NY

**Susan Schnabel & Edward Plummer**
Pacific Palisades, CA

**Lisa & Dmitri Shklovsky**
Greenwich, CT

EXHIBIT 36
003

**Barry Sternlicht**
Greenwich, CT

**Mary & Mark Stevens**
Atherton, CA

**Steve Strandberg**
San Francisco, CA

**Ben Sutton**
Winston-Salem, NC

**Stuart Weitzman**
Greenwich, CT

**Lisa & Greg Wendt**
San Francisco, CA

**Kevin D. White**
New York, NY

**Geoff Yang**
Menlo Park, CA

**Lisa & Dan Zelson**
Southport, CT

*Sarah Hirshland, Ex-Officio*
*Larry Probst, Ex-Officio*

## Menu

## Why Giving Matters

From the President (/US-Olympic-and-Paralympic-Foundation/From-the-President)
Case for Support (http://usopf.uberflip.com/i/356072)
Donor Stories (/US-Olympic-and-Paralympic-Foundation/Donor-Stories)
Team Behind the Team (/US-Olympic-and-Paralympic-Foundation/Team-Behind-the-Team)
Budget and Stewardship (/US-Olympic-and-Paralympic-Foundation/Budget-and-Stewardship)

(/US-Olympic-and-Paralympic-Foundation/Budget-and-Stewardship)

(https://donate.teamusa.org/page/contribute/support-america-s-athletes)

## Focus Areas

EXHIBIT 36
004

Achieving Sustained Competitive Excellence (/US-Olympic-and-Paralympic-Foundation/Achieving-Sustained-Competitive-Excellence)

Serving America's Athletes and Sports (/US-Olympic-and-Paralympic-Foundation/Serving-American-Athletes-and-Sports)

Inspiring All Americans (/US-Olympic-and-Paralympic-Foundation/Inspiring-All-Americans)

Building the Team of Tomorrow (/US-Olympic-and-Paralympic-Foundation/Building-the-Team-of-Tomorrow)

## Leadership

USOPF Board of Directors (/US-Olympic-and-Paralympic-Foundation/USOPF-Board-of-Directors)

USOPF Trustees (/US-Olympic-and-Paralympic-Foundation/USOPF-Trustees)

**Governance**     ❯

**Resources**     ❯

**Get Involved**     ❯

©2018 United States Olympic Committee. All Rights Reserved.

EXHIBIT 36
005

# EXHIBIT "37"



**Secretary of State**

**Application to Register a Foreign Limited Liability Company (LLC)**

| LLC-5 |

**2018 19810553**

**FILED**
Secretary of State
State of California

**JUL 16 2018**

*This Space For Office Use Only*

**IMPORTANT** — Read Instructions before completing this form.

Must be submitted with a current Certificate of Good Standing issued by the government agency where the LLC was formed. See Instructions.

**Filing Fee** — **$70.00**

**Copy Fees** — First page $1.00; each attachment page $0.50; Certification Fee - $5.00

*Note:* Registered LLCs in California may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

**1a. LLC Name** (Enter the exact name of the LLC as listed on your attached Certificate of Good Standing.)

UNITED STATES OLYMPIC AND PARALYMPIC PROPERTIES, LLC

**1b. California Alternate Name, If Required** (See Instructions – Only enter an alternate name if the LLC name in 1a not available in California.)

**2. LLC History** (See Instructions – Ensure that the formation date and jurisdiction match the attached Certificate of Good Standing.)

| a. Date LLC was formed in home jurisdiction (MM/DD/YYYY) | b. Jurisdiction (State, foreign country or place where this LLC is formed.) |
|---|---|
| 6 / 13 / 2018 | DELAWARE |

**c. Authority Statement** (Do not alter Authority Statement)

This LLC currently has powers and privileges to conduct business in the state, foreign country or place entered in Item 2b.

**3. Business Addresses** (Enter the complete business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Executive Office - Do not enter a P.O. Box<br>c/o LA 2028, 10960 Wilshire Boulevard, Suite 1050 | Los Angeles | CA | 90024 |
| b. Street Address of Principal Office in California, if any - Do not enter a P.O. Box | | CA | |
| c. Mailing Address of Principal Executive Office, if different than item 3a | | | |

**4. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** — Complete Items 4a and 4b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | | State<br>CA | Zip Code |

**CORPORATION** — Complete Item 4c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 4a or 4b

Corporation Service Company Which Will Do Business In California As CSC - Lawyers Incorporating Service

**5. Read and Sign Below** (See Instructions. Title not required.)

I am authorized to sign on behalf of the foreign LLC.

_____
Signature

Brian E. Nelson, Esq.
_____
Type or Print Name

2017 California Secretary of State
www.sos.ca.gov/business/be

**EXHIBIT 37**
**001**



# Delaware

## The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "UNITED STATES OLYMPIC AND PARALYMPIC PROPERTIES, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTEENTH DAY OF JULY, A.D. 2018.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "UNITED STATES OLYMPIC AND PARALYMPIC PROPERTIES, LLC" WAS FORMED ON THE THIRTEENTH DAY OF JUNE, A.D. 2018.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

6930800  8300

5R# 20185687769

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203071617

Date: 07-16-18

2018 198 10 5 5 3

EXHIBIT 37

002



**UNITED STATES**
**OLYMPIC COMMITTEE**
1 Olympic Plaza
Colorado Springs, CO 80909

June 28, 2018

California Secretary of State
1500 11th Street
Sacramento, CA  95814

Re:   Los Angeles 2024 Exploratory Committee Corporate # C3700549

To Whom It May Concern:

The United States Olympic Committee ("USOC") hereby consents to the use of the trade name United States Olympic and Paralympic Properties ("USOPP") in the state of California. The USOC is one of the two partners in the formation of this legal entity; accordingly, the USOPP is authorized to use Olympic trademarks and terminology, both in its name and in doing business.

Please accept this letter as the required consent of the USOC.

Thank you for your attention to this matter.

Sincerely,

*Kelly C. Maser*

Kelly C. Maser

# EXHIBIT "38"

Carolyn Kubota (Bar No. 113660)
ckubota@cov.com
Mitchell A. Kamin (Bar No. 202788)
mkamin@cov.com
Mark Y. Chen (Bar No. 310450)
mychen@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749

David Jolley (Bar No. 191164)
djolley@cov.com
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

Attorneys for Defendant
UNITED STATES OLYMPIC COMMITTEE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA ROSE RAISMAN, an individual.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OLYMPIC COMMITTEE, a Business Entity of form unknown; USA GYMNASTICS, an Indiana Business Entity of Form Unknown; LARRY NASSAR, an individual, STEVE PENNY, an individual, PAUL PARRILLA, an individual, MICHIGAN STATE UNIVERSITY, and DOES 1 through 500.<br><br>Defendants. | Civil Case No. 5:18-cv-02479-BLF<br><br>[The Honorable Beth Labson Freeman]<br><br><br>**DEFENDANT USOC'S RESPONSES AND OBJECTIONS TO PLAINTIFF ALEXANDRA ROSE RAISMAN'S REQUESTS FOR ADMISSIONS TO USOC, SET TWO**<br><br>**(JURISDICTIONAL DISCOVERY)** |

EXHIBIT 38
001

United States Olympic Committee ("USOC") submits the following objections and responses to Plaintiff Alexandra Rose Raisman's Requests for Admission, Set Two to USOC, dated October 16, 2018.

**GENERAL OBJECTIONS**

USOC makes each of the following general objections, which are incorporated in its response to each of the Requests for Admission (the "Requests").

1.    USOC's inquiry and research into the subject matter of this litigation, and the items requested and enumerated in the Requests, are ongoing.  USOC intends to conduct further inquiry and investigation.  No response or partial response contained herein is to be construed as precluding USOC from further developing or investigating contentions, facts, documents, or any other matter which is the subject of these Requests, or from modifying or supplementing its responses accordingly.

2.    USOC objects to the Requests and definitions to the extent they impose obligations or requirements on USOC which are greater than or different from those imposed by the Federal Rules of Civil Procedure and/or any other applicable law, rule or regulation.

3.    USOC objects to the Requests to the extent they seek information that is neither relevant nor proportional to the needs of the case.

4.    USOC objects to the Requests to the extent that they exceed the bounds of jurisdictional discovery permitted by the Court and pursuant to the Parties' agreement to stay merits discovery pending resolution of USOC's motion to dismiss.

5.    USOC objects to the Requests, including the definitions, to the extent they are vague and ambiguous. By identifying specific language in the Requests or accompanying Instructions as vague or ambiguous, USOC does not intend to suggest that the language called out is the only vague or ambiguous language in the Requests.

EXHIBIT 38
002

6.      USOC objects to the Requests to the extent they seek information subject to and protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or protection.  No written response or production of documents with respect to the Requests which contains information, opinions, documents, or facts subject to any privilege or protection, or references to information, opinions, documents, or facts subject to any privilege or protection, is to be construed as a waiver of the attorney-client privilege, the attorney work product doctrine or any other applicable privilege, protection or doctrine for any purpose.

7.      USOC objects to the Requests to the extent they call for information not within the control of USOC.  USOC's response is based upon information known by or reasonably available to USOC.

8.      These responses are subject to all objections as to competence, authenticity, relevance, materiality, propriety, privilege, admissibility and any and all other objections and grounds which would or could require or permit the exclusion of any document or statement therein from evidence, all of which objections and grounds are reserved and may be interposed any time prior to or at the time of trial.

9.      USOC has made an effort to respond to the Requests, to the extent they call for information that is not otherwise privileged or objectionable, as USOC understands and interprets them.

10.     If Plaintiff later asserts a different interpretation, USOC reserves the right to supplement its responses.

11.     USOC incorporates its General Objections into each of the individual responses that follow. Although specific objections may also be interposed in response to individual requests, in part for clarity, USOC's failure to repeat any part of its General Objections below shall not be construed as a waiver of its objections.

3

EXHIBIT 38
003

Subject to the foregoing Objections and without waiving any of them, USOC responds as follows:

## SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST FOR ADMISSION NO. 27:**

Admit that USOC has never obtained a "Certificate of Qualification" to do business in California, pursuant to California Corporations Code § 2105.

**RESPONSE:**

USOC incorporates its General Objections by reference as though fully set forth herein.  Subject to and without waiving those objections, USOC admits that it has never obtained a "Certificate of Qualification" to do business in California pursuant to California Corporations Code § 2105.

Dated: November 19, 2018                    Covington & Burling LLP


By:   /s/ Mark Chen
         Mark Chen

*Attorneys for United States Olympic Committee*

4

EXHIBIT 38
004

**CERTIFICATE OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Covington & Burling LLP, 1999 Avenue of the Stars, Los Angeles, CA 99067

On November 19, 2018, I served the within documents:

1. **DEFENDANT UNITED STATES OLYMPIC COMMITTEE'S RESPONSES AND OBJECTIONS TO ALEXANDRA ROSE RAISMAN'S REQUESTS FOR ADMISSION TO DEFENDANT USOC, SET TWO**

**<u>SEE ATTACHED SERVICE LIST</u>**

**[X]     BY E-MAIL OR ELECTRONIC TRANSMISSION** - I caused the documents to be sent to the persons on the e-mail addresses as listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

FEDERAL - I certify under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on November 19, 2018, at Los Angeles, California.

*/s/* Mark Y. Chen
Mark Y. Chen

EXHIBIT 38
005

SERVICE LIST
Alexandra Rose Raisman v. United States Olympic Committee. et al.
USDC. Case No. 5:18-cv-02479-BLF


John C. Manly
Vince W. Finaldi
Alexander Cunny
Manly, Stewart & Finaldi
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 252-9990
Fax: (949) 252-9991
Email: jmanly@manlystewart.com
vfinaldi@manlystewart.com
acunny@manlystewart.com
Attorneys for Plaintiff ALEXANDRA ROSE RAISMAN

Kevin James Minnick
Skadden Arps Slate Meagher and Flom LLP
300 South Grand Avenue Flr 34
Los Angeles, CA 90071
Telephone: (213) 687-5000
Fax:  (213) 687-5600
Email:  kevin.minnick@skadden.com
Attorneys for Defendant MICHIGAN STATE UNIVERSITY

Margaret M. Holm
Bonne Bridges Mueller O'Keefe & Nic
1750 E. 4th St. Suite 450
Santa Ana, CA 92705
Telephone: (717) 835-1157
Fax: (714) 480-7806
Email: margaret.holm@clydeco.us

Melissa McKenna Leos
Sheryl M Rosenberg
Clyde & Co US LLP
2020 Main Street Suite 1100
Irvine, CA 92614
Telephone: (949) 567-7806
Email: melissa.leos@clydeco.us
sheryl.rosenberg@clydeco.us
Attorneys for Defendants USA GYMNASTICS, an Indiana business entity of form unknown and
Defendant PAUL PARILLA

EXHIBIT 38
006

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Edith R Matthai
Leigh Porter Robie
Robie and Matthai
500 South Grand Avenue Suite 1500
Los Angeles, CA 90071
213-706-8000
Fax: 213-706-9913
Email: ematthai@romalaw.com
Lrobie@romalaw.com
Attorneys for Defendant STEVE PENNY

EXHIBIT 38
007

# EXHIBIT "39"

1  ROBIE & MATTHAI
   A Professional Corporation
2  EDITH R. MATTHAI, ESQ. (SBN 66730)
   LEIGH P. ROBIE, ESQ. (SBN 294688)
3  500 South Grand Avenue, Suite 1500
   Los Angeles, California 90071
4  Telephone: (213) 706-8000
   Facsimile: (213) 706-9913
5  E-Mail:    ematthai@romalaw.com
              lrobie@romalaw.com
6
   Attorneys for Specially Appearing Defendant
7  STEVE PENNY

8              UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 ALEXANDRA ROSE RAISMAN, an          Case No.:        5:18-cv-02479-BLF
11 individual,
                                       **DECLARATION OF SPECIALLY**
12        Plaintiff,                   **APPEARING DEFENDANT**
                                       **STEPHEN PENNY IN SUPPORT**
13    v.                               **OF HIS MOTION TO DISMISS**
                                       **FOR LACK OF PERSONAL**
14 UNITED STATES OLYMPIC               **JURISDICTION UNDER FEDERAL**
   COMMITTEE, a Business Entity of     **RULE OF CIVIL PROCEDURE**
15 form unknown; USA GYMNASTICS,       **12(b)(2)**
   an Indiana Business Entity of Form
16 Unknown; LARRY NASSAR, an
   individual; STEVE PENNY, an         DATE:    February 7, 2019
17 individual, PAUL PARRILLA, an       TIME:    9:00 a.m.
   individual, and DOES 1 through 500, CTRM:    3
18
          Defendants.
19

20

21        I, Stephen Penny, hereby declare as follows:

22        1.     I was the President and Chief Executive Officer of defendant USA

23 Gymnastics ("USAG") from April 2005 through March 2017 and have personal

24 knowledge of all matters stated herein.

25        2.     USAG is the National Governing Body for gymnastics in the United

26 States. USAG receives this designation from the U.S. Olympic Committee and the

27 International Gymnastics Federation. USAG is a non-profit corporation incorporated

28 in Texas and headquartered in Indianapolis, Indiana. USAG sets the rules and

                                    1                    Civil Case No. 5:18-cv-02479-HRL
EXHIBIT 39
001

1 policies that govern the Olympic sport of gymnastics in the United States.

2      3.    I was first hired by USAG in 1999. At that time I was tasked with

3 special projects, public relations and liaising with the United States Olympic

4 Committee. Between 1999 and April 2005, I had no authority over the women's

5 gymnastics program or the medical program related to women's artistic gymnastics.

6      4.    In April 2005, I became the President and Chief Executive Officer

7 ("CEO") of USAG.

8      5.    I am a resident of the State of Indiana and have been since March 1999.

9      6.    Prior to moving to Indiana, I lived in the states of Washington and

10 Colorado. I have not lived in California since the 1980s.

11      7.    All of my visits to the State of California since 2001 were trips related

12 to the business of USAG, and were made in the capacity of my employment with

13 USAG.

14      8.    I visited California during my tenure as President of USAG to represent

15 and promote the organization, meet with sponsors, and attend USAG competitions

16 in my capacity as Present of USAG.  Since 2016, I have had to fly to California a

17 few times as a result of the ongoing Nassar litigation.

18      9.    I am not employed in the State of California.

19      10.    I do not and have never owned real property in the State of California.

20      11.    I have not owed or paid taxes to the State of California since the 1980s.

21      12.    I do not derive any income from any source within the State of

22 California, nor have I since the late 1980s.

23      13.    I do not hold any licenses issued by the State of California, nor am I

24 subject to any regulatory authority of the State.

25      14.    Prior to the cases involving allegations of sexual abuse against Larry

26 Nassar I have never been a party in any litigation in the State of California. I am

27 contesting jurisdiction in all of the Nassar related cases in which I am named as a

28 party—*Jane LM Doe v. Dr. Larry Nassar, et al.* Central District Case No. 8:18-cv-

EXHIBIT 39
002

1   01117-JLS-KES, *Alexandra Rose Raisman v. United States Olympic Committee, et*

2   *al.* Northern District Case No. 5:18-cv-02479-BLF, and *Jordyn Marie Wieber v.*

3   *United States Olympic Comittee, et al.* Central District Case No. 2:18-03462-JLS-

4   KES.

5   15.    Based on the records kept by USAG and as reflected on the website,

6   during Ms. Raisman's time on the National Team for the period at issue in her

7   complaint (2009-2012 and 2015), she participated in one National USAG

8   competition in California, the 2012 Olympic Trials. This event was held in San Jose,

9   California.

10   16.    Larry Nassar was an osteopathic physician who volunteered his

11   services to USAG and the U.S. Olympic Committee.

12   17.    I did not choose Dr. Nassar to be the lead physician for the women's

13   national team.  That decision was at the discretion of those involved in the women's

14   program in consultation with the athletes and coaches.

15   18.    Larry Nassar did not attend every USAG event. USAG had other

16   volunteer doctors who attended camps, competitions and events.

17   19.    I did not decide whether Nassar would attend the 2012 Olympic Trials.

18   Whether Nassar would attend these events as part of the USAG medical team was

19   determined by Ron Galimore, Jeff Smith, the directors of the Women's Program and

20   Larry Nassar among others.

21   20.    In June 2015, I was informed by Rhonda Faehn, head of the USAG

22   Women's Artistic Program, that an athlete had told a coach that she felt

23   uncomfortable with and had questions about Nassar's treatment. I called the coach.

24   It was my understanding from this conversation with the coach that the athlete had

25   questions about the treatment. After receiving that report I was directed by counsel

26   for USAG on how to proceed.

27   21.    Prior to June 2015 I was not aware there were any issues related to the

28   care being provided by Larry Nassar.  Prior to June 2015, I was not aware of and

1 | had no knowledge of Nassar's inappropriate conduct or use of intravaginal and/or
2 | intrarectal treatments. I had not received any complaints about Nassar's treatments
3 | making athletes uncomfortable prior to June 2015.

4 |     22.    After I received the June 2015 report from Rhonda Faehn, Nassar was
5 | not assigned to or allowed to participate in an USAG events.

6 |     I declare under penalty of perjury under the laws of the United States that the
7 | foregoing is true and correct.  Executed at Pella, State of Iowa this 31st day of
8 | August, 2018.

9

10

11 |     STEPHEN PENNY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 39
004

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 500 South Grand Avenue, Suite 1500, Los Angeles, California 90071.

4

5

On August 31, 2018, I served the foregoing document described as **DECLARATION OF SPECIALLY APPEARING DEFENDANT STEPHEN PENNY IN SUPPORT OF HIS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

6

7

8

**SEE ATTACHED ELECTRONIC SERVICE LIST**

9

_x_ **VIA ELECTRONIC SERVICE:** I caused the listed documents to be electronically filed through the CM/ECF system at the United States District Court for the Northern District of California which generated a Notice of Electronic Filing to all parties and constitutes service of the electronically filed documents on all parties listed on attached Electronic Service List for purposes of the Federal Rules of Civil Procedure.

10

11

12

13

I hereby certify that I am a member of the Bar of the United States District Court, Central District of California.

14

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

15

16

Executed August 31, 2018, at Los Angeles, California.

17

18

/s/ Edith R. Matthai
_____
EDITH R. MATTHAI

19

20

21

22

23

24

25

26

27

28

5

PENNY DECLARATION ISO MOTION TO DISMISS

Civil Case No. 5:18-cv-02479-HRL

EXHIBIT 39
005

1

**ELECTRONIC SERVICE LIST**

2   Alexander E. Cunny:        acunny@manlystewart.com

3   Carolyn Kubota:            ckubota@cov.com, rtoombs@cov.com

4   David M. Jolley:           djolley@cov.com, echiulos@cov.com, eerlich@cov.com

5   Edith R. Matthai:          ematthai@romalaw.com, mmendoza@romalaw.com

6   John C. Manly:             jmanly@manlystewart.com

7   Kevin J. Minnick:          Kevin.Minnick@skadden.com, dlmlclac@skadden.com

8   Leigh P. Robie:            lrobie@romalaw.com, mmendoza@romalaw.com

9   Margaret M. Holm:          margaret.holm@clydeco.us, krista.gutierrez@clydeco.us,
                               lorraine.gallo@clydeco.us, melissa.leos@clydeco.us
10

11  Mark Y. Chen:              mychen@cov.com

12  Melissa McKenna Leos:      melissa.leos@clydeco.us

13  Mitchell A. Kamin:         mkamin@cov.com, mitchell-kamin-
                               1218@ecf.pacerpro.com, tspath@cov.com
14

15  Paulina Slagter:           pslagter@cov.com

16  Sheryl Rosenberg:          sheryl.rosenberg@clydeco.us

    Udit Sood:                 usood@cov.com
17
    Vince W. Finaldi:          vfinaldi@manlystewart.com
18

19

20

21

22

23

24

25

26

27

28

Civil Case No. 5:18-cv-02479-HRL

PENNY DECLARATION ISO MOTION TO DISMISS

EXHIBIT 39
006

# EXHIBIT "40"

Case 5:18-cv-02478-BLF   Document 103   Filed 11/21/18   Page 599 of 655

SCH. A, PART II-A COMPENSATION OF THE 5 HIGHEST PAID FOR PROF. SERV.
======================================================================

```
WELLS AND WEST INC                      CONSTRUCTION            1,233,004.
2345 ACADEMY PLACE SUITE 222
COLORADO SPRINGS, CO 80909

WILLIAMS AND CONNOLLY LLP               LEGAL SERVICES          1,156,243.
725 TWELFTH STREET NW
WASHINGTON, DC 20005

THOMPSON HABIB AND DENISON INC          FUNDRAISING COUNSEL       756,130.
80 HAYDEN AVENUE SUITE 300
LEXINGTON, MA 02421

LEJ  ASSOCIATES INC                     EVENT CONSULTING          754,900.
4015 WETHERBURN WAY
NORCROSS, GA 30092

MANATT PHELPS PHILLIPS LLP              LEGAL SERVICES            592,919.
11355 W OLYMPIC BLVD
LOS ANGELES, CA 90064                                          ------------
                    TOTAL COMPENSATION                          4,493,196.
                                                              ============
```

TQ7876 1722                    V06-6.2   787707                      73

EXHIBIT 40
USOC-001-00002248
001

# EXHIBIT "41"

**2012 U.S. OLYMPIC TEAM TRIALS AND EXHIBITIONS AGREEMENT**
**USA GYMNASTICS**

This 2012 U.S. Olympic Team Trials and Exhibitions Agreement (this **"Agreement"**), is made and entered into as of the 12th day of October, 2010 by and between the United States Olympic Committee, with a principal place of business at One Olympic Plaza, Colorado Springs, Colorado 80909 (the **"USOC"**) and USA Gymnastics with a principal place of business at 132 E. Washington Street, Suite 700, Indianapolis, Indiana 46204 (the **"NGB"**).

## Background

**A.** The NGB is recognized by the USOC as the national governing body for the sport of Gymnastics (the **"Sport"**) within the meaning of the Bylaws of the USOC and The Ted Stevens Olympic and Amateur Sports Act (the **"Act"**).

**B.** Pursuant to the Act, the USOC is empowered to organize, finance and control the representation of the United States in the competitions and events of the Olympic Games, and to select, directly or by delegation to the appropriate national governing body, the athletes for final appointment by the USOC to the 2012 U.S. Olympic Team (the **"Team"**).

**C.** Pursuant to the Bylaws of the USOC and the Act, the USOC has exclusive jurisdiction over all matters pertaining to the participation of the United States in the Olympic Games, including the authority to conduct the Trials (defined below), and the exclusive right to control the use of Olympic-related marks, images and designations in the United States.

**D.** The USOC desires to engage the NGB to conduct one or more high-quality competitions that will, in the manner described more particularly in the Selection Procedures, determine the athletes in the Sport who will be nominated by the NGB to the USOC for inclusion on the Team for the Sport (**"the Trials"**). The parties acknowledge that, while the NGB conducts other events (e.g. the U.S. Classic and the National Championships) that may play a role in qualifying an athlete for the Trials, those events are not included within the definition of the Trials under this Agreement.

**E.** The NGB may schedule one or more high-quality Exhibitions on the terms and subject to the conditions set forth herein. For purposes of this Agreement, the term **"Exhibitions"** refers to any sporting event conducted in the United States in which more than fifty percent (50%) of the athletes participating (i) have been nominated to the Team by the NGB or named by the USOC as members of the Team, (ii) were members of the Team in the case of those sporting events that occur within one year after the 2012 Olympic Games, or (iii) were members of any United States Olympic Team, in each case provided that the event utilizes Olympic marks, images and/or terminology. The parties acknowledge that the NGB has historically has conducted, and intends to continue to conduct, sporting exhibitions that are not subject to the terms and conditions of this Agreement, and therefore do not constitute "Exhibitions, " as the NGB does not employ Olympic-related marks, images and/or terminology in connection with such sporting exhibitions.

**F.** The USOC and the NGB have agreed that the NGB will stage the Trials and the Exhibitions on behalf of the USOC, on the terms and subject to the conditions set forth below.

EXHIBIT 41
001

<div align="center">**Agreement**</div>

**1.**     **Staging of the Trials and Exhibitions; Selection Procedures**

       1.1     <u>Venues and Scheduling</u>.  The NGB's selection of the Trials and Exhibitions venues and locations requires the prior consultation with, and approval of (such approval not to be unreasonably withheld), the USOC.  The Trials and Exhibitions will be scheduled by the NGB, subject to the approval of the USOC and the broadcasters (as such term is defined in <u>Section 3.2</u> below).  <u>Exhibit A</u> contains information on the dates of the Trials and Exhibitions scheduled by the parties as of the date of this Agreement.  The parties agree to update and supplement this information, as necessary.  The parties agree to update and supplement this information as necessary.  The NGB will be solely responsible for ensuring the availability of the sports equipment and facilities necessary for the conduct of the Trials and Exhibitions.  The NGB may subcontract its responsibility for staging the Trials and Exhibitions  to a local organizing committee ("**LOC**") solely with the prior written consent of the USOC.

       1.2     <u>Selection Procedures</u>.  The United States Olympic Committee Selection Procedures Manual for the Olympic Games, Paralympic Games and Pan American Games (the "**Manual**") is incorporated herein by this reference.  The NGB agrees to comply with the procedures set forth in the Manual, as such manual may be updated by the USOC and delivered to the NGB from time to time, in the planning and staging of the Trials.

       1.3     <u>Sponsorships; No Conflicting Sponsorship Rights; No Ambush</u>

              1.3.1    In order to ensure the success of the Trials and Exhibitions, the USOC agrees that the NGB may sell sponsorships with respect to the Trials and Exhibitions to the USOC's sponsors and suppliers (collectively referred to herein as "**USOC Sponsors**").  A list of current USOC Sponsors is attached hereto as <u>Exhibit B</u>.  The USOC shall update this Exhibit periodically.  The NGB shall also be entitled to sell certain camera-visible commercial signage as approved by the USOC and the broadcaster(s) at Trials and Exhibition venues to USOC Sponsors, provided that such USOC Sponsor has made an appropriate advertising buy from the broadcaster(s).

              1.3.2    With the USOC's prior written approval on a case-by-case basis, which may be withheld by the USOC in its sole discretion, the NGB may sell sponsorships with respect to the Trials and Exhibitions to third parties that do not conflict with USOC Sponsors.

              1.3.3.   With the USOC's prior written approval on a case-by-case basis, which may be withheld by the USOC in its sole discretion, and consistent with the terms of <u>Section 1.3.6</u> below, the NGB may provide certain benefits (*e.g.*, VIP hospitality) to NGB sponsors outside of the venues for the Trials and Exhibitions, and in the Trials and Exhibitions venues on the condition that such benefits do not create a visible commercial presence for the NGB Sponsor inside the Trials and Exhibitions venues.

              1.3.4    The USOC acknowledges that the LOC may solicit the support of local patrons in the hosting of the Trials or Exhibitions.  The NGB acknowledges that such local patrons may not be granted any marketing rights with respect to the Trials or Exhibitions.

              1.3.5    The NGB acknowledges and agrees that the USOC retains the sole right to sell presenting sponsorship(s) with respect to the Trials, and the USOC may authorize broadcasters to sell presenting sponsorships(s) with respect to the Trials and Exhibitions broadcasts.  The USOC will not permit title sponsorship(s) of the Trials.  If a presenting sponsorship for the Trials is sold by the USOC, the signage for such presenting sponsor shall be additional to the signage described in <u>Section 1.3.1</u> above.  The USOC will discuss any potential presenting sponsor(s) of the Trials with the NGB before

<div align="center">2</div>

EXHIBIT 41
002

selling any presenting sponsorship(s) for the Trials, and will not grant presenting sponsorship rights to a third party that conflicts with an NGB sponsor (the "Conflicting Presenting Sponsor") unless the USOC determines that it is commercially unreasonable for the USOC not to enter into such an agreement with the Conflicting Presenting Sponsor.  In the event the USOC sells any presenting sponsorship(s) for the Trials, the USOC will provide to the NGB an equitable portion of the USOC's revenues with respect to any such presenting sponsorship, and the USOC and the NGB will timely discuss and agree upon such division of revenue, including the provision by the NGB of additional benefits to the presenting sponsor which are appropriate under the circumstances.

      1.3.6    Unless the USOC otherwise agrees in its sole discretion, on a case-by-case basis, in writing, sponsors, suppliers and licensees of the NGB (other than those entities that are also USOC Sponsors), and sponsors, suppliers and licensees of the NGB's athletes (other than those entities that are also USOC Sponsors), will not be permitted to publicize their association with the NGB or any athlete in a manner that suggests a relation to the 2012 Olympic Games, the Trials and Exhibitions, the Team or the USOC, and will not be permitted to use any Olympic-related marks, words or designations (collectively, "**Olympic Marks**") in advertising or other promotional activities.  The NGB represents and warrants that, except with the prior written consent of the USOC, it has not granted and will not grant any sponsorship, suppliership, merchandising or similar rights pursuant to which third parties that are not USOC Sponsors could be perceived as having a commercial association with the Trials and Exhibitions.  The NGB agrees to notify in writing each of its athletes participating in the Trials and Exhibitions of this prohibition.

      1.3.7    Unless otherwise agreed by the USOC in writing, the NGB will: (a) ensure that all food and beverages served at the sites of the Trials and Exhibitions, including at all hospitality areas and press conference areas, are provided by USOC Sponsors or licensees ("**USOC Licensees**") or are served in generic, unbranded containers, (b) not permit the distribution of samples or other promotional items at  the sites of the Trials and Exhibitions by entities other than USOC Sponsors and USOC Licensees, (c) not permit competitors of USOC Sponsors or USOC Licensees to publicize any sponsor, supplier or other commercial relationship with the Trials and Exhibitions, or with the NGB, at or in proximity to the Trials and Exhibitions, and (d) not permit any third party that is not a USOC Sponsor to publicize any commercial relationship with the Trials and Exhibitions on the tickets therefor.

      1.3.8    Except as specifically authorized in subsection 1.3.1, unless otherwise agreed by the USOC in writing, the NGB will not permit any commercial identification of any product or service or any promotional matter of any kind (*e.g.,* name, logo, trademark or trade name of any third party) to appear: (a) in camera-visible competition areas of the Trials and Exhibitions, or (b) in camera-visible areas that are located in proximity to the sites of the Trials and Exhibitions (to the extent controlled by the NGB or the site operators).

      1.3.9    With the exception of standard manufacturers' equipment identification permitted by Rule 51 of the Olympic Charter or the manufacturers' equipment identification rules of the Fédération Internationale de Gymnastique, or as otherwise agreed by the parties in writing, the uniforms and the bibs/numbers of the competitors and officials at the Trials and Exhibitions may not bear any commercial identification or promotional material of any kind.

      1.4    Signage and Look of the Trials.  The Look of the Trials includes all Field of Play signage, as well as any other graphics used to dress the Trials or Exhibitions venue.  The Look of the Trials must include the Trials Logo described in Section 2 below, and may include other neutral graphics, including color schemes that are consistent with red, white, blue and black.  The USOC will provide to the NGB production-ready artwork for the Look of the Trials signage and creative.  The NGB, the USOC and the broadcaster will work cooperatively to produce a plan for the appearance of the venue(s) that a) is designed to prevent the venue's permanent commercial signage from being visible during the broadcast,

EXHIBIT 41
003

and b) ensures that all signage specific to the Trials or Exhibitions is hung in the arena (regardless of whether in or out of the camera's view) in a way that maximizes its exposure.

1.5     VISA.  The USOC has advised the NGB that the USOC has entered into a sponsorship agreement with Visa International Service Association ("**VISA**") through December 31, 2020.  The NGB agrees that no credit cards, cash or debit cards, travelers' cheques (including electronic travelers' cheques), travel vouchers or stored value cash cards (collectively, "**Payment Methods**"), other than VISA Payment Methods, will be accepted as payment for any goods, services, tickets or donations in connection with the Trials and Exhibitions, and that all associated sales outlets will prominently display point of sale signage promoting usage of VISA Payment Methods to the exclusion of all other Payment Methods; provided, however, that in the event that, and to the extent that, the NGB provides the USOC with evidence of a contract executed prior to the date of this Agreement (including but not limited to a contract between a venue and a payment systems or ticket services provider), which contract prevents the NGB from complying with the foregoing, the NGB will instead use its best efforts to ensure that: (a) VISA Payment Methods are positioned as the preferred method of payment in all forms of advertising and promotions of the Trials and Exhibitions, (b) VISA Payment Methods are featured prominently and exclusively at all points of sale for the Trials and Exhibitions, subject to the understanding that VISA will supply all required point of sale signage, and (c) VISA's trademark is depicted on the tickets for the Trials and Exhibitions.

1.6     Ownership.  The USOC shall retain ownership of the Trials and Exhibitions and all related rights, including but not limited to all rights and data, in whatever form, relating to the Trials and Exhibitions' format, organization, exploitation, broadcast, recording, representation, marketing, reproduction, access and dissemination by any means whatsoever, and all design, trademark and copyright rights.  Without limiting the generality of the foregoing, the USOC shall be the owner of the copyright, throughout the world, in all depictions, transcriptions, recordings and broadcasts of the Trials and Exhibitions.  The NGB acknowledges that the USOC has the exclusive, worldwide right, on a live or tape-delayed basis, to broadcast the Trials and Exhibitions and to produce and distribute recorded audio, visual and audiovisual images of the Trials and Exhibitions, including, but not limited to, photographs, films, videotapes, videodiscs and online.  All reports, plans, analyses, studies, marketing materials, and other materials prepared by or on behalf of the NGB under this Agreement (the "Materials") shall be provided on a "work-made-for-hire" (as that term is used under U.S. Copyright Law) basis for the USOC.  To the extent that any Materials are not the property of the USOC by operation of law (i.e., a "work for hire"), the NGB hereby irrevocably assigns, transfers and conveys to the USOC all of its rights, title and interest in such Materials.  The NGB agrees to take all actions necessary to secure copyright from any independent contractors engaged by the NGB in the production of the Materials.  The USOC agrees that the NGB shall be permitted to maintain copies of the Materials for its internal, corporate purposes.

1.7     USOC Promotional Assistance.  The USOC agrees to provide Internet marketing support for the Trials and Exhibitions.  The USOC further agrees to use commercially reasonable efforts to assist the NGB in executing a local promotional plan for the Trials and Exhibitions, and to engage USOC Sponsors to activate local promotional activities in connection with the Trials and Exhibitions.

EXHIBIT 41
004

2.      **The Trials Logo**

2.1      Ownership.  The NGB acknowledges that the USOC is the owner of the mark U.S. OLYMPIC TEAM TRIALS (the "**USOC Trials Mark**") and all goodwill derived through use of the USOC Trials Mark, and that the USOC has a federal registration of the USOC Trials Mark.  In order to create a stronger association to the Team and a consistent look and feel for all U.S. Olympic Team Trials, the USOC will create a trials logo that incorporates the USOC Trials Mark and the Look of the Trials (the "**Trials Logo**"), and an identity system for the Trials.  The USOC shall be the owner of the Trials Logo.

2.2      Grant of License.  Subject to the terms and conditions of this Agreement, the USOC hereby grants to the NGB, during the Term (defined below), a non-exclusive, nontransferable right and license to use the Trials Logo to identify the Trials, in the staging of the Trials, and in connection with the advertising and promotion of the Trials, in all media, within the United States.  The NGB shall have the right to sublicense these rights to the LOC, if any, for the Trials; provided that (a) any sublicense to the LOC shall require the prior written approval of the USOC, (b) the NGB shall be liable for the LOC's compliance with all of the terms and conditions of this Agreement, and (c) the NGB shall not provide the LOC any right to transfer, assign or further sublicense any rights in the Trials Logo.  The NGB shall not have the right to sublicense to any other third party any of the rights and licenses granted under this Section 2.2 without the USOC's prior written approval.  All rights not specifically granted to the NGB are reserved by the USOC.  All goodwill arising out of the use of the Trials Logo shall inure to the benefit of the USOC.

2.3      The NGB's Use of the Trials Logo.  The NGB's right and license to use the Trials Logo is subject to the following material conditions:

(a)      Each use of the Trials Logo must be accompanied by an authenticating notice approved by the USOC (e.g., 36USC220506).

(b)      The Trials Logo must be reproduced fully, accurately and without embellishment.  No partial version of the Trials Logo or component thereof may be used at any time for any purpose without the USOC's prior written consent.

(c)      The NGB will not authorize or permit any third party, including, but not limited to, sponsors, suppliers and licensees of the NGB and the owner of any Trials sites, to use the Trials Logo without the USOC's prior written consent.

(d)      The NGB will not use the Trials Logo, or authorize the Trials Logo to be used or exploited, in any manner that is deceptive or misleading or that reflects unfavorably upon the good name, goodwill, reputation or image of the USOC or the Olympic movement, nor in any manner that is inconsistent with the Olympic Charter or contrary to applicable laws.

(e)      The NGB will not use the Trials Logo on premiums or on merchandise for retail sale without the prior written consent of the USOC, which, if given, will require that all merchandise bearing the Trials Logo shall be sourced through existing USOC Licensees, shall be subject to USOC approval, and shall comply the Merchandise Guidelines set forth in Exhibit D hereto.

(f)      The NGB will not, during the term of this Agreement or thereafter, attack the title or any rights of the USOC in and to the Trials Logo.

(g)      The NGB will not at any time adopt or use any mark confusingly similar to, or a simulation or colorable imitation of, the Trials Logo.

EXHIBIT 41
005

(h)     The NGB will not use the trade name, trademark or service mark of any third party on any materials bearing the Trials Logo without the USOC's prior written consent, and the NGB will not use the Trials Logo in any manner that creates or implies any association or affiliation between a third party and the Trials, the USOC, the Team, or the Olympic Games.

(i)     Without the prior written consent of the USOC, the NGB will not use or permit the use by third parties of any Olympic Marks (other than use of the Trials Logo as authorized herein) in connection with the staging or promotion of the Trials and Exhibitions.

2.4     <u>Artwork</u>.  Without limiting the generality of <u>Section 1.6</u> above, the NGB acknowledges and agrees that any artwork displaying the Trials Logo and created by or for the NGB (collectively, the "Artwork") shall be the property of the USOC.  To the extent the Artwork is not a "work for hire" and the property of the USOC by operation of law, the NGB hereby irrevocably assigns, transfers and conveys all its right, title and ownership, including copyright, in the Artwork to the USOC.  The NGB agrees to obtain written assignments of copyright from any independent contractors engaged by the NGB in the creation of the Artwork to the extent necessary to vest copyright ownership in the Artwork with the USOC.  Furthermore, the NGB agrees to obtain from each author of a work of visual art a written waiver of any and all rights arising under 17 U.S.C. §106A and any rights arising from any other federal law, state law or under the laws of any country that conveys rights of the same nature as those conveyed under 17 U.S.C. §106A or any other type of moral right or *droit moral*.  This written waiver shall (a) be executed for the benefit of the USOC, (b) specifically identify the work(s) covered by the waiver and included in the Artwork, and (c) specify that the waiver applies to any and all uses by or for the benefit of the USOC in which either the right of attribution or the integrity right may be implicated.  Items publicly distributed shall bear a short-form notice of copyright in compliance with 17 U.S.C. §401 identifying the USOC as the owner of the copyright in the Artwork.

## 3.     <u>Trials and Exhibitions Broadcast</u>

3.1     <u>Definition of Broadcast</u>.  For purposes of this Agreement, the term "**broadcast**" means the transmission, re-transmission, display, projection or performance of an audio or audiovisual program for display or reception on a television receiver, computer monitor, radio, or other form of display or reception device, whether now existing or developed in the future.

3.2     <u>Sale of Broadcast Rights</u>.  The USOC has sold the worldwide broadcast rights to the Trials and Exhibitions to NBC Universal, Inc.  For purposes of this Agreement, the term **"broadcaster"** shall refer to the entities to which the USOC has licensed all or any portion of the broadcast rights to the Trials and Exhibitions, and their respective sublicensees.

3.3     <u>Protection of Rights</u>.  The USOC shall have the right to control all aspects of the production of any broadcast of the Trials and Exhibitions. The NGB will not take any steps that restrict in any way the USOC's or any broadcaster's ability to broadcast the Trials and Exhibitions and will ensure that: (a) film, television, and other media crews, other than those of a broadcaster, are not permitted access to the sites of the Trials and Exhibitions during the events and preparations therefor without the USOC's prior written approval, and (b) tickets to the Trials and Exhibitions include language on the back thereof restricting the use of photographs, videotape and other audio and/or visual recordings to noncommercial purposes and prohibiting all Internet use, without the prior written consent of the USOC. In the event tickets are not issued for any Trials and/or Exhibitions event, the NGB agrees to have an announcement made restricting the use of photographs, videotape and other audio and/or visual recordings to noncommercial purposes and prohibiting all Internet use, without the prior written consent of the USOC. The ticket back language and form of announcement will be provided by the USOC. Media will be given access to the sites of the Trials and Exhibitions for purposes of conducting interviews and

EXHIBIT 41
006

limited rights to broadcast highlights of the Trials and Exhibitions on the terms and conditions of the news access rules established by the USOC and each broadcaster. The NGB agrees to require photographers and media to agree in writing to abide by such news access rules prior to issuing accreditations for the Trials and Exhibitions to such photographers and media. The parties agree to keep each other up to date on all discussions with any broadcaster. The NGB acknowledges and agrees that it may not make any decision with a broadcaster that results in increasing the fees and/or costs payable by the USOC, or the responsibilities of the USOC to, a broadcaster, without the USOC's prior written consent.

3.4    Suitability; Access. The Trials and Exhibitions sites shall be technically suitable for the origination of national and international television coverage, and each broadcaster and its employees, contractors and agents will be permitted complete and unrestricted access to the sites free of charge when engaged in the business of broadcasting the Trials and Exhibitions. Without limiting the generality of the foregoing, the NGB shall provide to each broadcaster or its designee(s), at the sole cost of the NGB: (a) all reasonably requested ingress and egress to the sites of the Trials and Exhibitions, including without limitation, all reasonably requested on-site locations and space at the sites that permit a full view of the area of competition and are suitable for producing broadcast coverage of the Trials and Exhibitions, (b) reasonable space for the installation and operation of all microphones, cameras and related equipment, including any platforms or scaffolding necessary or desirable to produce, originate and transmit the broadcasts of the Trials and Exhibitions, (c) all power at existing power outlets (provided that, if the broadcaster requests additional generators, the parties and the broadcaster will negotiate in good faith a resolution to the issue), (d) lighting in the playing area that satisfies the broadcasters, which may involve the NGB hiring a lighting consultant and/or purchasing auxiliary lighting if so required by the broadcasters, and (e) accreditations necessary for all working personnel's access to the venues and parking (including an acceptable mobile unit parking area, as necessary, for coverage of events). The NGB will ensure that each broadcaster and its designee(s) shall have the right to install, maintain and remove such wires, cables and other apparatus at locations designated by each broadcaster as are necessary for the production, origination, recording and transmission of the Trials and Exhibitions. The NGB will ensure that each broadcaster is permitted to prominently display its name and logo in camera-visible locations at the venues. Upon request by the USOC, the NGB shall provide a contact person who will be attached to each broadcaster's crew during planning and recording or live broadcasts of the Trials and Exhibitions to ensure that the broadcaster can locate, interview and cover the activities of persons involved in the Trials and Exhibitions. The NGB will give the broadcaster the first opportunity to interview its coaches, officials, and the competitors before, during intermissions of, and after events. At the USOC's request, the NGB will assist with hotel and other logistical arrangements for each broadcaster's crew at the Trials and Exhibitions (but each broadcaster shall bear the costs thereof).

3.5    Names and Likenesses; Event Data

3.5.1    The NGB shall secure and convey to the USOC all necessary rights so that the USOC shall have the right and may grant to others the right to reproduce, publish and otherwise distribute, in any medium, the names, pictures, likenesses and voices, as well as biographical material (as applicable) of the NGB, its officers, the competitors, officials and other persons participating in the Trials and Exhibitions. In no event shall the USOC or any third party be entitled to use such material in the manner of an endorsement of any product or service, or of any other event, without the consent of the individual involved.

3.5.2    The NGB will provide each broadcaster with access to the event data feed utilized by the NGB in conducting the Trials or Exhibitions, including, but not limited to, timing and results (*e.g.*, times of competitors and standings), rulings and other relevant information from participants and officials, and participant information, which access shall be exclusive vis-à-vis other third parties.

7

EXHIBIT 41
007

Although all equipment, software and the like necessary to compile and deliver such event data to the broadcaster(s) shall be paid for by the NGB, the broadcaster(s) shall pay for any costs incurred in their accessing of such event data feed.

       3.6    <u>Music</u>. The NGB will provide the USOC, at least forty-five (45) days prior to the commencement of each of the Trials and Exhibitions, a list of any musical compositions (including names of composers and publishers, if any) which will be performed during the events.   If any musical composition scheduled to be played during a broadcaster's coverage of events is not: (a) in the public domain, (b) covered by the broadcaster's music licenses with performing rights societies, or (c) cleared for all uses by the NGB at the source, the NGB must eliminate the playing of such composition unless otherwise agreed by the USOC in writing.

       3.7    <u>Advertising Inventory</u>. The NGB will not receive any advertising inventory and will not be entitled to sell any advertising on any Trials or Exhibitions broadcast. USOC Sponsors will be given a first opportunity to purchase broadcast advertising and other commercial opportunities on each Trials and Exhibitions broadcast.

       3.8    <u>No Broadcast Fees</u>. NGB shall not charge any fees to any broadcaster in connection with the NGB's performance of its obligations under this Agreement, unless specifically stated otherwise herein or subsequently agree to in writing by the parties and the broadcaster.

       3.9    <u>Survival</u>. The provisions of this <u>Section 3</u> shall survive the expiration or termination of this Agreement.

**4.**    <u>**Tickets**</u>**.** The NGB will provide the USOC with free tickets and credentials to each Trials and Exhibitions event for which tickets are issued for use by USOC staff, and will allow the USOC to purchase, for use by USOC Sponsors, VIP seating and other mutually-agreed hospitality benefits. The number of tickets and credentials to be provided to the USOC in connection with each Trials and Exhibitions event shall be as specified in <u>Exhibit A</u>.

**5.**    <u>**Approvals.**</u> The NGB shall submit to the USOC, for its prior written approval, representative samples of all advertising and promotional materials containing the Trials Logo at least seven  (7) business days prior to any proposed production or release to the public.  If the NGB's request for approval is not responded to by the USOC within seven (7) business days after the USOC has received the material from the NGB, the NGB may provide written notification to the USOC of such fact and the USOC agrees that any such proposed materials shall be deemed reasonable and approved if the NGB's request is not responded to within three (3) business days following receipt of such written notice. The USOC reserves the right to withdraw any consent or approval for good cause unless the NGB has relied to its detriment on such consent or approval and has incurred significant expense.

**6.**    <u>**Consideration.**</u> In consideration for the services performed by the NGB hereunder and the NGB's compliance with the terms hereof and the Act, the USOC shall pay to the NGB the Management Fee set forth in <u>Exhibit C</u> hereto in accordance with payment schedule set forth therein. The NGB acknowledges that the Management Fee is based on the interest and activation of broadcasters and sponsors with respect to the event, and the size, scope and complexity of the event.

**7.**    <u>**Insurance.**</u> The NGB shall procure and maintain at its expense, beginning not later than ninety (90) days prior to the commencement of the Trials and Exhibitions events and continuing until three (3) months after such events, a commercial general liability insurance policy written on an occurrence basis by an insurance company reasonably acceptable to the USOC covering bodily injury (including death),

EXHIBIT 41
008

property damage, personal injury, and advertising liability, including contractual liability, as may be applicable to the NGB's responsibilities, with limits complying with USOC requirements. The policy(ies) providing the foregoing insurance shall include the USOC and each broadcaster as Additional Insureds and shall contain a cross liability (severability of interests) provision. The foregoing insurance shall be endorsed to be primary and non-contributing to that of the USOC. The NGB agrees that any self-retained limits shall respond as if such an endorsement existed for such limits. The NGB, upon request by the USOC, shall provide each broadcaster and the USOC with satisfactory evidence of such insurance and certify that at least the minimum insurance coverage required above is in effect and that the insurance policy(ies) providing such coverage will not be canceled or materially changed without thirty (30) days advance written notice to the broadcaster(s) and the USOC, and that no material change in such coverage may be made without the prior written agreement of the broadcaster(s) and the USOC.

**8.**     **Indemnification**

     8.1     The NGB. The NGB shall indemnify, defend and hold harmless the USOC and its officers, directors, agents, employees and volunteers from any and all fines and penalties, and any and all claims by, or liability to, any third party, for loss, damage or injury to persons or property that is based on or in any manner arises out of or is incidental to (a) any breach of this Agreement or breach of the representations and warranties made herein by the NGB; (b) any use of the Trials Logo by the NGB, the LOC, or any other third party authorized to use the Trials Logo by the NGB; and (c) the NGB's staging of the Trials and Exhibitions.

     8.2     The USOC. The USOC shall indemnify, defend and hold harmless the NGB and its officers, directors, agents, employees and volunteers from any and all fines and penalties, and any and all claims by, or liability to, any third party, for loss, damage or injury to persons or property that is based on or in any manner arises out of or is incidental to (a) any breach of this Agreement by the USOC, and (b) the actions or omissions of any USOC employee, agent (including broadcasters and sponsors), volunteer, or invitee.

     8.3     Defense. Each indemnification is conditional upon the indemnifying party being given notice as soon as practicable of any event likely to give rise to a claim or liability, the right to control the defense of such claim (to the extent the indemnifying party assumes responsibility for the outcome of the claim) and the full cooperation of the indemnified party in doing so. Notwithstanding the foregoing, if and to the extent that any claim involves the ownership or use of the USOC Trials Mark, the Trials Logo, or any other Olympic Marks in the United States, the USOC shall have the right to control the defense of such claim without forfeiting its right to indemnification.

     8.4     Survival. The provisions of this Section 8 shall survive the expiration or termination of this Agreement.

**9.**     **Term, Termination and Remedies**

     9.1     Term. The term of this Agreement shall commence on the date hereof and shall continue until three (3) months after the completion of the Trials and Exhibitions (the "**Term**").

     9.2     Termination. Either party may terminate this Agreement and the rights granted hereunder, in whole or in part, by delivering written notice to other in the event that the other party commits a material breach of this Agreement and does not remedy such breach within thirty (30) days after receipt of written notice specifying the breach, provided that, the USOC may terminate this Agreement without providing a cure period with respect to actions of the NGB that are part of a continuing course of conduct and that have been the subject of a prior written notice. The USOC shall

EXHIBIT 41
009

have the right to terminate this Agreement if the NGB does not qualify a team or individuals to compete in the 2012 Olympic Games.

   9.3  <u>Effect of Expiration/Termination</u>.  Upon the expiration or termination of this Agreement for any reason, the NGB shall cease all use of the Trials Logo and all rights in and to the Trials Logo granted to the NGB under this Agreement shall terminate.  The NGB shall immediately (a) cease distribution of all advertising and other materials bearing the Trials Logo, and (b) destroy or deliver to the USOC all advertising and other materials bearing the Trials Logo that are still in the possession of the NGB or under the NGB's control; <u>provided that</u> the NGB may retain a limited number of advertising and promotional materials solely for its own archival purposes.

   9.4  <u>Remedies</u>. In the event that the NGB breaches this Agreement, the USOC may, in its sole discretion, forego entering into future U.S. Olympic Team Trials and Exhibitions Agreement(s) with the NGB, or prohibit the NGB from using the LOC for future Trials and Exhibitions.

**10.**  <u>**Assignment**</u>.  Neither party shall have the right to assign this Agreement or to delegate any of its obligations under this Agreement without the prior written consent of the other party.   Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

**11.**  <u>**Restrictions on Liability**</u>.  Each party agrees that no director, officer, employee, agent, or volunteer of the other shall incur any financial responsibility or liability in connection with this Agreement.  In no event shall either party be liable to the other, or its agents, under any provision of this Agreement for any consequential, incidental, or special damages, whether in contract (including breach of warranty) or tort, and including but not limited to lost profits or other economic loss.  The foregoing limitation of liability shall not apply to the parties' indemnification obligations under <u>Section 8</u> of this Agreement.

**12.**  <u>**Confidentiality**</u>.  The parties agree that the terms and conditions of this Agreement shall be confidential and therefore agree to undertake whatever measures are reasonably necessary to preserve such confidentiality unless disclosure is required by financial, legal or governmental proceedings.  The USOC shall also have the right to make limited disclosure of the terms of this Agreement to each broadcaster, as necessary, to enable such entity to exercise the rights granted to it by the USOC.

**13.**  <u>**Governing Law**</u>.  The parties agree that this Agreement will be interpreted and enforced under and according to the laws of the United States and the State of Colorado.  The parties hereby agree and irrevocably consent to the venue and jurisdiction of the courts of the State of Colorado, and the courts of the United States of America located in Colorado, with respect to any dispute, claim or controversy arising hereunder.

**14.**  <u>**Injunctive Relief**</u>.  The NGB acknowledges that Olympic Marks (including, but not limited to the USOC Trials Mark and the Trials Logo) possess special, unique and extraordinary characteristics that make difficult the assessment of monetary damages that would be sustained as a result of the NGB's unauthorized use or misappropriation thereof.  The NGB recognizes that irreparable injury could be suffered by the USOC in the event of the NGB's unauthorized use or misappropriation of Olympic Marks, and therefore agrees that, notwithstanding <u>Section 13</u>, the USOC may seek from any court of competent jurisdiction, injunctive and other equitable relief as appropriate.  If the USOC seeks injunctive or other equitable relief in the event of a breach or threatened breach of this Agreement by the NGB involving an unauthorized use of any Olympic Marks, the NGB agrees that it shall not allege in any such proceeding that the USOC's remedy at law is adequate.  If the USOC seeks any equitable remedies (including injunctive relief), it shall not be precluded or prevented from seeking remedies at law, nor shall

EXHIBIT 41
010

the USOC be deemed to have made an election of remedies.  The NGB hereby irrevocably submits to the venue and jurisdiction of the courts of the State of Colorado, and the courts of the United States of America located in Colorado, with respect to any equitable relief that is sought under this Agreement.

**15.** **Costs and Expenses.**  In any action, suit or proceeding brought to enforce this Agreement or to collect damages as a result of a breach hereof, the prevailing party in such action, suit or proceeding shall be entitled to collect from the other party all of its costs and expenses incurred in connection with such proceeding, including, but not limited to, reasonable attorneys' fees, court costs and expert witness fees.

**16.** **Notices.**  Notices required or permitted under this Agreement shall be in writing and delivered in person or by mail or facsimile transmission to the addresses of the parties shown below.  Notice shall be deemed given on the date of personal delivery, five (5) days after mailing, or if by facsimile transmission, one (1) day after the date such facsimile transmission is sent and receipt is confirmed.  Subject to any notice of change given by either party to this Agreement, the address of each party to which notices are to be addressed is as follows:

> In the case of the USOC:
>
> United States Olympic Committee
> One Olympic Plaza
> Colorado Springs, CO  80909
> Telecopy: (719) 632-4180
> Attention: Chief Executive Officer
>
> With a copy to:
> General Counsel (at the same address)
> Facsimile: (719) 866-4839
>
> In the case of the NGB:
>
> USA Gymnastics
> 132 E. Washington Street, Suite 700
> 201 South Capitol Avenue
> Indianapolis, IN  46204
> Facsimile: (317) 237-5069
> Attention: President/CEO

**17.** **Waiver.**  No waiver of any provision of this Agreement or of any breach of this Agreement shall be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. A waiver of any provision of this Agreement or any breach of any provision in one instance shall not be construed as a waiver of that provision or any subsequent breach in the future, unless specifically stated otherwise, in writing.

**18** **Severability.**  The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, all of said provisions being inserted conditionally on their being considered legally valid and in compliance with the Act, and this Agreement shall be construed and performed in all respects as if such invalid or unenforceable provisions were omitted insofar as the primary purpose of this Agreement is not frustrated.

**19.** **Integration and Amendment.**  This Agreement contains the entire understanding between the parties relating to the subject matter herein contained and supersedes all prior oral and written

EXHIBIT 41
011

understandings, arrangements and agreements between the parties relating thereto.  Any amendment to this Agreement must be in writing and signed by both parties.  The Exhibits are an integral part of this Agreement.

20.     **Relationship of the Parties.**  This Agreement does not constitute the USOC or the NGB the agent of the other, or create a partnership, joint venture or similar relationship between the parties, and neither party shall have the power to obligate or bind the other party in any manner whatsoever.  The parties agree not to contend to the contrary or to attempt to enforce any contrary intention in any court.  In addition, neither party shall represent to third parties that it is an agent or partner of or joint venturer with the other.

21.     **Consents.**  Whenever the consent or approval of a party to this Agreement is required, such consent or approval may be given or withheld by such party in its sole discretion, unless otherwise specifically stated.

22.     **Survival.**  The provisions of this Agreement shall survive the expiration or termination of this Agreement to the extent necessary to protect the rights of the USOC in and to the Olympic Marks.

        **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first written above.

**USA GYMNASTICS**                              **UNITED STATES OLYMPIC COMMITTEE**

By: _____               By: _____

Name: Steve Penny                               Name: Scott Blackmun

Title: President/CEO                            Title: Chief Executive Officer

12

EXHIBIT 41
012

Exhibit A

**INFORMATION ON TRIALS AND EXHIBITIONS**

**2012 TRIALS AND EXHIBITIONS**

| DATES | LOCATION | NAME(S) OF EVENT(S) |
|-------|----------|---------------------|
| June 28-<br>July 1, 2012 | San Jose, CA | U.S. Olympic Team Trials - Gymnastics |

TICKETS AND CREDENTIALS

The NGB will provide to the USOC, at no cost or expense to the USOC, 35 event tickets per session to each day of the Olympic Trials and Exhibitions, plus 3 "all access" credentials to each day for USOC staff, including VIP parking.

A-1

EXHIBIT 41
013

<u>Exhibit B</u>

## **USOC SPONSORS**

**<u>Partners</u>**
The Coca Cola Company
Acer
Anheuser-Busch
AT&T
Atos Origin
BMW
BP
Dow
General Electric
McDonald's
Omega
Panasonic
Procter & Gamble
Samsung
Visa
NBC

**<u>Sponsors</u>**
24 Hour Fitness
Adecco
Allstate
Deloitte
Hilton Hotels Corporation
Jet Set Sports
Nike
United Airlines

**<u>Suppliers</u>**
Highmark
Oroweat

EXHIBIT 41
014

Exhibit C

**MANAGEMENT FEE**

The USOC shall pay to the NGB a Management Fee of $850,000, the entire amount of which shall be paid in cash. The USOC shall pay 50% of the cash consideration on July 1, 2011, and the remaining 50% within 45 days after the NGB's completion of the Trials and Exhibitions to the USOC's satisfaction and the NGB's submission of a final report with respect to the Trials and Exhibitions, including a full accounting of the revenues and expenses associated therewith.

EXHIBIT 41
015

Exhibit D

**MERCHANDISE GUIDELINES**

Any Trials merchandise must comply with the following guidelines:

- The NGB may not grant any merchandising rights with respect to the Trials to the LOC or to any third party without the prior written consent of the USOC.

- Trials merchandise includes any merchandise bearing the Trials Logo, any Trials terminology, or any other Olympic Marks.

- All proposed Trials merchandise is subject to the prior review and approval of the USOC.

- Any Trials merchandise so approved by the USOC must be sourced solely from USOC Licensees (for example, Nike for apparel), except as otherwise specified herein.

- The NGB must provide the USOC's retail store licensee with the first right to negotiate for all onsite retail opportunities at the Trials.  If selected, the NGB will not be responsible for paying any royalties to the USOC with respect to merchandise sold at the Trials.  If the NGB cannot reach agreement with the USOC's retail store licensee and the Trials will not be held on USOC premises, the NGB may enter into an agreement with a third party retailer; provided that, the NGB shall be responsible for paying to the USOC royalties equal to 10% of retail sales of any such merchandise.

- The USOC will consider requests from the NGB to sell specific non-Trials merchandise at or near the Trials venue on a case-by-case basis.

- The most updated list of USOC Licensees can be obtained by contacting the USOC Licensing Manager, Laura Sokol, at (719) 866-4988 or laura.sokol@usoc.org.

- If the NGB wishes to create an item of licensed merchandise for which there is a current USOC Licensee, the NGB should contact the USOC Licensing Manager.  With respect to any Trials merchandise approved by the USOC, the USOC Licensee will work with the NGB to design the merchandise and will manage the review/approval process with the USOC's Licensing Department.

- If there is no current USOC Licensee for a particular item of merchandise, the NGB should contact the USOC Licensing Manager to request that the USOC enter into a one-time license agreement with the NGB's preferred manufacturer.

- Each licensee will manage all administrative aspects of the process with the NGB, including review/approval.

EXHIBIT 41
016

# EXHIBIT "42"

EXECUTED
ORIGINAL

## HOUSING DEVELOPMENT AGREEMENT

THIS HOUSING DEVELOPMENT AGREEMENT (the "**Agreement**") is dated June 13, 2012, by and between the **UNITED STATES OLYMPIC COMMITTEE**, a congressionally chartered not-for-profit organization (hereinafter referred to as "**USOC**"), and **EASTON SPORTS DEVELOPMENT FOUNDATION II**, a California nonprofit public benefit corporation ("**ESDF II**"). As used herein, the term "**Effective Date**" shall mean the date upon which USOC shall have delivered to ESDF II a fully executed copy of this Agreement.

## R E C I T A L S

A.     USOC is the owner of that certain real property located in the City of Chula Vista, County of San Diego, State of California, more particularly described on **Exhibit A** attached hereto (the "**Property**"), and commonly known as the "Chula Vista Olympic Training Center" or "Chula Vista OTC" (the "**OTC**"). The Property is partially improved with athletic facilities used for training in Olympic sporting events, housing for athletes, coaches and their families, and offices for USOC.

B.     Concurrently herewith, USOC and EASTON SPORTS DEVELOPMENT FOUNDATION, a California nonprofit public benefit corporation ("**ESDF**") are entering into that certain License, Lease and Operations Agreement (the "**Lease**"), for a portion of the Property, as such is more particularly described in the Lease (the "**Premises**"), on which ESDF and USOC will construct certain improvements pursuant to the terms of the Lease (the "**Archery Improvements**"). Capitalized terms not defined in this Agreement have the same definition as set forth in the Lease.

C.     ESDF II and USOC are required to enter into this Agreement in connection with and as a condition to ESDF and USOC entering into the Lease.

NOW, THEREFORE, with reference to the foregoing Recitals and upon the terms and conditions contained herein, USOC and ESDF II hereby agree as follows:

1.     **TERM OF AGREEMENT; CROSS DEFAULT.**

1.1     TERM.

The term of this Agreement ("**Term**") shall commence on the Effective Date and shall continue thereafter until the Lease is terminated pursuant to the terms of the Lease (including, without limitation, as a result of the exercise by USOC and/or ESDF of any of their respective express termination rights set forth in the Lease).

1.2     CROSS DEFAULT.

An "Event of Default" by ESDF as defined in Section 17.1 of the Lease shall also constitute a default hereunder by ESDF II and, in such event, USOC shall have the right to pursue any and all rights and remedies available to it under law or in equity, subject, however, to any restrictions set forth in the Lease. A "USOC Event of Default" by USOC as defined in

EXHIBIT 42
001

Section 17.4 of the Lease shall also constitute a default hereunder by USOC and, in such event, ESDF II shall have the right to pursue any and all rights and remedies available to it under law or in equity, subject, however, to any restrictions set forth in the Lease.

**2.     HOUSING AGREEMENTS.**

   2.1     OVERVIEW.

   USOC, in its sole and absolute discretion, may elect to construct, or cause to be constructed, additional housing for athletes, coaches and staff at the OTC (the "**OTC Additional Housing**"). Except as provided herein, USOC shall make all decisions (including, without limitation, all decisions relating to location, design and construction) regarding the OTC Additional Housing in USOC's sole and absolute discretion. Notwithstanding anything to the contrary contained herein, at any time prior to USOC so constructing the OTC Additional Housing, ESDF II shall have the right to construct, at its sole cost and expense, the ESDF II Archery Housing Improvements pursuant to Section 2.4 below. If ESDF II so elects to construct the ESDF II Archery Housing Improvements, then ESDF II shall have no rights to any OTC Additional Housing thereafter constructed by USOC (except as otherwise expressly provided in Section 2.2.4 and elsewhere in this Agreement).

   2.2     CONSTRUCTION.

   2.2.1   If USOC elects to construct the OTC Additional Housing, USOC shall construct, as part of the OTC Additional Housing, subject to reimbursement from ESDF II for the cost thereof (including design, planning, engineering, legal and other out of pocket costs and expenses) pursuant to Section 2.3.1 below, the dedicated housing for athletes, coaches and staff as selected pursuant to Section 2.8 below (collectively, "**ESDF II's Selected Residents**") described as "Phase I" on **Exhibit D** attached hereto (the "**ESDF II Archery Housing**"). All housing units described as "Phase I" on **Exhibit D** attached hereto shall be substantially similar in design, quality and construction as the other OTC Additional Housing. If ESDF II elects to construct the ESDF II Archery Housing pursuant to Section 2.4 below, then such ESDF II Archery Housing must be in conformance with the housing units described as "Phase I" on **Exhibit D** attached hereto (it being agreed that ESDF II may construct, at its sole discretion, only a portion of "Phase I"); provided, however, that additional beds and/or units or suites ("**Additional Beds/Units/Suites**") may be added provided that (i) USOC approves of the addition of such Additional Beds/Units/Suites, in USOC's reasonable discretion, (ii) ESDF II obtains, at its sole cost and expense all land use, zoning or other discretionary permits, licenses and approvals from all applicable governmental bodies and agencies to the extent necessary in connection with the construction of such Additional Beds/Units/Suites (it being agreed that (A) USOC shall reasonably cooperate in connection with such process, at no cost to USOC, (B) the provisions of Section 2.4 of the Lease and any other provisions of the Lease pertaining to Entitlements shall have no applicability with respect to the permits, licenses and approvals for such Additional Beds/Units/Suites, and (C) notwithstanding anything to the contrary in the Lease, USOC shall have no responsibility [other than the duty to reasonably cooperate in connection therewith as provided in clause (A) hereinabove] with respect to such permits, licenses and approvals for such Additional Beds/Units/Suites). USOC hereby pre-approves the addition of the Additional Beds/Units/Suites described as "Phase II" on **Exhibit D** attached

EXHIBIT 42
002

hereto.  Upon completion of construction of such Additional Beds/Units/Suites, the "ESDF II Archery Housing Improvements" shall be deemed to include such Additional Beds/Units/Suites for purposes of this Agreement, including, without limitation, EDSF II's obligation to reimburse USOC for the Operating Expenses (as defined in and pursuant to Section 2.5.6 below) of such Additional Beds/Units/Suites; provided, however, that prior to the commencement of construction of the Additional Beds/Units/Suites, USOC and ESDF II shall meet and confer in good faith in order to agree upon an allocation between USOC and ESDF II of the Operating Expenses for such Additional Beds/Units/Suites.  If the parties are unable to agree upon such allocation of the Operating Expenses for such Additional Beds/Units/Suites, and ESDF II elects not to construct such Additional Beds/Units/Suites, then ESDF II and/or USAA shall have the right to request, from time to time, the right to use additional housing at the OTC (other than the ESDF II Archery Housing Improvements) for ESDF II's Selected Residents and USAA resident archery athletes.  If USAA is the party requesting such additional housing, USOC will follow its then-current resource allocation process for USAA (if applicable) or its process for NGB requests for OTC housing.  If ESDF II is the party requesting such additional housing, USOC will follow its then-current process for third party/NGB non-resource allocation housing requests.

2.2.2  USOC shall, subject to reimbursement from ESDF II as provided in Section 2.3.1 below, for each building containing ESDF II Archery Housing, construct common areas for the buildings that house the beds described in Section 2.2.1 above (such common areas, together with the ESDF II Archery Housing, being collectively referred to herein as the "**ESDF II Archery Housing Improvements**").

2.2.3  Upon completion of construction of the ESDF II Archery Housing Improvements, USOC shall own the ESDF II Archery Housing Improvements without any conditions, restrictions or limitations from ESDF II except as set forth in this Agreement and except for ESDF II's reimbursement to USOC of the ESDF II Housing Payment (as defined in Section 2.3.1 below) as provided herein.

2.2.4  If and to the extent the ESDF II Archery Housing Improvements are constructed, the ESDF II Archery Housing shall be in addition to the housing USOC allocates to USAA for resident archery athletes at the OTC (including the OTC Additional Housing, if any) on an annual basis, which allocation shall be made in a manner consistent with the manner in which USOC allocates housing to other NGBs at the OTC.

2.2.5  If and to the extent the OTC Additional Housing is constructed, including the ESDF II Archery Housing Improvements, ESDF II's Selected Residents shall at all times be housed in such newly constructed OTC Additional Housing.

2.3     EXPENSES.

2.3.1  ESDF II shall reimburse USOC for all of the costs and expenses incurred by USOC and payable to third parties in connection with the design, permitting and construction of the ESDF II Archery Housing Improvements (including design, planning, engineering, legal and other out of pocket costs and expenses), it being agreed that ESDF II shall have no obligation to reimburse USOC for any costs and expenses for USOC's personnel or USOC's

EXHIBIT 42
003

administrative costs to construct the ESDF II Archery Housing Improvements pursuant to the provisions of this <u>Section 2.3.1</u>. The total amount that ESDF II must reimburse USOC pursuant to this <u>Section 2.3.1</u> is referred to herein as the "**ESDF II Housing Payment**". The ESDF II Housing Payment shall equal an amount which is the total cost of all OTC Additional Housing multiplied by a fraction, the numerator of which shall be the number of beds in the ESDF II Archery Housing and the denominator of which shall be the total number of beds in the OTC Additional Housing (the "**ESDF II Proportional Share**"). ESDF II shall reimburse USOC for the ESDF II Housing Payment in proportion to the ESDF II Proportional Share as costs are incurred by USOC for the design, permitting and construction of the OTC Additional Housing thirty (30) days after receipt of an invoice from USOC (together with appropriate evidence and documentation of such costs). ESDF II shall have the right to inspect, copy and audit USOC's books and records as to such costs and expenses.

      2.3.2   The total amounts (excluding the ESDF II Housing Payment) that ESDF II must reimburse USOC in connection with the operation of the ESDF II Archery Housing Improvements shall include those costs and expenses set forth in <u>Sections 2.5.4</u>, <u>2.5.5</u> and <u>2.5.6</u> below and are referred to herein collectively as the "**ESDF II Housing Reimbursement Costs**". USOC shall have the right to invoice ESDF II monthly or otherwise from time to time, for the ESDF II Housing Reimbursement Costs, as reasonably determined by USOC, and ESDF II shall pay to USOC, those amounts for which ESDF II is invoiced within thirty (30) days after receipt of said invoice.

    2.4      **EASTON'S ELECTION TO BUILD.**

      2.4.1   At any time prior to the construction by USOC of the OTC Additional Housing, ESDF II shall have the right to construct, at ESDF II's sole cost and expense, on a lien-free basis and in a good and workmanlike manner, the ESDF II Archery Housing Improvements as a separate stand-alone housing unit on the Premises in a location selected by ESDF II and reasonably approved by USOC (it being agreed that ESDF II shall be permitted to construct the ESDF II Archery Housing Improvements in the location designated as Item "E" in the legend of **Exhibit C** attached hereto), and pursuant to plans and specifications approved by USOC (in USOC's reasonable discretion). Prior to the commencement of the design, permitting and construction of the ESDF II Archery Housing Improvements by ESDF II, USOC and ESDF II shall in good faith negotiate and agree to any other written agreements reasonably required by USOC in connection with ESDF II's design, permitting and construction of the ESDF II Archery Housing Improvements. ESDF II shall document and provide evidence to USOC of ESDF II's actual, documented, third-party, out-of-pocket costs and expenses incurred and paid for by ESDF II in connection with the construction of the ESDF II Archery Housing Improvements (including without limitation, all costs for labor, material, employees, insurance, bonds, construction management services, permit and inspection fees and utilities) ("**ESDF II Housing Costs**"). Upon completion of construction of the ESDF II Archery Housing Improvements, USOC shall own the ESDF II Archery Housing Improvements, subject to the conditions, restrictions and limitations set forth in this Agreement and the Lease.

      2.4.2   Notwithstanding anything to the contrary herein, in the event ESDF II elects to build the ESDF II Archery Housing pursuant to <u>Section 2.4.1</u> above, then (i) the provisions of <u>Section 2.3.1</u> above shall not apply, and (ii) if USOC thereafter elects to build any

EXHIBIT 42
004

OTC Additional Housing, USOC shall have no obligation to construct any dedicated housing for any of ESDF's or ESDF II's athletes, coaches and staff as part of such OTC Additional Housing.

2.4.3   USOC, at its expense (subject to reimbursement by ESDF II pursuant to Section 2.5 below), shall clean, maintain, preserve, repair and replace and keep the ESDF II Archery Housing Improvements in good order, condition and repair, ordinary wear and tear and damage by casualty or condemnation excepted.   Such maintenance and repair shall include, without limitation, maintenance and repair of all structural and nonstructural components, trash areas, lighting, sidewalks, walkways, landscaping, gates and HVAC of the ESDF II Archery Housing Improvements.   If USOC fails to so maintain the ESDF II Archery Housing Improvements in accordance with the provisions of this Section 2.4.3, and such failure continues for thirty (30) days following USOC's receipt of written notice from ESDF II stating the nature of such failure (or such longer period as may be necessary or such shorter period in the event of an emergency), then ESDF II shall have the right, but not the obligation, to perform such maintenance obligation at its sole cost and expense.   USOC shall maintain written records of its maintenance and repairs of the ESDF II Archery Housing Improvements as and to the extent required by applicable law and shall use certified technicians to perform such maintenance and repairs to the extent reasonably required.   If USOC delivers to ESDF II a Notice of Closure (as defined in and pursuant to Section 8 of the Lease), then USOC shall thereafter make available to ESDF II for review copies of all service and maintenance contracts entered into by USOC for the ESDF II Housing Improvements within ten (10) days following ESDF II's request therefor.

2.5   USE OF ESDF II ARCHERY HOUSING.

2.5.1   Subject to prior scheduling by the parties, at all times during the Term of this Agreement, all of the beds within the ESDF II Archery Housing shall be available on a first priority for use by ESDF II Selected Residents and USAA resident archery athletes.

2.5.2   Subject to Section 2.5.1 above, USOC shall use commercially reasonable efforts to:

(a)   Allow ESDF II's Selected Residents to room together if practicable and desired by USAA; and

(b)   Ensure that ESDF II's Selected Residents are located in one area of the OTC Additional Housing if practicable and desired by USAA (if USOC builds the ESDF II Archery Housing Improvements).

2.5.3   ESDF II's Selected Residents shall be selected in accordance with Section 2.8 below.   All archery athletes, coaches, staff and others that reside in housing at the OTC, including the ESDF II Selected Residents, shall be subject to USOC's policies and procedures, the OTC Rules and Regulations.   USOC shall have the right to suspend or terminate access and/or privileges for persons who violate the same.

2.5.4   As part of the ESDF II Housing Reimbursement Costs, if (i) USOC constructs the OTC Additional Housing, ESDF II shall pay to USOC the ESDF II Proportional Share of any state or federal tax applicable to the OTC Additional Housing, or (ii) ESDF II elects to build the ESDF II Archery Housing Improvements pursuant to Section 2.4.1 above, ESDF

EXHIBIT 42
005

shall pay to USOC one hundred percent (100%) of any state or federal tax applicable to the ESDF II Archery Housing Improvements.

2.5.5   As part of the ESDF II Housing Reimbursement Costs, if (i) USOC constructs the OTC Additional Housing, ESDF II shall reimburse USOC for the ESDF II Proportional Share of the cost of furnishing the OTC Additional Housing, including the ESDF II Archery Housing Improvements, which shall be furnished in a manner consistent with the other housing units at the OTC, and (ii) ESDF II elects to build the ESDF II Archery Housing Improvements pursuant to Section 2.4.1 above, ESDF II shall reimburse USOC for one hundred percent (100%) of the cost of furnishing the ESDF II Archery Housing Improvements which shall be furnished in a manner consistent with the other housing units at the OTC.

2.5.6   As part of the ESDF II Housing Reimbursement Costs, if (i) USOC constructs the OTC Additional Housing, ESDF II shall reimburse (subject to the exclusions set forth hereinbelow) USOC for the ESDF II Proportional Share of the cost of the cleaning, repair, replacement, maintenance, utility costs and operational costs (collectively, the "**Operating Expenses**") of the OTC Additional Housing, or (ii) ESDF II elects to build the ESDF II Archery Housing Improvements pursuant to Section 2.4.1 above, on a monthly basis, ESDF II shall reimburse USOC for one hundred percent (100%) of the Operating Expenses of the ESDF II Archery Housing Improvements (subject, however, to any alternative Operating Expense allocation for the Additional Beds/Units/Suites agreed upon by the parties pursuant to Section 2.2.1 above).  Notwithstanding the foregoing, Operating Expenses shall not include the following:

(i)      the cost of any special work or service performed for any particular resident or groups of residents only (and not for ESDF II and the ESDF II Archery Housing Improvements);

(ii)     if, and only if, the OTC Additional Housing is built by USOC, the cost of correcting defects (including latent defects) in the construction of the OTC Additional Housing;

(iii)    compensation paid to officers, executives and managers of USOC;

(iv)     the cost of any items for which USOC is reimbursed by insurance, condemnation or otherwise;

(v)      the cost of repairs incurred by reason of fire or other casualty reimbursed by insurance proceeds under policies maintained by USOC;

(vi)     depreciation, interest on debt or amortization payments on any mortgage or deed to secure debt (except to the extent specifically permitted by Section 2.5.6(viii) below) and rental under any ground lease or other underlying lease;

(vii)    any expenses for repairs or maintenance which are covered by warranties and service contracts, to the extent such maintenance and repairs are made at no cost to USOC;

EXHIBIT 42
006

(viii)   the cost of the installation and acquisition of capital items, except that Operating Expenses shall expressly include the costs of capital improvements and structural repairs and replacements made in or to the OTC Additional Housing and/or the ESDF II Archery Housing Improvements, as applicable, that are required in order for USOC to operate the OTC Additional Housing and/or the ESDF II Archery Housing Improvements, as applicable, in a first class manner, including, without limitation, replacement of the roof and roof membrane to the extent so required (herein the "**Permitted Capital Improvements**"), which Permitted Capital Improvements shall be amortized over the useful life of such Permitted Capital Improvements (as reasonably determined by USOC in accordance with standard real estate accounting practices, consistently applied), together with interest on the balance of the unreimbursed expenditure at a rate equal to the floating commercial loan rate announced from time to time by US Bank, a national banking association, or its successor, as its prime rate, plus 2% per annum which is in effect on the date the expenditure was incurred by USOC;

(ix)   costs incurred by the USOC due to the violation by USOC of the terms and conditions of any laws, conditions, covenants, restrictions, mortgages or other agreements affecting the OTC;

(x)   if, and only if, the OTC Additional Housing is built by USOC, costs incurred in connection with upgrading the OTC Additional Housing to comply with handicap, life, fire and safety codes which were in effect on or prior to the date of obtaining permits for the construction of the OTC Additional Housing;

(xi)   any costs incurred by USOC (including the cost of repairs, replacement and restoration) in the event any portion of the OTC Additional Housing is damaged, destroyed or made untenantable by fire or other casualty required to be insured against pursuant to this Agreement, provided that costs incurred by USOC as a result of commercially reasonable insurance deductibles shall be included in such expenses;

(xii)   USOC's general administrative expenses or legal expenses; or

(xiii)   the wages and benefits of any employee who does not devote substantially all of his or her time to the OTC Additional Housing unless such wages and benefits are reasonably prorated to reflect time spent on operating and managing the OTC Additional Housing vis-à-vis time spent on matters unrelated to operating and managing the OTC Additional Housing.

2.5.7   Within thirty (30) days after ESDF II's receipt of invoice therefor, ESDF II shall pay all costs and expenses directly incurred by USOC as a result of the use by of the OTC (including the ESDF II Archery Housing Improvements) by ESDF II Selected Residents that are not Elite Athletes (as defined in the Lease). Without limiting the generality of the foregoing, ESDF II shall pay for all food, utilities, services (e.g., sports medicine, massage, etc.) and appropriate day use fees used by ESDF II's Selected Residents that are not Elite Athletes. USOC will pay for food and appropriate day use fees for ESDF II's Selected Residents that are Elite Athletes. Nothing herein shall affect or limit the right of USAA to seek Elite Athlete designation for an athlete, or USAA's right to seek an increase in its Elite Athlete allocation,

EXHIBIT 42
007

notwithstanding the fact that such athletes may reside in the ESDF II Archery Housing Improvements. The 2012 schedule of day use fees is attached hereto as **Exhibit B**. For the avoidance of doubt, USOC shall not pay for (and may bill back to the appropriate person or entity) any expense stemming from the spouses or significant other who is not an ESDF II Selected Resident of any athlete living in the married housing as set forth above, and as is consistent with USOC policies.

2.5.8   After ESDF II and USAA have reserved rooms in the ESDF II Archery Housing Improvements for: (i) ESDF II's Selected Residents; (ii) athletes for USAA special events; (iii) ESDF II camps or special events for archery athletes as part of its Grass Roots Programs; and (iv) USAA resident archery athletes, then ESDF II, at its sole discretion, may advise USOC of the availability of the remaining beds in the ESDF II Archery Housing Improvements, and thereafter USOC may schedule and use the unused beds in the ESDF II Archery Housing to house other athletes, coaches and support staff; provided that USOC must keep a running total of the number of units of each type (that is, one bedroom units, two bedroom units and married housing units) and days used, which number shall be transferred to an equal number of useable credits for ESDF II's use of other housing operated by USOC at the OTC in the future. USOC and ESDF II shall meet on an annual basis to discuss the amount and disposition of such housing credits.

2.5.9   ESDF II may use the housing credits described herein to reserve and use rooms at no cost; provided that the number of rooms reserved for archery does not exceed 50% of all rooms at the OTC at any one time, unless pre-approved by USOC. ESDF II may give housing credits to USAA for USAA use if it so desires.

2.5.10 USOC has the option of invalidating housing credits beginning four (4) years after each year's credits have accrued.

2.6   USOC COMMITMENT TO USAA ARCHERY FUNDING.

With regard to USOC funding allocated to USAA, USOC shall use a methodology that is consistent with the methodology used to determine funding for all other NGBs. USOC will not factor in ESDF II's funding under this Agreement or the Contribution Agreement as a subsidy and reduce funding otherwise to be allocated to USAA.

2.7   INCREMENTAL HOUSING.

With regard to any housing at the OTC (not including the ESDF II Archery Housing Improvements) ESDF II would like to use for its ESDF II Selected Residents during the planning for and prior to and after the completion of any ESDF II Archery Housing, USOC will follow the resource allocation process it uses for all other housing requests at the OTC from third-party non-NGB entities.

2.8   ATHLETE AND COACH SELECTION PROCEDURES.

If the ESDF II Archery Housing Improvements are completed, selection of athletes, coaches and staff at the OTC for use of the ESDF II Archery Housing shall be based upon, and subject to, selection procedures determined by ESDF II in collaboration with USAA, which

EXHIBIT 42
008

selection procedures shall be designed to coordinate with and further the goals of ESDF, USAA and USOC. ESDF II's selection procedures may be amended or modified by ESDF II at any time. All resident athletes, coaches and staff selected pursuant to ESDF II's selection procedures shall be subject to prior written approval from USOC.

2.9   INSURANCE.

USOC shall maintain property insurance for the ESDF II Archery Housing Improvements against risks customarily included under what is commonly referred to as "Special Form" (aka "All Risk") policies in an amount equal to 100% of the replacement cost of the ESDF II Archery Housing Improvements and all furnishing and equipment therein. USOC shall maintain property insurance for the ESDF II Archery Housing Improvements against risks customarily included under what is commonly referred to as "Special Form" (aka "All Risk") policies in an amount equal to 100% of the replacement cost of the ESDF II Archery Housing Improvements and all furnishings and equipment therein. If the ESDF II Archery Housing Improvements are damaged by fire or other casualty covered by such All Risk policy, then (i) if USOC has built the ESDF II Archery Housing Improvements, USOC shall be obligated to rebuild such ESDF II Archery Housing Improvements as soon as practicable after receipt of, or arrangement for, the payment of insurance proceeds and (ii) if ESDF II has built the ESDF II Archery Housing Improvements, USOC shall assign all insurance proceeds therefor to ESDF II and ESDF II shall have the right to either elect to rebuild the ESDF II Archery Housing Improvements or retain such insurance proceeds. If the ESDF II Archery Housing Improvements are damaged by a peril not covered by insurance required to be maintained by USOC under this Section 2.9, and if USOC has built the ESDF II Archery Housing Improvements, then ESDF II shall have the option to pay the costs not covered by insurance and, in such event, USOC shall act with all due diligence to repair or rebuild the ESDF II Archery Housing Improvements as reasonably practicable after receipt from ESDF II of funds sufficient to cover such costs. USOC shall have no obligation to rebuild any of the ESDF II Archery Housing Improvements for which USOC has refunded to ESDF II the ESDF II Housing Payment. In the event of a Taking (as defined in the Lease) of the ESDF II Archery Housing Improvements, ESDF II shall be entitled to all awards for the ESDF II Archery Housing Improvements as a result of such Taking.

Additionally, ESDF II shall procure and maintain General Liability Insurance in an amount not less than One Million Dollars ($1,000,000) per occurrence which includes endorsements for contractual liability and cross-severability, premises and operations coverage including the operations of any subcontractors and name USOC as an Additional Insured as respects this Agreement.

If in connection with this Agreement, ESDF II requires the use of a motorized vehicle by its employees, contractors or subcontractors, Automobile Liability Insurance with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit per occurrence for all vehicles. Said coverage will name USOC as an Additional Insured as respects this Agreement.

If ESDF II has any employees at the OTC or working on behalf of USOC at an off-site location, ESDF II shall maintain Workers Compensation Insurance that meets statutory minimums for California and any jurisdictions under which this Agreement shall be in force. Said insurance shall waive subrogation in favor of USOC.

Concurrently with its execution of this Agreement, ESDF II shall provide and maintain a valid Certificate/Proof of Insurance evidencing all required coverage hereunder. All insurance policies shall be written by company(ies) qualified to conduct business in California, shall be reasonably acceptable to USOC and have an A.M. Best's Rating of A- VII or better. All such insurance may be written under the same policy as required for ESDF and under the Lease and such insurance is not intended to be duplicative to the policies required under the Lease.

ESDF II and USOC shall ensure that any and all approved subcontractors performing work at the OTC maintain and comply with the insurance requirements as set forth above. Further, ESDF II shall include the following language in each and every contract with subcontractors: Subcontractor shall be responsible for, and shall indemnify, defend and hold USOC harmless from all loss, damage injury or any of Subcontractors employees, agents or subcontractors in the performance of services under this agreement. Further, to the extent that it may be required, errors and omissions coverage with limits no less than One Million Dollars ($1,000,000) per claim shall be provided by applicable contractors conducting, among other professional operations, engineering and architectural design work.

## 3.   INDEMNIFICATION/DEFINITIONS/REIMBURSEMENT.

### 3.1   INDEMNIFICATION BY ESDF II

Except to the extent caused by the negligence or willful misconduct of USOC or its agents, employees or contractors, ESDF II covenants and agrees to pay, defend, indemnify and save harmless USOC from and against any and all liability, loss, damage, cost, expense, causes of action, suits, claims, demands or judgments of any nature whatsoever (including reasonable attorneys' and expert witness fees), to the extent arising from ESDF II's acts or omissions with respect to ESDF II's obligations under this Agreement. If any action or proceeding should be brought against USOC based upon any such claim and if ESDF II, upon notice from USOC, shall cause such action or proceeding to be defended at ESDF II's expense by counsel reasonably satisfactory to USOC, ESDF II shall not be required to indemnify USOC for additional attorneys' fees and expenses incurred by USOC in connection with such action or proceeding. The obligations of ESDF II under this Section 3.1 shall commence to accrue on the Effective Date and with respect to any such matters occurring prior to the termination of this Agreement, shall survive any termination of this Agreement.

### 3.2   INDEMNIFICATION BY USOC

Except to the extent caused by the negligence or willful misconduct of ESDF II or its agents, employees or contractors, USOC covenants and agrees to pay, defend, indemnify and save harmless ESDF II from and against any and all liability, loss, damage, cost, expense, causes of action, suits, claims, demands or judgments of any nature whatsoever (including reasonable attorneys' and expert witness fees), to the extent arising from USOC's acts or omissions with respect to USOC's obligations under this Agreement. If any action or proceeding should be brought against ESDF II based upon any such claim and if USOC, upon receipt of written notice from ESDF II, shall cause such action or proceeding to be defended at USOC's expense by counsel reasonably satisfactory to ESDF II, USOC shall not be required to indemnify ESDF II

EXHIBIT 42
010

for additional attorneys' fees and expenses incurred by ESDF II in connection with such action or proceeding.  The obligations of USOC under this Section 3.2 shall commence to accrue on the Effective Date and with respect to any such matters occurring prior to the termination of this Agreement, shall survive any termination of this Agreement.

3.3    USOC'S EARLY TERMINATION RIGHT

In the event USOC terminates the Lease pursuant to Article 8 of the Lease, then (i) this Agreement shall expire on the Termination Date (as defined in the Lease); (ii) if as of the date of ESDF's receipt of USOC's Termination Notice, either the Final Tract Map (as defined in the Lease), or a Subdivision Adjustment (as defined in the Lease) which creates the Easton Parcel (as defined in the Lease) as a separate legal parcel, has been recorded in the Official Records (as defined in the Lease), then on the Termination Date, USOC and ESDF shall conduct a closing in which USOC shall convey the Premises to ESDF II or a Related Entity Transferee, as defined in and pursuant to Article 8 of the Lease (and all improvements thereon, including the ESDF II Archery Housing Improvements if the same have been constructed on the Premises); (iii) if USOC has constructed the ESDF II Archery Housing Improvements as part of the OTC Additional Housing and such ESDF II Archery Housing Improvements are not located on the Premises, then USOC shall reimburse ESDF II an amount equal to the unamortized portion of the ESDF Housing Payment; and (iv) from and after the Termination Date, neither party shall have any further obligations under this Agreement, except for those obligations under this Agreement which expressly survive the termination or expiration of the Agreement.  For purposes of Section 3.3, the ESDF Housing Payment shall be amortized on a straight-line basis over the period (the "**Amortization Period**") commencing on the date upon which USOC completes the ESDF II Archery Housing Improvements and ending on the expiration of the entire scheduled Term (i.e., the Initial Term of the Lease plus each of the 5-year Extension Terms), and the unamortized portion thereof shall be determined based upon the unexpired portion of the Amortization Period as of the Termination Date pursuant to Article 8 of the Lease, prorated on a daily basis based on 360 day years.  By way of example, if (A) USOC completes the ESDF II Archery Housing Improvements on the date which is two (2) years after the Commencement Date of the Lease, (B) the Termination Date occurs on the date which is ten (10) years after the date USOC completes the ESDF II Archery Housing Improvements, and (C) the ESDF Housing Payment is an amount equal to $500,000.00, then (1) the Amortization Period shall be the 28-year period from the date USOC completes the ESDF II Archery Housing Improvements through and including the last day of the entire scheduled Term, (2) the unexpired portion of the Amortization Period as of the Termination Date shall be eighteen (18) years, and (C) USOC shall reimburse ESDF II an amount equal to $321,428.55 (i.e., $500,000.00 x [18/28]).

4.    **ASSIGNMENT.**

Except for an assignment to ESDF, ESDF II may not assign, pledge, encumber or otherwise transfer this Agreement, by operation of law or otherwise, without the prior written consent of USOC, which consent may be withheld in USOC's sole and absolute discretion.

EXHIBIT 42
011

## 5.   MISCELLANEOUS.

### 5.1   SEPARABILITY.

All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate applicable law and shall be limited to the extent necessary to render this Agreement valid and enforceable.  If any term, provision or covenant of this Agreement or the application thereof to any person or circumstance shall be held to be invalid, illegal or unenforceable, by a court of last resort having jurisdiction in the Premises, the validity of the remainder of this Agreement shall not be affected, this Agreement shall not terminate, and there shall be substituted for such illegal, invalid or unenforceable provision a like provision which is legal, valid and enforceable within the limits established by such court's final opinion and which most nearly accomplishes and reflects the original intention of the parties.

### 5.2   NOTICES, DEMANDS AND OTHER INSTRUMENTS.

All notices, demands, requests, consents, approvals and other communications submitted, desired, necessary, required or permitted to be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been properly given when actually delivered or refused, if personally delivered (including delivery by FedEx, express mail or other similar overnight courier service which confirms delivery in writing), or sent by certified mail, postage prepaid, return receipt requested or, if any such notice shall also be sent by telecopy or fax machine, such notice shall be deemed properly given at the time and on the date of machine transmittal if the sending party receives a written send verification on its machine.  Such notices shall be addressed to the parties as set forth below:

USOC:                                United States Olympic Committee
                                     One Olympic Plaza
                                     Colorado Springs, CO  80909
                                     Attention:  General Counsel
                                     Facsimile:  (719) 866-4839
                                     Telephone:  (719) 866-4117

                                     United States Olympic Committee
                                     One Olympic Plaza
                                     Colorado Springs, CO  80909
                                     Attention:  CEO
                                     Facsimile:  (719) 866-4141
                                     Telephone:  (719) 866-4701

                                     United States Olympic Committee
                                     2800 Olympic Parkway
                                     Chula Vista, CA  91915
                                     Attention:  Director of Chula Vista Olympic
                                     Training Center
                                     Facsimile:  (619) 482 6200
                                     Telephone:  (619) 656 1500

EXHIBIT 42
012

with a copy to:                     Allen Matkins Leck Gamble Mallory & Natsis LLP
                                    515 South Figueroa Street, 9th Floor
                                    Los Angeles, California  90071
                                    Attention:  Frederick L. Allen, Esq.
                                    Facsimile:  (213) 620-8816
                                    Telephone:  (213) 622-5555

ESDF II:                            Easton Sports Development Foundation II
                                    Executive Director - Easton Foundations
                                    7855 Haskell Avenue, Suite 350
                                    Van Nuys, California  91406-1902
                                    Facsimile:  (818) 994-3889
                                    Telephone: (818) 901-0127

                                    Easton Sports Development Foundation II
                                    Director – Archery Complex
                                    US Olympic Training Center
                                    2800 Olympic Parkway
                                    Chula Vista, California  91915

with a copy to:                     Edward F. Whittler, Esq.
                                    Peterson & Price, APC
                                    530 B Street, Suite 1800
                                    San Diego, CA 92101
                                    Facsimile:  (619) 234-0361
                                    Telephone:  (619) 234-4786

or at such other address(es) in the United States as USOC or ESDF II may from time to time designate by like notice.  Any such notice, demand, request or other communication shall be considered received on the date of personal delivery or on the date of actual receipt or, if sent by telecopy or fax machine, at the time and on the date of machine transmittal as provided above. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, demand, request or other communication.

5.3     SUCCESSORS AND ASSIGNS.

Each and every covenant, term, condition and obligation contained in this Agreement shall apply to and be binding upon and inure to the benefit or detriment of the respective legal representatives, heirs, successors and permitted assigns of USOC and ESDF II.  Whenever reference to the parties hereto is made in this Agreement, such reference shall be deemed to include the legal representatives, successors, heirs and permitted assigns of said party the same as if in each case expressed.  The term "**persons**" when used in this Agreement shall mean any individual, corporation, partnership, firm, trust, joint venture, business association, syndicate, government or governmental organization or any other entity.

EXHIBIT 42
013

5.4     HEADINGS.

The headings to the various Articles and Sections of this Agreement have been inserted for purposes of reference only and shall not limit or define or otherwise affect the express terms and provisions of this Agreement.

5.5     COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.

5.6     INTENTIONALLY DELETED.

5.7     AMENDMENTS.

No modification or amendment of this Agreement shall be binding upon USOC and ESDF II, or either, unless in writing and fully executed.

5.8     ALL GENDERS AND NUMBERS INCLUDED.

Whenever the singular or plural number, or masculine, feminine, or neuter gender is used in this Agreement, it shall equally apply to, extend to, and include the other.

5.9     TIME OF ESSENCE.

Time is declared to be of the essence of this Agreement.

5.10    CORPORATE AUTHORITY.

ESDF II and USOC each represent and warranty to the other that it has the authority to enter into this Agreement, and perform all of the terms herein provided to be performed, as applicable.

5.11    RELATIONSHIP OF THE PARTIES.

Nothing contained herein shall be deemed or construed by the parties hereto, or any third party, as creating the relationship of principal and agent or a partnership or joint venture between the parties hereto.

5.12    SURVIVAL.

All obligations of ESDF II or USOC which by their nature involve performance after the end of the term, or which cannot be ascertained to have been performed until after the end of the term of this Agreement, shall survive the expiration or sooner termination of this Agreement.

5.13    JURY TRIAL WAIVER.

TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING,

EXHIBIT 42
014

COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

### 5.14   ATTORNEYS' FEES.

If either USOC or ESDF II should prevail in any litigation, arbitration or other legal proceeding instituted by or against the other related to this Agreement, the prevailing party, as determined by the court, arbitrator or the like, shall receive from the non-prevailing party all costs and reasonable attorneys' fees incurred in such litigation, arbitration or proceeding, including costs on appeal, as determined by the court, arbitrator or the like.

### 5.15   GOVERNING LAW.

This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state of California.

### 5.16   DEFAULT

### 5.16.1  ESDF II EVENTS OF DEFAULT.

The occurrence of any of the following acts, events or conditions, shall constitute an "**Event of Default**" under this Agreement.

(a)      The failure or refusal of ESDF II, at any time during the Term, to fulfill or perform any other covenant, agreement or obligation of ESDF II hereunder if such failure or refusal shall continue without correction for a period of sixty (60) consecutive calendar days from and after ESDF II's receipt of written notice thereof, provided that if such covenant, agreement or obligation shall be of such nature that it can be fulfilled or performed and if ESDF II in good faith commences to fulfill or perform same within said sixty (60) day period, but due to the nature of same it could not be reasonably fulfilled or performed within said sixty (60) day period exercising due diligence, an Event of Default shall not be deemed to have occurred if ESDF II is then diligently pursuing the fulfillment or performance of the covenant, agreement or obligation and shall thereafter continuously and diligently proceed therewith until completion;

(b)      The entry of any decree or order for relief by a court having jurisdiction in respect of ESDF II in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of ESDF II or for any substantial part of the assets of ESDF II, or the entry of any decree or order with respect to winding-up or liquidation of the affairs of ESDF II, if any such decree or order continues unstayed and in effect for a period of sixty (60) consecutive days;

(c)      The commencement by ESDF II of a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by ESDF II to the appointment of or possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of ESDF II or for any substantial part of the assets of ESDF II, or any assignment made by ESDF II for the benefit of creditors.

EXHIBIT 42
015

5.16.2    In the occurrence of an Event of Default, USOC shall have the option to pursue any and all remedies available at law or in effect.  Each right and remedy of USOC provided for herein or now or hereafter existing at law, in equity, by statute or otherwise shall be cumulative and shall not preclude USOC from exercising any other rights or remedies provided for in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.

5.16.3    USOC DEFAULT.

The occurrence of any of the following acts, events or conditions shall constitute a "**USOC Event of Default**" under this Agreement:

(a)    In the event USOC fails to perform any of its obligations under this Agreement, and such failure continues for sixty (60) days after written notice from ESDF II (or if such obligation cannot be cured within sixty (60) days, then after such period of time as reasonably necessary to cure so long as USOC has commenced such cure within said 60-period and diligently prosecutes the same to completion).

(b)    In the occurrence of an Event of Default, ESDF II shall have the option to pursue any and all remedies available at law or in effect.  Each right and remedy of ESDF II provided for herein or now or hereafter existing at law, in equity, by statute or otherwise shall be cumulative and shall not preclude ESDF II from exercising any other rights or remedies provided for in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.

5.17    ARBITRATION OF DISPUTES.

IN THE EVENT OF A DISPUTE BETWEEN USOC AND ESDF II UNDER THIS AGREEMENT, USOC AND ESDF II AGREE THAT SUCH DISPUTE SHALL BE SETTLED BY FINAL AND BINDING ARBITRATION IN ACCORDANCE WITH THE ARBITRATION PROCEDURES SET FORTH ON EXHIBIT K ATTACHED THE LEASE. BY EXECUTING THIS AGREEMENT, USOC AND ESDF II ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THIS AGREEMENT DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND USOC AND ESDF II ARE GIVING UP ANY RIGHTS THEY MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.  BY EXECUTING THIS AGREEMENT, USOC AND ESDF II ARE GIVING UP THEIR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL WITH RESPECT TO DISPUTES ARISING IN CONNECTION WITH THIS AGREEMENT, EXCEPT TO THE EXTENT SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE ARBITRATION OF DISPUTES PROVISION SET FORTH ON EXHIBIT N ATTACHED TO THE LEASE.  IF EITHER USOC OR ESDF II REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO SUCH PROVISIONS, SUCH PARTY MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  EACH OF USOC'S AND ESDF II'S AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.  EACH OF USOC AND ESDF II ACKNOWLEDGES AND AGREES THAT SUCH PARTY HAS READ AND UNDERSTANDS THE FOREGOING AND AGREES TO SUBMIT DISPUTES ARISING OUT OF THIS AGREEMENT TO NEUTRAL ARBITRATION.

EXHIBIT 42
016

IN WITNESS WHEREOF, USOC and ESDF II have executed this Agreement as of the date first set forth above.

USOC:

UNITED STATES OLYMPIC COMMITTEE,
a congressionally chartered not-for-profit
organization

By: _____

    Name:_____
    Title:_____


ESDF II:

EASTON SPORTS DEVELOPMENT
FOUNDATION II,
a California nonprofit public benefit corporation

By: _____

    Name: Greg Easton
    Title:  President


## JOINDER BY USAA

National Archery Association of the United States, a non-profit corporation incorporated and licensed pursuant to the laws of the State of Colorado ("**USAA**"), hereby acknowledges that it has received this Housing Development Agreement dated as of June 13, 2012 (the "**Housing Agreement**"), executed by USOC and ESDF II and agrees to be bound by and perform the covenant and obligations of USAA under the Housing Agreement.

Dated: June ___, 2012

**NATIONAL ARCHERY ASSOCIATION OF THE UNITED STATES**

By: _____

    Name: _DENISE PARKER_
    Title: _CEO_

EXHIBIT 42
017

## EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

Parcel 1 of Parcel Map No. 16318, in the City of Chula Vista, County of San Diego, State of California, filed in the Office of the County Recorder of San Diego County, December 6, 1990 as File No. 90-65217, of Official Records.

EXCEPTING THEREFROM an undivided ½ interest in all oil, gas and minerals 500 feet or more below the surface of said land, but without the right of entry on the surface of said land, as reserved by Western Salt Company, by deed recorded February 16, 1994 as File No. 1994-0104492, of Official Records.

EXHIBIT 42
018

## EXHIBIT B

## 2012 SCHEDULE OF DAY USE FEES

**All Inclusive Packages** *(see "Definition of Use Types" for list of services included)*
   *Per Person/Per Night*
      On-Site ......................................................................................................$45.00
      Off-Site with Meal Access.........................................................................$30.00
      Facility Use (Applicable to NGBs only).....................................................$8.00
      International Users TravMed daily charge..................................................$3.00

**Individual Services**

**Dining**
   *Meal Coupons per person*
      Breakfast ....................................................................................................$10.00
      Lunch .........................................................................................................$10.00
      Dinner ........................................................................................................$10.00
   *Catering for Meetings* (Choose one of three options below) *not available in Colorado Springs*
      Coffee and Tea/person ................................................................................$2.00
      Coffee, Tea, Juice, and Water/person .......................................................$3.00
      Coffee Tea, Juices, Water and choice of fruit,
        muffins, yogurt, or breakfast bars............................................................$5.00

**Transportation** *(see Vehicle Policy for further details)*
   Airport Pickup (Co. Springs & San Diego only.  Call for Albany & Denver rates)................. No Charge
   Local Shuttles * ....................................................................................... No Charge
   *\* Excessive/special cases will be charged at Driver Hourly Rate x # of shuttle runs x vehicle usage charge*
   Vehicle Rental (OTC program related) ....................................................... No Charge
   Vehicle Rental (Non-OTC related)
      Car/Pick-Up Truck .....................................................................................$25.00/Day
      SUV ...........................................................................................................$50.00/Day
      Van/Box Trucks .........................................................................................$75.00/Day

**Venue Usage**
   *Meeting Rooms (includes AV & set up)*
      Small (Holds approx. 5- 25 people) ...........................................................$20/Hour
      Medium (Holds approx. 25 – 60 people)....................................................$40/Hour
      Large (60 + people) ...................................................................................$60/Hour
      Gym/Bay ....................................................................................................$60/Hour
      Strength & Conditioning ............................................................................$10/Hour/Person
      Indoor Pool ..................................................................... $100/Hour/$10/Lane
      Outdoor Pool..............................................................................................$50/Hour
   *Fields*
      Soccer ........................................................................................................$200/Day
      Rugby .........................................................................................................$300/Day
      Softball ......................................................................................................$200/Day
      Field Hockey ..............................................................................................$200/Day

**Event Set Up/Tear Down** ...................................................... Call for rates

**Customized Services** .............................................................. Call for rates
      Tours
      Athlete Demos
      Sport Experiences
      Aquatics Filming

C:\Users\davidstone\AppData\Roaming\OpenText\DM\Temp\LA-
#883304-v15-
REVISED_USOC_Easton_Housing_Agreement.DOC

EXHIBIT 42
019

**EXHIBIT C**

**SITE PLAN**



EXHIBIT 42
020

**EXHIBIT D**

**ESDF II ARCHERY HOUSING DESCRIPTION**

**Housing Complex** – situated on an upper pad to the Northeast of the Archery Building, to be built in two phases.  Proposed are six two story Housing Buildings, and a seventh, one story Multipurpose Building.  **"Phase I"** will be comprised of Buildings 1, 2, 3, and the Multipurpose Building for a total of 17,169 square feet.  **"Phase II"** will be comprised of Buildings 4, 5, and 6 for a total of 13,062 square feet.  All units will have private baths and kitchenettes. All of the ground floor units will be fully accessible. Parking will be provided, with 16 spaces:

**Building 1**
2,223 square feet/floor x 2 floors =                    4,446 square feet
(3) 2 BDR units/floor = 6 BDR/floor x 2 =                    12 Bedrooms

**Building 2**
3,090 square feet/floor x 2 floors =                    6,180 square feet
(3) 2 BDR units/floor = 6 BDR/floor x 2 =                    12 Bedrooms

**Building 3**
1,218 square feet/floor x 2 floors =                    2,436 square feet
(3) 1 BDR units/floor = 3 BDR/floor x 2 =                    6 Bedrooms

**Building 4**
2,223 square feet/floor x 2 floors =                    4,446 square feet
(3) 2 BDR units/floor = 6 BDR/floor x 2 =                    12 Bedrooms

**Building 5**
3,090 square feet/floor x 2 floors =                    6,180 square feet
(3) 2 BDR units/floor = 6 BDR/floor x 2 =                    12 Bedrooms

**Building 6**
1,218 square feet/floor x 2 floors =                    2,436 square feet
(3) 1 BDR units/floor = 3 BDR/floor x 2 =                    6 Bedrooms

**Housing Buildings Total:**                    **26,124 square feet, 60 Bedrooms**

**Multipurpose Building** – 4,107 square foot one story building, with Multipurpose Room, Restrooms, future Kitchen, Laundry, Housekeeping, Office, and attached two bedroom Manager's Apartment.

**Summary:**
| | | |
|---|---|---|
| **Archery Center Building** | 34,996 square feet | |
| **Housing Buildings  #1 - 6** | 26,124 square feet | 60 Bedrooms |
| **Multipurpose Building** | 4,107 square feet | 2 Bedrooms |
| **Total Building Area, Grand total:** | **65,227 square feet** | **62 Bedrooms** |

C:\Users\davidstone\AppData\Roaming\OpenText\DM\Temp\LA-
#883304-v15-
REVISED_USOC_Easton_Housing_Agreement.DOC

EXHIBIT 42
021

# EXHIBIT "43"



# 2012 U.S. OLYMPIC TEAM TRIALS AND EXHIBITIONS AGREEMENT
## USA CYCLING

This 2012 U.S. Olympic Team Trials and Exhibitions Agreement (this **"Agreement"**), is made and entered into as of the 4th day of May, 2011, by and between the United States Olympic Committee, with a principal place of business at One Olympic Plaza, Colorado Springs, Colorado 80909 (the **"USOC"**) and USA Cycling, Inc., with a principal place of business at 210 USA Cycling Point, Suite 100 Colorado Springs, Colorado 80919 (the **"NGB"**).

### Background

**A.**     The NGB is recognized by the USOC as the national governing body for the sport of Cycling (the **"Sport"**) within the meaning of the Bylaws of the USOC and The Ted Stevens Olympic and Amateur Sports Act (the **"Act"**).

**B.**     Pursuant to the Act, the USOC is empowered to organize, finance and control the representation of the United States in the competitions and events of the Olympic Games, and to select, directly or by delegation to the appropriate national governing body, the athletes for final appointment by the USOC to the 2012 U.S. Olympic Team (the **"Team"**).

**C.**     Pursuant to the Bylaws of the USOC and the Act, the USOC has exclusive jurisdiction over all matters pertaining to the participation of the United States in the Olympic Games, including the authority to conduct the Trials (defined below), and the exclusive right to control the use of Olympic-related marks, images and designations in the United States.

**D.**     The USOC desires to engage the NGB to conduct one or more high-quality competitions that will determine the athletes in the Sport who will be nominated by the NGB to the USOC for inclusion on the Team for the Sport (the **"Trials"**).  The NGB may also schedule one or more high-quality Exhibitions on the terms and subject to the conditions set forth herein.  For purposes of this Agreement, the term **"Exhibitions"** refers to sporting events conducted in the United States in which more than fifty percent (50%) of the athletes participating (i) have been nominated to the Team by the NGB or named by the USOC as members of the Team, (ii) were members of the Team in the case of those sporting events that occur within one year after the 2012 Olympic Games, or (iii) were members of any United States Olympic Team.  The parties shall mutually agree upon the sporting events that constitute Exhibitions hereunder, if any.  The USOC acknowledges and agrees that the term "Exhibitions" does not include any event that (a) is not Olympicized, or (b) is not produced and conducted by the NGB or under a license from the NGB.

**E.**     The USOC and the NGB have agreed that the NGB will stage the Trials and Exhibitions on behalf of the USOC, on the terms and subject to the conditions set forth below.

### Agreement

**1.**     **Staging of the Trials and Exhibitions; Selection Procedures**

1.1     Venues and Scheduling.  The Trials and Exhibitions venues and locations shall be subject to the approval of the USOC.  The Trials and Exhibitions will be scheduled by the NGB, subject to the approval of the USOC, which scheduling will take into account the needs of the broadcasters (as such

EXHIBIT 43
001

term is defined in Section 3.2 below). <u>Exhibit A</u> contains information on the dates of the Trials and Exhibitions scheduled by the parties as of the date of this Agreement. The parties agree to update and supplement this information, as necessary. The USOC shall promptly notify the NGB upon obtaining a firm commitment from any broadcaster for the broadcast of any Trials or Exhibitions event. The NGB will be solely responsible for ensuring the availability of the sports equipment and facilities necessary for the conduct of the Trials and Exhibitions. The NGB may subcontract its responsibility for staging the Trials and Exhibitions to a local organizing committee ("**LOC**") solely with the prior written consent of the USOC.

      1.2    <u>Selection Procedures</u>. The United States Olympic Committee Selection Procedures Manual for the Olympic Games, Paralympic Games and Pan American Games (the "**Manual**") is incorporated herein by this reference. The NGB agrees to comply with the procedures set forth in the Manual, as such manual may be updated by the USOC and delivered to the NGB from time to time, in the planning and staging of the Trials, however any changes will not materially increase the expenses and costs NGB is obligated to bear pursuant to this Agreement.

      1.3    <u>Sponsorships; No Conflicting Sponsorship Rights; No Ambush</u>

          1.3.1    In order to ensure the success of the Trials and Exhibitions, the USOC and the NGB may sell sponsorships with respect to the Trials and Exhibitions to the USOC's sponsors and suppliers (collectively referred to herein as "**USOC Sponsors**"). A list of current USOC Sponsors is attached hereto as <u>Exhibit B</u>. The USOC shall update this Exhibit periodically. The USOC and the NGB shall also be entitled to sell certain camera-visible commercial signage as approved by the USOC and the broadcaster(s) at Trials and Exhibition venues to USOC Sponsors, provided that such USOC Sponsor has made an appropriate advertising buy from the broadcaster(s). The proceeds of all sponsorship and signage sales to USOC Sponsors under this paragraph shall be payable to the USOC.

          1.3.2    With the USOC's prior written approval on a case-by-case basis, which may be withheld by the USOC in its sole discretion, the NGB may sell sponsorships with respect to the Trials and Exhibitions to third parties that do not conflict with USOC Sponsors. The proceeds of all NGB sponsorship sales under this paragraph shall be payable to the NGB.

          1.3.3.    With the USOC's prior written approval on a case-by-case basis, which may be withheld by the USOC in its sole discretion, the NGB may provide certain benefits (*e.g.*, VIP hospitality) to its long-term NGB sponsors outside of the venues for the Trials and Exhibitions.

          1.3.4    The NGB acknowledges and agrees that the USOC retains the sole right to sell presenting sponsorship(s) with respect to the Trials and Exhibitions, and that the USOC may authorize broadcasters to sell presenting sponsorship(s) with respect to the Trials and Exhibitions broadcasts. The USOC will not permit title sponsorship(s) of the Trials or Exhibitions.

          1.3.5    Unless the USOC otherwise agrees in its sole discretion, on a case-by-case basis, in writing, sponsors, suppliers and licensees of the NGB (other than those entities that are also USOC Sponsors), and sponsors, suppliers and licensees of the NGB's athletes (other than those entities that are also USOC Sponsors), will not be permitted to publicize their association with the NGB or any athlete in a manner that suggests a relation to the 2012 Olympic Games, the Trials and Exhibitions, the Team or the USOC, and will not be permitted to use any Olympic-related marks, words or designations (collectively, "**Olympic Marks**") in advertising or other promotional activities. The NGB represents and warrants that, except with the prior written consent of the USOC, it has not granted and will not grant any sponsorship, suppliership, merchandising or similar rights pursuant to which third parties that are not USOC Sponsors

<div align="center">2</div>

EXHIBIT 43
002

could be perceived as having a commercial association with the Trials and Exhibitions.  The NGB agrees to notify in writing each of its athletes participating in the Trials and Exhibitions of this prohibition.

1.3.6    Unless otherwise agreed by the USOC in writing, the NGB will: (a) ensure that all food and beverages served at the sites of the Trials and Exhibitions, including at all hospitality areas and press conference areas, are provided by USOC Sponsors or licensees ("**USOC Licensees**") or are served in generic, unbranded containers, (b) not permit the distribution of samples or other promotional items in proximity to the sites of the Trials and Exhibitions by entities other than USOC Sponsors and USOC Licensees, (c) not permit competitors of USOC Sponsors or USOC Licensees to publicize any sponsor, supplier or other commercial relationship with the Trials and Exhibitions, or with the NGB, at or in proximity to the Trials and Exhibitions, and (d) not permit any third party that is not a USOC Sponsor to publicize any commercial relationship with the Trials and Exhibitions on the tickets therefor.

1.3.7    Except as specifically authorized in subsection 1.3.1, unless otherwise agreed by the USOC in writing, the NGB will not permit any commercial identification of any product or service or any promotional matter of any kind (*e.g.*, name, logo, trademark or trade name of any third party) to appear: (a) in camera-visible competition areas of the Trials and Exhibitions, or (b) in camera-visible areas that are located in proximity to the sites of the Trials and Exhibitions (to the extent controlled by the NGB or the site operators).

1.3.8    With the exception of standard manufacturers' equipment identification permitted by Rule 51 of the Olympic Charter (or the manufacturers' equipment identification permitted by the NGB's International Federation's rules, if applicable), the uniforms and the bibs/numbers of the competitors and officials at the Trials and Exhibitions may not bear any commercial identification or promotional material of any kind.

1.4    <u>Signage and Look of the Trials</u>.  The Look of the Trials includes all Field of Play signage, as well as any other graphics used to dress the Trials or Exhibitions venue.  The Look of the Trials must include the Trials Logo described in <u>Section 2</u> below, and may include the NGB's name and/or logo in addition to other neutral graphics, including color schemes that are consistent with red, white, blue and black.  The USOC will provide to the NGB signage with the Trials Logo, at the USOC's cost and expense and NGB will be responsible for displaying the signage provided by the USOC.   The NGB will cause any camera-visible permanent signage at the sites of the Trials and Exhibitions to be covered, including both static and rotational signage.  All other in-arena signs of a commercial nature must be out of the camera's view and cannot be back lit. No signage specific to the Trials or Exhibitions may be hung in the arena (regardless of whether in or out of the camera's view) without the USOC's prior approval.

1.5    <u>VISA</u>.  The USOC has advised the NGB that the USOC has entered into a sponsorship agreement with Visa International Service Association ("**VISA**") through December 31, 2020.  The NGB agrees that no credit cards, cash or debit cards, travelers' cheques (including electronic travelers' cheques), travel vouchers or stored value cash cards (collectively, "**Payment Methods**"), other than VISA Payment Methods, will be accepted as payment for any goods, services, tickets or donations in connection with the Trials and Exhibitions, and that all associated sales outlets will prominently display point of sale signage promoting usage of VISA Payment Methods to the exclusion of all other Payment Methods; provided, however, that in the event that, and to the extent that, the NGB provides the USOC with a contract executed prior to the date of this Agreement, which contract prevents the NGB from complying with the foregoing, the NGB will instead use its best efforts to ensure that: (a) VISA Payment Methods are positioned as the preferred method of payment in all forms of advertising and promotions of the Trials and Exhibitions, (b) VISA Payment Methods are featured prominently and exclusively at all

3

EXHIBIT 43
003

points of sale for the Trials and Exhibitions, subject to the understanding that VISA will supply all required point of sale signage, and (c) VISA's trademark is depicted on the tickets for the Trials and Exhibitions.

1.6     Ownership.  The USOC shall retain ownership of the Trials and Exhibitions and all related rights, including but not limited to all rights and data, in whatever form, relating to the Trials and Exhibitions' format, organization, exploitation, broadcast, recording, representation, marketing, reproduction, access and dissemination by any means whatsoever, and all design, trademark and copyright rights.  Without limiting the generality of the foregoing, the USOC shall be the owner of the copyright, throughout the world, in all depictions, transcriptions, recordings and broadcasts of the Trials and Exhibitions.  The NGB acknowledges that the USOC has the exclusive, worldwide right, on a live or tape-delayed basis, to broadcast the Trials and Exhibitions and to produce and distribute recorded audio, visual and audiovisual images of the Trials and Exhibitions, including, but not limited to, photographs, films, videotapes, videodiscs and online.  All reports, plans, analyses, studies, marketing materials, and other materials prepared by or on behalf of the NGB under this Agreement (the "Materials") shall be provided on a "work-made-for-hire" (as that term is used under U.S. Copyright Law) basis for the USOC. To the extent that any Materials are not the property of the USOC by operation of law (i.e., a "work for hire"), the NGB hereby irrevocably assigns, transfers and conveys to the USOC all of its rights, title and interest in such Materials.  The NGB agrees to take all actions necessary to secure copyright from any independent contractors engaged by the NGB in the production of the Materials.  The USOC agrees that the NGB shall be permitted to maintain copies of the Materials for its internal, corporate purposes, except of Materials relating to the specifics of the Trials that are of public knowledge and the official results, time splits reports, race and rider analysis, and the like, of which NGB may retain and use for any purpose.

1.7     USOC Promotional Assistance.  The USOC agrees to provide Internet marketing support for the Trials and Exhibitions.  The USOC further agrees to use commercially reasonable efforts to assist the NGB in executing a local promotional plan for the Trials and Exhibitions, and to engage USOC Sponsors to activate local promotional activities in connection with the event.

## 2.     **The Trials Logo**

2.1     Ownership.  The NGB acknowledges that the USOC is the owner of the mark U.S. OLYMPIC TEAM TRIALS (the "**USOC Trials Mark**") and all goodwill derived through use of the USOC Trials Mark, and that the USOC has a federal registration of the USOC Trials Mark.  In order to create a stronger association to the Team and a consistent look and feel for all U.S. Olympic Team Trials, the USOC has  created a trials logo that incorporates the USA/5-Ring Logo, USOC Trials Mark and the Look of the Trials (the "**Trials Logo**"), and an identity system for the Trials.  The USOC is the owner of the Trials Logo.

2.2     Grant of License.  Subject to the terms and conditions of this Agreement, the USOC hereby grants to the NGB, during the Term (defined below), a non-exclusive, nontransferable right and license to use the Trials Logo  and separately, the USOC Trials Mark, to identify the Trials, in the staging of the Trials, and in connection with the advertising and promotion of the Trials, in all media, within the United States.  The NGB shall have the right to sublicense these rights to the LOC, if any, for the Trials; provided that (a) any sublicense to the LOC shall require the prior written approval of the USOC, (b) the NGB shall be liable for the LOC's compliance with all of the terms and conditions of this Agreement, and (c) the NGB shall not provide the LOC any right to transfer, assign or further sublicense any rights in the Trials Logo or the USOC Trials Mark.  The NGB shall not have the right to sublicense to any other third party any of the rights and licenses granted under this Section 2.2 without the USOC's prior written

4

EXHIBIT 43
004

approval. All rights not specifically granted to the NGB are reserved by the USOC. All goodwill arising out of the use of the Trials Logo and the USOC Trials Mark shall inure to the benefit of the USOC.

2.3    The NGB's Use of the Trials Logo and the USOC Trials Mark. The NGB's right and license to use the Trials Logo and the USOC Trials Mark is subject to the following material conditions:

(a)    Each use of the Trials Logo must be accompanied by an authenticating notice approved by the USOC (*e.g.*, 36USC220506).

(b)    The Trials Logo must be reproduced fully, accurately and without embellishment. No partial version of the Trials Logo or component thereof may be used at any time for any purpose without the USOC's prior written consent.

(c)    The NGB shall submit to the USOC, for its prior written approval, representative samples of all advertising and promotional materials containing the Trials Logo or the USOC Trials Mark at least ten (10) business days prior to any production or release to the public. If the NGB's request for approval is not responded to by the USOC within ten (10) business days after the USOC has received the material from the NGB, the NGB may provide written notification to the USOC of such fact and the USOC agrees that any such proposed materials shall be deemed reasonable and approved if the NGB's request is not responded to within five (5) business days following receipt of such written notice. The USOC reserves the right to withdraw any consent or approval for good cause unless the NGB has relied to its detriment on such consent or approval and has incurred significant expense.

(d)    The NGB will not authorize or permit any third party, including, but not limited to, sponsors, suppliers and licensees of the NGB and the owner of any Trials sites, to use the Trials Logo or the USOC Trials Mark without the USOC's prior written consent.

(e)    The NGB will not use the Trials Logo/USOC Trials Mark, or authorize the Trials Logo/USOC Trials Mark to be used or exploited, in any manner that is deceptive or misleading or that reflects unfavorably upon the good name, goodwill, reputation or image of the USOC or the Olympic movement, nor in any manner that is inconsistent with the Olympic Charter or contrary to applicable laws.

(f)    The NGB will not use the Trials Logo or USOC Trials Mark on premiums or on merchandise for retail sale without the prior written consent of the USOC, which, if given, will require that all merchandise bearing the Trials Logo or USOC Trials Mark shall be sourced through existing USOC Licensees, shall be subject to USOC approval, and shall comply with the Merchandise Guidelines set forth in Exhibit D hereto.

(g)    The NGB will not, during the term of this Agreement or thereafter, attack the title or any rights of the USOC in and to the Trials Logo or the USOC Trials Mark.

(h)    The NGB will not at any time adopt or use any mark confusingly similar to, or a simulation or colorable imitation of, the Trials Logo or the USOC Trials Mark.

(i)    The NGB will not use the trade name, trademark or service mark of any third party on any materials bearing the Trials Logo or the USOC Trials Mark without the USOC's prior written consent, and the NGB will not use the Trials Logo or the USOC Trials Mark in any manner that creates or implies any association or affiliation between a third party and the Trials, the USOC, the Team, or the Olympic Games.

5

EXHIBIT 43
005

(j)     Without the prior written consent of the USOC, the NGB will not use or permit the use by third parties of any Olympic Marks (other than as authorized in <u>Section 2.2</u> above) in connection with the staging or promotion of the Trials and Exhibitions.

2.4     <u>Artwork</u>.   Without limiting the generality of <u>Section 1.6</u> above, the NGB acknowledges and agrees that any artwork displaying the Trials Logo and created by or for the NGB (collectively, the "Artwork") shall be the property of the USOC.  To the extent the Artwork is not a "work for hire" and the property of the USOC by operation of law, the NGB hereby irrevocably assigns, transfers and conveys all its right, title and ownership, including copyright, in the Artwork to the USOC.  The NGB agrees to obtain written assignments of copyright from any independent contractors engaged by the NGB in the creation of the Artwork to the extent necessary to vest copyright ownership in the Artwork with the USOC.  Furthermore, the NGB agrees to obtain from each author of a work of visual art a written waiver of any and all rights arising under 17 U.S.C. §106A and any rights arising from any other federal law, state law or under the laws of any country that conveys rights of the same nature as those conveyed under 17 U.S.C. §106A or any other type of moral right or *droit moral*.  This written waiver shall (a) be executed for the benefit of the USOC, (b) specifically identify the work(s) covered by the waiver and included in the Artwork, and (c) specify that the waiver applies to any and all uses by or for the benefit of the USOC in which either the right of attribution or the integrity right may be implicated.  Items publicly distributed shall bear a short-form notice of copyright in compliance with 17 U.S.C. §401 identifying the USOC as the owner of the copyright in the Artwork.  USOC shall provide to NGB the form of the waiver.

## 3.     <u>Trials and Exhibitions Broadcast</u>

3.1     <u>Definition of Broadcast</u>.   For purposes of this Agreement, the term **"broadcast"** means the transmission, re-transmission, display, projection or performance of an audio or audiovisual program for display or reception on a television receiver, computer monitor, radio, or other form of display or reception device, whether now existing or developed in the future.

3.2     <u>Sale of Broadcast Rights</u>.   The USOC has sold the worldwide broadcast rights to the Trials and Exhibitions to NBC Universal Inc.  For purposes of this Agreement, the term **"broadcaster"** shall refer to the entities to which the USOC has licensed all or any portion of the broadcast rights to the Trials and Exhibitions, and their respective sublicensees.

3.3     <u>Protection of Rights</u>.   The USOC shall have the right to control all aspects of the production of any broadcast of the Trials and Exhibitions.  The NGB will not take any steps that restrict in any way the USOC's or any broadcaster's ability to broadcast the Trials and Exhibitions and will ensure that: (a) film, television, and other media crews, other than those of a broadcaster, are not permitted access to the sites of the Trials and Exhibitions during the events and preparations therefor without the USOC's prior written approval, and (b) tickets to the Trials and Exhibitions include language on the back thereof restricting the use of photographs, videotape and other audio and/or visual recordings to noncommercial purposes and prohibiting all Internet use, without the prior written consent of the USOC.  In the event tickets are not issued for any Trials and/or Exhibitions event, the NGB agrees to have an announcement made restricting the use of photographs, videotape and other audio and/or visual recordings to noncommercial purposes and prohibiting all Internet use, without the prior written consent of the USOC. The ticket back language and form of announcement will be provided by the USOC.  Media will be given access to the sites of the Trials and Exhibitions for purposes of conducting interviews and limited rights to broadcast highlights of the Trials and Exhibitions on the terms and conditions of the news access rules established by the USOC and each broadcaster.  The NGB agrees to require photographers and media to agree in writing to abide by such news access rules prior to issuing accreditations for the Trials and Exhibitions to such photographers and media.  USOC shall provide to NGB the form of such written agreement.  Any and all communications between the NGB and the

EXHIBIT 43
006

broadcasters with respect to the Trials and Exhibitions must be communicated through the USOC; under no circumstances will the NGB discuss the Trials and Exhibitions directly with a broadcaster.

3.4     Suitability; Access.  The Trials and Exhibitions sites shall be technically suitable for the origination of national and international television coverage, and each broadcaster and its employees, contractors and agents will be permitted complete and unrestricted access to the sites free of charge when engaged in the business of broadcasting the Trials and Exhibitions; provided, however, they shall not interfere with the conduct of the of the Trials and Exhibitions.  Without limiting the generality of the foregoing, the NGB shall provide to each broadcaster or its designee(s), at the sole cost of the NGB: (a) all reasonably requested ingress and egress to the sites of the Trials and Exhibitions, including without limitation, all reasonably requested on-site locations and space at the sites that permit a full view of the area of competition and are suitable for producing broadcast coverage of the Trials and Exhibitions, (b) reasonable space for the installation and operation of all microphones, cameras and related equipment, including any platforms or scaffolding necessary or desirable to produce, originate and transmit the broadcasts of the Trials and Exhibitions, (c) all necessary power, which may require additional generators at the broadcasters' discretion, (d) lighting in the playing area that satisfies the broadcasters, which may involve the NGB hiring a lighting consultant if so required by the broadcasters, and (e) accreditations necessary for all working personnel's access to the venues and parking (including an acceptable mobile unit parking area, as necessary, for coverage of events).  The NGB will ensure that each broadcaster and its designee(s) shall have the right to install, maintain and remove such wires, cables and other apparatus at locations designated by each broadcaster as are necessary for the production, origination, recording and transmission of the Trials and Exhibitions.  The NGB will ensure that each broadcaster is permitted to prominently display its name and logo in camera-visible locations at the venues.  Upon request by the USOC, the NGB shall provide a contact person who will be attached to each broadcaster's crew during planning and recording or live broadcasts of the Trials and Exhibitions to ensure that the broadcaster can locate, interview and cover the activities of persons involved in the Trials and Exhibitions.  The NGB will give the broadcaster the first opportunity to interview its coaches, officials, and the competitors before, during intermissions of, and after events.  At the USOC's request, the NGB will assist with hotel and other logistical arrangements for each broadcaster's crew at the Trials and Exhibitions (but each broadcaster shall bear the costs thereof).

3.5     Names and Likenesses; Event Data

3.5.1     The USOC agrees that it shall provide the NGB with appropriate language for inclusion in the Code of Conduct/Waiver to be signed by employees of the NGB, its officers, the competitors, officials and other persons participating in the Trials and Exhibitions in order to secure on behalf of and in the name of the USOC all necessary rights so that the USOC shall have the right and may grant to others the right to reproduce, publish and otherwise distribute, in any medium, their names, pictures, likenesses and voices, as well as biographical material (as applicable) (provided that in no event shall the USOC or any third party be entitled to use such material in the manner of an endorsement of any product or service, or of any other event, without the consent of the individual involved).  The NGB agrees to disseminate the Code of Conduct/Waiver language to such persons a reasonable period of time before the Trials and Exhibitions.  The USOC will not permit any such person to participate in the Trials and Exhibitions unless and until such person has executed such Code of Conduct/Waiver.

3.5.2     The NGB will provide each broadcaster with access to the event data feed utilized by the NGB in conducting the Trials or Exhibitions, including, but not limited to, timing and results (*e.g.,* times of competitors and standings), rulings and other relevant information from participants and officials, and participant information, which access shall be exclusive vis-à-vis other third parties. Although all equipment, software and the like necessary to compile and deliver such event data to the broadcaster(s) shall be paid for by the NGB, the broadcaster(s) shall pay for any costs incurred in their

EXHIBIT 43
007

accessing of such event data feed. Notwithstanding the foregoing, the NGB can publish general competitor information and the competition results on its website, in press releases, and in its Media Guide in addition to any other communication methods (e.g., membership newsletter, Twitter, Facebook, etc). The NGB has no control of and makes no representations concerning third-parties publishing information obtained from the NGB or other sources.

       3.6    <u>Music</u>. The NGB will provide the USOC, at least forty-five (45) days prior to the commencement of each of the Trials and Exhibitions, a list of any musical compositions (including names of composers and publishers, if any) which will be performed during the events. If any musical composition scheduled to be played during a broadcaster's coverage of events is not: (a) in the public domain, (b) covered by the broadcaster's music licenses with performing rights societies, or (c) cleared for all uses by the NGB at the source, the NGB must eliminate the playing of such composition unless otherwise agreed by the USOC in writing.

       3.7    <u>Advertising Inventory</u>. The NGB will not receive any advertising inventory and will not be entitled to sell any advertising on any Trials or Exhibitions broadcast. USOC Sponsors will be given a first opportunity to purchase broadcast advertising and other commercial opportunities on each Trials and Exhibitions broadcast.

       3.8    <u>No Broadcast Fees</u>. NGB shall not charge any fees to any broadcaster in connection with the NGB's performance of its obligations under this Agreement, unless specifically stated otherwise herein.

       3.9    <u>Survival</u>. The provisions of this <u>Section 3</u> shall survive the expiration or termination of this Agreement.

**4.**    **Tickets.** The NGB will provide the USOC with free tickets and credentials to each Trials and Exhibitions event for which tickets are issued for use by USOC staff, and will allow the USOC to purchase, for use by USOC Sponsors, VIP seating and other mutually-agreed hospitality benefits. The number of tickets and credentials to be provided to the USOC in connection with each Trials and Exhibitions event shall be as specified in <u>Exhibit A</u>.

**5.**    **Consideration.** In consideration for the services performed by the NGB hereunder and the NGB's compliance with the terms hereof and the Act, the USOC shall pay to the NGB the Management Fee set forth in <u>Exhibit C</u> hereto in accordance with payment schedule set forth therein. The NGB acknowledges that the Management Fee is based on the interest and activation of broadcasters and sponsors with respect to the event, and the size, scope and complexity of the event.

**6.**    **Insurance.** The NGB shall procure and maintain at its expense, beginning not later than ninety (90) days prior to the commencement of the Trials and Exhibitions events and continuing until three (3) months after such events, a commercial general liability insurance policy written on an occurrence basis by an insurance company reasonably acceptable to the USOC covering bodily injury (including death), property damage, personal injury, and advertising liability, including contractual liability, as may be applicable to the NGB's responsibilities, with limits complying with USOC requirements. The policy(ies) providing the foregoing insurance shall include the USOC and each broadcaster as Additional Insureds and shall contain a cross liability (severability of interests) provision. The foregoing insurance shall be endorsed to be primary and non-contributing to that of the USOC. The NGB agrees that any self-retained limits shall respond as if such an endorsement existed for such limits. The NGB, upon request by the USOC, shall provide each broadcaster and the USOC with satisfactory evidence of such insurance and

EXHIBIT 43
008

certify that at least the minimum insurance coverage required above is in effect and that the insurance policy(ies) providing such coverage will not be canceled or materially changed without thirty (30) days advance written notice to the broadcaster(s) and the USOC, and that no material change in such coverage may be made without the prior written agreement of the broadcaster(s) and the USOC.

**7.     Indemnification**

7.1     The NGB.  The NGB shall indemnify, defend and hold harmless the USOC and its officers, directors, agents, employees and volunteers from any and all fines and penalties, and any and all claims by, or liability to, any third party, for loss, damage or injury to persons or property that is based on or in any manner arises out of or is incidental to (a) any breach of this Agreement or breach of the representations and warranties made herein by the NGB; (b) any use of the Trials Logo by the NGB, the LOC, or any other third party authorized to use the Trials Logo by the NGB; and (c) the NGB's  staging of the Trials and Exhibitions.

7.2     The USOC.  The USOC shall indemnify, defend and hold harmless the NGB and its officers, directors, agents, employees and volunteers from any and all fines and penalties, and any and all claims by, or liability to, any third party, for loss, damage or injury to persons or property that is based on or in any manner arises out of or is incidental to any breach of this Agreement by the USOC.

7.3     Defense.  Each indemnification is conditional upon the indemnifying party being given notice as soon as practicable of any event likely to give rise to a claim or liability, the right to control the defense of such claim (to the extent the indemnifying party assumes responsibility for the outcome of the claim) and the full cooperation of the indemnified party in doing so.  Notwithstanding the foregoing, if and to the extent that any claim involves the ownership or use of the USOC Trials Mark, the Trials Logo, or any other Olympic Marks in the United States, the USOC shall have the right to control the defense of such claim without forfeiting its right to indemnification.

7.4     Survival.  The provisions of this Section 7 shall survive the expiration or termination of this Agreement.

**8.     Term, Termination and Remedies**

8.1     Term.  The term of this Agreement shall commence on the date hereof and shall continue until three (3) months after the completion of the Trials and Exhibitions (the **"Term"**).

8.2     Termination.   Either party may terminate this Agreement and the rights granted hereunder, in whole or in part, by delivering written notice to other in the event that the other party commits a material breach of this Agreement and does not remedy such breach within thirty (30) days after receipt of written notice specifying the breach, provided that, the USOC may terminate this Agreement without providing a cure period with respect to actions of the NGB that are part of a continuing course of conduct and that have been the subject of a prior written notice.  The USOC shall have the right to terminate this Agreement if the NGB does not qualify a team or individuals to compete in the 2012 Olympic Games.

8.3     Effect of Expiration/Termination.  Upon the expiration or termination of this Agreement for any reason, the NGB shall cease all use of the Trials Logo and all rights in and to the Trials Logo granted to the NGB under this Agreement shall terminate.  The NGB shall immediately (a) cease distribution of all advertising and other materials bearing the Trials Logo, and (b) destroy or deliver to the USOC all advertising and other materials bearing the Trials Logo that are still in the possession of the

EXHIBIT 43
009

NGB or under the NGB's control; <u>provided that</u> the NGB may retain a limited number of advertising and promotional materials solely for its own archival purposes.

8.4     <u>Remedies</u>. In the event that the NGB breaches this Agreement, the USOC may, in its sole discretion, forego entering into future U.S. Olympic Team Trials and Exhibitions Agreement(s) with the NGB, or prohibit the NGB from using the LOC for future Trials and Exhibitions.

9.     <u>**Assignment**</u>. With notice to the NGB, the USOC may assign this Agreement to any entity controlled by, or affiliated with, the USOC. The NGB shall not have the right to assign this Agreement or to delegate any of its obligations under this Agreement without the prior written consent of the USOC. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

10.     <u>**Restrictions on Liability**</u>. Each party agrees that no director, officer, employee, agent, or volunteer of the other shall incur any financial responsibility or liability in connection with this Agreement. In no event shall either party be liable to the other, or its agents, under any provision of this Agreement for any consequential, incidental, or special damages, whether in contract (including breach of warranty) or tort, and including but not limited to lost profits or other economic loss. The foregoing limitation of liability shall not apply to the parties' indemnification obligations under <u>Section 7</u> of this Agreement.

11.     <u>**Confidentiality**</u>. The parties agree that the terms and conditions of this Agreement shall be confidential and therefore agree to undertake whatever measures are reasonably necessary to preserve such confidentiality unless disclosure is required by financial, legal or governmental proceedings, or as is necessary to disclose such terms hereof that are required to assure the LOC has knowledge of such terms so it can comply with the same as required pursuant to Section 2.2 above. The USOC shall also have the right to make limited disclosure of the terms of this Agreement to each broadcaster, as necessary, to enable such entity to exercise the rights granted to it by the USOC.

12.     <u>**Governing Law**</u>. The parties agree that this Agreement will be interpreted and enforced under and according to the laws of the United States and the State of Colorado. The parties hereby agree and irrevocably consent to the venue and jurisdiction of the courts of the State of Colorado, and the courts of the United States of America located in Colorado, with respect to any dispute, claim or controversy arising hereunder.

13.     <u>**Injunctive Relief**</u>. The NGB acknowledges that Olympic Marks (including, but not limited to the USOC Trials Mark and the Trials Logo) possess special, unique and extraordinary characteristics that make difficult the assessment of monetary damages that would be sustained as a result of the NGB's unauthorized use or misappropriation thereof. The NGB recognizes that irreparable injury could be suffered by the USOC in the event of the NGB's unauthorized use or misappropriation of Olympic Marks, and therefore agrees that, notwithstanding <u>Section 12</u>, the USOC may seek from any court of competent jurisdiction, injunctive and other equitable relief as appropriate. If the USOC seeks injunctive or other equitable relief in the event of a breach or threatened breach of this Agreement by the NGB involving an unauthorized use of any Olympic Marks, the NGB agrees that it shall not allege in any such proceeding that the USOC's remedy at law is adequate. If the USOC seeks any equitable remedies (including injunctive relief), it shall not be precluded or prevented from seeking remedies at law, nor shall the USOC be deemed to have made an election of remedies. The NGB hereby irrevocably submits to the venue and jurisdiction of the courts of the State of Colorado, and the courts of the United States of America located in Colorado, with respect to any equitable relief that is sought under this Agreement.

EXHIBIT 43
010

14.   **Costs and Expenses.**  In any action, suit or proceeding brought to enforce this Agreement or to collect damages as a result of a breach hereof, the prevailing party in such action, suit or proceeding shall be entitled to collect from the other party all of its costs and expenses incurred in connection with such proceeding, including, but not limited to, reasonable attorneys' fees, court costs and expert witness fees.

15.   **Notices.**  Notices required or permitted under this Agreement shall be in writing and delivered in person or by mail or facsimile transmission to the addresses of the parties shown below.  Notice shall be deemed given on the date of personal delivery, five (5) days after mailing, or if by facsimile transmission, one (1) day after the date such facsimile transmission is sent and receipt is confirmed.  Subject to any notice of change given by either party to this Agreement, the address of each party to which notices are to be addressed is as follows:

> In the case of the USOC:
>
> United States Olympic Committee
> One Olympic Plaza
> Colorado Springs, CO  80909
> Telecopy: (719) 632-4180
> Attention: Chief Executive Officer
>
> With a copy to:
> General Counsel (at the same address)
> Facsimile: (719) 866-4839
>
>
> In the case of the NGB:
>
> USA Cycling
> 210 USA Cycling Point, Suite 100
> Colorado Springs, CO  80919
> Facsimile: (719) 866-4596
> Attention: Chief Executive Officer
>
> With a copy to:
> Chief Financial Officer (at the same address)
> Facsimile: (719) 866-4628

16.   **Waiver.**  No waiver of any provision of this Agreement or of any breach of this Agreement shall be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. A waiver of any provision of this Agreement or any breach of any provision in one instance shall not be construed as a waiver of that provision or any subsequent breach in the future, unless specifically stated otherwise, in writing.

17.   **Severability.**  The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, all of said provisions being inserted conditionally on their being considered legally valid and in compliance with the Act, and this Agreement shall be construed and performed in all respects as if such invalid or unenforceable provisions were omitted insofar as the primary purpose of this Agreement is not frustrated.

EXHIBIT 43
011

18.     **Integration and Amendment**.  This Agreement contains the entire understanding between the parties relating to the subject matter herein contained and supersedes all prior oral and written understandings, arrangements and agreements between the parties relating thereto.  Any amendment to this Agreement must be in writing and signed by both parties.  The Exhibits are an integral part of this Agreement.

19.     **Relationship of the Parties**.  This Agreement does not constitute the USOC or the NGB the agent of the other, or create a partnership, joint venture or similar relationship between the parties, and neither party shall have the power to obligate or bind the other party in any manner whatsoever.  The parties agree not to contend to the contrary or to attempt to enforce any contrary intention in any court.  In addition, neither party shall represent to third parties that it is an agent or partner of or joint venturer with the other.

20.     **Consents**.  Whenever the consent or approval of a party to this Agreement is required, such consent or approval may be given or withheld by such party in its sole discretion, unless otherwise specifically stated.

21.     **Survival**.  The provisions of this Agreement shall survive the expiration or termination of this Agreement to the extent necessary to protect the rights of the USOC in and to the Olympic Marks.

                **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first written above.

**USA CYCLING INC**                             **UNITED STATES OLYMPIC COMMITTEE**

By:                                             By:
Name: Steve Johnson                             Name: Scott A. Blackmun
Title: Chief Executive Officer                  Title: Chief Executive Officer

12

EXHIBIT 43
012

Exhibit A

## INFORMATION ON TRIALS AND EXHIBITIONS

### 2012 TRIALS AND EXHIBITIONS

| DATES | LOCATION | NAME(S) OF EVENT(S) |
|-------|----------|---------------------|
| TBD | Chula Vista OTC | U.S. Olympic Team Trials - BMX |

TICKETS/CREDENTIALS

The NGB will provide to the USOC, at no cost or expense to the USOC, 35 event tickets, per session per day to each day of the Trials and Exhibitions for use by USOC employees and guests, plus 3 "all access" credentials to each day, including VIP parking.

EXHIBIT 43
013

Exhibit B

## USOC SPONSORS

### Partners
The Coca Cola Company
Acer
Anheuser-Busch
AT&T
Atos Origin
BMW
BP
Dow
General Electric
McDonald's
Omega
Panasonic
Procter & Gamble
Samsung
Visa
NBC

### Sponsors
24 Hour Fitness
Adecco
Allstate
Citi
Deloitte
Hilton Hotels Corporation
Jet Set Sports
Kellogg's
Nike
TD Ameritrade
United Airlines

### Suppliers
Highmark
Oroweat

B-1

EXHIBIT 43
014

Exhibit C

**MANAGEMENT FEE**

The USOC shall pay to the NGB a Management Fee of $150,000.   The USOC shall pay 50% of the consideration on July 1, 2011, and the remaining 50% within 45 days after the NGB's completion of the Trials and Exhibitions to the USOC`s satisfaction and the NGB's submission of a final report with respect to the Trials and Exhibitions, including a full accounting of the revenues and expenses associated therewith.

EXHIBIT 43
015

Exhibit D

## MERCHANDISE GUIDELINES

Any Trials merchandise must comply with the following guidelines:

- The NGB may not grant any merchandising rights with respect to the Trials to the LOC or to any third party without the prior written consent of the USOC.

- Trials merchandise includes any merchandise bearing the Trials Logo, any Trials terminology, or any other Olympic Marks.

- All proposed Trials merchandise is subject to the prior review and approval of the USOC.

- Any Trials merchandise so approved by the USOC must be sourced solely from USOC Licensees (for example, Nike for apparel), except as otherwise specified herein.

- The NGB must provide the USOC's retail store licensee with the first right to negotiate for all onsite retail opportunities at the Trials. If selected, the NGB will not be responsible for paying any royalties to the USOC with respect to merchandise sold at the Trials. If the NGB cannot reach agreement with the USOC's retail store licensee and the Trials will not be held on USOC premises, the NGB may enter into an agreement with a third party retailer; provided that, the NGB shall be responsible for paying to the USOC royalties equal to 10% of retail sales of any such merchandise.

- The USOC will consider requests from the NGB to sell specific non-Trials merchandise at or near the Trials venue on a case-by-case basis.

- The most updated list of USOC Licensees can be obtained by contacting the USOC Licensing Manager, Laura Sokol, at (719) 866-4988 or laura.sokol@usoc.org.

- If the NGB wishes to create an item of licensed merchandise for which there is a current USOC Licensee, the NGB should contact the USOC Licensing Manager. With respect to any Trials merchandise approved by the USOC, the USOC Licensee will work with the NGB to design the merchandise and will manage the review/approval process with the USOC's Licensing Department.

- If there is no current USOC Licensee for a particular item of merchandise, the NGB should contact the USOC Licensing Manager to request that the USOC enter into a one-time license agreement with the NGB's preferred manufacturer.

- Each licensee will manage all administrative aspects of the process with the NGB, including review/approval.

EXHIBIT 43
016